## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORP., *et al.*,[1] | Case No. 10-11890 (____) |
| Debtors. | Joint Administration Pending |

## DECLARATION OF JAMES SHELBY MARLOW IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Shelby Marlow, being duly sworn, depose and say:

1.      I am the Chief Financial Officer of NEC Holdings Corp. ("**NEC Holdings**"), a

corporation organized under the laws of the state of Delaware and the ultimate parent corporation

of the other debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**")

in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I am authorized

to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

2.     As Chief Financial Officer of NEC Holdings, I am responsible for overseeing the financial activities of the Company, including but not limited to, monitoring cash flow, and tax and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.     On June 9, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

4.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motions.

Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of the Debtors' reorganization.

5.     Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

## Part I

### I.     BUSINESS OVERVIEW

6.     The Company is the largest privately-held envelope manufacturing company in the United States with facilities and customers located throughout the nation. The Debtors' products include commodity and custom-made envelopes of all kinds, as well as business aids of various types including certificates, presentation folders, binders, specialty bags, and coin and currency bags. In addition, the Company maintains printing plants and presses which allow them to emboss, print, or foil stamp envelopes to provide custom products to meet the particular demands of the Company's customers.

#### A.     Company History

7.     The Company was founded by William Ungar, a Holocaust survivor and Polish immigrant, in 1952. The Company was first located only in New York, New York and grew rapidly in the post-war years. The Company began to expand through strategic acquisitions in 1991, when it acquired Aristocrat Envelope, and it has since acquired such nationally-known companies and brand names as Williamhouse and Atlantic Envelope. To facilitate these

acquisitions, NEC Holdings Corp. was founded and incorporated in 1994 under the laws of Delaware. Today, the Company continues to be privately-held within the Ungar family.

**B.    Business Operations and Sales**

8.    The Company's corporate headquarters is located in Uniondale, New York, and it has 14 manufacturing facilities spread across California, Colorado, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Pennsylvania, Tennessee, Texas, and Wisconsin. In addition, the Company maintains warehouse facilities in Washington and Ontario, Canada. In total, the Debtors employ approximately 3,389 employees, and their manufacturing facilities produce an estimated 37 billion envelopes per year. Six of the Company's manufacturing facilities employ unionized employees.

9.    Over the past three years, the Company has faced declining aggregate revenues, net income and EBITDAR as a result of the global recession and the displacement of traditional print communications and media by electronic formats. The Company's consolidated net sales were approximately $866.8 million in 2007, $799.0 million in 2008, $676.2 million in 2009, and $224.4 million from January 2010 through April 2010. Despite the declines in sales, due to the Company's restructuring and reorganization efforts, described below, the Company's EBITDAR has improved and net losses have declined thus far in 2010 as compared to the 2009 fiscal year. The Company's consolidated EBITDAR was approximately $35.8 million in 2007, $28.6 million in 2008, $7.5 million in 2009, and $10.1 million from January 2010 through April 2010. The Company has incurred net losses from 2007 through the present. The Company's consolidated net income was a loss of approximately $1.4 million in 2007, a loss of approximately $7.9 million in 2008, a loss of approximately $44.2 million in 2009, and a loss of approximately $6.1 million from January 2010 through April 2010.

10. The envelope industry categorizes its business by type of customer, rather than by product, as different types of customers may purchase a wide variety of products depending on their needs. In total, the Company held a 21 percent market share of the overall envelope industry in 2008, making it the leader of the $3.7 billion North American envelope market. The Company's chief competitors are Cenveo, with 19 percent of the market, Mead Westvaco, with 8 percent, and Tension Envelope, with 5 percent. In each customer channel, the Company competes on the basis of quality, depth of product offerings, price, and service.

11. The Company's largest customer segment consists of products directed toward the merchant and wholesale market. In total, this segment made up 61.6 percent of the Company's total revenue in 2009. The primary customers of this product line are paper merchants and jobbers, or specialized envelope printers who sell to brokers and end-users.

12. The Company also is a leader in direct sales to consumers that are the ultimate users of the Company's products. In total, consumer sales made up 34 percent of the Company's aggregate revenue in 2009. Consumers are largely concentrated in the financial, direct mail, insurance, utilities, fulfillment, non-profit, and courier industries, and also includes large corporations with a need for envelopes in their daily activities. Among the products produced for these segments are envelopes used for interoffice transactions, automated teller machines, payroll, and direct mail, including outer and return envelopes. The Company occupies 14 percent of the consumer channel, behind only Cenveo among its competitors.

13. The balance of the Company's business, accounting for 4.4 percent of aggregate revenue in 2009, consists of specialty products produced for wholesale customers. Much of this business is attributable to the popular Williamhouse brand, which was acquired by the Company in 2000. Such customers include greeting card publishers, social announcement companies,

specialty printers, wholesale clubs, converters, exporters, and medical imaging suppliers. Including both merchant and specialty products, the Company accounts for 66 percent of the wholesale envelope industry. This market share is far larger than any of the Company's competitors. The next largest market share is held by Quality Park, with 6 percent of market.

14.     Purchasing and logistics are managed strategically out of the Company's offices in Frisco, Texas. However, once negotiations with vendors have been completed, day-to-day purchasing decisions are managed by each local facility to allow flexibility and minimize burdensome inventory costs. Expenses spent on raw materials total about 60 percent of the Debtors' total sales. The largest expense by far is paper, which consisted of 50.5 percent of all raw materials purchases made by the Company.

### C.     The Debtors' Financial Results Fluctuate with External Economic Trends

15.     Because the vast majority of domestic mail in the United States consists of communications between two non-household entities or between a household and a non-household entity, the Debtors' business is tied closely to the business cycle, especially trends in sales, investment, and employment. The envelope industry, and the Debtors in general, are also linked to postage price, the shift toward electronic communications, and the popularity of direct mail among advertisers. Rises in postal rates suppress mail volume and with it, demand for the Company's products. In addition, consumers have moved not only away from communicating via letter, but have also begun to pay bills through electronic means. Real or perceived increases in privacy protections online may facilitate further drops in consumer demands for envelopes. Given the importance of direct mail advertisers to the Debtors' business, any drop in rate of return or rise in costs for direct mail advertising will adversely impact the Debtors. In sum, the results of the Debtors' businesses fluctuate with a direct relationship to overall economic trends.

## II.  OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

### A.  Prepetition Credit Facility

16.     Prior to the Petition Date, certain of the Debtors entered into that certain Second Amended and Restated Credit Agreement, dated as of December 28, 2006 (as amended from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**"), by and among the Debtors, as borrowers or credit parties, the lenders party thereto from time to time (the "**Prepetition Lenders**"), General Electric Capital Corporation, as administrative agent (in such capacity, the "**Prepetition Agent**"), and the other arrangers and agents parties thereto.

17.     The Prepetition Credit Agreement provides for (a) a Term A loan of $75 million which required repayment in nineteen consecutive quarterly installments, with the balance payable on December 28, 2011 (the "**Term A Loan**"), (b) a Term B commitment of $35 million due June 28, 2012 (the "**Term B Loan**" and, together with the Term A Loan, the "**Prepetition Term Facility**"); and (c) a revolving credit facility in an aggregate principal amount of up to $120 million (the "**Prepetition Revolving Facility**" and, together with the Prepetition Term Facility, the "**Prepetition Secured Credit Facility**").

18.     The obligations of the Debtors under the Prepetition Credit Facility were secured by, among other things, a first-priority lien on and security interest in substantially all of the properties and assets of the Debtors.

19.     As of the Petition Date, the Debtors were indebted and liable to the Prepetition Lenders under the Prepetition Credit Agreement without objection, defense, counterclaim or offset of any kind, (a) in the aggregate principal amount of not less than I) $74,309,934 with respect to the Prepetition Term Facility, and (II) $70,600,471 with respect to the Prepetition Revolving Facility, plus, in each case, accrued and unpaid interest thereon; (b) for fees, expenses and all other Obligations (as defined in the Prepetition Credit Agreement); (c) for $3,553,000

with respect to the Existing Letters of Credit; and (d) for $1,781,765 with respect to the Capital Transaction Fee (as defined in the Third Forbearance Agreement (as defined below)) (collectively, the "**Prepetition Secured Obligations**").

**B.** **Spirit Promissory Note.**

20.     In addition to the Prepetition Secured Obligations, the Debtors owe approximately $343,000 on account of their obligations under that certain promissory note by and among certain of the Debtors and Spirit Finance Acquisitions, LLC, dated as of October 1, 2009 (the "**Spirit Promissory Note**"), plus, accrued and unpaid interest thereon. The Spirit Promissory Note is an unsecured obligation of those Debtors party thereto.

**C.** **Other Unsecured Debt.**

21.     In addition to the foregoing, as of June 4, 2010, the Debtors had approximately $89 million in unpaid ordinary course trade debt, consisting of approximately $83.8 million in trade accounts payable and $5.4 million owed in connection with purchases for which invoices had not yet been received.

**D.** **Equity.**

22.     All of the equity in NEC Holdings Corp. is held by members of the Ungar Family. NEC Holdings Corp. has 27 wholly owned direct or indirect subsidiaries, each of whom is a Debtor in these Chapter 11 Cases. An organizational chart is attached hereto as Exhibit A.

**III.   EVENTS LEADING TO THE CHAPTER 11 FILINGS**

**A.     Global Economic Crisis and Restructuring Efforts**

23.     In late 2008, the current global economic crisis began, significantly depressing the global economy. The global recession that has ensued has placed added pressure on the Company by reducing sales and accordingly constraining liquidity. In response to the global economic crisis, in 2008 the Company engaged in a strategic restructuring to reduce expenses,

increase competitiveness, strengthen customer relationships and enhance shareholder value. From January 2008 to November 2008, the Company implemented a series of cost-cutting measures, including the closure of a manufacturing plant located in Union, New Jersey, which resulted in annualized savings of approximately $12 million.

24. In November 2008, the Company retained Loughlin Meghji + Company as its restructuring advisors. Working with its advisors, the Company implemented further cost-savings measures in the first quarter of 2009, including a Company-wide wage reduction and headcount reductions that resulted in additional annualized savings of approximately $13 million. Over the course of 2009, the Company embarked on two phases of comprehensive restructuring efforts. In the first phase, the Company closed facilities located in Long Island City, New York, Chino, California, and Hamburg, New York, obtained price reductions from paper suppliers and reduced shareholder compensation by 75 percent. The Company projects that these restructuring efforts will realize annualized savings of approximately $25.1 million and improve cash flow by approximately $24.5 million per year. Furthermore, the Company has identified a second set of initiatives to improve customer service and reduce waste and freight charges. The Company estimates that this second phase of restructuring efforts will result in savings of approximately $34.9 million by the end of the 2012 fiscal year.

25. Notwithstanding the above-referenced restructuring efforts and cost-saving measures, the Company remains over-levered and is facing significant liquidity constraints as a result of outstanding defaults under the Prepetition Credit Agreement and inability to access new funds from that facility. Given the Company's current liquidity position and projected ongoing liquidity needs, the Company simply has insufficient liquidity to continue to operate outside of a Chapter 11.

**B. Credit Agreement Amendments and Forbearance Agreements**

26. The Debtors have addressed defaults under the Prepetition Credit Agreement with the Prepetition Lenders from time to time beginning in 2007. The Debtors and certain of the Prepetition Lenders first began to discuss the potential that a default under the Prepetition Credit Agreement might occur in late 2007. The Debtors entered into the first amendment to the Prepetition Credit Agreement (the "**First Amendment**") with certain of the Prepetition Lenders on September 28, 2007. Pursuant to the First Amendment, certain of the Prepetition Lenders waived the events of default existing as of September 28, 2007, subject to a mandatory prepayment by the Company to be made by November 25, 2007.

27. The Debtors met their obligations under the First Amendment, but by 2008 faced further events of default under the Prepetition Credit Agreement. The Debtors and certain of the Prepetition Lenders entered into a second amendment and waiver to the Prepetition Credit Agreement (the "**Second Amendment**") on June 5, 2008. The Second Amendment waived the then-currently existing events of default, subject to an increase in the interest rate margins payable to the Prepetition Lenders and the Debtors' development and delivery of an operating plan to the Prepetition Lenders following the close of each fiscal year.

28. On March 25, 2009, the Debtors gave notice to the Prepetition Lenders that they had incurred further defaults under the terms of the Prepetition Credit Agreement. On July 31, 2009, the Debtors and certain of the Prepetition Lenders entered into a forbearance agreement (the "**First Forbearance Agreement**"), under which certain of the Prepetition Lenders agreed to forbear on exercising remedies and to continue providing credit to Debtors and not to require further advances from the Debtors under the Prepetition Credit Agreement. Pursuant to the First Forbearance Agreement, the Debtors agreed to continue their retention of Loughlin Meghji +

Company as their restructuring advisors and provide budget and variance reporting to the Prepetition Lenders. The First Forbearance Agreement expired on November 2, 2009.

29.     On November 2, 2009, the Debtors and certain of the Prepetition Lenders entered into a second forbearance agreement (the "**Second Forbearance Agreement**"), pursuant to which the Debtors obtained forbearance from certain of the Prepetition Lenders through January 31, 2010. Under the Second Forbearance Agreement, the Debtors agreed to evaluate strategic restructuring alternatives, including obtaining additional capital from third parties and a sale of the Company. In addition, certain of the Prepetition Lenders agreed to consent to Debtors' sale of a facility located in Houston, Texas owned by NEC TX Equity. The proceeds of the sale were remitted to the Prepetition Lenders pursuant to the Prepetition Credit Agreement. On January 31, 2010, the Second Forbearance Agreement was amended to extend its terms to February 12, 2010.

30.     On February 12, 2010, the Debtors and certain of the Prepetition Lenders entered into a third forbearance agreement (the "**Third Forbearance Agreement**") pursuant to which certain of the Prepetition Lenders agreed to forbear from exercising their rights and remedies under the Credit Agreement through June 11, 2010. In exchange, Debtors agreed to pay the principal of their outstanding obligations under the Prepetition Credit Agreement pursuant to a specified schedule of monthly installments. Furthermore, the Debtors agreed to a series of milestones for the evaluation and negotiation of a capital transaction to raise additional capital, including through issuance of equity or subordinated debt.

31.     On May 19, 2005, the Debtors received a letter from the Prepetition Agent asserting a default under the Third Forbearance Agreement as a result of the Company's alleged failure to execute a letter of intent in connection with a sale transaction by May 12, 2010

pursuant to Section 7(d)(viii) of the Third Forbearance Agreement. In that letter, the Prepetition Agent asserted that the Third Forbearance Agreement expired pursuant to its terms as a result of this alleged forbearance default.

### C. Evaluation of Strategic Alternatives

32. In December 2009, the Company retained William Blair & Company, LLC ("**Blair**") as its investment banker and financial advisor. Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Blair and in consultation with certain of the Prepetition Lenders pursuant to the Debtors' forbearance agreements, pursued a range of options to address their liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtors' assets or businesses.

33. Starting in March 2010, Blair initiated a sales process for the Company by reaching out to private equity sponsors to solicit interest in a potential sale transaction, subject to the milestones imposed under the Third Forbearance Agreement. Blair contacted 108 potential investors in their first round of outreach. Following those discussions, 88 potential investors reviewed preliminary, non-confidential solicitation materials. Of those investors, 43 agreed to confidentiality agreements with the Debtors and received a confidential information memorandum prepared by Blair to serve as the basis for discussions towards potential bids. Following review of the confidential materials provided by the Company, fifteen potential investors submitted indications of interest in purchasing the Company. Eight potential bidders were invited by the Company's board to attend presentations from management, which occurred between March 17, 2010 and April 1, 2010. Following those presentations and initial diligence conducted by the potential investors, on May 3 and 4, 2010, the Debtors received four bids to purchase the Company.

34.     During this same period, the Debtors also investigated other strategic alternatives, including issuance of subordinated debt to potential new lenders and issuance of high yield debt in the capital markets.  The Debtors have been unable to raise additional equity or debt to continue to fund their operating losses.

## IV.    OBJECTIVES OF THE CHAPTER 11 CASES

35.     Notwithstanding the global economic circumstances that contributed to the Debtors' current liquidity challenges, the Company is a national market leader in the manufacture and sale of envelope products.  These cases have been initiated to enable the Company to obtain debtor-in-possession financing and to stabilize its businesses while it seeks a long-term strategic solution and to address the corresponding liquidity issues or to otherwise maximize the value of its assets through a sale or reorganization.

## PART II

36.     In furtherance of the objective of successfully reorganizing, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

37.     I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

# I. ADMINISTRATIVE AND PROCEDURAL MOTIONS

## A. Joint Administration Motion

38.     The Debtors seek the joint administration of their Chapter 11 Cases, 28 in total, for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors. Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

## B. Retention Applications

39.     The retention of chapter 11 professionals is essential to the Debtors' reorganization efforts. Accordingly, during the filing of these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins, LLP as co-counsel; (b) Young Conaway Stargatt & Taylor, LLP as co-counsel; and (c) Garden City Group, Inc., as noticing, claims and balloting agent. I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the Debtors' reorganization, and that the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as these Chapter 11 Cases progress.

## C. DIP Facility Motion

40.     The Debtors seek authority to enter into and borrow under the DIP Facility being offered by the DIP Lenders, as defined in the DIP Facility Motion. With respect to the DIP Facility, the Debtors seek interim and final approval to obtain postpetition secured loans and other financial accommodations in the aggregate principal amount of up to $135 million. For the

reasons set forth in the DIP Facility Motion and below, I believe the Court's approval of this First Day Motion is critical.

41.     I believe the DIP Facility is necessary for the Debtors to maintain sufficient liquidity so that the Debtors may continue to operate their businesses in the ordinary course of business during the Chapter 11 Cases. In this regard, the use of the DIP Facility will allow the Debtors to preserve and maintain the going concern value of the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders. Further, access to additional financing will provide the Debtors' customers and vendors with the requisite security that the Company will be able to continue conducting its business in the ordinary course without interruption.

42.     To secure continued shipment of goods, pay employees and maintain the operation of their businesses as they restructure, the Debtors must have immediate access to continued and additional financing in the form of the DIP Facility. The Debtors believe that such financing will enable them to begin restoring critical relationships and retain employees, and maintain or restore trade terms with suppliers. Moreover, access to such financing on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the final hearing.

43.     I believe the Debtors made all reasonable efforts to obtain financing on the best terms available in light of market circumstances. Despite their efforts, the Debtors have not been able to obtain postpetition financing or other financing accommodations from any alterative prospective lender or group of lenders on more favorable terms and conditions that those for which approval is sought in the DIP Facility Motion. Specifically, the Debtors were unable to obtain debtor-in-possession financing without providing would prime and be senior in all

respects to the Prepetition Liens and the Replacement Liens (as defined in the Interim DIP Order). The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Board of Director's approval. The terms of the DIP Agreement are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and are in the best interests of the Debtors' estates.

## II.    BUSINESS OPERATION MOTIONS

### A.    Cash Management Motion

44.    The Debtors seek an order (I) authorizing continued use of existing (a) bank accounts, (b) cash management system, and (c) business forms and checks; (II) authorizing the continuation of intercompany transactions among Debtors and the Non-Debtor Affiliates and according administrative expense status to all postpetition intercompany claims ("**Intercompany Transactions**"); and (III) waiving the investment and deposit requirements of 11 U.S.C. § 345(b). As described below, I believe the relief sought in the Cash Management Motion is essential and in the best interests of the Debtors' estates.

45.    <u>Bank Accounts</u>. Prior to the commencement of these cases, in the ordinary course of business, the Debtors maintained eighteen bank accounts (the "**Bank Accounts**") at two institutions, Citibank N.A. and Wachovia Bank N.A. The Bank Accounts include those maintained, among others, as concentration accounts, payroll accounts, controlled disbursement accounts, lockbox accounts and zero-balance master accounts. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts by various methods including checks, automated clearing house transactions, electronic funds transfers and direct deposits. The Debtors generate thousands of checks per month from the Bank Accounts. I

believe that the Bank Accounts are generally in financially-stable banking institutions with the Federal Deposit Insurance Corporation ("**FDIC**"), the Federal Savings and Loan Insurance Corporation ("**FSLIC**"), or other appropriate government-guaranteed deposit protection insurance.

46.     Furthermore, the Bank Accounts are part of a carefully constructed and complex, automated cash management system (described more fully below) that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements. Closing the existing Bank Accounts and opening new accounts inevitably would disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully maximize value for their estates and creditors.

47.     In my opinion, it is thus essential that the Debtors be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new accounts (and give notice to the U.S. Trustee prior to opening such accounts), wherever they are needed, irrespective of whether such banks are designated depositories in the District of Delaware; provided however, that any new bank account opened by the Debtors shall be with a bank that is insured by the FDIC or the FSLIC and organized under the laws of the United States of America or any state therein and shall be designated a "debtor-in-possession" or "DIP" account by the respective bank.  The Debtors request that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

48.    Cash Management System. In order to ensure an orderly transition into chapter 11, the Debtors also request authority to continue to use their existing cash management system as required by the Debtors in the ordinary course of business.   Prior to the commencement of these cases, the Debtors used a complex, automated, integrated and centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "**Cash Management System**").

49.    As described more fully in the Cash Management Motion, the Cash Management System is complex, automated and computerized, and includes accounting controls needed to enable the Debtors, as well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. When manual transactions are made in the system, the Debtors closely monitor the accounts to ensure the transactions are appropriately documented.

50.    I believe that the cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises.   The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.   The Cash Management System would continue seamlessly as the Debtors shift from receiving funding under the Prepetition Revolving Facility to receiving funding under the Debtors' proposed debtor-in-possession financing facility, as described more fully in the DIP Facility Motion, because General Electric Capital Corporation serves as both the Prepetition Agent and the

administrative agent for the lenders under the Debtors' proposed debtor-in-possession financing facility.

51.     Requiring the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems, and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully.   Indeed, I believe that requiring Cash Management System changes could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while systems were changed.

52.     Business Forms and Checks.  Prior to the Petition Date, in the ordinary course of business, the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "**Business Forms**").

53.     In order to minimize expenses to their estates, the Debtors also request that they be authorized to continue to use all Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession.  I believe that changing Business Forms at this critical, early stage of their Chapter 11 Cases would be expensive and burdensome to the Debtors' estates, disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  Accordingly, I believe it would be appropriate for this Court to authorize the Debtors to use their existing Business Forms without being required to place the label "Debtor-in-Possession," an account type, or a so-called "debtor-in-possession number" thereon.

54.     Intercompany Transactions.   The Debtors' books and records also reflect numerous intercompany account balances among various Debtors as of the Petition Date.  To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of

another Debtor entity, the Debtors respectfully request that, pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions and allocations be accorded administrative expense status. The Debtors request that this administrative expense status will be subject and subordinate only to the priorities, liens, claims and security interests granted under any DIP Facility or any order granting adequate protection to the prepetition secured lenders, and any other valid and perfected liens. The Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.

55. <u>Investment and Deposit Guidelines</u>. Out of an abundance of caution, the Debtors also request a waiver of the approved deposit and investment practices identified in section 345 of the Bankruptcy Code to the extent it may be necessary. As discussed in the Cash Management Motion, the Debtors maintain a concentration account at Citibank N.A. (the "**NEC Concentration Account**"), which is the sole source of funding for all disbursements made by the Debtors. On a daily basis, all funds in the NEC Concentration Account are swept to repay the Debtors' obligations under the Prepetition Revolving Facility, except that $10,000 is maintained in the NEC Concentration Account at all times and up to $1 million may remain in the NEC Concentration Account when needed to cover large outstanding disbursements. The majority of the Debtors' other existing bank accounts are zero balance accounts. I believe that the Debtors' use of the Bank Accounts, including the NEC Concentration Account, substantially conforms with the approved investment practices I am told are identified in section 345 of the Bankruptcy Code, and that all deposits and investments into the NEC Concentration Account and

their other Bank Accounts are safe, prudent and designed to yield the maximum reasonable net return on the funds invested.

**B.      Customer Programs Motion**

56.      The Debtors seek authority, but not direction, to pay amounts related to the Debtors' practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "**Customer Programs**") in the ordinary course of business, and to continue their Customer Programs postpetition.

57.      An accurate and detailed description of the significant Customer Programs offered by the Debtors is set forth in paragraphs 10 through 14 of the Customer Programs Motion. These programs include customer price adjustments and/or rebates (the "**Customer Price Adjustments**") that are derived from negotiations between the Debtors and their customers. The Customer Price Adjustments generally consist of percentage adjustments based on the volume of goods or particular products purchased by the customer, and may vary based on conditions, amount, timing, and manner of payment. In addition, some Customer Price Adjustments take effect on occasions when the Debtors' product deliveries do not meet the terms set by customers. Customer Price Adjustments are common in the Debtors' industry and are essential tools for acquiring and maintaining sales. In all cases, I believe that the Customer Price Adjustments are an essential aspect of maintaining valuable customer relationships.

58.      The Debtors also have other commitments that must be honored to sustain and build their consumer base and business. Among these is a potential agreement with a specialty paper provider by which they create custom envelopes to match the specialty papers marketed by the supplier. In this arrangement, the paper supplier will provide the Debtors with specialty papers for production into envelopes to be sold by the Debtors to third parties under the paper

supplier's brand pursuant to a license. The Debtors will then award a Customer Price Adjustment to the specialty paper supplier on a per-item basis. In additional to the specialty paper program, at any one time there are a number of customer requests for credit, not covered above, relating to invoice price queries, short shipments, input errors, customer errors, etc. Based on a typical claims-in-progress situation, the Debtors estimate that at any given time the liability for such claims is <u>de minimis</u>.

59.     The Debtors estimate that prepetition obligations related to Customer Price Adjustments and rebates, which constitute the grand majority of the prepetition obligations under the Customer Programs, totals approximately $3.7 million as of the Petition Date.

60.     The markets for certain of the Debtors' products are highly competitive, and the Debtors' Customer Programs are integral to their ability to induce customers to purchase certain of the Debtors' products. I believe that discontinuation of the Debtors' Customer Programs would disrupt business operations, generate adverse publicity, and undermine the Debtors' relationship with their customers. Continuing the Customer Programs uninterrupted is necessary to attract new customers and maintain existing customer satisfaction, and is thus essential to the Debtors' ability to reorganize.

C.      **Employee Obligations Motion**

61.     The Debtors seek, in their discretion and in the exercise of their business judgment, interim and final orders to (a) pay or otherwise honor the Debtors' various employee-related prepetition obligations (of which the material obligations are set forth more fully below); (b) continue postpetition certain of the Debtors' employee benefit plans and programs in effect immediately prior to the filing of these cases (of which the material plans and programs are set forth more fully below); and (c) honor the Debtors' workers' compensation obligations (the

foregoing and other similar obligations collectively referred to herein as the "**Employee Obligations**"). Pursuant to the Employee Obligations Motion, the Debtors seek an interim order authorizing the payment of Employee Obligations to the extent such Employee Obligations do not exceed $11,750.[3] The Debtors also moved for the authority to pay all Employee Obligations (which term excludes certain payments to insiders), irrespective of whether they exceed $11,750, upon the entry of a final order with respect to the Employee Obligations Motion.[4]

62.     The Debtors employ approximately 3,389 employees, of which 413 are active salaried employees and 2,976 are active hourly employees (the "**Employees**"). Approximately 1,432 Employees are governed by seven collective bargaining agreements (the "**Union Employees**"). The remaining Employees do not belong to a union. I believe that the continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations and to their ability to maximize value through a sale or reorganization.

63.     As set forth in Part I above, as part of the Company's cost-cutting strategy, the Company has taken many steps to reduce its labor costs. For example, in the prior year, the Debtors' workforce has been reduced by approximately 16 percent, from approximately 4,037 employees to approximately 3,389 employees, for an annual savings of $21.7 million. To minimize the personal hardship to remaining Employees and to maintain the Employees' morale during this critical time, I believe it is imperative that the Debtors be granted the authority, in

---

[3]     As discussed in the Employee Obligations Motion, the Debtors are seeking authority pursuant to an interim order to pay approximately 13 employees commission payments for prepetition sales that could be in excess of $11,750 pursuant to the interim order.

[4]     For the avoidance of doubt, the Debtors pay salaries to their directors and, for purposes of this Motion, deem the directors Employees. The Debtors request authority to pay directors who are paid bi-weekly their base compensation in the ordinary course of business. The directors bi-weekly compensation averages approximately $38,921 in the aggregate. The directors individual bi-weekly compensation ranges from approximately $3,365 to approximately $13,269. As of the Petition Date, the Debtors anticipate that there will be approximately $10,000 in earned and unpaid salary due to the directors.

their sole discretion, to pay the Employee Obligations outlined below and more fully described in the Employee Obligations Motion.

64.     Salaries and Wages.  The combined average monthly payroll for the Debtors' salaried and hourly Employees is approximately $11 million.  The Debtors' active salaried Employees are paid on a bi-weekly basis (the "**Salaried Employees**").  Salaried employees are paid current as of their pay dates.  Direct deposits and payroll checks for accrued payroll for Salaried Employees were issued on June 4, 2010.  As of the Petition Date, the Debtors anticipate that there will be approximately $664,867 in earned and unpaid salary owed to the Salaried Employees.[5]  The Debtors active hourly employees are paid on a weekly basis, one week in arrears (the "**Hourly Employees**").  Because Hourly Employees are paid one week in arrears, the Hourly Employees are owed earned but unpaid wages for the time period from June 4, 2010 to the Petition Date.  As of the Petition Date, the Debtors anticipate that there will be approximately $3.25 million in earned and unpaid salary due to the Hourly Employees.

65.     Further, the Debtors have approximately 40 employees who earn commissions in addition to their wages (the "**Commission Employees**").  The Commission Employees' wages are paid on the same bi-weekly schedule as the Salaried Employees.  As of the Petition Date, the Debtors anticipate that there will be approximately $40,000 in earned and unpaid salary due to the Commission Employees.  The vast majority of the compensation of the Commission Employees, however, comes from commission payments determined based on the monthly sales made by each Commission Employee and, for certain Commission Employees, the margin of such sales.  Commissions are paid during the second week of each month for the previous

---

[5]     The Debtors do not seek authority to pay any amount for accrued prepetition wages or benefits due and owing to Nathan Moser or Avery Levy pursuant to any order approving the relief requested in the Employee Obligation Motion on an interim basis.  However, the Debtors reserve the right to seek such authority pursuant to a final order approving the relief requested in the Employee Obligation Motion.

months sales. As of the Petition Date, the Debtors anticipate that there will be approximately $250,000 in earned and unpaid commissions due to the Commission Employees. The Debtors estimate that there are approximately 13 Commission Employees who, as a result of the prior month sales, may be owed amounts in excess of $11,750. The total amount owed to such Commission Employees is approximately $165,000 and will likely not exceed approximately $23,000 for any single Commission Employee. I believe that the Commission Employees provide a critical service and failure to pay the Commission Employees their commission payments in due course would risk losing a valuable asset that increases the value of the estate for all constituents. As a result, the Debtors request interim and final authority to pay the Commission Employees the commission amounts owed to such Employees regardless of whether they exceed $11,750.

66. **Independent Contractors.** In addition to the Employees described above, the Debtors employ approximately 10 independent contractors (the "**Independent Contractors**") to provide sales services primarily to the Debtors' Canadian based customers. Ensuring that the Independent Contractors are paid in the ordinary course just like the Employees is essential to the Debtors' continuing operations and, therefore, to their ability to maximize value through a sale or reorganization. As of the Petition Date, the total accrued but unpaid wages for the Independent Contractors are approximately $42,500 in the aggregate. Pursuant to the Employee Obligations Motion, the Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Independent Contractors and their agencies to ensure the uninterrupted employment of the Independent Contractors with the Debtors.

67. **Temporary Employees.** The Debtors also employ 60 temporary Employees (the "**Temporary Employees**"). Temporary Employees are typically hired as interim replacements,

to supplement the work force temporarily, or to assist in the completion of a specific project. The Debtors pay agencies who then pay the Temporary Employees for their hours worked on behalf of the Debtors. Ensuring that the Temporary Employees are paid in the ordinary course is essential to the Debtors' continuing operations and, therefore, to their ability to maximize value through a sale or reorganization. As of the Petition Date, the total accrued but unpaid wages for the Temporary Employees is approximately $142,000 in the aggregate. Pursuant to the Employee Obligations Motion, the Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Temporary Employees to ensure their uninterrupted employment with the Debtors.

68.     <u>Vacations, Sick Leave and Holidays</u>. Most of the Debtors' locations structure their vacation based on years of service to the Debtors, and in increments of 40 hours, 80 hours, 120 hours, 160 hours, and 200 hours. Employees at certain facilities may accrue additional hours of vacation for each month of perfect work attendance. The vacation structure is the same for both Hourly Employees and Salaried Employees. Employees are allowed to carryover an amount of vacation each year. While the amount permitted varies by facility and union, the majority of Employees are allowed to carry over between three days and one week of vacation time per year. Whether Employees are compensated for unused vacation also varies by facility and union. Certain Employees are not compensated at all for unused vacation time that is not carried over to the next year. Other Employees are compensated for unused vacation time up to one week, although most with this payout are not allowed to rollover their unused vacation time to the following year. Additionally, a smaller number of the Employees, those who were employees of the Atlantic Envelope Corporation,[6] with over fifteen years of service, are paid for three to four

---

[6]     The Debtors acquired Atlantic Envelope Corporation in 2006.

weeks of unused vacation time per year.  As of the Petition Date, the Debtors' liability for all accrued vacation time for all Employees is approximately $7.4 million if such time were to be paid in cash.

69.     The Employees are entitled to a certain number of sick days per year.  Sick days are accrued in various ways, depending on facility and union affiliation; however, the majority of Employees accrue hours for each month worked.  The amount of sick time varies between 0 and 48 hours, with most Employees having between 16 hours and 40 hours.  Those Employees who were employees of the Atlantic Envelope Corporation are entitled to approximately 80 hours of sick days, and are allowed to carry over sick days up to a maximum accrual of 144 hours. Employees are not typically paid for sick days upon termination.

70.     The Debtors also permit all Employees ten days of paid holiday time off.  Holiday pay for the Employees is calculated based on the Employee's straight-time pay rate multiplied by the number of hours a particular Employee would normally have worked on such a day.  As of the Petition Date, the Debtors' estimate that any amounts owed for accrued sick leave and holiday pay, to the extent there are any such amounts, are negligible.

71.     Existing Bonus Plan.  The Debtors offer incentive bonuses to certain Employee constituencies through a variety of award plans (collectively, the "**Bonus Plans**").  Bonuses may be awarded pursuant to the Bonus Plans for, among other things, continuous service for a period of at least five years, perfect attendance at work each month, reaching site sales goals, or having a perfect safety record.  In 2009, Debtors made approximately $246,876 in payments to approximately 286 Employees pursuant to the Bonus Plans.  As of the Petition Date, 250 Employees were eligible to receive bonuses under the Bonus Plans.  The Debtors estimate the bonuses earned but unpaid under the Bonus Plans to be $330,000 in the aggregate as of the

Petition Date, owed to approximately 250 Employees. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to continue to honor and perform their obligations under the existing Bonus Plans set forth above, subject to the entry of a final order with respect to this Motion.

72.     Bonus Payments to Insiders.   Certain of the Debtors' officers and directors participate in the Bonus Plans and/or a corporate bonus plan (the "**Corporate Bonus Plan**") pursuant to which bonuses are determined based on corporate profitability.  The Debtors do not seek authority to make payments under the Corporate Bonus Plan, or to otherwise make any bonus payments to insiders (as such term is defined in the Bankruptcy Code) under either the Bonus Plans, the Corporate Bonus Plan, or otherwise, by the Employee Obligations Motion, and will not make any such payments without further order of the Court.

73.     Miscellaneous Payroll Deductions.  In addition to the deductions discussed herein, the Debtors deduct certain amounts from their Employees' paychecks to make payments on behalf of Employees for, among other things, garnishments, bond deductions, child support, union dues, union initiation fees, private insurance plans, and tax liens (collectively, the "**Miscellaneous Payroll Deductions**").  The Debtors subsequently forward these deductions to appropriate third party recipients.   On average, the Debtors have historically deducted approximately $120,000 in Miscellaneous Payroll Deductions from Employees' paychecks per month.   As of Petition Date, approximately $32,000 that was previously deducted from Employees' paychecks has not yet been remitted to the appropriate third party recipients. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to continue (a) to remit the funds, and (b) to forward all of the Miscellaneous Payroll Deductions to the appropriate parties.

74. <u>Reimbursable Business Expenses</u>.  In the ordinary course of the Debtors' businesses, many Employees incur a variety of business expenses that are typically reimbursed by the Debtors, pursuant to the Debtors' normal business practices.  The reimbursable business expenses incurred by the Employees include, among other things, business travel expenses, business meals, business entertainment, and lodging during business travel (collectively, the "**Reimbursable Business Expenses**").  Certain Employees have not yet been reimbursed for Reimbursable Business Expenses previously incurred on behalf of the Debtors primarily because the Debtors filed their chapter 11 petitions in the midst of their regular reimbursement cycle for Reimbursable Business Expenses.  All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtors.  As of the Petition Date, the Debtors estimate that approximately $100,000 in Reimbursable Business Expenses have been incurred by certain Employees and have not yet been reimbursed to Employees.  Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay all Reimbursable Business Expenses in the ordinary course of business, including those incurred prior to the Petition Date.

75. <u>Health Care Programs</u>.  In the ordinary course of their business, the Debtors provide medical, vision, and dental coverage (the "**Health Care Programs**").  The specific benefits under the Health Care Programs and the health plan alternatives available to Employees vary depending on the location of the Employee and whether the Employee is a Union Employee or a Non-Union Employee.  However, all Employees are entitled to some form of medical, vision, and dental coverage.  The Health Care Programs, other than vision coverage, are funded through contributions by the Debtors and participating Employees.  Vision coverage is entirely paid by employee contributions.  The percentage contributed by an Employee varies depending

on, among other things, applicable collective bargaining agreements and whether the Employee's family members, partners, or dependents are covered under the Health Care Programs. On average, the Debtors pay approximately $1.6 million per month in the aggregate for the Health Care Programs, including claim payments, premiums, and administrative fees. On average, approximately $707,000 is withheld from Employee payroll per month as the required contributions to the Health Care Programs. In total, as of the Petition Date, the estimated outstanding but unpaid amount for the Health Care Programs is approximately $3.1 million.

76.     Employee Welfare Programs. In the ordinary course of business, the Debtors also provide long and short-term disability insurance, life insurance, accidental death and dismemberment insurance, and other related insurance to various Employees (the "**Employee Welfare Programs**"). The Employee Welfare Programs available to Employees vary depending on the location of the Employee and whether the Employee is a Union Employee or a Non-Union Employee. For example, Non-Union Employees at the Debtors' Uniondale, New York location are entitled to life insurance, accidental death and dismemberment, long term disability, short term disability, and also have access to Employee paid supplemental life insurance and supplemental accidental death and dismemberment insurance. The Union Employees at the Debtors' Lenexa, Kansas location are entitled to life insurance, accidental death and dismemberment, and short term disability. The dollar amounts of the benefits afforded under the various plans also vary by location of the Employee and whether the Employee is a Union Employee or a Non-Union Employee. On average, the Debtors pay approximately $122,000 per month in the aggregate for the Employee Welfare Programs, including claim payments, premiums, and administrative fees. On average, approximately $42,350 is withheld from Employee payroll as the required contributions to the Employee Welfare Programs. In total, as

of the Petition Date, the estimated outstanding but unpaid amount for the Employee Welfare Programs is approximately $275,000.

77.     Furthermore, the Debtors provide Employees with flexible spending account plans and dependant care account plans, pursuant to which certain Employees currently maintain flexible spending accounts for healthcare and dependent care accounts for dependant care expenses.  Flexible spending accounts are composed entirely of Employee contributions with average monthly Employee payroll deductions of $39,000.   Dependant care accounts are composed entirely of Employee contributions with average monthly Employee payroll deductions of $5,500.  The Debtors believe that such amounts are being held in trust for the benefit of the contributing Employees and, therefore, are not property of the Debtors' bankruptcy estates.  Nonetheless, out of an abundance of caution, the Debtors seek the approval of this Court to continue these programs and reimburse Employees in the ordinary course.

78.     Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to continue post-petition and to pay all amounts due and owing as of the Petition Date for the Health Care Programs and the Employee Welfare Programs.

79.     Workers' Compensation Obligations.  Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.   Accordingly, the Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law.  The Debtors insure their workers' compensation liabilities through a

workers' compensation policy issued by Ace American Insurance Company.[7]  The Debtors'

aggregate annual premium payments to the Ace American Insurance Company for workers'

compensation insurance in 2009 were $511,313.  The Ace American Insurance Company policy

also has deductible amounts of $350,000 per claim, which is subject to an annual aggregate cap

of $11 million for all claims.  In support of their deductible obligations, the Debtors have

obtained, and there are currently outstanding, irrevocable standby letters of credit in the

aggregate amount of $3.9 million, issued by Wells Fargo Bank, N.A. for the benefit of Ace

American Insurance Company.  If the Debtors fail to satisfy their deductible obligations under

the workers' compensation policies, the Ace American Insurance Company may draw on the

letters of credit to satisfy such obligations.  The Debtors' claims administrator for workers'

compensation claims is ESIS, Inc. ("**ESIS**"), which handles the investigation and payment of

insurance claims against the Debtors, including workers' compensation claims.  Pursuant to a

contract for claims administration with ESIS for the period of November 1, 2009, through

October 31, 2010, the Debtors pay ESIS approximately $150,000 per year in service fees.  As of

the Petition Date, the Debtors do not believe that any outstanding amounts are due to ESIS for

service fees.  The Debtors' outstanding obligations relating to workers' compensation arise from

incurred but not paid claims ("**IBNP**") and incurred but not reported claims ("**IBNR**").  The

Debtors estimate their IBNR through an actuarial process that is common in the insurance

industry.  The Debtors expect that cash payments related to all workers' compensation claims for

the next 12 months will be approximately $1.97 million.  Pursuant to the Employee Obligations

---

[7]      The Debtors have also filed the *Debtors' Motion for Entry of an Order Under 11 U.S.C. §§ 105(a), 361 and 363(b) Authorizing the Debtors to (I) Maintain Existing Insurance Policies and Pay All Policy Premiums and Brokers' Fees Arising Thereunder or in Connection Therewith, (II) Continue Honoring Prepetition Letters of Credit and Insurance Premium Finance Agreement, (III) Continue Grant of Security Interest to an Insurance Premium Finance Company and (IV) Enter Into New Insurance Policies* (the "**Insurance Financing Motion**") which requests authority to continue paying all prepetition amounts due for, and related to, the Debtors' various insurance policies and premiums, including the Debtors' workers' compensation policy.

Motion, the Debtors seek authority, but not direction, to pay amounts related to workers' compensation claims that arose prior to the Petition Date as they become due; to maintain, enter into, or renew necessary letters of credit related to workers' compensation; and to continue honoring all workers' compensation obligations in the ordinary course of business.

80. <u>Retirement Savings Plan</u>. The Debtors maintain various retirement savings plans (the "**Retirement Savings Plans**") which cover substantially all of the Employees. The Retirement Savings Plans are defined contribution retirement plans qualified under Section 401(k) of the Internal Revenue Code. All of the Retirement Savings Plans are non-contributory plans, except for one, to which the Debtors are required to make a weekly contribution for Union Employees who work at the Debtors' facility in Appleton, Wisconsin. The amount of this contribution is approximately $1,000 per week. For each pay period, on average, the Debtors deduct approximately $38,035 from the payroll of weekly Employees and approximately $138,162 from the payroll of bi-weekly Employees for the Retirement Savings Plans. The Debtors estimate that approximately $2,000 is due from the Debtors for prepetition contributions to the Retirement Savings Plans and that approximately $180,000 has been deducted from the payroll of the Employees but not yet transferred to the Retirement Savings Plans. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay amounts owed as of the Petition Date and continue performing under the Retirement Savings Plans.

81. <u>Pension Plans</u>. The Debtors maintain non-contributory pension plans covering substantially all eligible Non-Union Employees and certain Union Employees. In total, the Debtors maintain the following four defined benefit pension plans: (1) National Envelope – North Union Employees' Pension Plan; (2) National Envelope – East Union Employees' Pension Plan; (3) National Envelope – Central Union Employees' Pension Plan; (4) National Envelope

Corporation Retirement Plan (the "**Pension Plans**"). Pursuant to the Pension Plans, a benefit is payable to an Employee or other designated beneficiary upon the Employee's retirement from the company, total and permanent disability, or death. Benefits are based on years of credited service to the Debtors and an Employees' compensation. As of January 1, 2010, the Pension Plans were underfunded.[8] The National Envelope Corporation Retirement Plan and the National Envelope – Central Union Employees' Pension Plan were frozen on December 31, 2005 and October 31, 1995, respectively. In August 2008, the Debtors terminated all of the participants in the National Envelope – East Union Employees' Pension Plan. The Debtors have total pension contributions of approximately $154,787, $154,787, $288,240 and $145,902 due on July 15, 2010, October 15, 2010, September 15, 2010 and January 15, 2011, respectively. In addition, the Debtors have a Pension Benefit Guaranty Corporation premium of approximately $100,000 due on October 15, 2010. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not the direction, to continue funding the Pension Plans and to any make payments with respect thereto, including premium payments to the Pension Benefit Guaranty Corporation, as they become due.

82. <u>Multi-Employer Pension Plans</u>. Certain of the Union Employees participate in multi-employer pension plans that are maintained by the Employees' unions (the "**Multi-Employer Pension Plans**"). The Multi-Employer Pension Plans provide defined benefits based on Union Employees' earnings and period of service under the respective plans. Pursuant to the terms of certain collective bargaining agreements between the Debtors and the various unions, the Debtors are required to make certain contributions to the Multi-Employer Pension Plans on a

---

[8] The National Envelope – North Union Employees' Pension Plan was underfunded by $1,069,729. The National Envelope – East Union Employees' Pension Plan was underfunded by $866,926. The National Envelope – Central Employees' Pension Plan was underfunded by $193,066. The National Envelope Corporation Retirement Plan was underfunded by $5,774,445.

monthly basis. In 2008 the Debtors contributed a total of $1,922,000 to the Multi-Employer Pension Plans and in 2009 the Debtors contributed a total of $1,666,382 to the Multi-Employer Pension Plans. On average, the Debtors contribute approximately $160,000 per month to the Multi-Employer Pension Plans. The Debtors estimate that contributions of approximately $220,000 are due to the Multi-Employer Pension Plans as of the Petition Date. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not the direction, to continue funding the Multi-Employer Pension Plans and to make any payments with respect thereto.

83. <u>Severance Plan</u>. Prior to the Petition Date, the Debtors entered into settlement agreements (the "**<u>Severance Agreements</u>**") with certain unions regarding severance payments for terminated union employees.[9] Pursuant to the Severance Agreements, the covered terminated Employees receive severance payments from the Debtors conditioned on each Employee waiving all claims against the Debtors and each Employee not having taken certain economic actions prior to termination. The amount of the severance payments to be made are calculated based primarily on the Employee's base rate salary amount, and amount of accrued but unused vacation, sick, and personal days remaining at the time of termination. As of the Petition Date, there are amounts owed under the Severance Agreements to approximately 12 terminated Employees (individually a "**<u>Terminated Employee</u>**" and, collectively, the "**<u>Terminated Employees</u>**"). The remaining payments to be made under the Severance Agreements are approximately $16,200 in the aggregate, and no single Terminated Employee will receive more than approximately $1,780. None of the Terminated Employees constitute insiders (as such term is defined in the Bankruptcy Code). Pursuant to the Employee Obligations Motion, the Debtors

---

[9] The Severance Agreements were entered with Graphic Communications Conference Local No. 447-S International Brotherhood of Teamsters and Truck Drivers Local Union 807, International Brotherhood of Teamster.

seek authority to honor all outstanding obligations to the Terminated Employees under the Severance Agreements.

84. <u>COBRA Obligations</u>. As of the Petition Date, there were approximately 87 former Employees receiving COBRA medical benefits and approximately 68 former Employees receiving COBRA dental benefits ("**Continued Healthcare Benefits**"). The total subsidy amount paid for May 2010 was $26,425.55. Further, as of the Petition Date, there were 136 former Employees that are eligible but have not yet elected Continued Healthcare Benefits. By this Motion, the Debtors request authority to pay pre-petition and post-petition Continued Healthcare Benefits to severed Employees that elect to receive COBRA benefits. The Debtors estimate the amount outstanding under these programs is approximately $14,000. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay amounts owed for Continued Healthcare Benefits as of the Petition Date and continue providing Continued Healthcare Benefits postpetition.

85. <u>Miscellaneous Programs</u>. The Debtors provide a number of miscellaneous benefits to Employees (the "**Miscellaneous Programs**"). For example, the Debtors have a military leave policy, a maternity leave policy, a jury duty policy, and a medical leave policy. The Debtors believe that the amounts owing on the Petition Date under all of these and other miscellaneous benefits programs are negligible. Pursuant to the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay any outstanding prepetition obligations under the miscellaneous benefit programs and to continue these benefits postpetition.

86. <u>Administration of Payroll and Employee Benefits</u>. As is customary in the case of most large companies, the Debtors pay various third parties to maintain or provide record keeping and other administrative services with respect to their payroll and various Employee

benefit programs. For example, the Debtors utilize the services of ADP to pay their payroll and administer their payroll taxes. The ADP administration services cost the Debtors approximately $80,000 per month. Additionally, the Debtors pay ADP a yearly fee, typically in January of each year, for year-end administrative services of approximately $36,000. The Debtors request that they be authorized, but not directed, to pay the various costs incident to maintaining, or paying third parties to maintain and provide, record keeping relating to their payroll and various Employee benefit programs identified in the Employee Obligations Motion that may be outstanding as of the Petition Date, including, without limitation, the amounts payable to ADP. The Debtors believe that these unpaid administrative processing costs are approximately $80,000 as of the Petition Date.

87.     <u>Employment and Withholding Taxes</u>. The Debtors accrue, in the ordinary course of business, state, local and federal employment and withholding taxes as wages are earned by the Debtors' Employees. These taxes are calculated based on statutorily mandated percentages of earned wages. Historically the Debtors have timely paid all federal, state and local Employment and Withholding Taxes to the relevant taxing authority, usually on a per pay period basis. The Debtors' payroll taxes, including both the employee and employer portion, for calendar year 2009 were approximately $43.3 million. The Employment and Withholding Taxes constitute so-called "trust fund" taxes which are required to be collected from third parties and held in trust for payment to the taxing authorities, and thus, are not property of the Debtors' estates under Section 541(d) of the Bankruptcy Code. As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the payroll taxes to be approximately $980,000. In the event the Court authorizes the Debtors to pay

the Employee Obligations, the Debtors seek the authority Pursuant to the Employee Obligations Motion to continue to timely pay the Employment and Withholding Taxes with respect thereto.

88.     As stated above, the relief requested in the Employee Obligations Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest. In short, all parties in interest will suffer if the Employee Obligations are not paid when due and as expected during this critical time.

### D.     Tax Motion

89.     Pursuant to the Tax Motion, the Debtors seek an order (a) authorizing, but not directing, the Debtors to remit and pay certain sales, use, income, real property, and other taxes, as well as fees for licenses, permits, and other similar charges and assessments and (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the foregoing

90.     In the ordinary course of the Debtors' businesses, the Debtors (a) incur taxes, including, but not limited to, sales, use, income, franchise, personal property, real property, Canadian Goods and Services Tax ("**GST**")[10] and other taxes in operating their businesses (collectively, the "**Taxes**")[11] and (b) charge fees and other similar charges and assessments (collectively, the "**Fees**")[12] on behalf of various taxing, licensing and regulatory authorities (collectively, the "**Authorities**," a listing of which is annexed to the Tax Motion as <u>Exhibit B</u>) and pay Fees to such Authorities for licenses and permits required to conduct the Debtors'

---

[10]     The Canadian Goods and Services Tax is a multi-level value added tax that applies to the goods that the Debtors ship and sell in Canada.

[11]     The Debtors have a taxable presence in 41 states.

[12]     The Debtors collect certain Fees from their customers on behalf of governmental entities. For such Fees, the Debtors are required to remit the collected amounts to the appropriate governmental entity. The Debtors hereby request authority to pay Fees regardless of whether they constitute "trust fund" obligations.

businesses.[13] The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

91.     The Debtors pay approximately $600,000 in sales and use taxes per month. The Debtors collect sales taxes in connection with the sale of product to their customers, and remit the sales taxes to the Authorities following their collection. Use taxes typically arise if the Debtors do not have business operations in the state in which they are selling product and do not charge and collect state sales taxes. The Debtors pay approximately $50,000 per quarter in gross receipts taxes, including commercial activity taxes ("**CAT Taxes**") and business and occupation taxes ("**B&O Taxes**"). Such gross receipts taxes are annual business privilege taxes measured by gross receipts from business activities in certain states. The Debtors pay approximately $18,000 per year in annual reporting taxes, which allow the Debtors to maintain good standing in certain states. The Debtors also pay approximately $500,000 per year in franchise taxes. Franchise taxes are imposed by certain states for the privilege of allowing companies to do business in a state or to maintain a company's good standing in a state. The Debtors pay approximately $40,000 per month in GST for products imported to their Canadian distribution facility. The Debtors pay approximately $2,031,000 annually in real property taxes and $788,000 per year in personal property taxes.

92.     The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $1,852,000. The Debtors believe payment of the prepetition Taxes and Fees is in the best interests of their estates and creditors for a number of reasons. First, any amounts that are actually due, but have not yet been paid to the relevant governmental authorities because of the bankruptcy filings, represent a small fraction of

---

[13]     The Debtors do not seek authority to collect and pay state and federal withholding taxes under the Tax Motion but rather request such authority as part of the Employee Obligations Motion.

the Debtors' total assets. Second, some, if not all, of the applicable governmental authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from the reorganization or sale process. Third, if the Debtors do not pay such amounts in a timely manner, the governmental authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates. Finally, some of these outstanding tax liabilities are for "trust fund" taxes that the Debtors have collected and hold in trust for the benefit of the applicable governmental authority. Therefore, such funds do not constitute property of the Debtors' estates and could not otherwise be used by the Debtors.

93. In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business. Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole

E. **Utilities Motion**

94. In connection with the operation of their business and management of their properties, the Debtors obtain services ( the "**Utility Services**") from various providers of Utility Services (each a "**Utility Company**" and, collectively, the "**Utility Companies**").

95. Uninterrupted Utility Services to the Debtors are vital to the continued operation of the Debtors' business enterprise and, consequently, to the success of their Chapter 11 Cases. The Debtors depend on the reliable delivery of power and other Utility Services to operate their facilities and manufacture their products. Thus, I submit that termination of the Utility Services would result in substantial (and potentially) irreparable disruption to the Debtors' businesses that could decimate their revenue and profits and, therefore, substantially diminish or eliminate the

Debtors' chances for a successful reorganization. Accordingly, the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors' estates and their creditors.

96. I believe that the Debtors have provided sufficient assurances of their future performance with respect to the Utility Companies. Furthermore, the adequate assurance method proposed is a reasonable accommodation of the interests of the Utility Companies and the Debtors. The total amount of cash proposed as the Adequate Assurance Deposit is $1,089,161. The Debtors have availability under their proposed DIP financing to reserve such funds.

**F.      Insurance Financing Motion**

97. The Debtors seek authorization, but not direction, to (a) maintain, and to pay all policy premiums and brokers' fees related to, their various insurance policies (collectively, the "**Insurance Policies**"), which the Debtors have obtained through several third-party insurance carriers (collectively, the "**Insurance Carriers**"); (b) continue honoring their obligations related to the Debtors' letter of credit obligations in favor of the Insurance Carriers (collectively, the "**Letter of Credit Obligations**"); (c) continue honoring their obligations pursuant to a prepetition insurance premium financing agreement (the "**Finance Agreement**") entered into for the purpose of financing the purchase of certain insurance coverage; (d) continue to grant a security interest to the Insurance Premium Finance Company (as defined in the Insurance Financing Motion); and (e) enter into new insurance policies through renewal of the current Insurance Policies or purchase of new postpetition policies. The Debtors further request that any party holding a letter of credit to secure any of the Debtors' obligations under the Insurance Policies be authorized to continue using such letter of credit to secure the Debtors' postpetition insurance obligations.

98. In connection with the operation of their businesses and management of their properties, the Debtors maintain various Insurance Policies. The Insurance Policies include, but are not limited to, coverage for general liability, automobile, workers' compensation, umbrella liability, international, crime, fiduciary and directors and officers, employers' liability, environmental impairment liability and property insurance. I believe that the third-party claims that are covered by the Insurance Policies are neither unusual in amount, nor in number, in relation to the extent of the business operations conducted by the Debtors.

99. <u>Payment of the Insurance Premiums and Brokers' Fees.</u> Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines (the "**Operating Guidelines**") for chapter 11 cases, the laws of the various states in which the Debtors operate and the Debtors' various debt agreements. Thus, I believe the court should authorize the Debtors to continue to pay Insurance Policy premiums as such premiums come due in the ordinary course of the Debtors' businesses.

100. The Debtors have been represented in their negotiations with their various insurance underwriters by Aon Corporation ("**Aon**"). The employment of Aon as the Debtors' insurance broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies. Aon charges the Debtors an annual fee of $160,000, per year for services related to the negotiation and renewal of Insurance Policies. In addition, Aon performs claims handling services, for which the Debtors pay approximately $82,000 in fees annually. As of the Petition Date, the Debtors have paid Aon in full through October 31, 2010. The Debtors

believe that it is in the best interests of their creditors and estates to continue their business relationship with Aon.

101.    In addition, the Debtors are represented in their negotiations with Aon by Insurance Consulting Associates ("**ICA**"). ICA reviews each Insurance Policy, negotiates prices with AON and individual Insurance Carriers, and completes renewals for certain of the Debtors' medical insurance policies. ICA is paid $7,000 per month for its services. As of the Petition Date, the Debtors have paid ICA in full through June, 2010. I believe that it is in the best interests of their creditors and estates to continue their business relationship with ICA.

102.    Furthermore, certain Insurance Carriers require the Debtors to retain an independent company to handle claims that are below the deductible amount stated in the applicable Insurance Policy. In satisfaction of this requirement, the Debtors retain ESIS, Inc. ("**ESIS**"), which handles the investigation and payment of insurance claims against the Debtors that are below the deductible limit of the applicable Insurance Policy. The Debtors pay ESIS approximately $150,000 per year in service fees. As of the Petition Date, the Debtors have paid ESIS in full through October 31, 2010.

103.    <u>Letter of Credit Obligations</u>. To secure certain of the Debtors' obligations under their workers compensation program, the applicable Insurance Carrier required the Debtors to post collateral in the form of an unconditional and irrevocable letter of credit. As of the Petition Date, the aggregate amount of the outstanding letter of credit posted by the Debtors in support of their workers compensation program is approximately $3.39 million. The letter of credit is required to maintain workers compensation insurance, which is essential to the Debtors' businesses.

104.     _Prepetition Insurance Premium Finance and Security Agreement._  As described more fully in the Insurance Financing Motion, the Finance Agreement was executed for the purpose of financing the purchase of property insurance coverage.  I believe that the terms of the Finance Agreement represent the best possible terms for financing the premiums of the applicable Insurance Policy.  The Debtors' estates will benefit by maintaining this low-cost financing from the Insurance Premium Finance Company.  Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.

## III.     CONTINUING VENDOR MOTIONS

### A.     Essential Supplier Motion

105.     The Debtors seek entry of an order authorizing but not directing (a) the Debtors to pay, in the ordinary course of business, the prepetition claims of certain suppliers, vendors, shippers, adhesive suppliers, window film suppliers, and other prepetition creditors (collectively, the "**Essential Suppliers**," whose claims shall be identified as "**Essential Supplier Claims**") that provide goods or services to the Debtors that the Debtors deem in the exercise of their business judgment to be essential to the uninterrupted functioning of the Debtors' business operations (the "**Essential Goods and Services**") in an aggregate amount not to exceed $3 million on an interim basis and an additional $4.5 million on a final basis for a total of $7.5 million (the "**Essential Supplier Cap**"), and (b) financial institutions to honor and process related checks and transfers.

106.     The Debtors are highly mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  Accordingly, the preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business relationships, are among management's primary goals as the Debtors transition into chapter 11.

Providing seamless service to customers is key to meeting those goals. For these reasons, the Debtors seek to minimize the adverse business effects – as well as the cash flow impact – of their chapter 11 filing to the fullest extent possible by obtaining authority to pay certain vendors that are of paramount importance to their business operations.

107. In connection with the commencement of these cases, the Debtors are making every effort to avoid interruptions in the supply chain and the adverse effects that even a temporary break in the supply chain could have on their businesses. Because of the nature of the Debtors' businesses, I believe that many vendors will make credible threats that, unless paid on account of their prepetition debt, they will cease to supply the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses. Certain aspects of the Debtors' business operations, which are described in detail in the Essential Supplier Motion, demonstrate the Debtors' need for authority to make payments on account of the prepetition claims of essential vendors as required in the exercise of their business judgment, and subject to appropriate terms and conditions, to preserve the value of their businesses.

108. The Debtors purchase goods and services from approximately 300 to 400 separate vendors, and the Debtors have determined in their business judgment that approximately 30 to 40 of these vendors provide goods and services that are essential to the Debtors' operations. The Essential Suppliers provide key direct materials, raw materials, equipment, supplies and other goods utilized in the Debtors' manufacturing processes, including adhesive and window film supplies. The remaining Essential Suppliers provide shipping services essential to delivering goods to customers. In many cases, the Essential Suppliers provide goods for which there are no alternative suppliers available at a comparable cost or provide goods in such a scale that it would be impossible to obtain the same amount of goods at a feasible price, if at all. In other cases,

they provide specialty products for which it would require a substantial capital outlay to re-fit the Debtors' facilities for an alternative producer, or the Essential Suppliers provide branded products which can only be obtained from one source.

109. Most of the Debtors' relationships with Essential Suppliers are not governed by long-term contracts. The Essential Suppliers are well aware of their market power and their importance to the Debtors' business operations as a result of the uniqueness of the materials or services that they supply and/or the cost and delay that would be required for the Debtors to obtain replacement supplies or services. I believe that these vendors, feeling confident that they possess the "upper hand" in their dealings with the Debtors, likely would demand prepetition payments as a condition of continuing to do business with the Debtors. Although it is possible that some of these demands might amount to empty threats (and presumably would violate the Bankruptcy Code), I believe that many Essential Suppliers, at minimum, would stop shipping to the Debtors or providing services to the Debtors for a period of time, quickly causing production or delivery delays that would adversely impact the Debtors' ability to meet the needs of their customers.

110. Similarly, even if the Essential Supplier ultimately agreed to supply the Debtors with the goods essential to their businesses, the harm to relations with the Essential Supplier could have a long-term adverse impact on the Debtors' businesses. The Debtors rely on the Essential Suppliers to provide high levels of service to the Debtors, including regular accommodations to address pressing and unscheduled production demands. Absent the payment of the Essential Suppliers' claims, the Debtors may be unable to obtain such accommodation for the occasional requirement for materials, components and finished goods on short notice, a need that is driven by the nature of the Debtors' business and cannot be predicted or mitigated. The

inability to rely on such assistance would create an ongoing risk that could adversely impact the Debtors' ability to service their customers.

111. Shipping Claims. Pursuant to the Essential Supplier Motion, the Debtors seek authorization to pay prepetition shipping expenses, including customs duties, freight and trucking charges, customers brokerage fees, amounts owed to the Paying Agent (as defined below), and the like (collectively, the "**Shipping Claims**"), as the Debtors determine, in the exercise of their business judgment, may be necessary or appropriate to obtain goods in transit and to satisfy the liens, if any, in respect thereof. Paragraphs 14 to 18 of the Essential Supplier Motion provide an accurate and detailed description of these obligations. On a monthly basis, the Debtors incur total shipping costs and fees payable to any shippers or other transportation providers of approximately $2.3 million.

112. The Debtors seek to pay the prepetition Shipping Claims for several reasons. First, if they are not paid, many independent shippers and distributors may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace these shippers and distributors, which amounts will likely exceed the amount of unpaid prepetition Shipping Claims that the Debtors request permission to pay hereunder.

113. I believe that any delays in delivery with respect to goods that may be in the possession of shippers, customs brokers, and/or distributors as of the commencement of these cases will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such shippers, customs brokers or distributors, and could disrupt the Debtors' inventory distribution network to the detriment of their operations.

114.   The failure of the Debtors to receive some of the goods at issue can cause temporary shutdowns of the Debtors' manufacturing facilities.  Such shutdowns will not only frustrate the expectations of their customers and erode customer goodwill, but also ruin the Debtors' efforts to maximize the value of their estates for their creditors.

115.   <u>Paying Agent Fees</u>.  In the ordinary course of business, the Debtors utilize one vendor to act as a third party paying agent (the "**<u>Paying Agent</u>**") for all freight and shipping services.  The Paying Agent collects invoices in connection with various Shipping Claims, reconciles such invoices against the Debtors' records and then periodically bills the Debtors for amounts owed to the Shippers.  Once payment from the Debtors is received, the Paying Agent pays the Debtors' shipping charges on the Debtors' behalf.  The Paying Agent's charges fees on per-transaction basis, and the Debtors incur, in the aggregate, Paying Agent fees of approximately $7,600 per month.

116.   The Debtors do not have an alternative system in place to pay most of their Shipping Claims absent the use of the Paying Agent.  Therefore, I believe that the continued utilization of the Paying Agent to process invoices in connection with the Shipping Claims is critical to the Debtors' efforts to maximize the value of the estate and believe it would be in the Debtors' best interest for the court to grant them authority to continue paying the Paying Agent all amounts owed for outstanding Shipping Claims, as well as the Paying Agent's standard fees for processing and paying such Shipping Claims, including payment in the ordinary course of any prepetition amounts outstanding.

117.   I believe that the relief requested in connection with the Shipping Claims under the Essential Supplier Motion will ensure the continuous supply of goods that are vital to the Debtors' continuous operations and integral to maximizing the value of the estate for their

creditors. Absent the relief requested in the Essential Supplier Motion, the Debtors would be required to expend substantial time and resources convincing shippers, distributors, and parties holding goods that they should not assert a lien on or hold goods in transit. The attendant disruption to the continuous flow of goods (including imported goods held by shippers, customs brokers and/or distributors) to the Debtors would likely result in a shortage of goods used by the Debtors in their operations and disruption of the Debtors' ability to fulfill orders from their customers. Without the goods and the ability to meet customer orders, the Debtors' business would rapidly deteriorate and their opportunity to successfully maximize the value of the estate would be seriously jeopardized. Accordingly, I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

118. I believe that the Debtors' management and employees have exercised high levels of care in reviewing the facts and circumstances of their Essential Suppliers and have identified a reasonable list of such vendors that I believe could cause material business disruptions of the kinds described above if the Debtors do not obtain the relief sought herein. The Debtors intend to pay only certain of these vendors and to require the Essential Suppliers to provide written, signed postpetition commitments from these vendors as a quid pro quo for, and as a condition to, the payment of the Essential Supplier Claims, as discussed in detail in the Essential Supplier Motion. I therefore believe it is in the best interest of the Debtors for the court to grant them the authority, in their sole discretion, to pay the prepetition claims of the Essential Suppliers, up to the Essential Supplier Cap and subject to the terms proposed in the Essential Supplier Motion. Given the size of their businesses, the magnitude of the costs of any disruption in their operations and the demonstrated benefits to be obtained in exchange for any payments to the Essential

Suppliers, I submit that this is a reasonable and appropriate cap on the expenditure of estate funds.

## IV. CONCLUSION

119. The Debtors' ultimate goal is to reorganize their financial affairs pursuant to the terms of a confirmed chapter 11 plan or achieve a sale of their businesses if such a sale would be in the best interests of the Debtors' estates. In the near term, however, to minimize any loss of value of their businesses during their restructuring, the Debtors' immediate objective is to maintain a business as usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization or sale of the Debtors' businesses will be substantially enhanced.

120. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of June, 2010.

Respectfully Submitted,

James Shelby Marlow
NEC Holdings Corp.
Chief Financial Officer

On behalf of the other Debtors:
Authorized Signatory

# EXHIBIT A

## Corporate Organizational Chart

# National Envelope Organized Structure



**NEC Holdings Corp.**

State of Organization: DE (7/15/1994)

Directors:
William Ungar
Florette D. Ungar Shaashua
Joan E. Ungar Levy
Denise F. Ungar Stern
Rita L. Ungar Moser

Officers:
Stephen Gawrlewski: Interim Chief Executive Officer + Chief Restructuring Officer
John Grymes: Chief Operating Officer
James Shelby Marlon: Chief Financial Officer
Dale Nissenbaum: General Counsel

Sole Stockholder

**National Envelope Corporation**

State of Organization: NY (5/16/1951)

State of Qualification: IL, TX, GA, KS, PA

Directors:
William Ungar
Florette D. Ungar Shaashua
Joan E. Ungar Levy
Denise F. Ungar Stern
Rita L. Ungar Moser

Officers:
Stephen Gawrlewski: Interim Chief Executive Officer + Chief Restructuring Officer
John Grymes: Chief Operating Officer
James Shelby Marlon: Chief Financial Officer
Dale Nissenbaum: General Counsel

Sole Member & Manager

Sole Member

**National Envelope - WH LLC**

State of Organization: NY (9/15/2000)
States of Qualification: TX, CA

**National Envelope - AECO LLC**

State of Organization: DE (3/29/2006)

See next page for subsidiaries of National Envelope – AECO LLC

Sole Member

**National Envelope - City of Industry LLC**

State of Organization: CA (9/22/2000)
State of Qualification: WA

**National Envelope - Corsicana LLC**

State of Organization: TX (10/3/2000)

**National Envelope - Aurora LLC**

State of Organization: CO (9/22/2000)

**National Envelope - Appleton LLC**

State of Organization: WI (10/5/2000)

**National Envelope - Scottdale LLC**

State of Organization: PA (10/5/2000)
States of Qualification: NJ, MA

Sole Member

**National Envelope - Chino LLC**

State of Organization: CA (12/17/2002)
State of Qualification: WA

Sole Member

**National Envelope - Ennis LLC**

State of Organization: DE (10/15/2007)
State of Qualification: TX

Sole Member

**National Envelope – Grand Prairie LLC**

State of Organization: TX (12/23/2002)

Sole Member

**National Envelope - Lenexa LLC**

State of Organization: KS (12/17/2002)

Sole Member

**National Envelope – Elk Grove Village LLC**

State of Organization: IL (12/17/2002)

Sole Stockholder

**National Envelope Corporation - East**

State of Organization: NJ (12/9/1996)
States of Qualification: MA, GA, MO, NY

**NOTE:** National Envelope – AECO LLC's subsidiaries and shell corporations are listed on bottom of next page.

1171156.1



**National Envelope – AECO LLC**

State of Organization: DE (3/29/2006)
State of Qualification: TX

Sole Member

**National Envelope – Specialties Group LLC**

State of Organization: DE (3/29/2006)
States of Qualification: KY, PA, TN, GA, NC

**National Envelope –Houston LLC**

State of Organization: DE (3/29/2006)
State of Qualification: TX

**National Envelope – Shelbyville Equity LLC**

State of Organization: DE (3/29/2006)
State of Qualification: KY

**National Envelope – Exton Equity LLC**

State of Organization: DE (3/29/2006)
State of Qualification: PA

**National Envelope – Nashville Equity LLC**

State of Organization: DE (3/29/2006)
State of Qualification: TN

**National Envelope – Houston Equity LLC**

State of Organization: DE (3/29/2006)
State of Qualification: TX

**National Envelope – Leasing LLC**

State of Organization: DE (3/29/2006)
States of Qualification: GA, NC

<u>Shell Corporations</u>

National Envelope Corporation maintains the following dormant corporations in the states set forth opposite their respective names and holds 100% of the stock of such corporations:

| NAME | JURISDICTION |
|------|--------------|
| **New York Envelope Corp.** | New York (6/7/1979) |
| **National Envelope Corporation - North** | Massachusetts (10/23/1997) |
| **National Envelope Corporation – South** | Georgia (10/3/1997) |
| **National Envelope Corporation – Central** | Missouri (10/20/1997) |
| **Old Colony Envelope Corp.** | Massachusetts (10/22/1997) |
| **Aristocrat Envelope Corporation** | New York (1/4/2002) |