# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORP.,<br>*et al.*,[1] | Case No. 10-11890 (PJW) |
| Debtors. | Joint Administration Pending |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE PREPETITION LENDERS, (II) OBTAIN POST-PETITION FINANCING AND (III) PROVIDE ADEQUATE PROTECTION TO THE PREPETITION LENDERS, AND (B) PROVIDING NOTICE AND SCHEDULING FINAL HEARING

("DIP Financing Motion")

The above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"** or

the **"Company"**), hereby move this Court (the **"Motion"**) for entry of an interim order (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

"**Interim Order**"),[2] in substantially the form attached hereto as Exhibit 1, and a final order (the

"**Final Order**"), (A) authorizing the Debtors to (I) use cash collateral, pursuant to Section 363 of

title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), (II) obtain postpetition

financing pursuant to Sections 361, 362 and 364 of the Bankruptcy Code and (III) provide

adequate protection to the Prepetition Lenders (defined below) pursuant to Sections 361, 362 and

363 of the Bankruptcy Code, and (B) scheduling interim and final hearings pursuant to Rule

4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy**

**Rules**"), all as more fully described herein. In support of this Motion, the Debtors respectfully

state:[3]

### Preliminary Statement

1.      The Debtors intend to support the ongoing operations of their business during

these cases through the use of Cash Collateral (defined below) and a senior secured,

superpriority debtor-in-possession credit facility in the amount of $138,955,324, including a

"roll-up" of all the existing outstanding obligations under the Prepetition Revolving Facility (as

defined below) and the Term A Loan (as defined below), and structured as a revolving credit

facility (as hereafter amended, supplemented or otherwise modified from time to time in

accordance with the terms hereof and thereof, the "**DIP Facility Agreement**"). Pursuant to the

DIP Facility Agreement, (A) upon the entry the Interim Order and until entry of the Final Order,

the Debtors may borrow an amount equal to the sum of (a) subject to the satisfaction of the

conditions precedent to borrowing set forth in the DIP Facility Agreement, an amount sufficient

---

[2]      Unless indicated otherwise, capitalized terms used but not immediately defined herein have the meanings ascribed to them in the Interim Order or the DIP Facility Agreement, as appropriate.

[3]      The facts and circumstances supporting this Motion are set forth in the Declaration of James Shelby Marlow in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**"), filed on the Petition Date (defined below).

to meet the Debtors' working capital and other needs pending the final hearing as set forth in the Interim DIP Budget not to exceed $10 million (such aggregate amount, the "**Interim Order Commitment Amount**"), plus (b) the amount of collections received by the Credit Parties in the ordinary course of business and applied first to the Pre-Petition Revolving Credit Obligations and then, if the Prepetition Revolving Facility has been repaid in full prior to the Final Hearing, to the Prepetition Tranche A Obligations; (B) Revolving Credit Advances in excess of the Interim Order Commitment Amount will not be made available unless and until this Court has entered the Final Order; and (C) upon the entry of the Final Order, the Debtors will be entitled to borrow all amounts available under the DIP Facility Agreement, including, but not limited to, amounts sufficient to pay any amounts then remaining outstanding on the Pre-Petition Tranche A Obligations and the Pre-Petition Revolving Credit Obligations, subject to the terms and conditions contained in the DIP Facility Agreement (including, without limitation, satisfaction of the conditions precedent to borrowing set forth herein) or as may otherwise be limited by the Final Order.[4]

2. The reasons supporting the Debtors' request for authority to use Cash Collateral and obtain postpetition financing under the DIP Facility (as defined below) are compelling and yet simple. As explained in greater detail below, the DIP Facility will be used to provide liquidity for working capital, to pay the Prepetition Revolving Facility and the Term A Loan, and for other general corporate purposes of the Debtors. The proposed DIP Facility will ensure that the Debtors will be able to meet their payroll, vendor and other obligations without interruption. The Debtors rely on a significant amount of trade credit. If there are any

---

[4] A copy of the DIP Facility Agreement in substantially final form is annexed to the Interim Order as <u>Exhibit A</u> (excluding schedules and exhibits).

interruptions in such credit terms and the Debtors do not otherwise have liquidity to meet their vendors' demands, the Debtors' business will suffer immediately.

3.     By this Motion and pursuant to Sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 9014, the Debtors hereby seek entry of two orders—an Interim Order in the form annexed hereto as <u>Exhibit 1</u> and a Final Order,[5] following notice of the Motion and the Interim Order and a hearing (the "**Final Hearing**") on the relief requested, approving such relief on a final basis (together, the "**DIP Orders**"), in each case:

>     (a)     authorizing and approving National Envelope Corporation, a New York corporation, National Envelope – Chino LLC, a California limited liability company, National Envelope – Grand Prairie LLC, a Texas limited liability company, National Envelope – Lenexa LLC, a Kansas limited liability company, National Envelope – Elk Grove Village LLC, an Illinois limited liability company, National Envelope Corporation – East, a New Jersey corporation, National Envelope – Aeco LLC, a Delaware limited liability company, National Envelope – Specialties Group LLC, a Delaware limited liability company, National Envelope – Houston LLC, a Delaware limited liability company, National Envelope – Houston Equity LLC, a Delaware limited liability company, National Envelope – Leasing LLC, a Delaware limited liability company, National Envelope – WH LLC, a New York limited liability company, National Envelope – Scottdale LLC, a Pennsylvania limited liability company, National Envelope – Appleton LLC, a Wisconsin limited liability company, National Envelope – Aurora LLC, a Colorado limited liability company, National Envelope – Corsicana LLC, a Texas limited liability company, National Envelope – Ennis LLC, a Delaware limited liability company, and National Envelope – City of Industry LLC, a California limited liability company, as Borrowers, and the other Credit Parties to obtain postpetition financing up to the principal amount of $138,955,324 (the "**DIP Facility**") from General Electric Capital Corporation, a Delaware corporation (in its individual capacity, "**GE Capital**"), for itself as a DIP Lender, and as administrative agent for the DIP Lenders (in such capacity, the "**DIP Agent**"), and the other lenders from time to time parties to the DIP Facility Agreement (collectively, in their lender capacity, the "**DIP Lenders**"), to (A) fund, among other things, ongoing working capital, general corporate, letters of credit and other financing needs of the Debtors, (B) pay down the Revolver and Term A Advances, which amounts are stipulated to be secured by the Prepetition Collateral, (C) provide the Prepetition Lenders with the Adequate Protection, (D) pay certain transaction fees, and other costs and expenses of administration of the Chapter 11 Cases, and (E) pay fees and

---

[5]     A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing.

expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Facility Documents (obligations under the DIP Facility and under the Interim Order, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses, and all other obligations and amounts due from time to time under the DIP Facility Documents shall be referred to hereinafter collectively as the "**Postpetition Indebtedness**"));

(b)     authorizing and empowering the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(c)     providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the obligations under the DIP Facility;

(i)     have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Chapter 11 Cases or any successor case, which allowed superpriority claims of the DIP Agent and DIP Lenders shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as provided in the Interim Order (other than from the Avoidance Actions), subject to the payment in full in cash of the Carve-Out (the "**DIP Facility Superpriority Claims**"); and

(ii)     be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "**DIP Facility Liens**") in and on all prepetition and postpetition property and assets of the Debtors, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof (the "**Collateral**"), subject only to the Carve-Out and the Permitted Prior Liens; provided, however, that the Collateral shall not include avoidance actions and/or the proceeds thereof pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code (the "**Avoidance Actions**")

(d)     authorizing the Debtors pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code to use "cash collateral" (as defined under section 363 of the Bankruptcy Code) and provide Adequate Protection to the Prepetition Lenders on account of their claims under the Prepetition Loan Documents for any diminution in the value of their respective interests in the Prepetition Collateral caused by the use of Cash Collateral and the terms of the financing being granted in the Interim Order;

(e)     approving the IP Offset as provided in the Interim Order; and

(f)     scheduling pursuant to Bankruptcy Rule 4001, a Final Hearing before this Court to consider entry of the Final Order approving the DIP Facility, authorizing the use of Cash Collateral, and authorizing the grant of Adequate Protection to the Prepetition Lenders, all on a final basis.

## Jurisdiction

4.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested herein are Sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 2002-1 and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## Background

6.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.   No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official statutory committees have been appointed or designated.   Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

7.     As of the date hereof, no official committee of unsecured creditors has been appointed.

8.     The Company is the largest privately-held envelope manufacturing company in the United States with facilities and customers located throughout the nation. The Debtors' products include commodity and custom-made envelopes of all kinds, as well as business aids of various types including certificates, presentation folders, binders, specialty bags, and coin and currency bags. In addition, the Company maintains printing plants and presses which allow them to emboss, print, or foil stamp envelopes to provide custom products to meet the particular demands of the Company's customers.

9.     The Company was founded by William Ungar, a Holocaust survivor and Polish immigrant, in 1952. The Company was first located only in New York, New York and grew rapidly in the post-war years. The Company began to expand through strategic acquisitions in 1991, when it acquired Aristocrat Envelope, and it has since acquired such nationally-known companies and brand names as Williamhouse and Atlantic Envelope. To facilitate these acquisitions, NEC Holdings Corp. was founded and incorporated in 1994 under the laws of Delaware. Today, the Company continues to be privately-held within the Ungar family.

10.     The Company's corporate headquarters is located in Uniondale, New York, and it has 14 manufacturing facilities spread across California, Colorado, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Pennsylvania, Tennessee, Texas, and Wisconsin. In addition, the Company maintains warehouse facilities in Washington and Ontario, Canada. In total, the Debtors employ approximately 3,389 employees, and their manufacturing facilities produce an estimated 37 billion envelopes per year. Six of the Company's manufacturing facilities employ unionized employees.

11.     Over the past three years, the Company has faced declining aggregate revenues, net income and EBITDAR as a result of the global recession and the displacement of traditional

print communications and media by electronic formats. The Company's consolidated net sales were approximately $866.8 million in 2007, $799.0 million in 2008, $676.2 million in 2009, and $224.4 million from January 2010 through April 2010. Despite the declines in sales, due to the Company's restructuring and reorganization efforts, described below, the Company's EBITDAR has improved and net losses have declined thus far in 2010 as compared to the 2009 fiscal year. The Company's consolidated EBITDAR was approximately $35.8 million in 2007, $28.6 million in 2008, $7.5 million in 2009, and $10.1 million from January 2010 through April 2010. The Company has incurred net losses from 2007 through the present. The Company's consolidated net income was a loss of approximately $1.4 million in 2007, a loss of approximately $7.9 million in 2008, a loss of approximately $44.2 million in 2009, and a loss of approximately $6.1 million from January 2010 through April 2010.

12.     The envelope industry categorizes its business by type of customer, rather than by product, as different types of customers may purchase a wide variety of products depending on their needs. In total, the Company held a 21 percent market share of the overall envelope industry in 2008, making it the leader of the $3.7 billion North American envelope market. The Company's chief competitors are Cenveo, with 19 percent of the market, Mead Westvaco, with 8 percent, and Tension Envelope, with 5 percent. In each customer channel, the Company competes on the basis of quality, depth of product offerings, price, and service.

13.     The Company's largest customer segment consists of products directed toward the merchant and wholesale market. In total, this segment made up 61.6 percent of the Company's total revenue in 2009. The primary customers of this product line are paper merchants and jobbers, or specialized envelope printers who sell to brokers and end-users.

14.     The Company also is a leader in direct sales to consumers that are the ultimate users of the Company's products. In total, consumer sales made up 34 percent of the Company's aggregate revenue in 2009. Consumers are largely concentrated in the financial, direct mail, insurance, utilities, fulfillment, non-profit, and courier industries, and also includes large corporations with a need for envelopes in their daily activities. Among the products produced for these segments are envelopes used for interoffice transactions, automated teller machines, payroll, and direct mail, including outer and return envelopes. The Company occupies 14 percent of the consumer channel, behind only Cenveo among its competitors.

15.     The balance of the Company's business, accounting for 4.4 percent of aggregate revenue in 2009, consists of specialty products produced for wholesale customers. Much of this business is attributable to the popular Williamhouse brand, which was acquired by the Company in 2000. Such customers include greeting card publishers, social announcement companies, specialty printers, wholesale clubs, converters, exporters, and medical imaging suppliers. Including both merchant and specialty products, the Company accounts for 66 percent of the wholesale envelope industry. This market share is far larger than any of the Company's competitors. The next largest market share is held by Quality Park, with 6 percent of market.

16.     Purchasing and logistics are managed strategically out of the Company's offices in Frisco, Texas. However, once negotiations with vendors have been completed, day-to-day purchasing decisions are managed by each local facility to allow flexibility and minimize burdensome inventory costs. Expenses spent on raw materials total about 60 percent of the Debtors' total sales. The largest expense by far is paper, which consisted of 50.5 percent of all raw materials purchases made by the Company.

17.     Additional information regarding the events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.

**A.      Prepetition Indebtedness and Capital Structure**

18.     NEC Holdings Corp. is the direct and indirect parent of each of the other Debtors.

19.     Prepetition Senior Credit Facilities.  Prior to the Petition Date, certain of the Debtors entered into that certain Second Amended and Restated Credit Agreement, dated as of December 28, 2006 (as amended from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**"), by and among the Debtors, as borrowers or credit parties, the lenders party thereto from time to time (the "**Prepetition Lenders**"), General Electric Capital Corporation, as administrative agent (in such capacity, the "**Prepetition Agent**"), and the other arrangers and agents parties thereto.

20.     The Prepetition Credit Agreement provides for (a) a Term A loan of $75 million which required repayment in nineteen consecutive quarterly installments, with the balance payable on December 28, 2011 (the "**Term A Loan**"), (b) a Term B commitment of $35 million due June 28, 2012 (the "**Term B Loan**" and, together with the Term A Loan, the "**Prepetition Term Facility**"); and (c) a revolving credit facility in an aggregate principal amount of up to $120 million (the "**Prepetition Revolving Facility**" and, together with the Prepetition Term Facility, the "**Prepetition Secured Credit Facility**").

21.     The obligations of the Debtors under the Prepetition Secured Credit Facility were secured by, among other things, a first-priority lien on and security interest in substantially all of the properties and assets of the Debtors.

22.     As of the Petition Date, the Debtors were indebted and liable to the Prepetition Lenders under the Prepetition Credit Agreement without objection, defense, counterclaim or

offset of any kind, (a) in the aggregate principal amount of not less than (I) $74,309,934 with respect to the Prepetition Term Facility, and (II) $70,600,471 with respect to the Prepetition Revolving Facility, plus, in each case, accrued and unpaid interest thereon; (b) for fees, expenses and all other Obligations (as defined in the Prepetition Credit Agreement); (c) for $3,553,000 with respect to the Existing Letters of Credit; and (d) for $1,781,765 with respect to the Capital Transaction Fee (as defined in the Third Forbearance Agreement (as defined below)) (collectively, the "**Prepetition Indebtedness**").

23. <u>Spirit Promissory Note</u>. In addition to the Pre-Petition Secured Obligations, the Debtors owe approximately $343,000 on account of their obligations under that certain promissory note by and among certain of the Debtors and Spirit Finance Acquisitions, LLC, dated as of October 1, 2009 (the "**Spirit Promissory Note**"), plus, accrued and unpaid interest thereon. The Spirit Promissory Note is an unsecured obligation of those Debtors party thereto.

24. <u>Credit Agreement Waivers and Forbearance</u>. The Debtors have addressed defaults under the Prepetition Credit Agreements with the Prepetition Lenders from time to time beginning in 2007. The Debtors and certain of the Prepetition Lenders first began to discuss the potential that a default under the Prepetition Credit Agreement might occur in late 2007. The Debtors entered into the first amendment to the Prepetition Credit Agreement (the "**First Amendment**") with certain of the Prepetition Lenders on September 28, 2007. Pursuant to the First Amendment, certain of the Prepetition Lenders waived the events of default existing as of September 28, 2007, subject to a mandatory prepayment by the Company to be made by November 25, 2007.

25. The Debtors met their obligations under the First Amendment, but by 2008 faced further events of default under the Prepetition Credit Agreement. The Debtors and certain of the

Prepetition Lenders entered into a second amendment and waiver to the Prepetition Credit Agreement (the "**Second Amendment**") on June 5, 2008. The Second Amendment waived the then-currently existing events of default, subject to an increase in the interest rate margins payable to the Prepetition Lenders and the Debtors' development and delivery of an operating plan to the Prepetition Lenders following the close of each fiscal year.

26. On March 25, 2009, the Debtors gave notice to the Prepetition Lenders that they had incurred further defaults under the terms of the Prepetition Credit Agreement. On July 31, 2009, the Debtors and certain of the Prepetition Lenders entered into a forbearance agreement (the "**First Forbearance Agreement**"), under which certain of the Prepetition Lenders agreed to forbear on exercising remedies and to continue providing credit to Debtors and not to require further advances from the Debtors under the Prepetition Credit Agreement. Pursuant to the First Forbearance Agreement, the Debtors agreed to continue their retention of Loughlin Meghji + Company as their restructuring advisors and provide budget and variance reporting to the Prepetition Lenders. The First Forbearance Agreement expired on November 2, 2009.

27. On November 2, 2009, the Debtors and certain of the Prepetition Lenders entered into a second forbearance agreement (the "**Second Forbearance Agreement**"), pursuant to which the Debtors obtained forbearance from certain of the Prepetition Lenders through January 31, 2010. Under the Second Forbearance Agreement, the Debtors agreed to evaluate strategic restructuring alternatives, including obtaining additional capital from third parties and a sale of the Company. In addition, certain of the Prepetition Lenders consented to Debtors' sale of a facility located in Houston, Texas owned by NEC TX Equity. The proceeds of the sale were directed to the Prepetition Lenders pursuant to the Prepetition Credit Agreement. On January 31, 2010, the Second Forbearance Agreement was amended to extend its terms to February 12, 2010.

28.    On February 12, 2010, the Debtors and certain of the Prepetition Lenders entered into a third forbearance agreement (the "**Third Forbearance Agreement**") pursuant to which certain of the Prepetition Lenders agreed to forbear from any exercising their rights and remedies under the Credit Agreement through June 11, 2010. In exchange, Debtors agreed to pay the principal of their outstanding obligations under the Prepetition Credit Agreement pursuant to a specified schedule of monthly installments. Furthermore, the Debtors agreed to a series of milestones for the evaluation and negotiation of a capital transaction to raise additional capital, including through issuance of equity or subordinated debt.

29.    On May 19, 2010, the Debtors received a letter from the Prepetition Agent asserting a default under the Third Forbearance Agreement as a result of the Company's alleged failure to execute a letter of intent to in connection with a sale transaction by May 12, 2010 pursuant to Section 7(d)(viii) of the Third Forbearance Agreement. In that letter, the Prepetition Agent asserted that the Third Forbearance Agreement expired pursuant to its terms as a result of this alleged forbearance default.

## Terms and Conditions of the Postpetition Financing Arrangements

### A.    Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

30.    The following sets forth the sections of the DIP Facility Agreement and the Interim Order that are required to be identified in accordance with Rule 4001(c)(i)(B):

(i)    Grant of Priority or a Lien on Property of the Estate. DIP Facility Agreement ¶¶ 1.19, 3.27, 3.28(c); Interim Order ¶¶ 3; 4; 9(b).

(ii)    Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case. Interim Order ¶ 9.

(iii)    Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case. Interim Order ¶¶ D(iv), 9(f).

(iv)	Waiver or Modification of the Automatic Stay. DIP Facility Agreement ¶¶ 3.28(e), 8.2(c); Interim Order ¶¶ 9(h); 12; 15

(v)	Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral or Request Authority to Obtain Credit. DIP Facility Agreement ¶ 8.1(r); Interim Order ¶ 11.

(vi)	Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation or Entry of a Confirmation Order. Not Applicable [There is a Commitment Termination Date under DIP Facility Agreement with an outside termination date of [October [__], 2010] [120 days from Closing Date]].

(vii)	Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien. DIP Facility Agreement ¶ 3.27; Interim Order ¶¶ 4; 9; 12.

(viii)	Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate. Interim Order ¶ D; 6; DIP Facility Agreement ¶ 1.22 [Debtors waive any right to challenge any of the Prepetition Indebtedness and the security for the Prepetition Indebtedness, and any action against the Released Parties].

(ix)	Indemnification of Any Entity. DIP Facility Agreement ¶¶ 1.13, 1.15(b), 9.6, 9.7, 12.7(e).

(x)	Release, Waiver or Limitation on Rights under Section 506(c). Interim Order ¶ 7 (subject to Final Order).

(xi)	Liens Granted on Claims Arising Under Chapters 5 or 7. Not applicable.

(xii)	Prepayment Premium. Not applicable.

31.	In accordance with Local Rule 4001-2(a)(i), the Debtors also draw the Court's attention to certain material provisions of the DIP Facility Agreement and the Interim Order:

(i)	Grant of Cross-Collateralization Protection (Local Rule 4001-2(a)(i)(A)). Not applicable.

14

(ii)  <u>Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B))</u>. Interim Order ¶¶ D(iv), 6 [Official Committee of Unsecured Creditors has the sole right to challenge validity of liens until Investigation Termination Date]

(iii)  <u>Waiver of Section 506(c) Surcharge (Local Rule 4001-2(a)(i)(C))</u>. DIP Facility Agreement ¶ 8.1(r)(vii); Interim Order ¶ 7 (subject to Final Order).

(iv)  <u>Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>. Not applicable.

(v)  <u>Roll-Over Provisions (Local Rule 4001-2(a)(i)(E))</u>. DIP Facility Agreement ¶ 5.16; Interim Order ¶¶ 2, 9(a).

(vi)  <u>Disparate Treatment of Professionals (Local Rule 4001-2(a)(i)(F))</u>. DIP Facility Agreement ¶¶ 1.19(c), 3.27(b), 3.27(c), 6.3(c), 6.7, 6.25, 8.1(r)(xvii); Interim Order ¶ 5.

(vii)  <u>Priming Lien (Local Rule 4001-2(a)(i)(G))</u>. DIP Facility Agreement ¶ 1.19; Interim Order ¶¶ 2, 3.

**B.      Summary of Principal Terms of the DIP Facility Agreement**

32.      The DIP Facility Agreement sets forth specific sale milestones that, unless otherwise waived by the Requisite Lenders under the DIP Facility in their sole and absolute discretion, the Debtors must take all action reasonably necessary to achieve. The sale milestones include: (a) execution of a definitive asset purchase agreement, in form and substance satisfactory to the DIP Agent for the sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code pursuant to an asset purchase agreement ("**Asset Purchase Agreement**") on or before July 2, 2010; (b) filing of a motion, in form and substance satisfactory to the DIP Agent seeking approval of agreed bidding procedures (the "**Bidding Procedures**") and authority to sell the Debtors' assets pursuant to Section 363 of the Bankruptcy Code on or before July 6, 2010; (c) entry of a Bankruptcy Court order in form and substance satisfactory to the DIP Agent approving the Bidding Procedures on or before July 16, 2010; (d) an auction for

the sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code shall have occurred on or before August 23, 2010; (e) entry of a Bankruptcy Court order, in form and substance satisfactory to the DIP Agent authorizing the sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code on or before August 27, 2010; and (f) the closing of the sale pursuant to the Asset Purchase Agreement which shall provide sufficient cash proceeds to repay in full in cash all outstanding obligations under the DIP Facility and the Pre-Petition Tranche A Obligations (if any) shall have occurred on or before August 31, 2010.

33. Additionally, the Interim Order provides for relief requested by the Debtors' largest supplier and customer, International Paper, Inc. and certain of its affiliates (collectively, "**IP**"). As of the Petition Date, the Debtors owe approximately $49.6 million to IP on account of goods sold by IP to the Debtors (the "**IP Claim**"). Further, as set forth in the Interim Order, the Debtors acknowledge and agree that 632 tons of roll paper, packaging materials, finished paper goods, and other products affixed with International Paper labels located at 2989 Pacific Street, Austell, Georgia 30106 (the "**IP Consigned Goods**"). Pursuant to the Interim Order, the IP Consigned Goods and any additional goods consigned to the Debtors during these Cases are the exclusive property of IP, and IP's interest in the IP Consigned Goods (a) is deemed to be valid, binding, enforceable and perfected, and (b) is not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, subject to the provisions of paragraph 19 of the Interim Order.

34. On the other hand, IP is indebted to the Debtors as of the Petition Date in the aggregate amount of $10,625,000 on account of (a) prepetition purchases of goods from the Debtors in the amount of $8,547,000 (the "**IP Account Receivables**") and (b) rebates in the amount of $2,078,000 that may be payable by IP to the Debtors (the "**IP Rebate Receivables**"

and together with the IP Account Receivables, the "**IP Receivable**"). IP may also become indebted to the Debtors on account of postpetition purchases of goods from the Debtors and on account of rebates which may become payable to the Debtors.

35. IP has asserted a right to offset the IP Receivable against the IP Claim. The cash that may be received by the Debtors on account of the IP Receivable is a critical component of the DIP Budget. Accordingly, the Debtors may suffer irreparable harm if IP immediately moves to exercise its offset rights, and it is in the best interests of the Debtors' estates that the Debtors obtain IP forbearance from exercising its offset rights. IP has agreed, subject to the terms of the Interim Order, to forbear from immediately moving to exercise or otherwise preserving its right to offset the IP Account Receivables against the IP Claim. In exchange, the Interim Order provides for certain consideration to be granted to IP from the Debtors, including among other things unconditional acknowledgment of IP's right of offset and a general release by the Debtors and their estates of any and all claims against IP (other than the IP Receivable), including claims (if any) pursuant to chapter 5 of the Bankruptcy Code, subject to the Investigation Rights (as defined in the Interim Order) that are set forth in paragraph 6 of the Interim Order.

36. To implement this arrangement, the Debtors propose that the Court enter the Interim Order acknowledging and allowing IP's right(s) to offset the IP Receivable against the IP Claim without further order of the Court. Furthermore, the Debtors request that notwithstanding postpetition payment by IP of all or any portion of the IP Receivable, IP shall be entitled to offset any and all of the IP Receivable against the IP Claim regardless of (a) whether IP's obligations to the Debtors arose prior to or subsequent to the Petition Date and (b) whether "mutuality" exists between the amounts owed by IP to the Debtors and the IP Claim (the "**IP Offset**"). In exchange, the Interim Order provides that IP shall forbear from moving to exercise or otherwise

preserving its IP Offset right with respect to IP Account Receivables until the earlier of July 16, 2010 and the date of the final hearing on this Motion. Additionally, the Debtors' propose that the Interim Order provide that the Debtors and their estates waive and generally release any and all claims and/or causes of action that they have, had or may have against IP other than the IP Receivable, including claims (if any) pursuant to chapter 5 of the Bankruptcy Code; provided, however, that any waiver or release provided pursuant to the Interim Order shall be binding only on the Debtors and shall not be binding on nor prevent other parties in interest, including, without limitation, any official committee of unsecured creditors appointed in these cases, from objecting to or otherwise opposing the relief granted to IP herein or IP's efforts to effect the IP Offset.

37.    The various fees and charges, discussed below and required by the DIP Lenders under the DIP Facility Agreement, are necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets. The terms and conditions of the DIP Facility Agreement, including the fees and charges, were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the DIP Lenders under the DIP Facility Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

38.    First the Debtors will pay to the DIP Agent, for the ratable benefit of the DIP Lenders, in arrears, on the first Business Day of each month prior to the Commitment Termination Date and on the Commitment Termination Date, a Fee for the Debtors' non-use of available funds in an amount equal to the Applicable Unused Line Fee Margin per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the difference between (x) the Maximum Amount (as it may be reduced from time to time) and (y) the average

for the period of the daily closing balances of the aggregate Revolving Loan and the Swing Line Loan outstanding during the period for which such Fee is due.

39.    Second, the DIP Facility Agreement also provides for a closing fee in an amount equal to 2.00% of the amount of the DIP Facility less the outstanding amount of the Pre-Petition Tranche A Obligations as of the Closing Date to the DIP Agent, for the ratable benefit of the DIP Lenders (the "**Closing Fee**"), with an amount equal to 50% of the Closing Fee to be paid upon entry of the Interim Order, and the remainder of the Closing Fee to be paid upon entry of the Final Order.

40.    Finally, the Debtors will also pay to the DIP Agent, for the ratable benefit of the DIP Lenders, as compensation to such DIP Lenders for Letter of Credit Obligations incurred under the DIP Facility Agreement, (i) all costs and expenses incurred by the DIP Agent or any DIP Lender on account of such Letter of Credit Obligations, and (ii) for each month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "**Letter of Credit Fee**") in an amount equal to the Applicable L/C Margin from time to time in effect multiplied by the maximum amount available from time to time to be drawn under the applicable Letter of Credit.

41.    The provisions above were negotiated and are necessary for the Debtors to procure the financing made available under the DIP Facility Agreement in a sufficient amount and on a timely basis.  The Debtors believe that IP is acting in good faith and is providing to the Debtors' estates with reasonably equivalent value and fair consideration in exchange for the treatment of IP pursuant to the Interim Order.

C.    **Use of Cash Collateral**

42.    During the ordinary course of operations, the Debtors generate cash from the use of the assets pledged under the Prepetition Credit Agreement.  The Debtors use Cash Collateral

in the normal course of their business in order to finance their operations, make essential payments, such as employee payroll, taxes and inventory. As of the Petition Date, the Debtors' books reflect a cash balance of approximately $410,000. It is imperative that the Debtors obtain authority to use Cash Collateral. Without the use of Cash Collateral, the Debtors will be unable to meet their working capital needs. The Debtors therefore request authorization to use the proceeds of the Prepetition Lenders' collateral and Cash Collateral to fund the Debtors' operation of their businesses in accordance with the terms of the DIP Facility and the DIP Orders.

<strong>Adequate Protection</strong>

43. As adequate protection for the interests of the Prepetition Lenders in the Prepetition Collateral (including Cash Collateral) the Debtors and the DIP Lenders have agreed to provide to the Prepetition Agent for benefit of the Prepetition Lenders the following (collectively, the "**Adequate Protection Obligations**"):

**Adequate Protection:**     (a)    <u>Pay Down</u>. Upon entry of a Final Order providing for such relief, the Debtors shall pay from Cash Collateral or Revolving Credit Advances under the DIP Facility, the remaining outstanding Revolver and Term A Advances (the "**Pay Down**"). For the avoidance of doubt, the Pay Down shall include only the amounts (including accrued and unpaid interest thereon plus accrued fees, costs and expenses) set forth in paragraph D(ii)(1) and (2) of the Interim Order (and shall not include at that time the "Capital Transaction Fee" referenced in paragraph D(ii)(5) of the Interim Order.

                                                 (b)    <u>Adequate Protection Liens</u>. To the extent there is a diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent (on behalf of the Prepetition Lenders) seeking vacation of the

automatic stay or the Court granting such relief), the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the Prepetition Agent, on behalf of the Prepetition Lenders, is granted replacement liens (the "**Replacement Liens**") in the Prepetition Collateral, which Replacement Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the Prepetition Agent of security agreements, pledge agreements, financing statements, or other agreements, and which shall be subordinate only to the Carve-Out, the DIP Liens and the Permitted Prior Liens and shall be equivalent to a lien granted under section 364(c) of the Bankruptcy Code, and which such Replacement Liens shall cover assets, interest, and proceeds of the Debtors that are or would be collateral under the Prepetition Loan Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents (with the exception of the Avoidance Actions and proceeds thereof).

(c)     Administrative Claim.  The Prepetition Agent (on behalf of the Prepetition Lenders) is hereby granted in each of the Debtors' Cases an allowed administrative claim (the "**Administrative Claim**") under Bankruptcy Code section 507(b) with respect to all Adequate Protection obligations, to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Administrative Claim shall be junior and subordinate only to any superpriority claim of the kind specified in, or ordered pursuant to, section 364 of the Bankruptcy Code, the Carve-Out and any Permitted Prior Liens.  The Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (with the exception of the Avoidance Actions and proceeds thereof).

(d)     Access.  In accordance with the terms of the Prepetition Credit Agreement, the Prepetition Agent and Prepetition Lenders shall be afforded continued reporting as to Collateral amounts and reasonable access to the Collateral and the Debtors' business premises, during normal business hours, for purposes of verifying the Debtors' compliance with the terms of the Interim Order as it pertains to the Prepetition

Agent and Prepetition Lenders.

(e) <u>Adequate Protection Payments</u>. Subject to the remainder of this paragraph and paragraph 10 of the DIP Facility Agreement, the Debtors shall timely pay to the Prepetition Agent from Cash Collateral or Revolving Credit Advances under the DIP Facility amounts as they accrue in connection with the Prepetition Indebtedness (the "**Adequate Protection Payments**"), including, without limitation, the current cash payment of interest charged on the Prepetition Indebtedness at the times provided for in the Prepetition Credit Agreement, cash management fees, expenses and charges and letter of credit fees and commissions. Notwithstanding the foregoing, prior to consummation of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, the Adequate Protection Payments provided for in the Interim Order shall exclude (i) any principal amortization payment on Term A Loans scheduled prior to the Pay Down, (ii) any scheduled principal amortization or interest or other payments (whether for fees, costs or expenses) on or with respect to Term B Loans (including reimbursement of fees, costs or expenses of Term B Lenders), and (iii) payment of the "Capital Transaction Fee" referenced in paragraph D(ii)(5) of the Interim Order. Upon entry of a final non-appealable order by the Court determining any of the Prepetition Agent (on behalf of the Prepetition Lenders) or any of the Prepetition Lenders to be undersecured or that such payment is not permitted under section 506(b) of the Bankruptcy Code, any payment of post-petition interest, fees, costs or expenses to such party (whether pursuant to this paragraph or paragraph 10 of the DIP Facility Agreement) shall be reapplied, recharacterized or disgorged as the Court so orders; <u>provided</u>, <u>however</u>, that any such reapplication, recharacterization or disgorgement of payments to the Prepetition Agent or any Prepetition Lender shall have no effect on the respective rights and remedies of the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Agreement.

(f) <u>Allowance of Claims</u>. The claims arising from or in connection with the Prepetition Indebtedness are hereby deemed "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

(g) <u>Right to Credit Bid</u>. The Prepetition Agent (on behalf of the Prepetition Lenders) shall have the right to "credit bid" the allowed amount of the Prepetition Lenders' claims during

any sale of all or substantially all of the Prepetition Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

(h)     The automatic stay is modified as to the Prepetition Agent (on behalf of the Prepetition Lenders) to allow implementation of the provisions of paragraphs (a)-(h), without further notice or order of the Court.

44.     The Prepetition Agent and a majority of the Prepetition Lenders have consented to the foregoing Adequate Protection arrangements.

## Basis for Relief

### A.     Approval Pursuant to Section 364(c) of the Bankruptcy Code

45.     The Debtors propose to obtain financing under the DIP Facility Agreement by providing security interests and liens as set forth above pursuant to Sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under Section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c). Financing pursuant to Section 364(d) of the Bankruptcy Code is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

46.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

      (a)      the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim;

      (b)      the credit transaction is necessary to preserve the assets of the estate; and

      (c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

47.     While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital markets conditions, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders would be unobtainable. Without the postpetition financing, the Debtors would not be able to ensure that they would be able to continue operations without interruption to their trade relations. In fact, the Debtors fear that without postpetition financing, a single trade creditor that wishes to discontinue providing the Debtors with trade credit could bring the Debtors' business to a screeching halt--no trade, no inventory; no inventory, no customers; no customers, no revenues. Accordingly, without postpetition financing the Debtors may be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities, and their ability to maximize value through a sale or reorganization. Nevertheless, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe that the terms of the DIP Facility Agreement are fair, reasonable and adequate, all as more fully set forth below.

**B.** **Approval of Priming Liens and Adequate Protection Pursuant to Section 364(d) of the Bankruptcy Code**

48.     If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). The DIP Facility Liens are valid, binding, enforceable and fully perfected as of the date the Interim Order is entered, and will prime and be senior in all respects to the Prepetition Liens and the Replacement Liens (each as defined in the Interim Order) pursuant to section 364(d) of the Bankruptcy Code, and are subject only to the Carve-Out and the Permitted Prior Liens. The DIP Facility Liens do not prime any Permitted Prior Liens.

49.     Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (a)     the trustee is unable to obtain credit otherwise; and
>
> (b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

50.     The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under Sections 362, 363 or 364 of the Bankruptcy Code:

> (1)     requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the…use…under section 363 of this title, or

any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)    providing to such entity an additional or replacement lien to the extent that such…use…or grant results in a decrease in the value of such entity's interest in such property; or

(3)    granting such other relief…as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

51.    Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under Section 361, 363, and 364. However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." See 11 U.S.C. § 361. Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

52.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736). The Debtors have concluded that

financing comparable to that provided by the DIP Lenders under the DIP Facility Agreement is currently unobtainable.

53.     In accordance with Section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Lenders with the Adequate Protection as described in paragraph 36 above, including: (a) adequate protection liens, (b) an adequate protection superpriority claim, and (c) payment of interest.   Moreover, the proposed DIP Facility contemplates a "going-concern" sale of all or substantially all of the Debtors' assets, subject to a marketing and auction process to determine the highest or otherwise best offer.  The net proceeds of such sale will be used to, among other things, pay the Prepetition Indebtedness on the sale consummation date. This process further provides adequate protection to the Prepetition Lenders since the Debtors are seeking to monetize their collateral.

54.     The Prepetition Agent and a majority of the Prepetition Lenders have consented to the foregoing Adequate Protection arrangements and the priming of their respective liens.

**C.     Use of Cash Collateral**

55.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

---

[6]     Pursuant to Section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

11 U.S.C. § 363(c)(1).

56.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in Section 363 of the Bankruptcy Code. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363 of the Bankruptcy Code].

11 U.S.C. § 363(c)(2).

57.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved. The Prepetition Agent and a majority of the Prepetition Lenders have consented to the use of Cash Collateral provided that the relief requested herein is granted.

**D.      No Comparable Alternative to the DIP Facility is Currently Available**

58.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). The Debtors, through their advisors, contacted a number of potential third party lenders who have historically been active in the debtor-in-possession financing market. In light of the fact that the Debtors believe that the Prepetition Lenders would not consent to any postpetition credit facility that primed their prepetition liens (i.e., a non-consensual priming fight would be required), and that none of the lenders contacted submitted a proposal or commitment to provide postpetition financing, the Debtors determined that the financing provided under the terms of the DIP Facility was the only

financing available on comparable terms. Thus, in addition to evidence to be introduced at the Interim Hearing if necessary, the Debtors submit that the requirement of Sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

E.    **The DIP Facility Agreement Terms are Fair, Reasonable and Adequate**

59.    The proposed terms of the DIP Facility Agreement are fair, reasonable and adequate given today's market and the facts of these cases. The purpose of the DIP Facility Agreement is to provide the Debtors with sufficient working capital and liquidity to bridge the Debtors to consummation of a going-concern sale of their assets pursuant to section 363 of the Bankruptcy Code.

60.    The proposed DIP Facility Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders and Prepetition Lenders are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

F.    **The Section 506(c) Waiver in the Final Order Should Be Approved**

61.    The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge any or all of the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders, their respective claims, or their respective collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re

29

*Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000).  See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

62.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders by allowing the Debtors to continue to use Cash Collateral and the proceeds of the Collateral to fund the administration of the Debtors' estates in accordance with the DIP Budget.  See In re Lunan Family Restaurants Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that (1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing In re Flagstaff, 739 F.2d 73, 77 (2d Cir. 1984) and New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers), 112 B.R. 811, 815 (E.D. La. 1990), rev'd on other grounds sub nom., In re Delta Towers, 924 F.2d 74 (5th Cir. 1991).

**G.    Modification of Automatic Stay**

63.    The DIP Facility Agreement contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the DIP Facility Agreement as set forth in the Interim Order.

Provisions of this kind are standard in debtor-in-possession financing and are reasonable under the circumstances.

**H.**     **Interim Approval Should Be Granted**

64.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code or to use cash collateral pursuant to Section 363 may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

65.     The Debtors request that the Court hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to borrow an amount sufficient to fund operating expenses and to use Cash Collateral. This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

66.     Pending entry of the Final Order the Debtors request $10 million in available financing. Such interim availability will avoid a disruption in the Debtors' operations pending the Final Hearing and will provide the Debtors' customers, independent contractors, vendors and employees with the level of confidence necessary to continue operating.

**I.**     **Notice Procedures and the Final Hearing**

67.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing a hearing to consider the Final Order is ordinarily not held until at least ten (10) days after the organizational meeting of the creditors' committee. The Debtors shall, within three business days of the entry of the Interim Order by the Court, serve by overnight mail, a

copy of the Interim Order and a notice of the Final Hearing (the "**Final Hearing Notice**") to consider entry of the Final Order on the date established by the Court.

68.     Any party in interest objecting to the relief sought at the Final Hearing shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware by 4 p.m. (EST) on the day that is no less than five (5) business days before the Final Hearing (the "**Objection Deadline**") and (iv) be served upon the following parties so as to be received by the Objection Deadline:  (a) the Debtors, at 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553 (Attn: Dale Nissenbaum, General Counsel), (b) the U.S. Trustee, 844 King Street, J. Caleb Boggs Federal Building, Room 2207, Lockbox 35, Wilmington, Delaware 19801 (hand delivery or overnight) or 19899 (postal box) (Attn: David M. Klauder), (c) proposed co-counsel to the Debtors, Latham & Watkins, LLP, 233 South Wacker Drive, Chicago, IL 60606 (Attn: David S Heller, Esq. and Josef S. Athanas, Esq.) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Michael R. Nestor and Kara Hammond Coyle), (d) ) counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement, Paul Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Twenty-Fourth Floor, Atlanta, GA 30308 (Attn: Jesse H. Austin, III), (e) local Delaware counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement and the DIP Agent, Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE 19801 (Attn:  Kurt F. Gwynne, Esq.), (f) counsel to the Debtors' shareholders, Moses and Singer, LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-1299 (Attn: Allan Grauberd, Esq.) and Hahn & Hessen, LLP, 488 Madison Avenue, New York, NY 10022 (Attn: Don D. Grubman, Esq.) and Halperin Battaglia Raicht,

LLP, 555 Madison Avenue, 9th Floor, New York, NY 10022 (Attn: Alan D. Halperin), and (g) counsel to the official committee of unsecured creditors, if appointed, in these chapter 11 cases.

69.     The Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later than thirty (30) days after the date of entry of the Interim Order.  Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

### Notice

70.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement; (c) counsel to Spirit Acquisitions, LLC; (d) the Environmental Protection Agency; (e) the New Jersey Environmental Protection Agency; (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (g) the Pension Benefit Guaranty Corporation; (h) the Internal Revenue Service; (i) counsel to the unions of which the Debtors' employees are members; (j) counsel to the Debtors' shareholders; (j) counsel to International Paper; and (k) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

71.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, The Garden City Group, Inc., at www.nationalenvelopeinfo.com or can be requested by calling 866-405-2134.

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit 1; (ii) after the Final Hearing, enter of the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems appropriate.

Dated: June 10, 2010
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Stephen R. Tetro II
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:   (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION