# Exhibit A

## DIP Facility Agreement

SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of June [10], 2010

among

NATIONAL ENVELOPE CORPORATION, NATIONAL ENVELOPE – CHINO LLC,
NATIONAL ENVELOPE – GRAND PRAIRIE LLC, NATIONAL ENVELOPE – LENEXA LLC,
NATIONAL ENVELOPE – ELK GROVE VILLAGE LLC, NATIONAL ENVELOPE
CORPORATION – EAST, NATIONAL ENVELOPE – AECO LLC, NATIONAL ENVELOPE –
SPECIALTIES GROUP LLC, NATIONAL ENVELOPE – HOUSTON LLC,
NATIONAL ENVELOPE – HOUSTON EQUITY LLC, NATIONAL ENVELOPE – LEASING LLC,
NATIONAL ENVELOPE – WH LLC, NATIONAL ENVELOPE – SCOTTDALE LLC, NATIONAL
ENVELOPE – APPLETON LLC, NATIONAL ENVELOPE – AURORA LLC, NATIONAL
ENVELOPE – CORSICANA LLC, NATIONAL ENVELOPE – ENNIS LLC AND
NATIONAL ENVELOPE – CITY OF INDUSTRY LLC, AS DEBTORS-IN-POSSESSION,

as Borrowers,

THE OTHER CREDIT PARTIES SIGNATORY HERETO, AS DEBTORS-IN-POSSESSION,

as Credit Parties,

THE LENDERS SIGNATORY HERETO FROM TIME TO TIME,

as Lenders,

GENERAL ELECTRIC CAPITAL CORPORATION,

as Agent,

and

GE CAPITAL MARKETS, INC.,

as Sole Lead Arranger, Sole Bookrunner and Syndication Agent

# TABLE OF CONTENTS

**Page**

1. AMOUNT AND TERMS OF CREDIT .................................................................. 2
   1.1 Credit Facilities ........................................................................................ 2
   1.2 Letters of Credit ....................................................................................... 6
   1.3 Prepayments ............................................................................................. 6
   1.4 Use of Proceeds ........................................................................................ 7
   1.5 Interest and Applicable Margins ............................................................. 8
   1.6 Eligible Accounts ..................................................................................... 9
   1.7 Eligible Inventory .................................................................................. 12
   1.8 Cash Management Systems .................................................................... 13
   1.9 Fees ......................................................................................................... 14
   1.10 Receipt of Payments .............................................................................. 14
   1.11 Application and Allocation of Payments .............................................. 14
   1.12 Loan Account and Accounting ............................................................. 15
   1.13 Indemnity ............................................................................................... 15
   1.14 Access .................................................................................................... 16
   1.15 Taxes ...................................................................................................... 16
   1.16 Capital Adequacy; Increased Costs; Illegality .................................... 18
   1.17 Single Loan ............................................................................................ 19
   1.18 [Intentionally Omitted.] ........................................................................ 19
   1.19 Super-Priority Nature of Obligations and Agent's Liens ................... 19
   1.20 Payment of Obligations ......................................................................... 20
   1.21 No Discharge; Survival of Claims ........................................................ 20
   1.22 Release ................................................................................................... 20
   1.23 Waiver of any Priming Rights ............................................................... 21
2. CONDITIONS PRECEDENT ........................................................................... 21
   2.1 Conditions to the Initial Loans ............................................................. 21
   2.2 Further Conditions to Each Loan .......................................................... 22
3. REPRESENTATIONS AND WARRANTIES .................................................. 24
   3.1 Corporate Existence; Compliance with Law ........................................ 24
   3.2 Executive Offices, Collateral Locations, FEIN .................................... 24

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 3.3 | Corporate Power, Authorization, Enforceable Obligations | 24 |
| 3.4 | Financial Statements | 25 |
| 3.5 | Material Adverse Effect | 25 |
| 3.6 | Ownership of Property; Liens | 26 |
| 3.7 | Labor Matters | 26 |
| 3.8 | Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness | 27 |
| 3.9 | Government Regulation | 27 |
| 3.10 | Margin Regulations | 27 |
| 3.11 | Taxes | 28 |
| 3.12 | ERISA | 28 |
| 3.13 | No Litigation | 29 |
| 3.14 | Brokers | 30 |
| 3.15 | Intellectual Property | 30 |
| 3.16 | Full Disclosure | 30 |
| 3.17 | Environmental Matters | 31 |
| 3.18 | Insurance | 31 |
| 3.19 | Deposit and Disbursement Accounts | 31 |
| 3.20 | Government Contracts | 32 |
| 3.21 | Customer and Trade Relations | 32 |
| 3.22 | Agreements and Other Documents | 32 |
| 3.23 | 363 Sale | 33 |
| 3.24 | Restrictions on or Relating to Subsidiaries | 33 |
| 3.25 | Foreign Assets Control Regulations | 33 |
| 3.26 | Anti-Terrorism Law | 33 |
| 3.27 | Bankruptcy Matters | 34 |
| 4. | FINANCIAL STATEMENTS AND INFORMATION | 35 |
| 4.1 | Reports and Notices | 35 |
| 4.2 | Communication with Accountants | 35 |
| 5. | AFFIRMATIVE COVENANTS | 35 |
| 5.1 | Maintenance of Existence and Conduct of Business | 35 |

| | | | |
|---|---|---|---|
| 5.2 | Payment of Charges | | 36 |
| 5.3 | Books and Records | | 36 |
| 5.4 | Insurance; Damage to or Destruction of Collateral | | 36 |
| 5.5 | Compliance with Laws | | 37 |
| 5.6 | Supplemental Disclosure | | 38 |
| 5.7 | Intellectual Property | | 38 |
| 5.8 | Environmental Matters | | 38 |
| 5.9 | Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases | | 39 |
| 5.10 | ERISA | | 39 |
| 5.11 | Further Assurances | | 40 |
| 5.12 | Patriot Act Compliance | | 40 |
| 5.13 | Compliance with Milestones | | 40 |
| 5.14 | Cooperation with Advisors | | 40 |
| 5.15 | Chief Restructuring Officer; Temporary Staff; M&A Advisor | | 41 |
| 5.16 | Use of Proceeds | | 41 |
| 5.17 | Financing Order; Final Order | | 42 |
| 5.18 | Mortgages | | 42 |
| 5.19 | Asset Purchase Agreement Negotiations | | 42 |
| 6. | NEGATIVE COVENANTS | | 42 |
| 6.1 | Mergers, Subsidiaries, Etc | | 42 |
| 6.2 | Investments; Loans and Advances | | 42 |
| 6.3 | Indebtedness | | 43 |
| 6.4 | Employee Loans and Affiliate Transactions | | 43 |
| 6.5 | Capital Structure and Business | | 44 |
| 6.6 | Guaranteed Indebtedness | | 44 |
| 6.7 | Liens | | 44 |
| 6.8 | Sale of Stock and Assets | | 45 |
| 6.9 | ERISA | | 45 |
| 6.10 | Budget Covenants | | 45 |

6.11 Hazardous Materials ...................................................................... 46

6.12 Sale-Leasebacks .......................................................................... 46

6.13 Cancellation of Indebtedness ........................................................ 46

6.14 Restricted Payments ...................................................................... 46

6.15 Change of Corporate Name or Location; Change of Fiscal Year ........................ 47

6.16 No Impairment of Intercompany Transfers ............................................. 47

6.17 No Speculative Transactions ........................................................... 47

6.18 Leases; Real Estate Purchases ........................................................ 47

6.19 Changes Relating to Subordinated Debt, Material Contracts and Certain Other Agreements ......................................................................... 47

6.20 Credit Parties Other than Borrowers .................................................. 48

6.21 Adverse Transactions .................................................................... 48

6.22 Charitable Contributions ............................................................... 48

6.23 Severance Arrangement .................................................................. 48

6.24 [Intentionally Omitted.] ............................................................... 48

6.25 Chapter 11 Claims ........................................................................ 48

6.26 Pre-Petition Indebtedness .............................................................. 48

7.   TERM ....................................................................................... 48

7.1 Termination ............................................................................... 48

7.2 Survival of Obligations Upon Termination of Financing Arrangements ............ 48

8.   EVENTS OF DEFAULT; RIGHTS AND REMEDIES ............................................... 49

8.1 Events of Default ........................................................................ 49

8.2 Remedies ................................................................................... 53

8.3 Waivers by Credit Parties ............................................................... 54

9.   ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT ................................. 55

9.1 Assignment and Participations ........................................................... 55

9.2 Appointment of Agent ..................................................................... 57

9.3 Agent's Reliance, Etc. ................................................................... 58

9.4 GE Capital and Affiliates ................................................................ 59

9.5 Lender Credit Decision ................................................................... 59

9.6    Indemnification ................................................................................................. 59

9.7    Successor Agent .............................................................................................. 60

9.8    Setoff and Sharing of Payments .................................................................. 60

9.9    Advances; Payments; Non-Funding Lenders; Information; Actions in Concert ........................................................................................................... 61

10.    SUCCESSORS AND ASSIGNS ................................................................... 63

     10.1   Successors and Assigns .................................................................... 63

11.    MISCELLANEOUS ....................................................................................... 64

     11.1   Complete Agreement; Modification of Agreement ......................... 64

     11.2   Amendments and Waivers ................................................................ 64

     11.3   Fees and Expenses ............................................................................. 65

     11.4   No Waiver ............................................................................................ 67

     11.5   Remedies ............................................................................................. 67

     11.6   Severability ......................................................................................... 67

     11.7   Conflict of Terms ............................................................................... 67

     11.8   Confidentiality ................................................................................... 68

     11.9   GOVERNING LAW ........................................................................... 68

     11.10 Notices ................................................................................................. 69

     11.11 Section Titles ...................................................................................... 70

     11.12 Counterparts ....................................................................................... 70

     11.13 WAIVER OF JURY TRIAL ............................................................... 70

     11.14 Press Releases and Related Matters ................................................ 70

     11.15 Reinstatement ..................................................................................... 70

     11.16 Advice of Counsel .............................................................................. 71

     11.17 No Strict Construction ....................................................................... 71

     11.18 Agent for Service ............................................................................... 71

     11.19 Patriot Act Notice .............................................................................. 71

     11.20 Obligations Absolute ......................................................................... 71

     11.21 Parties Including Trustees; Bankruptcy Court Proceedings ......... 72

12.    CROSS-GUARANTY; SUBORDINATION ................................................................. 72

    12.1    Cross-Guaranty ....................................................................................... 72

    12.2    Waivers by Borrowers ............................................................................ 73

    12.3    Benefit of Guaranty ................................................................................ 73

    12.4    Subordination of Subrogation, Etc. ......................................................... 73

    12.5    Election of Remedies .............................................................................. 73

    12.6    Limitation ............................................................................................... 74

    12.7    Contribution with Respect to Guaranty Obligations ................................ 74

    12.8    Liability Cumulative ............................................................................... 75

    12.9    Subordination ......................................................................................... 75

## INDEX OF APPENDICES

| | | |
|---|---|---|
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.2) | - | Letters of Credit |
| Annex C (Section 1.8) | - | Cash Management System |
| Annex D (Section 2.1(a)) | - | Closing Checklist |
| Annex E (Section 4.1(a)) | - | Financial Statements and Projections -- Reporting |
| Annex F (Section 4.1(b)) | - | Collateral Reports |
| Annex G | - | [Intentionally Omitted] |
| Annex H (Section 9.9(a)) | - | Lenders' Wire Transfer Information |
| Annex I (Section 11.10) | - | Notice Addresses |
| Annex J (Annex A) | - | Revolving Loan Commitments as of Closing Date |
| | | |
| Exhibit 1.1(a) | - | Form of Notice of Revolving Credit Advance |
| Exhibit 1.1(b) | - | Form of Revolving Note |
| Exhibit 4.1(b) | - | Form of Borrowing Base Certificate |
| Exhibit 9.1(a) | - | Form of Assignment Agreement |
| Exhibit A-1 | - | First Day Orders |
| Exhibit A-2 | - | Interim Order |
| Exhibit A-3 | - | Form of Master Documentary Agreement |
| Exhibit A-4 | - | Form of Master Standby Agreement |
| | | |
| Disclosure Schedule 1.1 | - | Agent's Representative |
| Disclosure Schedule 1.2 | - | Existing Letters of Credit |
| Disclosure Schedule 3.1 | - | Type of Entity; State of Organization |
| Disclosure Schedule 3.2 | - | Executive Offices, Collateral Locations, FEIN |
| Disclosure Schedule 3.3 | - | Required Consents and Approvals |
| Disclosure Schedule 3.4(a) | - | Financial Statements |
| Disclosure Schedule 3.4(b) | - | DIP Budget |
| Disclosure Schedule 3.6 | - | Ownership of Properties; Real Estate and Leases; Purchase Options and similar rights |
| Disclosure Schedule 3.7 | - | Labor Matters |
| Disclosure Schedule 3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock; Indebtedness |
| Disclosure Schedule 3.11 | - | Tax Matters |
| Disclosure Schedule 3.12 | - | ERISA Plans |
| Disclosure Schedule 3.13 | - | Litigation |
| Disclosure Schedule 3.15 | - | Intellectual Property |
| Disclosure Schedule 3.17 | - | Hazardous Materials |
| Disclosure Schedule 3.18 | - | Insurance |
| Disclosure Schedule 3.19 | - | Deposit and Disbursement Accounts |
| Disclosure Schedule 3.20 | - | Government Contracts |
| Disclosure Schedule 3.22(a) | - | Material Agreements |
| Disclosure Schedule 3.22(b) | - | Material Customer Agreements |
| Disclosure Schedule 3.22(c) | - | Material Supplier/ Vendor Agreements |
| Disclosure Schedule 5.1 | - | Trade Names |
| Disclosure Schedule 6.3 | - | Indebtedness |

Disclosure Schedule 6.4(a)    -    Transactions with Affiliates
Disclosure Schedule 6.4(b)    -    Loans with Affiliates
Disclosure Schedule 6.7       -    Existing Liens

LEGAL_US_E # 88239000.12

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of June [10], 2010 among National Envelope Corporation, a New York corporation, as debtor-in-possession ("NEC"), National Envelope - Chino LLC, a California limited liability company, as debtor-in-possession ("NEC Chino"), National Envelope - Grand Prairie LLC, a Texas limited liability company, as debtor-in-possession ("NEC Grand Prairie"), National Envelope - Lenexa LLC, a Kansas limited liability company, as debtor-in-possession ("NEC Lenexa"), National Envelope - Elk Grove Village LLC, an Illinois limited liability company, as debtor-in-possession ("NEC Elk Grove"), National Envelope Corporation - East, a New Jersey corporation, as debtor-in-possession ("NEC East"), National Envelope – AECO LLC, a Delaware limited liability company, as debtor-in-possession ("NEC AECO"), National Envelope – Specialties Group LLC, a Delaware limited liability company, as debtor-in-possession ("NEC Specialties"), National Envelope –Houston LLC, a Delaware limited liability company, as debtor-in-possession ("NEC Houston"), National Envelope – Houston Equity LLC, a Delaware limited liability company, as debtor-in-possession ("NEC TX Equity"), National Envelope – Leasing LLC, a Delaware limited liability company, as debtor-in-possession ("NEC Leasing"), National Envelope - WH LLC, a New York limited liability company, as debtor-in-possession ("NEC WH"), National Envelope - Scottdale LLC, a Pennsylvania limited liability company, as debtor-in-possession ("NEC Scottdale"), National Envelope – Appleton LLC, a Wisconsin limited liability company, as debtor-in-possession ("NEC Appleton"), National Envelope - Aurora LLC, a Colorado limited liability company, as debtor-in-possession ("NEC Aurora"), National Envelope - Corsicana LLC, a Texas limited liability company, as debtor-in-possession ("NEC Corsicana"), National Envelope – Ennis LLC, a Delaware limited liability company, as debtor-in-possession ("NEC Ennis") and National Envelope - City of Industry LLC, a California limited liability company, as debtor-in-possession ("NEC Industry"; NEC, NEC Chino, NEC Grand Prairie, NEC Lenexa, NEC Elk Grove, NEC East, NEC AECO, NEC Specialties, NEC Houston, NEC TX Equity, NEC Leasing, NEC WH, NEC Scottdale, NEC Appleton, NEC Aurora, NEC Corsicana, NEC Ennis and NEC Industry are sometimes collectively referred to herein as "Borrowers" and individually as a "Borrower"); the other Credit Parties signatory hereto; GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (in its individual capacity, "GE Capital"), as administrative agent for the Lenders (in such capacity, "Agent"), and the Lenders signatory hereto from time to time.

## RECITALS

WHEREAS, on June [10], 2010 (the "Petition Date"), NEC Holdings Corp., a Delaware corporation, as debtor-in-possession ("Holdings"), Borrowers and their Subsidiaries (collectively, the "Debtors") commenced Chapter 11 Case Nos. [_____] through [_____], as administratively consolidated at Chapter 11 Case No. [_____] (collectively, the "Chapter 11 Case") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, from and after the Petition Date, Borrowers and the Guarantors each continue to operate their business and manage their properties as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Pre-Petition Tranche A Lenders provided a revolving credit facility and a term loan A to Borrowers pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 28, 2006, among Borrowers, certain Subsidiaries of Borrowers party thereto and the Pre-Petition Lenders (as defined herein), and GE Capital as administrative agent for the Pre-Petition Lenders (as amended, restated, supplemented or otherwise modified through the Petition Date, the "Pre-Petition Credit Agreement");

WHEREAS, Borrowers have requested that Lenders provide a first priority senior secured, super-priority debtor-in-possession credit facility to Borrowers of up to $138,955,323.79 in aggregate principal amount to fund the working capital requirements and other financial needs of the Debtors during the pendency of the Chapter 11 Case, including a "roll-up" of all the existing outstanding obligations under the Revolving Loan and Term A Loan (each as defined in the Pre-Petition Credit Agreement), including the letters of credit issued under the Pre-Petition Credit Agreement;

WHEREAS, Holdings and each other Guarantor shall guarantee all of the obligations of Borrowers to Agent and Lenders under the Loan Documents and grant to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of its existing and after-acquired personal and real property to secure such guaranty; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Disclosure Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

### 1.1 Credit Facilities.

(a) Revolving Credit Facility.

(i) Subject to the terms and conditions hereof, each Revolving Lender agrees to make available to Borrowers from time to time until the Commitment Termination Date its Pro Rata Share of advances (each, a "Revolving Credit Advance"); provided, that (A) upon the entry the Interim Order and until entry of the Final Order, the Borrowers shall only be entitled to borrow an amount equal to the sum of (a) collections received by the Credit Parties in the normal course of business and applied to the Pre-Petition Tranche A Obligations as provided for herein, plus (b) subject to the satisfaction of the conditions precedent to borrowing set forth herein, an amount sufficient to meet the Borrowers' working capital and other needs pending the final hearing as set forth in the Interim DIP Budget not to exceed $10,000,000 (such aggregate amount, the "Interim Order Commitment Amount"); (B)

notwithstanding anything to the contrary set forth in this Agreement, until entry of the Final Order, the sum of the aggregate amount of the Revolving Loan and the Swing Line Loan plus the aggregate amount of the Pre-Petition Revolving Credit Obligations shall not exceed the Borrowing Base; (C) Revolving Credit Advances in excess of the Interim Order Commitment Amount shall not be made available unless and until the Bankruptcy Court shall have entered the ·Final Order; and (D) upon the entry of the Final Order, the Borrowers shall be entitled to borrow all amounts available under this Agreement, including, but not limited to, amounts sufficient to pay any amounts then remaining outstanding on the Pre-Petition Tranche A Obligations, subject to the terms and conditions contained herein (including, without limitation, satisfaction of the conditions precedent to borrowing set forth herein) or as may otherwise be limited by the Final Order. The Pro Rata Share of the Revolving Loan of any Revolving Lender shall not at any time exceed its separate Revolving Loan Commitment. The obligations of each Revolving Lender hereunder shall be several and not joint. Until the Commitment Termination Date, Borrowers may borrow, repay and reborrow under this Section 1.1(a); provided that all Revolving Credit Advances shall be made consistent with the DIP Budget, subject to (i) the conditions precedent set forth herein being satisfied or waived and (ii) Reserves imposed by Agent in its reasonable credit judgment as provided herein. Each Revolving Credit Advance shall be made on notice by Borrower Representative on behalf of the applicable Borrower to one of the representatives of Agent identified in Disclosure Schedule (1.1) at the address specified therein. Any such notice must be given no later than 12:00 noon (New York time) on the Business Day of the proposed Revolving Credit Advance. Each such notice (a "Notice of Revolving Credit Advance") must be given in writing (by telecopy or overnight courier) substantially in the form of Exhibit 1.1(a), and shall include the information required in such Exhibit and such other information as may be required by Agent. The entire unpaid balance of the aggregate Revolving Loan and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date. Notwithstanding the occurrence of the Commitment Termination Date or anything herein to the contrary, and to the extent that any postpetition administrative expenses that were incurred from and after the Petition Date have not been paid or payment thereof has not been otherwise provided for, the Debtors may continue to use Cash Collateral (including, without limitation, the proceeds of any sale of Collateral outside the ordinary course of business) after the Commitment Termination Date for the payment of any unpaid postpetition administrative expenses incurred at the times set forth in the DIP Budget, but only in the amounts set forth in the DIP Budget so long as such expenses existed and were actually incurred prior to the Commitment Termination Date; provided, however, that the foregoing shall not apply to or be available for payment of any claims payable pursuant to Section 503(b)(9) of the Bankruptcy Code.

(ii)    Upon any Lender's request, the Borrowers shall promptly execute and deliver a Revolving Note to such Lender evidencing the Revolving Loan Commitment of such Lender and substantially in the form of Exhibit 1.1(b) (each a "Revolving Note" and collectively, the "Revolving Notes"); provided, however, only one Revolving Note shall be issued to each Revolving Lender, except (i) to an existing Revolving Lender exchanging existing Revolving Notes to reflect changes in the Loan Account relating to such Lender, in which case the new Revolving Notes delivered to such Revolving Lender shall be dated the date of the original Revolving Notes and (ii) in the case of loss, destruction or mutilation of existing Revolving Notes and similar circumstances. Each Revolving Note, if issued, shall only be issued as a means to evidence the right, title or interest of a Revolving Lender or a registered assignee

in and to the Revolving Loan, as set forth in the Loan Account, and in no event shall any Revolving Note be considered a bearer instrument or obligation.

(iii)     Anything in this Agreement to the contrary notwithstanding, at the request of Borrower Representative, in its discretion Agent may (but shall have absolutely no obligation to), make Revolving Credit Advances to Borrowers on behalf of Revolving Lenders in amounts that cause the outstanding balance of the aggregate Revolving Loan to exceed the Borrowing Base (less the Swing Line Loan and the Pre-Petition Revolving Credit Obligations) to the extent borrowings are at such time limited by the Borrowing Base (any such excess Revolving Credit Advances are herein referred to collectively as "Overadvances"); provided that (A) no such event or occurrence shall cause or constitute a waiver of Agent's, Swing Line Lender's or Revolving Lenders' right to refuse to make any further Overadvances, Swing Line Advances or Revolving Credit Advances, or incur any Letter of Credit Obligations, as the case may be, at any time that an Overadvance exists, and (B) no Overadvance shall result in a Default or Event of Default based on Borrowers' failure to comply with Section 1.3(b)(i) for so long as Agent permits such Overadvance to be outstanding, but solely with respect to the amount of such Overadvance. Anything in this Agreement to the contrary notwithstanding, Overadvances may be made even if the conditions to lending set forth in Section 2 have not been met.  All Overadvances shall constitute Index Rate Loans, shall bear interest at the Default Rate and shall be payable on demand.  Except as otherwise provided in Section 1.11(b), the authority of Agent to make Overadvances is limited to an aggregate amount not to exceed at any time the lesser of (x) $10,000,000, and (y) ten percent (10%) of the Borrowing Base (without giving effect to any Reserves in effect at such time), shall not cause the aggregate Revolving Loan to exceed the Maximum Amount (or until entry of the Final Order the aggregate Revolving Credit Advances to exceed the Interim Order Commitment Amount), and may be revoked prospectively by a written notice to Agent signed by Requisite Lenders.  In addition, there shall not be Overadvances outstanding for more than 90 days in any 180 consecutive day period, and Agent shall not make any Overadvance if as of the date of making any such Overadvance there are Overadvances which have been outstanding for more than 90 days (whether or not consecutive) in the 180 consecutive day period ending on such date.

(b)     Swing Line Facility.

(i)     Agent shall notify the Swing Line Lender upon Agent's receipt of any Notice of Revolving Credit Advance.  Subject to the terms and conditions hereof, the Swing Line Lender may, in its discretion, make available from time to time until the Commitment Termination Date advances (each, a "Swing Line Advance") in accordance with any such notice. The provisions of this Section 1.1(c) shall not relieve Revolving Lenders of their obligations to make Revolving Credit Advances under Section 1.1(a); provided that if the Swing Line Lender makes a Swing Line Advance pursuant to any such notice, such Swing Line Advance shall be in lieu of any Revolving Credit Advance that otherwise may be made by Revolving Credit Lenders pursuant to such notice.  The aggregate amount of Swing Line Advances outstanding shall not exceed at any time the lesser (A) of the Swing Line Commitment and (B) the lesser of (1) the Maximum Amount less the outstanding balance of the Revolving Loan at such time, and (2) until entry of the Final Order, the Borrowing Base less the sum of the aggregate amount of the Revolving Loan plus the aggregate amount of the Pre-Petition Revolving Credit Obligations ("Swing Line Availability").  Until the Commitment Termination Date, Borrowers may from

time to time borrow, repay and reborrow under this Section 1.1(c). Each Swing Line Advance shall be made pursuant to a Notice of Revolving Credit Advance delivered to Agent by Borrower Representative on behalf of the applicable Borrower in accordance with Section 1.1(a). Any such notice must be given no later than 12:00 noon (New York time) on the Business Day of the proposed Swing Line Advance. Unless the Swing Line Lender has received at least one Business Day's prior written notice from Requisite Lenders instructing it not to make a Swing Line Advance, the Swing Line Lender shall, notwithstanding the failure of any condition precedent set forth in Section 2.2, be entitled to fund that Swing Line Advance, and to have each Revolving Lender make Revolving Credit Advances in accordance with Section 1.1(c)(iii). Borrowers shall repay the aggregate outstanding principal amount of the Swing Line Loan upon demand therefor by Agent.

        (ii)      [Intentionally omitted.]

        (iii)      The Swing Line Lender, at any time and from time to time in its sole and absolute discretion, but not less frequently than weekly, shall on behalf of any Borrower (and each Borrower hereby irrevocably authorizes the Swing Line Lender to so act on its behalf) request each Revolving Lender (including the Swing Line Lender) to make a Revolving Credit Advance to each Borrower in an amount equal to that Revolving Lender's Pro Rata Share of the principal amount of the applicable Borrower's Swing Line Loan (the "Refunded Swing Line Loan") outstanding on the date such notice is given. Regardless of whether the conditions precedent set forth in this Agreement to the making of a Revolving Credit Advance are then satisfied, each Revolving Lender shall disburse directly to Agent, its Pro Rata Share of a Revolving Credit Advance on behalf of the Swing Line Lender prior to 3:00 p.m. (New York time) in immediately available funds on the Business Day next succeeding the date that notice is given. The proceeds of those Revolving Credit Advances shall be immediately paid to the Swing Line Lender and applied to repay the Refunded Swing Line Loan of the applicable Borrower.

        (iv)      [Intentionally omitted.]

        (v)      Each Revolving Lender's obligation to make Revolving Credit Advances in accordance with Section 1.1(c)(iii) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Revolving Lender may have against the Swing Line Lender, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of any Default or Event of Default; (C) any inability of any Borrower to satisfy the conditions precedent to borrowing set forth in this Agreement at any time or (D) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. If any Revolving Lender does not make available to Agent or the Swing Line Lender, as applicable, the amount required pursuant to Section 1.1(c)(iii)), as the case may be, the Swing Line Lender shall be entitled to recover such amount on demand from such Revolving Lender, together with interest thereon for each day from the date of non-payment until such amount is paid in full at the Federal Funds Rate for the first two Business Days and at the Index Rate thereafter.

        (c)      Reliance on Notices; Appointment of Borrower Representative. Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Credit Advance or similar notice believed by Agent to be genuine. Agent may

assume that each Person executing and delivering any notice in accordance herewith was duly authorized, unless the responsible individual acting thereon for Agent has actual knowledge to the contrary. Each Borrower hereby designates NEC as its representative and agent on its behalf for the purposes of issuing a Notice of Revolving Credit Advance or similar notice, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, requesting Letters of Credit, and effecting repayment of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents. Borrower Representative hereby accepts such appointment. Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and shall give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to Borrower Representative on behalf of such Borrower or Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

1.2    Letters of Credit.    Subject to and in accordance with the terms and conditions contained herein and in Annex B, Borrower Representative, on behalf of the applicable Borrower, shall have the right to request, and Revolving Lenders agree to incur, or purchase participations in, Letter of Credit Obligations in respect of each Borrower. The Existing Letters of Credit shall be deemed to have been issued hereunder on the Closing Date (and shall not be deemed Indebtedness under the Pre-Petition Credit Agreement for purposes of this Agreement), and no request for issuance thereof need be made.

1.3    Prepayments.

(a)    Voluntary Reductions in Revolving Loan Commitments. Borrowers may at any time on at least five (5) days' prior written notice by Borrower Representative to Agent permanently reduce (but not terminate) the Revolving Loan Commitment; provided that (A) any such reductions shall be in a minimum amount of $1,000,000 and integral multiples of $500,000 in excess of such amount, (B) the Revolving Loan Commitment shall not be reduced to an amount less than the sum of (i) the Revolving Loan then outstanding, plus (ii) the outstanding amount of Pre-Petition Tranche A Obligations, plus, (iii) $15,000,000 and (C) after giving effect to such reductions, Borrowers shall comply with Section 1.3(b)(i). In addition, Borrowers may at any time on at least 10 days' prior written notice by Borrower Representative to Agent terminate the Revolving Loan Commitment; provided that upon such termination, all Loans and other Obligations shall be immediately due and payable in full and all Letter of Credit Obligations shall be cash collateralized or otherwise satisfied in accordance with Annex B hereto. Upon any such reduction or termination of the Revolving Loan Commitment, each Borrower's right to request Revolving Credit Advances, or request that Letter of Credit Obligations be incurred on its behalf, or request Swing Line Advances, shall simultaneously be permanently reduced or terminated, as the case may be; provided that a permanent reduction of the Revolving Loan Commitment shall not require a corresponding pro rata reduction in the L/C

Sublimit. Each notice of partial prepayment shall designate the Loans or other Obligations to which such prepayment is to be applied.

(b) <u>Mandatory Prepayment</u>. If at any time the aggregate outstanding balances of (i) the Revolving Loan and the Swing Line Loan then outstanding exceeds the lesser of (A) the Maximum Amount and (B) the amount permitted under the Interim Order or the Final Order, as the case may be, or (ii) until entry of the Final Order, the sum of the aggregate amount of the Revolving Loan and the Swing Line Loan <u>plus</u> the aggregate amount of the Pre-Petition Revolving Credit Obligations exceed the Borrowing Base; Borrowers shall immediately repay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Credit Advances, Borrowers shall provide cash collateral for the Letter of Credit Obligations in the manner set forth in <u>Annex B</u> to the extent required to eliminate such excess. Notwithstanding the foregoing, any Overadvance made pursuant to <u>Section 1.1(a)(iii)</u> shall be repaid only on demand.

(c) <u>Application of Collections and Asset Sales</u>. Following the entry of the Interim Order and until the entry of the Final Order, so long as no Event of Default then exists, all collections of the Credit Parties, including, without limitation, insurance or condemnation proceeds in accordance with <u>Section 5.4(c)</u>) and proceeds from any disposition of Collateral, in each case, in the ordinary course of business or otherwise (collectively, "<u>Collections</u>") shall be applied as follows: <u>first</u> to repay obligations outstanding under the Revolving Loan (as defined in the Pre-Petition Credit Agreement) until repaid in full, <u>second</u> to repay obligations outstanding under the Term A Loan (as defined in the Pre-Petition Credit Agreement) until repaid in full, and <u>third</u> to repay Obligations outstanding under this Agreement in accordance with <u>Section 1.3(d)</u> below; <u>provided</u> that following entry of the Final Order or at any time during which an Event of Default exists, all Collections (subject to the Carve-Out and Permitted Prior Liens) shall be applied in accordance with clause "<u>third</u>" above.

(d) <u>Application of Collections</u>. Any Collections made by any Borrower shall be applied as follows: <u>first</u>, to Fees and reimbursable expenses of Agent then due and payable pursuant to any of the Loan Documents, until the same has been paid in full; <u>second</u>, to interest then due and payable on Swing Line Loans, until the same has been paid in full; <u>third</u>, to the outstanding principal balance of the Swing Line Loan of Borrowers, pro rata, until the same has been repaid in full; <u>fourth</u>, to interest then due and payable on Revolving Credit Advances, until the same has been paid in full; <u>fifth</u>, to the principal balance of Revolving Credit Advances outstanding; and <u>last</u>, to any Letter of Credit Obligations of Borrowers in order to provide cash collateral therefor in the manner set forth in <u>Annex B</u>, pro rata, until all such Letter of Credit Obligations have been fully cash collateralized in the manner set forth in <u>Annex B</u>. Neither the Revolving Loan Commitment nor the Swingline Commitment shall be reduced by the amount of any such prepayments; <u>provided</u> that any amounts applied to repay Obligations under this Agreement pursuant to <u>Section 1.3(c)</u> above during the continuance of an Event of Default shall, to the extent required by the Agent or Requisite Lenders in their discretion, result in a permanent reduction of the Revolving Loan Commitment.

1.4 <u>Use of Proceeds</u>. Borrowers shall use the proceeds of the Loans and the Letters of Credit in accordance with <u>Section 5.16</u>.

1.5     Interest and Applicable Margins.

(a)     Borrowers shall pay interest to Agent, for the ratable benefit of Lenders in accordance with the various Loans being made by each Lender, in arrears on each applicable Interest Payment Date, at the following rates:  (i) with respect to the Revolving Credit Advances, the Index Rate plus the Applicable Revolver Index Margin per annum based on the aggregate Revolving Credit Advances outstanding from time to time; and (ii) with respect to the Swing Line Loan, the Index Rate plus the Applicable Revolver Index Margin per annum.

The Applicable Margins are as follows:

| | |
|---|---|
| Applicable Revolver Index Margin | 3.25% |
| Applicable L/C Margin | 3.25% |
| Applicable Unused Line Fee Margin | 1.00% |

(b)     If any payment on any Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of Fees calculated on a per annum basis and interest shall be made by Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest and Fees are payable.  The Index Rate is a floating rate determined for each day.  Each determination by Agent of an interest rate and Fees hereunder shall be final, binding and conclusive on Borrowers, absent manifest error.

(d)     So long as an Event of Default has occurred and is continuing under Section 8.1(a) or so long as any other Default or Event of Default has occurred and is continuing and at the election of Agent (or upon the written request of Requisite Lenders) confirmed by written notice from Agent to Borrower Representative, the interest rates applicable to the Loans and the Letter of Credit Fees shall be increased by two percentage points (2.00%) per annum above the rates of interest or the rate of such Fees otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations; provided, that in the case of a Default or Event of Default unrelated to payment, Agent shall provide Borrower Representative three Business Days prior notice of its intent to implement the Default Rate which Default Rate shall apply to the Obligations from the date of such Default or Event of Default.  Interest and Letter of Credit Fees at the Default Rate shall accrue from the initial date of such Default or Event of Default until that Default or Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 1.5, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate,

- 8 -

Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 1.5(a) through (e), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply. In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 1.5(e), a court of competent jurisdiction shall finally determine that a Lender has received interest hereunder in excess of the Maximum Lawful Rate, Agent shall, to the extent permitted by applicable law, promptly apply such excess in the order specified in Section 1.11 and thereafter shall refund any excess to Borrowers or as a court of competent jurisdiction may otherwise order.

1.6     Eligible Accounts. All of the Accounts owned by each Borrower and reflected in the most recent Borrowing Base Certificate delivered by or on behalf of each Borrower to Agent shall be "Eligible Accounts" for purposes of this Agreement, except any Account to which any of the exclusionary criteria set forth below applies. Agent shall have the right to establish, modify or eliminate Reserves against Eligible Accounts from time to time in its reasonable credit judgment. In addition, Agent reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below, to establish new criteria and to adjust advance rates with respect to Eligible Accounts, in its reasonable credit judgment; provided, that (i) Agent will not increase advance rates without the consent of Requisite Lenders and (ii) unless a Default or Event of Default shall have occurred and be continuing, Agent will not decrease advance rates without the consent of Borrowers. Eligible Accounts shall not include any Account of any Borrower:

(a)     that does not arise from the sale of goods or the performance of services by such Borrower in the ordinary course of its business;

(b)     (i) upon which such Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever, (ii) as to which such Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process or (iii) if the Account represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to such Borrower's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

(c)     in the event that any defense, counterclaim, setoff or dispute (other than any defense, counterclaim, setoff or dispute arising out of damaged or returned goods or as a result of Borrower or its Subsidiaries being liable for goods sold or services rendered by the applicable Account Debtor) is asserted as to such Account;

(d)     that is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for merchandise sold to or services rendered and accepted by the applicable Account Debtor;

(e)     with respect to which an invoice, reasonably acceptable to Agent in form and substance, has not been sent to the applicable Account Debtor;

(f)     that (i) is not owned by such Borrower or (ii) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Agent, on behalf of itself and Lenders;

(g)     that arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity that has any common officer or director with any Credit Party;

(h)     that is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof but only to the extent that the aggregate of all such obligations of all such Account Debtors exceeds $1,500,000 (or such other amount as may be determined by Agent), provided that no more than $600,000 (or such other amount as may be determined by Agent) of such amount shall be attributable to such Account Debtors that are not the United States Postal Service), in which case Agent, in its sole discretion may permit any excess amounts to be included as an Eligible Account and require such Borrower to comply with the Federal Assignment of Claims Act of 1940, or any applicable state, county or municipal law restricting assignment thereof with respect to such obligation;

(i)     that is the obligation of an Account Debtor located in a foreign country other than Canada (excluding the province of Newfoundland, the Northwest Territories and the Territory of Nunavit) unless payment thereof is assured by a letter of credit assigned and delivered to Agent, reasonably satisfactory to Agent as to form, amount and issuer;

(j)     (1) if any defense, counter claim, setoff or disputes arising from damaged or returned goods is asserted as to such Account but only to the extent of such damaged or returned goods or (2) if such Borrower or any Subsidiary thereof is liable for goods sold or services rendered by the applicable Account Debtor to such Borrower or any Subsidiary thereof but only to the extent of the potential offset, provided, however, that, in the case of clause (j)(2), if the applicable Account Debtor is Xpedx and Borrowers and their Subsidiaries have made all payments due and owing to Xpedx or International Paper, then only to the extent that the potential offset exceeds $1,500,000 in the aggregate for all Borrowers and their Subsidiaries;

(k)     that arises with respect to goods that are delivered on a bill-and-hold, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional; provided, however, that Accounts, in an aggregate amount for all Account Debtors not to exceed $1,000,000, arising from sales of goods that are delivered on a bill-and-hold basis shall not be excluded so long as such goods are (i) properly deducted from inventory and excluded from Eligible Inventory, (ii) subject to proper documentation (including signed purchase orders which specify that such goods

shall be on a bill and hold basis), (iii) required to be shipped within ninety (90) days of the applicable purchase order, and (iv) readily identifiable in the warehouse as the goods of such Account Debtor subject to such bill and hold purchase order;

(l)     that is in default; provided, that, without limiting the generality of the foregoing, an Account shall be deemed in default upon the occurrence of any of the following:

(i)     the Account is not paid within the earlier of: sixty (60) days following its due date or ninety (90) days following its original invoice date provided, however that Accounts which are not paid within such time frame (the "Extended Payment Amounts") shall not be excluded so long as such Accounts are paid within the earlier of 75 days following their respective due dates and one hundred and five (105) days following their respective original invoice dates and the aggregate Extended Payment Amounts for all Account Debtors which shall be included as Eligible Accounts as a result of this proviso does not exceed $850,000 in the aggregate for all Borrowers;

(ii)     the Account Debtor obligated upon such Account suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or

(iii)     a petition is filed by or against any Account Debtor obligated upon such Account under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

(m)     that is the obligation of an Account Debtor if 60% or more of the Dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth in this Section 1.6;

(n)     as to which Agent's Lien thereon, on behalf of itself and Lenders, is not a first priority perfected Lien;

(o)     as to which any of the applicable representations or warranties in the Loan Documents is untrue;

(p)     to the extent such Account is evidenced by a judgment, Instrument or Chattel Paper;

(q)     to the extent such Account exceeds any credit limit established by Agent, in its reasonable credit judgment provided that Borrower Representative has received at least 5 Business Days' prior written notice of such credit limit;

(r)     to the extent that such Account, together with all other Eligible Accounts owing by such Account Debtor (other than Unisource, Xpedx, Capital One, Federal Express and their Affiliates) as of any date of determination exceed 10% of all Eligible Accounts (or with respect to (i) Accounts owing by Unisource and its Affiliates or Xpedx and its Affiliates or Federal Express and its Affiliates, exceed the lesser of 20% of all Eligible Accounts or $20,000,000 and (ii) Accounts owing by Capital One and its Affiliates, exceed the lesser of 10% of all Eligible Accounts or $5,000,000);

- 11 -

(s) that is payable in any currency other than (i) Dollars or (ii) Canadian dollars in an amount in excess of the equivalent of $1,000,000 Dollars in the aggregate; provided that Borrowers shall report any amounts on the Borrowing Base Certificate with respect to this clause (s) in Dollars and, at the request of Agent, Borrowers shall enter into arrangements to hedge against fluctuations in the value of Canadian dollars; or

(t) that is otherwise unacceptable to Agent in its reasonable credit judgment.

1.7 **Eligible Inventory.** All of the Inventory owned by the Borrowers and reflected in the most recent Borrowing Base Certificate delivered by or on behalf of each Borrower to Agent shall be "Eligible Inventory" for purposes of this Agreement, except any Inventory to which any of the exclusionary criteria set forth below applies. Agent shall have the right to establish, modify or eliminate Reserves against Eligible Inventory from time to time in its reasonable credit judgment. In addition, Agent reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below, to establish new criteria and to adjust advance rates with respect to Eligible Inventory, in its reasonable credit judgment; provided, that (i) Agent will not increase advance rates without the consent of Requisite Lenders and (ii) unless a Default or Event of Default shall have occurred and be continuing, Agent will not decrease advance rates without the consent of Borrowers. Eligible Inventory shall not include any Inventory of any Borrower that:

(a) is not owned by such Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure such Borrower's performance with respect to that Inventory), except the Liens in favor of Agent, on behalf of itself and Lenders, and Permitted Encumbrances in favor of landlords, warehousemen and bailees to the extent permitted in Section 5.9 hereof (subject to Reserves established by Agent in accordance with Section 5.9 hereof);

(b) (i) is not located on premises owned, leased or rented by such Borrower and set forth in Disclosure Schedule (3.2), or (ii) is stored at a leased or rented location, unless Agent has given its prior consent thereto and unless either (x) a reasonably satisfactory landlord waiver has been delivered to Agent, or (y) either the Interim Order, or the Final Order provides for collateral access to the reasonable satisfaction of Agent, or (z) Reserves reasonably satisfactory to Agent have been established with respect thereto, or (iii) is stored with a bailee or warehouseman unless either (x) a reasonably satisfactory, acknowledged bailee letter has been received by Agent, (y) either the Interim Order or the Final Order provides for collateral access to the reasonable satisfaction of Agent or (z) Reserves reasonably satisfactory to Agent have been established with respect thereto, or (iv) is located at an owned location subject to a mortgage in favor of a lender other than Agent unless either (x) a reasonably satisfactory mortgagee waiver has been delivered to Agent or (y) either the Interim Order or the Final Order provides for collateral access to the reasonable satisfaction of Agent, or (v) is located at any site if the aggregate book value of Inventory at any such location is less than $100,000, or (vi) is located outside of the United States of America;

(c) is placed on consignment or is in transit unless such Inventory is (i) in an amount not in excess of $4,500,000 in the aggregate, (ii) properly insured and (iii) (x) in transit

in the continental United States from one Borrower to another Borrower using company owned vehicles, and such transit is completed within five (5) Business Days, or (y) from a vendor to a Borrower, and such transit is completed within five (5) Business Days, and, in each case, Borrowers have possession of all bills of lading and all other applicable documents of title, if any, relating thereto and hold such documents as agent for Agent; provided that at the request of Agent, Borrowers shall have all bills of lading and all other applicable documents of title, if any, delivered to Agent or its designee and shall pay for all expenses and costs related to the tracking of such titles.

(d)    is covered by a negotiable document of title, unless such document has been delivered to Agent with all necessary endorsements, free and clear of all Liens except those in favor of Agent and Lenders;

(e)    is excess, obsolete, unsalable, shopworn, seconds, damaged or unfit for sale;

(f)    consists of display items or packing or shipping materials, manufacturing supplies, work-in-process Inventory or replacement parts;

(g)    consists of goods which have been returned by the buyer unless such goods are not custom goods and are deemed resalable following proper inspection and evaluation, and any Eligible Account related to the sale of such goods has been eliminated from the Borrowing Base;

(h)    is not of a type held for sale in the ordinary course of such Borrower's business;

(i)    is not subject to a first priority lien in favor of Agent on behalf of itself and Lenders, subject to Permitted Prior Liens;

(j)    as to which any of the applicable representations or warranties pertaining to Inventory set forth in the Loan Documents is untrue;

(k)    consists of any costs associated with "freight-in" charges;

(l)    consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(m)    is not covered by casualty insurance reasonably acceptable to Agent; or

(n)    is otherwise unacceptable to Agent in its reasonable credit judgment.

1.8    <u>Cash Management Systems</u>. Subject to entry of the First Day Orders by the Bankruptcy Court, on or prior to the Closing Date, Borrowers will establish and will maintain until the Termination Date, the cash management systems described in <u>Annex C</u> (the "<u>Cash Management Systems</u>").

1.9    Fees.

(a)    Borrowers shall pay to GE Capital or its Affiliates the Fees specified in the GE Fee Letter in the amounts, and at the times, specified for payment therein.

(b)    As additional compensation for the Revolving Lenders, Borrowers shall pay to Agent, for the ratable benefit of such Lenders, in arrears, on the first Business Day of each month prior to the Commitment Termination Date and on the Commitment Termination Date, a Fee for Borrowers' non-use of available funds in an amount equal to the Applicable Unused Line Fee Margin per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the difference between (x) the Maximum Amount (as it may be reduced from time to time) and (y) the average for the period of the daily closing balances of the aggregate Revolving Loan and the Swing Line Loan outstanding during the period for which such Fee is due.

(c)    Borrowers shall pay to Agent, for the ratable benefit of Revolving Lenders, the Letter of Credit Fee as provided in Annex B.

All fees payable to Agent for the benefit of itself or the Revolving Lenders payable under this Agreement shall be fully earned on the date such payment is due and shall be non-refundable.

1.10    Receipt of Payments.   Borrowers shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.

1.11    Application and Allocation of Payments.

(a)    All Collections shall be applied as provided in Section 1.3(c). All payments and prepayments applied to a particular Loan shall be applied ratably to the portion thereof held by each Lender as determined by its Pro Rata Share. As to any other payment, and as to all payments made when a Default or Event of Default has occurred and is continuing or following the Commitment Termination Date, each Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of such Borrower, and each Borrower hereby irrevocably agrees that Agent shall have the continuing exclusive right to apply any and all such payments against the Obligations of Borrowers as Agent may deem advisable notwithstanding any previous entry by Agent in the Loan Account or any other books and records. In the absence of a specific determination by Agent with respect thereto, payments shall be applied to amounts then due and payable in the following order: (1) to Fees and Agent's expenses reimbursable hereunder; (2) to interest on the Swing Line Loan; (3) to principal payments on the Swing Line Loan; (4) to interest on the other Loans ratably in proportion to the interest accrued as to each Loan; (5) to principal payments on the other Loans and to provide cash collateral for Letter of Credit Obligations in the manner described in Annex B, ratably to the aggregate, combined principal balance of the other Loans and outstanding Letter of Credit Obligations; and (6) to all other Obligations, including expenses of Lenders to the extent reimbursable under Section 11.3.

(b)    Agent is authorized to, and at its sole election may, charge to the Revolving Loan balance on behalf of each Borrower and cause to be paid all Fees, expenses,

- 14 -

Charges, costs (including insurance premiums in accordance with Section 5.4(a)) and interest and principal owing by Borrowers under this Agreement or any of the other Loan Documents if and to the extent Borrowers fail to pay promptly any such amounts as and when due, even if the amount of such charges is not set forth in the DIP Budget. At Agent's option and to the extent permitted by law, any charges so made shall constitute part of the Revolving Loan hereunder.

      1.12   Loan Account and Accounting. Agent shall maintain a loan account (the "Loan Account") on its books to record: all Advances, all payments made by Borrowers, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. Subject to the Borrower's right to object in accordance with the terms and conditions set forth below, the balance in the Loan Account, as recorded on Agent's most recent printout or other written statement (which printout or statement shall be delivered to Borrower Representative upon its reasonable request), shall, absent manifest error, be presumptive evidence of the amounts due and owing to Agent and Lenders by each Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay the Obligations. Agent shall render to Borrower Representative a monthly accounting of transactions with respect to the Loans setting forth the balance of the Loan Account as to each Borrower for the immediately preceding month. Unless Borrower Representative notifies Agent in writing of any objection to any such accounting (specifically describing the basis for such objection), within 30 days after the date thereof, each and every such accounting shall (absent manifest error) be deemed final, binding and conclusive on Borrowers in all respects as to all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by Borrowers.

      1.13   Indemnity. Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities, and any and all reasonable legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction). NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT

HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

1.14 <u>Access</u>. Each Credit Party that is a party hereto shall, during normal business hours, from time to time upon three Business Days' prior notice as frequently as Agent reasonably determines to be appropriate: (a) provide Agent and any of its officers, employees and agents access to its properties, facilities, advisors and employees (including officers) of each Credit Party and to the Collateral, (b) permit Agent, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's books and records, and (c) permit Agent, and its officers, employees and agent, (including third party appraisers selected by Agent) to appraise, inspect, review, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party. If a Default or Event of Default has occurred and is continuing, or if access is necessary to preserve or protect the Collateral as determined by Agent, each such Credit Party shall provide such access to Agent and to each Lender at all times and without advance notice. Furthermore, so long as any Event of Default has occurred and is continuing, Borrowers shall provide Agent and each Lender with access to their suppliers and customers. Each Credit Party shall make available to Agent and its counsel, as quickly as is reasonably possible under the circumstances, originals or copies of all books and records that Agent may reasonably request. Each Credit Party shall deliver any document or instrument necessary for Agent, as it may from time to time reasonably request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on traditional or electronic media, including, at such Credit Party's option, computer tapes and discs owned by such Credit Party. Such duplicate records shall be kept at an owned location or a location with respect to which Agent has received a satisfactory landlord waiver. Agent will give Lenders at least 5 days' prior written notice of regularly scheduled audits. Representatives of other Lenders may accompany Agent's representatives on regularly scheduled audits at no charge to Borrowers.

1.15 <u>Taxes</u>.

(a) Any and all payments by each Borrower hereunder (including any payments made pursuant to <u>Section 12</u>) or under the Revolving Notes shall be made, in accordance with this <u>Section 1.15</u> and subject to <u>clause (d)</u> of this <u>Section 1.15</u>, free and clear of and without deduction for any and all present or future Taxes. If any Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder (including any sum payable pursuant to <u>Section 12</u>) or under the Revolving Notes, (i) subject to <u>clause (d)</u> of this <u>Section 1.15</u>, the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 1.15</u>) Agent or Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) such Borrower shall make such deductions, and (iii) such Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Promptly upon written request, but not later than 30 days after the date of any payment of Taxes, Borrower Representative shall furnish to Agent the original or a certified copy of a receipt evidencing payment thereof.

(b)     Subject to clause (d) of this Section 1.15, each Credit Party that is a signatory hereto shall jointly and severally indemnify and, within 15 days of demand therefor, pay Agent and each Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 1.15) paid by Agent or such Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

(c)     Each Lender organized under the laws of a jurisdiction outside the United States (a "Foreign Lender") as to which payments to be made under this Agreement or under the Revolving Notes are exempt from United States withholding tax under an applicable statute or tax treaty shall provide to Borrower Representative and Agent two copies of a properly completed and executed IRS Form W-8ECI or Form W-8BEN or other applicable form, certificate or document prescribed by the IRS or the United States certifying as to such Foreign Lender's entitlement to such exemption (a "Certificate of Exemption").  Any Person organized under the laws of a jurisdiction outside the United States (a "Foreign Person") that seeks to become a Lender under this Agreement including any Foreign Person who seeks to become an assignee or participant pursuant to Section 9.1 shall provide a Certificate of Exemption to Borrower Representative and Agent prior to becoming a Lender hereunder.  No Foreign Person may become a Lender hereunder if such Person fails to deliver a Certificate of Exemption in advance of becoming a Lender.  Each Foreign Lender shall promptly deliver further copies of any forms or certificates required to be delivered pursuant to this clause (c) if the most recently delivered form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recently delivered form.  Notwithstanding any other provision of this Section 1.15(c), a Foreign Lender shall not be required to deliver any form pursuant to this Section 1.15(c) that such Foreign Lender is not legally able to deliver.

(d)     Neither the Borrowers nor the Credit Parties shall be required to pay any additional amounts to any Lender pursuant to clause (a)(i) of this Section 1.15, or to indemnify any Lender pursuant to clause (b) of this Section 1.15, in respect of United States withholding taxes to the extent imposed as a result of (i) the failure of such Lender to deliver to Borrower Representative and Agent a Certificate of Exemption pursuant to clause (c), (ii) such Certificate of Exemption not establishing a complete exemption from United States withholding taxes or the information or certifications made therein by the Lender being untrue or inaccurate on the date delivered in any material respect, (iii) the Lender designating a successor lending office which has the effect of causing the Borrowers or the Credit Parties to become obligated to make a payment pursuant to clause (a)(i) of this Section 1.15 or clause (b) of this Section 1.15 in excess of its payment obligation immediately prior to such designation, or (iv) such Lender being treated as a "conduit entity" within the meaning of U.S. Treasury Regulations Section 1.881-3 or any successor provision; provided, however, that Borrowers and the Credit Parties shall be required to pay additional amounts to any Lender pursuant to clause (a)(i) of this Section 1.15, or to indemnify any Lender pursuant to clause (b) of this Section 1.15, in respect of United States withholding taxes if (x) any such failure to deliver a Certificate of Exemption or the failure of such Certificate of Exemption to establish a complete exemption from United States withholding taxes or inaccuracy or untruth contain therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date hereof, which change rendered such Lender no longer legally entitled to deliver such Certificate of Exemption or otherwise ineligible for a complete exemption from United

States withholding taxes or render the information or certifications made in such Certificate of Exemption untrue or inaccurate in any material respect, (y) the redesignation of the Lender's lending office was made at the request of a Borrower or (z) the obligation to pay any additional amounts to any such Lender pursuant to clause (a)(i) of this Section 1.15, or to indemnify any such Lender pursuant to clause (d) of this Section 1.15, is with respect to an assignee Lender that becomes an assignee Lender pursuant to Section 9.1 as a result of an assignment made at the request of a Borrower.

      (e)    If, solely as a result of an event described in subparagraph (x) of clause (d) of this Section 1.15 (i) a Lender is unable to provide to Borrower Representative a Certificate of Exemption or such Certificate of Exemption is unable to establish a complete exemption from United States withholding taxes or (ii) the Borrowers become liable to make to pay additional amounts to a Lender pursuant to clause (a)(i) of this Section 1.15, or to indemnify a Lender pursuant to clause (b), of this Section 1.15, Borrowers may exercise the remedies available to it under Section 1.16(d).

      (f)    If Agent or any Lender receives a refund in respect of any Taxes as to which it has been paid additional amounts by a Borrower pursuant to clause (a) of this Section 1.15 or indemnified by a Borrower or Credit Party pursuant to clause (b) of this Section 1.15, such Agent or Lender shall promptly notify Borrower Representative of such refund and shall, within 30 days, remit to Borrower Representative an amount as such Agent or Lender determines to be the proportion of the refunded amount as will leave it, after such remittance, in no better or worse position than it would have been if the Taxes had not be imposed and the corresponding additional amounts or indemnification payment not been made, provided that Borrower Representative, upon the request of such Lender or Agent, agrees to return such refund and any amounts which after such return, will leave such Lender in no better or worse position than it would have been had Borrower not be required to return such refund to such Lender or Agent in the event such Lender or Agent is required to repay such refund.

    1.16   Capital Adequacy; Increased Costs; Illegality.

      (a)    If any Lender shall have determined that any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender and thereby reducing the rate of return on such Lender's capital as a consequence of its obligations hereunder, then Borrowers shall from time to time upon demand by such Lender (with a copy of such demand to Agent) pay to Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by such Lender to Borrower Representative and to Agent shall, absent manifest error, be final, conclusive and binding for all purposes.

      (b)    If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline

or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining any Loan, then Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost. A certificate as to the amount of such increased cost, submitted to Borrower Representative and to Agent by such Lender, shall be conclusive and binding on Borrowers for all purposes, absent manifest error. Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances referred to in clause (a) above or in this clause (b), which would result in any such increased cost, the affected Lender shall, to the extent not inconsistent with such Lender's internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrowers pursuant to Section 1.16(a) and (b).

(c)     [Intentionally omitted.]

(d)     Within 15 days after receipt by Borrower Representative of written notice and demand from any Lender (an "Affected Lender") for payment of additional amounts or increased costs as provided in Sections 1.15(a), 1.16(a) or 1.16(b), Borrower Representative may, at its option, notify Agent and such Affected Lender of its intention to replace the Affected Lender. So long as no Default or Event of Default has occurred and is continuing, Borrower Representative, with the consent of Agent, may obtain, at Borrowers' expense, a replacement Lender ("Replacement Lender") for the Affected Lender, which Replacement Lender must be reasonably satisfactory to Agent. If Borrowers obtain a Replacement Lender within 90 days following notice of their intention to do so, the Affected Lender must sell and assign its Loans and Revolving Loan Commitments to such Replacement Lender for an amount equal to the principal balance of all Loans held by the Affected Lender and all accrued interest and Fees with respect thereto through the date of such sale; provided, that Borrowers shall have reimbursed such Affected Lender for the additional amounts or increased costs that it is entitled to receive under this Agreement through the date of such sale and assignment. Notwithstanding the foregoing, Borrowers shall not have the right to obtain a Replacement Lender if the Affected Lender rescinds its demand for increased costs or additional amounts within 15 days following its receipt of Borrowers' notice of intention to replace such Affected Lender. Furthermore, if Borrowers give a notice of intention to replace and do not so replace such Affected Lender within 90 days thereafter, Borrowers' rights under this Section 1.16(d) shall terminate and Borrowers shall promptly pay all increased costs or additional amounts demanded by such Affected Lender pursuant to Sections 1.15(a), 1.16(a) and 1.16(b).

1.17     Single Loan. All Loans to each Borrower and all of the other Obligations of each Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of that Borrower secured, until the Termination Date, by all of the Collateral.

1.18     [Intentionally Omitted.]

1.19     Super-Priority Nature of Obligations and Agent's Liens. Each Credit Party represents, warrants, covenants and agrees that:

- 19 -

(a)     the priority of Agent's and Lenders' Liens on the Collateral owned by Borrowers shall be set forth in the Financing Orders;

(b)     the priority of the super-priority administrative claims granted to Agent and the Lenders shall be as set forth in the Financing Orders; and.

(c)     subject to the terms of the Financing Orders, Agent's and Lenders' Liens on the Collateral owned by the Credit Parties and Agent's and Lenders' respective administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims, including, upon entry of the Final Order, those arising under Section 506(c) of the Bankruptcy Code.

1.20    Payment of Obligations.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court, subject to the last sentence of Section 1.1(a).

1.21    No Discharge; Survival of Claims.  Each Credit Party agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any case commenced under Chapter 11 of the Bankruptcy Code (and Borrowers pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) the super priority administrative claim granted to Agent and Lenders pursuant to the Financing Orders and described in Section 1.19 and the Liens granted to Agent pursuant to the Financing Orders and described in Section 1.19 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any case commenced under Chapter 11 of the Bankruptcy Code.

1.22    Release.  The Credit Parties hereby acknowledge effective upon entry of the Final Order and to the extent permitted by the Financing Orders, that Credit Parties have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender.  Upon entry of the Final Order and to the extent permitted by the Financing Orders, the Credit Parties, in their own right, on behalf of each of their bankruptcy estates and on behalf of all their successors, assigns, Subsidiaries, Guarantors and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Agent, Lenders, Pre-Petition Agent and Pre-Petition Tranche A Lenders and all of Agent's, Lenders', Pre-Petition Agent's and Pre-Petition Tranche A Lenders' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive

damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Financing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided that nothing herein shall be deemed to be a release of Agent or any Lender from its obligations under the Loan Documents, provided further, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Financing Orders .

      1.23    <u>Waiver of any Priming Rights</u>. Upon the Closing Date, and to the extent permitted by the Financing Orders, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrowers hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations (other than with respect to the Carve-Out and Permitted Prior Liens).

## 2.    CONDITIONS PRECEDENT

      2.1    <u>Conditions to the Initial Loans</u>. No Lender shall be obligated to make any Loan or incur any Letter of Credit Obligations on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Agent, or waived in writing by Agent and Requisite Lenders:

      (a)    <u>Credit Agreement; Loan Documents</u>. This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrowers, each other Credit Party, Agent and Lenders; and Agent shall have received such documents, instruments and agreements as Agent shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as <u>Annex D</u>, each in form and substance reasonably satisfactory to Agent.

      (b)    <u>Approvals</u>. The Credit Parties and the transactions contemplated by this Agreement and the Loan Documents shall be in compliance, in all material respects, with all applicable U.S., foreign, federal, state and local laws and regulations. All necessary consents and approvals necessary of Governmental Authorities and other third parties in connection with the transactions referred to herein shall have been obtained and be effective and all applicable waiting periods shall have expired without any adverse action being taken by any competent authority, other than those which the failure to obtain, individually or in the aggregate, could not reasonably be expected to have a material adverse effect or to result in criminal or civil sanctions against any party thereto, any affiliate of any such party or any director or employee of any of the foregoing.

      (c)    <u>Petition Date</u>. The Petition Date shall have occurred.

(d)    Payment of Fees.  Borrowers shall have paid the Fees required to be paid on the Closing Date in the respective amounts specified in Section 1.9, and shall have reimbursed Agent for all fees, costs and expenses of closing presented as of the Closing Date.

(e)    Capital Structure; Other Indebtedness.  The capital structure of each Credit Party and the terms and conditions of all Indebtedness of each Credit Party shall be acceptable to Agent in its sole discretion.

(f)    Financial Information.  Agent shall have received financial information reasonably requested by it and such other financial information as may be reasonably requested by Agent.

(g)    Chapter 11 Case Administration.  Entry by the Bankruptcy Court of the Interim Order, by no later than five 5 days after the Petition Date.

(h)    First Day Orders and Motions.  The First Day Orders entered by the Bankruptcy Court shall, to the extent (i) affecting the rights or obligations of Agent, the Lenders, the Pre-Petition Agent or the Pre-Petition Tranche A Lenders or (ii) which may give rise to a post-petition claim, administrative in nature or otherwise, be in form and substance reasonably acceptable to Agent.

(i)    Interim DIP Budget.  The Credit Parties shall have delivered the Interim DIP Budget to Agent prior to the Closing Date.

(j)    Supply Agreements.  The terms of all supply arrangements among the Credit Parties and their Material Suppliers shall have been fully disclosed to Agent and the Lenders.

2.2    Further Conditions to Each Loan.  Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Advance or incur any Letter of Credit Obligation, if, as of the date thereof:

(a)    such Advance or the issuance of such Letter of Credit shall violate any applicable requirement of law, or shall be enjoined, temporarily, preliminarily or permanently;

(b)    any representation or warranty by any Credit Party contained herein or in any other Loan Document is (subject to any materiality or other qualifiers contained in such representation or warranty) untrue or incorrect as of such date, except to the extent that such representation or warranty expressly relates to an earlier date and except for changes therein expressly permitted or expressly contemplated by this Agreement (including to the extent a supplement to a Disclosure Schedule is consented to by Agent and Requisite Lenders under Section 5.6) and Agent or Requisite Lenders have determined not to make such Advance Loan or incur such Letter of Credit Obligation as a result of the fact that such warranty or representation is untrue or incorrect; provided, Agent may, but shall not be required to exercise any rights or remedies described in this clause (a) above prior to the date which is three (3) Business Days after demand therefore is made by Requisite Lenders, unless Requisite Lenders have made such request of Agent;

- 22 -

(c)     any event or circumstance having a Material Adverse Effect since the Petition Date has occurred and is continuing since the date hereof as determined by the Requisite Lenders and Agent or Requisite Lenders have determined not to make such Advance or incur such Letter of Credit Obligation as a result of the fact that such event or circumstance has occurred;

(d)     after giving effect to any Advance (or the incurrence of any Letter of Credit Obligations), the outstanding principal amount of the aggregate Revolving Loan would exceed the lesser of (A) the Maximum Amount, (B) the amount permitted under the Interim Order or the Final Order, as the case may be and (C) until entry of the Final Order, the Borrowing Base (less the sum of the aggregate amount of the Swing Line Loan plus the aggregate amount of the Pre-Petition Revolving Credit Obligations);

(e)     any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance (or the incurrence of any Letter of Credit Obligation), and Agent or Requisite Lenders shall have determined not to make any Advance or incur any Letter of Credit Obligation as a result of that Default or Event of Default; or

(f)     at the time of any such Advance or the incurrence of any Letter of Credit Obligation, (i) if such Advance or the incurrence of such Letter of Credit Obligation is prior to the entry and effectiveness of the Final Order, the Interim Order shall have been signed and entered by the Bankruptcy Court and shall be in full force and effect and shall not have terminated or expired, and the date of such Advance or the issuance of such Letter of Credit shall not be more than thirty (30) days from the Petition Date, (ii) if such Advance or the issuance of such Letter of Credit is after the entry and effectiveness of the Final Order or the Final Order shall have been signed and entered by the Bankruptcy Court and shall be in full force and effect, and shall not have terminated or expired, (iii) no Financing Order shall have been vacated, reversed, stayed, amended, supplemented or otherwise modified without the consent of Agent, (iv) no motion for reconsideration of any Financing Order shall be pending, and (v) no appeal of any Financing Order shall be pending and no Financing Order shall be subject of a stay pending appeal or a motion for a stay pending appeal; and

(g)     at the time of such Advance or the incurrence of such Letter of Credit Obligation, the proposed use of proceeds of such Advance or the incurrence of such Letter of Credit Obligation is consistent with the DIP Budget together with any variance permitted under Section 6.10 in effect at such time.

The request and acceptance by any Borrower of the proceeds of any Advance or the incurrence of any Letter of Credit Obligations shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrowers that the conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by Borrowers of the cross-guaranty provisions set forth in Section 12 and of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

## 3. REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loans and to incur Letter of Credit Obligations, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Agent and each Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1 <u>Corporate Existence; Compliance with Law</u>. Each Credit Party (a) is a corporation limited liability company or limited partnership duly organized, validly existing and in good standing (other than as otherwise disclosed in <u>Disclosure Schedule (3.1)</u> with respect to the Inactive Subsidiaries) under the laws of its respective jurisdiction of incorporation or organization set forth in <u>Disclosure Schedule (3.1)</u>; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not reasonably be expected to result in exposure to losses, damages or liabilities in excess of $100,000; (c) subject to entry of the Financing Orders by the Bankruptcy Court, has the requisite corporate, limited liability company or partnership power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) subject to specific representations regarding Environmental Laws and subject to entry of the Financing Orders by the Bankruptcy Court, has all material licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and bylaws or partnership or operating agreement, as applicable; and (f) subject to specific representations set forth herein regarding ERISA, Environmental Laws, tax and other laws, is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.2 <u>Executive Offices, Collateral Locations, FEIN</u>. As of the Closing Date, the current location of each Credit Party's chief executive office and the warehouses and premises at which any Collateral is located are set forth in <u>Disclosure Schedule (3.2)</u>, and, except as set forth in <u>Disclosure Schedule (3.2)</u>, none of such locations has changed within the 12 months preceding the Closing Date. In addition, <u>Disclosure Schedule (3.2)</u> lists the federal employer identification number of each Credit Party.

3.3 <u>Corporate Power, Authorization, Enforceable Obligations</u>. Subject to the entry of the Financing Orders by the Bankruptcy Court, and except as set forth on <u>Disclosure Schedule (3.3)</u>, the execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's power; (b) have been duly authorized by all necessary corporate, limited liability company or limited partnership action; (c) do not contravene any provision of such Person's charter, bylaws or partnership or operating agreement as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority applicable to such Person; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or

by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Agent, on behalf of itself and Lenders, pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in Section 2.1(b), all of which will have been duly obtained, made or complied with prior to the Closing Date. Subject to the entry of the Financing Orders by the Bankruptcy Court, each of the Loan Documents shall be duly executed and delivered by each Credit Party that is a party thereto and each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating or affecting creditors' rights (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealings.

3.4     Financial Statements. All Financial Statements concerning Holdings and its Subsidiaries have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

(a)     Financial Statements. The following Financial Statements attached hereto as Disclosure Schedule (3.4(a)) have been delivered on the date hereof:

(i)     The audited consolidated and consolidating balance sheets at December 31, 2008 and the related statements of income and cash flows of each of (A) Holdings and its Subsidiaries, and (b) Borrowers and their Subsidiaries for the Fiscal Year then ended, as prepared by Borrowers.

(ii)     The unaudited balance sheet at April 30, 2010 and the related statement of income of Borrowers and their Subsidiaries, for the one Fiscal Month then ended, as prepared by Borrowers.

(b)     DIP Budget. The projections in the DIP Budget delivered on the date hereof and attached hereto as Disclosure Schedule (3.4(b)) were believed by the Credit Parties at the time furnished to be reasonable, were prepared in good faith by the Credit Parties, and were based on assumptions, methods and tests stated therein which were believed by the Credit Parties to be reasonable at the time prepared and upon information believed by the Credit Parties to have been accurate based upon the information available to the Credit Parties at the time such projections were prepared, and Holdings is not aware of any facts or information that would lead it to believe that such projections are incorrect or misleading in any material respect..

3.5     Material Adverse Effect. As of the Closing Date, except with respect to the Chapter 11 Case: (a) no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are outstanding as of the Closing Date and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon

any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has had or could reasonably be expected to have a Material Adverse Effect, (c) no Credit Party is in default and to the best of Borrowers' knowledge no third party is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect, and (d) no event has occurred, that alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

3.6 <u>Ownership of Property; Liens</u>. As of the Closing Date, the real estate ("<u>Real Estate</u>") listed in <u>Disclosure Schedule (3.6)</u> constitutes all of the real property owned, leased or subleased, or used by any Credit Party as warehouse, storage or office space or where assets may otherwise be located, and identifies any such real property leased from an Affiliate of any Credit Party. Each Credit Party owns good and marketable fee simple title to all of its owned Real Estate, and valid leasehold interests in all of its leased Real Estate, all as described on <u>Disclosure Schedule (3.6)</u>, and copies of all such leases or a summary of terms thereof reasonably satisfactory to Agent have been delivered or made available to Agent. <u>Disclosure Schedule (3.6)</u> further describes any Real Estate with respect to which any Credit Party is a lessor, sublessor or assignor as of the Closing Date. Each Credit Party also has good and marketable title to, or valid leasehold interests in, all of its material personal property and assets. To the best knowledge of any Credit Party as of the Closing Date, no other party to any such Lease is in default of its material obligations thereunder, and no Credit Party (or any other party to any such Lease) has at any time delivered or received any notice of default which remains uncured under any such Lease and, as of the Closing Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such Lease other than the commencement of the Chapter 11 Case. As of the Closing Date, none of the properties and assets of any Credit Party are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to any Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Permitted Encumbrances. Each Credit Party has received all deeds, assignments, waivers, consents, bills of sale and other similar documents, and has duly effected all recordings, filings and other actions necessary to establish, protect and perfect such Credit Party's right, title and interest in and to all such Real Estate and other properties and assets. <u>Disclosure Schedule (3.6)</u> also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, no portion of any Credit Party's Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its pre-casualty condition or otherwise remedied. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.7 <u>Labor Matters</u>. As of the Closing Date (a) no strikes or other material labor disputes against any Credit Party are pending or, to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of each Credit Party comply in all material respects with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters; (c) subject to entry of the First Day Orders by the Bankruptcy Court, all payments due from any Credit Party for employee health and welfare insurance have been paid or accrued as a liability on the books of such Credit Party; (d) except as

- 26 -

set forth in Disclosure Schedule (3.7), no Credit Party is a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (and true and complete copies of any agreements described on Disclosure Schedule (3.7) have been delivered to Agent); (e) there is no organizing activity involving any Credit Party pending or, to any Credit Party's knowledge, threatened by any labor union or group of employees; (f) there are no representation proceedings pending or, to any Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of any Credit Party has made a pending demand for recognition; and (g) except as set forth in Disclosure Schedule (3.7), there are no material complaints or charges against any Credit Party pending or, to the knowledge of any Credit Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Credit Party of any individual.

3.8     Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. Except as set forth in Disclosure Schedule (3.8), as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person. All of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule (3.8). Except as set forth in Disclosure Schedule (3.8), there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in Section 6.3 (including Disclosure Schedule (6.3)). Except for assets of Holdings with an aggregate fair market value of not more than $100,000, neither Holdings nor any Inactive Subsidiary has any assets (except Stock of their Subsidiaries), engages in any business or operations other than owning Stock of their Subsidiaries, or has any Indebtedness or Guaranteed Indebtedness (except with respect to the Obligations).

3.9     Government Regulation. No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940. No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder. Subject to entry of the Financing Orders by the Bankruptcy Court, the making of the Loans by Lenders to Borrowers, the incurrence of the Letter of Credit Obligations on behalf of Borrowers, the application of the proceeds thereof and repayment thereof and the consummation of the Related Transactions will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.10     Margin Regulations. No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being

- 27 -

referred to herein as "Margin Stock"). No Credit Party owns any Margin Stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board. No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

      3.11    Taxes. All tax returns, reports and statements, including information returns, required by any Governmental Authority ("Tax Returns") to be filed by any Credit Party have been filed with the appropriate Governmental Authority except Tax Returns relating to state and local taxes which do not exceed $250,000 in the aggregate; but, even then, only if the failure to do so would not result in material fines, interests, penalties or other Charges; all such Tax Returns are true, correct and complete in all material respects; and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid), excluding Charges or other amounts being contested in accordance with Section 5.2(b). There are no Liens for Charges (other than for current Charges not yet due and payable) upon the assets of any Credit Party. No adjustment relating to such Tax Returns has been proposed formally (whether verbally or in writing) or informally (in writing) by any Governmental Authority and, to the knowledge of each Credit Party, no basis exists for any such adjustment. Proper and accurate amounts have been withheld by each Credit Party from its respective employees, independent contractors, creditors, members, partners and other third parties for all periods in compliance in all material respects with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities. Disclosure Schedule (3.11) sets forth as of the Closing Date those taxable years for which any Credit Party's Tax Returns are currently being audited by the IRS or any other applicable Governmental Authority, and any assessments or to the knowledge of any Credit Party, any threatened assessments in connection with such audit, or otherwise currently outstanding. Except as described in Disclosure Schedule (3.11), no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges. None of the Credit Parties nor their respective predecessors are liable to any Governmental Authority for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which would have a Material Adverse Effect.

      3.12    ERISA.

      (a)    Disclosure Schedule (3.12) lists (i) all ERISA Affiliates, (ii) all material Plans and separately identifies each such Plan as a Title IV Plan, ESOP or other Pension Plan or as a Welfare Plan, including Retiree Welfare Plans and (iii) each Multiemployer Plan. Copies of all such listed Plans (other than Multiemployer Plans), together with a copy of the latest IRS/DOL 5500-series form for each such Plan, have been delivered or made available to Agent.

Except as disclosed on <u>Disclosure Schedule (3.12)</u>, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and nothing has occurred that would reasonably be expected to cause the loss of such qualification or tax-exempt status. Each Plan is in material compliance with its provisions and the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23. Neither any Credit Party nor ERISA Affiliate has failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA. Neither any Credit Party nor ERISA Affiliate has engaged in a "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject any Credit Party to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)     Except as set forth in <u>Disclosure Schedule (3.12)</u>: (i) no Title IV Plan has any Unfunded Pension Liability, no assets of any Credit Party or ERISA Affiliate are subject to any Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA, and no event has occurred that could reasonably be expected to result in the imposition of such Lien; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Credit Party, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) no Credit Party or ERISA Affiliate has incurred or reasonably expects to incur any liability as a result of a complete or partial withdrawal from a Multiemployer Plan; (v) within the last five years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, nor has any Title IV Plan of any Credit Party or any ERISA Affiliate (determined at any time within the last five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate (determined at such time) with respect to which termination or transfer a Credit Party has a material unsatisfied liability; (vi) except in the case of any ESOP, Stock of all Credit Parties and their ERISA Affiliates makes up, in the aggregate, no more than 10% of fair market value of the assets of any Plan measured on the basis of fair market value as of the latest valuation date of any Plan; and (vii) no liability under any Title IV Plan has been satisfied with the purchase of a contract from an insurance company that is not rated AAA by the Standard & Poor's Corporation or an equivalent rating by another nationally recognized rating agency.

3.13    <u>No Litigation</u>. Except with respect to the Chapter 11 Case, and litigation that is stayed by the commencement of the Chapter 11 Case, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any Credit Party, threatened against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "<u>Litigation</u>"), (a) that challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that would reasonably be expected to be determined adversely to any Credit Party and that, if so determined, would reasonably be expected to have a Material Adverse Effect. Except as set

forth on <u>Disclosure Schedule (3.13)</u>, as of the Closing Date there is no Litigation pending or, to any Credit Party's knowledge, threatened, that seeks damages in excess of $100,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

3.14 <u>Brokers</u>. No broker or finder brought about the obtaining, making or closing of the Loans and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

3.15 <u>Intellectual Property</u>. As of the Closing Date, each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now or heretofore conducted by it or proposed to be conducted by it. Each Trademark and Copyright registered with or that is the subject of an application with the United States Patent and Trademark Office, or its foreign equivalents, or the United States Copyright Office or its foreign equivalents, as applicable, each Patent and each License is listed, together with application or registration numbers, as applicable, in <u>Disclosure Schedule (3.15)</u>. Except as set forth in <u>Disclosure Schedule (3.15)</u>, each Credit Party, jointly and severally, represents and warrants that all Patents, Trademarks and Copyrights which are necessary or material to the operations of such Credit Party have been registered with the United States Patent and Trademark Office or its foreign equivalents or the United States Copyright Office or its foreign equivalents, as applicable. Each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect. Except as set forth in <u>Disclosure Schedule (3.15)</u>, no Credit Party is aware of any infringement claim by any other Person with respect to any Intellectual Property.

3.16 <u>Full Disclosure</u>. No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports (other than the Projections) from time to time delivered hereunder and no written statement furnished by or on behalf of any Credit Party to Agent or any Lender pursuant to the terms of this Agreement contains or will contain when delivered or furnished any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. Subject to the entry of the Financing Orders, the Liens granted to Agent, on behalf of itself and Lenders, pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to the Carve-Out and Permitted Prior Liens. The DIP Budget and other projections included in such information are or will be based on assumptions and estimates developed by management of the Credit Parties in good faith and considered by the preparer to be reasonable as of the date such projections are prepared and are delivered to Agent and/or Lenders, subject to the understanding expressed in <u>Section 3.4(b)</u> hereto. Other than the commencement of the Chapter 11 Case and liabilities the enforcement of which are stayed by the commencement of the Chapter 11 Case, there is no contingent liability or fact that could reasonably be expected to have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

3.17    Environmental Matters.

(a)    Except as set forth in Disclosure Schedule (3.17), as of the Closing Date: (i) the Real Estate is free of contamination from any Hazardous Material except for such contamination that would not impact the value or marketability of such Real Estate and that would not result in material Environmental Liabilities; (ii) no Credit Party has caused or suffered to occur any Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; (iii) the Credit Parties are and have been in compliance with all Environmental Laws, except for such noncompliance that would not result in material Environmental Liabilities; (iv) the Credit Parties have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, except where the failure to so obtain or comply with such Environmental Permits would not result in material Environmental Liabilities, and all such Environmental Permits are valid, uncontested and in good standing; (v) no Credit Party is involved in operations or knows of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any material Environmental Liabilities; and no Credit Party has permitted any current or former tenant or occupant of the Real Estate to engage in any such operations; (vi) there is no Litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Material that seeks damages, penalties, fines, costs or expenses in excess of $100,000 or injunctive relief against, or that alleges criminal misconduct by, any Credit Party; and (vii) no notice has been received by any Credit Party identifying it as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any Credit Party being identified as a "potentially responsible party" under CERCLA or analogous state statutes.

(b)    The Credit Parties have provided to Agent copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities performed at the request of any Credit Party or otherwise received by any Credit Party, in each case relating to any Credit Party.

(c)    Each Credit Party hereby acknowledges and agrees that Agent (i) is not now, and has not ever been, in control of any of the Real Estate or any Credit Party's affairs, and (ii) is not authorized by the Loan Documents or otherwise to influence any Credit Party's conduct with respect to the ownership, operation or management of any of its Real Estate or compliance with Environmental Laws or Environmental Permits.

3.18    Insurance.  Disclosure Schedule (3.18) lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the terms of each such policy.

3.19    Deposit and Disbursement Accounts.  Disclosure Schedule (3.19) lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.20    <u>Government Contracts</u>. Except as set forth in <u>Disclosure Schedule (3.20)</u>, as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local law.

3.21    <u>Customer and Trade Relations</u>. As of the Closing Date, except with respect to the Chapter 11 Case there exists no actual or, to the knowledge of any Credit Party, threatened termination or cancellation of, or any material adverse modification or change in: the business relationship of any Credit Party with any customer or group of customers whose purchases during the preceding 12 months caused them to be ranked among the ten largest customers of such Credit Party; or the business relationship of any Credit Party with any supplier material to its operations.

3.22    <u>Agreements and Other Documents</u>. (a) As of the Closing Date, each Credit Party has provided to Agent or its counsel, on behalf of Lenders, accurate and complete copies (or summaries) of all of the following agreements or documents to which it is subject and each of which is listed in <u>Disclosure Schedule (3.22)(a)</u>: supply agreements and purchase agreements not terminable by such Credit Party within 60 days following written notice issued by such Credit Party and involving transactions in excess of $1,000,000 per annum; leases of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $500,000 per annum; licenses and permits held by the Credit Parties, the absence of which could reasonably be expected to have a Material Adverse Effect; instruments and documents evidencing any Indebtedness or Guaranteed Indebtedness of such Credit Party (other than as to the Obligations) and any Lien granted by such Credit Party with respect thereto; and instruments and agreements evidencing the issuance of any equity securities, warrants, rights or options to purchase equity securities of such Credit Party.

(b)    Set forth in <u>Disclosure Schedule (3.22(b))</u> is a list, as of the Closing Date of the ten largest customers and clients of the Credit Parties, taken as a whole, as measured by gross revenues of the Credit Parties generated by such customers and clients, for the two years ended as of December 31, 2008 and 2009. Except as disclosed in <u>Disclosure Schedule (3.22(b))</u>, as of the Closing Date, except in connection with the Chapter 11 Case, no significant customer or client (or group of related customers or clients which in the aggregate is significant) of the Credit Parties, taken as a whole, has given them notice or, to the knowledge of the Credit Parties, has taken any other action which has given any Credit Party any reason to believe that such customer or client (or group of related customers or clients) will materially reduce the amount of its purchases or materially adversely change the price or terms of such purchases. For such purposes, a customer or client (or group of related customers or clients) shall be deemed "significant" if such customer or client (or group of related customers or clients) has accounted for more than 5% of the total gross revenues of the Credit Parties (taken as a whole) during the past Fiscal Year.

(c)    Set forth in <u>Disclosure Schedule (3.22(c))</u> is a list, as of the Closing Date of the ten largest suppliers and vendors of the Credit Parties, taken as a whole, as measured by the cost of purchases made by the Credit Parties, for the two years ended as of December 31, 2008 and 2009. Except as disclosed in <u>Disclosure Schedule (3.22(c))</u>, except with respect to the Chapter 11 Case, as of the Closing Date, no significant supplier or vendor (or group of related

LEGAL_US_E # 88239000.12

suppliers or vendors which in the aggregate is significant) of the Credit Parties, taken as a whole, has given them notice or, to the knowledge of the Credit Parties, has taken any other action which has given any Credit Party any reason to believe that such supplier or vendor (or group of related suppliers or vendors) will cease to supply or materially restrict the amount supplied or materially adversely change its price or terms to any Credit Party of any products or services. For such purposes, a supplier or vendor (or group of related suppliers or vendors) shall be deemed "significant" if such supplier or vendor (or group of related suppliers or vendors) has accounted for more than 5% of such total cost of purchases of the Credit Parties (taken as a whole) during the past Fiscal Year.

3.23    363 Sale. As of the Closing Date, the Credit Parties have not entered into an agreement or other documents related to the sale of their assets pursuant to Section 363 of the Bankruptcy Code, other than that certain letter of intent, dated as of June 4, 2010, between The Gores Group, LLC and NEC.

3.24    Restrictions on or Relating to Subsidiaries. Except with respect to the Chapter 11 Case and the restrictions imposed by the Bankruptcy Code, and subject to entry of the First Day Orders by the Bankruptcy Court, there does not exist any encumbrance or restriction on the ability of (a) any Borrower or any Subsidiary of any Borrower to pay dividends or make any other distributions on its Stock or any other interest or participation in its profits owned by any Borrower or any Subsidiary of any Borrower, or to pay any Indebtedness owed to any Borrower or any Subsidiary of any Borrower, (b) any Borrower or any Subsidiary of any Borrower to make loans or advances to any Borrower or any Subsidiary of any Borrower or (c) any Borrower or any Subsidiary of any Borrower to transfer any of its properties or assets to any Borrower or any Subsidiary of any Borrower, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) the Loan Documents, and (iii) the Pre-Petition Credit Agreement.

3.25    Foreign Assets Control Regulations. None of the Credit Parties nor, to the best knowledge of each Credit Party, any Affiliate of any Credit Party, is, or will be after consummation of the Related Transactions and application of the proceeds of the Loans, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation of, any United States Federal statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof or the ownership or operation of any Property.

3.26    Anti-Terrorism Law.

(a)    No Credit Party and, to the knowledge of the Credit Parties, none of its Affiliates is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "Patriot Act").

(b)     No Credit Party, and to the knowledge of the Credit Parties, no Affiliate or broker or other agent of any Credit Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; or

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order.

(c)     No Credit Party and, to the knowledge of the Credit Parties, no broker or other agent of any Credit Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in paragraph (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

3.27    Bankruptcy Matters.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice for (x) the motion seeking approval of the Loan Documents and the Financing Orders, (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order has been given. Borrowers shall give, on a timely basis as specified in the Financing Orders, all notices required to be given to all parties specified in the Financing Orders.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject to the terms of the Financing Orders, subject, as to priority only, to the Carve-Out and Permitted Prior Liens.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Loan Documents.

## 4.     FINANCIAL STATEMENTS AND INFORMATION

4.1     Reports and Notices.

(a)     Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and Lenders, as required, the Financial Statements, notices and other information at the times, to the Persons and in the manner set forth in Annex E.

(b)     Each Credit Party executing this Agreement hereby agrees that, from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and Lenders, as required, the various Collateral Reports (including Borrowing Base Certificates in the form of Exhibit 4.1(b)) at the times, to the Persons and in the manner set forth in Annex F.

4.2     Communication with Accountants.     Each Credit Party executing this Agreement authorizes (a) Agent, and (b) so long as an Event of Default has occurred and is continuing, Agent and each Lender, to communicate directly with its independent certified public accountants, including Amper, Politziner & Mattia, LLP and authorizes and, at Agent's request, shall instruct those accountants and advisors to disclose and make available to Agent and each Lender any and all Financial Statements and other supporting financial documents, schedules and information relating to any Credit Party (including copies of any issued management letters) with respect to the business, financial condition and other affairs of any Credit Party.

## 5.     AFFIRMATIVE COVENANTS

Each Credit Party executing this Credit Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

5.1     Maintenance of Existence and Conduct of Business.     Each Credit Party (other than Inactive Subsidiaries) shall: do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its material rights and franchises; continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; at all times maintain, preserve and protect all of its assets and material properties useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and except as permitted by Section

6.15, transact business only in such corporate and trade names as are set forth in <u>Disclosure Schedule (5.1)</u>.

5.2    <u>Payment of Charges</u>.

(a)    Subject to <u>Section 5.2(b)</u>, and except to the extent such nonpayment is permitted by the Bankruptcy Code, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it (other than Charges that it does not have knowledge of and which do not exceed $250,000 in the aggregate), including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due.  Notwithstanding the foregoing, Borrowers shall not be required to pay any taxes, fees or other charges, the nonpayment of which is permitted by the Bankruptcy Code.

(b)    Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in <u>Section 5.2(a)</u>; <u>provided</u>, that except to the extent nonpayment or inaction is permitted by the Bankruptcy Code (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) subject to compliance with the DIP Budget, such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Agent evidence reasonably acceptable to Agent of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this <u>Section 5.2(b)</u> are no longer met.

5.3    <u>Books and Records</u>.  Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as <u>Disclosure Schedule (3.4(a))</u>.

5.4    <u>Insurance; Damage to or Destruction of Collateral</u>.

(a)    Subject to the entry of the First Day Orders, the Credit Parties shall, at their sole cost and expense, maintain the policies of insurance described on <u>Disclosure Schedule (3.18)</u> as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Agent.  Such policies of insurance (or the loss payable and additional insured endorsements delivered to Agent) shall contain provisions pursuant to which the insurer agrees to provide 30 days prior written notice to Agent in the event of any non-renewal, cancellation or amendment of any such insurance policy.  If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above, or to pay all premiums relating thereto, Agent may at any time or times thereafter obtain and maintain

such policies of insurance and pay such premiums. Agent shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, Agent shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor. All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrowers to Agent and shall be additional Obligations hereunder secured by the Collateral.

(b)     Agent reserves the right at any time upon any change in any Credit Party's risk profile (including any change in the product mix maintained by any Credit Party or any laws affecting the potential liability of such Credit Party) to require additional forms and limits of insurance to, in Agent's reasonable opinion, adequately protect both Agent's and Lender's interests in all or any portion of the Collateral and to ensure that each Credit Party is protected by insurance in amounts and with coverage customary for its industry. If reasonably requested by Agent, each Credit Party shall deliver to Agent from time to time a report of a reputable insurance broker, reasonably satisfactory to Agent, with respect to its insurance policies.

(c)     Within 20 days following the Closing Date, each Credit Party shall deliver to Agent, in form and substance reasonably satisfactory to Agent, endorsements to (i) all "All Risk" and business interruption insurance naming Agent, on behalf of itself and Lenders, as loss payee, and (ii) all general liability and other liability policies naming Agent, on behalf of itself and Lenders, as additional insured. Subject to the restrictions imposed by the Bankruptcy Code, each Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as any Default or Event of Default has occurred and is continuing or the anticipated insurance proceeds exceed $1,500,000, as such Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such "All Risk" policies of insurance, endorsing the name of such Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance. Agent shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney. Borrower Representative shall promptly notify Agent of any loss, damage, or destruction to the Collateral in the amount of $100,000 or more, whether or not covered by insurance or reimbursable under condemnation provisions. Subject to the restrictions imposed by the Bankruptcy Code and the Financing Orders, after deducting from such proceeds the expenses, if any, incurred by Agent in the collection or handling thereof, Agent may, subject to the immediately succeeding sentence, at its option, either (i) apply such insurance or condemnation proceeds to the reduction of the Obligations in accordance with Section 1.3(c) or (ii) permit the Credit Parties to replace, restore, repair or rebuild the property on terms acceptable to Agent in its sole discretion; provided that in the case of insurance or condemnation proceeds pertaining to any Credit Party that is not a Borrower, (i) such insurance or condemnation proceeds shall be applied ratably to all of the Loans owing by each Borrower, or (ii) permit or require the applicable Credit Party to use such money, or any part thereof, to replace, repair, restore or rebuild the Collateral in a diligent and expeditious manner with materials and workmanship of substantially the same quality as existed before the loss, damage or destruction.

5.5     Compliance with Laws. Except to the extent that non-compliance is permitted by the Bankruptcy Code, each Credit Party shall comply with all federal, state, local

- 37 -

and foreign laws and regulations applicable to it, including those relating to ERISA and labor matters and Environmental Laws and Environmental Permits, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.6     Supplemental Disclosure.   From time to time as may be reasonably requested by Agent, the Credit Parties shall supplement each Disclosure Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify the term "Disclosure Schedule" as used herein or any representation with respect thereto, or be or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Agent and Requisite Lenders in writing, (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date and (c) the requirement to supplement the Disclosure Schedules hereto shall be subject to any materiality and other qualifiers set forth in any representation and warranty.

5.7     Intellectual Property.   Each Credit Party will conduct its business and affairs without knowingly infringing or interfering with any Intellectual Property of any other Person in any material respect.

5.8     Environmental Matters.   Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) subject to compliance with the DIP Budget, implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate; (c) notify Agent promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that could reasonably be expected to result in any material Environmental Liabilities; and (d) promptly forward to Agent a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in material Environmental Liabilities, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of

its Real Estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then each Credit Party shall, upon Agent's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrowers' expense, as Agent may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent, and (ii) permit Agent or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and testing as Agent deems appropriate, including subsurface sampling of soil and groundwater. Borrowers shall reimburse Agent for the costs of such audit and tests and the same will constitute a part of the Obligations secured hereunder.

5.9 <u>Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases</u>. Subject to entry of the Financing Orders, any landlord's agreement, mortgagee agreement or bailee letter executed in connection with the Pre-Petition Credit Agreement shall also apply to GE Capital as Agent hereunder. After the Closing Date, no real property or warehouse space shall be leased or rented by any Credit Party and no assets shall be otherwise located at any public warehouse and no Inventory shall be shipped to a processor or converter under arrangements established after the Closing Date without the prior written consent of Agent unless and until a reasonably satisfactory landlord agreement or bailee letter, as appropriate, shall first have been obtained with respect to such location. Subject to compliance with the DIP Budget and except as such nonpayment is permitted by the Bankruptcy Code, each Credit Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased or rented location or public warehouse where any Collateral is or may be located. To the extent otherwise permitted hereunder, if any Credit Party proposes to acquire a fee ownership interest in Real Estate after the Closing Date, it shall first provide to Agent a mortgage or deed of trust granting Agent a first priority Lien on such Real Estate, subject to Permitted Encumbrances, together with environmental audits, mortgage title insurance commitment, real property survey, local counsel opinion(s), and, if required by Agent, supplemental casualty insurance and flood insurance, and such other documents, instruments or agreements reasonably requested by Agent, in each case, in form and substance reasonably satisfactory to Agent.

5.10 <u>ERISA</u>. Except as such noncompliance is permitted by the Bankruptcy Code, with respect to each Plan, each Credit Party shall comply in all material respects with the applicable provisions of ERISA and the IRC, except to the extent such failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The Credit Parties shall furnish to Agent written notice within 30 Business Days after any Credit Party knows or has reason to know, of: (a) a plan amendment that materially increases the benefits of any existing Plan, the establishment of any new Plan providing material additional benefits, or the commencement of material contributions to any Multiemployer Plan; or (b) an ERISA Event or any event, whether an ERISA Event or not, that could reasonably be expected to result in the imposition of a Lien against a Credit Party or an ERISA Affiliate under Code Section 412 or ERISA Section 302 or 4068, together with a statement of an officer setting forth the details of such Event and action which the Credit Parties propose to take with respect thereto. Upon Agents' written request, each Credit Party shall furnish to Agent, within 30 Business Days after the filing thereof with the Department of Labor, IRS or PBGC, copies of

each annual report (Form 5500 series) filed for each Plan and the most recent actuarial report for each Title IV Plan.

5.11    Further Assurances. Each Credit Party executing this Agreement agrees that it shall and shall cause each other Credit Party to, at such Credit Party's expense and upon request of Agent, duly execute and deliver, or cause to be duly executed and delivered, to Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Agent to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

5.12    Patriot Act Compliance. The Credit Parties shall provide such information and take such actions as are reasonably required by Agent or any Lender in order to assist Agent and Lenders with compliance with the Patriot Act.

5.13    Compliance with Milestones. Unless otherwise waived by Agent and the Requisite Lenders in their sole and absolute discretion, each Credit Party shall achieve the Milestones set forth below by the dates specified (or such later date as may be agreed to by Agent and the Requisite Lenders in their sole discretion).

(a)    Execution of a definitive asset purchase agreement ("Asset Purchase Agreement"), in form and substance satisfactory to Agent, for the sale of all or substantially all of the Credit Parties' assets under section 363 of the Bankruptcy Code on or before July 2, 2010;

(b)    Filing of a motion, in form and substance satisfactory to Agent, seeking approval of agreed bidding procedures (the "Bidding Procedures") and authority to sell the Credit Parties' assets pursuant to Section 363 of the Bankruptcy Code on or before July 6, 2010;

(c)    Entry of a Bankruptcy Court order in form and substance satisfactory to Agent approving the Bidding Procedures on or before July 16, 2010;

(d)    An auction for the sale of the Credit Parties assets pursuant to Section 363 of the Bankruptcy Code shall have occurred on or before August 23, 2010;

(e)    Entry of a Bankruptcy Court order, in form and substance satisfactory to Agent, authorizing the sale of the Credit Parties' assets pursuant to Section 363 of the Bankruptcy Code on or before August 27, 2010; and

(f)    The closing of the sale pursuant to the Asset Purchase Agreement which shall provide sufficient cash proceeds to repay in full in cash all outstanding Obligations and the Pre-Petition Tranche A Obligations (if any) shall have occurred on or before August 31, 2010.

5.14    Cooperation with Advisors. Each of the Credit Parties will use commercially reasonable efforts to provide full cooperation and assistance to Advisors hired by or at the discretion of Agent and the Lenders (or their counsel) to enable such Advisors to perform the services for which they are engaged, including without limitation relating to the preparation and negotiation of the Asset Purchase Agreement.

- 40 -

5.15  Chief Restructuring Officer; Temporary Staff; M&A Advisor. The Credit Parties shall continue to retain at all times (i) the services of Stephen Gawrylewski of Loughlin Meghji + Company as Chief Restructuring Officer (the "Chief Restructuring Officer") with at least as much responsibility and authority as exists with respect to Mr. Gawrylewski's role in relation to the Credit Parties on the Closing Date, (ii) the services of additional temporary staff to be provided by Loughlin Meghji + Company in connection with the Chapter 11 Case (the "Temporary Staff") with at least as much responsibility and authority as exists with respect to Loughlin Meghji + Company's role in relation to the Credit Parties on the Closing Date, and (iii) William Blair & Company as its advisor in connection with the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code (the "M&A Advisor"). The Credit Parties shall be permitted to replace the Chief Restructuring Officer, the Temporary Staff or the M&A Advisor with any another advisor acceptable to Agent, and shall be permitted a period a time (not to exceed 10 Business Days) to file an application with the Bankruptcy Court to employ such replacement advisor.

5.16  Use of Proceeds. Borrowers shall utilize the proceeds of the Loans for working capital and for other general corporate purposes in a manner consistent in all material respects with the DIP Budget, together with any variance permitted under Section 6.10, for payment of (a) post-petition operating expenses and other working capital and financing requirements of Borrowers subject to the DIP Budget, (b) certain transaction fees, costs and expenses, (c) certain other costs and expenses incurred in the administration of the Chapter 11 Case, (d) the Pre-Petition Tranche A Obligations, and (e) amounts owed pursuant to the Pre-Petition Credit Agreement to the extent consistent with the DIP Budget. Subject to the terms of the Financing Orders, Borrowers shall not be permitted to use the proceeds of the Loans: (a) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to (i) the interests of Agent and the Lenders or their rights and remedies under this Agreement or the other Loan Documents, or (ii) the interests of the Pre-Petition Agent or the Pre-Petition Lenders under the Pre-Petition Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by Borrowers or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (A) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Pre-Petition Tranche A Obligations or the Liens securing same, (B) for monetary, injunctive or other affirmative relief against any Pre-Petition Tranche A Lender, Pre-Petition Agent, Lender or Agent or their respective counsel, or (C) preventing, hindering or otherwise delaying the exercise by any Pre-Petition Tranche A Lender, Pre-Petition Agent, Lender or Agent of any rights and remedies under the Financing Orders, the Pre-Petition Loan Documents, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Pre-Petition Tranche A Lenders, the Pre-Petition Agent, the Lenders and Agent upon any of their Collateral; provided, however, that an amount not in excess of $100,000 will be available for the payment of fees and expenses of professionals of any Committee incurred in investigating the claims of Pre-Petition Agent and lenders under the Pre-Petition Credit Agreement, (a) to make any distribution under a plan of reorganization in the Chapter 11 Case or under a plan of compromise, (b) to make any payment in settlement of any claim, action or proceedings, before any court, arbitrator or other governmental body without the prior written consent of Agent or as

- 41 -

may be ordered or approved by such court after appropriate notice or hearing and (c) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interest in Borrowers or any other Credit Party (including so-called "topping fees", "breakup fees" and similar amounts) without the prior written consent of Agent.

5.17 <u>Financing Order; Final Order</u>. The Financing Order shall contain findings and conclusions with respect to, among other things, the validity and amount of the lenders under the Pre-Petition Credit Agreement claims and the validity, priority and perfection of their pre-petition liens. The Final Order shall provide for the payment in full in cash of all outstanding Obligations and Pre-Petition Tranche A Obligations (if any).

5.18 <u>Mortgages</u>. On or before the date on which the Final Order is entered, the Credit Parties shall deliver a Mortgage to Agent for each location set forth on <u>Disclosure Schedule 3.6</u> that is still owned by any Credit Party.

5.19 <u>Asset Purchase Agreement Negotiations</u>. The Credit Parties and their counsel and other advisors shall regularly consult with Agent and its Advisors regarding negotiation of the terms of the Asset Purchase Agreement with The Gores Group, LLC for the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code, and Agent and its Advisors shall have the right to be included in the negotiation and preparation of the Asset Purchase Agreement and all agreements and other documents related thereto.

## 6. NEGATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof until the Termination Date:

6.1 <u>Mergers, Subsidiaries, Etc</u>. No Credit Party shall directly or indirectly, by operation of law or otherwise, (a) form or acquire any Subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person, or all or substantially all of the assets constituting the business of a division, branch or other unit of operation of any Person.

6.2 <u>Investments; Loans and Advances</u>. Except as otherwise expressly permitted by this <u>Section 6</u>, no Credit Party shall make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that: (a) Borrowers may hold investments comprised of notes payable, or stock or other securities issued by Account Debtors to any Borrower pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, so long as the aggregate amount of such Accounts so settled by Borrowers does not exceed $500,000; and (b) each Credit Party may maintain or increase its existing investments in the Borrowers (other than Inactive Subsidiaries).

LEGAL_US_E # 88239000.12

6.3    Indebtedness.

(a)    No Credit Party shall create, incur, assume or permit to exist any Indebtedness, except (without duplication) (i) Indebtedness secured by purchase money security interests and Capital Leases permitted in Section 6.7(c), (ii) the Loans and the other Obligations, (iii) unfunded pension fund and other employee benefit plan obligations and liabilities to the extent they are permitted to remain unfunded under applicable law, (iv) [intentionally omitted]; (v) existing Indebtedness described in Disclosure Schedule (6.3) and refinancings thereof or amendments or modifications thereto that do not have the effect of increasing the principal amount thereof or changing the amortization thereof (other than to extend the same) and that are otherwise on terms and conditions no less favorable to any Credit Party, Agent or any Lender, as determined by Agent, than the terms of the Indebtedness being refinanced, amended or modified, (vi) Indebtedness specifically permitted under Sections 6.6 and 6.17; (vii) Indebtedness consisting of intercompany loans and advances made by any Borrower to any other Borrower; and (viii) the loans and other obligations under the Pre-Petition Credit Agreement.

(b)    No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness, other than (i) the Obligations; (ii) Indebtedness secured by a Permitted Encumbrance if the asset securing such Indebtedness has been sold or otherwise disposed of in accordance with Sections 6.8(b) or (c); and (iii) as otherwise permitted in Section 6.14.

(c)    Notwithstanding the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 6.3 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the super priority administrative expense claims of Agent and the Lenders as set forth herein and in the Financing Orders.

6.4    Employee Loans and Affiliate Transactions.

(a)    Except as otherwise expressly permitted in this Section 6 with respect to Affiliates and Designated Affiliates, and except as permitted by a First Day Orders, no Credit Party shall enter into or be a party to any transaction with any other Credit Party, any Affiliate or any Designated Affiliate thereof except in the ordinary course of and pursuant to the reasonable requirements of such Credit Party's business and upon fair and reasonable terms that are no less favorable to such Credit Party than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of such Credit Party. In addition, if any such transaction or series of related transactions (other than the transactions permitted under clause (b) below) involves payments in excess of $100,000 in the aggregate, the terms of these transactions must be disclosed in advance to Agent and Lenders. All transactions existing as of the date hereof with any Affiliate or any Designated Affiliate are described in Disclosure Schedule (6.4(a)).

(b)    No Credit Party shall enter into or permit to exist any lending or borrowing transaction with any employee, consultant, director, officer or Stockholder of any Credit Party, except (i) loans to its employees and consultants (excluding any Designated Affiliate) in the ordinary course of business consistent with past practices, (ii) loans outstanding

on the date hereof and set forth on Disclosure Schedule (6.4(b)), and (iii) loans permitted under Section 6.3(a)(vii); in each case, only to the extent consistent with the DIP Budget.

6.5    Capital Structure and Business.    No Credit Party shall (a) make any changes in any of its business objectives, purposes or operations that could reasonably be expected to materially adversely affect the repayment of the Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect, (b) make any change in its capital structure as described in Disclosure Schedule (3.8), including the issuance or sale of any shares of Stock, warrants or other securities convertible into Stock or any revision of the terms of its outstanding Stock, or (c) amend its charter or bylaws in a manner that would adversely affect Agent or Lenders or such Credit Party's duty or ability to repay the Obligations and provided, further, that any Inactive Subsidiary may be dissolved so long as any assets held by it are transferred to a Credit Party not being dissolved.    No Credit Party shall engage in any business other than the businesses currently engaged in by it or businesses reasonably related thereto.

6.6    Guaranteed Indebtedness.    No Credit Party shall create, incur, assume or permit to exist any Guaranteed Indebtedness except (a) by endorsement of instruments or items of payment for deposit to the general account of any Credit Party, and (b) for Guaranteed Indebtedness incurred for the benefit of any other Credit Party if the primary obligation is expressly permitted by this Agreement; provided, that, in no event shall any Credit Party (other than Holdings) incur any Guaranteed Indebtedness for the benefit of Holdings without the prior written consent of Agent and Requisite Lenders.

6.7    Liens.    No Credit Party shall create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties or assets (whether now owned or hereafter acquired) except for (a) Permitted Encumbrances; (b) Liens in existence on the Petition Date and summarized on Disclosure Schedule (6.7) and securing Indebtedness described on Disclosure Schedule (6.3) and permitted refinancings, extensions and renewals thereof, including extensions or renewals of any such Liens; provided that the principal amount of the Indebtedness so secured is not increased and the Lien does not attach to any other property; (c) Liens created after the date hereof by conditional sale or other title retention agreements (including Capital Leases) or in connection with purchase money Indebtedness with respect to Equipment and Fixtures and other capital assets acquired by any Credit Party in the ordinary course of business, involving the incurrence of an aggregate amount of purchase money Indebtedness and Capital Lease Obligations of not more than $250,000 outstanding at any one time for all such Liens (provided that such Liens attach only to the assets subject to such purchase money debt and such Indebtedness is incurred within 20 days following such purchase and does not exceed 100% of the purchase price of the subject assets), and (d) Liens arising from precautionary UCC-1 financing statements with respect to Equipment or Real Estate which is the subject of an operating lease. In addition, no Credit Party shall become a party to any agreement, note, indenture or instrument, or take any other action, that would prohibit the creation of a Lien on any of its properties or other assets in favor of Agent, on behalf of itself and Lenders, as additional collateral for the Obligations, except operating leases, Capital Leases or Licenses which prohibit Liens upon the assets that are subject thereto. The prohibition provided for in this Section 6.7 specifically includes, without limitation, any effort by Borrowers, the Committee or any other party-in-interest in any Chapter 11 Case to prime or create pari passu Liens to any

- 44 -

claims of Agent or the Lenders (subject to the Carve-Out) irrespective of whether such claims or interest may be "adequately protected".

6.8    Sale of Stock and Assets.    No Credit Party shall sell, transfer, convey, lease, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) or any of its Accounts, other than (a) the sale of Inventory in the ordinary course of business; (b) the sale, transfer, conveyance or other disposition by a Credit Party of Equipment, Fixtures or Real Estate that are obsolete or no longer used or useful in such Credit Party's business and having an appraised value not exceeding $100,000 in any single transaction or $200,000 in the aggregate in any Fiscal Year; (c) the sale, transfer, conveyance or other disposition by a Credit Party of other Equipment and Fixtures having a value not exceeding $100,000 in any single transaction or $200,000 in the aggregate in any Fiscal Year; (d) the sale or transfer of any Inventory, Accounts or Equipment by a Borrower to another Borrower in the ordinary course of business and consistent with past practices; (e) the lease, sublease or license of real property, in the ordinary course of business for fair market consideration, provided that such real property is not necessary for the operations of Borrowers' business, at the time thereof and after giving effect thereto, no Default or Event of Default had occurred and is continuing and Agent has a first priority perfected lien on any such lease, sublease, license and the proceeds therefrom; and (f) the sale of the Hamburg Facility upon Agent's prior written consent.    With respect to any disposition of assets or other properties permitted pursuant to clauses (b) and (c) above, subject to Section 1.3(c), Agent agrees on reasonable prior written notice to release its Lien on such assets or other properties in order to permit the applicable Credit Party to effect such disposition and shall execute and deliver to Borrowers, at Borrowers' expense, appropriate UCC-3 termination statements and other releases as reasonably requested by Borrowers.

6.9    ERISA.    No Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur an event that could result in the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA or cause or permit to occur an ERISA Event to the extent such ERISA Event could reasonably be expected to have a Material Adverse Effect.

6.10    Budget Covenants.    Borrowers shall not breach or fail to comply with any of the following covenants:

(a)    Cumulative Disbursement Covenant.    The aggregate cumulative expenditures ("Total Uses" line item under the DIP Budget) by the by the Credit Parties after the Petition Date (i) for the week ended June 18, 2010 shall not exceed 135% of the aggregate amount budgeted for such week pursuant to the DIP Budget, (ii) for the two weeks ended June 25, 2010 shall not exceed 125% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 2, 2010 shall not exceed 115% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 9, 2010 and for any weekly period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis) shall not exceed 115%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

- 45 -

(b)    Minimum Collections Covenant.  The aggregate cumulative collections ("Total Sources" line item under the DIP Budget) by the Credit Parties after the Petition Date (i) for the week ended June 18, 2010 shall not be less than 80% of the aggregate amount budgeted for such week pursuant to the DIP Budget, (ii) for the two weeks ended June 25, 2010 shall not be less than 85% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 2, 2010 shall not be less than 85% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 9, 2010 and for any weekly period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis) shall not be less than 85%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

(c)    Minimum Sales Covenant.  The aggregate cumulative sales ("Sales" line item under the DIP Budget) by the Credit Parties after the Petition Date (i) for the week ended June 18, 2010 shall not be less than 80% of the aggregate amount budgeted for such week pursuant to the DIP Budget, (ii) for the two weeks ended June 25, 2010 shall not be less than 85% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 2, 2010 shall not be less than 85% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 9, 2010 and for any weekly period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis) shall not be less than 85%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

6.11    Hazardous Materials.  No Credit Party shall cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any material respect, or form the basis for any material Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities that could not reasonably be expected to have a Material Adverse Effect.

6.12    Sale-Leasebacks.  No Credit Party shall engage in any sale leaseback, synthetic lease or similar transaction involving any of its assets.

6.13    Cancellation of Indebtedness.  No Credit Party shall cancel any claim or debt owing to it, except (a) for debt owing by employees or consultants permitted under Section 6.4(b) which is cancelled and treated as compensation expense and (b) for reasonable consideration negotiated on an arm's length basis and in the ordinary course of its business consistent with past practices.

6.14    Restricted Payments. No Credit Party shall make any Restricted Payment, except (a) payments of principal and interest on intercompany loans and advances between Borrowers to the extent permitted by Section 6.3, (b) dividends and distributions by Subsidiaries of any Borrower paid to such Borrower, (c) dividends and distributions in an amount not to exceed $10,000 in the aggregate for the term hereof by Borrowers to Holdings necessary for Holdings to maintain its corporate existence and to pay other ordinary expenses consistent with

past practices, and (d) dividends and distributions by Borrowers to Holdings to enable Holdings to make payments when due and payable under the Tax Sharing Agreement.

6.15  Change of Corporate Name or Location; Change of Fiscal Year.  Except as expressly permitted under Section 6.5, no Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization (b) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization.  No Credit Party shall change its Fiscal Year.

6.16  No Impairment of Intercompany Transfers.  Subject to entry of the First Day Orders, no Credit Party shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents and the Pre-Petition Credit Agreement) that directly or indirectly restricts, prohibits or requires the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany loans by a Subsidiary of any Borrower to any Borrower or between Borrowers.

6.17  No Speculative Transactions.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions, except solely to hedge against fluctuations in the prices of commodities owned or purchased by it and the values of foreign currencies receivable or payable by it and interest swaps, caps or collars.

6.18  Leases; Real Estate Purchases.  No Credit Party shall enter into or be a party to any operating lease for Equipment or Real Estate (including the Sale Leaseback Lease), if the aggregate of all such operating lease payments payable in any year for all Credit Parties on a consolidated basis would exceed $19,000,000 for such Fiscal Year.  No Credit Party shall purchase a fee simple ownership interest in Real Estate.

6.19  Changes Relating to Subordinated Debt, Material Contracts and Certain Other Agreements.

(a)  No Credit Party shall change or amend the terms of any Subordinated Debt (or any indenture or agreement in connection therewith).

(b)  Except as permitted by the Financing Orders and the First Day Orders, no Credit Party shall change or amend the terms of any of the following material contracts: (i) the Tax Sharing Agreement, (ii) the Employment Agreements, (iii) the Sale Leaseback Lease and (iv) the non-compete agreement referred to in clause (ii) of the definition of "Manager Employment Agreements".

(c)  No Credit Party shall make any payments or transfer, or agree to setoff or recoupment, with respect to any Pre-Petition claim, Pre-Petition Lien or Pre-Petition Indebtedness, except (a) to the extent authorized by any First Day Order or the Financing Orders, (b) as otherwise permitted by law or order of the Bankruptcy Court, or (c) as expressly permitted by the terms of the Loan Documents and the DIP Budget or the Financing Orders; or

(d)     No Credit Party shall change, amend or modify, or permit the amendment or modification of, (i) the Financing Orders, or (ii) the First Day Orders, to the extent (A) affecting the rights or obligations of Agent, the DIP Lenders, the Pre-Petition Agent or Pre-Petition Lenders or (B) which may give rise to a post-petition claim, administrative in nature or otherwise, without the prior written consent of Agent.

6.20    Credit Parties Other than Borrowers.  From and after the Closing Date, none of the Credit Parties other than Borrowers shall engage in any trade or business, or own any assets (other than Stock of their Subsidiaries or incur any Indebtedness or Guaranteed Indebtedness (other than the Obligations).  Notwithstanding the foregoing, nothing herein shall limit any Credit Party from engaging in activities incidental to (a) the maintenance of its corporate existence in compliance with applicable law, and (b) legal, tax and accounting matters in connection with any of the foregoing activities.

6.21    Adverse Transactions.  No Credit Party shall enter into or be a party to, or permit any of its Subsidiaries to enter into or be a party to, any transaction the performance of which in the future does or could reasonably be expected to result in a breach of any covenant contained herein or giving rise to a Default or Event of Default.

6.22    Charitable Contributions.  No Credit Party shall directly or indirectly make any contributions to any charitable or not-for-profit organization.

6.23    Severance Arrangement.  Without the prior written consent of Agent, no Credit Party shall enter into any agreement, arrangement or understanding with any Designated Affiliate providing for the payment of severance or any other similar benefit in connection with the termination by such Credit Party or Designated Affiliate of any arrangement whereby such Designated Affiliate is an employee, director or officer of, or provides consulting or other services to, any Credit Party or any Affiliate thereof.

6.24    [Intentionally Omitted.]

6.25    Chapter 11 Claims.  Except for the Carve-Out and as otherwise allowed pursuant to the Financing Orders, incur, create, assume, suffer to exist or permit any other super priority administrative claim which is pari passu with or senior to the claims of Agent and the Lenders against Borrowers, except as set forth in Section 1.19(b).

6.26    Pre-Petition Indebtedness.  The Credit Parties shall not make any adequate protection payments on account of any Pre-Petition Indebtedness other than as expressly permitted by the DIP Budget or the Financing Orders.

## 7.     TERM

7.1     Termination.  The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2     Survival of Obligations Upon Termination of Financing Arrangements. Except as otherwise expressly provided for in the Loan Documents, no termination or

cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of Agent and Lenders relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of Agent and each Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; provided, that the provisions of Section 11, the payment obligations under Sections 1.15 and 1.16, and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 8. EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1 <u>Events of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, or any notice to any Credit Party, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "<u>Event of Default</u>" hereunder:

(a) Any Borrower (i) fails to make any payment of principal of, or interest on, or Fees owing in respect of, the Loans or any of the other Obligations when due and payable, or (ii) fails to pay or reimburse Agent or Lenders for any expense reimbursable hereunder or under any other Loan Document within 10 days following Agent's demand for such reimbursement or payment of expenses.

(b) Any Credit Party fails or neglects to perform, keep or observe any of the provisions of <u>Sections 1.4, 1.8, 5.4(a), 5.14, 5.15, 5.16 or 6</u>, or any of the provisions set forth in <u>Annex C</u>.

(c) Any Borrower fails or neglects to perform, keep or observe any of the provisions of <u>Section 4</u> or any provisions set forth in <u>Annexes E or F</u>, respectively, and the same shall remain unremedied for 3 days or more.

(d) Any Credit Party fails or neglects to perform, keep or observe any other provision of this Agreement or of any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this <u>Section 8.1</u> and the same shall remain unremedied for 30 days or more; provided, however, that with respect to the provisions of <u>Section 5.2(a)</u>, unless such failure or neglect to perform could reasonably be expected to result in a Material Adverse Effect, the Credit Parties shall in any event have 3 Business Days, commencing on the date a Person with managerial responsibility has knowledge of such failure or neglect, within which to cure or remedy such failure or neglect.

(e) Except for defaults occasioned by the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party

from complying or permits any Credit Party not to comply, a default or breach occurs under any other agreement, document or instrument to which any Credit Party becomes a party to after the Petition Date, or prior to the Petition Date and is affirmed, that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness or Guaranteed Indebtedness (other than the Obligations) of any Credit Party in excess of $250,000 in the aggregate (including (x) undrawn committed or available amounts and (y) amounts owing to all creditors under any combined or syndicated credit arrangements) incurred or entered into after the Petition Date, or (ii) causes, or permits any holder of such Indebtedness or Guaranteed Indebtedness or a trustee to cause, Indebtedness or Guaranteed Indebtedness incurred or entered into after the Petition Date or a portion thereof in excess of $250,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(f) Any representation or warranty herein or in any Loan Document is untrue or incorrect in any material respect or any representation or warranty in any written statement, report, financial statement or certificate made or delivered to Agent or any Lender by any Credit Party is untrue or incorrect in any material respect as of the date when made or deemed made.

(g) Assets of any Credit Party, the aggregate fair market value of which is $250,000 or more for all Credit Parties, are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Credit Party and such condition continues for 30 days or more (unless in the case of any attachment with respect to which the applicable creditor does not have (and no person for the benefit of such creditor has) or obtains physical possession of any assets of any Credit Party, such claim is being contested in good faith by such Credit Party).

(h) [Intentionally omitted.]

(i) [Intentionally omitted.]

(j) A final judgment or judgments, entered after the Petition Date, for the payment of money in excess of $250,000 in the aggregate at any time are outstanding against one or more of the Credit Parties and the same are not, within 30 days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (and such judgment is not paid or covered by insurance, and complete coverage for such liability is confirmed in writing by the provider of such insurance).

(k) Any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document ceases to be a valid and perfected first priority Lien

(except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(l)     Any Change of Control occurs.

(m)     Any default or breach by any Credit Party or any other guarantor, grantor or pledgor in the observance or performance of any covenant or agreement contained or incorporated by reference in any Collateral Document and such default shall continue beyond the grace period, if any, provided in such Collateral Document.

(n)     [Intentionally Omitted].

(o)     Any "Event of Default" under and as defined in any Mortgage occurs.

(p)     Any actual termination or cancellation of, or any material adverse modification or change in, the business relationship of any Credit Party with any supplier material to its operations occurs, including, without limitation, the failure of any material supplier to make deliveries in the ordinary course of business, consistent with past practices; provided that such material adverse modification or change in the business relationship continues for at least 3 Business Days.

(q)     Any Material Supplier ceases to continue to provide paper to the Credit Parties at levels that are not materially below historical levels unless otherwise requested by the Credit Parties and on general terms materially no less favorable to the Credit Parties than cash on delivery (excluding any discount extended for immediate payment) or on other terms acceptable to Agent.

(r)     The occurrence of any of the following in the Chapter 11 Case:

(i)     the bringing of a motion by any Credit Party, or the entry of an order or ruling (which has not been withdrawn, stayed, dismissed or reversed): (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations due under this Agreement and the Pre-Petition Tranche A Obligations with the termination of all related lending commitments thereunder); (B) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of Agent and Requisite Lenders; (C) except as provided in the Financing Orders, to use cash collateral of Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of Agent and the Requisite Lenders; or (D) the entry of an order materially adverse to Agent and Lenders or their rights and remedies hereunder or their interest in the Collateral or under the Pre-Petition Loan Documents;

(ii)     the filing of motion by any Credit Party seeking approval of a disclosure statement, or the entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization, unless such disclosure statement, plan or plans provide for termination of the Revolving Loan Commitments and repayment in full in cash of all of the Obligations under this Agreement and the Pre-Petition Tranche A Obligations on or before the effective date of such plan or plans;

(iii)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Agent and the Requisite Lenders;

(iv)     the filing of a motion for reconsideration with respect to the Interim Order or the Final Order, in each case, that is not dismissed or denied, within thirty (30) days after the date of the filing of such motion;

(v)     the Final Order is not entered on or before the date that is 30 days after the Petition Date, subject to the Bankruptcy Court calendar (and in any event is not entered on or before the date that is 40 days after the Petition Date);

(vi)     subject to the payments permitted by the DIP Budget, the payment by a Credit Party of, or application by any Credit Party for authority to pay by a Credit Party, any Pre-Petition claim or adequate protection to any other party, in each case without Agent's prior written consent unless such payment is otherwise permitted under this Agreement or provided for pursuant to the Financing Orders;

(vii)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Agent, any Lender or any of the Collateral or against the Pre-Petition Agent, any Pre-Petition Tranche A Lender or any Collateral (as defined in the Pre-Petition Credit Agreement);

(viii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, business, or reorganization of any Credit Party;

(ix)     the sale without Agent's and the Requisite Lenders' consent, of all or substantially all of the assets of the Credit Parties through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and the Pre-Petition Tranche A Obligations, expiration or cancellation (undrawn) of all outstanding Letters of Credit and termination of Lenders' Revolving Loan Commitments on the consummation thereof;

(x)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (except as consented to by Agent and the Requisite Lenders), or any Credit Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)     subject to any exceptions permitted by the Financing Orders, the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value in excess of $100,000 without the consent of the Requisite Lenders, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental, tax or regulatory agency or authority;

(xii)     the entry of a ruling adverse to the interests of Agent, or any Lender (in their capacities as such under the Loan Documents) in an suit or action against Agent or any Lender that asserts or seeks by or on behalf of Borrowers, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in the Chapter 11 Case or any other party in interest in the Chapter 11 Case, (a) a claim for an amount in excess of an of $100,000, (b) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of Agent or any Lender under the Loan Documents to any other claim, or (c) have a Material Adverse Effect on the rights and remedies of Agent or any Lender under any Loan Document, the Pre-Petition Loan Documents, or the collectability of all or any portion of the Obligations or the Pre-Petition Tranche A Obligations;

(xiii)     the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiv)     the failure of any Credit Party to perform any of its material obligations under the Interim Order or the Final Order beyond any applicable cure period, which adversely affects the interests of Lenders, as reasonably determined by Agent or a breach by any Credit Party of a material term or condition of the Financing Orders, beyond any applicable grace period;

(xv)     except for the Carve-Out or as otherwise provided by the Financing Orders, the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Agent, on behalf of itself and the Lenders;

(xvi)     the filing of a motion by any Credit Party (or any party in interest or the Committee or any other Person) that is not dismissed or denied within thirty (30) days after the date of the filing of such motion, or the entry of any order in the Chapter 11 Case permitting recovery from any portion of the Collateral (or from Agent or any Lender) of any costs or expenses of preserving or disposing of Collateral under Section 506(c) or 552(b) of the Bankruptcy Code (or otherwise); or

(xvii)     Agent shall fail to have a first priority perfected security interest in the Collateral, except for the Carve-Out and Permitted Prior Liens.

(s)     Prior to July 6, 2010, The Gores Group, LLC shall cease good faith negotiations with Debtors of a definitive Asset Purchase Agreement for the purchase of Debtors' assets pursuant to Section 363 of the Bankruptcy Code as contemplated by that certain letter of intent, dated as of June 4, 2010, between The Gores Group, LLC and NEC.

8.2     Remedies.     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but in any event subject to the terms of the Financing Orders, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court:

(a)     If any Default or Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall), without notice, suspend the Revolving Loan facility with respect to additional Advances and/or the incurrence of additional

Letter of Credit Obligations, whereupon any additional Advances and additional Letter of Credit Obligations shall be made or incurred in Agent's sole discretion (or in the sole discretion of the Requisite Lenders, if such suspension occurred at their direction) so long as such Default or Event of Default is continuing. If any Default or Event of Default has occurred and is continuing, Agent may (and at the written request of Requisite Lenders shall), without notice except as otherwise expressly provided herein, increase the rate of interest applicable to the Loans and the Letter of Credit Fees to the Default Rate.

(b)     If any Event of Default has occurred and is continuing, Agent may, and at the written request of the Requisite Lenders, shall, without notice: (i) terminate the Revolving Loan facility with respect to further Advances or the incurrence of further Letter of Credit Obligations; (ii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, and require that the Letter of Credit Obligations be cash collateralized as provided in Annex B, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers and each other Credit Party; or (iii) exercise any rights and remedies provided to Agent under the Loan Documents or at law or equity, including all remedies provided under the Code; and provided, Agent may, but shall not be required to exercise any rights or remedies described in clause (ii) or (iii) above prior to the date which is three (3) Business Days after demand therefore is made by Requisite Lenders, unless Requisite Lenders have made such request of Agent.

(c)     If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall): (i) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to Agent pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (ii) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral; or (iii) exercise any rights and remedies provided to Agent under the Loan Documents or at law or equity, including all remedies provided under the Code and, subject to the Financing Orders, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Agent and the Lenders to exercise their remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, subject to the Financing Orders, Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of and the Credit Party in the Collateral only upon five (5) days prior written notice to such Credit Party and counsel approved by the Bankruptcy Court for the Committee.

8.3     Waivers by Credit Parties.  Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives (including for purposes of Section 12): (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Agent on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever Agent may do

- 54 -

in this regard, (b) all rights to notice and a hearing prior to Agent's taking possession or control of, or to Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 9.    ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT

9.1    Assignment and Participations.

(a)    Subject to the terms of this Section 9.1, any Lender may make an assignment to a Qualified Assignee or any other Person of, or sell participations in, at any time or times, the Loan Documents, Loans, Letter of Credit Obligations and any Revolving Loan Commitment or any portion thereof or interest therein, including any Lender's rights, title, interests, remedies, powers or duties thereunder. Any assignment by a Lender shall: (i) require the consent of Agent (which consent shall not be unreasonably withheld or delayed with respect to a Qualified Assignee) and the execution of an assignment agreement (an "Assignment Agreement") substantially in the form attached hereto as Exhibit 9.1(a) and otherwise in form and substance reasonably satisfactory to, and acknowledged by, Agent; (ii) be conditioned on such assignee Lender representing to the assigning Lender and Agent that it is purchasing the applicable Loans to be assigned to it for its own account, for investment purposes and not with a view to the distribution thereof; (iii) after giving effect to any such partial assignment, the assignee Lender shall have Revolving Loan Commitments in an amount at least equal to $5,000,000 and the assigning Lender shall have retained Revolving Loan Commitments in an amount at least equal to $5,000,000; (iv) with respect to any assignment of the Revolving Loan Commitment or the Revolving Loan, be for a ratable portion of the assigning Lender's interest in the Revolving Loan Commitment and the Revolving Loan; (v) include a payment to Agent of an assignment fee of $3,500 by either assignee Lender or assignor Lender; (vi) so long as no Event of Default has occurred and is continuing, require the consent of Borrower Representative, which shall not be unreasonably withheld or delayed; provided that no such consent shall be required for an assignment to a Qualified Assignee and (vii) unless such assignment is to an Affiliate of such Lender, Lender shall give notice to the other Lenders of any intent to assign. Such Lenders shall be permitted to purchase such assignment on terms agreed to by assignor Lender and assignee Lender. If more than one Lender wishes to purchase Loans or Revolving Loan Commitments from the assigning Lender, such assignments to Lenders will be allocated on a pro-rata basis. In the case of an assignment by a Lender under this Section 9.1, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as all other Lenders hereunder. The assigning Lender shall be relieved of its obligations hereunder with respect to its Revolving Loan Commitments or assigned portion thereof from and after the date of such assignment. Each Borrower hereby acknowledges and agrees that any assignment shall give rise to a direct obligation of Borrowers to the assignee and that the assignee shall be considered to be a "Lender". In all instances, each Lender's liability to make Loans hereunder shall be several and not joint and shall be limited to such Lender's Pro Rata Share of the applicable Revolving Loan Commitment. In the event Agent or any Lender assigns or otherwise transfers all or any part of the Obligations, Agent or any such Lender shall so notify Borrowers and Borrowers shall, upon the request of Agent or such Lender, execute new Revolving Notes in exchange for the Revolving Notes, if any, being assigned. Notwithstanding the foregoing provisions of this Section 9.1(a), any Lender may at any time pledge the Obligations held by it

- 55 -

and such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank, and any Lender that is an investment fund may assign the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to another investment fund managed by the same investment advisor; provided, that no such pledge to a Federal Reserve Bank shall release such Lender from such Lender's obligations hereunder or under any other Loan Document. Agent shall maintain at its address referred to in Section 11.10 a copy of each Assignment Agreement delivered to and accepted by it and a register of the recordation of the names and addresses of the Lenders and the Revolving Loan Commitments, and principal amounts thereunder owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by any Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(b)     Any participation by a Lender of all or any part of its Revolving Loan Commitments shall be made with the understanding that all amounts payable by Borrowers hereunder shall be determined as if that Lender had not sold such participation, and that the holder of any such participation shall not be entitled to require such Lender to take or omit to take any action hereunder except actions directly affecting (i) any reduction in the principal amount of, or interest rate or Fees payable with respect to, any Loan in which such holder participates, (ii) any extension of the scheduled amortization of the principal amount of any Loan in which such holder participates or the final maturity date thereof, and (iii) any release of all or substantially all of the Collateral (other than in accordance with the terms of this Agreement, the Collateral Documents or the other Loan Documents). Solely for purposes of Sections 1.13, 1.15, 1.16 and 9.8, each Borrower acknowledges and agrees that a participation shall give rise to a direct obligation of Borrowers to the participant and the participant shall be considered to be a "Lender". Except as set forth in the preceding sentence no Borrower or Credit Party shall have any obligation or duty to any participant. Neither Agent nor any Lender (other than the Lender selling a participation) shall have any duty to any participant and may continue to deal solely with the Lender selling a participation as if no such sale had occurred.

(c)     Except as expressly provided in this Section 9.1, no Lender shall, as between Borrowers and that Lender, or Agent and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of participation in, all or any part of the Loans, the Revolving Notes or other Obligations owed to such Lender.

(d)     Each Credit Party executing this Agreement shall assist any Lender permitted to sell assignments or participations under this Section 9.1 as reasonably required to enable the assigning or selling Lender to effect any such assignment or participation, including the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and, if requested by Agent, the preparation of informational materials for, and the participation of management in meetings with, potential assignees or participants. Each Credit Party executing this Agreement shall certify the correctness, completeness and accuracy of all descriptions of the Credit Parties and their respective affairs contained in any selling materials provided by them and all other information provided by them and included in such

materials, except that any Projections delivered by Borrowers shall only be certified by Borrowers as having been prepared by Borrowers in compliance with the representations contained in Section 3.4(b).

(e)     Any Lender may furnish any information concerning Credit Parties in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants); provided that such Lender shall obtain from assignees or participants confidentiality covenants substantially equivalent to those contained in Section 11.8.

(f)     So long as no Event of Default has occurred and is continuing, no Lender shall assign or sell participations in any portion of its Loans or Revolving Loan Commitments to a potential Lender or participant, if, as of the date of the proposed assignment or sale, the assignee Lender or participant would be subject to capital adequacy or similar requirements under Section 1.16(a), increased costs under Section 1.16(b) or withholding taxes in accordance with Section 1.15(a).

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender"), may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing by the Granting Lender to Agent and Borrowers, the option to provide to Borrowers all or any part of any Loans that such Granting Lender would otherwise be obligated to make to Borrowers pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan; and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Revolving Loan Commitment of the Granting Lender to the same extent, and as if such Loan were made by such Granting Lender. No SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). Any SPC may (i) with notice to, but without the prior written consent of, Borrowers and Agent and assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by Borrowers and Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC. This Section 9.1(g) may not be amended without the prior written consent of each Granting Lender, all or any of whose Loans are being funded by an SPC at the time of such amendment. For the avoidance of doubt, the Granting Lender shall for all purposes, including the approval of any amendment or waiver of any provision of any Loan Document or the obligation to pay any amount otherwise payable by the Granting Lender under the Loan Documents, continue to be the Lender of record hereunder.

9.2     Appointment of Agent. GE Capital is hereby appointed to act on behalf of all Lenders as Agent under this Agreement and the other Loan Documents. The provisions of this Section 9.2 are solely for the benefit of Agent and Lenders and no Credit Party nor any other Person shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement and the other Loan Documents, Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Credit Party or

any other Person. Agent shall have no duties or responsibilities except for those expressly set forth in this Agreement and the other Loan Documents. The duties of Agent shall be mechanical and administrative in nature and Agent shall not have, or be deemed to have, by reason of this Agreement, any other Loan Document or otherwise a fiduciary relationship in respect of any Lender. Except as expressly set forth in this Agreement and the other Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to any Credit Party or any of their respective Subsidiaries or any Account Debtor that is communicated to or obtained by GE Capital or any of its Affiliates in any capacity. Neither Agent nor any of its Affiliates nor any of their respective officers, directors, employees, agents or representatives shall be liable to any Lender for any action taken or omitted to be taken by it hereunder or under any other Loan Document, or in connection herewith or therewith, except for damages caused by its or their own gross negligence or willful misconduct.

If Agent shall request instructions from Requisite Lenders or all affected Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, then Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Requisite Lenders or all affected Lenders, as the case may be, and Agent shall not incur liability to any Person by reason of so refraining. Agent shall be fully justified in failing or refusing to take any action hereunder or under any other Loan Document (a) if such action would, in the opinion of Agent, be contrary to law or the terms of this Agreement or any other Loan Document, (b) if such action would, in the opinion of Agent, expose Agent to Environmental Liabilities or (c) if Agent shall not first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of Requisite Lenders or all affected Lenders, as applicable. Without limiting the generality of the foregoing, each Lender hereby authorizes Agent and the Requisite Lenders to consent, on behalf of each Lender, to an Interim Order substantially in the form attached as Exhibit A-2, and a Final Order.

9.3    Agent's Reliance, Etc. Neither Agent nor any of its Affiliates nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, Agent: (a) may treat the payee of any Note as the holder thereof until Agent receives written notice of the assignment or transfer thereof signed by such payee and in form reasonably satisfactory to Agent; (b) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Credit Party or to inspect the Collateral (including the books and records) of any Credit Party; (e) shall not be responsible to any Lender for the due execution, legality, validity,

enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (f) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

9.4    GE Capital and Affiliates.    With respect to its Revolving Loan Commitments hereunder, GE Capital shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include GE Capital in its individual capacity. GE Capital and its Affiliates may lend money to, invest in, and generally engage in any kind of business with, any Credit Party, any of their Affiliates and any Person who may do business with or own securities of any Credit Party or any such Affiliate, all as if GE Capital were not Agent and without any duty to account therefor to Lenders. GE Capital and its Affiliates may accept fees and other consideration from any Credit Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders. Each Lender acknowledges the potential conflict of interest between GE Capital as a Lender holding disproportionate interests in the Loans and GE Capital as Agent. None of the Lenders identified on the facing page or signature pages of this Agreement as a "syndication agent" or "documentation agent" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders so identified as a "syndication agent" or "documentation agent" shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

9.5    Lender Credit Decision.    Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the Financial Statements referred to in Section 3.4(a) and such other documents and information as it has deemed appropriate, made its own credit and financial analysis of the Credit Parties and its own decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement. Each Lender acknowledges the potential conflict of interest of each other Lender as a result of Lenders holding disproportionate interests in the Loans, and expressly consents to, and waives any claim based upon, such conflict of interest.

9.6    Indemnification.    Lenders agree to indemnify Agent (to the extent not reimbursed by Credit Parties and without limiting the obligations of Borrowers hereunder), ratably according to their respective Pro Rata Shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by Agent in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses,

damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that Agent is not reimbursed for such expenses by Credit Parties.

9.7     Successor Agent. Agent may resign at any time by giving not less than 30 days' prior written notice thereof to Lenders and Borrower Representative. Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor Agent. If no successor Agent shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 30 days after the resigning Agent's giving notice of resignation, then the resigning Agent may, on behalf of Lenders, appoint a successor Agent, which shall be a Lender, if a Lender is willing to accept such appointment, or otherwise shall be a commercial bank or financial institution or a subsidiary of a commercial bank or financial institution if such commercial bank or financial institution is organized under the laws of the United States of America or of any State thereof and has a combined capital and surplus of at least $300,000,000. If no successor Agent has been appointed pursuant to the foregoing, within 30 days after the date such notice of resignation was given by the resigning Agent, such resignation shall become effective and the Requisite Lenders shall thereafter perform all the duties of Agent hereunder until such time, if any, as the Requisite Lenders appoint a successor Agent as provided above. Any successor Agent appointed by Requisite Lenders hereunder shall be subject to the approval of Borrower Representative, such approval not to be unreasonably withheld or delayed; provided that such approval shall not be required if a Default or an Event of Default has occurred and is continuing. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning Agent. Upon the earlier of the acceptance of any appointment as Agent hereunder by a successor Agent or the effective date of the resigning Agent's resignation, the resigning Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents, except that any indemnity rights or other rights in favor of such resigning Agent shall continue. After any resigning Agent's resignation hereunder, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as Agent under this Agreement and the other Loan Documents.

9.8     Setoff and Sharing of Payments. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default and subject to Section 9.9(f), each Lender is hereby authorized at any time or from time to time, without notice to any Credit Party or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of any Borrower or Guarantor (regardless of whether such balances are then due to such Borrower or Guarantor) and any other properties or assets at any time held or owing by that Lender or that holder to or for the credit or for the account of any Borrower or Guarantor against and on account of any of the Obligations that are not paid when due. Subject to the application of any amounts received as a result of this Section 9.8, any Lender exercising a right of setoff or

otherwise receiving any payment on account of the Obligations in excess of its Pro Rata Share thereof shall purchase for cash (and the other Lenders or holders shall sell) such participations in each such other Lender's or holder's Pro Rata Share of the Obligations as would be necessary to cause such Lender to share the amount so offset or otherwise received with each other Lender or holder in accordance with their respective Pro Rata Shares (other than offset rights exercised by any Lender with respect to Sections 1.13, 1.15 or 1.16). Each Lender's obligation under this Section 9.8 shall be in addition to and not in limitation of its obligations to purchase a participation in an amount equal to its Pro Rata Share of the Swing Line Loans under Section 1.1. Each Credit Party that is a Borrower or Guarantor agrees, to the fullest extent permitted by law, that (a) any Lender may exercise its right to offset with respect to amounts in excess of its Pro Rata Share of the Obligations and may sell participations in such amounts so offset to other Lenders and holders and (b) any Lender so purchasing a participation in the Loans made or other Obligations held by other Lenders or holders may exercise all rights of offset, bankers' lien, counterclaim or similar rights with respect to such participation as fully as if such Lender or holder were a direct holder of the Loans and the other Obligations in the amount of such participation. Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Lender that has exercised the right of offset, the purchase of participations by that Lender shall be rescinded and the purchase price restored together with interest at such rate, if any, as such Lender is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

      9.9     Advances; Payments; Non-Funding Lenders; Information; Actions in Concert.

      (a)     Advances; Payments.

      (i)     Revolving Lenders shall refund or participate in the Swing Line Loan in accordance with clauses (iii) and (iv) of Section 1.1(c). If the Swing Line Lender declines to make a Swing Line Loan or if Swing Line Availability is zero, Agent shall notify Revolving Lenders, promptly after receipt of a Notice of Revolving Credit Advance and in any event prior to 1:00 p.m. (New York time) on the date such Notice of Revolving Advance is received, by telecopy, telephone or other similar form of transmission. Each Revolving Lender shall make the amount of such Lender's Pro Rata Share of such Revolving Credit Advance available to Agent in same day funds by wire transfer to Agent's account as set forth in Annex H not later than 3:00 p.m. (New York time) on the requested funding date. After receipt of such wire transfers (or, in Agent's sole discretion, before receipt of such wire transfers), subject to the terms hereof, Agent shall make the requested Revolving Credit Advance to the Borrower designated by Borrower Representative in the Notice of Revolving Credit Advance. All payments by each Revolving Lender shall be made without setoff, counterclaim or deduction of any kind.

      (ii)     On the 2nd Business Day of each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone, or telecopy of the amount of such Lender's Pro Rata Share of principal, interest and Fees paid for the benefit of Lenders with respect to each applicable Loan. Provided that each Lender has funded all payments or Advances required to be made by it and has purchased all participations required to be purchased by it under this Agreement and the other Loan

Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Pro Rata Share of principal, interest and Fees paid by Borrowers since the previous Settlement Date for the benefit of such Lender on the Loans held by it. To the extent that any Lender (a "Non-Funding Lender") has failed to fund all such payments and Advances or failed to fund the purchase of all such participations, Agent shall be entitled to set off the funding short-fall against that Non-Funding Lender's Pro Rata Share of all payments received from Borrowers. Such payments shall be made by wire transfer to such Lender's account (as specified by such Lender in Annex H or the applicable Assignment Agreement) not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date.

(b)     Availability of Lender's Pro Rata Share. Agent may assume that each Revolving Lender will make its Pro Rata Share of each Revolving Credit Advance available to Agent on each funding date. If such Pro Rata Share is not, in fact, paid to Agent by such Revolving Lender when due, Agent will be entitled to recover such amount on demand from such Revolving Lender without setoff, counterclaim or deduction of any kind. If any Revolving Lender fails to pay the amount of its Pro Rata Share forthwith upon Agent's demand, Agent shall promptly notify Borrower Representative and Borrowers shall immediately repay such amount to Agent. Nothing in this Section 9.9(b) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Revolving Lender or to relieve any Revolving Lender from its obligation to fulfill its Revolving Loan Commitments hereunder or to prejudice any rights that Borrowers may have against any Revolving Lender as a result of any default by such Revolving Lender hereunder. To the extent that Agent advances funds to any Borrower on behalf of any Revolving Lender and is not reimbursed therefor on the same Business Day as such Advance is made, Agent shall be entitled to retain for its account all interest accrued on such Advance until reimbursed by the applicable Revolving Lender.

(c)     Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)     Non-Funding Lenders. The failure of any Non-Funding Lender to make any Revolving Credit Advance or any payment required by it hereunder or to purchase any participation in any Swing Line Loan to be made or purchased by it on the date specified therefor

- 62 -

shall not relieve any other Lender (each such other Revolving Lender, an "Other Lender") of its obligations to make such Advance or purchase such participation on such date, but neither any Other Lender nor Agent shall be responsible for the failure of any Non-Funding Lender to make an Advance, purchase a participation or make any other payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Revolving Lender" (or be included in the calculation of "Requisite Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document. At Borrower Representative's request, Agent or a Person reasonably acceptable to Agent shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from any Non-Funding Lender, and each Non-Funding Lender agrees that it shall, at Agent's request, sell and assign to Agent or such Person, all of the Revolving Loan Commitments of that Non-Funding Lender for an amount equal to the principal balance of all Loans held by such Non-Funding Lender and all accrued interest and fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.

(e)     Dissemination of Information.   Agent shall use reasonable efforts to provide Lenders with any notice of Default or Event of Default received by Agent from, or delivered by Agent to, any Credit Party, with notice of any Event of Default of which Agent has actually become aware and with notice of any action taken by Agent following any Event of Default; provided, that Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's gross negligence or willful misconduct. Lenders acknowledge that Borrowers are required to provide Financial Statements and Collateral Reports to Lenders in accordance with Annexes E and F hereto and agree that Agent shall have no duty to provide the same to Lenders.

(f)     Actions in Concert.   Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Revolving Notes (including exercising any rights of setoff) without first obtaining the prior written consent of Agent and Requisite Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Revolving Notes shall be taken in concert and at the direction or with the consent of Agent or Requisite Lenders, in accordance with the terms hereof.

## 10.   SUCCESSORS AND ASSIGNS

10.1   Successors and Assigns.   This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Credit Party, Agent, Lenders and their respective successors and assigns (including, in the case of any Credit Party, a debtor-in-possession on behalf of such Credit Party), except as otherwise provided herein or therein. No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Agent and Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of Agent and Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, Agent and Lenders

with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 11.    MISCELLANEOUS

11.1    Complete Agreement; Modification of Agreement.  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 11.2.  Any letter of interest, commitment letter or fee letter (other than the GE Fee Letter) or confidentiality agreement, if any, between any Credit Party and Agent or any Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

11.2    Amendments and Waivers.

(a)    Except for actions expressly permitted to be taken by Agent, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Agent and Borrowers, and by Requisite Lenders or all affected Lenders, as applicable.  Except as set forth in clause (b) below, all such amendments, modifications, terminations or waivers requiring the consent of any Lenders shall only require the written consent of Requisite Lenders, Agent and Borrowers.

(b)    No amendment, modification, termination or waiver shall, unless in writing and signed by Agent and each Lender directly affected thereby: (i) increase the principal amount of any Lender's Revolving Loan Commitment (which action shall be deemed only to affect those Lenders whose Revolving Loan Commitments are increased and may be approved by Requisite Lenders, including those Lenders whose Revolving Loan Commitments are increased); (ii) reduce the principal of, rate of interest on or Fees payable with respect to any Loan or Letter of Credit Obligations of any affected Lender (including as a result of a change in the definition of Applicable Margin); (iii) extend the final maturity date of the principal amount of any Loan of any affected Lender; (iv) waive, forgive, defer, extend or postpone any payment of interest or Fees as to any affected Lender; (v) release all or substantially all of the Collateral (which action shall be deemed to directly affect all Lenders); (vi) change the percentage of the Revolving Loan Commitments or of the aggregate unpaid principal amount of the Loans that shall be required for Lenders or any of them to take any action hereunder; and (vii) amend or waive this Section 11.2 or the definition of the term "Requisite Lenders" insofar as such definition affects the substance of this Section 11.2.  Furthermore, in addition to the consent of Agent and Borrowers, no amendment, modification, termination or waiver affecting the rights or duties of Agent or L/C Issuer, under this Agreement or any other Loan Document, including any release of any Guaranty or Collateral requiring a writing signed by all Lenders, shall be effective unless in writing and signed by Agent or L/C Issuer or GE Capital, as the case may be, in addition to Lenders required hereinabove to take such action.  Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.  No amendment, modification, termination or waiver shall be required for Agent to take additional Collateral pursuant to any Loan Document.  No amendment,

modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the holder of that Note. No notice to or demand on any Credit Party in any case shall entitle such Credit Party or any other Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 11.2</u> shall be binding upon each holder of the Revolving Notes at the time outstanding and each future holder of the Revolving Notes.

(c)     If, in connection with any proposed amendment, modification, waiver or termination (a "<u>Proposed Change</u>"):

(i)     requiring the consent of all affected Lenders, the consent of Requisite Lenders is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this <u>clause (i)</u> and in <u>clause (ii)</u> below being referred to as a "<u>Non-Consenting Lender</u>"),

(ii)     requiring the consent of Requisite Lenders, the consent of Lenders holding 51% or more of the aggregate Revolving Loan Commitments is obtained, but the consent of Requisite Lenders is not obtained,

then, so long as Agent is not a Non-Consenting Lender, at Borrower Representative's request, Agent or a Person reasonably acceptable to Agent shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from such Non-Consenting Lenders, and such Non-Consenting Lenders agree that they shall, upon Agent's request, sell and assign to Agent or such Person, all of the Revolving Loan Commitments of such Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lenders and all accrued interest and Fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.

(d)     Upon payment in full in cash and performance of all of the Obligations (other than indemnification Obligations), termination of the Revolving Loan Commitments and a release of all claims against Agent and Lenders, and so long as no suits, actions, proceedings or claims are pending or threatened against any Indemnified Person asserting any damages, losses or liabilities that are Indemnified Liabilities, Agent shall deliver to Borrowers termination statements, mortgage releases and other documents necessary or appropriate to evidence the termination of the Liens securing payment of the Obligations.

11.3     <u>Fees and Expenses</u>. Subject to the terms of the Financing Orders, Borrowers shall reimburse Agent and Lenders for all fees, costs and expenses, including the reasonable fees, costs and expenses of counsel, consultants, auditors or other advisors (including environmental and management consultants and appraisers), incurred in connection with the negotiation and preparation of the Loan Documents, the Interim Order, the Final Order, and any other documents prepared in connection herewith or in connection with the Chapter 11 Case, and incurred in connection with:

(a)     the negotiation, preparation and filing and/or recordation of the Loan Documents, the Interim Order, the Final Order, and any other documents prepared in connection

herewith or in connection with the Chapter 11 Case and consummation of the transactions contemplated hereby and thereby;

(b)     the forwarding to Borrowers or any other Person on behalf of Borrowers by Agent of the proceeds of any Loan (including a wire transfer fee of $25 per wire transfer);

(c)     any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or Related Transactions Documents or advice in connection with the syndication and administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(d)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by Agent, any Lender, any Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against any or all of the Borrowers or any other Person that may be obligated to Agent by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that reimbursement of counsel shall be limited to the reasonable fees of one counsel representing Agent, on the one hand, and for the Revolving Lenders, on the other hand; provided, further, that no Person shall be entitled to reimbursement under this clause (c) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction);

(e)     any attempt to enforce any remedies of Agent against any or all of the Credit Parties or any other Person that may be obligated to Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that in the case of reimbursement of counsel for Lenders other than Agent, such reimbursement shall be limited to one counsel for all Lenders;

(f)     any workout or restructuring of the Loans during the pendency of one or more Events of Default;

(g)     all of the reasonable out-of-pocket fees and expenses of the Advisors in connection with the preparation, reproduction, delivery and review of pleadings, documents and reports related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; and

(h)     efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify,

protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including, as to each of clauses (a) through (h) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 11.3, all of which shall be payable, on demand, by Borrowers to Agent. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

      11.4   No Waiver.  Agent's or any Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of Agent or such Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of Section 11.2, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or waived by Agent or any Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Agent and the applicable required Lenders, and directed to Borrowers specifying such suspension or waiver.

      11.5   Remedies.  Agent's and Lenders' rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Agent or any Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

      11.6   Severability.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

      11.7   Conflict of Terms.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control. Notwithstanding the foregoing, if any provision of this Agreement or any other Loan Document

conflicts with any provision in the Financing Orders, the provision in the Financing Orders shall govern and control.

11.8 <u>Confidentiality</u>. Agent, for itself and on behalf of GE Capital Commercial Finance, Inc., and GE Capital Markets, Inc., and each Lender agree to use commercially reasonable efforts (equivalent to the efforts Agent or such Lender applies to maintaining the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to them by the Credit Parties for a period of 2 years following receipt thereof, except that Agent and any Lender may disclose such information on a confidential "need to know" basis (a) to Persons employed or engaged by Agent or such Lender; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this <u>Section 11.8</u> (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by it as described in <u>clause (a)</u> above); (c) as required or requested by any Governmental Authority or reasonably believed by Agent or such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Agent's or such Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which Agent or such Lender is a party; or (f) that ceases to be confidential through no fault of Agent or any Lender.

11.9 <u>GOVERNING LAW</u>. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE). EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, AGENT AND LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; <u>PROVIDED</u>, THAT AGENT, LENDERS AND THE CREDIT PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED FURTHER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH CREDIT PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u> AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH

CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN <u>ANNEX I</u> OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR 5 DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.

11.10 <u>Notices</u>.

(a) <u>Addresses</u>. All notices, demands, requests, directions and other communications required or expressly authorized to be made by this Agreement shall, whether or not specified to be in writing but unless otherwise expressly specified to be given by any other means, be given in writing and (i) addressed to (A) the party to be notified and sent to the address or facsimile number indicated in <u>Annex I</u>, or (B) otherwise to the party to be notified at its address specified on the signature page of any applicable Assignment Agreement, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-coded fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System set up by or at the direction of Agent in an appropriate location or (iv) addressed to such other address as shall be notified in writing (A) in the case of Borrower Representative, Agent and Swingline Lender, to the other parties hereto and (B) in the case of all other parties, to Borrower Representative and Agent. Transmission by electronic mail (including E-Fax, even if transmitted to the fax numbers set forth in clause (i) above) shall not be sufficient or effective to transmit any such notice under this clause (a) unless such transmission is an available means to post to any E-System.

(b) <u>Effectiveness</u>. All communications described in <u>clause (a)</u> above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one Business Day after delivery to such courier service, (iii) if delivered by mail, when deposited in the mails, (iv) if delivered by facsimile (other than to post to an E-System pursuant to <u>clause (a)(ii) or (a)(iii)</u> above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the date of such posting in an appropriate location and the date access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrower Representative or Agent) designated in <u>Annex I</u> to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

11.11   Section Titles.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

11.12   Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

11.13   WAIVER OF JURY TRIAL.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG AGENT, LENDERS AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.14   Press Releases and Related Matters.  Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure (i) using the name of GE Capital or its affiliates or, (ii) other than standard disclosures associated with its financial reporting or other similar, ordinary course of business disclosures, referring to this Agreement, the other Loan Documents or the Related Transactions Documents without at least 2 Business Days' prior notice to GE Capital and without obtaining GE Capital's prior written consent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under law and then, in any event, such Credit Party or Affiliate will consult with GE Capital before issuing such press release or other public disclosure. Each Credit Party consents to the publication by Agent or any Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement.   Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

11.15   Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Borrower for liquidation or reorganization, should any Borrower become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Borrower's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be

LEGAL_US_E # 88239000.12

reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.16 <u>Advice of Counsel</u>. Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of <u>Sections 11.9</u> and <u>11.13</u>, with its counsel.

11.17 <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

11.18 <u>Agent for Service</u>. Each Credit Party hereby appoints, and Borrower Representative hereby accepts the appointment of, Borrower Representative, located at 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553 as Agent for service of process for Agent and Lenders solely in connection with the Loan Documents  Such appointment shall not be terminated by Borrower Representative or any Credit Party without the prior written consent of Agent.

11.19 <u>Patriot Act Notice</u>. Each Lender and Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, such Lender and Agent may be required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender and Agent, as the case may be, to identify the Credit Parties in accordance with the Patriot Act.

11.20 <u>Obligations Absolute</u>. To the fullest permitted by applicable law, and subject to the terms of the Financing Orders, all obligations of the Credit Parties hereunder shall be absolute and unconditional irrespective of:

(a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Credit Party;

(b) any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any other Credit Party;

(c) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d) any exchange, release or non-perfection of any other Collateral, or any release or amendment or wavier of or consent to any departure from any guarantee, for all or any of the Obligations;

(e) any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Credit Parties (other than payment in full).

11.21   <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. Subject to the terms of the Financing Orders, this Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the bankruptcy estate of each Credit Party, and any trustee, other bankruptcy estate representative or any successor in interest of any Credit Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. Subject to the terms of the Financing Orders, this Agreement and other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agent and Lenders and their respective assigns, transferees and assignees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code, for any reason, without the necessity that Agent files financing statements or otherwise perfect its Liens under applicable law.

## 12.     CROSS-GUARANTY; SUBORDINATION

12.1    <u>Cross-Guaranty</u>. Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Agent and Lenders and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and   performance of, all Obligations owed or hereafter owing to Agent and Lenders by each other Borrower.  Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Section 12</u> shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this <u>Section 12</u> shall be absolute and unconditional, irrespective of, and unaffected by,

(a)     the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any other agreement, document or instrument to which any Borrower is or may become a party;

(b)     the absence of any action to enforce this Agreement (including this <u>Section 12</u>) or any other Loan Document or the waiver or consent by Agent and Lenders with respect to any of the provisions thereof;

(c)     the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by Agent and Lenders in respect thereof (including the release of any such security);

(d)     the insolvency of any Credit Party; or

(e)     any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

LEGAL_US_E # 88239000.12

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

12.2 <u>Waivers by Borrowers</u>. Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Agent or Lenders to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Credit Party, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower. It is agreed among each Borrower, Agent and Lenders that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this <u>Section 12</u> and such waivers, Agent and Lenders would decline to enter into this Agreement.

12.3 <u>Benefit of Guaranty</u>. Each Borrower agrees that the provisions of this <u>Section 12</u> are for the benefit of Agent and Lenders and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and Agent or Lenders, the obligations of such other Borrower under the Loan Documents.

12.4 <u>Subordination of Subrogation, Etc</u>. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth in <u>Section 12.7</u>, each Borrower hereby expressly and irrevocably subordinates to payment of the Obligations any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations are indefeasibly paid in full in cash. Each Borrower acknowledges and agrees that this subordination is intended to benefit Agent and Lenders and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this <u>Section 12</u>, and that Agent, Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this <u>Section 12.4</u>.

12.5 <u>Election of Remedies</u>. If Agent or any Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Agent or such Lender a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, Agent or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this <u>Section 12</u>. If, in the exercise of any of its rights and remedies, Agent or any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by Agent or such Lender and waives any claim based upon such action, even if such action by Agent or such Lender shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by Agent or such Lender. Any election of remedies that results in the denial or impairment of the right of Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. In the event Agent or any Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent or such Lender may bid all or less than the amount of the Obligations and the amount of

such bid need not be paid by Agent or such Lender but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether Agent, Lender or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section 12, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

12.6    Limitation.    Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 12 (which liability is in any event in addition to amounts for which such Borrower is primarily liable under Section 1) shall be limited to an amount not to exceed as of any date of determination the greater of:

(a)    the net amount of all Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(b)    the amount that could be claimed by Agent and Lenders from such Borrower under this Section 12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 12.7.

12.7    Contribution with Respect to Guaranty Obligations.

(a)    To the extent that any Borrower shall make a payment under this Section 12 of all or any of the Obligations (other than Loans made to that Borrower for which it is primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Obligations and termination of the Revolving Loan Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

- 74 -

(c)    This <u>Section 12.7</u> is intended only to define the relative rights of Borrowers and nothing set forth in this <u>Section 12.7</u> is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including <u>Section 12.1</u>. Nothing contained in this <u>Section 12.7</u> shall limit the liability of any Borrower to pay the Loans made directly or indirectly to that Borrower and accrued interest, Fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrower to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Borrowers against other Credit Parties under this <u>Section 12.7</u> shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Revolving Loan Commitments.

12.8    <u>Liability Cumulative</u>. The liability of Borrowers under this <u>Section 12</u> is in addition to and shall be cumulative with all liabilities of each Borrower to Agent and Lenders under this Agreement and the other Loan Documents to which such Borrower is a party or in respect of any Obligations or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

12.9    <u>Subordination</u>.

(a)    Each Credit Party executing this Agreement covenants and agrees that the payment of all indebtedness, principal, interest (including interest which accrues after the commencement of any case or proceeding in bankruptcy, or for the reorganization of any Credit Party), fees, charges, expenses, attorneys' fees and any other sum, obligation or liability owing by any other Credit Party to such Credit Party, including any intercompany trade payables or royalty or licensing fees (collectively, the "<u>Intercompany Obligations</u>"), is subordinated, to the extent and in the manner provided in this <u>Section 12.9</u>, to the prior payment in full of all Obligations (herein, the "<u>Senior Obligations</u>") and that the subordination is for the benefit of Agent and Lenders, and Agent may enforce such provisions directly.

(b)    Each Credit Party executing this Agreement hereby (i) authorizes Agent to demand specific performance of the terms of this <u>Section 12.9</u>, whether or not any other Credit Party shall have complied with any of the provisions hereof applicable to it, at any time when such Credit Party shall have failed to comply with any provisions of this <u>Section 12.9</u> which are applicable to it and (ii) irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(c)    Upon any distribution of assets of any Credit Party in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

LEGAL_US_E # 88239000.12

(i)      Agent and Lenders shall first be entitled to receive payment in full in cash of the Senior Obligations before any Credit Party is entitled to receive any payment on account of the Intercompany Obligations.

(ii)      Any payment or distribution of assets of any Credit Party of any kind or character, whether in cash, property or securities, to which any other Credit Party would be entitled except for the provisions of this Section 12.9(c), shall be paid by the liquidating trustee or agent or other Person making such payment or distribution directly to Agent, to the extent necessary to make payment in full of all Senior Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to Agent and Lenders.

(iii)      In the event that notwithstanding the foregoing provisions of this Section 12.9(c), any payment or distribution of assets of any Credit Party of any kind or character, whether in cash, property or securities, shall be received by any other Credit Party on account of the Intercompany Obligations before all Senior Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to Agent for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been paid in full, after giving effect to any concurrent payment or distribution or provision therefor to Agent and Lenders.

(d)      No right of Agent and Lenders or any other present or future holders of any Senior Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by any Credit Party with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

[SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**BORROWERS:**

**NATIONAL ENVELOPE CORPORATION**
**NATIONAL ENVELOPE CORPORATION - EAST**
**NATIONAL ENVELOPE – LENEXA LLC**
**NATIONAL ENVELOPE – CHINO LLC**
**NATIONAL ENVELOPE – GRAND PRAIRIE LLC**
**NATIONAL ENVELOPE – ELK GROVE VILLAGE LLC**
**NATIONAL ENVELOPE – AECO LLC**
**NATIONAL ENVELOPE – SPECIALTIES GROUP LLC**
**NATIONAL ENVELOPE – HOUSTON LLC**
**NATIONAL ENVELOPE – HOUSTON EQUITY LLC**
**NATIONAL ENVELOPE – LEASING LLC**
**NATIONAL ENVELOPE – WH LLC**
**NATIONAL ENVELOPE – CITY OF INDUSTRY LLC**
**NATIONAL ENVELOPE – AURORA LLC**
**NATIONAL ENVELOPE – SCOTTDALE LLC**
**NATIONAL ENVELOPE – CORSICANA LLC**
**NATIONAL ENVELOPE – APPLETON LLC**
**NATIONAL ENVELOPE – ENNIS LLC**


By:_____
Name:
Title:



By:_____
Name:
Title:

The following Persons are signatories to this Agreement in their capacity as Credit Parties and not as Borrowers.

**CREDIT PARTIES:**

**NEC HOLDINGS CORP.**
**NATIONAL ENVELOPE – SHELBYVILLE EQUITY LLC**
**NATIONAL ENVELOPE – EXTON EQUITY LLC**
**NATIONAL ENVELOPE – NASHVILLE EQUITY LLC**
**NEW YORK ENVELOPE CORP.**
**NATIONAL ENVELOPE CORPORATION – NORTH**
**NATIONAL ENVELOPE CORPORATION – SOUTH**
**NATIONAL ENVELOPE CORPORATION – CENTRAL**
**OLD COLONY ENVELOPE CORP.**
**ARISTOCRAT ENVELOPE CORPORATION**


By:_____
Name:
Title:


By:_____
Name:
Title:

**LENDERS:**

**GENERAL ELECTRIC CAPITAL CORPORATION**, as Agent and Lender

By: _____

Name:

Title:  Its Duly Authorized Signatory

**BANK OF AMERICA, N.A.**, as Lender

By: _____
Name:
Title:

**THE CIT GROUP/BUSINESS CREDIT, INC.,**

as Lender
By: _____
Name:
Title:

**CITIZENS BUSINESS CREDIT CO.,**
**a division of Citizens Leasing Corp.,** as Lender

By: _____
Name:
Title:

**HSBC BUSINESS CREDIT (USA) INC.**
as Lender

By: _____
Name:
Title:

**WACHOVIA BANK, NATIONAL ASSOCIATION,** as Lender

By: _____
Name:
Title:

# ANNEX A (RECITALS)
## TO
## CREDIT AGREEMENT

### DEFINITIONS

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"Account Debtor" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Accounting Changes" has the meaning ascribed thereto in Annex G.

"Accounts" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to any Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party), (e) all health care insurance receivables and (f) all collateral security of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing.

"Advance" means any Revolving Credit Advance or Swing Line Advance, as the context may require.

"Advisors" means outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers or other advisors of Agent or Lenders.

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 5% or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers and partners and (d) in the case of Borrowers, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of any Borrower. For the purposes of this definition, "control" of a Person shall mean the

possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, however, that the term "Affiliate" shall specifically exclude Agent and each Lender.

"Agent" means GE Capital in its capacity as Agent for Lenders or its successor appointed pursuant to Section 9.7.

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of the Closing Date by and among Borrowers, the other Credit Parties party thereto, GE Capital, as Agent and Lender and the other Lenders from time to time party thereto, as the same may be amended, restated, supplemented, restated or otherwise modified from time to time.

"Appendices" has the meaning ascribed to it in the recitals to the Agreement.

"Applicable L/C Margin" means the per annum fee, from time to time in effect, payable with respect to outstanding Letter of Credit Obligations as determined by reference to Section 1.5(a).

"Applicable Margins" means collectively the Applicable L/C Margin, the Applicable Unused Line Fee Margin and the Applicable Revolver Index Margin.

"Applicable Revolver Index Margin" means the per annum interest rate margin from time to time in effect and payable in addition to the Index Rate applicable to the Revolving Loan, as determined by reference to Section 1.5(a).

"Applicable Unused Line Fee Margin" means the per annum fee, from time to time in effect, payable in respect of Borrowers' non-use of committed funds pursuant to Section 1.9(b), which fee is determined by reference to Section 1.5(a).

"Assignment Agreement" has the meaning ascribed to it in Section 9.1(a).

"Bankruptcy Code" has the meaning ascribed to such term in the recitals hereto.

"Bankruptcy Court" has the meaning ascribed to such term in the recitals hereto.

"Blocked Accounts" has the meaning ascribed to it in Annex C.

"Borrower Representative" means NEC in its capacity as Borrower Representative pursuant to the provisions of Section 1.1(d).

"Borrowers" and "Borrower" have the respective meanings ascribed thereto in the preamble to the Agreement.

"Borrowing Base" means, as of any date of determination by Agent, from time to time, an amount equal to the sum at such time of the following clauses (a) and (b) (in each case, less any Reserves established by Agent at such time):

(a)     85% of the book value of the Borrowers' Eligible Accounts; and

(b)     the lesser of (i) 65% of the book value of the Borrowers' Eligible Inventory valued at the lower of cost (determined on a first in, first out basis) or market and (ii) 85% of the net orderly liquidation value of the Borrowers' Eligible Inventory (as determined by an appraisal in form, scope and from an appraiser acceptable to Agent).

"Borrowing Base Certificate" means a certificate to be executed and delivered from time to time by Borrower Representative with respect to the Borrowing Base in the form attached to this Agreement as Exhibit 4.1(b).

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Capital Expenditures" means, with respect to any Person, all expenditures (by the expenditure of cash or the incurrence of Indebtedness) by such Person during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto that have a useful life of more than one year and that are required to be capitalized under GAAP.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"Capital One" means Capital One Financial Corporation, a Delaware corporation.

"Carve-Out" shall have the meaning set forth in the Financing Order.

"Carve-Out Reserve" means a reserve in the amount equal to the unused portion of the Carve-Out.

"Cash Collateral" means "cash collateral" as defined under Section 363 of the Bankruptcy Code.

"Cash Collateral Account" has the meaning ascribed to it Annex B.

"Cash Equivalents" has the meaning ascribed to it in Annex B.

"Cash Management Systems" has the meaning ascribed to it in Section 1.8.

"Change of Control" means any event, transaction or occurrence as a result of which (a) the Permitted Holders cease to own and control at least 90% of all of the economic and voting rights associated with all of the outstanding capital Stock of Holdings, (b) Holdings

ceases to own and control all of the economic and voting rights associated with all of the outstanding capital Stock of NEC, (c) NEC ceases to own and control all of the economic and voting rights associated with all of the outstanding capital Stock of any of its Subsidiaries, or (d) during any period of twelve consecutive calendar months, individuals who at the beginning of such period constituted the board of directors of NEC (together with any new directors whose election by the board of directors of NEC or whose nomination for election by the Stockholders of NEC was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason other than death or disability to constitute a majority of the directors then in office. "Permitted Holders" means each of (1) Mr. William Ungar and Mrs. Jerry Ungar, and any members of the immediate family of Mr. William Ungar and Mrs. Jerry Ungar, or the lineal descendants of Mr. William Ungar and Mrs. Jerry Ungar or the spouses of the lineal descendants of Mr. William Ungar and Mrs. Jerry Ungar, the respective heirs of, executors or trustees holding for the sole benefit of any members of the immediate family of Mr. William Ungar and Mrs. Jerry Ungar, the lineal descendants of, or the spouses of the lineal descendants of or trusts or foundations controlled by or for the benefit of Mr. William Ungar or Mrs. Jerry Ungar or any members of their immediate family or (2) NEC, provided that NEC has acquired the Stock of Holdings pursuant to the terms of the Warrant Agreement. For the purposes of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise.

"Chapter 11 Case" shall have the meaning assigned to such term in the recitals hereto.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"Chattel Paper" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Credit Party.

"Chief Restructuring Officer" has the meaning ascribed to it in Section 5.15.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex D.

"Closing Date" means June [10], 2010.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently

in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's or any Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" means the property covered by the Security Agreement, the Mortgages and the other Collateral Documents and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Agent, on behalf of itself and Lenders, to secure the Obligations.

"Collateral Documents" means the Security Agreement, the Pledge Agreements, the Guaranties, the Mortgages, the Intellectual Property Security Agreement and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"Collateral Reports" means the reports with respect to the Collateral referred to in Annex F.

"Collection Account" means that certain account of Agent, account number 50279513 in the name of "GE BUSINESS FINANCIAL SERVICES, INC." at Deutsche Bank in New York, New York ABA No. 021-001-033, Ref: National Envelope - CFN8698, or such other account as may be specified in writing by Agent as the "Collection Account".

"Collections" shall have the meaning ascribed to such term in Section 1.3(c).

"Commitment Termination Date" means the earliest of (a) October [9], 2010, (b) the date of termination of Lenders' obligations to make Advances and to incur Letter of Credit Obligations or permit existing Loans to remain outstanding pursuant to Section 8.2(b), (c) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets, (d) the effective date of a confirmed plan of reorganization for Borrowers in any case commenced pursuant to Chapter 11 of the Bankruptcy Code, (e) the date of a conversion pursuant to Chapter 7 of the Bankruptcy Code of any case in respect of Borrowers commenced pursuant to Chapter 11 of the Bankruptcy Code (unless consented to by Agent and the Requisite Lenders), (f) five (5) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (g) forty (40) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (h) the date on which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date and (i) the date of indefeasible prepayment in full by Borrowers of the Loans and the cancellation and return (or stand-by guarantee) of all Letters of Credit or the cash collateralization of all Letter of Credit Obligations pursuant to Annex B, and the permanent reduction of all Revolving Loan Commitments to zero dollars ($0).

"Committee" means the official committee of unsecured creditors formed in the Chapter 11 Case.

"Compliance Certificate" has the meaning ascribed to it in Annex E.

"Concentration Accounts" has the meaning ascribed to it in Annex C.

"Contracts" means all "contracts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control Letter" means a letter agreement between Agent and (i) the issuer of uncertificated securities with respect to uncertificated securities in the name of any Credit Party, (ii) a securities intermediary with respect to securities, whether certificated or uncertificated, securities entitlements and other financial assets held in a securities account in the name of any Credit Party, (iii) a futures commission merchant or clearing house, as applicable, with respect to commodity accounts and commodity contracts held by any Credit Party, whereby, among other things, the issuer, securities intermediary or futures commission merchant disclaims any security interest in the applicable financial assets, acknowledges the Lien of Agent, on behalf of itself and Lenders, on such financial assets, and agrees to follow the instructions or entitlement orders of Agent without further consent by the affected Credit Party and whereby Agent agrees with the affected Credit Party, to exercise its rights to direct the disposition of such securities or commodities accounts or contracts (as applicable) only upon the occurrence and during the continuation of an Event of Default.

"Copyright License" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyrights" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"Credit Parties" means Holdings, each Borrower, and each of their respective Subsidiaries.

"Debtors" has the meaning ascribed to it in the recitals hereto.

"Default" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning ascribed to it in Section 1.5(d).

"Designated Affiliate" means each of (a) Mr. William Ungar and Mrs. Jerry Ungar, and any members of the immediate family of Mr. William Ungar and Mrs. Jerry Ungar, or the lineal descendants of Mr. William Ungar and Mrs. Jerry Ungar or the spouses of the lineal descendants of Mr. William Ungar and Mrs. Jerry Ungar, the respective heirs of, executors or trustees holding for the sole benefit of any members of the immediate family of Mr. William Ungar and Mrs. Jerry Ungar, the lineal descendants of, or the spouses of the lineal descendants of or trusts or foundations controlled by or for the benefit of Mr. William Ungar or Mrs. Jerry Ungar or any members of their immediate family, and (b) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 5% or more of the Stock having ordinary voting power in the election of directors of any Credit Party, and each Person that controls, is controlled by or is under common control with any Credit Party, and (c) the immediate family members, spouses and lineal descendants of any Person identified in the foregoing clause (b). For the purposes of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise.

"DIP Budget" means the Interim DIP Budget together with the Final DIP Budget.

"Disbursement Accounts" has the meaning ascribed to it in Annex C.

"Disclosure Schedules" means the Schedules prepared by Borrowers and denominated as Disclosure Schedules (1.4) through (6.7) in the Index to the Agreement.

"Documents" means all "documents," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"Dollars" or "$" means lawful currency of the United States of America.

"E-Fax" means any system used to receive or transmit faxes electronically.

"Eligible Accounts" has the meaning ascribed to it in Section 1.6.

"Eligible Inventory" has the meaning ascribed to it in Section 1.7.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, and regulations in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any

and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located and, in any event, including all such Credit Party's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Credit Party, any trade or business (whether or not incorporated) that, together with such Credit Party, are treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any event described in Section 4043(c) of ERISA with respect to a Title IV Plan; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC;

(f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within 30 days; (g) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; or (i) the revocation or threatened revocation of a Qualified Plan's qualification or tax exempt status; or (j) the termination of a Plan described in Section 4064 of ERISA; but in each such case, only if and to the extent it could be reasonably be expected to result (directly or indirectly, individually or in the aggregate) in a Material Adverse Effect.

"E-System" means any electronic system, including Intralinks® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Affiliates, or any of such Person's respective officers, directors, employees, attorneys, agents and representatives or any other Person, providing for access to data protected by passcodes or other security system.

"ESOP" means a Plan that is intended to satisfy the requirements of Section 4975(e)(7) of the IRC.

"Event of Default" has the meaning ascribed to it in Section 8.1.

"Existing Letters of Credit" means the outstanding letters of credit issued under the Pre-Petition Credit Agreement and listed on Disclosure Schedule (1.2).

"Fair Labor Standards Act" means the Fair Labor Standards Act, 29 U.S.C. §201 et seq.

"Federal Funds Rate" means, for any day, a floating rate equal to the weighted average of the rates on overnight Federal funds transactions among members of the Federal Reserve System, as determined by Agent in its sole discretion, which determination shall be final, binding and conclusive (absent manifest error).

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System.

"Fees" means any and all fees payable to Agent or any Lender pursuant to the Agreement or any of the other Loan Documents.

"Final DIP Budget" means the updated Interim DIP Budget delivered by Borrowers prior to or in connection with the entry of the Final Order and approved in writing by Agent (and any subsequent budget prepared by the Borrowers and approved in writing by Agent).

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be reasonably satisfactory in

form and substance to Agent and the Requisite Lenders, and from which no appeal or motion to reconsider has been timely filed and such order in any respect is not the subject of a stay pending appeal (unless Agent and the Requisite Lenders waive such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and the Requisite Lenders, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Agent's and the Lenders' claims.

"Financial Statements" means the consolidated and consolidating income statements, statements of cash flows and balance sheets of Borrowers delivered in accordance with Section 3.4 and Annex E.

"Financing Orders" means the Final Order and the Interim order, together.

"First Day Orders" means the First Day Orders set forth on Exhibit A-1, which shall, to the extent (i) affecting the rights or obligations of Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Tranche A Lenders or (ii) which may give rise to a post-petition claim, administrative in nature or otherwise, be in form and substance reasonably satisfactory to Agent.

"Fiscal Month" means any of the monthly accounting periods of Borrowers.

"Fiscal Quarter" means any of the quarterly accounting periods of Borrowers, ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of Borrowers ending on December 31 of each year.

"Fixtures" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Funded Debt" means, with respect to any Person, without duplication, all Indebtedness for borrowed money evidenced by notes, bonds, debentures, or similar evidences of Indebtedness that by its terms matures more than one year from, or is directly or indirectly renewable or extendible at such Person's option under a revolving credit or similar agreement obligating the lender or lenders to extend credit over a period of more than one year from the date of creation thereof, and specifically including Capital Lease Obligations, current maturities of long-term debt, revolving credit and short-term debt extendible beyond one year at the option of the debtor, and also including, in the case of Borrowers, the Obligations and, without duplication, Guaranteed Indebtedness consisting of guaranties of Funded Debt of other Persons.

"GAAP" means generally accepted accounting principles in the United States of America consistently applied, as such term is further defined in Annex G to the Agreement.

"GE Capital" means General Electric Capital Corporation, a Delaware corporation.

"GE Fee Letter" means any letter or letters, dated as of the date hereof, between GE Capital and Borrowers relating to fees payable in connection with the arrangement and closing of this Agreement.

"General Intangibles" means all "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Goods" means all "goods" as defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including embedded software to the extent included in "goods" as defined in the Code, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x)

the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum stated or determinable amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Guaranty" means the Guaranty of even date herewith executed by Holdings and each Subsidiary of a Borrower in favor of Agent and Lenders.

"Guaranties" means the Guaranty and any other guaranty executed by any Guarantor in favor of Agent and Lenders in respect of the Obligations.

"Guarantors" means Holdings, each Subsidiary of any Borrower, and each other Person, if any, that executes a guaranty or other similar agreement in favor of Agent, for itself and the ratable benefit of Lenders, in connection with the transactions contemplated by the Agreement and the other Loan Documents.

"Hamburg Facility" means the facility owned by NEC EAST located at 160, Elmview Avenue, Hamburg, New York 14075.

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste", "hazardous waste", "hazardous material", "hazardous substance", "extremely hazardous waste", "restricted hazardous waste", "pollutant", "contaminant", "hazardous constituent", "special waste", "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Holdings" has the meaning ascribed thereto in the recitals hereto.

"Inactive Subsidiaries" means New York Envelope Corp., National Envelope Corporation-North, National Envelope Corporation-South, National Envelope Corporation-Central, Old Colony Envelope Corp., Aristocrat Envelope Corporation, National Envelope-Exton Equity LLC, National Envelope-Shelbyville Equity LLC and National Envelope-Nashville Equity LLC.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred 6 months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than 6 months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value (discounted at the Index Rate as in effect on the Closing Date) of future rental payments under all synthetic leases, (f) all obligations of

such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) the Obligations.

"Indemnified Liabilities" has the meaning ascribed to it in Section 1.13.

"Indemnified Person" has the meaning ascribed to in Section 1.13.

"Index Rate" means, for any day, a rate per annum equal to the highest of (i) the rate last quoted by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's largest banks" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate, or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent), (ii) the sum of (x) the Federal Funds Rate, plus (y) 0.50% per annum, and (iii) 4.75%.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement dated as of the date hereof made in favor of Agent, on behalf of itself and Lenders, by each Credit Party that is a signatory thereto.

"Intercompany Obligations" has the meaning ascribed to it in Section 12.9(a).

"Interest Payment Date" means the first Business Day of each month to occur while such Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Revolving Loan Commitments have been terminated and the Loans have been paid in full and (y) the Commitment Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under the Agreement.

"Interim DIP Budget" means the 13-week cash flow forecast detailing cash receipts and cash disbursements on a weekly basis for such weekly period and related

documents, in form and substance acceptable to Agent and is set forth on <u>Disclosure Schedule (3.4)</u>.

"<u>Interim Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and the Requisite Lenders, which, among other matters, but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit I.

"<u>Interim Order Commitment Amount</u>" has the meaning ascribed to it in <u>Section 1.1(a)(i)</u>.

"<u>International Paper</u>" means International Paper Company, a New York corporation.

"<u>Inventory</u>" means all "inventory," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"<u>Investment Property</u>" means all "investment property" as such term is defined in the Code now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of any Credit Party, including the rights of any Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts of any Credit Party; (iv) all commodity contracts of any Credit Party; and (v) all commodity accounts held by any Credit Party.

"<u>IRC</u>" means the Internal Revenue Code of 1986 and all regulations promulgated thereunder.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>L/C Issuer</u>" has the meaning ascribed to it in <u>Annex B</u>.

"<u>L/C Sublimit</u>" has the meaning ascribed to it in <u>Annex B</u>.

"Lenders" means GE Capital, the other Lenders named on the signature pages of the Agreement, and, if any such Lender shall decide to assign all or any portion of the Obligations, such term shall include any assignee of such Lender.

"Letter of Credit Fee" has the meaning ascribed to it in Annex B.

"Letter of Credit Obligations" means all outstanding obligations incurred by Agent and Lenders at the request of Borrower Representative, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of Letters of Credit by Agent or another L/C Issuer or the purchase of a participation as set forth in Annex B with respect to any Letter of Credit. The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable at such time or at any time thereafter by Agent or Lenders thereupon or pursuant thereto.

"Letters of Credit" means documentary or standby letters of credit issued for the account of any Borrower by any L/C Issuer, and bankers' acceptances issued by any Borrower, for which Agent and Lenders have incurred Letter of Credit Obligations.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by any Credit Party.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Litigation" has the meaning ascribed to it in Section 3.13.

"Loan Account" has the meaning ascribed to it in Section 1.12.

"Loan Documents" means the Agreement, the Revolving Notes, the Collateral Documents, the Master Standby Agreement, the Master Documentary Agreement, the Financing Orders, and all other agreements, instruments, documents and certificates identified in the Closing Checklist executed and delivered to, or in favor of, Agent or any Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Credit Party, or any employee of any Credit Party, and delivered to Agent or any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loans" means the Revolving Loan and the Swing Line Loan.

"Lock Boxes" has the meaning ascribed to it in Annex C.

"M&A Advisor" has the meaning ascribed to it in Section 5.15.

"Margin Stock" has the meaning ascribed to in Section 3.10.

"Master Documentary Agreement" means the Second Amended and Restated Master Agreement for Documentary Letters of Credit dated as of the Closing Date among Borrowers, as Applicant(s), and GE Capital attached as Exhibit A-3 hereto

"Master Standby Agreement" means the Second Amended and Restated Master Agreement for Standby Letters of Credit dated as of the Closing Date among Borrowers, as Applicant(s), and GE Capital, as issuer attached as Exhibit A-4 hereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or financial or other condition of any Credit Party or the Credit Parties considered as a whole, (b) any Borrower's ability to pay any of the Loans or any of the other Obligations in accordance with the terms of the Agreement, (c) the Collateral or Agent's Liens, on behalf of itself and Lenders, on the Collateral or the priority of such Liens, or (d) Agent's or any Lender's rights and remedies under the Agreement and the other Loan Documents; provided, however, the events leading up to the filing of the Chapter 11 Case that have been disclosed to the Lenders, the filing and effect of the Chapter 11 Case shall not, in and of itself, be deemed to constitute or give rise to a Material Adverse Effect.

"Material Supplier" means any supplier which in the previous 12 months has supplied greater than 20% of the Credit Parties' annual paper purchases in the aggregate.

"Maximum Amount" means, as of any date of determination, an amount equal to the Revolving Loan Commitment of all Lenders as of that date.

"Milestones" means certain milestones related to a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, as set forth in Section 5.13 (unless extended or modified with the consent of Agent and the Requisite Lenders).

"Mortgaged Properties" means any real property subject to a Mortgage in favor of Agent to secure the Obligations.

"Mortgages" means each of the mortgages, deeds of trust, collateral assignments of leases or other real estate security documents delivered by any Credit Party to Agent on behalf of itself and Lenders with respect to the Mortgaged Properties, all in form and substance reasonably satisfactory to Agent.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has or could reasonably be expected to have a direct or indirect liability under Title IV of ERISA or under Section 412 of the IRC.

"NEC" has the meaning ascribed to it in the Preamble hereto.

"Non-Funding Lender" has the meaning ascribed to it in Section 9.9(a)(ii).

"Notice of Revolving Credit Advance" has the meaning ascribed to it in Section 1.1(a).

"Obligations" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to Agent or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, letter of credit agreement or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed in such case or proceeding), Fees, expenses, attorneys' fees and any other sum chargeable to any Credit Party under the Agreement or any of the other Loan Documents.

"Overadvance" has the meaning ascribed to it in Section 1.1(a)(iii).

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent of the United States or of any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"Patriot Act" has the meaning ascribed to it in Section 3.26.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a Plan described in Section 3(2) of ERISA.

"Permitted Encumbrances" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with Section 5.2(b); (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Credit Party is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics', or similar liens arising in the ordinary course of business, so long as such Liens attach only to Equipment, Fixtures and/or Real Estate; (e) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business and securing liabilities in an outstanding aggregate amount not in excess of $100,000 at any time, so long as such Liens attach only to Inventory; (f) inchoate and

unperfected bailees' and landlord liens with respect to locations in which a bailee or landlord waiver is not required, and which arise in the ordinary course of business, so long as such Liens attach only to assets located on the applicable Real Estate; (g) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Credit Party is a party; (h) any attachment or judgment lien not constituting an Event of Default under <u>Section 8.1(j)</u>; (i) with respect to any Real Estate, the permitted exceptions set forth on Exhibit B of the Mortgage applicable to such Real Estate, and zoning restrictions, easements, licenses, or other restrictions on the use of any Real Estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such Real Estate; (j) presently existing or hereafter created Liens in favor of Agent, on behalf of Lenders; (k) Liens expressly permitted under <u>Section 6.7</u> (other than clause (a) thereto) of the Agreement; and (l) Primed Liens or Liens otherwise permitted by the Financing Orders.

"<u>Permitted Prior Lien</u>" shall have the meaning set forth in the Financing Order.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall have the meaning assigned to such term in the recitals hereto.

"<u>Plan</u>" means, at any time, an "employee benefit plan", as defined in Section 3(3) of ERISA (other than a Multiemployer Plan), that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to or has or could reasonably be expected to have a direct or indirect liability under Title IV of ERISA or under Section 412 of the IRC.

"<u>Pledge Agreement</u>" means the Pledge Agreement of even date herewith executed by each Credit Party in favor of Agent, on behalf of itself and Lenders, pledging all of the Stock of the Subsidiaries of each Credit Party and all intercompany notes owing to or held by each Credit Party.

"<u>Pledge Agreements</u>" means the Pledge Agreement and any pledge agreements entered into after the Closing Date by any Credit Party (as required by the Agreement or any other Loan Document).

"<u>Pre-Petition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"<u>Pre-Petition Agent</u>" means Agent (as defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

"<u>Pre-Petition Credit Agreement</u>" shall have the meaning assigned to such term in the recitals hereto.

"<u>Pre-Petition Lenders</u>" means the Pre-Petition Tranche A Lenders and the Pre-Petition Tranche B Lenders.

"<u>Pre-Petition Loan Documents</u>" means the Loan Documents (as defined in the Pre-Petition Credit Agreement).

"<u>Pre-Petition Revolving Credit Obligations</u>" means all Obligations (as defined in the Pre-Petition Credit Agreement) owed to the Revolving Lenders (as defined in the Pre-Petition Credit Agreement) pursuant to the terms of the Pre-Petition Credit Agreement.

"<u>Pre-Petition Tranche A Lenders</u>" means the lenders holding the Pre-Petition Tranche A Obligations.

"<u>Pre-Petition Tranche A Obligations</u>" means the obligations under the Revolving Loan and Term A Loan (each as defined in the Pre-Petition Credit Agreement) outstanding on the Petition Date prior to the effectiveness of this Agreement, including the letters of credit issued under the Pre-Petition Credit Agreement.

"<u>Pre-Petition Tranche B Lenders</u>" means the lenders holding the Term B Loan (as defined under the Pre-Petition Credit Agreement).

"<u>Primed Liens</u>" means any claims, Liens, and encumbrances of any of the Pre-Petition Agent and the Pre-Petition Lenders pursuant to the Pre-Petition Credit Agreement

"<u>Proceeds</u>" means "proceeds," as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Credit Party from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to any Credit Party from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental authority), (c) any claim of any Credit Party against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by any Credit Party against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"<u>Pro Rata Share</u>" means with respect to all matters relating to any Lender, (a) with respect to the Revolving Loan, the percentage obtained by dividing (i) the Revolving Loan Commitment of that Lender by (ii) the aggregate Revolving Loan Commitments of all Lenders, and (b) with respect to all Loans on and after the Commitment Termination Date, the percentage obtained by dividing (i) the aggregate outstanding principal balance of the Loans held by that Lender, by (ii) the outstanding principal balance of the Loans held by all Lenders.

"Qualified Plan" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"Qualified Assignee" means (a) any Lender, any Affiliate of any Lender and, with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor, and (b) any commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933) which extends credit or buys loans as one of its businesses, including insurance companies, mutual funds, lease financing companies and commercial finance companies, in each case, which has a rating of BBB or higher from S&P and a rating of Baa2 or higher from Moody's at the date that it becomes a Lender and which, through its applicable lending office, is capable of lending to Borrowers without the imposition of any withholding or similar taxes; provided that no Person determined by Agent to be acting in the capacity of a vulture fund or distressed debt purchaser shall be a Qualified Assignee, and no Person or Affiliate of such Person (other than a Person that is already a Lender) holding Subordinated Debt or Stock issued by any Credit Party shall be a Qualified Assignee.

"Real Estate" has the meaning ascribed to it in Section 3.6.

"Refunded Swing Line Loan" has the meaning ascribed to it in Section 1.1(c)(iii).

"Release" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Requisite Lenders" means Lenders having (a) more than 66 2/3% of the Revolving Loan Commitments of all Lenders, or (b) if the Revolving Loan Commitments have been terminated, more than 66 2/3% of the aggregate outstanding amount of all Loans.

"Reserves" means (a) reserves established pursuant to Section 5.4(c), (b) reserves established by Agent on the Closing Date pursuant to Section 5.9, which reserves may be decreased by Agent upon Agent obtaining landlord or mortgagee agreements or bailee letters, as applicable, in form and substance satisfactory to Agent, (c) the Carve-Out Reserve, (d) without duplication, reserves to provide for payment of amounts set forth in the DIP Budget that are incurred, but not paid, (e) without duplication, reserves for the professional fees of the Credit Parties and entities other than Agent and Lenders as set forth in the DIP Budget and (f) such other reserves against the Revolving Loan Commitment, Eligible Accounts, Eligible Inventory or the Borrowing Base that Agent may, in its reasonable credit judgment that Agent may, in its reasonable credit judgment, establish from time to time. Without limiting the generality of the foregoing, Reserves established to ensure the payment of accrued Interest Expenses or Indebtedness shall be deemed to be a reasonable exercise of Agent's credit judgment.

"Restricted Payment" means, with respect to any Credit Party (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any Subordinated Debt; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Credit Party's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Credit Party other than payment of compensation in the ordinary course of business and in accordance with past practices, to Stockholders who are employees or consultants of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Credit Party to any Stockholder of such Credit Party or its Affiliates.

"Retiree Welfare Plan" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the IRC or other applicable law or coverage through the last day of the month of a participant's termination of employment.

"Revolving Credit Advance" has the meaning ascribed to it in Section 1.1(a)(i).

"Revolving Lenders" means, as of any date of determination, Lenders having a Revolving Loan Commitment.

"Revolving Loan" means, at any time, the sum of (i) the aggregate amount of Revolving Credit Advances outstanding to Borrower plus (ii) the aggregate Letter of Credit Obligations incurred on behalf of Borrower. Unless the context otherwise requires, references to the outstanding principal balance of the Revolving Loan shall include the outstanding balance of Letter of Credit Obligations.

"Revolving Loan Commitment" means (a) as to any Lender, the aggregate of such Lender's Revolving Loan Commitment (including without duplication the Swing Line Lender's Swing Line Commitment as a subset of its Revolving Loan Commitment) as set forth on Annex J to the Agreement or in the most recent Assignment Agreement executed by such Lender and (b) as to all Lenders, the aggregate of all Lenders' Revolving Loan Commitments (including without duplication the Swing Line Lender's Swing Line Commitment as a subset of its Revolving Loan Commitment), which aggregate commitment shall be ONE HUNDRED THIRTY EIGHT MILLION NINE HUNDRED FIFTY FIVE THOUSAND THREE HUNDRED TWENTY FOUR DOLLARS SEVENTY NINE CENTS ($138,955,324.79) on the Closing Date, as to each

of clauses (a) and (b), as such Commitments may be reduced or adjusted from time to time in accordance with the Agreement.

"Revolving Note" has the meaning ascribed to it in Section 1.1(b).

"Security Agreement" means the Security Agreement of even date herewith entered into by and among Agent, on behalf of itself and Lenders, and each Credit Party that is a signatory thereto.

"Senior Obligations" has the meaning ascribed to it in Section 12.9(a).

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"Stockholder" means, with respect to any Person, each holder of Stock of such Person.

"Subordinated Debt" means any Indebtedness of any Credit Party subordinated to the Obligations in a manner and form satisfactory to Agent and Lenders in their sole discretion, as to right and time of payment and as to any other rights and remedies thereunder.

"Subsidiary" means, with respect to any Person, (a) any corporation of which an aggregate of more than 50% of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than 50% or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"Swing Line Advance" has the meaning ascribed to it in Section 1.1(c)(i).

"Swing Line Availability" has the meaning ascribed to it in Section 1.1(c)(i).

"Swing Line Commitment" means, as to the Swing Line Lender, the commitment of the Swing Line Lender to make Swing Line Advances as set forth on Annex J to the Agreement, which commitment constitutes a subfacility of the Revolving Loan Commitment of the Swing Line Lender.

"Swing Line Lender" means GE Capital.

"Swing Line Loan" means, as the context may require, at any time, the aggregate amount of Swing Line Advances outstanding to any Borrower or to all Borrowers.

"Tax Returns" has the meaning ascribed to it in Section 3.11.

"Tax Sharing Agreement" means the Tax Agreement, dated September 13, 1994 between NEC and Holdings.

"Taxes" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of Agent or a Lender by the jurisdictions under the laws of which Agent and Lenders are organized or conduct business or any political subdivision thereof.

"Temporary Staff" has the meaning ascribed to it in Section 5.15.

"Termination Date" means the date on which (a) the Loans have been indefeasibly repaid in full, (b) all other Obligations under the Agreement and the other Loan Documents have been completely discharged (c) all Letter of Credit Obligations have been cash collateralized, canceled or backed by standby letters of credit in accordance with Annex B, and (d) none of Borrowers shall have any further right to borrow any monies under the Agreement.

"Title IV Plan" means a Pension Plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter existing or adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, service marks, logos, all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"Unfunded Pension Liability" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of 5 years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by any Credit Party or any ERISA Affiliate as a result of such transaction.

"Unisource" means Unisource Worldwide, Inc., a Delaware corporation.

"Warrant Agreement" means that certain Agreement Relating to Transfer and Exercise of Warrant, Issuance of Shares, Cancellation of Note and Termination of Pledge and Security dated as of February 1, 2008, by and among Holdings, NEC, and Florette D. Ungar Shaashua, Joan E. Ungar Levy, Denise F. Ungar Stern, and Rita L. Ungar Moser, each acting solely as a Trustee of the Ungar Trust.

"Welfare Plan" means a Plan described in Section 3(i) of ERISA.

"Xpedx" means the Xpedx division of International Paper.

Unless otherwise specifically provided herein, any accounting term used in the Agreement shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. If any "Accounting Changes" (as defined below) occur and such changes result in a change in the calculation of the standards or terms used in the Agreement or any other Loan Document, then Borrowers, Agent and Lenders agree to enter into negotiations in order to amend such provisions of the Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating Borrowers' and their Subsidiaries' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made; provided, however, that the agreement of Requisite Lenders to any required amendments of such provisions shall be sufficient to bind all Lenders. "Accounting Changes" means (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions), (ii) changes in accounting principles concurred in by any Borrower's certified public accountants; (iii) purchase accounting adjustments under A.P.B. 16 or 17 and EITF 88-16, and the application of the accounting principles set forth in FASB 109, including the establishment of reserves pursuant thereto and any subsequent reversal (in whole or in part) of such reserves; and (iv) the reversal of any reserves established as a result of purchase accounting adjustments. If Agent, Borrowers and Requisite Lenders agree upon the required amendments, then after appropriate amendments have been executed and the underlying Accounting Change with respect thereto has been implemented, any reference to GAAP contained in the Agreement or in any other Loan Document shall, only to the extent of such Accounting Change, refer to GAAP, consistently applied after giving effect to the implementation of such Accounting Change. If Agent, Borrowers and Requisite Lenders cannot agree upon the required amendments within 30 days following the date of implementation of any Accounting Change, then all Financial Statements delivered and all calculations of financial covenants and other standards and terms in accordance with the Agreement and the other Loan Documents shall be prepared, delivered and made without regard to the underlying Accounting Change.

All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different

Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**LETTERS OF CREDIT**

(a)　Issuance. Subject to the terms and conditions of the Agreement, Agent and Revolving Lenders agree to incur, from time to time prior to the Commitment Termination Date, upon the request of Borrower Representative on behalf of the applicable Borrower and for such Borrower's account, Letter of Credit Obligations by causing Letters of Credit to be issued by GE Capital or a Subsidiary thereof or a bank or other legally authorized Person selected by or acceptable to Agent in its sole discretion (each, an "L/C Issuer") for such Borrower's account and guaranteed by Agent; provided, that if the L/C Issuer is a Revolving Lender, then such Letters of Credit shall not be guaranteed by Agent but rather each Revolving Lender shall, subject to the terms and conditions hereinafter set forth, purchase (or be deemed to have purchased) risk participations in all such Letters of Credit issued with the written consent of Agent, as more fully described in paragraph (b)(ii) below. The aggregate amount of all such Letter of Credit Obligations shall not at any time exceed the least of (i) FIVE MILLION DOLLARS ($5,000,000) (the "L/C Sublimit"), (ii) the Maximum Amount less the aggregate outstanding principal balance of the Revolving Credit Advances and the Swing Line Loan, and (iii) until the Bankruptcy Court shall have entered the Final Order, the Borrowing Base less the aggregate outstanding principal balance of the Revolving Credit Advances, the Swing Line Loan and the Pre-Petition Revolving Credit Obligations; provided that, until the Bankruptcy Court shall have entered the Final Order, the aggregate amount of all such Letter of Credit Obligations (excluding the aggregate amount of any Letter of Credit Obligations relating to any Existing Letter of Credit) shall not at any time exceed the Interim Commitment Amount less the aggregate outstanding principal balance of the Revolving Credit Advances and the Swing Line Loan. No such Letter of Credit shall have an expiry date that is more than one year following the date of issuance thereof, unless otherwise determined by Agent, in its sole discretion (including with respect to customary evergreen provisions), and neither Agent nor Revolving Lenders shall be under any obligation to incur Letter of Credit Obligations in respect of, or purchase risk participations in, any Letter of Credit having an expiry date that is later than ten (10) days prior to the Commitment Termination Date.

(b)　(i)　Advances Automatic; Participations. In the event that Agent or any Revolving Lender shall make any payment on or pursuant to any Letter of Credit Obligation, such payment shall then be deemed automatically to constitute a Revolving Credit Advance to the applicable Borrower under Section 1.1(a) of the Agreement regardless of whether a Default or Event of Default has occurred and is continuing and notwithstanding any Borrower's failure to satisfy the conditions precedent set forth in Section 2, and each Revolving Lender shall be obligated to pay its Pro Rata Share thereof in accordance with the Agreement. The failure of any Revolving Lender to make available to Agent for Agent's own account its Pro Rata Share of any such Revolving Credit Advance or payment by Agent under or in respect of a Letter of Credit shall not relieve any other Revolving Lender of its obligation hereunder to make available to Agent its Pro Rata Share thereof, but no Revolving Lender shall be responsible for the failure of any other Revolving Lender to make available such other Revolving Lender's Pro Rata Share of any such payment.

(ii)    If it shall be illegal or unlawful for any Borrower to incur Revolving Credit Advances as contemplated by paragraph (b)(i) above or otherwise or if it shall be illegal or unlawful for any Revolving Lender to be deemed to have assumed a ratable share of the reimbursement obligations owed to an L/C Issuer, or if the L/C Issuer is a Revolving Lender, then (A) immediately and without further action whatsoever, each Revolving Lender shall be deemed to have irrevocably and unconditionally purchased from Agent (or such L/C Issuer, as the case may be) an undivided interest and participation equal to such Revolving Lender's Pro Rata Share (based on the Revolving Loan Commitments) of the Letter of Credit Obligations in respect of all Letters of Credit then outstanding and (B) thereafter, immediately upon issuance of any Letter of Credit, each Revolving Lender shall be deemed to have irrevocably and unconditionally purchased from Agent (or such L/C Issuer, as the case may be) an undivided interest and participation in such Revolving Lender's Pro Rata Share (based on the Revolving Loan Commitments) of the Letter of Credit Obligations with respect to such Letter of Credit on the date of such issuance. Each Revolving Lender shall fund its participation in all payments or disbursements made under the Letters of Credit in the same manner as provided in the Agreement with respect to Revolving Credit Advances.

(c)    <u>Cash Collateral</u>.

(i)    If Borrowers are required to provide cash collateral for any Letter of Credit Obligations pursuant to the Agreement prior to the Commitment Termination Date, each Borrower will pay to Agent for the ratable benefit of itself and Revolving Lenders cash or cash equivalents acceptable to Agent ("<u>Cash Equivalents</u>") in an amount equal to 105% of the maximum amount then available to be drawn under each applicable Letter of Credit outstanding for the benefit of such Borrower. Such funds or Cash Equivalents shall be held by Agent in a cash collateral account (the "<u>Cash Collateral Account</u>") maintained at a bank or financial institution acceptable to Agent. The Cash Collateral Account shall be in the name of the applicable Borrower and shall be pledged to, and subject to the control of, Agent, for the benefit of Agent and Lenders, in a manner satisfactory to Agent. Each Borrower hereby pledges and grants to Agent, on behalf of itself and Lenders, a security interest in all such funds and Cash Equivalents held in the Cash Collateral Account from time to time and all proceeds thereof, as security for the payment of all amounts due in respect of the Letter of Credit Obligations and other Obligations, whether or not then due. The Agreement, including this <u>Annex B</u>, shall constitute a security agreement under applicable law.

(ii)    If any Letter of Credit Obligations, whether or not then due and payable, shall for any reason be outstanding on the Commitment Termination Date, Borrowers shall either (A) provide cash collateral therefor in the manner described above, or (B) cause all such Letters of Credit and guaranties thereof, if any, to be canceled and returned, or (C) deliver a stand-by letter (or letters) of credit in guaranty of such Letter of Credit Obligations, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus 30 additional days) as, and in an amount equal to 105% of, the aggregate maximum amount then available to be drawn under, the Letters of Credit to which such outstanding Letter of Credit Obligations relate and shall be issued by a Person, and shall be subject to such terms and conditions, as are be satisfactory to Agent in its sole discretion.

(iii)     From time to time after funds are deposited in the Cash Collateral Account by any Borrower, whether before or after the Commitment Termination Date, Agent may apply such funds or Cash Equivalents then held in the Cash Collateral Account to the payment of any amounts, and in such order as Agent may elect, as shall be or shall become due and payable by such Borrower to Agent and Lenders with respect to such Letter of Credit Obligations of such Borrower and, upon the satisfaction in full of all Letter of Credit Obligations of such Borrower, to any other Obligations of any Borrower then due and payable.

(iv)     No Borrower nor any Person claiming on behalf of or through any Borrower shall have any right to withdraw any of the funds or Cash Equivalents held in the Cash Collateral Account, except that upon the termination of all Letter of Credit Obligations and the payment of all amounts payable by Borrowers to Agent and Lenders in respect thereof, any funds remaining in the Cash Collateral Account shall be applied to other Obligations then due and owing and upon payment in full of such Obligations, any remaining amount shall be paid to Borrowers or as otherwise required by law.  Interest earned on deposits in the Cash Collateral Account shall be for the account of Agent.

(d)     Fees and Expenses.  Borrowers agree to pay to Agent for the benefit of Revolving Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) all costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "Letter of Credit Fee") in an amount equal to the Applicable L/C Margin from time to time in effect multiplied by the maximum amount available from time to time to be drawn under the applicable Letter of Credit.  Such fee shall be paid to Agent for the benefit of the Revolving Lenders in arrears, on the first day of each month and on the Commitment Termination Date.  In addition, Borrowers shall pay to any L/C Issuer, on demand, such fees (including all per annum fees), charges and expenses of such L/C Issuer in respect of the issuance, negotiation, acceptance, amendment, transfer and payment of such Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued.

(e)     Request for Incurrence of Letter of Credit Obligations.  Borrower Representative shall give Agent at least 2 Business Days' prior written notice requesting the incurrence of any Letter of Credit Obligation.  The notice shall be accompanied by the form of the Letter of Credit (which shall be acceptable to the L/C Issuer) and a completed Application for Standby Letter of Credit or Application for Documentary Letter of Credit (as applicable) in the form customarily used by the L/C Issuer.  Notwithstanding anything contained herein to the contrary, Letter of Credit applications by Borrower Representative and approvals by Agent and the L/C Issuer may be made and transmitted pursuant to electronic codes and security measures mutually agreed upon and established by and among Borrower Representative, Agent and the L/C Issuer.

(f)     Obligation Absolute.  The obligation of Borrowers to reimburse Agent and Revolving Lenders for payments made with respect to any Letter of Credit Obligation shall be absolute, unconditional and irrevocable, without necessity of presentment, demand, protest or other formalities, and the obligations of each Revolving Lender to make payments to Agent with respect to Letters of Credit shall be unconditional and irrevocable.  Such obligations of

Borrowers and Revolving Lenders shall be paid strictly in accordance with the terms hereof under all circumstances including the following:

(i)     any lack of validity or enforceability of any Letter of Credit or the Agreement or the other Loan Documents or any other agreement;

(ii)     the existence of any claim, setoff, defense or other right that any Borrower or any of their respective Affiliates or any Lender may at any time have against a beneficiary or any transferee of any Letter of Credit (or any Persons or entities for whom any such transferee may be acting), Agent, any Lender, or any other Person, whether in connection with the Agreement, the Letter of Credit, the transactions contemplated herein or therein or any unrelated transaction (including any underlying transaction between any Borrower or any of their respective Affiliates and the beneficiary for which the Letter of Credit was procured);

(iii)     any draft, demand, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     payment by Agent (except as otherwise expressly provided in paragraph (g)(ii)(C) below) or any L/C Issuer under any Letter of Credit or guaranty thereof against presentation of a demand, draft or certificate or other document that does not comply with the terms of such Letter of Credit or such guaranty;

(v)     any other circumstance or event whatsoever, that is similar to any of the foregoing; or the fact that a Default or an Event of Default has occurred and is continuing.

(g)     Indemnification; Nature of Lenders' Duties.

(i)     In addition to amounts payable as elsewhere provided in the Agreement, Borrowers hereby agree to pay and to protect, indemnify, and save harmless Agent and each Lender from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees and allocated costs of internal counsel) that Agent or any Lender may incur or be subject to as a consequence, direct or indirect, of (A) the issuance of any Letter of Credit or guaranty thereof, or (B) the failure of Agent or any Lender seeking indemnification or of any L/C Issuer to honor a demand for payment under any Letter of Credit or guaranty thereof as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority, in each case other than to the extent solely as a result of the gross negligence or willful misconduct of Agent or such Lender (as finally determined by a court of competent jurisdiction).

(ii)     As between Agent and any Lender and Borrowers, Borrowers assume all risks of the acts and omissions of, or misuse of any Letter of Credit by beneficiaries, of any Letter of Credit. In furtherance and not in limitation of the foregoing, to the fullest extent permitted by law, neither Agent nor any Lender shall be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document issued by any party in connection with the application for and issuance of any Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or

assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason; (C) failure of the beneficiary of any Letter of Credit to comply fully with conditions required in order to demand payment under such Letter of Credit; provided, that in the case of any payment by Agent under any Letter of Credit or guaranty thereof, Agent shall be liable to the extent such payment was made solely as a result of its gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction) in determining that the demand for payment under such Letter of Credit or guaranty thereof complies on its face with any applicable requirements for a demand for payment under such Letter of Credit or guaranty thereof; (D) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they may be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a payment under any Letter of Credit or guaranty thereof or of the proceeds thereof; (G) the credit of the proceeds of any drawing under any Letter of Credit or guaranty thereof; and (H) any consequences arising from causes beyond the control of Agent or any Lender. None of the above shall affect, impair, or prevent the vesting of any of Agent's or any Lender's rights or powers hereunder or under the Agreement.

(iii)     Nothing contained herein shall be deemed to limit or to expand any waivers, covenants or indemnities made by Borrowers in favor of any L/C Issuer in any letter of credit application, reimbursement agreement or similar document, instrument or agreement between or among Borrowers and such L/C Issuer, including any Application For Standby Letter of Credit or Documentary Letter of Credit, the Master Documentary Agreement and the Master Standby Agreement entered into with Agent.

## ANNEX C (Section 1.8)
## TO
## CREDIT AGREEMENT

## CASH MANAGEMENT SYSTEM

Subject to entry of the First Day Orders by the Bankruptcy Court, each Borrower shall, and shall cause its Subsidiaries to, establish and maintain the Cash Management Systems described below:

(a)     On or before the Closing Date and until the Termination Date, each Borrower shall (i) establish lock boxes ("Lock Boxes") or at Agent's discretion, blocked accounts ("Blocked Accounts") at one or more of the banks set forth in Disclosure Schedule (3.19), and shall request in writing and otherwise take such reasonable steps to ensure that all Account Debtors forward payment directly to such Lock Boxes, and (ii) deposit and cause its Subsidiaries to deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof (or in the event such deposit is not practicable due to an Act of God, terrorism or other city-wide catastrophe, the next day on which businesses generally are open), all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered to a Lock Box) into one or more Blocked Accounts in such Borrower's name or any such Subsidiary's name and at a bank identified in Disclosure Schedule (3.19) (each, a "Relationship Bank").  On or before the Closing Date, each Borrower shall have established a concentration account in its name (each a "Concentration Account" and collectively,   the "Concentration Accounts") at the bank or banks that shall be designated as the Concentration Account bank for each such Borrower in Disclosure Schedule (3.19) (each a "Concentration Account Bank" and collectively, the "Concentration Account Banks"), which banks shall be reasonably satisfactory to Agent.

(b)     Each Borrower may maintain, in its name, an account (each a "Disbursement Account" and collectively, the "Disbursement Accounts") at a bank reasonably acceptable to Agent into which Agent shall, from time to time, deposit proceeds of Revolving Credit Advances and Swing Line Advances made to such Borrower pursuant to Section 1.1 for use by such Borrower solely in accordance with the provisions of Section 1.4.

(c)     On or before the Closing Date, each Concentration Account Bank and all other Relationship Banks, shall have entered into tri-party blocked account agreements with Agent, for the benefit of itself and Lenders, and the applicable Borrower and Subsidiaries thereof, as applicable, in form and substance reasonably acceptable to Agent, which shall become operative on or prior to the Closing Date. Each such blocked account agreement shall provide, among other things, that (i) all items of payment deposited in such account and proceeds thereof deposited in the applicable Concentration Account are held by such bank as agent or bailee-in-possession for Agent, on behalf of itself and Lenders, (ii) the bank executing such agreement has no rights of setoff or recoupment or any other claim against such account, as the case may be, other than for payment of its service fees and other charges directly related to the administration of such account and for returned checks or other items of payment, and (iii) from and after the Closing Date (A) with respect to banks at which a Blocked Account is maintained,

such bank agrees to forward immediately all amounts in each Blocked Account to such Borrower's Concentration Account Bank and to commence the process of daily sweeps from such Blocked Account into the applicable Concentration Account and (B) with respect to each Concentration Account Bank, such bank agrees to immediately forward all amounts received in the applicable Concentration Account to the Collection Account through daily sweeps from such Concentration Account into the Collection Account. Except for amounts which do not exceed $1,000,000 in the aggregate, no Borrower shall, or shall cause or permit any Subsidiary thereof to, accumulate or maintain cash in Disbursement Accounts or payroll accounts as of any date of determination in excess of checks outstanding against such accounts as of that date and amounts necessary to meet minimum balance requirements.

(d)     So long as no Default or Event of Default has occurred and is continuing, Borrowers may amend Disclosure Schedule (3.19) to add or replace a Relationship Bank, Lock Box or Blocked Account or to replace any Concentration Account or any Disbursement Account; provided, that (i) Agent shall have consented in writing in advance to the opening of such account or Lock Box with the relevant bank and (ii) prior to the time of the opening of such account or Lock Box, the applicable Borrower or its Subsidiaries, as applicable, and such bank shall have executed and delivered to Agent a tri-party blocked account agreement, in form and substance reasonably satisfactory to Agent. Borrowers shall close any of their accounts (and establish replacement accounts in accordance with the foregoing sentence) promptly and in any event within 30 days following notice from Agent that the creditworthiness of any bank holding an account is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days following notice from Agent that the operating performance, funds transfer or availability procedures or performance with respect to accounts or Lock Boxes of the bank holding such accounts or Agent's liability under any tri-party blocked account agreement with such bank is no longer acceptable in Agent's reasonable judgment.

(e)     The Lock Boxes, Blocked Accounts, Disbursement Accounts and the Concentration Accounts shall be cash collateral accounts, with all cash, checks and other similar items of payment in such accounts securing payment of the Loans and all other Obligations, and in which each Borrower and each Subsidiary thereof shall have granted a Lien to Agent, on behalf of itself and Lenders, pursuant to the Security Agreement.

(f)     All amounts deposited in the Collection Account shall be deemed received by Agent in accordance with Section 1.10 and shall be applied (and allocated) by Agent in accordance with Section 1.11. In no event shall any amount be so applied unless and until such amount shall have been credited in immediately available funds to the Collection Account.

(g)     Each Borrower shall and shall cause its Affiliates, officers, employees, agents, directors or other Persons acting for or in concert with such Borrower (each a "Related Person") to (i) hold in trust for Agent, for the benefit of itself and Lenders, all checks, cash and other items of payment received by such Borrower or any such Related Person, and (ii) within 1 Business Day after receipt by such Borrower or any such Related Person (or in the event such deposit is not practicable due to an Act of God, terrorism or other city-wide catastrophe, the next day on which businesses generally are open)of any checks, cash or other items of payment, deposit the same into a Blocked Account of such Borrower. Each Borrower and each Related Person thereof acknowledges and agrees that all cash, checks or other items of payment

constituting proceeds of Collateral are part of the Collateral. All proceeds of the sale or other disposition of any Collateral, shall be deposited directly into the applicable Blocked Accounts.

# ANNEX D (SECTION 2.1(A))
## TO
## CREDIT AGREEMENT

## CLOSING CHECKLIST

In addition to, and not in limitation of, the conditions described in <u>Section 2.1</u> of the Agreement, pursuant to <u>Section 2.1(a),</u> the following items must be received by Agent in form and substance satisfactory to Agent on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in <u>Annex A</u> to the Agreement):

    A.    <u>Appendices</u>.  All Appendices to the Agreement, in form and substance satisfactory to Agent.

    B.    <u>Revolving Notes</u>.  Duly executed originals of the Revolving Notes for each Lender which has requested a Revolving Note, dated the Closing Date.

    C.    <u>Security Agreement</u>.  Duly executed originals of the Security Agreement, dated the Closing Date, and all instruments, documents and agreements executed pursuant thereto.

    D.    <u>Security Interests and Code Filings</u>.

    (a)    Evidence satisfactory to Agent that Agent (for the benefit of itself and Lenders) has a valid and perfected first priority security interest (subject to the Carve-Out and Prior Permitted Liens) in the Collateral, including (i) such documents duly executed by each Credit Party (including financing statements under the Code and other applicable documents under the laws of any jurisdiction with respect to the perfection of Liens) as Agent may request in order to perfect its security interests in the Collateral and (ii) copies of Code search reports listing all effective financing statements that name any Credit Party as debtor, together with copies of such financing statements, none of which shall cover the Collateral, except Liens permitted under <u>Section 6.7(b)</u>.

    (b)    Evidence satisfactory to Agent, including copies, of all UCC-1 and other financing statements filed in favor of any Credit Party with respect to each location, if any, at which Inventory may be consigned.

    E.    <u>Intellectual Property Security Agreement</u>.  Duly executed and notarized originals of the Intellectual Property Security Agreement, dated the Closing Date and signed by each Credit Party which owns Trademarks, Copyrights and/or Patents, as applicable, all in form and substance reasonably satisfactory to Agent, together with all instruments, documents and agreements executed pursuant thereto.

    F.    <u>Guaranty</u>.  Duly executed originals of the Guaranty, dated the Closing Date, and all documents, instruments and agreements executed pursuant thereto.

G.      Interim DIP Budget.  Agent shall have received a copy of the Interim DIP Budget, in form and substance acceptable to Agent and the Lenders, which may be updated from time to time pursuant to amendments thereto as approved by Agent and the Requisite Lenders.

H.      Initial Borrowing Base Certificate.  A duly executed original of an initial Borrowing Base Certificate reflecting information concerning Eligible Accounts and Eligible Inventory of Borrowers as of a date not more than 7 days prior to the Closing Date.

I.      Initial Notice of Revolving Credit Advance.  Duly executed originals of a Notice of Revolving Credit Advance, dated the Closing Date, with respect to the initial Revolving Credit Advance to be requested by Borrower Representative on the Closing Date.

J.      Bylaws and Resolutions.  For each Credit Party, (a) such Person's bylaws or operating agreement, as applicable, together with all amendments thereto and (b) resolutions of such Person's Board of Directors (or other governing body) approving and authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and the transactions to be consummated in connection therewith, each certified as of the Closing Date by such Person's corporate secretary or an assistant secretary as being in full force and effect without any modification or amendment.

K.      Incumbency Certificates.  For each Credit Party, signature and incumbency certificates of the member, officers or representative of each such Person executing any of the Loan Documents, certified as of the Closing Date by such Person's corporate secretary or assistant secretary or other authorized person as being true, accurate, correct and complete.

L.      Pledge Agreements.  Duly executed originals of the Pledge Agreement accompanied by (as applicable) (a) share certificates representing all of the outstanding Stock being pledged pursuant to such Pledge Agreement and stock powers for such share certificates executed in blank and (b) the original intercompany notes and other instruments evidencing Indebtedness being pledged pursuant to such Pledge Agreement, duly endorsed in blank.

M.      Fee Letter.  Agent shall have received a duly executed original of the GE Fee Letter.

N.      Master Standby Agreement.  A Master Agreement for Standby Letters of Credit among Borrowers and GE Capital.

O.      Master Documentary Agreement.  A Master Agreement for Documentary Letters of Credit among Borrowers and GE Capital.

P.      Other Documents.  Such other certificates, documents and agreements respecting any Credit Party as Agent may, in its sole discretion, request.

### FINANCIAL STATEMENTS AND PROJECTIONS -- REPORTING

Borrowers shall deliver or cause to be delivered to Agent or to Agent and Lenders, as indicated, the following:

(a)    Monthly Reports. To Agent and Lenders, within thirty (30) days after the end of each Fiscal Month, financial information regarding Borrowers and their Subsidiaries, certified by the Chief Financial Officer of Borrower Representative, including (A) unaudited balance sheets as of the close of such Fiscal Month and the related statements of income and cash flow for that portion of the Fiscal Year ending as of the close of such Fiscal Month, (B) unaudited statements of income and cash flows for such Fiscal Month, in each case setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Projections for such Fiscal Year, all prepared in accordance with GAAP (subject to normal year-end adjustments), and (C) unaudited non-GAAP management reports for each Fiscal Month, setting forth in comparative form the figures for the corresponding period in the prior year.

(b)    Quarterly Financials. To Agent and Lenders, within forty-five (45) days after the end of each Fiscal Quarter consolidated and consolidating (other than with respect to cash flow statements which shall be on a consolidated basis only) financial information regarding (i) Holdings and its Subsidiaries and (ii) Borrowers and their Subsidiaries, certified by the Chief Financial Officer of Borrower Representative, including (A) unaudited balance sheets as of the close of such Fiscal Quarter and the related statements of income and cash flow for that portion of the Fiscal Year ending as of the close of such Fiscal Quarter and (B) unaudited statements of income and cash flows for such Fiscal Quarter, in each case setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Projections for such Fiscal Year, all prepared in accordance with GAAP (subject to normal year-end adjustments). Such financial information shall be accompanied by the certification of the Chief Financial Officer of Borrower Representative that (i) such financial information presents fairly in accordance with GAAP (subject to normal year-end adjustments) the financial position, results of operations and statements of cash flows of Borrowers and their Subsidiaries, on both a consolidated and consolidating basis (other than with respect to cash flow statements which shall be on a consolidated basis only), as at the end of such Fiscal Quarter and for that portion of the Fiscal Year then ended, (ii) any other information presented is true, correct and complete in all material respects and that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default. In addition, Borrowers shall deliver to Agent and Lenders, within the time periods indicated above for each Fiscal Quarter, (x) a management discussion and analysis that includes a comparison to budget for that Fiscal Quarter and a comparison of performance for that Fiscal Quarter to the corresponding period in the prior year and (y) a summary of the outstanding balances of all intercompany loan balance of all intercompany notes as of the end of such Fiscal Quarter.

(c)     [Intentionally Omitted.]

(d)     [Intentionally Omitted.]

(e)     Management Letters.  To Agent and Lenders, within 5 Business Days after receipt thereof by any Credit Party, copies of all management letters, exception reports or similar letters or reports received by such Credit Party from its independent certified public accountants.

(f)     Default Notices.  To Agent and Lenders, as soon as practicable, and in any event within 5 Business Days after an executive officer of any Borrower has actual knowledge of the existence of any Default, Event of Default or other event that has had a Material Adverse Effect, telephonic or telecopied notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next Business Day.

(g)     SEC Filings and Press Releases.  To Agent and Lenders, promptly upon their becoming available, copies of: (i) all Financial Statements, reports, notices and proxy statements made publicly available by any Credit Party to its security holders; (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by any Credit Party with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority; and (iii) all press releases and other statements made available by any Credit Party to the public concerning material changes or developments in the business of any such Person.

(h)     Subordinated Debt and Equity Notices.  To Agent (and upon the request of any Lender, such Lender), as soon as practicable, copies of all material written notices given or received by any Credit Party with respect to any Subordinated Debt or Stock of such Person, and, within 2 Business Days after any Credit Party obtains knowledge of any matured or unmatured event of default with respect to any Subordinated Debt, notice of such event of default.

(i)     Supplemental Schedules.  To Agent (and upon the request of any Lender, such Lender), supplemental disclosures, if any, required by Section 5.6.

(j)     Litigation.  To Agent (and upon the request of any Lender, such Lender) in writing, promptly upon learning thereof, notice of any Litigation commenced or threatened against any Credit Party that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets or against any Credit Party or ERISA Affiliate in connection with any Plan (iv) alleges criminal misconduct by any Credit Party, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liabilities or (vi) involves any product recall.

(k)     Insurance Notices.  To Agent (and upon the request of any Lender, such Lender), disclosure of losses or casualties required by Section 5.4.

(l)     Lease Default Notices.  To Agent (and upon the request of any Lender, such Lender), within 2 Business Days after receipt thereof, copies of (i) any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located, and (ii) such other notices or documents as Agent may reasonably request.

(m)     Lease Amendments.  To Agent (and upon the request of any Lender, such Lender), within 2 Business Days after receipt thereof, copies of all material amendments to real estate leases.

(n)     Bankruptcy Matters.  To Agent, promptly upon there being filed by the Debtors with the Bankruptcy Court, copies of all monthly reports as well as pleadings, motions, applications, judicial information or other information with respect to each Credit Party's financial condition filed by or on behalf of each Credit Party with the Bankruptcy Court or provided or served by a Credit Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, at the time such document is filed with the Bankruptcy Court, or provided or served by a Credit Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Case or otherwise.

(o)     Statement of Cash Flows; Updated DIP Budget.  To Agent, on Thursday of each week, not later than 5:00 p.m. (New York City time), Borrowers and the other Credit Parties shall deliver to Agent a statement of actual cash inflows and outflows, for the Borrowers and the other Credit Parties on a consolidated basis, for the immediately preceding week, together with a comparison to the DIP Budget for the corresponding period and an explanation of the variance from the DIP Budget.  To Agent, no later than 5:00 p.m. (New York City time) on the first Thursday of each month, Borrowers and the other Credit Parties shall deliver an updated DIP Budget for the thirteen (13) week period commencing with the current week, prepared on a week by week basis and otherwise consistent with the DIP Budget and in form and substance satisfactory to Agent.

(p)     Fees Report.  Within thirty (30) days following the end of each month commencing with June 30, 2010, deliver to Agent a report of the (a) fees and expenses of Borrowers' professionals and any Committee's professionals incurred during such month, (b) fees and expenses referred to in clause (a) that were not paid during such month and (c) fees and expenses referred to in clause (a) that were paid during such month.

(q)     Sale Process Materials.  To Agent, promptly upon receipt thereof, copies of all substantive materials received from (and any substantive information requests with respect thereto) any interested bidders with respect to the sale of the assets of the Credit Parties, other than with respect to sales of asses that occur in the ordinary course of business and are consistent with past practices;

(r)     Summary of Confidentiality Agreements; Sale Process Update. To Agent, on each Thursday following the Closing Date, commencing with the first full week following the Closing Date, on a confidential basis of (a) a summary of any confidentiality agreements executed during such week along with a breakdown of confidentiality agreements entered into with strategic and/or financial buyers (in each case on a no-name basis) and (b) an update on any substantive discussions regarding asset sales, which shall include, among other things, the proposed sale price of such asset sales (and, in each case, such other information as Agent may reasonably request in connection therewith).

(s)    <u>Other Documents</u>.  To Agent and Lenders, such other financial and other information respecting any Credit Party's business or financial condition as Agent or any Lender shall from time to time reasonably request.

## ANNEX F (SECTION 4.1(B))
### TO
### CREDIT AGREEMENT

### COLLATERAL REPORTS

Borrowers shall deliver or cause to be delivered the following:

(a)     To Agent (and upon the request of any Lender, such Lender), each of the following reports, each of which shall be prepared by Borrowers as of the last day of the immediately preceding Fiscal Month:

(i)     on Thursday of each week following the Closing Date, not later than 5:00 p.m. (New York City time), a Borrowing Base Certificate (which shall include all information with respect to Accounts and Inventory as of the close of business on Friday of the immediately preceding week) accompanied by such supporting detail, documentation and other information as shall be requested by Agent in its reasonable discretion;

(ii)     no later than 21 days after the end of each Fiscal Month, a summary of Inventory of Borrowers by location and type with a supporting perpetual Inventory report, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iii)     no later than one month after the end of each Fiscal Month, a monthly trial balance showing Borrowers' Accounts outstanding aged from invoice date as follows: 1 to 30 days, 31 to 60 days, 61 to 90 days and 91 days or more, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iv)     no later than 5:00 p.m. (New York City time) on Tuesday of each week, a summary of gross accounts receivable as of the previous Friday, together with supporting detail and documentation, in each case in form and substance reasonably satisfactory to Agent; and

(v)     no later than 5:00 p.m. (New York City time) on Thursday of each week, an aging of outstanding accounts payable as of such date, in form and substance reasonably satisfactory to Agent.

(b)     To Agent (and upon the request of any Lender, such Lender), on a monthly basis or at such more frequent intervals as Agent may request from time to time (together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date), collateral reports, including all additions and reductions (cash and non-cash) with respect to Accounts of Borrowers, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion each of which shall be prepared by the Borrower Representative as of the last Friday of the month.

(c)     To Agent (and upon the request of any Lender, such Lender), at the time of delivery of each of the monthly management reports delivered pursuant to Annex E:

(i)     a reconciliation of the Accounts trial balance of each Borrower to Borrowers' most recent Borrowing Base Certificate and general ledger (and for months that are also the end of a Fiscal Quarter, to the quarterly Financial Statements delivered pursuant to Annex E), in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(ii)     a reconciliation of the perpetual inventory by location of each Borrower to Borrowers' most recent Borrowing Base Certificate, general ledger (and for months that are also at the end of a Fiscal Quarter, to the quarterly Financial Statements delivered pursuant to Annex E), in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iii)     an aging of accounts payable and a reconciliation of that accounts payable aging to each Borrower's general ledger and for months that are also at the end of a Fiscal Quarter, to the quarterly Financial Statements delivered pursuant to Annex E, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iv)     a reconciliation of the outstanding Loans as set forth in the monthly Loan Account statement provided by Agent to each Borrower's general ledger and for months that are also at the end of a Fiscal Quarter, to the quarterly Financial Statements delivered pursuant to Annex E, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion; and

(v)     a report of any defaults under any lease, warehouse agreement or other rental agreement with respect to any property where Agent does not have acceptable landlord, mortgagee or bailee waivers, as applicable.

(d)     To Agent (and upon the request of any Lender, such Lender), at the time of delivery of each of the quarterly Financial Statements delivered pursuant to Annex E, (i) a listing of government contracts of each Borrower subject to the Federal Assignment of Claims Act of 1940; and (ii) a list of any applications for the registration of any Patent, Trademark or Copyright filed by any Credit Party with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the prior Fiscal Quarter;

(e)     Each Borrower, at its own expense, shall deliver to Agent (and upon the request of any Lender, such Lender) the results of each physical verification, if any, that such Borrower or any of its Subsidiaries may in their discretion have made, or caused any other Person to have made on their behalf, of all or any portion of their Inventory (and, if a Default or an Event of Default has occurred and is continuing, each Borrower shall, upon the request of Agent, conduct, and deliver the results of, such physical verifications as Agent may require);

(f)     Each Borrower, at its own expense, shall deliver to Agent (and upon the request of any Lender, such Lender) such appraisals of its assets as Agent may request at any time after the occurrence and during the continuance of a Default or an Event of Default, such

appraisals to be conducted by an appraiser, and in form and substance reasonably satisfactory to Agent; and

(g)     Such other reports, statements and reconciliations with respect to the Borrowing Base, Collateral or Obligations of any or all Credit Parties as Agent or any Lender shall from time to time request in its reasonable discretion.

# ANNEX G

# [INTENTIONALLY OMITTED]

**ANNEX H (SECTION 9.9(A))**
**TO**
**CREDIT AGREEMENT**

**WIRE TRANSFER INFORMATION**

| | |
|---|---|
| Name: | General Electric Capital Corporation |
| Bank: | Deutsche Bank Trust Company Americas |
| | New York, New York |
| ABA #: | 021-001-033 |
| Account #: | 50279513 |
| Account Name: | GECC BUSINESS FINANCIAL, INC. |
| Reference: | National Envelope - CFN8698 |

# ANNEX I (SECTION 11.10)
## TO
# CREDIT AGREEMENT
## NOTICE ADDRESSES

(A)     If to Agent or GE Capital, at
        General Electric Capital Corporation
        201 Merritt 7, 4th Floor
        Norwalk, CT 06851
        Attention: Joseph Catarina
        Telecopier No.: (203) 567-8200
        Telephone No.: (203) 229-1893

        with copies to (which shall not constitute notice):

        Paul, Hastings, Janofsky & Walker LLP
        75 East 55th Street
        New York, New York 10022
        Attention: Mario J. Ippolito, Esq.
        Telecopier No.: (212) 230-7848
        Telephone No.: (212) 318-6420

        and

        General Electric Capital Corporation
        201 Merritt 7
        Norwalk, Connecticut 06851
        Attention: Pamela Corrie, Esq.
        Telecopier No.: (203) 229-5167
        Telephone No.: (203) 229-1406

(B)     If to any Borrower, any Credit Party, or any Guarantor, to Borrower Representative, at
        National Envelope Corporation
        333 Earle Ovington Boulevard, Suite 1035
        Uniondale, NY 11553
        Attention: General Counsel
        Telecopier No.: (516) 699-4020
        Telephone No.: (516) 699-4000

        with copies to (which shall not constitute notice):

        National Envelope Corporation
        333 Earle Ovington Boulevard, Suite 1035
        Uniondale, NY 11553
        Attention: Dale Nissenbaum, General Counsel
        Telecopier No.: (516) 699-4024
        Telephone No.: (516) 699-4005

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention: David Heller, Esq.
Telecopier No.: (212) 751-4864
Telephone No.: (212) 906-1200

| Lender | Revolving Loan Commitment | Swingline Commitment |
|---|---|---|
| General Electric Capital Corporation | $54,831,020.74 | $5,000,000.00 |
| Bank of America N.A. | $26,288,844.46 | |
| The CIT Group/Business Credit, Inc. | $23,659,959.79 | |
| Citizens Business Credit Co., a division of Citizens Leasing Corp. | $13,519,976.59 | |
| HSBC Business Credit (USA), Inc. | $11,266,647.71 | |
| Wachovia Bank, National Association | $9,388,874.50 | |
| **Total** | $138,955,323.79 | $5,000,000.00 |

## SCHEDULE 1.1

## AGENT'S REPRESENTATIVE

Joseph Catarina
General Electric Capital Corporation
201 Merritt 7, 4th Floor
Norwalk, CT 06851
T – (203) 229-1893
F – (203) 567-8200
email - joseph.catarina@ge.com

LEGAL_US_E # 88239000.12

**Exhibit B**

**DIP Budget**

National Envelope Corporation
DIP Budget Assumptions

**Timeline:**
*The DIP budget is forecast for 120 days*

**Projection Assumptions:**
DIP budget is based on Company's 13 week cash flow projected for additional weeks to accommodate an estimated 120 day process
Expense and collection patterns were re-forecasted in the DIP budget as necessary to reflect current run rate and Chapter 11 impact
Assumes 3% discount to ordinary course collections based on disruption from Chapter 11
Approximately $10 million reduction in collections assumed due to set off rights of certain customers
Essential vendor payments estimated at $7.5 million; will be negotiated and disbursed per the budget
During the first 5 weeks of Chapter 11, C.O.D / cash-in-advance payments are assumed for vendor as payment terms are negotiated
After essential vendor payments are made, most vendors are assumed to return to normal course payments or approximately 30 day terms
No interest will be paid to the Term B lenders
Plant restructuring costs / capex are budgeted at $75k per week, which includes on going IT systems conversions and other Phase 3 projects
Deposit for utilities estimated to be 2 weeks
Assumes current L/Cs for workers compensation continue post-petition, as part of $5 million carve out per DIP term sheet
Other terms and conditions per DIP Agreement (interest, covenants, other conditions)
Post-petition interest rate estimated at 8.0% per DIP Agreement

**Pre-Petition Liabilities Assumptions:**
Assume roll-up of pre-petition Revolver and Term Loan A debt into DIP facility which forms the basis for DIP interest expense
Company will cease to fund L/C withdrawal liability for multi-employer plan
Severance payments will cease for former executives released in 2009 and 2010
Equipment / Other Leases - Company will assume current equipment and IT related leases, pending review

## DIP BUDGET

| Week / Date | | 13-week Cash Flow Forecast | | | | | | | | | | | | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Week 1 18-Jun | Week 2 25-Jun | Week 3 2-Jul | Week 4 9-Jul | Week 5 16-Jul | Week 6 23-Jul | Week 7 30-Jul | Week 8 6-Aug | Week 9 13-Aug | Week 10 20-Aug | Week 11 27-Aug | Week 12 3-Sep | Week 13 10-Sep | Week 14 17-Sep | Week 15 24-Sep | Week 16 1-Oct | Week 17 8-Oct | 17/Week |
| **Sources** | $ 12,535 | $ 9,544 | $ 12,243 | $ 12,011 | $ 13,723 | $ 5,173 | $ 11,568 | $ 12,122 | $ 13,980 | $ 14,672 | $ 12,736 | $ 11,344 | $ 11,491 | $ 15,056 | $ 14,493 | $ 9,544 | $ 14,661 | $ 206,889 |
| **Uses** | | | | | | | | | | | | | | | | | | |
| Vendor Payments | $ 7,250 | $ 7,250 | $ 7,250 | $ 7,250 | $ 7,250 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,150 | $ 7,400 | $ 3,775 | $ 11,125 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 112,200 |
| Essential Vendor Payments | 500 | 500 | 500 | 500 | | 5,500 | | | | | | | | | | | | 7,500 |
| Other Cost of Goods Sold | 1,998 | 1,173 | 1,561 | 1,386 | 1,850 | 1,695 | 1,695 | 1,387 | 1,701 | 1,701 | 1,701 | 1,387 | 1,391 | 1,989 | 1,701 | 1,387 | 1,701 | 27,406 |
| Payroll | 3,658 | 1,830 | 3,313 | 2,105 | 3,383 | 1,830 | 3,383 | 2,035 | 3,383 | 1,830 | 3,371 | 1,750 | 3,646 | 1,809 | 3,369 | 1,806 | 3,297 | 45,795 |
| 401k and Medical | 423 | 1,531 | 424 | 530 | 413 | 1,532 | 1,425 | 527 | 423 | 407 | 1,423 | 527 | 423 | 527 | 1,423 | 407 | 407 | 12,775 |
| Rent | 500 | | 500 | | | | | 500 | | | | 500 | | | | | 500 | 2,500 |
| DIP Fees and Interest | 248 | | 782 | 248 | | | | 841 | | | | 829 | | | | 850 | | 3,799 |
| Professional Fees | 350 | | | | | | | 4,540 | | | | 2,060 | | | | 2,060 | | 9,010 |
| Utilities | | 2,000 | | | | | | | | | | | | | | | | 2,000 |
| Restructuring Expenses | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 1,275 |
| Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 850 |
| **Total Uses** | $ 15,052 | $ 14,409 | $ 14,454 | $ 12,144 | $ 13,021 | $ 14,683 | $ 10,628 | $ 13,955 | $ 9,782 | $ 11,463 | $ 10,395 | $ 18,304 | $ 13,085 | $ 11,950 | $ 14,119 | $ 14,135 | $ 13,530 | $ 225,109 |
| Net Cash Inflow / (Outflow) | $ (2,527) | $ (4,865) | $ (2,211) | $ (133) | $ 702 | $ (9,509) | $ 941 | $ (1,833) | $ 4,198 | $ 3,209 | $ 2,341 | $ (6,960) | $ (1,590) | $ 3,106 | $ 374 | $ (4,590) | $ 1,131 | $ (18,220) |
| Est. DIP Borrowing | $ 2,527 | $ 7,392 | $ 9,604 | $ 9,736 | $ 9,034 | $ 18,543 | $ 17,602 | $ 19,435 | $ 15,237 | $ 12,028 | $ 9,687 | $ 16,647 | $ 18,241 | $ 15,135 | $ 14,761 | $ 19,351 | $ 18,220 | $ 18,220 |

Note: Projections will be updated with actuals and variances on a weekly basis.

**Professional Fees**

| | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|
| 1 Company Bankruptcy Counsel (Latham) | $ 750 | $ 750 | $ 750 | $ 750 |
| 2 Company Financial Advisor (LM+Co) | 400 | 400 | 400 | 400 |
| 3 Company Investment Bank (W.Blair) | 125 | 125 | 125 | 125 |
| 4 Company Corporate Counsel (Fulbright) | 150 | 150 | 150 | 150 |
| 5 Term Loan A Advisors (FTI Consulting) | 400 | 400 | 300 | 300 |
| 6 Term Loan A Counsel (Paul Hastings) | 300 | 250 | 200 | 200 |
| 7 Term Loan B Counsel | 200 | 100 | 100 | 100 |
| 8 Unsecured Creditor Committee - FA | 75 | 75 | 50 | 50 |
| 9 Unsecured Creditor Committee - Counsel | 100 | 75 | 75 | 75 |
| 10 U.S. Trustee | 100 | 100 | 100 | 100 |
| 11 Delaware Counsel (Young Conway) | 125 | 125 | 125 | 125 |
| 12 Claims Agent (Garden City) | 150 | 150 | 150 | 150 |
| 13 Other | 50 | 50 | 50 | 50 |
| **Total Professional Fees** | $ 2,925 | $ 2,750 | $ 2,575 | $ 2,575 |