# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORP., et al.,[1] | Case No. 10-11890 (PJW) |
| Debtors. | Joint Administration Pending |

## PRELIMINARY OBJECTION OF TERM B LENDERS TO MOTION FOR ENTRY OF INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, AND (V) SCHEDULING A FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS

LBC Credit Partners, L.P., LBC Credit Partners Parallel, L.P., Island Funding, LLC, and Wayzata Recovery Fund, LLC (collectively, the "Term B Lenders"), as creditors and parties-in-interest herein, by and through their undersigned counsel, file this preliminary objection (the "Preliminary Objection") to the motion dated June 10, 2010 (the "Motion") filed by the above-

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corporation, a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

captioned debtors seeking entry of an Interim Order (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Authorizing The Use Of Cash Collateral Pursuant To Section 363 Of The Bankruptcy Code, (III) Granting Adequate Protection To The Prepetition Lenders Pursuant To Sections 361, 362, 363 And 364 Of The Bankruptcy Code, (IV) Granting Liens And Superpriority Claims, and (V) Scheduling A Final Hearing On The Debtors' Motion To Incur Such Financing On A Permanent Basis. In support of their Preliminary Objection,[2] the Term B Lenders respectfully represent as follows:

## Preliminary Statement

1. The proposed DIP financing compels a rushed sale process that is designed to generate recoveries only for the Senior Secured Lenders (as defined below) and provide extraordinary relief for a single unsecured creditor, International Paper, Inc. ("IP"). Because the proposed DIP financing would prime the Term B Lenders' liens, the proposed process, if approved, would be involuntarily funded by the Term B Lenders' recoveries. The proposed DIP financing would result in a full recovery only for the Senior Secured Lenders and extremely favorable treatment for IP on an unduly expedited basis. It would also be used to fuel a lavish and totally unwarranted professional fee budget. While the Term B Lenders would support a full and fair sale process that accommodates their legitimate interests as secured creditors, because the Term B Lenders were frozen out of the pre-filing negotiations and are not being offered any adequate protection, they do not consent to the priming of their liens. Without the consent of the Term B Lenders, the proposed financing is in direct conflict with controlling legal precedent and cannot be approved. Thus, the Court should deny the relief requested in the Motion.

---

[2] The Term B Lenders reserve the right to submit further Objections and avail themselves of their discovery rights in this contested matter prior to the final hearing on the Motion.

**Background**

2. The Debtors[3] are in the business of manufacturing envelopes and related products. The Debtors' largest unsecured creditor and supplier is IP, which apparently holds an unsecured claim in excess of $50 million. A division or subsidiary of IP is also a significant customer of the Debtors. As further detailed below, IP has used its leverage to receive favorable treatment in the proposed interim DIP financing order.

3. In 2006, the Debtors entered into the Prepetition Credit Agreement to Pursuant to the Prepetition Credit Agreement, there is a waterfall of payments upon default or maturity which provides that proceeds of collateral are applied first to fees and expenses, next to the Prepetition Revolving Facility and the Term A Loan (collectively, "Senior Secured Loans"), and third to the Term B Loan.

4. As of the Petition Date, there is approximately $110 million outstanding under the Senior Secured Loans and $36 million outstanding under the Term B Loan. As evidenced by a letter of intent executed by the Debtors prior to the Filing Date referred to below, there is sufficient value in the Debtors' assets to repay all or a portion of the Term B Loan. As IP will undoubtedly demand a significant payment of its unsecured debt in connection with a sale of the Debtors' business, there needs to be significant value received by the estates in a sale process for the Term B Lenders to recover their indebtedness.

---

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Declaration of James Shelby Marlow in support of Chapter 11 petitions and first day motions (the "Marlow Declaration") or the Motion, as the case may be.

**The Proposed Sale Process**

5.  The Debtors and the holders of the Senior Secured Loans (the "Senior Secured Lenders") have completely disregarded the interests of the Term B Lenders and are seeking to use the Term B Lenders' recoveries to fund a process that is not intended to maximize value and will only benefit the Senior Secured Lenders, IP and certain professionals. This is illustrated by Section 5.13(a) of the proposed DIP Credit Agreement, which requires the Debtors to adhere to a schedule that, at best, can only accommodate bidders who were able to conduct due diligence prior to the Petition Date. The time periods mandated by the proposed DIP Credit Agreement are as follows:

(a) Execution of a definitive asset purchase agreement on or before July 2, 2010;

(b) Filing of a motion seeking approval of bidding procedures on or before July 5, 2010;

(c) Entry of a Bankruptcy Court order approving the bidding procedures on or before July 16, 2010;

(d) An auction pursuant to section 363 of the Bankruptcy Code shall have occurred on or before August 23, 2010;

(e) Entry of a Bankruptcy Court order authorizing the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code on or before August 27, 2010; and

(f) The closing of the sale which shall provide **sufficient cash proceeds to repay in full in cash all outstanding obligations under the DIP Facility and the Pre-Petition Tranche A Obligations** shall have occurred on or before August 31, 2010.

6.  Thus, the proposed DIP financing literally _requires_ a rushed sale process and is conditioned _only_ on paying the Senior Secured Loans.

7.  The proposed process will likely result in the exclusion of strategic buyers, buyers who may well be willing to pay full value for the Debtors' business, as apparently only financial bidders were solicited to participate in the prepetition marketing and diligence process. This is

made clear by paragraph 33 of the Marlow Declaration, which states that prior to the Petition Date "private equity sponsors" were contacted regarding a potential transaction. Conspicuously absent is any mention of efforts to solicit interest from strategic buyers. Having been excluded from prepetition diligence, any interested strategic buyer would now have to start its due diligence from scratch. The proposed timetable will not allow such bidders to be in a position to make the highest possible bid, if they are able to bid at all.

8. The Senior Secured Lenders are unconcerned, as the Debtors have executed a letter of intent with Gores Group LLC,[4] a proposed stalking horse, which provides the Senior Secured Lenders with a full recovery on their prepetition claims and provides for a significant payment to IP – but only a partial payment of the obligations owed to the Term B Lenders and no consideration for any other constituency. The Term B Lenders believe this letter of intent is just a starting point for a sale process, and that a full and open process could yield much greater consideration. The Debtors' professionals are likewise unconcerned about the recoveries of the Term B Lenders, as they stand to benefit from a professional fee budget of a whopping $1.55 million per month (more than $6.2 million for 120 days) and a generous carve out.[5]

9. In short, the conditions of the proposed DIP financing sets these cases on a course that will not maximize value. The Motion, if granted, would lock in a fast track section 363 sale process. While this may result in sufficient proceeds to repay the Senior Secured Lenders' obligations, it will leave the Term B Lenders with significantly diminished recoveries. The Debtors owe fiduciary duties to all creditors, not solely the Senior Secured Lenders.

---

[4] Curiously, while not disclosed in the Marlow Declaration or the Motion, this letter of intent is referenced in Sections 3.23 and 8.1(s) of the DIP Credit Agreement.

[5] The Term B Lenders reserve their rights with respect to the proposed compensation payable to the Debtors' professionals.

**The Proposed Priming Liens Cannot Be Approved**

10. As the proposed DIP financing contemplates priming the liens held by the Term B Lenders by $10 million on an interim basis and $20 million upon entry of a final order, the recoveries of the Term B Lenders would effectively fund the payments to professionals and so-called "critical vendors" set forth in the budget annexed to the Motion. Indeed, quite tellingly, the Term B Lenders have been excluded from the discussions regarding the proposed DIP financing, the sale process, the arrangements with IP, the critical vendor payments and, indeed, all aspects of these cases.

11. None of the adequate protection proposed to be made available to the Senior Secured Lenders is being offered to the Term B Lenders – no interest payments, no replacement liens on post-petition collateral, no financial reporting, no participation in the "roll up" of the Prepetition Secured Obligations, and no ability to compensate professionals as provided for in the Prepetition Credit Agreement. To add insult to injury, the DIP budget provides that an as-yet formed committee of unsecured creditors, whose claims rank lower in priority than the secured claims of the Term B Lenders, can retain a financial advisor at the estates' expense and has a generous budget for its counsel.

12. The "adequate protection" offered to the Term B Lenders in the Motion for the priming of their liens and the use of their cash collateral is wholly illusory. All that is offered is a replacement lien on prepetition collateral – in other words, the Term B Lenders are being "offered," as "adequate protection," a security interest that they already have, and an administrative claim which appears to be worthless. This type of "adequate protection" is not permitted under section 364 of the Bankruptcy Code and the Debtors have failed to meet its burden to establish that the Term B Lenders are adequately protected. See In re Swedeland

Development Group, Inc., 16 F.3d 552 (3d Cir. 1994).

**Other Objections to the Proposed DIP Financing and Budget**

13.  Additionally, the proposed DIP budget authorizes excessive and inappropriate payments. As stated above, payments of $1.55 million per month for the Debtors' professionals is grossly excessive for a case of this size. A $350,000 payment in the first week, which may be intended for the Debtors' investment banker is unexplained.

14.  The DIP budget also contemplates critical vendor payments in excess of $7.5 million, which includes $2 million in the first month of these cases. No such payment should be authorized on the first day of these cases – except perhaps to freight forwarders who will release a possessory lien on goods with a value greater than the payment they receive to the extent the Debtors establish the need for such payments.

15.  The proposed interim DIP financing order also provides remarkable benefits to IP, without the opportunity for review by any creditor representative. In particular, the interim order validates IP's alleged consignment interest, allows IP to exercise its alleged offset rights immediately upon entry of the order with respect to certain purported rebate obligations (and later with respect to other alleged obligations), and provides for a general release in favor of IP from the Debtors' estates. Although there is a limited challenge period, the only proposed "remedy" is to limit IP's offset rights. If the interim order is entered, IP will have been fully released from any avoidance claims, without any disclosure as to the amount of payments IP received in the 90 days preceding the Petition Date or any opportunity for analysis by creditors as to whether this is in the best interests of the estates. This is wholly inappropriate first day relief.

WHEREFORE, the Term B Lenders request that the Motion be denied and that they be granted such other relief as this Court deems just and proper.

Dated: June 10, 2010
Wilmington, Delaware

PROSKAUER ROSE LLP
Jeffrey W. Levitan, Esq.
1585 Broadway
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

-and-

Peter J. Antoszyk, Esq.
One International Place
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile: (617) 526-9899

-and-

BAYARD, P.A.

*/s/ Daniel A. O'Brien, Esq.*
Neil B. Glassman (No. 2087)
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

*Attorneys for Term B Lenders*