# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| NEC HOLDINGS CORP., *et al*,[1] | ) | Case No. 10-11890 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Docket Ref. No. 16** |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) SCHEDULING A FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS

This matter is before the Court on the motion filed by NEC Holdings Corporation and the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corporation, a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

other debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases") dated June 10, 2010 (the "Motion") requesting entry of an interim order (the "Order"):[2]

(1)     authorizing and approving, pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for National Envelope Corporation, a New York corporation, National Envelope – Chino LLC, a California limited liability company, National Envelope – Grand Prairie LLC, a Texas limited liability company, National Envelope – Lenexa LLC, a Kansas limited liability company, National Envelope – Elk Grove Village LLC, an Illinois limited liability company, National Envelope Corporation – East, a New Jersey corporation, National Envelope – Aeco LLC, a Delaware limited liability company, National Envelope – Specialties Group LLC, a Delaware limited liability company, National Envelope – Houston LLC, a Delaware limited liability company, National Envelope – Houston Equity LLC, a Delaware limited liability company, National Envelope – Leasing LLC, a Delaware limited liability company, National Envelope – WH LLC, a New York limited liability company, National Envelope – Scottdale LLC, a Pennsylvania limited liability company, National Envelope – Appleton LLC, a Wisconsin limited liability company, National Envelope – Aurora LLC, a Colorado limited liability company, National Envelope – Corsicana LLC, a Texas limited liability company, National Envelope – Ennis LLC, a Delaware limited liability company, and National Envelope – City of Industry LLC, a California limited liability company, as Borrowers, and the other Credit Parties signatory thereto to obtain postpetition financing up to the principal amount of $138,955,324 (the "DIP

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Facility Agreement (defined below).

Facility") from General Electric Capital Corporation, a Delaware corporation (in its individual capacity, "GE Capital"), for itself as a Lender, and as administrative agent for the Lenders (in such capacity, the "DIP Agent"), and the other lenders from time to time parties to the DIP Facility Agreement (as defined below) (collectively, in their lender capacity, the "DIP Lenders"), to (A) fund, among other things, ongoing working capital, general corporate, letters of credit and other financing needs of the Debtors, (B) pay down the Revolver and Term A Advances (as defined below), which amounts are stipulated to be secured by the Prepetition Collateral (as defined below), (C) provide the Prepetition Agent and Prepetition Lenders with the Adequate Protection (each as defined below), (D) pay certain transaction fees, and other costs and expenses of administration of the Cases, and (E) pay fees and expenses (including, without limitation, reasonable fees and expenses of counsel and financial advisors) owed to the DIP Agent and the DIP Lenders under the DIP Facility Documents (obligations under the DIP Facility and under this Order, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses, and all other obligations and amounts due from time to time under the DIP Facility Documents (as defined below) shall be referred to hereinafter collectively as the "Postpetition Indebtedness");

(2)     Authorizing and empowering the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(3)     providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the obligations under the DIP Facility:

a.     have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a),

507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case, which allowed superpriority claims of the DIP Agent and DIP Lenders shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as provided herein (other than from the Avoidance Actions and proceeds thereof), subject to the payment in full in cash of the Carve-Out (as defined below) (the "DIP Facility Superpriority Claims"); and

        b.      be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "DIP Facility Liens") in and on all prepetition and postpetition property and assets of the Debtors, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof (the "Collateral"), subject only to the Carve-Out and the Permitted Prior Liens; provided, however, that the Collateral shall not include avoidance actions and/or the proceeds thereof pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code (the "Avoidance Actions");

        (4)      authorizing the Debtors pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code to use "cash collateral" (as defined under section 363 of the Bankruptcy Code) and provide Adequate Protection to the Prepetition Agent and Prepetition Lenders on account of their claims under the Prepetition Loan Documents (as defined below) for any diminution in the value of their respective interests in the Prepetition Collateral (as defined below) caused by the use of Cash Collateral and the terms of the financing being granted herein;

        (5)      approving the IP Offset (as defined below) as provided in this Order; and

(6)     scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") before this Court to consider entry of an order approving the DIP Facility, authorizing the use of Cash Collateral, and authorizing the grant of Adequate Protection to the Prepetition Agent and Prepetition Lenders, all on a final basis (the "Final Order"), as set forth in the Motion.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the interim hearing on the Motion before this Court to consider entry of this Order (the "Interim Hearing") having been provided by the Debtors as set forth in paragraph I below, and the Interim Hearing having been held on June 11, 2010, and upon consideration of all the pleadings filed with this Court; and any objections to the relief requested in the Motion that have not been resolved are hereby overruled; and upon the record made by the Debtors at the Interim Hearing and the Declaration of James Shelby Marlow in Support of First Day Applications and Motions, and after due deliberation and consideration and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.      On June 10, 2010 (the "Petition Date"), the Debtors each commenced in this Court a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      Pursuant to an order of this Court, the Cases have been consolidated for procedural purposes only and are being jointly administered. No request for the appointment of a trustee or examiner has been made in these Cases. No committees have been appointed or designated.

C.      This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        D.        Subject to the rights of any non-Debtor party in interest as provided in paragraph 6 herein, the Debtors acknowledge, agree and stipulate that:

        (i)        Pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 28, 2006, among National Envelope Corporation, National Envelope – Chino LLC, National Envelope – Grand Prairie LLC, National Envelope – Lenexa LLC, National Envelope – Elk Grove Village LLC, National Envelope Corporation – East, National Envelope – Aeco LLC, National Envelope – Specialties Group LLC, National Envelope – Houston LLC, National Envelope – Houston Equity LLC, National Envelope – Leasing LLC, National Envelope – WH LLC, National Envelope – Scottdale LLC, National Envelope – Appleton LLC, National Envelope – Aurora LLC, National Envelope – Corsicana LLC, National Envelope – Ennis LLC, National Envelope – City of Industry LLC, as borrowers, the other Credit Parties (as defined in the Prepetition Credit Agreement) party thereto, GE Capital, as a Prepetition Lender and administrative agent (in such capacity, the "Prepetition Agent"), GECC Capital Markets Group, Inc., as sole lead arranger and sole bookrunner, and the lenders[3] (each, a "Prepetition Lender" and collectively in their lender capacity, the "Prepetition Lenders") party thereto (as amended, supplemented, or otherwise modified as of the Petition Date, the "Prepetition Credit Agreement"; and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents"), the Prepetition

---

[3] As used herein, the terms "Revolving Lenders," "Term A Lenders," and "Term B Lenders" shall have the meanings ascribed thereto in the Prepetition Credit Agreement.

Lenders made loans, issued letters of credit and provided other financial accommodations to or for the benefit of the Debtors;

(ii)     Pursuant to the Prepetition Loan Documents, the Debtors were, as of the Petition Date, jointly and severally, indebted to the Prepetition Agent and the Prepetition Lenders in the amount of:

1.     $70,714,610.44 with respect to "Revolving Credit Advances" (as defined in the Prepetition Credit Agreement, the "<u>Revolver</u>"), plus accrued and unpaid interest thereon plus accrued and unpaid fees, costs and expenses due and owing thereunder (exclusive of obligations with respect to issued and outstanding letters of credit (the "<u>Existing Letters of Credit</u>"));

2.     $39,0047,301 with respect to the "Term A Loan" (as defined in the Prepetition Credit Agreement, the "<u>Term A Advances</u>"), plus accrued and unpaid interest thereon plus accrued and unpaid fees, costs and expenses due and owing thereunder;

3.     $35,712,520 with respect to the "Term B Loan" (as defined in the Prepetition Credit Agreement), plus accrued and unpaid interest thereon plus accrued and unpaid fees, costs and expenses due and owing thereunder;

4.     $3,553,000 with respect to the Existing Letters of Credit; and

5.     $1,781,765 with respect to the "Capital Transaction Fee" (as defined in that certain Third Forbearance Agreement and Fifth Amendment to Second Amended and Restated Credit Agreement dated

February 12, 2010 by and among the Debtors, the Prepetition Agent and the Prepetition Lenders).

For purposes of this Order, the term "Prepetition Indebtedness" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents (including, without limitation, all "Obligations" as defined in the Prepetition Credit Agreement), and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the applicable provisions of the Prepetition Loan Documents), and any and all obligations and liabilities, contingent or otherwise, owed with respect to the Existing Letters of Credit or other obligations outstanding thereunder;

(iii)    Pursuant to the Prepetition Loan Documents, the Debtors granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, liens and security interests (the "Prepetition Liens") on and in substantially all of the Debtors' property and assets whether real or personal, tangible or intangible, and wherever located, and whether now or hereafter existing or acquired, and all the proceeds, products, offspring, rents and profits thereof (the "Prepetition Collateral") to secure the Prepetition Indebtedness and guaranties thereof;

(iv)    As of the Petition Date and immediately prior to giving effect to this Order, but subject to the rights of any non-Debtor party in interest as provided in paragraph 6 of this Order, (a) the Prepetition Loan Documents are valid and binding agreements and obligations of the Debtors, (b) the Prepetition Liens (i) constitute valid, binding, enforceable and perfected first priority security interests and liens, subject only to the Permitted Encumbrances (as defined in the Prepetition Credit Agreement) and (ii) are not subject to avoidance, reduction,

disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, and the Prepetition Indebtedness, and any amounts paid at any time to the Prepetition Agent or any Prepetition Lender on account thereof or with respect thereto, are not subject to (i) any objection, offset, defense or counterclaim of any kind or nature, or (ii) avoidance, reduction, disallowance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (d) no claims of any Debtor exist against the Prepetition Agent or any Prepetition Lender under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code; and

(v)     Subject to the rights of any non-Debtor party in interest as provided in paragraph 6 of this Order, Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition Indebtedness and the security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agent, the Prepetition Lenders and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees (in their respective capacities as such).

E.     The Debtors' businesses have an immediate need for financing under the DIP Facility and use of Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational, financial and general corporate needs. The access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness

for borrowed money and other financial accommodations (including letters of credit and other credit support) and use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtors and to the success of these Cases. Without such credit and use of Cash Collateral, the Debtors would not be able to operate their businesses and the Debtors' estates would be irreparably harmed.

F.     The Debtors are unable to obtain sufficient financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and all the documents and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Facility Agreement (as defined below), the "DIP Facility Documents"). The Debtors have been unable to obtain sufficient unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense. New credit is unavailable to the Debtors without providing (a) the DIP Agent, for the benefit of the DIP Lenders, with the DIP Facility Superpriority Claims and the DIP Facility Liens as provided herein and in the documents and instruments delivered pursuant to or in connection with the DIP Facility Agreement, and (b) the Prepetition Agent and Prepetition Lenders with Adequate Protection of their interests in the Prepetition Collateral on the terms and conditions as set forth herein.

G.     Pending entry of the Final Order, the DIP Agent, DIP Lenders, Prepetition Agent, Revolving Lenders and Term A Lenders are willing to provide financing to the Debtors and/or consent to the use of Cash Collateral and other Collateral by the Debtors subject to (i) the entry of this Order, (ii) the terms and conditions of the DIP Facility Documents, and (iii) findings by the Court that such interim postpetition financing and use of Cash Collateral is essential to the Debtors' estates, that the terms of such interim financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Facility Liens, DIP Facility

Superpriority Claims, and the other protections granted pursuant to this Order and the DIP Facility Documents with respect to such interim financing and use of Cash Collateral will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code. Without limiting the foregoing, any advances made to the Debtors under the DIP Facility Documents after entry of this Order and prior to entry of the Final Order shall be entitled to the protections provided by section 364(e) of the Bankruptcy Code. The DIP Agent, DIP Lenders, Prepetition Agent, Revolving Lenders and Term A Lenders have each acted in good faith in, as applicable, negotiating, consenting to and agreeing to provide the postpetition financing arrangements and/or use of Cash Collateral on an interim basis as contemplated by this Order and the other DIP Facility Documents, and the reliance by the DIP Agent, DIP Lenders, Prepetition Agent, Revolving Lenders and Term A Lenders on the assurances referred to above is in good faith.

H.     Claim of International Paper Company.

(i)     As of the Petition Date, the Debtors owe approximately $49.6 million to International Paper Company and to certain of its affiliates (collectively, "IP") on account of goods sold by IP to the Debtors (the "IP Claim"). IP also (x) is indebted to the Debtors as of the Petition Date in the aggregate amount of $10,625,000 on account of prepetition purchases of goods from the Debtors in the amount of $8,547,000 (the "IP Account Receivables") and on account of rebates to which the Debtors may be entitled in the amount of $2,078,000 (the "IP Rebate Receivables") and (y) will/may become indebted to the Debtors on account of postpetition purchases of goods from the Debtors and on account of rebates to which the Debtors may be entitled (the IP Account Receivables and the IP Rebate Receivables collectively referred to as the "IP

Receivable"). IP has asserted a right to offset the IP Receivable against the IP Claim.

(ii)     IP has also consigned to the Debtors certain goods, which as of the Petition Date consisted of 632 tons of roll paper, packaging materials, finished paper goods, and other products affixed with International Paper labels located at 2989 Pacific Street, Austell, Georgia 30106 (the "IP Consigned Goods"). The IP Consigned Goods and any additional goods consigned to the Debtors during these Cases are the exclusive property of IP and IP's interest in the IP Consigned Goods (a) is hereby deemed to be valid, binding, enforceable and perfected, and (b) is not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, subject to the provisions of paragraph 19 below.

(iii)     The cash that may be received by the Debtors on account of the IP Receivable is a critical component of the Budget. Accordingly, (i) the Debtors may suffer irreparable harm if IP immediately moves to exercise its offset rights, and, (ii) it is in the best interests of the Debtors that IP forbear from exercising fully its offset rights. IP is acting in good faith and is providing to the Debtors reasonably equivalent value and fair consideration in exchange for the treatment of IP pursuant to this Order. IP has agreed, subject to the terms of this Order, to forbear from immediately moving to exercise or otherwise preserving its right to offset the IP Account Receivables against the IP Claim in exchange for certain consideration from the Debtors, including among other things unconditional acknowledgment of IP's right of offset and a general release by the Debtors and their estates of any and all claims against IP (other than the IP Receivable), including claims (if any) pursuant to chapter 5 of the Bankruptcy Code, subject to the provisions of paragraph 19 of this Order.

I.     Telephonic, facsimile notice or overnight mail notice of the Interim Hearing and the proposed entry of this Order has been provided to (a) the thirty (30) largest creditors listed in the Debtors' consolidated list of creditors (excluding insiders), (b) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (c) counsel to the DIP Agent and Prepetition Agent, (d) counsel to the Term B Lenders (as defined in the Prepetition Credit Agreement) (e) all known parties asserting a lien against the Collateral, and (f) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules (collectively, the "Notice Parties"). Under all the exigent circumstances, the requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy Rule 4001.

J.     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.

K.     The ability of the Debtors to finance their respective operations and the availability to the Debtors of sufficient working capital and other financial and general corporate liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations, including letters of credit and credit support, and use of Cash Collateral are in the best interests of the Debtors and their respective creditors and estates. The interim financing and use of Cash Collateral authorized hereunder is vital to avoid immediate irreparable harm to the Debtors' businesses, properties and estates and to allow the orderly continuation of the Debtors' businesses.

L.     Based upon the record presented by the Debtors to this Court: (i) the terms of the DIP Facility and use of Cash Collateral are the best available under the

circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and use of Cash Collateral has been negotiated in good faith and at arm's length among the Debtors, DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders, and any loans, credit, letters of credit, credit support, use of Cash Collateral or other financial accommodations set forth in this Order shall be deemed to have been extended, issued, made, or consented to, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

M.     The consent of the Prepetition Agent, Revolving Lenders and Term A Lenders granted herein is expressly limited to: (i) the Debtors' use of Cash Collateral solely on the terms and conditions set forth in this Order; and (ii) the postpetition financing being provided by the DIP Agent and DIP Lenders as contemplated by this Order and the DIP Facility Documents. Nothing in this Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Agent and Prepetition Lenders are or will be adequately protected with respect to any non-consensual use of Cash Collateral or priming of the Prepetition Liens.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.     <u>Disposition</u>. The Motion is granted as set forth in this Order. Any objections that have not previously been withdrawn are hereby overruled. This Order shall immediately become effective upon its entry.

2.     <u>Authorization to Borrow Under the DIP Facility</u>. Upon execution and delivery of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement by and among the Debtors, the DIP Agent, and the DIP Lenders, in substantially the form

annexed to the Motion (the "DIP Facility Agreement"), and provided that the Debtors are not in default under the terms of this Order, the Debtors are authorized to borrow under the DIP Facility from the DIP Lenders up to $138,955,324 in an aggregate principal amount of advances, including letters of credit (the "DIP Facility Amount"), inclusive of Existing Letters of Credit, which shall be deemed to have been issued under the DIP Facility (together with interest and reasonable fees, charges and expenses payable under the DIP Facility Documents) pursuant to the terms and conditions of the DIP Facility Agreement and in conformity with the amounts set forth in the DIP Budget, and to use amounts borrowed under the DIP Facility to fund the Pay Down (as defined below) and to fund the Debtors' working capital and other general corporate needs pending the Final Hearing in accordance with the terms of the DIP Facility Agreement and this Order; provided, however, that, until entry of the Final Order and without further order of this Court, amounts actually advanced by the DIP Lenders shall not exceed (i) $10 million in additional advances plus (ii) the amount of collections received by the Debtors in the ordinary course of business and applied first to the Revolver and then, if the Revolver has been repaid in full prior to the Final Hearing, to the Term A Advances. Upon their execution and delivery, the DIP Facility Documents shall constitute legal, valid, and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms. To the extent that relief is approved at the Final Hearing and subject to the terms and conditions of the DIP Facility Agreement, the Debtors shall, subject to the terms of the DIP Facility Documents, be entitled to borrow all amounts available under the DIP Facility Agreement to fund the Debtors' working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the DIP Facility Documents, this Order and any other orders of this Court, including, but not limited to, any amounts then outstanding with respect to the Revolver and

Term A Advances. Notwithstanding the occurrence of the Commitment Termination Date or anything herein or in any DIP Facility Document to the contrary, and to the extent that any postpetition administrative expenses that were incurred from and after the Petition Date have not been paid or payment thereof has not been otherwise provided for, the Debtors may continue to use Cash Collateral (including, without limitation, the proceeds of any sale of Collateral outside the ordinary course of business) after the Commitment Termination Date for the payment of any unpaid postpetition administrative expenses incurred at the times set forth in the DIP Budget, but only in the amounts set forth in the DIP Budget so long as such expenses existed and were actually incurred prior to the Commitment Termination Date; provided, however, that the foregoing shall not apply to or be available for payment of any claims payable pursuant to section 503(b)(9) of the Bankruptcy Code.

3.      DIP Facility Superpriority Claims. For the Postpetition Indebtedness and any other of the Debtors' obligations arising under the DIP Facility Documents, the DIP Lenders and DIP Agent are each granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the payment in full in cash of the Carve-Out, the allowed DIP Facility Superpriority Claims, which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered prepetition or postpetition property of the Debtors whether now existing or hereafter acquired (other than the Avoidance Actions and proceeds thereof). The DIP Facility Superpriority Claims shall be deemed legal, valid, binding, enforceable, and perfected claims, not subject to subordination, impairment or avoidance other than as provided herein, for all purposes in the Cases and any successor case.

4.      DIP Facility Liens. As security for the repayment of the Postpetition Indebtedness arising under the DIP Facility Documents, pursuant to sections 364(c)(2),

(c)(3) and (d) of the Bankruptcy Code, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted (without the necessity of the execution by the Debtors or the filing, recordation, or execution and delivery of mortgages, security agreements, control agreements, financing statements, or otherwise) the DIP Facility Liens. The DIP Facility Liens are valid, binding, enforceable and fully perfected as of the date hereof, shall prime and be senior in all respects to the Prepetition Liens and the Replacement Liens (as defined below) pursuant to section 364(d) of the Bankruptcy Code, and are subject only to the Carve-Out and the Permitted Prior Liens. Immediately upon the Pay Down, all possessory collateral held by the Prepetition Agent shall be subject to the DIP Facility Liens and disbursed in accordance with the terms of this Order. As used herein, the term "Permitted Prior Liens") means only such liens and security interests that are (a) valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), (b) not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non bankruptcy law and (c) senior in priority to the Prepetition Liens under applicable law and after giving effect to any applicable subordination or intercreditor agreements. For the avoidance of doubt, the Permitted Prior Liens shall not include, or be deemed to include, any or all of the Primed Liens.

5.    Carve-Out.

(a)    As used in this Order, the term "Carve-Out" shall mean, to the extent there are not sufficient unencumbered funds available to the Debtors' estates, proceeds of Collateral to pay the following expenses: (i) the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of title 28 of the United States Code; and (ii) subject to the terms and conditions of this Order, the allowed and unpaid reasonable fees and

expenses of retained professionals employed pursuant to sections 327, 328, 363 and 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Professional Fees") by the Debtors or any official committee of unsecured creditors (if appointed, the "Committee") (X) prior to the Carve-Out Trigger Date (as defined herein) (and including amounts incurred but not invoiced or approved prior to the Carve-Out Trigger Date), an aggregate amount not to exceed the amounts for each such firm of professionals for each period as set forth in the DIP Budget, and (Y) following the Carve-Out Trigger Date, an aggregate amount not to exceed $350,000 with respect to a proposed "Financing Fee" (as that term is defined in the proposed engagement letter dated as of June 8, 2010 of William Blair & Company, LLC, "Blair") *plus* $1,500,000 for such other retained professionals for the Debtors (items (i) and (ii), collectively, the "Maximum Carve-Out Amount"). As used herein, "Carve-Out Trigger Date" shall mean the date on which the DIP Agent provides written notice to the Debtors and counsel to the Debtors, with a copy of such notice to counsel for the Committee (if appointed), that the Carve-Out is invoked, which notice shall be delivered only on or after and during the continuation of an Event of Default under the DIP Facility and the termination of funding under the DIP Facility. The Carve-Out Trigger Date shall be deemed to have occurred, regardless of whether notice has been delivered by the DIP Agent, upon the Commitment Termination Date.

(b)     Subject to the terms and conditions of the DIP Facility Documents and this Order, the Debtors shall be permitted to pay Professional Fees (including on an interim basis) as the same may be due and payable, and such payments shall reduce the amount of the Carve-Out specified in clause (a)(ii)(X) above but shall not reduce or be deemed to reduce the amount of the Carve-Out specified in clause (a)(ii)(Y) above.

(c)     Without limiting the DIP Agent's and DIP Lenders' rights under

the DIP Facility Agreement and this Order, upon the earlier of (i) the Carve-Out Trigger Date, and (ii) the Commitment Termination Date, the Debtors shall place an amount equal to the unused portion of the Maximum Carve-Out Amount into an interest-bearing reserve escrow at a financial institution reasonably acceptable to the DIP Agent (the "Carve-Out Escrow Account") in full and complete satisfaction of the DIP Agent's, the DIP Lenders', the Prepetition Agent's and the Prepetition Lenders' obligations in respect of the Carve-Out, which amount shall be approved by order of the Court. Notwithstanding anything to the contrary contained in this Order or in any DIP Facility Document, the liens and claims granted to any of the agents or lenders (including, without limitation, the Prepetition Agent, the DIP Agent, the Prepetition Lenders and/or the DIP Lenders) under, pursuant to or in connection with the DIP Facility, any DIP Facility Document, this Order, the Final Order or any Prepetition Loan Document, whether for adequate protection, postpetition financing or otherwise, shall be subject to the payment in full in cash of the Carve-Out to the extent of fees, costs and expenses actually incurred and subject to the Maximum Carve-Out Amount; provided, however, that any unused amounts held in the Carve-Out Escrow Account shall continue to be subject to the Prepetition Liens and DIP Facility Liens. The funds held in the Carve-Out Escrow Account shall only be used by the Debtors to pay the amounts covered by the Carve-Out. Any obligation of the DIP Lenders to fund or otherwise pay any amounts toward the Carve-Out shall be added to and made a part of the Postpetition Indebtedness and secured by the Collateral, so long as such aggregate amount does not exceed the DIP Facility Amount, and each DIP Lender shall be entitled to all of the rights, claims, liens, priorities and protections under this Order, the DIP Facility Agreement, the Bankruptcy Code, and/or applicable law in connection therewith. For the avoidance of doubt, the portion of the Carve-Out allocated to each retained professional pursuant to clause (a)(ii)(X)

above shall be limited to the amount set forth in the DIP Budget for such professional.

(d)   Notwithstanding anything herein to the contrary, no Prepetition Collateral, Collateral, Cash Collateral, amounts borrowed under the DIP Facility Documents, proceeds of any of the foregoing, or any portion of the Carve-Out shall include, apply to, or be available for, any fees or expenses incurred by any party, including the Debtors or the Committee (if appointed), in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of, or asserting any defense, counterclaim, or offset to, the Postpetition Indebtedness, the DIP Facility Superpriority Claims, or the DIP Facility Liens, (ii) asserting (A) any claims or causes of action against the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, including, without limitation, claims or actions to hinder or delay the assertion or enforcement of the DIP Facility Liens or Replacement Liens, or realization on the Collateral, in accordance with the DIP Facility Documents or this Order by the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, or (B) any Avoidance Actions against any DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, or (iii) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Prepetition Agent or any Prepetition Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to, the Prepetition Indebtedness, any Prepetition Loan Document, or the Adequate Protection granted herein; provided, however, that the Committee (if appointed) shall be authorized to use up to an aggregate amount of $100,000 to (i) investigate the liens, claims and interests of the

Prepetition Agent and the Prepetition Lenders, or any other claims or causes of action against the Prepetition Agent or any Prepetition Lender which may be held by the Debtors' estates and (ii) negotiate and/or contest the terms or entry of the Final Order. The foregoing shall not be construed as consent to the allowance of any Professional Fees and shall not affect the right of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Committee, the U.S. Trustee, or other parties in interest to object to the allowance and payment of any Professional Fees, specifically including, but not limited to, any "Financing Fee" asserted to be due and payable to Blair. Payment of any portion of the Carve-Out shall not, and shall not be deemed to, (x) reduce any Debtor's obligations owed to the DIP Agent or any DIP Lender or the Prepetition Agent or any Prepetition Lender or (y) except as expressly provided herein, subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties on and in the Collateral or Prepetition Collateral (or their respective claims against the Debtors).

6.      Investigation Rights.  Notwithstanding anything herein to the contrary, until the later of (a) for parties-in-interest, seventy-five (75) days following entry of this Order and (b) sixty (60) days following formation of the Committee (the "Investigation Termination Date") the Committee, or, if no Committee has been formed, any party-in-interest, shall be entitled to investigate the validity, amount, perfection, priority, and enforceability of the Prepetition Liens and Prepetition Indebtedness, or to assert any other claims or causes of action held by the Debtors' estates against the Prepetition Agent or any Prepetition Lender.  If the Committee (or any party-in-interest, as applicable) determines that there may be a challenge to the Prepetition Agent or any Prepetition Lender's prepetition liens, claims or security interests, the Committee (or any party-in-interest, as applicable) may, on or before the Investigation

Termination Date, file a motion or otherwise initiate an appropriate action (including any motion

or other action seeking standing to prosecute such challenge) (each, a "Challenge"), and shall

have only until the Investigation Termination Date to file an objection or otherwise initiate an

appropriate action setting forth the basis of such Challenge.  If a party does not file a Challenge

on or before the Investigation Termination Date (or such other later date as extended by the

written consent of the Debtors and the Prepetition Agent or by order of this Court), (a) disputing

any agreement, acknowledgement, release and/or stipulation contained in paragraph D of this

Order, then the agreements, acknowledgements, releases and stipulations contained in paragraph

D of this Order which have not been expressly disputed as the basis of a Challenge shall be

irrevocably binding on all other parties, the estates, the Committee and all parties in interest

(including, without limitation, any receiver, administrator, or trustee appointed in any of the

Cases or any successor case in any jurisdiction) without further action by any party or this Court,

and (b) the Committee and any other party in interest (including without limitation, any receiver,

administrator, or trustee appointed in any of the Cases or any successor case or in any

jurisdiction) shall thereafter be forever barred from bringing any Challenge with respect to the

Prepetition Agent or any Prepetition Lender. ~~If any Challenge is timely filed on or before the~~

~~Investigation Termination Date, all other claims and actions against the Prepetition Agent or any~~

~~Prepetition Lender not expressly asserted in such Challenge shall be deemed, immediately and~~

~~without further notice, motion or application to, order of, or hearing before, this Court, to have~~

~~been forever relinquished, discharged, released and waived.~~ Nothing in this Order (a) confers

standing on any party to file or prosecute such claims and actions described herein or (b)
^(other than the Committee)

precludes the Prepetition Agent or any Prepetition Lender from seeking allowance of all or any

portion of the Prepetition Indebtedness prior to the occurrence of the Investigation Termination

Date. The Investigation Termination Date may not be extended unless (a) the DIP Agent (on behalf of the DIP Lenders), the Prepetition Agent (on behalf of the Prepetition Lenders), and the Debtors each consent in writing to an extension or (b) the Committee (if appointed) or any party in interest files a motion seeking an extension before the expiration of the Investigation Termination Date and the Court enters an order granting such an extension (regardless of whether such order is entered after the Investigation Termination Date). Notwithstanding anything herein to the contrary, if the Committee has been appointed and upon entry of a Final Order, only the Committee shall be entitled to bring a Challenge on behalf of the Debtors' estates against the Prepetition Agent or any Prepetition Lender; no other party in interest shall be entitled to investigate the validity, amount, perfection, priority, or enforceability of the Prepetition Liens and Prepetition Indebtedness, or to assert any other claims or causes of action held by the Debtors' estates against the Prepetition Agent or any Prepetition Lender.

       7.    <u>Section 506(c) and 552(b) Waivers</u>. Effective upon entry of a Final Order providing for such relief, with the exception of the Carve-Out and except as otherwise permitted by the DIP Facility or this Order, neither the Collateral nor the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, nor any of their claims, shall be subject to any costs or expenses of administration that have been or may be incurred at any time, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, by the Debtors or any other party in interest without the prior written consent of the DIP Agent, and no such consent shall be implied from any action, inaction, or acquiescence by any party, including, but not limited to, funding of the Debtors' ongoing operations by the DIP Agent and DIP Lenders. Effective upon entry of a Final Order providing for such relief, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived with respect to the Collateral.

LEGAL_US_E # 88260158.13
YCST01:9779499.4

069504.1001

Neither the DIP Agent or any DIP Lender, nor the Prepetition Agent or any Prepetition Lender shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral.

        8.    <u>Authorization to Use Cash Collateral and Application of Collections and Certain Sale Proceeds</u>.  Upon entry of this Order, to the extent that Debtors have cash on hand as of the Petition Date (the "<u>Petition Date Cash</u>"), the Debtors are immediately authorized pursuant to sections 105, 361, 363, 541 and 553 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, to use Cash Collateral up to the amount of the Petition Date Cash for the operation of their businesses in accordance with the DIP Budget; <u>provided</u>, <u>however</u>, that upon the closing and funding of the DIP Facility, all cash collected by the Debtors in the ordinary course of their operations shall, except as otherwise expressly provided in the DIP Facility Agreement, be paid to the Prepetition Agent to pay down first, the Revolver, and second, the Term A Advances in accordance with the Prepetition Loan Documents.  To fund the Debtors' working capital and other general corporate needs pending the Final Hearing, in accordance with the terms of this Order, the DIP Facility Documents and the DIP Budget, the Debtors may request revolving credit advances under the DIP Facility, including letters of credit ("<u>Revolving Credit Advances</u>").  In the event there are out of the ordinary course sales of Prepetition Collateral prior to the Final Hearing, the net cash proceeds of such sales shall be applied to the Revolver and Term A Advances in accordance with the Prepetition Loan Documents.  Upon entry of a Final Order providing for such relief, any remaining Revolver and Term A Advances shall be paid from the Revolving Credit Advances under the DIP Facility in accordance with paragraph 9(a) hereof, and thereafter, the Debtors shall receive Revolving Credit Advances under the DIP Facility to fund the Debtors' working capital and other general corporate needs in

accordance with the terms of the Final Order, the DIP Facility Documents and the DIP Budget.

9. <u>Adequate Protection of Prepetition Lenders</u>. In consideration for the use of the Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Liens, subject to the Investigation Rights set forth in paragraph 6 of this Order, the Prepetition Agent (on behalf of the Prepetition Lenders) shall receive the following (collectively the "<u>Adequate Protection</u>"):

(a) <u>Pay Down</u>. Upon entry of a Final Order providing for such relief, the Debtors shall pay from Cash Collateral or Revolving Credit Advances under the DIP Facility, the remaining outstanding Revolver and Term A Advances (the "<u>Pay Down</u>"). For the avoidance of doubt, the Pay Down shall include only the amounts (including accrued and unpaid interest thereon plus reasonable accrued fees, costs and expenses) set forth in paragraph D(ii)(1) and (2) hereof (and shall not include at that time the "Capital Transaction Fee" referenced in paragraph D(ii)(5).

(b) <u>Adequate Protection Liens</u>. To the extent there is a diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Court granting such relief), the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the Prepetition Agent, on behalf of the Prepetition Lenders, is granted replacement liens (the "<u>Replacement Liens</u>") in the Collateral, which Replacement Liens are valid, binding, enforceable

and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the Prepetition Agent of security agreements, pledge agreements, financing statements, or other agreements, and which shall be subordinate only to the Carve-Out, the DIP Liens and the Permitted Prior Liens and shall be equivalent to a lien granted under section 364(c) of the Bankruptcy Code, and which such Replacement Liens shall cover assets, interest, and proceeds of the Debtors that are or would be collateral under the Prepetition Loan Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents (with the exception of the Avoidance Actions and proceeds thereof).

(c)     Administrative Claim.  The Prepetition Agent (on behalf of the Prepetition Lenders) is hereby granted in each of the Debtors' Cases an allowed administrative claim (the "Administrative Claim") under Bankruptcy Code section 507(b) with respect to all Adequate Protection obligations, to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Administrative Claim shall be junior and subordinate only to any superpriority claim of the kind specified in, or ordered pursuant to, section 364 of the Bankruptcy Code, the Carve-Out and any Permitted Prior Liens.  The Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (with the exception of the Avoidance Actions and proceeds thereof).

(d)     Access.  In accordance with the terms of the Prepetition Credit Agreement, the Prepetition Agent and Prepetition Lenders shall be afforded continued reporting as to Collateral amounts and reasonable access to the Collateral and the Debtors' business premises, during normal business hours, for purposes of verifying the Debtors' compliance with the terms of this Order as it pertains to the Prepetition Agent and Prepetition Lenders.

(e)     Adequate Protection Payments.  Subject to the remainder of this

paragraph 9(e) and paragraph 10 below, the Debtors shall timely pay to the Prepetition Agent

from Cash Collateral or Revolving Credit Advances under the DIP Facility amounts as they

accrue in connection with the Prepetition Indebtedness (the "Adequate Protection Payments"),

including, without limitation, the current cash payment of interest charged on the Prepetition

Indebtedness at the times provided for in the Prepetition Credit Agreement, cash management

fees, expenses and charges and letter of credit fees and commissions.  Notwithstanding the

foregoing, prior to consummation of a sale of all or substantially all of the Debtors' assets

pursuant to section 363 of the Bankruptcy Code, the Adequate Protection Payments provided for

herein shall exclude (i) any principal amortization payment on Term A Loans scheduled prior to

the Pay Down[4], (ii) any scheduled principal amortization or interest or other payments (whether

for fees, costs or expenses) on or with respect to Term B Loans (including reimbursement of

fees, costs or expenses of Term B Lenders), and (iii) payment of the "Capital Transaction Fee"

referenced in paragraph D(ii)(5) hereof.  Upon entry of a final non-appealable order by the Court

determining any of the Prepetition Agent (on behalf of the Prepetition Lenders) or any of the

Prepetition Lenders to be undersecured or that such payment is not permitted under section

506(b) of the Bankruptcy Code, any payment of post-petition interest, fees, costs or expenses to

such party (whether pursuant to this paragraph or paragraph 10 below) shall be reapplied,

recharacterized or disgorged as the Court so orders; provided, however, that any such

reapplication, recharacterization or disgorgement of payments to the Prepetition Agent or any

Prepetition Lender shall have no effect on the respective rights and remedies of the Prepetition

---

[4] To the extent that the Pay Down is not included as part of the relief granted in the Final Order, the Prepetition Agent, on behalf of the Term A Lenders (as defined in the Prepetition Credit Agreement), reserves the right to seek payment of scheduled amortization payments on the Term A Loans as part of the Adequate Protection Payments following the Final Hearing.

Agent and Prepetition Lenders under the Prepetition Credit Agreement.

(f)    Allowance of Claims.  The claims arising from or in connection with the Prepetition Indebtedness are hereby deemed "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

(g)    Right to Credit Bid.  Upon entry of the Final Order providing for such relief, the Prepetition Agent (on behalf of the Prepetition Lenders) shall have the right to "credit bid" the allowed amount of the Prepetition Lenders' claims during any sale of all or substantially all of the Prepetition Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

(h)    The automatic stay is modified as to the Prepetition Agent (on behalf of the Prepetition Lenders) to allow implementation of the provisions of this paragraph 9, without further notice or order of the Court.

10.    Reimbursement of Fees and Expenses.  The Debtors shall promptly reimburse (i) the DIP Agent and the DIP Lenders in accordance with the DIP Facility Documents and (ii) subject to paragraph 9(e) hereof, the Prepetition Agent and the Prepetition Lenders (other than the Term B Lenders) in accordance with the terms of the Prepetition Credit Agreement for their reasonable costs, fees (including, without limitation, reasonable attorneys' and financial advisors' fees and expenses; provided that (other than local counsel) there shall be no more than one law firm acting as counsel for the Prepetition Agent, and one separate law firm acting as counsel for the Prepetition Lenders), charges, and expenses incurred in connection with the Cases or under the DIP Facility, whether incurred prepetition or postpetition, within ten (10) business days (if no written objection is received within such ten (10) business-day

period) after such professional has delivered a summary invoice describing such fees and expenses to local Delaware counsel for the Debtors, which invoice may not be disclosed to or discussed with any third party, including, without limitation, lead counsel to the Debtors; provided further that, in the event such fees, costs and expenses exceed the amounts set forth in the DIP Budget for such applicable professional, the Debtors shall nonetheless pay such excess amounts and such incurrence and/or payment shall not be the basis for a Default or Event of Default under any DIP Facility Document. A copy of each invoice submitted shall be delivered to the U.S. Trustee and counsel to the Committee (if appointed) concurrently with delivery to local Delaware counsel to the Debtors. Any written objection to such fees or expenses must contain a specific basis for the objection and a quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. None of such costs, fees, charges, and expenses shall be subject to Court approval or required to be maintained in accordance with the United States Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, that to the extent the Debtors fail to reimburse the Prepetition Agent, the Prepetition Lenders, the DIP Agent and/or the DIP Lenders for any such fees and expenses that are not subject to objection as provided herein, the applicable professionals shall be permitted to apply any amounts held in escrow or retainer (whether obtained prior to, on, or after, the Petition Date) against such unpaid fees and expenses without the need to file any application with the Court; provided, further, that the Court shall have jurisdiction to determine any dispute concerning such invoices; provided, however, if an objection to a professional's invoice is timely received, the Debtors shall only be required to

timely pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

11.     Restrictions on the Debtors.  Other than the Carve-Out and the Permitted Prior Liens, no claim or lien having a priority superior or *pari passu* with those granted by this Order to the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders shall be granted by any Debtor, while any obligations under the DIP Facility (or refinancing thereof) or any Prepetition Indebtedness remains outstanding without the written consent of the DIP Agent and Prepetition Agent.  Except as expressly permitted by the DIP Facility Documents and this Order, the Debtors will not, at any time during the Cases while any obligations under the DIP Facility and/or the Prepetition Credit Agreement remain outstanding, grant senior or *pari passu* mortgages, security interests, or liens in the Collateral, the Prepetition Collateral, or any portion thereof pursuant to section 364(d) of the Bankruptcy Code or otherwise.

12.     Additional Perfection Measures.  Neither the DIP Agent nor any DIP Lender or the Prepetition Agent or any Prepetition Lender shall be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction, or take any other action, to attach or perfect the security interests and liens granted under the DIP Facility Documents and this Order (including, without limitation, taking possession of or obtaining control over any of the Collateral, or taking any action to have security interests or liens noted on certificates of title or similar documents).  Notwithstanding the foregoing, the DIP Agent or any DIP Lender may, in its discretion, file this Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments, or otherwise confirm perfection of such liens, security interests, and mortgages, without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, and all such

documents shall be deemed to have been filed or recorded or other action taken on the Petition Date, with the priorities set forth herein; provided, that the failure of the DIP Facility Agent or any DIP Facility Lender to file any such financing statement, mortgage, deed of trust, notice of lien or other instrument, or to otherwise confirm perfection of such liens, security interests or mortgages or make any other such request shall not affect either the perfection or priority of the DIP Facility Liens.

       13.   <u>Rights with Respect to Certain Prepetition Agreements</u>. The DIP Agent and the DIP Lenders shall have all the rights and benefits with respect to each Blocked Account (as defined in the Prepetition Credit Agreement), any securities or other accounts subject to a Control Letter (as defined in the Prepetition Credit Agreement), each other agreement with a third party (including, but not limited to, any agreement with a landlord, warehouseman, customs broker, or freight forwarder), and each other notification or agreement received or furnished in connection with the Prepetition Credit Agreement, and all depository banks, blocked account banks, landlords, securities intermediary, warehousemen, customs brokers, freight forwarders and other third parties shall continue to comply, for the benefit of the DIP Lenders, with the terms and conditions of each such agreement or notification, in each such case whether or not, and as if, an additional agreement or notification has been executed or furnished in connection with the DIP Facility.

       14.   <u>Access to Collateral – No Landlord's Liens</u>. Upon entry of a Final Order providing for such relief and subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Order or the DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Facility Documents and

paragraph 15 below, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Facility Documents, the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP Agent (the "Separate Agreement"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, that, subject to the Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

      15.    <u>Automatic Stay</u>. Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence and during the continuation of any Event of Default under the DIP Facility Documents, and delivery by the DIP Agent of written notice of its intent to exercise remedies (a "<u>Remedies Notice</u>") in each case given to the Debtors and their counsel, counsel to the Committee (if appointed) and the United States Trustee, the DIP Agent shall be entitled to exercise its rights and remedies in accordance with the DIP Facility Agreement without further order of this Court beginning five (5) business days following delivery of the Remedies Notice (the "<u>Remedies Notice Period</u>") unless otherwise provided by order of this Court; provided, however, immediately upon the commencement of the Remedies Notice Period and thereafter until the Remedies Expiration Date: (i) the DIP Lenders may charge default rates of interest; (ii) the Debtors shall have no right to use any Collateral except for payment of the Carve-Out, the Adequate Protection Payments

and the Postpetition Indebtedness or as otherwise provided in the last sentence of paragraph 2 of this Order; and (iii) except as otherwise provided in the last sentence of paragraph 2 of this Order, any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility Agreement shall be suspended.  During the Remedies Notice Period, the Debtors, the Committee (if appointed) and/or the U.S. Trustee shall be entitled to an emergency hearing before this Court; provided, however, that the Debtors, the Committee (if appointed) and/or the U.S. Trustee shall have the initial burden of proof at such hearing and the only issue to be determined at such hearing shall be whether an Event of Default under the DIP Facility Documents has occurred and is continuing, and if an Event of Default under the DIP Facility Documents is determined to have occurred and be continuing, the automatic stay will not be re-imposed or continue with respect to the DIP Agent or DIP Lenders.  After the expiration of the Remedies Notice Period, without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and the DIP Agent and the DIP Lenders may exercise all rights and remedies provided for in the DIP Facility Documents. Notwithstanding the occurrence of an Event of Default under the DIP Facility Documents or termination of the commitments under the DIP Facility Agreement or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Agent and DIP Lenders under the DIP Facility Documents and this Order shall survive the date of termination of the DIP Facility.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay with respect to the DIP Agent and DIP Lenders.  For the avoidance of doubt, the Remedies Notice Period shall expire no later than the earliest date of cure or waiver of the applicable Event of Default or payment in full in cash of the

Postpetition Indebtedness (such date, the "Remedies Expiration Date").

16. **Binding Effect.** The provisions of this Order shall be binding upon and inure to the benefit of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, the Debtors, the Committee (if appointed), and their respective successors and assigns, including any trustee hereafter appointed for the estate of any of the Debtors, whether in these Cases or any successor case, including the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Order.

17. **Survival.** The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order (a) confirming any plan under chapter 11 of the Bankruptcy Code in any of the Cases (and, to the extent not satisfied in full in cash, the Postpetition Indebtedness shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge), (b) approving any sale under section 363 of the Bankruptcy Code, (c) converting any of the Cases to a chapter 7 case unless permitted under the DIP Facility Documents, or (d) to the maximum extent permitted by law, dismissing any of the Cases unless permitted under the DIP Facility Documents, and notwithstanding the entry of any such order, the terms and provisions of this Order shall continue in full force and effect, and the DIP Facility Superpriority Claims, DIP Facility Liens and Adequate Protection granted pursuant to this Order and/or the DIP Facility Documents shall continue in full force and effect and shall maintain their priority as provided by this Order and the DIP Facility Documents to the maximum extent permitted by law until all of the Postpetition Indebtedness is indefeasibly paid in full in cash or otherwise addressed pursuant to a confirmed plan.

18. **After-Acquired Property.** Except as otherwise provided in this Order,

pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Facility Documents and this Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date (or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

19.     IP Offset Rights.  Subject to the challenge rights of parties in interest set forth in this paragraph, IP's right(s) to offset the IP Receivable against the IP Claim is acknowledged and allowed without further order of the Court and IP shall be authorized to exercise its IP Offset rights with respect to the IP Rebate Receivables immediately upon entry of this Order.  Notwithstanding the post-petition payment by IP of all or any portion of the IP Receivable, IP shall be entitled to offset any and all of the IP Receivable against the IP Claim irrespective of (a) whether such obligations to the Debtors arose prior to or subsequent to the Petition Date and (b) whether "mutuality" exists between the amounts owed by IP to the Debtors and the IP Claim as a result of the Debtors becoming debtors-in-possession (the "IP Offset").  In exchange for the consideration being provided to the Debtors by IP pursuant hereto, IP shall forbear from exercising or otherwise preserving its IP Offset right with respect to IP Account Receivables until the earlier of (a) July 16, 2010 and (b) the date of the Final Hearing.  Until such date, IP shall pay to the Debtors, in accordance with the time and manner payment had been

LEGAL_US_E # 88260158.13
YCST01:9779499.4                                         35                                    069504.1001

made to them prepetition, the IP Account Receivables, except to the extent that making any such

payment(s) to the Debtors would result in IP maintaining a payable balance to the Debtors of

more than $1,000,000 less than the IP Account Receivables.  The Debtors and their estates

waive and generally release any and all claims and/or causes of action that they have, had or may

have against IP other than the IP Receivable, including claims (if any) pursuant to chapter 5 of

the Bankruptcy Code; provided, however, until ~~the Investigation Termination Date~~ July 31, 2010, unless such date is extended by IP or the Court, for cause, the

Committee, or, only if no Committee has been formed, any party-in-interest (other than the DIP

Agent, any DIP Lender, the Prepetition Agent, or any Revolving Lender or Term A Lender),

shall be entitled to file an objection or otherwise challenge (a) IP's eligibility to offset the IP

Accounts Receivables and/or the IP Rebate Receivables against the IP Claim pursuant to section

553 of the Bankruptcy Code, including, without limitation, on the grounds that "mutuality" does

not exist between the IP entities to which the Debtors owed money prior to the Petition Date and

the IP entities which owed the Debtors money prior to the Petition Date, (b) the validity, amount,

perfection, priority, and enforceability of IP's rights in and to the IP Consigned Goods, and/or (c)

the waiver and release pursuant to this Order of any other claims or causes of actions the Debtors and/or their estates

have or may have against IP.  To the extent that, as a result of such a challenge, this Court

determines that IP was not entitled to offset a portion of the IP Receivable, IP shall continue to

be entitled to the IP Offset with respect to the remainder of the IP Receivable.  To the extent that,

as a result of a challenge, this Court determines that IP did not have a perfected interest in the IP

Consigned Goods, the remedy shall be limited to the recharacterization or disgorgement of any

payment received on account of such Consigned Goods.  Nothing contained herein shall or shall

be deemed to amend or modify the rights of IP except as specifically provided herein and IP's

rights are expressly reserved.

20.    Access to the Debtors.  In accordance with the provisions of access in the DIP Facility Documents, the Debtors shall permit representatives, agents, and employees of the DIP Agent and the DIP Lenders to have reasonable access to the Debtors' premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such representatives, agents, and/or employees all such information as is reasonably requested.

21.    Authorization to Act.  Each of the Debtors is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees and all other amounts as provided under this Order and the DIP Facility, which may be reasonably required or necessary for the Debtors' full and timely performance under the DIP Facility and this Order, including, without limitation:

(a)    the execution of the DIP Facility Documents;

(b)    the modification or amendment of the DIP Facility Agreement or any other DIP Facility Documents without further order of this Court, in each case, in such form as the Debtors, the DIP Agent, and the DIP Lenders may agree in accordance with the terms of the DIP Facility; provided, however, that notice of any material modification or amendment shall be provided to counsel for the Committee (if appointed) and the U.S. Trustee, each of which will have five (5) days from the date of delivery of such notice within which to object in writing; provided further, that such modification or amendment shall be permitted only pursuant to an order of the Court; and

(c)    the non-refundable payments to the DIP Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Facility Agreement, and reasonable costs

and expenses as may be due from time to time as provided in this Order, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Facility Documents.

22.     <u>Insurance Policies</u>.  Upon entry of this Order, the DIP Agent, on behalf of the DIP Lenders, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral and each liability insurance policy maintained by the Debtors (other than D&O insurance and any "tail" policy).  After the Pay Down, any insurance proceeds or other receipts from any source that relate to the Collateral and are paid to the Prepetition Agent or any Prepetition Lender shall be immediately delivered to the Debtors and subject to the DIP Facility Liens and the terms of the DIP Facility Documents.

23.     <u>Subsequent Reversal</u>.  If any or all of the provisions of this Order or the DIP Facility Documents are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court:  (a) such modification, vacatur, amendment, or stay shall not affect (i) the validity of any obligation of any Debtor to the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders pursuant to this Order that is or was incurred prior to such party receiving written notice of the effective date of such modification, vacatur, amendment, or stay (the "<u>Effective Date</u>"), or (ii) the validity, enforceability or priority of the DIP Facility Superpriority Claims, DIP Facility Liens, Adequate Protection or other grant authorized or created by this Order and the DIP Facility Documents that is or was incurred prior to such party receiving written notice of the Effective Date; (b) the Postpetition Indebtedness and Adequate Protection pursuant to this Order and the DIP Facility Documents arising prior to the Effective Date shall be governed in all respects by the provisions of this Order and the DIP Facility

Documents in effect immediately prior to the Effective Date; and (c) the use of Cash Collateral and the validity of any financing provided or security interest granted pursuant to this Order and the DIP Facility Documents is and shall be protected by section 364(e) of the Bankruptcy Code.

24. <u>Effect of Dismissal of Cases</u>. If the Cases are dismissed, converted or substantively consolidated, then neither the entry of such order nor the dismissal, conversion or substantive consolidation of these Cases shall affect the rights of the DIP Agent and DIP Lenders under their respective documents or this Order, and all of the respective rights and remedies thereunder of the DIP Agent and DIP Lenders shall remain in full force and effect as if the Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Facility Liens and DIP Facility Superpriority Claims granted to and conferred upon the DIP Agent and DIP Lenders and the protections afforded to the DIP Agent and the DIP Lenders pursuant to this Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided in this Order until all Postpetition Indebtedness shall have been paid and satisfied in full in cash (and that such DIP Facility Liens, DIP Facility Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties), (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Facility Liens, Prepetition Liens, DIP Facility Superpriority Claims and Adequate Protection, and (iii) any hearing on a motion to dismiss any of the Cases shall require at least twenty (20) days' prior notice to the DIP Agent, unless otherwise ordered by the Court for good cause shown.

25. <u>Findings of Fact and Conclusions of Law</u>. This Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the

Petition Date immediately upon the entry thereof.

26. _Controlling Effect of Order_.  To the extent any provision of this Order conflicts with any provision of the Motion, any documents executed or delivered prior to the Petition Date, or any DIP Facility Documents, the provisions of this Order shall control.

27. _Final Hearing_.  The Final Hearing shall be heard before this Court on July [13], 2010 at 9 :00 a.m. ( EST ) at the United States Bankruptcy Court for the District of Delaware, Wilmington, Delaware.

28. _Adequate Notice_.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  Within three (3) business days after the Court's entry of this Order, the Debtors shall mail copies of this Order and notice of the Final Hearing to the Notice Parties and all landlords of the Debtors.  Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file same with the Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than [ July 8 ], 2010 at 4 :00 p.m. ( EST ) on the following:

    (a)    **Latham & Watkins LLP**, 233 South Wacker Drive, Suite 5800, Chicago, Illinois, 60606 (Attn: David S. Heller, Esq. and Josef S. Athanas, Esq.), proposed counsel to the Debtors;

    (b)    **Young, Conaway, Stargatt & Taylor, LLP**, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq.), proposed local Delaware counsel to the Debtors;

    (c)    **Paul, Hastings, Janofsky & Walker LLP**, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308 (Attn: Jesse H. Austin, III, Esq. and Cassie Coppage, Esq.), counsel to the Prepetition Agent and the DIP Agent;

(d)     **Reed Smith LLP**, 1201 Market Street, Suite 1500, Wilmington, DE 19801(Attn: Kurt F. Gwynne, Esq.), local Delaware counsel to the Prepetition Agent and the DIP Agent;

(e)     **Office of the United States Trustee for the District of Delaware**, 44 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: David Klauder, Esq.).

Dated: June 11, 2010

_____

The Honorable Peter J. Walsh
United States Bankruptcy Judge