# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORPORATION, et al.,[1] | Case No. 10-11890 (PJW) |
| | Jointly Administered |
| Debtors. | |
| | Re: Docket Nos. 16, 25 and 32 |

## PREPETITION AGENT'S AND DIP AGENT'S BRIEF IN SUPPORT OF A FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corporation, a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

# TABLE OF AUTHORITIES

                                                                                                                            **Page(s)**

**CASES**

*In re Cardell*,
    No. CIV A 08-5190, 2009 WL 1973551 (D.N.J. July 7, 2009) ................................................ 10

*In re Club Assocs.*,
    107 B.R. 385 (Bankr. N.D. Ga. 1989), *aff'd*, 956 F.2d 1065 (11th Cir. 1992) ........................ 14

*In re DeSardi*,
    340 B.R. 790 (Bankr. S.D. Tex. 2006) ..................................................................................... 11

*In re GWLS Holdings*,
    No. 08-12430, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) ............................................. 7

*In re Levitt & Sons, LLC*,
    384 B.R. 630 (Bankr. S.D. Fla. 2008) ..................................................................................... 13

*In re Mosello*,
    195 B.R. 277 (Bankr. S.D.N.Y. 1996) .................................................................................... 11

*In re Swedeland Dev. Group*,
    16 F.3d 552 (3d Cir. 1994) ...................................................................................................... 11

*In re Weinstein*,
    227 B.R. 284 (B.A.P. 9th Cir. 1998) ...................................................................................... 12

*In re Westpoint Stevens*,
    600 F.3d 231 (2d Cir. 2010) .................................................................................................... 10

**STATUTES**

11 U.S.C. § 361 .............................................................................................................................. 11

General Electric Capital Corporation, as Prepetition Agent (defined below) on behalf of the Prepetition Lenders (defined below), as DIP Agent (defined below) on behalf of the DIP Lenders (defined below), and as a creditor in the above-captioned proceedings, hereby files this *Brief in Support of a Final Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims* (the "Brief"). In support of this Brief, the Prepetition Agent respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. The matter before the Court is a core matter under 28 U.S.C. § 157(b)(2). Venue of these cases and this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On June 10, 2010 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief (the "Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. On June 10, 2010, the Debtors filed their *Motion for Interim and Final Orders Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral of the Prepetition Lenders, (II) Obtain Post-petition Financing and (III) Provide Adequate*

*Protection to the Prepetition Lenders, and (B) Providing Notice and Scheduling Final Hearing* ([Docket No. 16]; the "DIP Motion").

4. On June 10, 2010, the Term B Lenders (defined below) filed a *Preliminary Objection to Debtors' Motion For Entry of Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, and (V) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis* ([Docket No. 25]; the "DIP Objection").

5. On June 11, 2010, a hearing was held regarding the first day motions, including the DIP Motion (the "First Day Hearing"). The final hearing on the DIP Motion (the "Final Hearing") is scheduled for July 13, 2010.[2]

6. Following presentation of evidence and arguments at the First Day Hearing, the Court entered the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, and (V) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis* ([Docket No. 32]; the "Interim DIP Order").

---

[2] On June 23, 2010, the United States Trustee for the District of Delaware formed the Official Committee of Unsecured Creditors (the "Committee"). [Docket No. 71].

B.  **The Prepetition Secured Credit Facility**

7. Pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 28, 2006, among the Debtors, General Electric Capital Corporation, as a lender and as administrative agent (in such capacity, the "Prepetition Agent"), GECC Capital Markets Group, Inc., as sole lead arranger and sole bookrunner, and the lenders[3] (each, a "Prepetition Lender" and collectively in their lender capacity, the "Prepetition Lenders") party thereto (as amended, supplemented, or otherwise modified as of the Petition Date, the "Prepetition Credit Agreement"; and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents"), the Prepetition Lenders made loans, issued letters of credit and provided other financial accommodations to or for the benefit of the Debtors. A composite copy of the Prepetition Credit Agreement and each amendment thereto was entered into evidence as the Prepetition Agent's Exhibit 1 at the First Day Hearing.

8. The Prepetition Credit Agreement is a contract governed by the laws of the State of New York. Prepetition Credit Agreement, section 11.9.

9. The Prepetition Credit Agreement provides for, among other things, (a) a Term A loan of $75 million (the "Term A Loan"); (b) a revolving credit facility in an aggregate principal amount of up to $120 million (the "Prepetition Revolver" and, together with the Term A Loan, the "Prepetition Senior Secured Loans"); and (c) a Term B loan of $35 million (the "Term B Loan").

10. Pursuant to the Prepetition Loan Documents, the Debtors were, as of the Petition Date, jointly and severally, indebted to the Prepetition Agent and the Prepetition Lenders

---

[3] As used herein, the terms "Revolving Lenders," "Term A Lenders," and "Term B Lenders" shall have the meanings ascribed thereto in the Prepetition Credit Agreement. The Revolving Lenders and Term A Lenders shall be referred to collectively herein as the "Prepetition Senior Secured Lenders."

in the amount of: (a) approximately $71 million with respect to the Prepetition Revolver; (b) approximately $39 million with respect to the Term A Loan; (c) approximately $36 million with respect to the Term B Loan; (d) $3,553,000 with respect to the Existing Letters of Credit; and (e) $1,781,765 with respect to the Capital Transaction Fee (as defined in that certain Third Forbearance Agreement and Fifth Amendment to Second Amended and Restated Credit Agreement dated February 12, 2010 by and among the Debtors, the Prepetition Agent and the Prepetition Lenders). *See* Interim DIP Order, ¶ D(ii).

11. Pursuant to the Prepetition Loan Documents, the Debtors granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, liens and security interests (the "<u>Prepetition Liens</u>") on and in substantially all of the Debtors' property and assets whether real or personal, tangible or intangible, and wherever located, and whether now or hereafter existing or acquired, and all the proceeds, products, offspring, rents and profits thereof (the "<u>Prepetition Collateral</u>") to secure the Prepetition Indebtedness (as defined in the Interim DIP Order). *See* Interim DIP Order, ¶ D(iii).

12. Pursuant to the Prepetition Credit Agreement, the Term B Loan is a "last-out" loan, *i.e.*, following an event of default, no payments may be made with respect to the Term B Loan unless and until all amounts due and owing on the Prepetition Senior Secured Loan have been paid in full. *See* Prepetition Credit Agreement, section 1.18. As of the Petition Date, events of default existed under the Prepetition Credit Agreement.

C.  **Interim DIP Order**

13. The Debtors propose to support the ongoing operations of their businesses during these Cases primarily through that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "<u>DIP Facility</u>") dated as of June 11, 2010 by and among the Debtors, General Electric Capital Corporation, as a lender and as administrative agent (in such

capacity, the "DIP Agent"), and the lenders party thereto (the "DIP Lenders") in substantially the form annexed to the DIP Motion (the "DIP Facility Agreement"). Upon final approval of the DIP Motion, the Debtors will be authorized to borrow up to $138,955,324 in an aggregate principal amount of advances, including letters of credit (the "DIP Facility Amount") from the DIP Lenders under the DIP Facility Agreement. DIP Financing Motion, ¶ 1.

14. In addition to the additional funding provided under the DIP Facility Agreement, International Paper Company ("IP") has provided liquidity to the Debtors by agreeing to delay the exercise of certain setoff rights asserted by IP until the earlier of (i) the Final Hearing and (ii) July 16, 2010. The value of such delayed setoff rights is approximately $8.5 million. *See* Interim DIP Order, ¶¶ H, 19.

### D. Adequate Protection

15. The Interim DIP Order provides, that, to the extent there is a diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, the Prepetition Agent, on behalf of the Prepetition Lenders (including the Term B Lenders), is granted replacement liens (the "Replacement Liens") in the Postpetition Collateral in the same order of priority existing under the Prepetition Credit Agreement. Interim DIP Order ¶ 9(b).

16. The Interim DIP Order also provides that the Prepetition Agent (on behalf of the Prepetition Lenders, including the Term B Lenders) is granted in each of the Debtors' Cases an allowed administrative claim (the "Administrative Claim") under Bankruptcy Code section 507(b) to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date. The Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (with the exception of the Avoidance Actions and proceeds thereof). Interim DIP Order ¶ 9(c).

### E. Correspondence Between the Prepetition Agent and the Term B Lenders

17. In a letter from the Prepetition Agent to the Term B Lenders dated May 27, 2010, notice was given in accordance with the Buy-Out Provision of the Prepetition Credit Agreement that the Prepetition Senior Secured Lenders intended to exercise the right to accelerate the Prepetition Senior Secured Obligations (the "Notice Letter"). The Notice Letter was entered into evidence at the First Day Hearing as Exhibit 3.

18. In a letter from the Prepetition Agent to the Term B Lenders dated June 7, 2010, the Prepetition Agent also made a demand for the return of an interest payment in the approximate amount of $500,000, which was inadvertently and erroneously distributed to the Term B Lenders prepetition (the "Demand Letter"). The Demand Letter was entered into evidence at the First Day Hearing as Exhibit 2. As of the date of filing this Brief, the Term B Lenders have not returned to the Prepetition Agent the erroneously paid interest.

### F. First Day Hearing Exhibits

19. During the contested hearing regarding approval of the DIP Motion held during the First Day Hearing, the following exhibits were submitted in connection with the DIP Motion:

| Exhibit Number | Document |
|---|---|
| 1 | Composite copy of the Prepetition Credit Agreement conformed through the fourth amendment dated as of February 12, 2010 |
| 2 | Demand Letter |
| 3 | Notice Letter |

Because these documents have been admitted into evidence and are part of the record of the First Day Hearing, these documents are not attached as exhibits to the Brief.

## BRIEF IN SUPPORT OF FINAL APPROVAL OF THE DIP FACILITY

I. **THE PREPETITION CREDIT AGREEMENT ALLOWS THE PREPETITION SENIOR SECURED LENDERS TO INCREASE THEIR LOAN COMMITMENTS AND IT PRECLUDES THE TERM B LENDERS FROM OBJECTING TO THE DIP FACILITY.**

20. The Prepetition Credit Agreement is a contract governed by the laws of the State of New York. Under New York law, a contract must be interpreted and enforced according to the plain meaning of its unambiguous terms. *In re GWLS Holdings*, No. 08-12430, 2009 WL 453110, at *4 (Bankr. D. Del. Feb. 23, 2009) (internal citations omitted). The plain meaning of words and phrases should be read to give force and effect to all of a contract's provisions. *Id.* (internal citations omitted). Here, the Prepetition Credit Agreement expressly allows the Prepetition Senior Secured Lenders to increase their loan commitments and provide additional liquidity to the Debtors, and it expressly precludes the Term B Lenders from asserting any rights under the Prepetition Credit Agreement without the written consent of the Prepetition Agent.

A. **The Prepetition Credit Agreement allows the Prepetition Senior Secured Lenders to increase their loan commitments to provide the additional funding offered to the Debtors under the DIP Facility.**

21. Under the Prepetition Credit Agreement, the Prepetition Senior Secured Lenders may increase the Revolver and Term Loan A amounts to approximately $152 million without the consent of the Term B Lenders. *See* Prepetition Credit Agreement, section 11.2(b) (allowing the increase of the Revolving Loan Commitment and the Term A Loan Commitment up to an amount 110% greater than the amount in effect on December 28, 2006, less any principal payments on the Term A Loan, without the consent of the Term B Lenders). The DIP Facility Agreement contemplates a revolving credit facility of approximately $139 million,

which is well within the limit on the Prepetition Senior Secured Lenders' increased commitments permitted by the Prepetition Credit Agreement without the Term B Lenders' consent.

22. The Term B Lenders were notified by the Notice Letter that the Prepetition Agent intended to accelerate the Prepetition Obligations[4] and exercise its rights and remedies under the Prepetition Credit Agreement. Such exercise includes the Prepetition Senior Secured Lenders' decision to increase their loan commitments, inclusive of the amounts outstanding under the Prepetition Credit Agreement, by offering the DIP Facility. Further, the Term B Lenders were given the opportunity to buy out claims of the Prepetition Senior Secured Lenders. *See* Prepetition Credit Agreement, section 9.10; Notice Letter, page 2. The Term B Lenders chose not to exercise their "buy out right" to expand their limited rights under the Prepetition Credit Agreement. In the absence of the Term B Lenders taking the actions contemplated by the Prepetition Credit Agreement to ameliorate their position relative to the Prepetition Senior Secured Lenders, the Term B Lenders should not now be allowed to assert a *de facto* "veto right" over the DIP Facility where the Prepetition Credit Agreement expressly authorizes the Prepetition Senior Secured Lenders to increase their loan commitments without the Term B Lenders' consent.

### B. The Term B Lenders are precluded from objecting to the DIP Facility by the express terms of the Prepetition Credit Agreement.

23. The Prepetition Credit Agreement effectively subordinates the claims of the Term B Lenders to the claims of the Prepetition Senior Secured Lenders, and it expressly precludes the Term B Lenders from taking any action to enforce their rights under the Prepetition Credit Agreement, including objecting to the DIP Facility.

---

[4] As defined in the Prepetition Credit Agreement.

24. As "last-out" lenders, the Term B Lenders are not entitled to receive any payment of any kind on their claims until all obligations owing to the Prepetition Senior Secured Lenders are paid in full in cash. Because all Prepetition Obligations are now due and payable, all proceeds of the Prepetition Collateral must be applied first to the Prepetition Agent's fees and expenses, and then to all payments due on account of the Prepetition Revolver and the Term A Loan, before the Term B Lenders will be entitled to receive anything at all. *See* Section 1.18 of the Prepetition Credit Agreement ("Any payments . . . with respect to the Loans and other Obligations and all Proceeds of Collateral received by the Agent or any Lender at any time (i) after all of the Obligations have become immediately due and payable . . . shall be applied <u>first</u>, to the Fees and reimburseable expenses of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, to the A Obligations in such order as Agent may elect . . . and <u>third</u>, to the B Obligations.").

25. The DIP Objection contravenes the bargained-for terms of the Prepetition Credit Agreement, attempting to gain an advantage for the Term B Lenders by using this Court as leverage. The Term B Lenders expressly agreed that they would not take action to enforce their rights under the Prepetition Credit Agreement without the consent of the Prepetition Agent, yet the Term B Lenders are now asking this Court to sanction a violation of that agreement by sustaining the DIP Objection. *See* Prepetition Credit Agreement, section 9.9(f) ("Anything in [the Prepetition Credit Agreement] notwithstanding, each Lender hereby agrees with each other Lender that ***no Lender shall take any action to protect or enforce its rights arising out of the [Prepetition Credit Agreement] . . . without first obtaining the prior written consent of Agent*** . . . it being ***the intent of Lenders that any such action to protect or enforce rights . . . shall be taken in concert and at the direction or with the consent of Agent*** or Requisite Lenders,

Supermajority Lenders, Requisite A Lenders or Requisite B Lenders, as applicable, in accordance with the terms hereof." (emphasis supplied)

26. By its plain terms, the Prepetition Credit Agreement operates here to expressly (i) allow the Prepetition Senior Secured Lenders to increase their commitments and provide additional funding to the Debtors as they have done by entering into the DIP Facility Agreement and (ii) precludes the Term B Lenders from objecting to the DIP Facility Agreement or otherwise attempting to exercise their rights under the Prepetition Credit Agreement without the consent of the Prepetition Agent. This Court should not now allow the Term B Lenders to disregard the terms of the Prepetition Credit Agreement to which they have agreed, and the Term B Lenders must be bound by the express terms of the contract they bargained for and executed. Accordingly, the DIP Objection should be overruled.

II. **TO THE EXTENT THAT THE TERM B LENDERS ARE ENTITLED TO ADEQUATE PROTECTION, THE TERM B LENDERS' INTERESTS IN THE PREPETITION COLLATERAL ARE ADEQUATELY PROTECTED BY THE REPLACEMENT LIENS AND ADMINISTRATIVE CLAIM GRANTED BY THE INTERIM DIP ORDER.**

27. This Court has broad discretion in determining whether adequate protection has been provided to the Term B Lenders. *See generally In re Westpoint Stevens*, 600 F.3d 231 (2d Cir. 2010) (second lien creditors party to an intercreditor agreement that expressly authorized them to seek adequate protection were entitled to certain amounts held in escrow pending a sale of the debtors' assets where there was uncontested evidence that there was sufficient value in the debtors' assets to secure both the first and second lien lenders); *In re Cardell*, No. CIV A 08-5190, 2009 WL 1973551, at *3 (D.N.J. July 7, 2009) (holding that payments to secured creditors from the sale proceeds of a sale under section 363 of the Bankruptcy Code constituted sufficient adequate protection and noting that "the legislature expressly intended to give the courts great flexibility in formulating methods of protection

appropriate to the circumstances of each case.") (internal citations omitted). Section 361 of the Bankruptcy Code states that adequate protection "may be provided by (1) requiring the [Debtors] to make a cash payment or periodic cash payments . . . (2) providing . . . an additional or replacement lien . . . **or** (3) granting such other relief . . . as will result in the realization . . . of the indubitable equivalent of [the Term B Lenders'] interest in [the Prepetition Collateral]." 11 U.S.C. § 361 (2006) (emphasis supplied). Here, the Replacement Liens and the Administrative Claim will provide the Term B Lenders with the indubitable equivalent of their interest in the Prepetition Collateral.

28. Whether adequate protection has been provided "depends directly on how effectively it compensates the secured creditor for the loss of value caused by the superpriority given to the post-petition loan. In other words, the proposal should provide the pre-petition creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Dev. Group*, 16 F.3d 552, 564 (3d Cir. 1994) (internal citations omitted). The determination of whether adequate protection has been provided to a secured creditor whose interest is to be "primed" by a superpriority credit facility is a fact-specific inquiry, whose application is specific to the facts of each case, but whose focus is on protection of the secured creditor from diminution in the value of its collateral during the reorganization process. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *see also In re DeSardi*, 340 B.R. 790 (Bankr. S.D. Tex. 2006) (the purpose of adequate protection is to ensure that the lender's economic position is not worsened because of the bankruptcy case).

29. Under the Interim DIP Order, the Term B Lenders have received the Replacement Liens and the Administrative Claim for any diminution in the value of their

interests in the Prepetition Collateral following the Petition Date.[5] However, the Term B Lenders have objected to the DIP Motion and seem to be seeking, among other things, immediate cash payments and reimbursement of their professional fees. The DIP Objection and the request for any cash payment under the guise of "adequate protection" is simply an end-run around the Prepetition Credit Agreement and an attempt to improve the Term B Lenders' position relative to the Prepetition Senior Secured Lenders. Such improvement is not the purpose of adequate protection. *See In re Weinstein*, 227 B.R. 284 (B.A.P. 9th Cir. 1998) (payments intended to provide adequate protection are not meant to improve an undersecured creditor's position in relation to other creditors; where there is no depreciation in the value of collateral, there is no entitlement to adequate protection payments). The Replacement Liens and the Administrative Claim that have already been provided to the Term B Lenders are sufficient adequate protection of the value of the Term B Lenders' interests in the Debtors' property.

### A. The value of the Term B Lenders' liens would be increased, not reduced, by final approval of the DIP Facility.

30. Here, the DIP Facility does not change the Term B Lenders' position in the Prepetition Collateral relative to the Prepetition Senior Secured Lenders, who are identical to the DIP Lenders. Payment of the Term B Lenders' claims is subordinate to payment in cash in full of the Prepetition Agent's fees and expenses and all obligations under the Prepetition Revolver and the Term A Loans. Without the additional liquidity provided by the DIP Facility

---

[5] In addition, the Term B Lenders have erroneously received an interest payment of approximately $500,000, which has not been returned to the Prepetition Agent. Pursuant to the terms of the Prepetition Credit Agreement, the Term B Lenders are required to hold such amount in trust and return such amount to the Prepetition Agent. *See* Prepetition Credit Agreement, section 1.18 ("In the event that any holder of B Obligations shall receive any Proceeds of Collateral in contravention of [the Prepetition Credit Agreement], *the holders of such B Obligations shall promptly so notify the holders of the A Obligations, shall segregate and hold in trust any such payment or distribution, and shall promptly pay over any such payment or distribution on demand to Agent for the benefit of the holders of the A Obligations*, for application to the payment of the A Obligations until the same shall have been paid in full in cash . . . ."). To the extent that the Term B Lenders fail to return the funds erroneously received, as required under the Prepetition Credit Agreement, such amount should be considered part of the adequate protection package provided to the Term B Lenders.

Agreement and IP's agreement to delay exercising its setoff rights, the Debtors would have been forced to begin liquidating on the Petition Date. If that had been the case, the Term B Lenders would have been unlikely to recover anything on account of their claims.

31. The DIP Facility allows the DIP Lenders to provide additional funding to the Debtors without any detrimental effect on the Term B Lenders because the DIP Lenders are essentially stepping into the position of the Prepetition Senior Secured Lenders. In fact, the Term B Lenders are likely to recover more value on their liens as a result of the DIP Facility, without having to provide any additional funding as the DIP Lenders have done. As a result, the Term B Lenders' position is actually improved by the DIP Facility to which they are objecting.

**B.    The Replacement Liens and Administrative Claim provide adequate protection to the Term B Lenders because there has been no decline in value of the Term B Lenders' interests in the Prepetition Collateral as a result of the DIP Facility.**

32. As discussed herein, the purpose of adequate protection is to protect secured creditors from diminution in the value of their interests in the collateral as a result of a bankruptcy case, not to improve the rights held by such secured creditors under applicable non-bankruptcy law. Here, there is no decline in the value of the Term B Lenders' interests in the Prepetition Collateral as a result of the DIP Facility.

33. Nonetheless, the Interim DIP Order provides the Term B Lenders with the Replacement Liens and an Administrative Claim for any diminution in the value of their interests in the Prepetition Collateral. Before the DIP Facility, the Term B Lenders were "second in line" to the Prepetition Senior Secured Lenders. Following final approval of the DIP Facility, the Term B Lenders remain "second in line" to the DIP Lenders and have gained Replacement Liens

and the Administrative Claim in the bargain.[6] Thus, the Term B Lenders' position has not changed or been "primed," and accordingly, the Replacement Liens and Administrative Claim are sufficient to adequately protect the Term B Lenders. *See In re Club Assocs.*, 107 B.R. 385, 394 (Bankr. N.D. Ga. 1989) (holding that a secured creditor who is suffering no loss other than the loss of regular monthly payments and the ability to foreclose is not entitled to adequate protection and noting that adequate protection may be provided by replacement liens and other relief in lieu of cash payments), *aff'd* 956 F.2d 1065 (11th Cir. 1992).

34. The additional funding provided to the Debtors by the DIP Facility will enable the Debtors to engage in a sale process as a going concern, which will maximize any return recoverable by the Term B Lenders. Thus, to the extent that the Term B Lenders' secured position in the Prepetition Collateral has changed, it has changed for the better. There has been no decline in the value of the Term B Lenders' interest in the Prepetition Collateral. If, however, the value of the Term B Lenders' interest in the Prepetition Collateral declines as a result of these Cases, they are adequately protected by the Replacement Liens and the Administrative Claim.

## CONCLUSION

Without the DIP Facility, the Debtors would have been forced to cease operations and begin liquidating their assets immediately, and any expected recovery to creditors would be drastically reduced from the expected recovery resulting from the sale of the Debtors' assets on a

---

[6] To the extent that the Term B Lenders' claims were "underwater" as of the Petition Date, it may be that little or no adequate protection to the Term B Lenders is required because the value of their claims is zero or close to zero. *In re Levitt & Sons, LLC*, 384 B.R. 630, 642 (Bankr. S.D. Fla. 2008) (holding junior creditors whose liens were "out of the money" and would be primed by a postpetition lender who was also a prepetition lender holding liens senior to such junior creditors' liens were not entitled to any adequate protection because "they would receive nothing under non-bankruptcy law").

going-concern basis. In a liquidation scenario, the Term B Lenders would likely receive nothing at all on their claims because any payment on account of such claims is subordinate to payment in full of the Prepetition Senior Secured Lenders' claims under the Prepetition Credit Agreement.

The DIP Objection is nothing more than the Term B Lenders' attempt to make an end run around (i) the Prepetition Senior Secured Lenders' ability to increase their loan commitments without the Term B Lenders' consent and (ii) the Prepetition Credit Agreement's express prohibition on any action by the Term B Lenders to enforce their rights under the Prepetition Credit Agreement without the consent of the Prepetition Agent, which they do not have. The Term B Lenders could have expanded their rights under the Prepetition Credit Agreement by exercising their buy-out rights prior to the Petition Date, but they chose not to do so. This Court should not now allow the Term B Lenders to derail the Debtors' reorganization efforts by denying approval of the DIP Facility, nor should the Court allow the Term B Lenders to use the bankruptcy process to gain rights or advantages that they do not have under the terms of the Prepetition Credit Agreement.

Pursuant to the DIP Facility, the DIP Lenders have essentially stepped into the position of the Prepetition Senior Secured Lenders. By so doing, the DIP Lenders have provided the Debtors with desperately needed additional funding, which will allow the Debtors to maintain employees and continue operations to the greatest extent possible. As a result, (i) the Debtors have gained precious time and operating funds, (ii) constituents of these Cases have the prospect of receiving a greater recovery than they would receive through a liquidation process, and (iii) the Term B Lenders remain in a position that is the same or better than their position would have been without the DIP Facility. The Term B Lenders have provided no support for the Debtors' reorganization efforts so far in these Cases, and they may in fact be grossly undersecured, yet the

Term B Lenders now attempt to prevent approval of the DIP Facility in violation of the Prepetition Credit Facility.

The Term B Lenders have been granted the Replacement Liens and the Administrative Claim by the Interim DIP Order, but the Term B Lenders claim that they are not adequately protected. Instead, the Term B Lenders criticize the expedited sale process in these Cases and seem to demand cash payment of professional fees in exchange for their support for the DIP Facility. However, the Term B Lenders make no offer to finance a lengthier sale process, and the Term B Lenders ignore the fact that under the Prepetition Credit Facility, they are not entitled to any cash payment for any purpose until the Prepetition Senior Secured Lenders are paid in full in cash.

Based on the facts of these Cases, the Replacement Liens and the Administrative Claim provided under the Interim DIP Order represent all the adequate protection to which the Term B Lenders are entitled. Any attempt to grasp for more runs afoul of the express terms of the Prepetition Credit Agreement and twists the purpose of adequate protection. Accordingly, the Prepetition Agent asks the Court to overrule the DIP Objection.

WHEREFORE, the Prepetition Agent respectfully requests that this Court:

(i) overrule the Term B Lenders' Objection for the reasons discussed herein; and

(ii) grant such other and further relief as is just and necessary.

Dated: June 30, 2010
      Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ Kurt F. Gwynne
    Kurt F. Gwynne (No. 3951)
    1201 Market Street, Suite 1500
    Wilmington, DE 19801
    Telephon: (302) 778-7500
    Facsimile: (302) 778-7575
    E-mail: kgwynne@reedsmith.com

and

Jesse H. Austin, III, Esquire.
Cassie Coppage, Esquire
PAUL HASTINGS JANOFSKY & WALKER, LLP
600 Peachtree Street, N.E.
Twenty-Fourth Floor
Atlanta, GA 30308
Telephone: (404) 815-2400
Facsimile: (404) 685-5167
E-mail: jessaustin@paulhastings.com
       cassiecoppage@paulhastings.com

*Counsel for General Electric Capital Corporation as Prepetition Agent and DIP Agent*