## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORP., *et al.*, [1] | Case No. 10-11890 (PJW) |
| Debtors. | (Jointly Administered) |

Proposed Bidding Procedures Obj. Deadline: TBD
Proposed Bidding Procedures Hearing: TBD
Proposed Sale Objection Deadline:
    August 16, 2010 at 4:00 p.m.
Proposed Sale Hearing:
    August 23, 2010 at 10:00 a.m.

## DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND (D) OTHER RELATED RELIEF; AND (II) AN ORDER APPROVING AND AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS PART OF THE SALE AND (C) OTHER RELATED RELIEF

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Blvd., Suite 1035, Uniondale, NY 11553.

# Motion Contents

**Jurisdiction** ............................................................................................................. 3

**Introduction** ............................................................................................................ 3

**Relief Requested** .................................................................................................... 4

**Factual Background** ............................................................................................... 5

    I.     The Debtors' Business and Operations ............................................... 5

    II.    Decision to Sell the Debtors' Assets ................................................... 6

**Overview of the Proposed Sale** ........................................................................... 7

    I.     Material Terms of the APA ................................................................. 7

    II.    Provisions to Be Highlighted under the Local Rules ........................ 10

**Bidding Procedures Order** ................................................................................ 12

    I.     Outline of the Bidding Procedures .................................................. 12

    II.    Provisions to Be Highlighted Under the Local Rules ...................... 13

    III.   Summary of the Assumption and Assignment Procedures ............... 16

**Basis for Relief** .................................................................................................... 18

    I.     The Bidding Procedures Order Should be Entered on the Terms Proposed ............... 18

        A.   The Bidding Procedures Are Fair, Appropriate and Should be Approved .......... 18

        B.   The Bid Protections Have Sound Business Purpose and Should be Approved. .. 20

        C.   The Assumption Procedures Are Appropriate and Should be Approved ............ 24

        D.   The Form and Manner of the Sale Notice Should be Approved. ........................ 24

    II.    The Sale Order Should be Entered on the Terms Proposed. ........................ 25

        A.   The Sale Should be Approved as an Exercise of the Debtors' Sound Business Judgment. ............... 25

        B.   The Sale Should be Approved "Free and Clear" Under § 363(f). ....................... 31

        C.   Assumption and Assignment of Contracts and Leases Should be Approved. ..... 33

**Notice** .................................................................................................................... 36

NEC Holdings Corp. and the other above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**"), submit this motion for entry of the Bidding Procedures Order attached hereto as **Exhibit A** and Sale Order attached hereto as **Exhibit B** (as such terms are each defined herein). In support of this motion, the Debtors submit the *Declaration of Geoffrey A. Richards in Support of the Debtors' Motion for Entry of an Order Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, Stalking Horse Bid Protections and Manner of Notice of the Sale and Other Related Relief* (the "**Richards Declaration**") attached hereto as **Exhibit C**[2] and also respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases (as defined below).

2.      The statutory bases for the relief requested herein are Sections 105(a), 363, 365 and, if applicable, 1146(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## Introduction

3.      On June 10, 2010 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The

---

[2]      The Debtors will file the Richards Declaration on or before July 12, 2010.

Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On June 11, 2010, the Court entered an order consolidating these Chapter 11 Cases for procedural purposes only [Docket No. 34]. On June 23, 2010, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code (the "**Committee**").

## Relief Requested

4.     *First*, by this motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

a.     authorizing and approving bidding procedures in connection with the receipt and analysis of competing bids, substantially in the form attached hereto as **Exhibit D** (the "**Bidding Procedures**"), including customary bid protections for the Stalking Horse Bidder (defined herein) pursuant to the Asset Purchase Agreement dated July 8, 2010, between the Debtors, as sellers, and NEV Holdings, LLC, as buyer, (the "**APA**"), attached hereto as **Exhibit E**;[3]

b.     authorizing and approving procedures for the assumption and assignment of the Assumed Contracts (defined below) in connection with the sale;

c.     approving the form and manner of notice of the sale and hearing thereon, substantially in the form attached hereto as **Exhibit F** (the "**Sale Notice**");

d.     establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:

- <u>Preliminary Bid Deadline</u>:  July 30, 2010, as the last date by which potential bidders may deliver the bid documents required to participate in the auction pursuant to the Bidding Procedures;

---

[3]     The schedules to the APA have not been attached due to the confidential, competitive and/or proprietary nature of certain information contained therein. However, a non-redacted version of such schedules or, as applicable, such confidential, competitive and/or proprietary information, will be provided to: (a) potential bidders party to an appropriate confidentiality agreement with the Debtors in accordance with the Bidding Procedures (as defined herein); (b) the Court, *in camera*; (c) the U.S. Trustee; (d) counsel to the any official statutory committees appointed by the U.S. Trustee subject to the prior execution of a confidentiality agreement reasonably satisfactory to the Debtors; and (e) counsel to the DIP agent.

- Sale Objection Deadline: August 16, 2010 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Sale transactions and/or the assumption and assignment of Assumed Contracts or cure amounts related thereto (the "**Sale Objection Deadline**");

- Bid Deadline: August 16, 2010 at 9:00 a.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**");

- Auction: August 20, 2010 at 9:00 a.m. prevailing Eastern Time, as the date and time the auction, if one is needed (the "**Auction**"), will be held at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022; and

- Sale Hearing: August 23, 2010, at 10:00 a.m. prevailing Eastern Time, as the date and time the sale hearing (the "**Sale Hearing**") will be held before the Honorable Judge Peter J. Walsh, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, at: 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.

5.      *Second*, by this motion, the Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), authorizing and approving (a) the sale of the Acquired Assets (as defined in the APA) free and clear of all liens, claims, interests and encumbrances and (b) the assumption and assignment of the Assumed Contracts in accordance with the Assumption Procedures (defined herein) set forth in the Bidding Procedures Order.

## Factual Background

## I.      The Debtors' Business and Operations

6.      A description of the Debtors' business, the reasons for commencing these Chapter 11 Cases, and the relief sought from this Court to allow for a smooth transition into chapter 11 (including the facts and circumstances supporting this motion) are set forth in the Declaration of James Shelby Marlow in Support of Chapter 11 Petitions and First Day Motions [Docket No. 2] (the "**First Day Declaration**").

## II.    **Decision to Sell the Debtors' Assets**

7.     In December 2009, the Company retained Williams Blair & Company, LLC ("**Blair**") as its investment banker and financial advisor.   Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Blair and in consultation with certain of the prepetition lenders pursued a range of options to address the Debtors' concerns about their ability to service their debt going forward, including new financing, refinancing and the sale of certain or all of the Debtors' assets or business.   After exploring the strategic alternatives available to them, the Debtors have determined that the best way at this time to maximize the value of their assets for the benefit of their creditors, is to seek a prompt conclusion to the Debtors' reorganization proceedings through an immediate sale of their assets.

8.     In March 2010, Blair began an extensive marketing and sale process, aggressively canvassing the marketplace to locate potential financial purchasers.   Blair contacted 108 potential investors in their first round of outreach.   Following those discussions, 88 potential investors reviewed preliminary, non-confidential solicitation materials.   Of those investors, 43 entered into confidentiality agreements with the Debtors and received a confidential information memorandum prepared by Blair to serve as the basis for discussions towards formulating potential bids (the "**CIM Recipients**").   Approximately fifteen CIM Recipients responded with preliminary letters of interest (the "**Potential Purchasers**").

9.     The preliminary letters of interest came from a variety of Potential Purchasers with wide-ranging bids.   After evaluating these preliminary letters of interest, the Debtors, in consultation with Blair, opted to pursue further discussions with eight Potential Purchasers. Between March 17, 2010 and April 1, 2010, each of the eight Potential Purchasers received access to an electronic data room and a management presentation.   Following those presentations

and initial diligence conducted by the Potential Purchasers, on May 3 and 4, 2010, the Debtors received four bids to purchase the Company.

10.    After considering these four proposals, the Debtors, in consultation with their advisors, narrowed the selection down to one proposal, and thereafter engaged in arm's-length, good faith negotiations with counsel and advisors to the Potential Purchaser. Following extensive negotiations on the terms and conditions of a potential sale, the Debtors, with the assistance of Blair and their other advisors ultimately made the considered determination that the offer of NEV Holdings, LLC, a Delaware limited liability company, formed by Gores Group, LLC to facilitate the sale (the "**Stalking Horse Bidder**"), was the best offer presented.

11.    Accordingly, with a stalking horse bidding floor and APA in place (the key terms of which have already been subject to a fulsome market test) the Debtors now seek to promptly effectuate the sale transaction (the "**Sale**") to the Stalking Horse Bidder, subject to a competitive bidding process that is consistent with both the timing of these Chapter 11 Cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders and parties in interest.

**Overview of the Proposed Sale**

I.    **Material Terms of the APA**

12.    The principal terms of the APA are summarized in the following chart:[4]

| APA Provision | Summary Description |
|---|---|
| APA Parties | Sellers:  NEC Holdings Corp., National Envelope Corp., National Envelope – WH LLC, National Envelope – AECO LLC, National Envelope – Chino LLC, National Envelope – City of Industry, LLC, National Envelope – Ennis LLC, National Envelope – Corsicana LLC, National Envelope – Grand Prairie LLC, National Envelope – Aurora LLC, National Envelope – Lenexa LLC, National Envelope – Appleton LLC, National Envelope – Elk Grove Village LLC, National Envelope – Scottdale LLC, National Envelope Corp. – East, National Envelope – Specialties Group LLC, National Envelope – Houston LLC, National Envelope – Shelbyville |

---

[4]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the APA, the latter governs in all respects. Capitalized terms used but not defined in this chart have the meaning ascribed in the APA.

| APA Provision | Summary Description |
|---|---|
| | Equity LLC, National Envelope – Exton Equity LLC, National Envelope – Nashville Equity LLC, National Envelope – Houston Equity LLC, national Envelope – Leasing LLC, New York Envelope Corp., National Envelope Corp. – North, National Envelope Corp. – North, National Envelope Corp. – Central, Old Colony Envelop Corp. and Aristocrat Envelope Corp. <br><br> Buyer: NEV Holdings LLC. <br><br> Guarantor: Gores Capital Partners II, L.P. |
| Consideration | $134,500,000, subject to adjustment pursuant to Section 2(g)(iv)(A) of the APA, plus assumption of the Assumed Liabilities. **See APA, at § 2(d).** |
| Acquired Assets | The APA sets forth the assets to be purchased by the Stalking Horse Bidder (the "**Acquired Assets**"), including, without limitation, all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, in each case that are used primarily in the Business. **See APA, at § 2(a).** |
| Excluded Assets | The APA sets forth the assets that will be not be purchased by the Stalking Horse Bidder, including assets of Sellers that are not Acquired Assets. **See APA, at § 2(a).** |
| Assumed Liabilities | The APA sets forth the liabilities that will be assumed by the Stalking Horse Bidder (the "**Assumed Liabilities**"), including, without limitation, (i) liabilities relating exclusively to Buyer's ownership or operation of the Business or Acquired Assets that arise exclusively from events, facts or circumstances that occur after the Closing, but excluding any Liabilities arising from Sellers' ownership or operation of the Business or the Acquired Assets prior to the Closing or relating to any Products or services that were sold or provided prior to the Closing, and (ii) all accrued employee and employee benefit obligations. **See APA, at § 2(b).** |
| Excluded Liabilities | The APA sets forth the liabilities that will not be assumed by the Stalking Horse Bidder, including the Liabilities of Sellers that are not specifically, exclusively and entirely Assumed Liabilities. **See APA, at § 2(b).** |
| Assumption of Executory Contracts and Unexpired Leases and Assignment to the Stalking Horse Bidder | All Intellectual Property owned by the Sellers, all Leases and the related Leased Real Property and other Contracts used primarily in the Business that are proposed to be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the Sale transactions set forth in the APA are listed on Annex B to the APA (as the same may be revised, amended and supplemented from time to time by Buyer prior to the Closing pursuant to §2(i)(ii) of the APA, collectively, the "**Assumed Contracts**"). **See APA, § 2(a), (i).** |
| Payment of Cure Amounts | The APA provides that the Buyer is responsible for payment of cure costs (the "**Cure Costs**") associated with the Assumed Contracts. **See APA, at § 5(m).** |

| APA Provision | Summary Description |
|---|---|
| Employment Provisions | <u>Transfer</u>.  Prior to the Closing, but effective as of the Closing, Buyer shall make offers of employment to any officer or employee of either Seller or any of their respective Affiliates whose duties relate, or in connection with the transactions contemplated in this Agreement are expected to relate, primarily or exclusively to the operation of the Business:  (i) at substantially the same base salaries or, as applicable, base wage rates and (ii) that provide for employee benefit plans (within the meaning of Section 3(3) of ERISA) that are substantially comparable or more favorable to such eligible employees in the aggregate than those in which they participated prior to the Closing (excluding any severance policies, defined benefit pension and equity compensation programs) beginning on the first day of the calendar month immediately following the Closing Date.  <u>See</u> APA, at § 6(g)(i). |
| | <u>Service</u>.  Buyer shall grant all Transferred Employees credit after the Closing for continuous service with Sellers or any of their respective Affiliates or their respective predecessors prior to the Closing (to the extent such service was recognized by Sellers and their respective Affiliates) for purposes of participation and vesting and, in the case of any Buyer severance plan or program (if any), benefit accruals under any Buyer Plan.  <u>See</u> APA, at § 6(g)(ii). |
| Closing Conditions | The APA includes closing conditions typical and customary for transactions of this kind, including, without limitation: |
| | • <u>Buyer/Guarantor</u>: (i) Bankruptcy Court enters the Sale Order and it has become a final and non-appealable order, (iii) Sellers' representations and warranties are true and correct in all material respects, (iv) Sellers complied with all covenants under the APA, (v) Sellers and Buyer received all scheduled required consents, (vi) no Government issued injunction or decree is in place, (vii) no Material Adverse Effect has occurred, and (viii) Sellers delivered all closing deliverables to Buyer. |
| | • <u>Sellers</u>: (i) each of Buyer's and Guarantor's representations and warranties are true in all material respects, (ii) Buyer and Guarantor complied with all applicable covenants under the APA, (iii) Sellers and Buyer received all scheduled required consents, (iv) no Government issued injunction or decree is in place, (v) Buyer delivered all closing deliverables to Sellers and (vi) Buyer cured all defaults under Assumed Contracts and paid the Cure Amounts. |
| | <u>See</u> APA, at § 7. |
| Representations, Warranties and Covenants | The APA includes representations, warranties and covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, representations, warranties and covenants relating to (i) organization/good standing, (ii) authorization of transaction, (iii) non-contravention, (iv) title to and condition of Assets, (v) financial statements, (vi) employees and employee benefits, (vii) legal compliance, (viii) intellectual property, (ix) tax matters, (x) material contracts, (xi) litigation, (xii) brokers fees, (xiii) absence of changes, and (xiv) disclosure waiver.  <u>See</u> APA, at § 3, 4, 5, 6. |
| Bid Protections | The APA provides for a Break-Up Fee equal to $2,650,000 of the Initial Purchase Price.  <u>See</u> APA, at § 8(c).  The APA further provides a cap for reimbursable expenses of $2,000,000.  <u>See</u> APA, at § 8(c)(iv). |
| Deposit | $15,450,000 to be held in escrow.  <u>See</u> APA, at § 2(d)(ii). |

## II. Provisions to Be Highlighted under the Local Rules

13.     The APA contains the following terms, conditions and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

a.     **Sale to Insider**. Not applicable.

b.     **Management Agreements**. The APA contains provisions regarding post-Sale employment offers to be extended to certain officers and employees whose duties relate to the Sale or operation of the business. *See* APA, at § 6(g). The Debtors believe these provisions are typical and customary for transactions of this kind. In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

c.     **Releases**. The APA contains provisions regarding covenants by the Buyer and Sellers not to sue with respect to any and all claims against the Buyer, Seller and their respective current and former officers, directors, employees, agents, managers, advisors, attorneys and Representatives based in whole or in part upon the transactions contemplated by the APA. *See* APA, at § 9(f). The Debtors believe these provisions are typical and customary for transactions of this kind. In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

d.     **Private Sale/No Competitive Bidding**. Not applicable.

e.     **Closing and Other Deadlines**. The APA contains provisions allowing for its termination by the Buyer or Sellers if the Closing has not occurred by September 7, 2010. *See* APA, at § 8(a)(x). In addition, the APA contains provisions allowing for its termination by the Buyer if a final order approving the Debtors' debtor-in-possession financing is not entered by July 16, 2010 (or such later date if extended by the DIP Lenders). *See* APA, at § 8(a)(ix). The Debtors believe these provisions are typical and customary for transactions of this kind. In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

f.     **Good Faith Deposit**. The APA contains provisions requiring a good faith deposit by the Buyer in the amount of $15,450,000. *See* APA, at § 2(d)(ii). The Debtors believe these provisions are typical and customary

for transactions of this kind. In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

g.    **Interim Arrangements with Proposed Buyer**. The APA provides that the parties to the APA shall use commercially reasonable efforts to cooperate to provide an orderly transition of the Acquired Assets and Assumed Liabilities and to minimize any disruption resulting from the transactions contemplated by the APA. See APA, at § 6(a). In addition, the APA provides for implementation of a Transition Services Agreement on the Closing Date for the Debtors to provide necessary services to the Buyer in connection with the transactions contemplated by the APA. See APA, at § 2(f)(i)(D).

h.    **Use of Proceeds**. The APA requires that the Sale Order provide that upon receipt of the Purchase Price by the Debtors, the Debtors shall pay in cash from the sale proceeds the claims of the DIP Agent, on behalf of the DIP Lenders, and the claims of the Prepetition Agent, on behalf of the Prepetition Lenders, in the same order of priority as existed prior to the Closing, with any remaining unused portion of the Purchase Price to be retained by the Debtors; provided that the Debtors shall be permitted to retain any proceeds held in the Transition Account and Wind-Down Account in accordance with the APA and Transition Services Agreement. See APA, at § 5(j)(v); Sale Order, at ¶ 11. The APA also provides that the Buyer and Sellers shall agree on allocation schedules allocating the Purchase Price, including the Assumed Liabilities, among the Acquired Assets. See APA, at § 2(h). In light of the extensive marketing of this transaction, sufficient notice of the Sale to parties in interest, the non-voluminous nature of such provisions and the Debtors' stipulations to the validity of the claims of the DIP Lenders and Prepetition Lenders under the final order approving the Debtors' DIP Facility, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

i.    **Tax Exemption**. Not applicable.

j.    **Record Retention**. The Debtors will have access to their books and records sufficient to administer the bankruptcy estate. See APA, at § 6(e).

k.    **Sale of Avoidance Actions**. Not applicable.

l.    **Requested Findings as to Successor Liability**. The Stalking Horse Bidder required that the Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability as part of its offer to purchase the Acquired Assets and enter into the APA. See APA, at § 5(j)(v) Sale Order, at ¶ 41. In light of the extensive

marketing of this transaction, sufficient notice of the Sale (which includes a disclosure regarding the successor liability findings in the Sale Order) to parties in interest and the non-voluminous nature of such findings, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

m. **Sale Free and Clear of Unexpired Leases**. The APA requires that the Sale Order provide that the Acquired Assets, including real property, are being sold free and clear of all leases, real property licenses and other rights. See APA, at § 5(j)(v); Sale Order, at ¶ 10. In light of the extensive marketing of this transaction, sufficient notice of the Sale (which includes a disclosure regarding the successor liability findings in the Sale Order) to parties in interest and the non-voluminous nature of such findings, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

n. **Credit Bid**. Not applicable.

o. **Relief from Bankruptcy Rule 6004(h)**. The APA requires that the Sale Order provide for a waiver of the 14-day stay of the Sale Order, including the parties' ability to close the Sale and assign the Assumed Contracts in connection therewith, arising under Bankruptcy Rules 6006(g) and 6006(d), respectively. See APA, at § 5(j)(v); Sale Order at ¶ 45. The Court may grant this request if it "orders otherwise." See, e.g., Fed. R. Bankr. P. 6006(g) and 6006(d). Finally, the Sale was extensively marketed and notice of the Sale was adequately provided to all parties in interest. Thus, the Debtors respectfully submit that there is adequate grounds for the Court to "order otherwise" so the Sale Order is effective immediately.

### Bidding Procedures Order

## I.   Outline of the Bidding Procedures

14.   The Bidding Procedures are intended to permit a fair and efficient competitive sale process, consistent with the timeline of these cases, to confirm that the stalking horse bid is, indeed, the best offer, or promptly identify the alternative bid that is higher or otherwise better. Because the Bidding Procedures are attached as **Exhibit C** hereto, they are not restated herein. Generally speaking however, the Bidding Procedures establish, among other things:[5]

---

[5]   Capitalized terms used but not defined in this Paragraph 14 shall have the meanings set forth in the Bid Procedures.

- the requirements Potential Bidders must satisfy to be entitled to participate in the bidding process and become "Acceptable Bidders" (<u>See</u> Bid. Proc., at ¶ C);

- the availability of, access to, and conduct during due diligence by Acceptable Bidders (<u>See</u> Bid. Proc., at ¶ D);

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are to become entitled to be "Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied, by any Acceptable Bidder (other than the Stalking Horse Bidder) to be entitled to be the "Qualified Bidder" (<u>See</u> Bid. Proc., at ¶¶ D, F, G);

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid for the Auction (<u>See</u> Bid. Proc., at ¶ H);

- the procedures for conducting the Auction, if any (<u>See</u> Bid. Proc., at ¶ J);

- the criteria by which the "Successful Bidder" will be selected the Debtors, in consultation with their advisors and certain other parties (<u>See</u> Bid. Proc., at ¶ K); and

- and various other matters relating to the Sale process generally, including regarding the Sale Hearing, requirements for credit bids, designation of a "Back-Up Bidder," payment of the Bid Protections, return of any "Good Faith Deposits" and certain reservations of rights (<u>See</u> Bid. Proc., at ¶¶ G, L, M, N, O, P, Q).

15. Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates in consultation with key parties set forth therein.

## II.  Provisions to Be Highlighted Under the Local Rules

16. The Bidding Procedures contains the following provisions that are to be highlighted pursuant to Local Rule 6004-1(c), which are more fully described in the Bidding Procedures:

    a. **Provisions Governing Qualification of Bidders**. "Potential Bidders" must, on or before July 30, 2010, deliver the "Preliminary Bid

Documents" to the Debtors and the agent for the DIP lenders, including an executed confidentiality agreement, a non-binding indication of interest with respect to a purchase of any or all of the Assets and preliminary proof of the Potential Bidder's financial capacity to close the proposed transaction. See Bid. Proc., at ¶ C.

b.    **Provisions Governing Qualified Bids**. To be entitled to be an "Acceptable Bidder," Potential Bidders must deliver to the Debtors in writing by 9:00 a.m. (prevailing Eastern Time) on August 16, 2010 an irrevocable, good faith and bona fide offer to purchase any or all of the Assets for an aggregate amount of at least the "Minimum Initial Bid Increment" and include with such offer in writing (i) a clean and executed copy of the Stalking Horse APA along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with the Stalking Horse Bidder, which may not be materially more burdensome to the Debtors or inconsistent with the Bidding Procedures; (ii) identification of each and every condition to closing and a timeline for satisfying such conditions; (iii) identification of the executory contracts and unexpired leases for which assumption and assignment is required; (iv) not be conditions upon any contingencies, including among other things, financing; shareholder, board or other approval; regulatory contingencies or diligence; (v) a commitment to close within the time specified in the Bidding Procedures; (vi) sufficient information to demonstrate to the satisfaction of the Debtors, after consultation with advisors for the Consulting Parties, that the Potential Bidder has the financial wherewithal and ability to consummate the proposed purchase with readily available funds and satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code; (vii) identification of each entity that will be bidding for purchasing or obtaining possession of any or all of the Assets, and the complete terms of such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions; (viii) a cash deposit equal to $15,450,000; (ix) a statement that the offering party or parties consent(s) to the jurisdiction of this Court; (x) no request or entitlement that the Potential Bidder receive any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment; and (xi) an acknowledgement and representation that the sale of the Assets is on an "as is" and "with all faults" basis and without representations, warranties or guarantees of any kind by the Debtors and that the Potential Bidder had an opportunity to conduct any and all due diligence regarding the Assets and that it has relied solely upon its own independent review, investigation and/or inspection in making its bids and that it did not rely on any written or oral statements, representations, warranties or guarantees, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets, the physical

condition of the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or the Stalking Horse APA. <u>See</u> Bid. Proc., at ¶ E. Such offer must not be conditioned upon any contingency and must remain irrevocable until 48 hours after the conclusion of the Sale Hearing or such longer time as is required by the Bidding Procedures if the Potential Bidder is selected as the "Back-Up Bidder." <u>See</u> Bid. Proc., at ¶¶ E, M. Furthermore, the Bidding Procedures include additional provisions allowing credit bidding by the DIP Lenders, Term A Lenders, Revolving Lenders and Term B Lenders subject to the requirements that, among other things, any credit bid (i) include a cash amount as part of the purchase price for all Assets upon which such DIP Lenders, Term A Lenders, Revolving Lenders and Term B Lenders do not have a first priority security interest, (ii) provide for payment in cash at closing and/or the assumption of the administrative and priority expense claims against the Debtors accrued and unpaid through closing, and (iii) include a cash amount as part of the purchase price sufficient to pay the Break-Up Fee and Reimbursable Expenses. <u>See</u> Bid. Proc., at ¶ G.

c. **<u>Provisions Providing Bid Protections to the Stalking Horse Bidder</u>**. The Bidding Procedures provide for the Break-Up Fee in the amount of $2,650,000 and payment of Reimbursable Expenses of up to $2,000,000 to the Stalking Horse Bidder in the event of any Competing Transaction. <u>See</u> Bid. Proc., at ¶ B. Furthermore, to be a Qualified Bid, bids must offer the Minimum Bid Increment of at least the aggregate of (i) the Cash Purchase Price; (ii) the Assumed Liabilities; (iii) the Break-Up Fee; (iv) the maximum Reimbursable Expenses; and (v) the minimum bid increment of Three Hundred and Fifty Thousand Dollars ($350,000). <u>See</u> Bid. Proc., at ¶ E. In the event of an Auction, subsequent bids shall be made in minimum increments of Three Hundred and Fifty Thousand Dollars ($350,000), and the Stalking Horse Bidder shall receive a credit equal to the sum of the Break-Up Fee and the Reimbursable Expenses in each round of bidding when bidding at the Auction. <u>See</u> Bid. Proc., at ¶ J.

d. **<u>Modification of Bidding and Auction Procedures</u>.** The Debtors reserve their rights, following consultation with their advisors and the advisors to the Consulting Parties, to modify these Bidding Procedures in any manner that is not inconsistent with the Stalking Horse APA or the Bidding Procedures Order and that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the Sale of all of the Assets and the transfer of all of the Assumed Liabilities, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids if, in the

Debtors' business judgment, following consultation with their advisors and the advisors to the Consulting Parties, the Debtors determine that such Qualified Bid is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (iii) contrary to the best interests of the Debtors. <u>See</u> Bid. Proc., at ¶ P.

e. **<u>Closing with Alternative Backup Bidders</u>.** The Bidding Procedures Provide that following the approval of the Sale to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale within the later of (i) five (5) days after the entry of the Sale Order or (ii) the expiration or termination of the applicable HSR waiting period, the Debtors shall be authorized, after consultation with the advisors to the Consulting Parties, but not required, to deem the next highest or otherwise best Qualified Bid (the "**<u>Back-Up Bid</u>**" and the party submitting the Back-Up Bid, the "**<u>Back-Up Bidder</u>**"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors, in consultation with the advisors to the Consulting Parties shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder submitting such bid without further order of the Court. <u>See</u> Bid. Proc., at ¶ M.

f. **<u>Provisions Governing the Auction</u>.** The Proposed Bidding Procedures Order provides that if one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction, and the Auction shall commence on August 20, 2010 at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834 at 9:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders following consultation with its advisors and the advisors to the Consulting Parties. <u>See</u> Bid. Proc. Order, at ¶ 5. Furthermore, the Proposed Bidding Procedures Order provides that if the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Sale, the Auction will be conducted openly and shall be transcribed or videotaped. <u>See</u> Bid. Proc. Order, at ¶ 9.

## III.    <u>Summary of the Assumption and Assignment Procedures</u>

17.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale (the "**<u>Assumption Procedures</u>**"). The Assumption Procedures are as set forth below:

i. **<u>Initial Designation Deadline and Subsequent Designation Deadline</u>.** On or before the "Initial Designation Deadline," the Successful Bidder shall have the right pursuant to the APA to (a) designate certain contracts

and leases by amending the "Assumed Contract List" and (b) designate any "Identified Assumed Contract" that is not to be an "Assumed Contract" by amending the Assumed Contract List to remove such Assumed Contract. Unless otherwise agreed to by the Successful Bidder and the Debtors in writing, the "Subsequent Designation Deadline" shall be December 17, 2010. On or before the Subsequent Designation Deadline, the Successful Bidder shall have the right pursuant to the Agreement to designate any Lease that is not already an Identified Assumed Contract as an Assumed Contract by amending the Assumed Contract List.

ii.  **Notices for Assumed Contracts**.  The Debtors shall serve, on all of the non-debtor counterparties to Assumed Contracts listed on the Assumed Contract List as of the Initial Designation Deadline, a "Contract Notice" that included, to the extent applicable (a) the Assumed Contract, (b) the name of the counterparty to such Assumed Contract, (c) the cure amount for such Assumed Contract, (d) the identity of the assignee for such Assumed Contract, and (e) the deadline by which any such Assumed Contract counterparty must file a "Contract Objection" to the proposed assumption and assignment, and no other or further notice will be required with respect to the Assumed Contracts listed on the Assumed Contract List as of the Initial Designation Deadline.

iii. **Objections to Assumption of Contracts**.  For all non-debtor counterparties to an Assumed Contract served a Contract Notice in accordance with the Sale Order, ten or more days prior to the Sale Hearing, to which no Contract Objection was timely filed, such Assumed Contract shall be deemed assumed and assigned in accordance with the Contract Notice.  For all non-debtor counterparties to an Assumed Contract served with a Contract Notice less than ten days prior to the Sale Hearing, if a timely filed Contract Objection is not received, the counterparty to such Assumed Contract shall be deemed to have consented to such assumption and assignment and cure amount, and the assignment will be deemed effective as of the date of the Sale Order.  If any counterparty timely files a Contract Objection that cannot be resolved by the Successful Bidder and the counterparty, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment shall be deemed effective as of the date set forth in the Contract Notice.

iv.  **Notices for Assumed Leases.**  Within five business days after the designation of a lease as a "Assumed Lease" pursuant to Section 2(i)(vi) of the APA, the Debtors shall serve, on the counterparty to such Assumed Lease, a Contract Notice that includes, to the extent applicable (a) the Assumed Lease, (b) the name of the counterparty to such Assumed Lease, (c) the cure amount for such Assumed Lease, (d) the identity of the

assignee for such Assumed Lease, and (e) the deadline by which any such Assumed Lease counterparty must file a Contract Objection to the proposed assumption and assignment (including any objection to the cure amount for such Lease or to adequate assurance of future performance thereunder), which deadline shall not be less than ten days following the service of the Contract Notice, and no other or further notice is required.

v. **Objections to Assumption of Leases.** If a timely filed Contract Objection is not received, the counterparty to such Assumed Lease shall be deemed to have consented to such assumption and assignment and Cure Amount, and the assignment will be deemed to be effective on such date. If any counterparty timely files a Contract Objection that cannot be resolved by the Successful Bidder and the counterparty, the Court shall resolve such Contract Objection prior to the assumption and assignment of such designated contract, and upon entry of an order by the Court resolving such Contract Objection, the assumption and assignment of such designated contract shall be deemed effective as of the date set forth in the Contract Notice.

18. Any party failing to timely file an objection to the assumption and assignment of any contract or lease or related cure amount specified on a Contract Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

**Basis for Relief**

I. **The Bidding Procedures Order Should be Entered on the Terms Proposed.**

A. **The Bidding Procedures Are Fair, Appropriate and Should be Approved.**

19. "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court Is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991. "Under Delaware law, the business judgment rule operates as a presumption 'that

directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

20.    Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates, and that the Debtors have sound business justifications for selling the Assets at this time. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by these estates. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provides potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

21.    At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the Assets. Entering into the APA with the Stalking Horse Bidder ensures the Debtors obtain the highest and best consideration for the Assets by setting the minimum purchase price which will be tested in the marketplace. As such, the Debtors and their creditors can be assured that, taking into account the financial condition of the business and the economy, the consideration obtained will be fair and reasonable and at or above market.

**B.    The Bid Protections Have Sound Business Purpose and Should be Approved.**

22.    The Debtors are also requesting approval of a break-up fee of $2,650,000, which is equal to approximately 2.0% of the "Initial Purchase Price" and up to $2,000,000 for reimbursement of expenses (collectively, the "**Bid Protections**") to be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, including, among other things, consummation of a competing transaction, an uncured breach of the APA or failure to obtain a final Sale Order or otherwise consummate the Sale within the agreed timeframe.

23.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe that having the ability to offer the bid protections (as outlined in the Bidding Procedures) to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

24.    Approval of the bid protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a

benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

25. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." O'Brien, 181 F.3d at 537. Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

26. In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

    a. the presence of self-dealing or manipulation in negotiating the break-up fee;

    b. whether the fee harms, rather than encourages, bidding;

    c. the reasonableness of the break-up fee relative to the purchase price;

    d. whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

    e. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

f. the correlation of the fee to a maximum of value of the debtor's estate;

g. the support of the principal secured creditors and creditors committees of the break-up fee;

h. the benefits of the safeguards to the debtor's estate; and

i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

27. <u>Stalking Horse Bidder Bid Protection</u>. The Break-Up Fee set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Asset Purchase Agreement and attracts other potential buyers to bid for all of the Assets subject to the Stalking Horse Asset Purchase Agreement – a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Break-Up Fee and the Expense Reimbursement, and there has been no showing of any self-dealing or manipulation in the negotiation of the Break-Up Fee. Without the Break-Up Fee and the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidder.

28. Moreover, payment of the Break-Up Fee will not diminish the Debtors' estates. The Break-Up Fee is only payable if a Sale to a higher or better bidder is consummated, and the

Minimum Initial Bid Increment under the Bidding Procedures includes the addition of the Break-Up Fee, among other things, to the Cash Purchase Price under the APA.

29. The Debtors further believe, and are advised, that the amounts of each of the Bid Protections are comparable to market and bid protections approved by courts in this and other districts. See, e.g., In re Global Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (breakup fee of approximately 4% of sale price); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006); In re Radnor Holdings, No. 06-10894 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); In re Great Kansas City Paper, Inc., No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., No. 00-04659 (Bankr. N.D. Ill. Feb. 28,2000) (expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).[6]

30. Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Bid Protections should be approved.

---

[6] Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of the Debtors' counsel.

### C. The Assumption Procedures Are Appropriate and Should be Approved.

31. In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which (i) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with Section 365 of the Bankruptcy Code, and (ii) such counterparties can object to the assumption and assignment of Assumed Contracts and/or related cure amounts.

32. As set forth in the Bidding Procedures Order, the Debtors are also requesting that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to Section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment. See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

33. The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

### D. The Form and Manner of the Sale Notice Should be Approved.

34. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

35.     Within two business days after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties: (i) the U.S. Trustee; (ii) the members of and counsel to the Committee; (iii) counsel to the agent for the DIP lenders; (iv) counsel to the Term B Lenders under the Debtors' prepetition credit agreement; (v) the attorneys general for each of the States in which the Debtors conduct operations; (vi) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (vii) the Environmental Protection Agency, (vii) the New Jersey Environmental Protection Agency, (viii) the Pension Benefit Guaranty Corporation; (ix) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (x) any parties who have expressed a written interest in the Acquired Assets; (xi) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets, and (xii) all governmental agencies that is an interested party with respect to the Sale and transactions proposed thereunder.

36.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

**II.     The Sale Order Should be Entered on the Terms Proposed.**

    **A.     The Sale Should be Approved as an Exercise of the Debtors' Sound Business Judgment.**

37.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although

Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at *3 (Bankr. S.D. Ohio 2005); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

38.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers, 91 F.3d at 395; see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the "Assets" pursuant to the Bidding Procedures at this time. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a sale of all of the

Assets in accordance with the procedures set forth in the Bidding Procedures is the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed sale.

39.     The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their businesses for the benefit of the Debtors' estates and their creditors. The sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[7]

40.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed sale. Accordingly, consummating the sale as soon as possible is in the best interests of the Debtors and its creditors and parties-in-interest.

(i)     A Sound Business Purpose Exists for the Sale.

41.     The Debtors have a sound business justification for entering into this transaction, including converting underperforming assets into cash that can be used to pay creditors or fund the estates through confirmation a chapter 11 plan that effectuates a discharge of the remaining

---

[7]     The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

claims, interests, liens and other "Excluded Liabilities" not assumed as part of the sale pursuant to Sections 541 and 1141 of the Bankruptcy Code.

42.     Notably, it was not without consideration that the APA was executed. Indeed, it was only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, (c) multiple rounds of competing proposals were evaluated and analyzed and (d) all of the foregoing was presented to the members of the board (who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment and determined to pursue the Sale on the terms of the APA, subject to competitive bidding sanctioned by the Court), that the Debtors and NEV Holdings, LLC entered into, and agreed to be bound by, the APA.

43.     Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the APA (or any marked APA, as the case may be) constitutes (or will constitute) the highest or otherwise best offer for the Assets, on balance of the facts and circumstances of moment, and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

                    (ii)     Adequate and Reasonable Notice of the Sale Will be Provided.

44.     As described above, the Sale Notice (a) will be served in a manner that provides at least 21-days notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale or the assumption and assignment of Assumed Contracts and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served

on parties in interest, and, as such, the Debtors are confident the Sale Notice will be properly vetted by the time of service thereof.

(iii)     <u>The Sale and Purchase Price Reflects a Fair Value Transaction.</u>

45.     It is a well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. <u>See</u> <u>Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship</u>, 526 U.S. 434, 457 (1999); <u>see</u> <u>also</u> <u>In Re Trans World Airlines, Inc.</u>, No. 01-00056, 2001 Bankr. Lexis 980, at *13 (Bankr. D. Del. April 2, 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where the Acquired Assets and related transaction have both been subjected to an extensive marketing process, reviewed by outside professionals firms and intensively scrutinized by the Debtors and their retained advisors.

46.     Moreover, even as the Debtors move forward with the Sale, after entry of the Bidding Procedures Order, Blair will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the APA purchase price will, conclusively, be fair value.

(iv)   The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser

47.    While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" In re Abbotts Dairies, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).

48.    In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., 1997 WL 283412, *7 (S.D.N.Y. 1997); In re Balcalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

49.    The Debtors submit the Stalking Horse Bidder, or other successful bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy

Code.[8] First, the consideration to be received by the Debtors pursuant to the APA is substantial, fair and reasonable. Second, the parties entered into the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions. Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or APA to be avoided under section 363(n) of the Bankruptcy Code. Finally, the Stalking Horse Bidder's offer was evaluated and approved by the board in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other successful bidder) and APA (or marked APA) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

### B. The Sale Should be Approved "Free and Clear" Under § 363(f).

50. Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that if any of the five conditions of § 363(f) are met, the trustee has the

---

[8] Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

See 11 U.S.C. § 363(m).

authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

51.     Finally, the Sale Order provides that upon receipt of the Purchase Price by the Debtors, the Debtors shall pay in cash from the proceeds of the Sale the claims of the DIP Agent, on behalf of the DIP Lenders, and the claims of the Prepetition Agent, on behalf of the Prepetition Lenders, in the same order of priority as existed prior to the Closing, with any remaining unused portion of the Purchase Price to be retained by the Debtors; provided that the Debtors shall be permitted to retain any proceeds held in the Transition Account and Wind-Down Account in accordance with the APA and Transition Services Agreement; and provided further that the Debtors are authorized and directed to pay to Blair from the proceeds of the Sale, and as part of the "Carve-Out" as set forth and defined in the Final Order (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Authorizing The Use Of Cash Collateral Pursuant To Section 363 Of The Bankruptcy Code, (III) Granting Adequate Protection To The Prepetition Lenders Pursuant To Sections 361, 362, 363 and 364 Of The Bankruptcy Code, And (IV) Granting Liens And Superpriority Claims that is set for hearing before this Court on July 13, 2010, the M&A Fee[9] upon entry of the Sale Order. Accordingly, the Debtors believe that the Sale will satisfy the statutory prerequisites of Section 363(f) of the Bankruptcy Code and the Sale of their Assets should be approved free and clear of all liens, claims and encumbrances.

---

[9]     The M&A Fee is defined in the Blair Engagement Letter contained in the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Williams Blair & Company LLC as Investment Banker for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Commencement Date [Docket No. 70].

**C. Assumption and Assignment of Contracts and Leases Should be Approved.**

(i) The Assumption of the Contacts and Leases Reflects Business Judgment.

52. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtors' estates and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

53.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors fee assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

54.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

55.     Upon Closing, the Stalking Horse Bidder will have financial resources that are more than sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors under the APA. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Stalking

Horse Bidder or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts that it seeks to assume.

56. The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such Contract Notice Parties will then be given an opportunity to object to such notice. If an objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

57. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale of the Assets, the Successful Bidder will cure any such default prior to such assumption and assignment. Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

58. Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures and the Rejection Procedures is appropriate in these cases. This Court therefore should have a sufficient basis to authorize the Debtors to assume and assign contracts as may be set forth in the APA or any Successful Bidder's asset purchase agreement.

## **Notice**

59.     The Debtors have provided notice of this Motion to:  (a) the U.S. Trustee; (b) counsel for the Committee; (c) counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement; (d) counsel to Spirit Acquisitions, LLC; (e) the Environmental Protection Agency; (f) the New Jersey Environmental Protection Agency; (g) the Pension Benefit Guaranty Corporation; (h) the Internal Revenue Service; (i) counsel to the unions of which the Debtors' employees are members; (j) counsel to the Debtors' shareholders; (k) counsel to International Paper Company; and (l) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

60.     A copy of the Motion is available on the Court's website:  www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Court-appointed claims, noticing, soliciting and balloting agent in these Chapter 11 Cases, The Garden City Group, Inc., at www.nationalenvelopeinfo.com or can be requested by calling 866-405-2134.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order and the Sale Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the applicable relief requested herein, and granting such other and further relief as is just and proper.

Dated: July 9, 2010
     Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Finnegan (No. 5294)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Stephen R. Tetro II
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION