**Exhibit 1**

**Asset Purchase Agreement**

EXECUTION COPY

ASSET PURCHASE AGREEMENT

BY AND AMONG

NEC HOLDINGS CORP.,

NATIONAL ENVELOPE CORPORATION

AND THOSE SUBSIDIARIES IDENTIFIED ON ANNEX A,

AS SELLERS

AND

NEV HOLDINGS, LLC,

AS BUYER

July 8, 2010

CHI 170911

# TABLE OF CONTENTS

Page

1.    Definitions................................................................................................................1

2.    Purchase and Sale ....................................................................................................16
    (a)    Purchase and Sale of Acquired Assets; Retention of Excluded Assets ...............16
    (b)    Assumption of Assumed Liabilities; Retention of Excluded Liabilities ..............16
    (c)    Treatment of Intercompany Accounts Receivable and Accounts Payable ...........16
    (d)    Consideration .......................................................................................................17
    (e)    Closing.................................................................................................................18
    (f)    Deliveries at Closing............................................................................................18
    (g)    Net Working Capital Adjustment ........................................................................19
    (h)    Allocation.............................................................................................................22
    (i)    Identification of Contracts; Assumption and Assignment of Contracts ...............23
    (j)    Withholding .........................................................................................................26

3.    Sellers' Representations and Warranties .................................................................26
    (a)    Organization of Sellers; Good Standing ..............................................................26
    (b)    Authorization of Transaction ...............................................................................26
    (c)    Noncontravention.................................................................................................27
    (d)    Financial Statements ............................................................................................27
    (e)    Absence of Changes.............................................................................................28
    (f)    Material Contracts................................................................................................28
    (g)    Insurance ..............................................................................................................30
    (h)    Real Property .......................................................................................................30
    (i)    Environmental Matters.........................................................................................30
    (j)    Employee Matters ................................................................................................31
    (k)    Employee Benefits................................................................................................32
    (l)    Intellectual Property.............................................................................................32
    (m)    Taxes....................................................................................................................34
    (n)    Title......................................................................................................................34
    (o)    Litigation..............................................................................................................34
    (p)    Compliance with Legal Requirements..................................................................35
    (q)    Permits .................................................................................................................35
    (r)    Affiliate Transactions...........................................................................................35
    (s)    Inventory ..............................................................................................................35
    (t)    Customers and Suppliers......................................................................................35
    (u)    Accounts and Notes Receivable and Payable.......................................................36
    (v)    Foreign Corrupt Practices Act .............................................................................36
    (w)    Brokers' Fees .......................................................................................................36

4.    Buyer's Representations and Warranties .................................................................37
    (a)    Organization of Buyer..........................................................................................37
    (b)    Authorization of Transaction ...............................................................................37
    (c)    Noncontravention.................................................................................................37

i

| | | | |
|---|---|---|---|
| | (d) | Litigation | 37 |
| | (e) | Brokers' Fees | 38 |
| | (f) | Financial Capacity | 38 |
| | (g) | Adequate Assurances Regarding Executory Contracts | 38 |
| 5. | | Pre-Closing Covenants | 38 |
| | (a) | Efforts; Cooperation | 38 |
| | (b) | Notices and Consents | 38 |
| | (c) | Permits | 39 |
| | (d) | Conduct of Business | 40 |
| | (e) | Information and Consultation | 42 |
| | (f) | Notice of Developments | 42 |
| | (g) | Access | 42 |
| | (h) | Delivery of Financial Information | 43 |
| | (i) | Press Releases and Public Announcements | 43 |
| | (j) | Bankruptcy Court Matters | 43 |
| | (k) | Competing Transaction | 45 |
| | (l) | Bulk Transfer Laws | 46 |
| | (m) | Cure Amounts | 46 |
| | (n) | Cooperation with Financing | 46 |
| | (o) | Registered Intellectual Property Recordations | 47 |
| | (p) | Debt Commitment | 48 |
| 6. | | Other Covenants | 48 |
| | (a) | Cooperation; Further Assurances | 48 |
| | (b) | Run-Off; Accounts | 48 |
| | (c) | Post-Closing Operations of Sellers; Name Changes | 49 |
| | (d) | Change of Caption | 49 |
| | (e) | Availability of Business Records | 49 |
| | (f) | Satisfaction of Assumed Liabilities | 50 |
| | (g) | Covered Employees and Employee Benefit Plans | 50 |
| | (h) | Payroll and Withholding | 53 |
| | (i) | Taxes | 53 |
| | (j) | No Reliance | 54 |
| | (k) | No Other Warranties | 55 |
| | (l) | Non-Competition; Non-Solicitation | 56 |
| | (m) | Replacement Credit Support Requirements | 56 |
| | (n) | Insurance | 56 |
| | (o) | Delivery of Wind-Down Escrow Information | 57 |
| 7. | | Conditions to Obligation to Close | 57 |
| | (a) | Conditions to Buyer's Obligations | 57 |
| | (b) | Conditions to Sellers' Obligations | 58 |
| | (c) | No Frustration of Closing Conditions | 59 |
| 8. | | Termination | 59 |
| | (a) | Termination of Agreement | 59 |

|  | (b) | Procedure Upon Termination | 61 |
|  | (c) | Effect of Termination; Break-Up Fee | 61 |
| 9. |  | Miscellaneous | 63 |
|  | (a) | Expenses | 63 |
|  | (b) | Entire Agreement | 63 |
|  | (c) | Incorporation of Annexes, Exhibits and Schedules | 63 |
|  | (d) | Amendments and Waivers | 63 |
|  | (e) | Succession and Assignment | 64 |
|  | (f) | Covenant Not to Sue | 64 |
|  | (g) | Notices | 64 |
|  | (h) | Governing Law; Jurisdiction | 65 |
|  | (i) | Consent to Service of Process | 66 |
|  | (j) | Waivers of Jury Trial | 66 |
|  | (k) | Specific Performance | 66 |
|  | (l) | Severability | 66 |
|  | (m) | No Third-Party Beneficiaries | 67 |
|  | (n) | No Survival of Sellers' Representations, Warranties and Agreements | 67 |
|  | (o) | Construction | 67 |
|  | (p) | Computation of Time | 67 |
|  | (q) | Mutual Drafting | 67 |
|  | (r) | Schedules | 67 |
|  | (s) | Headings; Table of Contents | 68 |
|  | (t) | Counterparts; Facsimile or Email Signatures | 68 |
|  | (u) | Time of Essence | 68 |
|  | (v) | Non-Recourse | 68 |

Exhibit A  –  Form of Bidding Procedures
Exhibit B  –  Form of Sale Order
Exhibit C  –  Form of Escrow Agreement
Exhibit D  –  Form of Bill of Sale
Exhibit E  –  Form of Assignment and Assumption Agreement
Exhibit F  –  Form of Assignment of Intellectual Property
Exhibit G  –  Form of Transition Services Agreement

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of July 8, 2010, by and among (i) NEC Holdings Corp., a corporation formed under the laws of the State of Delaware ("Parent"), National Envelope Corporation, a corporation formed under the laws of the State of New York (the "Company"), and the Subsidiaries of the Company identified on Annex A hereto (together with Parent and the Company, "Sellers," and each, individually, a "Seller"), and (ii) NEV Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("Buyer"). Sellers and Buyer are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Section 1.

**WHEREAS,** Sellers are engaged in the business of designing, producing, manufacturing, marketing and selling envelopes and related products (the "Business");

**WHEREAS,** each Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on June 10, 2010 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and such bankruptcy cases are hereinafter referred to collectively as the "Chapter 11 Cases"; and

**WHEREAS,** Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, the Acquired Assets as of the Closing, and Buyer desires to assume from Sellers the Assumed Liabilities as of the Closing, in each case, on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

1.    Definitions.

"Accounting Principles" has the meaning set forth in the definition of Net Working Capital.

"Acquired Assets" means all of Sellers' right, title and interest in and to all properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, in each case, that are used in connection with or related to the Business, including all of the following: (a) all Inventory, including all rights of Sellers to receive Inventory on order; (b) all Furnishings and Equipment; (c) all Records except as expressly included in Excluded Assets; (d) all Acquired Intellectual Property; (e) all Leases (and the related Leased Real Property) and other Contracts used in connection with or related to the Business set forth on Annex B hereto as amended from time to time in accordance with Section 2(i) (collectively, the "Assumed Contracts"); (f) all accounts receivable arising from the operation of the Business prior to the Closing; (g) any loans or notes payable from any Transferred Employee; (h) all open purchase orders with customers and suppliers of Sellers; (i) to the extent related to any other Acquired Asset or Assumed Liability, all prepaid expenses, advance payments, surety accounts, deposits and other similar prepaid items, checks in transit

and undeposited checks arising from the operation of the Business prior to the Closing; (j) all telephone and telephone facsimile numbers and other directory listings to the extent related to any other Acquired Assets; (k) all Permits related to any other Acquired Asset that are transferable in accordance with their terms, but excluding all Permits exclusively related to any Excluded Asset (collectively, the "Assumed Permits"); (l) any rights, demands, claims, credits, allowances, rebates or other rights of setoff arising out of or related to any of the Acquired Assets; (m) any rights, claims or causes of action of any Seller related to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assumed Contract in respect of the assets, properties, conduct of business or operations of such Seller arising out of events occurring on or prior to the Closing Date, excluding any rights, claims or causes of action, in each case, under chapter 5 of the Bankruptcy Code and related to any Excluded Assets or Excluded Liabilities; (n) all claims and causes of action (other than to the extent related to the Excluded Assets or Excluded Liabilities) of Sellers as of the Closing Date against Persons other than Sellers, their Affiliates and their respective Representatives and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery including rights to recover insurance proceeds as of the Closing Date (regardless of whether such rights are currently exercisable) to the extent related to the Acquired Assets; and (o) all items set forth on Annex C; provided, however, that, notwithstanding anything contained herein to the contrary, the Acquired Assets shall not include any Excluded Asset or any prepaid expenses, rights of setoff, or other rights of recovery related to any Acquired Asset prior to the Closing Date, in each case, solely with respect to Taxes.

"Acquired Intellectual Property" means all Intellectual Property owned by Sellers.

"Actual Net Working Capital Amount" has the meaning set forth in Section 2(g)(ii).

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule(s)" has the meaning set forth in Section 2(h).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2(f)(i)(B).

"Assignment of Intellectual Property" has the meaning set forth in Section 2(f)(i)(C).

"Assumed Contracts" has the meaning set forth in the definition of Acquired Assets.

"Assumed Contracts List" has the meaning set forth in Section 2(i)(ii).

"Assumed Leases" means the Leases included in the Assumed Contracts.

"Assumed Liabilities" means only (a) to the extent reflected on the Conclusive Net Working Capital Statement, (i) all Current Liabilities arising in the Ordinary Course of Business after the Petition Date, and (ii) all accrued and unpaid base salary or hourly wages, and accrued

2

and unpaid vacation, sick leave and other paid time off of the Transferred Employees assumed by Buyer in accordance with Section 6(g)(vi); (b) the International Paper Claim; (c) all Liabilities related to or arising out of the Assumed Contracts and the Assumed Permits to the extent such Liabilities arose from and after the Closing Date; (d) all Liabilities relating to or arising out of the use and occupation by Buyer of the Leased Real Property included in the Assumed Contracts to the extent such Liabilities arose from and after the Closing Date; (e) all Liabilities for Transfer Taxes allocated to Buyer in accordance with Section 6(i)(i) and Property Taxes allocated to Buyer in accordance with Section 6(i)(ii); (f) all Liabilities with respect to any claims against accounts transferred under Section 6(g)(iv) and all Liabilities assumed by Buyer in accordance with Section 6(g)(v); and (g) all Liabilities related to or arising out of the ownership or operation of the Acquired Assets after the Closing Date; provided, however, that, notwithstanding anything herein to the contrary, the Assumed Liabilities shall not include any Excluded Liabilities, all of which shall remain with Sellers.

"Assumed Non-Lease Contracts" means the Non-Lease Contracts that are included in the Assumed Contracts.

"Assumed Permits" has the meaning set forth in the definition of Acquired Assets.

"Auction" has the meaning set forth in the Bidding Procedures.

"Bankruptcy and Equity Exception" has the meaning set forth in Section 3(b)(iii);

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Bidding Incentives" means, collectively, the Break-Up Fee and the Reimbursable Expenses.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, in the form of Exhibit A attached hereto, with such changes as are reasonably acceptable to Buyer and Sellers and such other changes as do not adversely affect the rights of Buyer hereunder or thereunder.

"Bidding Procedures Hearing" means the hearing conducted by the Bankruptcy Court to approve the Bidding Procedures Order.

"Bidding Procedures Order" means an order or orders of the Bankruptcy Court approving, among other things, the Bidding Procedures and the Bidding Incentives.

"Bill of Sale" has the meaning set forth in Section 2(f)(i)(A).

"Break-Up Fee" has the meaning set forth in Section 8(c)(iv).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by applicable Legal Requirement to close.

"Business Intellectual Property" means (a) all Acquired Intellectual Property and (b) all other Intellectual Property used or held for use by Sellers.

"Buyer" has the meaning set forth in the preamble.

"Buyer's FSA Plans" has the meaning set forth in Section 6(g)(v).

"Buyer's Savings Plan" has the meaning set forth in Section 6(g)(iv).

"Cash" means cash and cash equivalents (including marketable securities and short-term investments) calculated in accordance with GAAP applied on a basis consistent with past preparation of Sellers' financial statements.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Section 2(e).

"Closing Date" has the meaning set forth in Section 2(e).

"Closing Net Working Capital Statement" has the meaning set forth in Section 2(g)(ii).

"Closing Purchase Price" has the meaning set forth in Section 2(d)(i).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Legal Requirement.

"Competing Purchaser" has the meaning set forth in the definition of Competing Transaction.

"Competing Transaction" means any acquisition or purchase of a material portion of the Acquired Assets by a purchaser other than Buyer or Buyer's assignee, or any merger, consolidation, recapitalization, reorganization or other business combination or disposition of the Acquired Assets to a Person other than Buyer or Buyer's assignee in accordance with the terms hereof (any such Person, a "Competing Purchaser").

"Conclusive Allocations Schedule(s)" has the meaning set forth in Section 2(h).

"Conclusive Net Working Capital Statement" has the meaning set forth in Section 2(g)(iii).

4

"Confidentiality Agreement" means that certain letter agreement, effective as of February 22, 2010, by and between the Company and The Gores Group, LLC, a limited liability company formed under the laws of the State of Delaware.

"Contract" means any agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, franchise, dealer and distributorship agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, partnership agreement or other arrangement, understanding, permission or commitment, whether written or oral.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to, or in connection with, any Contract, and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Copyrights" has the meaning set forth in the definition of Intellectual Property.

"Covered Employee" means any officer or employee of any Seller or any of its Affiliates whose duties relate, or in connection with the transactions contemplated by this Agreement are expected to relate, primarily to the operation of the Business.

"Credit Support Requirements" means standby letters of credit, guarantees, indemnity bonds and other credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries regarding the Business.

"Cure Amounts" has the meaning set forth in Section 5(m).

"Current Assets" has the meaning set forth in the definition of Net Working Capital.

"Current Liabilities" has the meaning set forth in the definition of Net Working Capital.

"Debt Commitment Letters" has the meaning set forth in Section 5(p).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2(d)(ii).

"Designation Deadlines" means, collectively, the Initial Designation Deadline and the Subsequent Designation Deadline.

"DIP Agent" means General Electric Capital Corporation, as administrative agent under the DIP Facility Agreement.

"DIP Facility Agreement" means that certain $138,955,324 Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of June 11, 2010, by and among

Sellers, the DIP Agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced from time to time in accordance with its terms.

"DIP Lenders" means General Electric Capital Corporation, Bank of America N.A., The CIT Group/Business Credit, Inc., Citizens Business Credit Co., a division of Citizens Leasing Corp., HSBC Business Credit (USA), Inc., Wachovia Bank, National Association, and the other lenders from time to time party to the DIP Facility Agreement.

"Disputed Items" has the meaning set forth in Section 2(g)(iii).

"Drop Dead Date" means September 7, 2010, or such later date as Buyer and Sellers may mutually agree in writing.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and each other fringe benefit, compensation arrangement or employee benefit plan, program or arrangement of any kind.

"Environmental Permit" means any Permit required by any Environmental Requirement for the operation of the Business.

"Environmental Requirements" means all United States federal, state and local and non-United States statutes, regulations, ordinances and other provisions having the force or effect of law (including common law), all judicial and administrative orders and all contractual obligations concerning pollution or protection of the environment or natural resources, including all those relating to the use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release or cleanup of any hazardous materials, hazardous substances or hazardous wastes, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation.

"Equity Commitment Letter" has the meaning set forth in Section 4(f).

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning set forth in Section 2(d)(ii).

"Escrow Agreement" has the meaning set forth in Section 2(d)(ii).

"Escrow Funds" means, at any given time after the Closing, the funds remaining in one or more accounts in which the Escrow Agent has deposited the Working Capital Escrow Amount in accordance with the Escrow Agreement.

"Estimated Net Working Capital Amount" has the meaning set forth in Section 2(g)(i).

"Estimated Net Working Capital Statement" has the meaning set forth in Section 2(g)(i).

"Excluded Assets" means all of Sellers' right, title and interest in and to all properties, assets and rights of every nature, kind and description, tangible and intangible (including

goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, in each case, that are not used in connection with or related to the Business. Notwithstanding the foregoing, "Excluded Assets" shall also include (a) all of Sellers' rights, claims and causes of action under this Agreement and the Related Agreements; (b) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity; (c) any shares of capital stock or membership or other equity interests of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or membership or other equity interests of any Seller; (d) all Records related to Taxes paid or payable by any Seller or any of its Affiliates; (e) all Cash (including, for the avoidance of doubt, the Purchase Price); (f) all rights of Sellers under Contracts that are not Assumed Contracts; (g) all insurance policies and binders of Sellers and all rights, claims, refunds, proceeds and credits from such insurance policies or binders except as otherwise included in Acquired Assets; (h) all bank accounts and lock boxes of Sellers; (i) all instruments, prepaid assets and deposits, letters of credit proceeds, unbilled costs and fees, tax assets and accounts, in each case, that relate to any Excluded Asset or Excluded Liability; (j) all claims and causes of action of Sellers as of the Closing Date against Persons other than Sellers and all rights to indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including all rights to insurance proceeds, in each case, to the extent related to any Excluded Asset or Excluded Liability; (k) all Tax refunds, rebates and credits; (l) all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state Legal Requirement, including all rights and avoidance claims of Sellers arising under chapter 5 of the Bankruptcy Code; (m) any loans or notes payable to any Seller from any employee of any Seller other than a Transferred Employee; (n) any Records that Sellers are required by applicable Legal Requirements to retain; provided, however, that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to any Acquired Asset; (o) any documents and agreements relating to the Chapter 11 Cases; (p) all Employee Benefit Plans and all assets maintained pursuant to, or in connection with, any Employee Benefit Plan or any other benefit or compensation plan, program, agreement or arrangement; (q) all Permits other than the Assumed Permits; (r) all items set forth on Annex D; and (s) without limiting the generality of the foregoing, all assets used in any business of any Seller other than the Business.

"Excluded Liabilities" means any and all Liabilities of Sellers other than the Assumed Liabilities, including all of the following: (a) all Indebtedness; (b) all Liabilities arising out of or related to the employment or termination of employment or services of any individual with any Seller, including Liabilities arising out of or related to (i) any accrued or contingent compensation (including leave entitlements), (ii) any collective bargaining agreement or individual employment, severance or termination agreement, or (iii) any Employee Benefit Plan, but excluding for purposes of this clause (b) any Liabilities with respect to any claims against accounts transferred under Section 6(g)(iv) and any Liabilities assumed by Buyer in accordance with Sections 6(g)(v) and 6(g)(vi); (c) all Liabilities for Taxes, except for Liabilities for Transfer Taxes allocated to Buyer in accordance with Section 6(i)(i) and Property Taxes allocated to Buyer in accordance with Section 6(i)(ii), respectively; (d) all Liabilities arising out of or related to the Excluded Assets, including all Contracts that are not Assumed Contracts; (e) all Liabilities

arising in connection with any noncompliance with or violation of any applicable Legal Requirement or Decree relating to the period prior to the Closing Date by any Seller; (f) subject to applicable Legal Requirements, all Liabilities under Environmental Requirements arising out of or related to (i) any noncompliance occurring on or prior to the Closing Date; (ii) the offsite transportation, storage, disposal, treatment or recycling of any Hazardous Substance generated by and taken offsite by or on behalf of any Seller or a predecessor thereof on or prior to the Closing Date; (iii) the Excluded Assets; and (iv) any real property formerly owned, leased, operated or otherwise used by any Seller; (g) all Liabilities of Sellers arising as a result of any Litigation to the extent related to Sellers or the Acquired Assets on or prior to the Closing Date, regardless of when such Litigation was initiated, including all Liabilities of Sellers arising in connection with the Litigation set forth on Annex E; (h) all Liabilities of Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-Petition or post-Petition claims for such services; (i) all Liabilities set forth, or related to the items set forth, on Annex F; and (j) all Liabilities arising out of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby.

"FCPA" has the meaning set forth in Section 3(v).

"Final Assumed Contracts List" has the meaning set forth in Section 2(i)(iii).

"Financial Statements" has the meaning set forth in Section 3(d)(ii).

"Furnishings and Equipment" means tangible personal property (other than Inventory and the Intellectual Property), including machinery, equipment, computers, furniture, fixtures, improvements and automobiles, in each case, that is used in connection with or related to the Business, including all items set forth on Annex G.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body, arbiter or other governmental entity, public or private.

"Guaranty" means that certain Limited Guaranty by and among Buyer, Gores Capital Partners II, L.P., a limited partnership formed under the laws of the State of Delaware, as guarantor, and Sellers dated as of the date hereof and delivered to Sellers.

"Hazardous Substance" means any material, substance or waste identified, characterized or regulated as "hazardous," "toxic," a "pollutant," or a "contaminant" or words of similar meaning or otherwise regulated under any Environmental Requirement because of its dangerous, deleterious or toxic characteristics.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"Identified Assumed Contract" has the meaning set forth in Section 2(i)(ii).

"Indebtedness" means (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, including all indebtedness under the DIP Facility Agreement, (b) any indebtedness evidenced by any note, bond, debenture or other debt security, (c) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current Liabilities incurred in the Ordinary Course of Business), (d) any obligations under capitalized leases with respect to which a Seller is liable as obligor, (e) any indebtedness secured by a Lien on a Seller's assets, (f) any distributions, loans or advances payable to any of such Seller's Affiliates, shareholders or partners as of the Closing which are not paid at Closing, (g) in respect of any obligations of the type referred to in clauses (a) through (e) of any Person for the payment of which any Seller is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, (h) in respect of any obligations of the type referred to in clauses (a) through (f) of any Person that is secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on any property or asset of any Seller and (i) any accrued interest, prepayment penalties and premiums on any of the foregoing.

"Initial Designation Deadline" means ten days before the Sale Hearing.

"Initial Purchase Price" means an amount equal to $134,500,000.

"Initial Purchase Price Decrease Amount" has the meaning set forth in Section 2(g)(iv)(A).

"Initial Purchase Increase Amount" has the meaning set forth in Section 2(g)(iv)(A).

"Intellectual Property" means all intellectual property and proprietary rights of any kind and related priority rights, whether protected, created or arising under the Legal Requirements of the United States or any other jurisdiction or under any international convention, including all: (a) patents, patent applications and patent disclosures together with all reissues, continuations, continuations-in-part, divisionals, revisions, substitutions, extensions or re-examinations thereof and all patents issuing on any of the foregoing (collectively, "Patents"); (b) trademarks, service marks, trade dress, trade names, brands, slogans, logos, Internet domain names, corporate names and all other indicia of origin, together with all translations, adaptations, derivations and combinations of any of the foregoing, and all applications, registrations, renewals and extensions in connection with any of the foregoing, together with all of the goodwill associated with any of the foregoing (collectively, "Marks"); (c) copyrights, works of authorship and moral rights, and all applications, registrations, renewals, extensions and reversions in connection with any of the foregoing (collectively, "Copyrights"); and (d) trade secrets, know-how and other confidential or proprietary information (including discoveries, concepts, ideas, research and development, inventions (whether patentable or not and whether reduced to practice or not), improvements, compositions, processes, techniques, technical data and information, databases and compilations of data, procedures, methods, designs, drawings, specifications, Software, algorithms, technology, formulas, customer lists, supplier lists and business and marketing plans and proposals), in each case excluding any rights in respect of any the foregoing in this clause (d)

that comprise or are protected by issued patents or published patent applications (collectively, "Trade Secrets").

"Intercompany" means, with respect to accounts receivable and accounts payable of Sellers, any accounts receivable or accounts payable, as applicable, reflecting the result of transactions between any Seller and any of its Affiliates.

"International Paper" means International Paper Company, a New York corporation.

"International Paper Claim" means $20,000,000 of that certain trade payable due and owing by Sellers to International Paper, and certain of its Affiliates, on account of goods sold to Sellers.

"Inventory" means inventories of raw materials and supplies, manufactured, spare and purchased parts, stores, goods in process and finished goods, in each case, that are used in connection with or related to the Business.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"IT Systems" means all communications systems, computer systems, servers, network equipment and other hardware owned, licensed or leased by Sellers.

"Leased Real Property" means all of Sellers' right, title and interest in all Leases pursuant to which any Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property, which is used in connection with or related to the Business.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto pursuant to which any Seller holds any Leased Real Property.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Decree, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes.

"Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, option, right of first refusal, easement, mortgage, security agreement or other encumbrance or restriction on the use or transfer of any property. For the avoidance of doubt, the definition of Lien shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, litigation, arbitration, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative,

commercial or arbitral, whether at law or in equity, whether public or private and whether before any Governmental Entity.

"<u>Local Bankruptcy Rules</u>" means the Local Bankruptcy Rules for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"<u>Loughlin</u>" means Loughlin Meghji + Company Associates, Inc., its Affiliates and employees.

"<u>Loughlin Services</u>" means services provided by Loughlin substantially similar to those services provided by Loughlin to Sellers prior to the date hereof, including those services provided pursuant to that certain Letter Agreement, dated as of April 1, 2009, by and between the Company and Loughlin.

"<u>Marks</u>" has the meaning set forth in the definition of Intellectual Property.

"<u>Material Adverse Effect</u>" means any effect, event, condition, circumstance, development or change that, individually or in the aggregate with all other effects, events, conditions, circumstances, developments or changes (a) has had or would reasonably be expected to have or result in a material adverse effect on the condition (financial or otherwise), Liabilities, operating results or operations of the Business or on the Acquired Assets and the Assumed Liabilities, taken as a whole; <u>provided</u>, <u>however</u>, that no effects, events, conditions, circumstances, developments or changes arising out of or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) general business or economic conditions affecting the industry or markets in which Sellers operate; (ii) national or international political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (iv) changes in Legal Requirements or in GAAP after the date hereof; (v) the taking of any action expressly contemplated by this Agreement or the Related Agreements; (vi) any action taken by Buyer or by Sellers at Buyer's request; (vii) the results of any Phase I or Phase II Environmental Site Assessments of Sellers' Owned Real Property or Leased Real Property conducted on or after the date hereof; (viii) changes as a result of the announcement or pendency of this Agreement; or (ix) reasonably anticipated actions, omissions, events and changes in the business or operations of any Seller arising after the Petition Date as a result of the Chapter 11 Cases; <u>provided</u>, <u>further</u>, <u>however</u>, that, in the case of clauses (i) through (iv), except to the extent such effect, event, condition, circumstance, development or change has a disproportionate adverse effect on the Business or on the Acquired Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses; or (b) would reasonably be expected to materially adversely affect the ability of Sellers to consummate the transactions contemplated by this Agreement or the Related Agreements on a timely basis.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 3(f)</u>.

11

"Necessary Consents" has the meaning set forth in Section 2(i)(ix).

"Net Working Capital" means, as of any date of determination, the excess of (a) Current Assets as of such date, minus (b) Current Liabilities as of such date, in each case, determined in accordance with GAAP and, to the extent consistent with GAAP, the accounting methods, policies, practices, procedures or classifications historically used by Sellers (the "Accounting Principles"). "Current Assets" means the aggregate of the current assets of Sellers included in the Acquired Assets (excluding Cash), and "Current Liabilities" means the aggregate of the current Liabilities included in the Assumed Liabilities, in each case, as determined in accordance with the Accounting Principles, subject to the modifications thereto set forth in this paragraph. In determining Current Assets and Current Liabilities hereunder, all Intercompany accounts receivable, Intercompany accounts payable and all Taxes shall be disregarded (other than Property Taxes allocated to Buyer in accordance with Section 6(i)(ii)). For purposes of determining the value of Inventory items included in the Net Working Capital, Inventory items will be valued at the lower of cost or market, with the cost being based on the purchase price of goods principally using a first-in, first-out flow of Inventory assumption, in accordance with the Accounting Principles. For illustrative purposes only, a sample of the accounts to be used in the calculation of Net Working Capital is set forth on Annex H attached hereto; provided, however, that Net Working Capital shall be determined in accordance with the immediately preceding sentences.

"Neutral Arbitrator" has the meaning set forth in Section 2(g)(iii).

"Non-Lease Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Open Source" means any Software that is, or that contains or is derived in any manner (in whole or in part) from any Software that is, distributed as open source Software or under similar licensing or distribution models, including any Software licensed or distributed under GNU's General Public License or Lesser/Library General Public License.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice since December 31, 2009, subject, in the case of Sellers or the Business, to reasonably anticipated actions, omissions, events and changes in the business or operations of any Seller arising after the Petition Date as a result of the Chapter 11 Cases.

"Owned Real Property" has the meaning set forth in Section 3(h).

"Parent" has the meaning set forth in the preamble.

"Party" or "Parties" has the meaning set forth in the preamble.

"Patents" has the meaning set forth in the definition of Intellectual Property.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Entity (other than with respect to Intellectual Property) held, used by or made by any Seller in connection with the operation of the Business.

"Permitted Lien" means (a) Liens for Taxes (i) not yet delinquent, (ii) which are being contested in good faith by appropriate proceedings, a complete and correct list of Liens that are being contested is set forth on Annex I, and with respect to which adequate reserves have been made in accordance with GAAP to the extent required thereby or (ii) arising as a result of the failure to file the Tax Returns listed on Annex I; (b) mechanics', workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been made in accordance with GAAP to the extent required thereby; (c) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not reasonably be expected to, individually or in the aggregate, materially impair the use or operation of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) Liens for any financing secured by an asset where the financing obligation is an Assumed Liability and such asset is an Acquired Asset; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property in the operation of the Business taken as a whole; (f) matters that would be disclosed on an accurate survey of the real property; (g) other Liens, none of which, individually or in the aggregate, materially impairs the use or operations of the affected property or the conduct of the Business therewith as it is currently being used and conducted; and (h) Liens to the extent released at or prior to the Closing, whether pursuant to the Sale Order or otherwise.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group of any of the foregoing.

"Petition Date" has the meaning set forth in the recitals.

"Property Taxes" has the meaning set forth in Section 6(i)(ii).

"Purchase Price" has the meaning set forth in Section 2(d)(i).

"Qualified APA" has the meaning set forth in Section 5(k)(iii).

"Records" means all books, records (including employment records), ledgers, files (including customer and supplier files), invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and other mailing lists), training materials, operating manuals, plans, drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, catalogs, studies, reports, data and other similar materials in any medium.

"Registered Intellectual Property" means all U.S. and foreign (a) issued Patents and pending applications for Patents, (b) registered Marks and pending applications for registration

13

of Marks, (c) registered Internet domain names and (d) registered Copyrights and pending applications for registration of Copyrights, in each case that are owned by any Seller.

"Reimbursable Expenses" means the reasonable, documented out-of-pocket fees and expenses incurred by Buyer and its Affiliates prior to termination of this Agreement in connection with this Agreement, the Related Agreements, the Bidding Procedures, the Sale Order and the transactions contemplated hereby and thereby, including the reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Buyer engages in its reasonable discretion; provided that the Reimbursable Expenses shall not exceed $2,000,000 in the aggregate.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, the Assignment of Intellectual Property, the Transition Services Agreement, the Consulting Agreement, the Guaranty and all other Contracts, Schedules, certificates or other documents being delivered pursuant to or in connection with this Agreement.

"Representatives" of a Person means the Person's Controlled Affiliates and the officers, directors, managers, employees, advisors (including its financial advisors), representatives (including its legal counsel, accountants and financing sources) and agents of the Person and/or its Controlled Affiliates.

"Resolution Period" has the meaning set forth in Section 2(g)(iii).

"Restricted Business" has the meaning set forth in Section 6(l)(i).

"Restricted Marks" has the meaning set forth in Section 6(c).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" has the meaning set forth in Section 5(i)(iii).

"Sale Order" means an order or orders of the Bankruptcy Court, in the form of Exhibit B attached hereto, with such changes as are reasonably acceptable to Buyer and Sellers and such other changes as do not adversely affect the rights of Buyer hereunder or thereunder.

"Schedules" means the schedules delivered to Buyer from Sellers herewith and dated as of the date hereof.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Software" has the meaning set forth in Section 3(l)(v).

"Sellers' Accounts" has the meaning set forth in Section 2(f)(ii)(J).

"Sellers' Knowledge" means the actual knowledge, without independent investigation, of Stephen Gawrylewski, John J. Grymes, Shelby Marlow, Dale G. Nissenbaum, Zory Ginzburg, Thomas Cristelli, Kevin Trischett and, solely with respect to Section 3(i), John DeGeorge.

14

"Software" means all (a) computer programs, including all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (c) documentation, including user manuals and other training documentation, related to any of the foregoing.

"Straddle Property Tax Period" has the meaning set forth in Section 6(i)(ii).

"Subsequent Designation Deadline" means 5:00 p.m. (New York time) on December 17, 2010.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or Control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Target Net Working Capital Amount" means an amount equal to $125,000,000.

"Tax" or "Taxes" means any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Entity.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property.

"Transfer Tax" has the meaning set forth in Section 6(i)(i).

15

"Transferred Employees" has the meaning set forth in Section 6(g)(i).

"Transferred Facility" means Owned Real Property and Leased Real Property that is included in the Acquired Assets, for the avoidance of doubt, including Leased Real Property as of the date hereof as to which Buyer enters into a new lease at the same location effective as of the Closing Date.

"Transition Services Agreement" has the meaning set forth in Section 2(f)(i)(D).

"TSA Contracts" has the meaning set forth in Section 2(i)(v).

"Unaudited Financial Statements" has the meaning set forth in Section 3(d)(i).

"Wind-Down Escrow Agreement" means an escrow agreement by and among Buyer, Sellers and the escrow agent thereunder, in form and substance reasonably acceptable to Sellers, dated on or prior to the Closing Date, establishing an escrow account for the Wind-Down Escrow Amount.

"Wind-Down Escrow Amount" means an amount equal to $9,020,000, which is the budgeted amount for wind-down costs and expenses (including attorneys' fees) expected to be incurred between the Closing Date and the date of the termination of the Transition Services Agreement; provided, however, that, for the avoidance of doubt and pursuant to the terms of the Wind-Down Escrow Agreement, such amount shall in no event be disbursable to Buyer.

"Working Capital Escrow Amount" means an amount equal to $15,000,000 less the Initial Purchase Price Decrease Amount, if any.

2.    Purchase and Sale.

(a)    Purchase and Sale of Acquired Assets; Retention of Excluded Assets.  On the terms, and subject to the conditions, of this Agreement at the Closing, Buyer agrees to purchase, acquire and accept from Sellers, and Sellers agree to sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets as of the Closing for the consideration specified in Section 2(d)(i).  Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in, and under the Excluded Assets.

(b)    Assumption of Assumed Liabilities; Retention of Excluded Liabilities.  On the terms, and subject to the conditions, of this Agreement at the Closing, Buyer agrees to assume and become responsible for the Assumed Liabilities and to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all of the Assumed Liabilities in a timely manner in accordance with the terms thereof.  Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all Excluded Liabilities.

(c)    Treatment of Intercompany Accounts Receivable and Accounts Payable.  All Intercompany accounts receivable, Intercompany accounts payable and other obligations due and owing between any Seller and any of its Affiliates shall (i) be disregarded for purposes of the

16

transactions contemplated in this Agreement and in calculating Net Working Capital, and (ii) not be treated as Acquired Assets, Assumed Liabilities, Excluded Assets or Excluded Liabilities.

(d)    Consideration.

(i)    The aggregate consideration for the sale and transfer of the Acquired Assets shall be (i) the Initial Purchase Price, subject to adjustment determined prior to the Closing pursuant to Section 2(g)(iv)(A) (as so adjusted, the "Closing Purchase Price"), which Closing Purchase Price is payable and deliverable, free and clear of, and, subject to Section 2(i), without reduction for, any Tax due in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated in this Agreement, to Sellers at the Closing in accordance with Section 2(f)(ii)(J) and (ii) the assumption by Buyer of the Assumed Liabilities. The Closing Purchase Price shall be subject to further adjustment pursuant to Section 2(g)(iv)(B) (as so adjusted, the "Purchase Price").

(ii)    If this Agreement is executed by all the Parties prior to 5:00 p.m. (Central Time) on a Business Day then on such day, or, if this Agreement is executed after such time or not on a Business Day, then on the immediately following Business Day, Buyer shall deposit with Union Bank, N.A., in its capacity as escrow agent (the "Escrow Agent"), pursuant to the terms of an escrow agreement, dated as of the date hereof, in the form of Exhibit C attached hereto (the "Escrow Agreement"), by wire transfer of immediately available funds, $15,450,000 (the "Deposit"), which Deposit (together with all accrued investment income or interest thereon) shall be held by the Escrow Agent in trust and distributed to either Buyer or Sellers as follows:

(A)    if the Closing shall occur, then the Deposit, together with all accrued investment income or interest thereon, shall be applied towards the Closing Purchase Price payable by Buyer to Sellers under Section 2(f)(ii)(J) and shall be paid to Sellers;

(B)    if this Agreement is terminated by Sellers pursuant to Section 8(a)(iii) other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, or by Sellers or Buyer, as applicable, pursuant to Sections 8(a)(i), 8(a)(ii), 8(a)(iv), 8(a)(vi), 8(a)(vii), 8(a)(viii), 8(a)(ix), 8(a)(x) (in the case of Section 8(a)(x), only if the Agreement was then terminable by Buyer pursuant to such Section) 8(a)(xii), or 8(a)(xiii), then the Deposit, together with all accrued investment income or interest thereon, shall be returned to Buyer; or

(C)    if this Agreement is terminated by Sellers pursuant to Sections 8(a)(iii) as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, or Sections 8(a)(v) or 8(a)(xi), or by Sellers or Buyer, as applicable, pursuant to Section 8(a)(x) (in the case of Section 8(a)(x), only if the Agreement was not then terminable by Buyer pursuant to such Section), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers.

(e)    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Latham & Watkins LLP, located at 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606 (or such other location as shall be mutually agreed upon by Sellers and Buyer), commencing at 11:00 a.m. (Central Time) on the date (the "Closing Date") that is no later than the third Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated in this Agreement, as set forth in Section 7 (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions), have been satisfied or waived.  The Closing shall be deemed to have occurred at 11:59 p.m. (Eastern Time) on the Business Day prior to the Closing Date.

(f)    Deliveries at Closing.

(i)    At the Closing, Sellers will deliver to Buyer the following duly executed documents and other items:

(A)    a Bill of Sale substantially in the form of Exhibit D attached hereto (the "Bill of Sale");

(B)    an Assignment and Assumption Agreement substantially in the form of Exhibit E attached hereto (the "Assignment and Assumption Agreement");

(C)    instrument of assignment of Intellectual Property substantially in the form of Exhibit F attached hereto, including the exhibits attached thereto related to the assignment and transfer to Buyer of each patent (or pending application therefor), registered trademark (or pending application therefor), registered copyright (or pending application therefor) and registered domain name (the "Assignment of Intellectual Property");

(D)    a Transition Services Agreement substantially in the form of Exhibit G attached hereto (the "Transition Services Agreement");

(E)    a certified copy of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement, including the Bidding Procedures Order and the Sale Order;

(F)    a certificate to the effect that each of the conditions specified in Section 7(a)(i), Section 7(a)(ii) and Section 7(a)(iii) is satisfied in all respects;

(G)    a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC stating that no Seller is a "foreign person" as defined in section 1445 of the IRC; and

(H)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Acquired Assets to Buyer.

18

(ii)     At the Closing, Buyer will deliver, or will cause to be delivered, to Sellers the following duly executed documents, cash amounts and other items:

(A)     the Bill of Sale;

(B)     the Assignment and Assumption Agreement;

(C)     the Assignment of Intellectual Property;

(D)     the Transition Services Agreement;

(E)     a copy of Buyer's certificate of formation certified as of a date on or after the date that is ten days prior to the Closing Date by the Secretary of State of the State of Delaware;

(F)     a copy of a certificate of good standing of Buyer issued as of a date on or after the date that is ten days prior to the Closing Date by the Secretary of State of the State of Delaware;

(G)     a certificate to the effect that each of the conditions specified in Section 7(b)(i) and Section 7(b)(ii) is satisfied in all respects;

(H)     the Working Capital Escrow Amount, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds to one or more bank accounts designated in writing by the Escrow Agent prior to the Closing Date;

(I)     the Wind-Down Escrow Amount, in accordance with the terms of the Wind-Down Escrow Agreement, by wire transfer of immediately available funds to one or more bank accounts designated in writing by the escrow agent thereunder prior to the Closing Date;

(J)     the Closing Purchase Price, reduced by the amount of the Deposit paid pursuant to Section 2(d)(ii), the Working Capital Escrow Amount paid pursuant to Section 2(f)(ii)(H) and the Wind-Down Escrow Amount paid pursuant to Section 2(f)(ii)(I), by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer prior to the Closing Date (the "Sellers' Accounts"); and

(K)     other documents, instruments and certificates as Sellers may reasonably request.

(g)     Net Working Capital Adjustment.

(i)     Estimated Net Working Capital Statement.  Within five days prior to the Closing Date, Sellers shall prepare (using calculations and methods consistent with the Accounting Principles and Annex H) and deliver to Buyer a statement setting forth Sellers' estimate of the Net Working Capital on the Closing Date (such amount, the

"Estimated Net Working Capital Amount"), the amount by which the Estimated Net Working Capital Amount exceeds the Target Net Working Capital Amount or is less than the Target Net Working Capital Amount, and the components, calculations, work papers and other information used in the preparation of such statement (collectively, the "Estimated Net Working Capital Statement"). The Estimated Net Working Capital Statement shall be prepared in accordance with the Accounting Principles.

(ii)    Closing Net Working Capital Statement.  Within 45 days after the Closing Date, Buyer shall prepare (using calculations and methods consistent with the Accounting Principles and Annex H) and deliver to Sellers a statement setting forth the Net Working Capital on the Closing Date (such amount, the "Actual Net Working Capital Amount"), the amount by which the Actual Net Working Capital Amount exceeds the Estimated Net Working Capital Amount or is less than the Estimated Net Working Capital Amount, and the components, calculations, work papers and other information used in the preparation of such statement, which statement shall give effect to the transactions contemplated in this Agreement (collectively, the "Closing Net Working Capital Statement"). The Closing Net Working Capital Statement shall be prepared in accordance with the Accounting Principles.

(iii)    Determination of Conclusive Net Working Capital Statement. Sellers will have 45 days following its receipt of the Closing Net Working Capital Statement from Buyer to review the Closing Net Working Capital Statement and, during such time, (A) Buyer shall give Sellers and their Representatives reasonable access to all Records, facilities and personnel of Buyer (including the Business) as reasonably necessary to undertake such review and (B) Sellers may dispute any items set forth on the Closing Net Working Capital Statement (or specific calculations or methods used therein). Unless Sellers deliver written notice(s) to Buyer of dispute thereof on or prior to the 45th day after Sellers' receipt of the Closing Net Working Capital Statement, Sellers will be deemed to have accepted and agreed to the Closing Net Working Capital Statement and such statement (and the specific calculations and methods used therein) will be final, binding and conclusive. If Sellers notify Buyer in writing of disputed items contained in the Closing Net Working Capital Statement (or specific calculations or methods used therein) within such 45-day period, then for 20 days following delivery of such notice by Sellers to Buyer (the "Resolution Period"), Buyer and Sellers shall attempt in good faith to resolve their differences with respect to the disputed items (the "Disputed Items"). Any resolution by Buyer and Sellers during the Resolution Period as to any Disputed Items shall be set forth in a writing executed by Buyer and Seller and will be final, binding and conclusive on both Buyer and Sellers. If Buyer and Sellers do not resolve all Disputed Items by the end of the Resolution Period, then all Disputed Items remaining in dispute will be submitted within 10 days after the expiration of the Resolution Period to Grant Thornton LLP or, if such firm declines to act in such capacity, a national independent accounting firm mutually acceptable to Buyer and Sellers (the "Neutral Arbitrator"). The Neutral Arbitrator shall act as an arbitrator to determine only those Disputed Items remaining in dispute as of the end of the Resolution Period. In resolving such Disputed Items, the Neutral Arbitrator may not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by any Party or less than the lowest value for such Disputed Item claimed by any Party upon presentment to the

20

Neutral Arbitrator. All fees and expenses relating to the work, if any, to be performed by the Neutral Arbitrator will be allocated between Buyer and Sellers in the same proportion that the aggregate amount of the Disputed Items so submitted to the Neutral Arbitrator that is unsuccessfully disputed by each such Party (as finally determined by the Neutral Arbitrator) bears to the total amount of such Disputed Items so submitted. In addition, Buyer and Sellers shall give the Neutral Arbitrator reasonable access to all Records, facilities, Representatives, and personnel of such Party as reasonably necessary to perform its function as arbitrator of the Disputed Items. In the event Buyer or Sellers shall participate in teleconferences or meetings with, or make presentations to, the Neutral Arbitrator, the other Party shall be entitled to participate in such teleconferences, meetings or presentations. Buyer and Sellers shall use their commercially reasonable efforts to cause the Neutral Arbitrator to deliver to Buyer and Sellers a written determination (such determination to include a work sheet setting forth all material calculations and methods used in arriving at such determination) of the Disputed Items submitted to the Neutral Arbitrator within 20 days of its engagement to review such Disputed Items, which determination will be final, binding and conclusive and upon which judgment may be entered. The final, binding and conclusive Closing Net Working Capital Statement based either upon agreement or deemed agreement by Buyer and Sellers or the written determination delivered by the Neutral Arbitrator in accordance with this Section 2(g)(iii), will be the "Conclusive Net Working Capital Statement."

(iv)    Purchase Price Adjustment.

(A)    Initial Purchase Price Adjustment. If the amount of Net Working Capital on the Estimated Net Working Capital Statement exceeds the Target Net Working Capital Amount, then the Initial Purchase Price shall be increased by the amount of such excess, subject to a maximum increase of $1,000,000 (the amount of such increase, if any, the "Initial Purchase Price Increase Amount"). If the Target Net Working Capital Amount exceeds the amount of the Estimated Net Working Capital Amount on the Estimated Net Working Capital Statement, then the Initial Purchase Price shall be decreased by the amount of such excess, subject to a maximum decrease of $1,000,000 (the amount of such decrease, if any, the "Initial Purchase Price Decrease Amount").

(B)    Closing Purchase Price Adjustment. If the amount of Net Working Capital on the Conclusive Net Working Capital Statement exceeds the Target Net Working Capital Amount, then (1) Buyer shall pay Sellers the amount of such excess plus the Initial Purchase Price Decrease Amount, if any, or minus the Initial Purchase Price Increase Amount, if any, and (2) the Escrow Agent shall pay Sellers out of the Escrow Funds an amount in cash equal to the amount of all of the Escrow Funds, in each case, by wire transfer of immediately available funds to Sellers' Accounts. If the Target Net Working Capital Amount exceeds the amount of Net Working Capital on the Conclusive Net Working Capital Statement by (1) an amount less than the amount of the Escrow Funds, the Escrow Agent shall pay (x) to Buyer out of the Escrow Funds an amount in cash equal to the amount by which the Target Net Working Capital Amount exceeds the amount of Net Working Capital on the Conclusive Net Working Capital

Statement plus the Initial Purchase Price Increase Amount, if any, or minus the Initial Purchase Price Decrease Amount, if any, (in either case only to the extent sufficient Escrow Funds are available for such adjustment) and (y) to Sellers the amount remaining in the Escrow Funds after giving effect to the payment to Buyer contemplated by the foregoing clause (x) or (2) an amount equal to or greater than the amount of the Escrow Funds, the Escrow Agent shall pay to Buyer out of the Escrow Funds an amount in cash equal to all of the Escrow Funds, in each case, by wire transfer of immediately available funds to an account designated by Buyer or Sellers' Accounts, as applicable. The Escrow Funds payable to Buyer pursuant to clause 2 above shall be the exclusive remedy of Buyer and its Affiliates if the Target Net Working Capital Amount exceeds the amount of Net Working Capital on the Conclusive Net Working Capital Statement. If the amount of Net Working Capital on the Conclusive Net Working Capital Statement equals the Target Net Working Capital Amount, then the Escrow Agent shall pay out of the Escrow Funds in cash (1) to Buyer an amount equal to the Initial Purchase Price Decrease Amount, if any, and (2) to Sellers the amount remaining in the Escrow Funds after giving effect to the payments to Buyer, if any, contemplated in this sentence, in each case, by wire transfer of immediately available funds to an account designated by Buyer or Sellers' Accounts, as applicable. All payments to be made pursuant to this Section 2(g)(iv)(B) shall be made no later than the second Business Day following the date on which Buyer and Sellers agree, or are deemed to have agreed to, or the Neutral Arbitrator delivers, the Conclusive Net Working Capital Statement. All payments made pursuant to this Section 2(g)(iv)(B) shall be treated as adjustments to the Closing Purchase Price for Tax purposes, and such agreed treatment shall govern for purposes of this Agreement. Any amounts at any time payable under this Section 2(g) shall be deemed allowed administrative claims in the Chapter 11 Cases, with priority over any and all claims of the kind specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, which claim shall be senior to, and have priority over, all other claims other than any claims arising under the DIP Facility Agreement.

(C) Upon determination of the payments due in accordance with clause (B), Sellers and Buyer shall execute joint instructions to the Escrow Agent instructing the Escrow Agent to disburse the Escrow Funds in accordance with such clause (B); provided, however, that if either Sellers or Buyer fails to execute such instructions, Sellers or Buyer, as applicable, shall be liable for all costs and expenses (including attorneys' fees and expenses) incurred by the other party in connection with obtaining such failing party's execution of such instructions.

(h)    Allocation. Within 75 days after the determination of the adjustment to the Closing Purchase Price, if any, according to Section 2(g)(iv)(B), Buyer shall deliver to Sellers for Sellers' review and approval allocation schedule(s) (the "Allocation Schedule(s)") allocating the Purchase Price, including the Assumed Liabilities to the extent such Liabilities are liabilities for federal income Tax purposes, among the Acquired Assets. The Allocation Schedule(s) shall be prepared in accordance with section 1060 of the IRC and the regulations thereunder. Buyers and Sellers shall determine the "Conclusive Allocation Schedule(s)" pursuant to the procedures

22

established in Section 2(g)(iii), except that for the purposes of this Section 2(h), the term "Allocation Schedule(s)" shall be substituted for the term "Closing Net Working Capital Statement" and the term "Conclusive Allocation Schedule(s)" shall be substituted for the term "Conclusive Net Working Capital Statement" in all places such terms appear in Section 2(g)(iii). Buyer and Sellers will each file all Tax Returns (including IRS Forms 8594) consistent with the Conclusive Allocation Schedule(s). Sellers, on the one hand, and Buyer, on the other hand, agree to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor any Seller shall take any Tax position inconsistent with the Conclusive Allocation Schedule(s) and neither Buyer nor any Seller shall agree to any proposed adjustment based upon or arising out of Conclusive Allocation Schedule(s) by any Governmental Entity without first giving the other Party prior written notice; provided, however, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Conclusive Allocation Schedule(s), and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Conclusive Allocation Schedule(s). The Conclusive Allocation Schedule(s) shall be revised in accordance with section 1060 of the IRC and the regulations thereunder to appropriately take into account any payments made under this Agreement.

(i)    Identification of Contracts; Assumption and Assignment of Contracts.

(i)    The Sale Order shall provide for the assumption by Sellers, and the Sale Order shall, to the extent permitted by law, provide for the assignment by Sellers to Buyer, of the Assumed Contracts on the terms and conditions set forth in this Section 2(i), and shall provide for the applicable Designation Deadlines.

(ii)    As of the date hereof, Annex B contains a list of Contracts (as amended, the "Assumed Contracts List") entered into in connection with or related to the Business to be assumed, if applicable, by Sellers and assigned (as Assumed Non-Lease Contracts or Assumed Leases, as applicable) by Sellers to Buyer (any such Contract initially identified on the Assumed Contracts List, an "Identified Assumed Contract").

(iii)    On or prior to the Initial Designation Deadline, Buyer may, in its sole and absolute discretion, (A) designate any Non-Lease Contract that is not already an Identified Assumed Contract as an Assumed Non-Lease Contract or any Lease that is not already an Identified Assumed Contract as an Assumed Lease, in each case, by amending the Assumed Contracts List to include such Non-Lease Contract or Lease, as applicable, and delivering such Assumed Contracts List, as amended, to Sellers at any time or from time to time prior to the Initial Designation Deadline and/or (B) designate any Identified Assumed Contract that is not to be an Assumed Non-Lease Contract or Assumed Lease, as applicable, by amending the Assumed Contracts List to remove such Assumed Non-Lease Contract or Assumed Lease, as applicable, and delivering such Assumed Contracts List, as amended, to Sellers at any time or from time to time prior to the Initial Designation Deadline. Upon delivery of an amended Assumed Contracts List by Buyer in connection with Section 2(i)(iii)(A), the applicable Seller shall move to assign such Non-Lease Contract(s) or Lease(s), as applicable, added to such Assumed Contracts List to Buyer and shall assume and assign to, and Buyer shall accept the assignment of, such

Non-Lease Contract(s) or Lease(s), as applicable. In the case of any removal or addition of any Contract from the Assumed Contracts List pursuant to the foregoing, in each case, Sellers shall give notice to the other parties to any such Contract in the timeframe approved by the Bankruptcy Court. The Assumed Contracts List as it exists on the Initial Designation Deadline shall be referred to herein as the "Final Assumed Contracts List."

(iv)    At Buyer's request, and at Buyer's cost and expense, Sellers shall cooperate with Buyer as reasonably requested by Buyer (A) to allow Buyer to enter into an amendment with respect to any Assumed Lease upon assumption of such Assumed Lease by Sellers, or a new Lease relating to the property underlying such Assumed Lease, and shall cooperate with Buyer, to the extent reasonably requested by Buyer, in negotiations with the landlords thereof, or (B) to otherwise amend any Assumed Lease to the extent such amendments would not adversely affect any Seller; provided, however, that Sellers shall not be required to enter into any such amendment or new Lease if such amendment or new Lease would result in an assumption by any Seller of such Assumed Lease, unless such Assumed Lease will contemporaneously therewith be assigned to Buyer; provided, further, that any amendment entered into pursuant to this Section 2(i)(iv) shall be effective only if the Closing occurs and no earlier than the Closing Date.

(v)    After the Closing and prior to the Subsequent Designation Deadline, Sellers shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any Lien with respect to any Lease, or increase, or take any affirmative action not required by the terms thereof, any payments required to be paid thereunder by any Seller or Buyer contingent upon any such Lease becoming an Assumed Lease, without the prior written consent of Buyer, unless Buyer has provided an amended Assumed Contracts List to Sellers designating such Lease for non-assumption pursuant to Section 2(i)(iii)(B) provided, however, that, notwithstanding the foregoing, if Buyer does not pay for all Liabilities of Sellers arising on or after the Closing Date related to the obligations of Sellers under each Lease that is not an Assumed Lease, whether pursuant to the Transition Services Agreement or otherwise, Seller shall be permitted to reject any such Lease. After the Closing and prior to the termination or expiration of the Transition Services Agreement in accordance with its terms, Sellers shall not move to reject any Non-Lease Contract pursuant to which Sellers are providing services to Buyer pursuant to the Transition Services Agreement (the "TSA Contracts") except as provided in Section 2(i)(vi); provided, however, that, notwithstanding the foregoing, if Buyer does not comply with its payment obligations with respect to any such TSA Contract pursuant to the terms of the Transition Services Agreement, Seller shall be permitted to reject any such TSA Contract.

(vi)    On or prior to the Subsequent Designation Deadline, Buyer may, in its sole and absolute discretion, designate any Lease that is not already identified on the Final Assumed Contracts List as an Assumed Lease by notifying Sellers in writing of such designation. Upon delivery of such written notification by Buyer, the applicable Seller shall (A) move promptly to assign such Lease(s) to Buyer and shall assume and assign to, and Buyer shall accept the assignment of, such Lease(s) and (B) give notice to the other parties to any such Lease in the timeframe approved by the Bankruptcy Court. After the Closing and prior to the Subsequent Designation Deadline, in the case of

24

Leases, and prior to the termination or expiration of the Transition Services Agreement or the earlier occurrence of the Subsequent Designation Deadline, in the case of TSA Contracts, upon written notice from Buyer to Sellers requesting that Sellers reject any Lease or TSA Contract, the applicable Seller shall promptly move to reject such Lease or TSA Contract, as applicable.

(vii)    As part of any motions required to effect the actions contemplated by this Section 2(i) (or, as necessary in one or more separate motions), Sellers shall request that the Bankruptcy Court deem any non-debtor party to any Identified Assumed Contract or any Contract subsequently designated for assignment pursuant to this Section 2(i) that does not file an objection with the Bankruptcy Court during the period to object to the such motions or any other necessary motions for subsequently designated Contracts to have given any required consent to the assumption of the Contract by such Seller and assignment to Buyer as provided for herein.

(viii)    In connection with the assumption and assignment to Buyer of any Assumed Non-Lease Contract or Assumed Lease pursuant to this Section 2(i), any Cure Amounts shall be payable in accordance with Section 5(m).

(ix)    Sellers shall use their commercially reasonable efforts to obtain an order of the Bankruptcy Court permitting the assignment of the Assumed Non-Lease Contracts and the Assumed Leases to Buyer on the terms set forth in this Section 2(i). In the event Sellers are unable to assign any such Assumed Non-Lease Contract or Assumed Lease to Buyer pursuant to such order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts prior to the applicable Designation Deadline to obtain, and to cooperate in obtaining, all consents and authorizations from Governmental Entities and third parties necessary to assume and assign such Assumed Non-Lease Contract or Assumed Lease to Buyer as Buyer may reasonably request (the "Necessary Consents"); provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Litigation or legal proceedings to obtain any such consent or approval.

(x)    To the extent that any consent or authorization from any Governmental Entity or third party required to assign to Buyer any Assumed Non-Lease Contract or Assumed Lease is not obtained by the applicable Designation Deadline, each Seller will, with respect to each such Assumed Non-Lease Contract or Assumed Lease, from and after the Closing and until the date on which such applicable Necessary Consent is obtained, use commercially reasonable efforts during the term of such Assumed Non-Lease Contract or Assumed Lease to (A) provide to Buyer the benefits under such Assumed Non-Lease Contract or Assumed Lease at no cost to Sellers after the Closing Date, (B) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Buyer pending receipt of the required consent or authorization) designed to provide such benefits to Buyer and (C) enforce for the account of Buyer any rights of such Seller under such Assumed Non-Lease Contract or Assumed Lease (including the right to elect to terminate such Assumed Non-Lease Contract or Assumed Lease in accordance with the terms thereof upon the written direction of Buyer). Buyer will cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits

contemplated by this <u>Section 2(i)(x)</u>, and Buyer shall promptly pay any and all costs and expenses incurred by Sellers or their Representatives in connection with the performance by Sellers of their obligations under this <u>Section 2(i)(x)</u>. Except as contemplated by the Transition Services Agreement, nothing in this <u>Section 2(i)(x)</u> shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

(j)    <u>Withholding</u>. Buyer shall be entitled to withhold, and shall withhold, from any amount otherwise payable to Sellers under this Agreement any withholding Taxes required by applicable Legal Requirement to be withheld from the amounts so payable as set forth in a statement of withholding delivered to Sellers by Buyer. Any amount so withheld and paid over to the appropriate Governmental Entity pursuant to this <u>Section 2(j)</u> shall be deemed to have been paid over to the applicable Seller for all purposes of this Agreement. If Buyer determines that it is required to withhold from any amount payable to Sellers under this Agreement, it will notify Sellers at least ten days prior to such payment and will work in good faith with Sellers to eliminate or minimize such withholding.

3.    <u>Sellers' Representations and Warranties</u>. Subject to the Schedules, Sellers jointly and severally represent and warrant to Buyer as of the date of this Agreement as follows:

(a)    <u>Organization of Sellers; Good Standing</u>. Except as set forth on <u>Schedule 3(a)</u>, each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, pursuant to sections 1107 and 1008 of the Bankruptcy Code and the orders of the Bankruptcy Court, has all requisite corporate or limited liability company power and authority to own, lease and operate its assets and to carry on the Business as a debtor in possession. Except as set forth on <u>Schedule 3(a)</u>, each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    <u>Authorization of Transaction</u>. Except as set forth on <u>Schedule 3(b)</u>, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(i)    each Seller has full corporate or limited liability company power and authority to execute and deliver this Agreement and any of the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder;

(ii)    the execution, delivery and performance of this Agreement and any of the Related Agreements to which any Seller is a party have been duly authorized by such Seller, and no other action on the part of any Seller is necessary to authorize the execution, delivery or performance of this Agreement or any of the Related Agreements; and

(iii)    this Agreement constitutes, and each Related Agreement to which a Seller is a party when so executed and delivered will constitute, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and

26

conditions, subject to applicable bankruptcy, insolvency, restructuring, moratorium and other similar Legal Requirements affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "Bankruptcy and Equity Exception").

(c)    Noncontravention.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated in this Agreement (including the assignments and assumptions referred to in Section 2), will (i) with or without notice or lapse of time, or both, conflict with or result in a breach of the constituent documents of any Seller (except if permitted or authorized by Decree of the Bankruptcy Court), (ii) violate any Legal Requirement or Decree to which any Seller or the Business is, or any Seller's respective assets (including the Acquired Assets) or properties are, subject or (iii) conflict with, result in a breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Assumed Contract to which any Seller is a party or by which it is bound or to which any of the Acquired Assets is subject, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets. Except as set forth on Schedule 3(c), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, except as required to comply with the HSR Act, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Person (including any Governmental Entity) in order for the Parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets.

(d)    Financial Statements.  Set forth on Schedule 3(d) are copies of (i) the unaudited consolidated balance sheet of Parent and its Subsidiaries as of May 31, 2010, and the related consolidated statements of income and cash flows of Parent and its Subsidiaries for the five-month period then ended, and the unaudited consolidated financial statements of Parent and its Subsidiaries for fiscal year ended 2009 (the "Unaudited Financial Statements") and (ii) the audited financial statements for the fiscal years ended 2008 (together with the Unaudited Financial Statements, the "Financial Statements").  The Financial Statements (A) fairly present (subject, in the case of Unaudited Financial Statements, to normal and recurring year-end adjustments which will not be material to Sellers in the aggregate) in all material respects the financial condition and results of operations of Parent and its Subsidiaries at and as of the dates thereof and for the periods covered thereby, (B) were compiled from books and records regularly maintained by management of Parent used to prepare the Financial Statements of Parent and its Subsidiaries and (C) were prepared in accordance with the Accounting Principles.  Except for any effects, events, conditions, circumstances, developments or changes arising or related to the restructuring of the Business or the Chapter 11 Cases, since December 31, 2009 until the date hereof, there has not occurred any effect, event, condition, circumstance or change that, individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect.

27

(e)    Absence of Changes. Except as set forth on Schedule 3(e) and except for actions taken in connection with the Chapter 11 Cases, since December 31, 2009, Sellers have conducted the Business in the Ordinary Course of Business, and without limiting the generality of the foregoing, since that date there has been no (i) disposition of any material Acquired Assets (other than sales of Inventory in the Ordinary Course of Business); (ii) material change in the accounting methods or practices (including assumptions underlying estimates of reserves for Inventory and accounts receivable and accruals for Liabilities) of Sellers, other than as required by GAAP; (iii) material damage, destruction or loss (whether or not covered by insurance) to any Acquired Assets, including any Transferred Facility; (iv) (A) adoption of, entry into or amendment of any material Employee Benefit Plan, (B) agreement to any material increase in the compensation payable or to become payable to, or any increase in the contractual term of employment of, any officer, director or salaried employee (other than annual salary increases in the Ordinary Course of Business) or (C) entry into any new collective bargaining agreement or agreement extending any applicable collective bargaining agreement; (v) settlement or compromise of any Litigation where the amount paid in settlement or compromise exceeds $500,000 individually, or $1,000,000 in the aggregate for all such Litigation, and which do not involve any other obligation of Sellers other than a customary release with respect to such Litigation; (vi) sale, transfer or assignment of any Acquired Assets to any Affiliates of Sellers (excluding such sales, transfers or assignments to other Sellers); (vii) change in sale practices or collections of accounts receivable, in each case, other than in the Ordinary Course of Business; or (viii) enforceable commitment to do any of the foregoing.

(f)    Material Contracts. Schedule 3(f) sets forth all of the following Contracts to which any Seller is a party or by which it is bound (collectively, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer, director or stockholder (or any of their respective Affiliates) of any Seller;

(ii)    Contracts with any labor union or association representing any employees of any Seller;

(iii)    Contracts involving consideration in excess of $1,000,000, in the case of purchases from vendors of the Business, and $2,000,000, in the case of sales to customers of the Business, in each case annually or $2,000,000, in the case of such purchases, and $4,000,000, in the case of such sales, in each case, in the aggregate over the term of the Contract;

(iv)    Contracts for the sale of material assets of any Seller (other than the sale of Inventory, Excluded Assets or the replacement of worn-out assets, in each case, in the Ordinary Course of Business) or for the grant to any Person of any preferential rights to purchase any material assets;

(v)    Contracts for joint ventures, strategic alliances or partnerships;

(vi)    Contracts containing covenants (A) of any Seller not to compete in any line of business, with any Person or in any geographical area, (B) of any other Person not

28

to compete with any Seller in any line of business or in any geographical area and (C) restricting the Persons any Seller may hire;

(vii)    Contracts relating to the acquisition by any Seller of any operating business (or all or any substantial portion of the assets of any operating business) or the capital stock of any other Person other than Affiliates of any Seller;

(viii)    Contracts imposing a Lien on any assets and involving a Liability in excess of $500,000;

(ix)    Contracts under which any Seller has made advances or loans to any other Person in excess of $100,000;

(x)    Contracts providing for severance, retention, change in control or similar payments to any Person in excess of $100,000;

(xi)    Contracts for the employment of any individual on a full-time, part-time, consulting or other basis providing annual compensation in excess of $100,000;

(xii)    Contracts including any grant of any license, right, permission, consent or non-assertion relating to any Intellectual Property (other than any shrink wrap or similar license for generally available Software on reasonable terms for a license fee of no more than $50,000);

(xiii)    Contracts for the lease of personal property in which the amount of payments which the applicable Seller is required to make on an annual basis exceeds $50,000;

(xiv)    Contracts providing for capital expenditures after the date hereof in an amount in excess of $1,000,000 individually or in the aggregate;

(xv)    outstanding letters or credit and agreements of guaranty, surety or indemnification, direct or indirect, by any Seller in excess of $100,000; and

(xvi)    Contracts (or a group of related Contracts) which involve aggregate payments by or to any Seller of more than $5,000,000.

Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of a Seller, enforceable against such Seller in accordance with its terms, subject to the Bankruptcy and Equity Exception.  Except as disclosed on <u>Schedule 3(f)</u>, no Seller is in material breach of or material default under any Material Contract, nor, to Sellers' Knowledge, is any other party to any Material Contract in material breach or material default thereunder.  To Sellers' Knowledge, no Seller has received any written notice of termination or cancellation under any Material Contract.  Except as disclosed on <u>Schedule 3(f)</u>, Sellers have delivered or otherwise made available to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments and supplements thereto.

(g)      Insurance.  Set forth on Schedule 3(g) is a correct and complete list of all insurance policies (including the scope and amount of the coverage provided thereunder) maintained by Sellers for the benefit of the Acquired Assets, the Assumed Liabilities and the Covered Employees.  All material casualty and property insurance policies of Sellers or covering the Acquired Assets, the Assumed Liabilities and the Covered Employees are in full force and effect and all premiums have been paid.  Such policies provide insurance in such amounts and against such risks as is sufficient to comply with Legal Requirements applicable to the Acquired Assets and the Assumed Liabilities, and no Seller is in breach or default, and no Seller has taken any action or failed to take any action which with notice or lapse of time, or both, would constitute such a breach or default, or permit termination or adverse modification of, any such insurance policies.  To Sellers' Knowledge, there are no pending notices or cancellation or non-renewal of any such insurance policy nor has the termination of any such insurance policy been threatened, and, to Sellers' Knowledge, there exists no event, occurrence, condition or act (including the purchase of the Acquired Assets hereunder) that with notice or lapse of time, or both, would entitle any insurer to terminate or cancel any such insurance policies.

(h)      Real Property.  Except as disclosed on Schedule 3(h), Sellers do not own any real property used in the conduct of the Business (such owned real property, the "Owned Real Property").  Set forth on Schedule 3(h) is a complete list of all Leased Real Property and the Leases corresponding thereto.  Sellers have delivered or otherwise made available to Buyer true, correct and complete copies of the written Leases and provided a description of the oral Leases. Except as disclosed on Schedule 3(h), (i) Seller has not leased or subleased the right to use and occupy the Owned Real Property or the Leased Real Property, respectively, related to the Transferred Facilities to any third-party lessee, sub-lessee or licensee, and (ii) other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to sub-lease such Leased Real Property or any portion thereof or interest therein created by, through or under Sellers.  Except as disclosed on Schedule 3(h) or as a result of the Chapter 11 Cases, (A) each of the Leases related to the Transferred Facilities is in full force and effect, (B) no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default, by Sellers under any such Lease, (C) to Sellers' Knowledge, no other party is in default under any such Lease, and no party to any such Lease has exercised any termination right with respect thereto, and (D) no Seller has received any written notice of any pending or threatened condemnation or eminent domain proceeding affecting any Leased Real Property related to the Transferred Facilities or any part thereof.

(i)      Environmental Matters.

    (i)      Except as disclosed on Schedule 3(i), or as would not reasonably be expected to be material to the Business or the Acquired Assets:

        (A)      The operations of the Business related to the Acquired Assets and Assumed Liabilities materially comply with all applicable Environmental Requirements, which compliance includes obtaining, maintaining and complying with all Environmental Permits necessary to operate the Business related to the Acquired Assets and Assumed Liabilities, and no action or proceeding is pending or, to Sellers' Knowledge, threatened to revoke, modify or terminate any such

30

Environmental Permit, and to Sellers' Knowledge, there are no circumstances or conditions that currently exist that would reasonably be expected to result in material noncompliance with any such Environmental Requirement or Environmental Permits or that would require the owner or operator of the Acquired Assets to incur any material unbudgeted capital expenditures to maintain such compliance.

(B)    No claim has been made or is pending or, to Sellers' Knowledge, threatened against Sellers, alleging that Sellers or any of the Acquired Assets are or may be in violation of any Environmental Requirement or any Environmental Permit or may have any Liability under any Environmental Requirement;

(C)    To Sellers' Knowledge, the Business related to the Acquired Assets and Assumed Liabilities has not caused any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of any Hazardous Substances at, on or under any of the Owned Real Property or Leased Real Property related to the Acquired Assets and Assumed Liabilities, except in material compliance with applicable Environmental Requirements;

(D)    None of the Owned Real Property or Leased Real Property related to the Acquired Assets and Assumed Liabilities has been used by Sellers or, to Sellers' Knowledge, any other Person, as a landfill or storage, treatment or disposal site for any type of Hazardous Substance; and

(E)    To Sellers' Knowledge, there are no circumstances or conditions that currently exist relating to the operations of the Business related to the Acquired Assets and Assumed Liabilities that would reasonably be expected to result in the owner or operator of the Acquired Assets incurring Liabilities under any Environmental Requirement.

(ii)    Except as disclosed on Schedule 3(i), no consent or approval of any Governmental Entity is required under or pursuant to any Environmental Requirement to consummate the transactions contemplated by this Agreement.

(iii)    Sellers have made available or provided Buyer with copies of all material documents, records and information in Sellers' possession concerning the condition of the environment at the Owned Real Property and the Leased Real Property, whether generated by Sellers or others, including environmental audits and environmental site assessments.

(j)    Employee Matters.  Schedule 3(j) lists each collective bargaining agreement to which any Seller is a party covering employees of the Business.  There is no pending or, to Sellers' Knowledge, threatened, strike, slowdown, picketing or work stoppage involving employees of the Business which would reasonably be expected to be material to the Business or the Acquired Assets.  Except as disclosed on Schedule 3(j), Sellers and the Business are in compliance with all Legal Requirements relating to the employment of labor, including all such

31

Legal Requirements relating to wages, hours, pay equity, employment equity, conditions of employment, employment standards, human rights, employee privacy, the Worker Adjustment and Retraining Notification Act and any similar laws, including Legal Requirements of any state, country or other locality that is applicable to a termination of employees, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding Taxes and/or social security Taxes and contributions and any similar Tax or contribution, except as would not reasonably be expected to be material to the Acquired Assets. Except as disclosed on Schedule 3(j), no Seller has received in the year prior to the date hereof, or has any currently outstanding U.S. Equal Employment Opportunity Commission, discrimination or civil rights complaints with regard to the operation of the Business that would reasonably be expected to be material to the Business or the Acquired Assets, and to Sellers' Knowledge, there are no threatened claims by or on behalf of employees of the Business under any federal, state, or local labor or employment Legal Requirement or regulations which would reasonably be expected to be material to the Business or the Acquired Assets.

(k)    Employee Benefits.  Schedule 3(k) lists each material Employee Benefit Plan, including each (i) "welfare" plan, fund or program (within the meaning of section 3(1) of ERISA), (ii) "pension" plan, fund or program (within the meaning of section 3(2) of ERISA), and (iii) employment (other than offer letters entered into in the Ordinary Course of Business), termination, severance or "change in control" agreement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Sellers or by any Person that is a trade or business, whether or not incorporated, that together with Sellers would be deemed a "single employer" within the meaning of section 4001(b) of ERISA, or to which Sellers or any such Person is party, for the benefit of any Covered Employee. Sellers have delivered to Buyer concurrently with the execution and delivery of this Agreement a complete and correct list of all Covered Employees as of the date set forth therein, separately grouped for each business location of Sellers, together with each such employee's position, principal place of employment, hire date and base salary or hourly wage rate. Sellers have delivered to Buyer concurrently with the execution and delivery of this Agreement a list of all former employees (including their "qualified beneficiaries" within the meaning of COBRA) whose employment was associated with the Acquired Assets and who (A) are receiving COBRA continuation coverage from Sellers or (B) are eligible to elect COBRA continuation coverage from Sellers, in each case, as of a date no more than three Business Days preceding the date hereof.

(l)    Intellectual Property.

(i)    Schedule 3(l)(i) lists all Registered Intellectual Property.  Except as set forth on Schedule 3(l)(i), Sellers individually or jointly are the sole owners, free and clear of all Liens, other than Permitted Liens, of all Acquired Intellectual Property (including all Registered Intellectual Property), and all Registered Intellectual Property is in effect and subsisting.  Except as set forth on Schedule 3(l)(i), there are no annuities, payments, fees, responses to office actions or other filings required to be made or paid with respect to any Registered Intellectual Property and having a due date within 180 days after the date hereof.

(ii)    To Sellers' Knowledge, one or more Sellers has a valid and continuing right to use all Business Intellectual Property (other than Acquired Intellectual Property)

32

in connection with the Business as now conducted and in the manner such Business Intellectual Property is now used or contemplated to be used by Sellers. To Sellers' Knowledge, the Acquired Intellectual Property together with the Business Intellectual Property licensed to any Seller includes all Intellectual Property necessary and sufficient to enable Sellers to conduct the Business as now conducted. To Sellers' Knowledge, the Acquired Intellectual Property is valid and enforceable.

(iii)    Except as set forth on Schedule 3(l)(iii), (A) to Sellers' Knowledge, neither the conduct of the Business by Sellers as currently conducted (including the products and services sold or provided by Sellers or the making, having made, use, practice, offer for sale, sale or other disposition or exploitation of any such products or services) nor any of the Acquired Intellectual Property (or the use, practice or exploitation thereof) infringes, constitutes or results from a misappropriation of or otherwise violates any Person's Intellectual Property, (B) no claims are pending or threatened in writing against any Seller alleging that such Seller is infringing, misappropriating or violating any Person's Intellectual Property or challenging the ownership, use, validity or enforceability of any Acquired Intellectual Property or challenging the use of any other Business Intellectual Property, (C) to Sellers' Knowledge, no Person is infringing, misappropriating or otherwise violating any Business Intellectual Property owned by or exclusively licensed to any Seller and (D) no claims are pending or threatened in writing against any Person by any Seller alleging that any Person is infringing, misappropriating or violating any Business Intellectual Property owned by or exclusively licensed to any Seller.

(iv)    Each Seller has taken commercially reasonable measures to protect the confidentiality of all material trade secrets, know-how and confidential information of each such Sellers and any confidential information of any Person to whom any Seller has a confidentiality obligation. Each Seller has established privacy compliance policies and is in compliance in all material respects with, and in the year prior to the date hereof has been in compliance in all material respects with, its privacy policies.

(v)    Schedule 3(l)(v) sets forth a complete and accurate list of (A) all material Software owned by any Seller ("Seller Software") and (B) all material Software not exclusively owned by Seller and incorporated, embedded or bundled with any Seller Software (excluding any generally available Software licensed to any Seller under a shrink wrap or similar license on reasonable terms for a one time license fee of no more than $50,000). Except as set forth on Schedule 3(l)(v), no Seller (X) has licensed or provided to any Person, or otherwise permitted any Person (in each case, other than an employee, contractor or agent of Seller) to access or use, any source code or related materials for any Seller Software or (Y) is a party to any source code escrow Contract or any other Contract (or a party to any Contract obligating any Seller to enter into a source code escrow Contract or other Contract) requiring the deposit of any source code or related materials for any Seller Software.

(vi)    No Open Source (A) forms part of any Seller Software, (B) was or is incorporated in whole or in part in, or has been or is distributed in whole or in part with, any Seller Software or (C) was or is used in the development, maintenance or operation

33

of any Seller Software, in the case of each of the foregoing clauses (A), (B) and (C), in a manner that requires or obligates any Seller to make available, disclose, contribute, distribute or license any source code or related materials for any Seller Software (or any portion thereof) to any Person.

(vii)    Except as set forth in Schedule 3(l)(vii), neither this Agreement nor the consummation of the transactions contemplated by this Agreement will result in (A) the loss or impairment of the right of Buyer to own, use, practice or exploit any material Business Intellectual Property or (B) the grant to any Person of any ownership interest, license, right or protection from any Litigation with respect to any Acquired Intellectual Property.

(viii)    The IT Systems included in the Acquired Assets are adequate (with respect to working condition, capacity and absence of damage or defects) for use in the continued operation of the Business. Each Seller has taken commercially reasonable security measures to protect the confidentiality, integrity and security of such IT Systems and any Software, data or information stored thereon. During the two-year period prior to the date hereof, to Sellers' Knowledge, there has been no unauthorized use of or access to any of such IT Systems (or any Software, data or information stored thereon).

(m)    Taxes.    Except as disclosed on Schedule 3(m), Sellers have each timely and appropriately filed all material (individually or in the aggregate) Tax Returns required to be filed in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, Sellers), and all such Tax Returns are complete, correct and accurate in all material respects. Except as disclosed on Schedule 3(m), all material Taxes due and payable have been paid whether or not show on any Tax Return. Except as set forth on Schedule 3(m): (i) no examination of any Tax Return of Sellers is currently in progress and (ii) no Tax deficiencies of Sellers are being claimed, proposed or assessed in writing. All material Taxes which Sellers are required by law to withhold or to collect for payment have been duly withheld and collected and have been timely paid to the appropriate authority.

(n)    Title.    Immediately prior to Closing, Sellers will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2(f), and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, good title to, or, in the case of property leased or licensed by Sellers a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Liens, except for (a) the Assumed Liabilities and (b) Permitted Liens. Except as disclosed on Schedule 3(n), all material Furnishings and Equipment included in the Acquired Assets are in all material respects in good repair and operating condition (subject to normal wear and tear).

(o)    Litigation.    Except for the Chapter 11 Cases and as disclosed on Schedule 3(o), there is no instance in which any Seller (i) is subject to any outstanding Decree or (ii) is a party or, to Sellers' Knowledge, is threatened to be made a party to any Litigation, in either case, which relates to any of the Acquired Assets or would be reasonably likely to (A) result in any material Liability to any Seller with respect to the Business, or (B) materially prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or the Related

Agreements.  Except as disclosed on Schedule 3(o), no Seller is a party to any settlement agreement that contains any ongoing obligations with respect to the Business or the Acquired Assets.  Except as disclosed on Schedule 3(o), no Seller is engaged in any Litigation to recover monies due it or for damages sustained by it.

(p)    Compliance with Legal Requirements.  Except as disclosed on Schedule 3(p), (i) Sellers and the Business are in compliance in all material respects with all Legal Requirements of any Governmental Entity applicable to their respective operations or assets or the Business, including the Acquired Assets, (ii) no Seller has received any written notice of the violation of any Legal Requirement and (iii) to Sellers' Knowledge, no Seller is under investigation with respect to the violation of any Legal Requirement.

(q)    Permits.  Set forth on Schedule 3(q) is a correct and complete list of all material Permits of Sellers.  Except as disclosed on Schedule 3(q), Sellers have obtained and possess all material Permits necessary for the lawful conduct of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated.  Except as disclosed on Schedule 3(q), each such Permit of Sellers is valid and in full force and effect and, to Sellers' Knowledge, Sellers are in compliance with all such Permits, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets.

(r)    Affiliate Transactions.  Except as disclosed on Schedule 3(r), no officer, director, member, stockholder or Affiliate of any Seller is, or since December 31, 2009 has been, a party to any Contract that is material to the Business or has an interest in any assets used in the Business, including the Acquired Assets, that are material to the Business.  Except as disclosed on Schedule 3(r), no Seller, at any time since December 31, 2009, has guaranteed or assumed (or had any obligation under any previous guarantee of) any obligations of their respective officers, directors, members, stockholders or Affiliates.

(s)    Inventory.  The Inventory is in good and marketable condition, and the Inventory is saleable in the Ordinary Course of Business, other than for normal discounts and liquidations in the Ordinary Course of Business.  The Inventory is held at the locations set forth on Schedule 3(s).  The Inventory set forth in the Financial Statements was stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly, in all material respects, the consolidated Inventory of Sellers as of the respective dates thereof (subject, in the case of Unaudited Financial Statements, to normal period-end adjustments).  Reserves for markdowns, shortage, salvage, lower of cost or market, obsolete, excess, damaged or otherwise unsaleable and unusable Inventory have been reflected in the Financial Statements in accordance with GAAP applied on a consistent basis throughout the periods indicated.

(t)    Customers and Suppliers.  Sellers have delivered to Buyer concurrently with the execution and delivery of this Agreement a list of the top 20 suppliers and top 20 customers of the Business, as measured by dollar amount of purchases therefrom or thereby, during the twelve-month period ended May 31, 2010, showing the approximate total sales by Sellers to each such customer and the approximate total purchases by Sellers from each such supplier, in each case, during such period.  Since the Petition Date, no customer or supplier listed thereon has

35

terminated its relationship with any Seller or materially reduced or changed the pricing terms or other terms of its business with any Seller or notified any Seller in writing that it intends to terminate or materially reduce or change the pricing terms or other terms of its business with any Seller.

(u)    <u>Accounts and Notes Receivable and Payable</u>.    Except as disclosed on <u>Schedule 3(u)</u>, all accounts and notes receivable of Sellers, including the accounts receivable, reflected in the Financial Statements have arisen in the Ordinary Course of Business.    The consolidated accounts receivable of Sellers, net of any allowances for doubtful accounts, set forth in the Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly, in all material respects, the consolidated accounts receivable of Sellers as of the respective dates thereof (subject, in the case of Unaudited Financial Statements, to normal period-end adjustments). All accounts payable of Sellers reflected in the Financial Statements have arisen in the Ordinary Course of Business.

(v)    <u>Foreign Corrupt Practices Act</u>.    No Seller, nor, to Sellers' Knowledge, any Representative, consultant or agent thereof acting on any Seller's behalf, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (i) any foreign official (as such term is defined in the Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>")) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof, or (ii) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both <u>clauses (i)</u> and <u>(ii)</u> above in order to assist any Seller to obtain, retain business for or direct business to any Seller and under circumstances which would subject any Seller to liability under the FCPA or any corresponding foreign Legal Requirement.

(w)    <u>Brokers' Fees</u>.    Except as disclosed on <u>Schedule 3(w)</u>, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

4.    <u>Buyer's Representations and Warranties</u>.   Buyer represents and warrants to Sellers as of the date of this Agreement as follows:

(a)    <u>Organization of Buyer</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

(b)    <u>Authorization of Transaction</u>.

(i)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder;

(ii)    the execution, delivery and performance of this Agreement and the Related Agreements have been duly authorized by Buyer, and no other action on the part of Buyer is necessary to authorize the execution, delivery or performance of this Agreement or any of the Related Agreements; and

(iii)    this Agreement constitutes, and each Related Agreement when so executed and delivered will constitute, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception.

(c)    <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated in this Agreement (including the assignments and assumptions referred to in <u>Section 2</u>), will (i) with or without notice or lapse of time, or both, conflict with or result in a breach of the constituent documents of Buyer, (ii) violate any Legal Requirement or Decree to which Buyer is, or its assets or properties are, subject or (iii) conflict with, result in a breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either <u>clause (ii)</u> or <u>(iii)</u>, for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or the Related Agreements on a timely basis.  Except as required to comply with the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Person (including any Governmental Entity) in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or the Related Agreements on a timely basis.

(d)    <u>Litigation</u>.  There is no instance in which Buyer (i) is subject to any outstanding Decree or (ii) is a party or, to Buyer's knowledge, is threatened to be made a party to any

37

Litigation, in either case, which would be reasonably likely to materially prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or the Related Agreements.

(e)    Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

(f)    Financial Capacity.  Buyer has delivered to Sellers true and complete copies of an executed equity commitment letter from Affiliates of Buyer (the "Equity Commitment Letter"). As of the date hereof, the Equity Commitment Letter has not been amended or modified, no such amendment or modification is contemplated, the commitment contained in the Equity Commitment Letter has not been withdrawn or rescinded in any respect and the Equity Commitment Letter are in full force and effect and are the valid, binding and enforceable obligations of Buyer and, to the knowledge of Buyer, the other parties thereto.  Assuming the financings described in Equity Commitment Letter and the Debt Commitment Letters are consummated, Buyer will have at the Closing (i) sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement and the Related Agreements and (ii) the financial resources to perform its obligations under this Agreement and the Related Agreements.

(g)    Adequate Assurances Regarding Executory Contracts.  Buyer is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(b) of the Bankruptcy Code with respect to the Assumed Contracts.

5.    Pre-Closing Covenants.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

(a)    Efforts; Cooperation.  Subject to Sellers' right to solicit and consummate a Competing Transaction to the extent permitted by Section 5(k) and except as otherwise set forth herein, each of the Parties will use its commercially reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement on or prior to the Drop Dead Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated in this Agreement set forth in Section 7).

(b)    Notices and Consents.

(i)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers will give any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third-party consents or sublicenses, if any, for which it is responsible or for which any responsible Party reasonably requests assistance, as are necessary to consummate the transactions contemplated in this Agreement.

(ii)    Each Party shall use its commercially reasonable efforts to, subject to clause (iv) below, take all actions consistent with applicable Legal Requirements and

38

give any notices to, make any filings with, and obtain all authorizations, consents and approvals of all Governmental Entities as, in each case, are necessary to consummate the transactions contemplated in this Agreement (all such actions, notices, filings, authorizations, consents and approvals are listed on Annex J).

(iii)    Subject to clause (iv) below, as soon as reasonably practicable (and, in any event, within ten Business Days) following Buyer's execution and delivery of this Agreement, Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the United States Department of Justice, and request early termination of the waiting period under the HSR Act. Sellers, on the one hand, and Buyer, on the other hand, shall promptly respond to any requests for additional information in connection with such filings and shall use commercially reasonable efforts to take all other actions necessary to cause the waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act, but not Sellers' costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of Sellers' portion of any antitrust filings.

(iv)    Sellers, on the one hand, and Buyer, on the other hand, (A) shall promptly inform each other of any communication from any Governmental Entity concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (B) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Entity in response thereto. In addition, none of the Parties shall agree to participate in any meeting with any Governmental Entity in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Entity, gives the other Parties the opportunity to attend and participate thereat, in each case, to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Seller, on the one hand, and Buyer, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives, on the one hand, and the Governmental Entity or members of its staff, on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work-product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Entity in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(c)    Permits. Sellers shall assist Buyer by identifying all material Permits required to own or operate the Acquired Assets following the Closing, including material Environmental

Permits, and transferring such Permits to Buyer, if transferable, or assisting Buyer in obtaining new Permits if such Permits are nontransferable.

(d)    Conduct of Business.

(i)    Except as (A) may be required or approved by the Bankruptcy Court, (B) agreed to in writing by Buyer, which agreement shall not be unreasonably delayed, conditioned or withheld or (C) disclosed on Annex K, from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall use their commercially reasonable efforts to operate the Business (normal wear and tear excepted) and conduct the Business in the Ordinary Course of Business.

(ii)    In furtherance of and subject to clause (i) above, from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall use commercially reasonable efforts to:

(A)    maintain its books, accounts and records in accordance with past custom and practice;

(B)    retain Covered Employees who are in good standing and are either necessary to conduct the Business as it is currently being conducted or are otherwise specifically designated in the Transition Services Agreement as persons needed to provide services thereunder; provided, however, that Sellers have no obligation to provide any retention benefits or any other additional compensation or benefits to Covered Employees, unless Buyer requests that Sellers provide retention benefits or other additional compensation or benefits to Covered Employees (and, in the case of Covered Employees covered by any collective bargaining agreement, only to the extent permitted under the terms and conditions of the applicable collective bargaining agreement or other agreement with the applicable labor union), in which case, Buyer shall reimburse Sellers for all costs incurred by Sellers in providing such retention benefits or additional compensation or benefits;

(C)    maintain its relationships with and preserve for the Business the goodwill of its key suppliers, customers and others having business dealings with the Business;

(D)    comply in all material respects with all applicable laws with respect to the conduct of the Business;

(E)    comply in all material respects with contractual obligations applicable to or binding upon Sellers pursuant to the Assumed Contracts;

(F)    maintain in full force and effect all material Permits related to the Acquired Assets and the Assumed Liabilities;

(G)    cause any of Sellers' current property insurance policies with respect to the Acquired Assets and the Covered Employees not to be canceled or

terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(H)    diligently prosecute applications included in the Acquired Intellectual Property, maintain in full force and effect issuances and registrations included in the Acquired Intellectual Property and maintain and enforce its rights to other material Business Intellectual Property; and

(I)    preserve in all material respects the Acquired Assets (excluding sales of Inventory in the Ordinary Course of Business).

(iii)    In furtherance of and subject to clause (i) above, from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall not:

(A)    sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed, any Lien (other than Assumed Liabilities or Permitted Liens on any Acquired Assets (excluding sales of Inventory in the Ordinary Course of Business));

(B)    terminate, renew, materially amend or waive any rights under, or create any Lien (other than a Permitted Lien) with respect to, any Assumed Contract or Assumed Permit, other than non-material amendments made in the Ordinary Course of Business, or increase any payments required to be paid thereunder by Buyer after the Closing, or enter into any material new Contract other than in the Ordinary Course of Business;

(C)    except as reasonably requested by Buyer in writing, cease to operate or maintain any facility used by Sellers in connection with or related to the Business in a manner consistent with past practice (after the Petition Date);

(D)    introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services sold in the Business;

(E)    acquire for the Business (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, or other business organization or division thereof or other material assets or properties;

(F)    enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(G)    enter into for the Business any agreement that contains a covenant or other provision restricting the ability of the Business (or which, following the Closing, could restrict the ability of Buyer) to compete with any Person or in any

41

geographic area or to engage in any activity or business, or pursuant to which any benefit is required to be given or is lost as a result of so competing or engaging;

      (H)    make any material changes in the manner in which employees are compensated or the amount of such compensation or materially increase (or provide additional or supplemental) benefits for employees, except, in any case, as required by applicable laws or normal increases, additions or supplements in the Ordinary Course of Business;

      (I)    settle, or agree to settle, any material Litigation that is an Acquired Asset or Assumed Liability other than in the Ordinary Course of Business;

      (J)    solely with respect to any action which could have an adverse effect on Buyer or any of its Affiliates following the Closing, make or rescind any material election related to Taxes, settle or compromise any material claim, action, suit, Litigation, arbitration, investigation, audit or controversy relating to Taxes, or except as required by applicable law or GAAP, make any material change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax Returns; and

      (K)    authorize or enter into any agreement or commitment to take any action prohibited by this Section 5(d)(iii).

    (e)    Information and Consultation. The Parties will, in a timely fashion, engage in all information and consultation processes, as required under domestic regulations, each with their appropriate bodies of worker representation, if any, in connection with the transactions contemplated herein.

    (f)    Notice of Developments. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, each Party will give prompt written notice to the other Parties of (i) the existence of any fact or circumstance, or the occurrence of any event or (ii) any inaccuracy or breach of such Party's representations and warranties (in each case, as if such representation or warranty was being made by such Party as of the date of such inaccuracy or breach) or covenants contained herein, in each case, which would cause a condition to a Party's obligations to consummate the transactions contemplated in this Agreement as set forth in Section 7 not to be satisfied; provided, however, that the delivery of any such notice pursuant to this Section 5(f) shall not be deemed to amend or supplement this Agreement or the Schedules, and the failure to deliver any such notice shall not constitute a waiver by any Party of any right or condition to the consummation of the transactions contemplated in this Agreement.

    (g)    Access. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, upon reasonable advance written notice by Buyer, Sellers will permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel (including all represented

employees), outside Representatives, Records and Contracts of or related to the Business for the purpose of evaluating and reviewing the Business, the Acquired Assets, and the Assumed Liabilities (including negotiations or discussions with landlords, represented employees and their bargaining representatives and customers, suppliers, vendors or licensors of the Business and as set forth on Annex L); provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Legal Requirements; provided, further, that Buyer shall provide Sellers with a reasonable opportunity to participate in all such negotiations and discussions. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers and Buyer and its Representatives may, at the reasonable request of Buyer, have joint discussions with customers, suppliers, vendors or licensors of the Business, landlords related to any Transferred Facility and represented employees and their bargaining representatives. Buyer agrees to indemnify and hold Sellers and their Affiliates and their respective directors, managers, members, stockholders, officers, employees, attorneys and agents harmless of and from all actions, suits, claims, investigations, fines, judgments, damages, losses, deficiencies, Liabilities, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to physical injuries arising from Buyer's inspection of the Business, and, notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement. All information obtained pursuant to this Section 5(g) shall be subject to the terms and conditions of the Confidentiality Agreement. For the avoidance of doubt, such access by Buyer pursuant to this Section 5(g) shall not affect the representations, warranties, conditions, covenants and agreements provided by Sellers hereunder.

(h)    Delivery of Financial Information.  Concurrently with the delivery by Sellers to the DIP Lenders pursuant to the DIP Facility Agreement of any reports or financial information required to be delivered to the DIP Lenders, Sellers shall deliver such reports or financial information to Buyer.

(i)    Press Releases and Public Announcements.  The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by Buyer, on the one hand, and Sellers, on the other hand. Notwithstanding the foregoing, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable Legal Requirement (for the avoidance of doubt, including the Bankruptcy Code), including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale Motion.

(j)    Bankruptcy Court Matters.

(i)    Sellers shall pursue diligently the entry of the Bidding Procedures Order and the Sale Order.  Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bidding Procedures Order and the Sale Order.  Sellers shall consult with Buyer and its Representatives concerning the Bidding Procedures Order, the Sale Order, any other orders of the

43

Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with copies of applications, motions, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

(ii)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining a finding of adequate assurance of future performance by Buyer and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(iii)    No later than five Business Days following the execution of this Agreement, Sellers shall file a motion seeking entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order (the "Sale Motion"), including all supporting pages, and shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order on or prior to July 22, 2010, subject to availability of the Bankruptcy Court (and only to the extent permitted by the relevant provisions of the Bankruptcy Rules and Local Bankruptcy Rules).

(iv)    Sellers acknowledge and agree that Buyer has expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Assets, and that the entry into this Agreement provides value to the Sellers' chapter 11 estates by, among other things, inducing other parties to submit higher or better offers for the Acquired Assets. In consideration therefor, the Bidding Procedures Order shall provide that the Break-Up Fee and Reimbursable Expenses are administrative priority expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code.

(v)    Sellers shall use their commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than August 27, 2010. The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code: (A) the Acquired Assets shall be sold to Buyer free and clear of all Liens, claims, interests, and encumbrances, including Liens as defined herein, of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), except for Permitted Liens, and the Assumed Liabilities shall be assumed by Buyer, in each case, pursuant to this Agreement and the Related Agreements; (B) Sellers shall assign to Buyer all of the Assumed Contracts as of the Closing Date pursuant to such order; (C) Buyer shall, on or before the Closing Date, or on or before the effective date of assignment of an Assumed Contract to Buyer, as

44

applicable, pay the Cure Amounts to the appropriate parties as ordered by the Bankruptcy Court so as to permit the assumption and assignment of each applicable Assumed Contract; (D) Buyer shall be found to have demonstrated and established any adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts; (E) Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code; (F) Buyer shall have no liability or responsibility for any liability or other obligation of Sellers arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity; (G) Buyer shall have no liability for any Excluded Liability; and (H) the Wind-Down Escrow Amount shall be deposited with the escrow agent under the Wind-Down Escrow Agreement. In the event the Sale Order is appealed, Sellers shall use their reasonable best efforts to defend such appeal.

(vi)    Sellers further covenant and agree and the Sale Order shall provide that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(k)    Competing Transaction.

(i)    From and after the date hereof and until the determination of the winning bidder at the Auction, Sellers shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any Competing Transaction; provided, however, that in no event shall Sellers enter into any agreement with respect to a Competing Transaction (other than a confidentiality or non-disclosure agreement meeting the requirements of Section 5(k)(ii)) until after the date the Bidding Procedures Order is entered by the Bankruptcy Court.

(ii)    In connection with the actions permitted pursuant to Section 5(k)(i), Sellers may supply information relating to the Business and the Acquired Assets to such prospective purchasers; provided, however, that no non-public information may be furnished by Sellers, their Affiliates or their Representatives to any such Person until Sellers receive an executed confidentiality agreement from any such Person containing terms and provisions that are substantially the same as those contained in the Confidentiality Agreement; provided, further, that any such confidentiality agreement shall not contain any terms or provisions that prohibit Sellers from complying with the provisions of this Agreement in any respect. In the event that Sellers, their Affiliates or Representatives provide or make available to any prospective purchasers any non-public information not previously provided or made available to Buyer and its Representatives, or non-public information in a form not previously provided or made available to Buyer

45

and its Representatives, Sellers shall, in each case, promptly post all such non-public information to Sellers' online data room.

(iii)    Sellers shall provide Buyer and its Representatives (A) as promptly as practicable (and in no event later than 24 hours) after the expiration of the Bid Deadline (as defined in the Bidding Procedures), copies of all asset purchase agreements received as part of any Qualified Bids (as defined in the Bidding Procedures) (the "Qualified APAs") and (B) as promptly as practicable (and in no event later than 48 hours) after the expiration of the Bid Deadline, copies of all agreements, schedules, exhibits and annexes related to the Qualified APAs, other than (x) agreements, schedules, exhibits and annexes which contain confidential or financial information of the Person submitting such Qualified APA and (y) financing letters delivered in connection with such Qualified APA.

(l)    Bulk Transfer Laws.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer and similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waive all claims related to the non-compliance therewith. The Parties intend that, pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any Liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

(m)    Cure Amounts.    As promptly as practicable following the date hereof (and in any event no later than July 19, 2010), Sellers shall provide Buyer with a substantially complete analysis of the amounts required to cure all defaults under each Assumed Contract. In addition to the foregoing, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the amounts required to cure all defaults under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement (as ultimately determined by the Bankruptcy Court, the "Cure Amounts"). In connection with the assignment and assumption of the Assumed Contracts, Buyer shall cure any defaults under the Assumed Contracts by payment of any Cure Amounts (or create reserves therefor) as ordered by the Bankruptcy Court and shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts, and notwithstanding anything to the contrary set forth herein, (i) neither the Cure Amounts paid nor the expense of any other obligation set forth in this Section 5(m) shall reduce, directly or indirectly, any consideration received by Sellers hereunder, and (ii) Buyer's payment of the Cure Amounts shall be in addition to its obligation to pay the Purchase Price. Notwithstanding anything to the contrary herein, Sellers shall have no Liability for any Cure Amounts related to any Assumed Contracts.

(n)    Cooperation with Financing.    In order to assist Buyer with obtaining the debt financing contemplated by the Debt Commitment Letters or any alternative debt financing, prior to the Closing Date, Sellers shall use their commercially reasonable efforts to provide Buyer, at Buyer's sole expense, all cooperation reasonably requested by Buyer to enable Buyer to meet the conditions precedent set forth in the Debt Commitment Letters or any alternative debt financing; provided that such cooperation does not unreasonably interfere with the ongoing operations of

Sellers. Subject to the foregoing limitations, such cooperation shall include cooperation in the preparation of any documentation or confidential information memorandum or similar document required in connection with such debt financing, making senior management of Sellers available for customary presentations, due diligence sessions and sessions with rating agencies in connection with such debt financing, cooperation with prospective lenders in performing their due diligence and entering into pledge and security documents and other definitive financing documents and/or providing requested certificates or documents; provided, that in no event shall Sellers be obligated to pass resolutions authorizing or otherwise relating to such debt financing. Notwithstanding anything in this Section 5(n) to the contrary, (i) no Seller shall be required to pay any commitment fee or similar fee or incur any liability with respect to obtaining any debt financing contemplated by Buyer prior to the Closing, (ii) no officer, director or employee of any Seller shall be required to execute any documents that will be effective prior to the Closing and (iii) no Seller shall be required to issue any confidential information memoranda or similar document or presentation or to indemnify any Person in connection with any such debt financing of Buyer. Buyer shall promptly upon demand reimburse Sellers for all reasonable and documented out-of-pocket costs, fees and expenses incurred in connection with such assistance and cooperation and shall indemnify and hold harmless Sellers and their respective Representatives from and against any and all losses, damages, claims, costs or expenses suffered or incurred by any of them in connection with any cooperation provided pursuant to this Section 5(n). Without limiting the foregoing, no Seller shall be liable for any obligation incurred in connection with any such debt financing of Buyer. Prior to Closing Date, in connection with the marketing of such debt financing, the proposed lenders shall be permitted to use, subject to Sellers' prior written consent (which shall not be unreasonably withheld or delayed), Sellers' names and logos (as such names and logos exist prior to the Closing Date) in any confidential information memorandum or similar document or presentation used in connection with Buyer's obtaining such debt financing; provided, that Buyer and/or its Subsidiaries shall be identified as the borrowers in any such information memorandum or similar document or presentation and such logos are used solely in a manner that is not intended to, or reasonably likely to, harm or disparage Sellers or the goodwill of any of Sellers. No non-public information may be furnished to the proposed lenders pursuant to this Section 5(n) until (A) Buyer receives, and provides a copy to Sellers of, an executed confidentiality agreement from any such Person pursuant to which (x) such proposed lenders have agreed to be bound by confidentiality undertakings containing terms and provisions that are substantially the same as the Confidentiality Agreement or (y) are on customary terms and provisions for confidentiality undertakings of proposed lenders in connection with syndicated financings of the type contemplated by the Debt Commitment Letters or any debt financing or (B) Buyer provides evidence to Sellers that such Person has agreed to be bound by the terms of the Confidentiality Agreement, provided, however, in the case of any and all agreements entered into pursuant to clauses (A) and (B), Buyer shall be liable to Sellers for any breaches by any such Persons.

(o)     Registered Intellectual Property Recordations.    Sellers shall record all assignments and other documents with the appropriate Governmental Entities and take all other actions necessary to reflect a Seller as the record owner (in a manner such that there is no break in the chain of title) of all Registered Intellectual Property that is part of the Acquired Intellectual Property no later than five Business Days prior to the Closing Date; provided, however, that Sellers shall not be required to correct any defect in the chain of title for any Registered

47

Intellectual Property due to prior events to which none of the Sellers or their respective Affiliates was a party or otherwise involved.

(p)    Debt Commitment.   Buyer will use its commercially reasonable efforts to negotiate and, prior to the Bidding Procedures Hearing, deliver to Sellers, a copy of a commitment letter or letters on customary terms and conditions for facilities and transactions of the type contemplated therein from Wells Fargo Capital Finance and/or Bank of America, or if Buyer so chooses, such other financial institutions or alternative financing sources as Buyer reasonably selects to provide, subject to the terms and conditions therein, debt financing in an amount set forth therein (the "Debt Commitment Letters").

6.    Other Covenants.   The Parties agree as follows with respect to the period from and after the Closing:

(a)    Cooperation; Further Assurances.   The Parties shall cooperate with each other, and shall use commercially reasonable efforts to cause their respective controlled Affiliates and Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Sellers to Buyer and to minimize any disruption resulting from the transactions contemplated in this Agreement.   Until the dissolution or liquidation of Sellers, if any further action is necessary or desirable to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's reasonable request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets and to confirm Buyer's assumption of the Assumed Liabilities.

(b)    Run-Off; Accounts.

(i)    As of the Closing Date, each Seller hereby (A) authorizes Buyer to open any and all mail addressed to any Seller relating to the Acquired Assets and delivered to any property included in the Acquired Assets or otherwise delivered to Buyer if received on or after the Closing Date and (B) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable that are Acquired Assets made payable or endorsed to any Seller, for Buyer's own account.

(ii)    For the period following the Closing until the dissolution or liquidation of Sellers, if Sellers receive any payment relating to any account receivable outstanding on or after the Closing Date related to the Acquired Assets reflected on the Conclusive Net Working Capital Statement (or if not yet determined, the Closing Net Working Capital Statement), such payment shall be the property of Buyer, and Sellers shall (A) until forwarding such payment to Buyer in accordance with the following clause (B), segregate such payment in an account separate from Sellers' other accounts and (B) promptly forward and remit such payment to Buyer, without any right of setoff or reimbursement. Sellers shall promptly endorse and deliver to Buyer any cash, checks or other documents received by Sellers on account of any such accounts receivable and Sellers shall use

commercially reasonable efforts to refer all customer or supplier inquiries received by Sellers relating to the Business to Buyer.

(iii)    Prior to the Closing, Sellers shall cooperate with Buyer to establish new bank accounts for Buyer related to the Acquired Assets and shall take all actions reasonably necessary to ensure that all customer receipts are promptly routed to such new bank accounts.

(c)    Post-Closing Operations of Sellers; Name Changes.  Sellers hereby acknowledge and agree that upon consummation of the transactions contemplated hereby, Buyer shall have the sole right to use the names set forth on Annex M and all Marks included in the Acquired Assets and any Marks containing or comprising any of the foregoing or similar to, or confusing with, any of the foregoing ("Restricted Marks").  As promptly as possible after the Closing Date, and in no event later than 90 days thereafter, each Seller shall take such corporate, limited liability company and any other action necessary to change its corporate and company name to a name that does not contain or comprise and is not similar to, or confusing with, its current name or any Restricted Marks, including any necessary filings required by the applicable Legal Requirement of the state of organization of such Seller.

(d)    Change of Caption.  As promptly as possible after the Closing Date, and in no event later than 90 days thereafter, each Seller shall cause the caption in the Chapter 11 Cases to be changed so that such Seller's name as of the Closing Date is not included in the caption.

(e)    Availability of Business Records.

(i)    After the Closing Date, Buyer shall provide to Sellers (including, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to, including electronic and computer access and the right to make copies (at Sellers' sole cost and expense) of, all Records included in the Acquired Assets to the extent that such Records relate to any period prior to the Closing Date and are not already in the possession of Sellers or their Representatives.  Buyer shall preserve such Records until the later of (A) seven years after the Closing Date; (B) the required retention period required by any United States or foreign Legal Requirement; (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Sellers at least 30 days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer will permit Sellers to retain such Records.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render reasonable assistance that Sellers may request in defending such Litigation or claim and shall make available Transferred Employees who are most knowledgeable about the matter in question, in each case, at Sellers' sole cost and expense and only at such time, and in such manner, so as not to interfere with the normal operations of Buyer or its Affiliates following the Closing Date.

(ii)    After the Closing Date, Sellers shall provide to Buyer and its Representatives (after reasonable notice and during normal business hours and without charge to Buyer) access to, including electronic and computer access and the right to make copies (at Buyer's sole cost and expense) of, all Records included in the Acquired Assets in the possession of Sellers to the extent that such Records relate to any period prior to the Closing Date and are not already in the possession of Buyer or its Representatives. Sellers shall preserve such Records until the earlier of (A) seven years after the Closing Date; (B) the required retention period required by any United States or foreign Legal Requirement; (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Sellers shall notify Buyer at least 30 days in advance of any such proposed destruction of its intent to destroy such Records, and Sellers will permit Buyer to retain such Records.

(f)    <u>Satisfaction of Assumed Liabilities</u>.  Buyer agrees to pay, perform and discharge the Assumed Liabilities, including the discharge and performance when due of each and every obligation of Sellers to be satisfied or performed on or after the Closing Date, under the Assumed Contracts, and shall indemnify and hold Sellers harmless with respect to the Assumed Liabilities.

(g)    <u>Covered Employees and Employee Benefit Plans</u>.

(i)    Buyer shall offer employment to substantially all of the Covered Employees that are primarily employed at a Transferred Facility at substantially the same base salaries or hourly wages and with substantially the same employee benefits (but if permitted by applicable Legal Requirements, excluding defined benefit pension benefits, multiemployer plans, retiree welfare benefits and equity-based compensation) in the aggregate as in effect for such Covered Employees immediately prior to the Closing. Such offer of employment shall be for employment commencing as of (A) the Closing Date, in the case of those employees who are actively employed immediately prior to such date or (B) the later of the date they are able to return to active employment and report for such employment (provided such date is within 180 days or such longer period required by applicable law), in the case of those employees who are not actively employed immediately prior to the Closing Date. Those employees who accept Buyer's offer of employment and become employees of Buyer on or after the Closing Date are referred to herein as "<u>Transferred Employees</u>" from and after such commencement of such employment.

(ii)    Buyer shall grant all Transferred Employees credit after the Closing for all service with Sellers or any of their respective Affiliates and their respective predecessors for purposes of participation, vesting and benefit accruals (except for benefit accruals under any defined benefit pension plan) under any vacation, severance or other employee benefit plans maintained by Buyer or any of its Affiliates for the benefit of such Transferred Employees to the extent such service was recognized by Sellers or their respective Affiliates under a similar plan of the Sellers or their Affiliates.  Buyer will

50

cause to be waived any waiting period and preexisting condition limitations applicable to Transferred Employees under any group health plan maintained by Buyer or any of its Affiliates in which Transferred Employees are otherwise permitted to participate to the extent such limitations did not apply under similar plans of Sellers or their Affiliates, and Buyer will grant to Transferred Employees credit after the Closing Date for any period with Sellers or any of their respective Affiliates and their respective predecessors for purposes of any waiting period and preexisting condition limitation applicable to such Transferred Employees under any group health plan maintained by Buyer or any of its Affiliates in which such Transferred Employees are otherwise permitted to participate to the extent such period was taken into account in satisfying any waiting period or preexisting condition limitation under similar plans of Sellers or their Affiliates. Buyer will take all action necessary to ensure that Transferred Employees are given full credit for all expenses and deductibles incurred under any group health plan sponsored by Sellers or any of their respective Affiliates for the portion of the plan year preceding the Closing Date for purposes of satisfying any maximum out-of-pocket expense limitations, coinsurance, copayments, deductibles and similar limitations for the remainder of that plan year under any group health plan sponsored by Buyer or any of its Affiliates in which Transferred Employees participate after the Closing.

(iii)    Buyer shall be solely responsible for satisfying the continuation coverage requirements of COBRA for all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation section 54.4980B-9. Sellers and Buyer shall cooperate with each other, and shall use commercially reasonable efforts to cause their respective controlled Affiliates and Representatives to cooperate with each other, to provide for the establishment by Sellers of a fully-insured group health plan (including dental and vision benefits), in lieu of Sellers' existing group health plan or plans, covering the Covered Employees and any COBRA-entitled individuals as soon as practicable prior to the Closing; provided, that, in the case of Covered Employees covered by any collective bargaining agreement, such change in the group health plan provided to such Covered Employees shall be made only to the extent permitted under the terms and conditions of the applicable collective bargaining agreement or other agreement with the applicable labor union. In the event Seller establishes such new fully-insured group health plan, Seller shall use commercially reasonable efforts to maintain such new fully-insured group health plan until the termination of the Transition Services Agreement for the benefit of the Covered Employees, any employee or former employee of Sellers who does not become a Transferred Employee, and COBRA-entitled individuals who become eligible to elect COBRA coverage on or following the Closing or any individuals who become eligible to receive COBRA continuation coverage on or following the Closing. Buyer acknowledges and agrees that Buyer shall be a "successor employer" under Treasury Regulation section 54.4980B-9 in connection with the sale of the Acquired Assets by Sellers to Buyer and Buyer agrees to provide COBRA coverage to the "M&A qualified beneficiaries" with respect to the sale of the Acquired Assets in connection with COBRA and the regulations thereunder, including any Covered Employee (and their dependents) who lose coverage under Sellers' group health plan upon termination of Sellers' plan following Closing or upon expiration of the applicable provisions of the Transition Services Agreement.

(iv)    Effective as of the Closing Date, Buyer shall sponsor a tax-qualified defined contribution plan (the "Buyer's Savings Plan") applicable to Transferred Employees. Buyer's Savings Plan shall accept a rollover contribution of the vested account balances of the Transferred Employees (including any participant loan held in such Transferred Employees account, provided, that Sellers provide Buyer sufficient documentation of the terms of such participant loans, including a full amortization schedule for each participant by the Closing Date) who, pursuant to Sellers' tax-qualified 401(k) and other defined contribution plans, elect a direct rollover distribution of their vested account balances. At Buyer's request prior to the Closing Date, Sellers shall cause a trust-to-trust transfer of the full account balances of Transferred Employees from any of the Sellers' tax-qualified 401(k) or other defined contribution plans to the Buyer's Savings Plan; provided, that such trust-to-trust transfer shall be on such terms and conditions as are mutually agreeable to Sellers and Buyer and any such trust-to-trust transfer shall satisfy the requirements of section 414(l) of the IRC and section 208 of ERISA.

(v)    Effective as of the Closing Date, Buyer shall establish a medical expense reimbursement flexible spending account plan and a dependent care assistance expense reimbursement flexible spending account plan (the "Buyer's FSA Plans") with respect to eligible expenses incurred on or after the Closing Date. Pursuant to Revenue Ruling 2002-32, the elections in effect as of the Closing Date under Sellers' medical expense reimbursement flexible spending account plan and dependent care assistance expense reimbursement flexible spending account plan shall automatically transfer to Buyer's FSA Plans as of the Closing Date. Buyer shall credit an amount in cash equal to the Transferred Employee's positive account balance (net of eligible expenses reimbursed before the Closing Date) to such Transferred Employee under Buyer's FSA Plans as of the Closing Date. Buyer shall assume all Liabilities for any benefits with respect to the account balances credited to Buyer's FSA Plans.

(vi)    Buyer shall assume the Liability for all accrued and unpaid base salary or hourly wages, and accrued and unused vacation, sick leave and other paid time off of the Transferred Employees to the extent included in the Conclusive Net Working Capital Statement.

(vii)    Nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of employment by Buyer after Closing, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Buyer, in the exercise of its business judgment, in modifying any of the terms or conditions of employment of the Transferred Employees after the Closing. Sellers shall use their reasonable best efforts to assist with Buyer, including employee notices and other communications reasonably requested by Buyer, regarding any matters relating to the termination of Sellers' employees in connection with the Closing and, if applicable, the transfer of employment to Buyer.

(h)    Payroll and Withholding.

(i)    Buyer and Sellers shall cooperate to share all such information regarding any issue relating to the compensation of the Transferred Employees as may be required in order to satisfy any requirements related to federal, state and/or local income tax reporting (including for purposes of preparing a Form W-2 for each such employee) and withholding.

(ii)    To the extent permitted by applicable Legal Requirements, Buyer and Sellers shall share with each other and their respective Representatives and vendors all participant information necessary for the efficient and accurate administration of each of the plans and programs of Buyer.  To the extent permitted by applicable Legal Requirements, Buyer and Sellers and their respective authorized Representatives shall, subject to applicable Legal Requirements on confidentiality, be given reasonable and timely access to, and may make copies of, all information relating to the subjects of this Agreement in the custody of the other Party, to the extent necessary for such administration.

(i)    Taxes.

(i)    Buyer shall pay (and shall indemnify and hold Sellers and their respective Affiliates, agents, successors and permitted assigns harmless) any sales, use, property transfer or gains, stamp, documentary, registration, transfer, recording, added value or similar tax (each, a "Transfer Tax") imposed in connection with the transactions contemplated by this Agreement that are not eliminated through the application of section 1146(a) of the Bankruptcy Code. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Tax described in the immediately preceding sentence.  To the extent permitted by applicable Legal Requirements, Buyer shall be responsible for filing such Tax Returns and remitting the Tax to the applicable taxing authority.

(ii)    All real and personal property, ad valorem or similar Taxes related to the Acquired Assets (collectively, "Property Taxes") with respect to Property Tax periods ending on or before the Closing Date shall be the responsibility of Seller.  All Property Taxes with respect to Property Tax periods that begin before the Closing Date and end after the Closing Date (a "Straddle Property Tax Period") shall be allocated between Sellers, on the one hand, and Buyer on the other hand, on a per-diem basis, and Sellers' proportionate share of Property Taxes shall be determined from the beginning of the Straddle Property Tax Period through the Closing Date. At the Closing, with respect to (A) Straddle Property Tax Periods for which bills have not yet been received and (B) the Tax period immediately preceding the Straddle Property Tax Period (e.g., calendar year 2009) where under standard billing procedures in the relevant jurisdiction such bills have not yet been issued before Closing, Property Taxes shall be estimated as of the Closing Date using 100% of the latest available final tax bill.  Sellers' proportionate share of unpaid Property Taxes for clause (A) and 100% of clause (B) shall be credited to Buyer in the Estimated Net Working Capital Statement, and Buyer's proportionate share of any pre-paid Property Taxes for Straddle Property Tax Periods shall be credited to Seller in

53

the Estimated Net Working Capital Statement. Such estimate of Property Taxes shall be subject to adjustment pursuant to <u>Section 2(g)</u> to reflect actual Property Taxes for <u>clauses (A)</u> and <u>(B)</u> assessed if final tax bills for such Property Taxes become available prior to the determination of the Conclusive Net Working Capital Statement. If final bills are not available with respect to a particular Property Tax for Straddle Property Tax Periods, then the estimate of such Property Tax set forth on the Estimated Net Working Capital Statement shall be final and shall not be subject to adjustment. For the avoidance of doubt, in no event shall Buyer shall be liable for any amount of Property Tax in excess of the amount included in the Conclusive Net Working Capital Statement.

(iii)    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; <u>provided, however,</u> that neither Buyer nor any Seller shall be required to disclose the contents of its income tax returns to any Person except where there is a Legal Requirement. Any expenses incurred in furnishing such information or assistance (including reasonable cost of employees) pursuant to this <u>Section 6(i)(iii)</u> shall be borne by the Party requesting it.

(j)    <u>No Reliance</u>.

(i)    Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the business, operations, technology, assets, prospects, financial condition, Liabilities, results of operations and projected operations of the Business and the nature and condition of its properties, assets and businesses and, in making the determination to proceed with the transactions contemplated by this Agreement and the Related Agreements, has relied solely on the results of its own independent investigation and the representations and warranties set forth in <u>Section 3</u>. Buyer acknowledges that Sellers have provided Buyer with access to the personnel, properties, premises and books and records of the Business. Except as set forth in this Agreement, Buyer acknowledges that none of Sellers, their respective Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information (including any projections, estimates or other forward-looking information) regarding Sellers, the Acquired Assets, the Business or other matters (including in any management presentations, information memorandum, supplemental information or other materials or information with respect to any of the above). Without limiting the generality of the foregoing, none of Sellers, their respective Affiliates or any other Person has made an express or implied representation or warranty to Buyer with respect to (A) any projections, estimates or budgets for the Business or (B) any material, documents or information relating to Sellers, the Acquired Assets, the Business or other matters that is not included in this Agreement made available to Buyer or its Representatives in any "data room", offering memorandum or otherwise, except as expressly covered by a representation or warranty set forth in <u>Section 3</u>. Buyer agrees, to the fullest extent permitted by law, that Sellers and their respective directors, officers, employees, Affiliates, agents and Representatives shall not have any liability or

54

responsibility whatsoever to Buyer or its Affiliates or any of its directors, officers, employees, Affiliates or Representatives on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made (or any omissions therefrom), to Buyer or its Affiliates or any of its directors, officers, employees, Affiliates, agents or Representatives except as set forth in Section 3 with respect to such representations and warranties and subject to the limitations and restrictions contained in this Agreement.

(ii)    In connection with Buyer's investigation of the Business, Buyer has received from Sellers and their respective Affiliates, agents and Representatives certain projections and other forecasts, including projected financial statements, cash flow items and other data of the Business and certain business plan information of the Business. Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to them, and that Buyer and its Affiliates, agents and Representatives shall have no claim against any Person with respect thereto (including the reasonableness of the assumptions underlying such projections, forecasts and plans). Accordingly, Buyer acknowledges that, without limiting the generality of this Section 6(i), none of Sellers or any of their respective Representatives, agents or Affiliates, have made any representation or warranty with respect to such projections and other forecasts and plans.

(iii)    Notwithstanding anything to the contrary in this Agreement or the Related Agreements, Buyer acknowledges and agree that Sellers make no representation or warranty with respect to, and nothing contained in this Agreement (except for the representations and warranties set forth in Section 3), in the Related Agreements or in any other agreement, document or instrument to be delivered in connection herewith or therewith is intended or shall be construed to be a representation or warranty (express or implied) of Sellers, for any purpose of this Agreement, the Related Agreements or any other agreement, document or instrument to be delivered in connection herewith or therewith, in respect of (A) the adequacy or sufficiency of any reserves of the Business or of any of the Acquired Assets, (B) whether or not the reserves specified in clause (A) above were determined in accordance with any actuarial, statutory or other standard, or concerning the effect of the adequacy or sufficiency of reserves on any "line item" or asset, liability or equity amount, or the effect of any "line item" or asset, liability or equity amount on the adequacy or sufficiency of reserves and (C) any information or data, irrespective of the medium, delivered or made available to Buyer or any of its Affiliates or Representatives or any Person between the date hereof and the Closing Date.

(k)    No Other Warranties.  BUYER AGREES THAT EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO THE ACQUIRED ASSETS.

(l)    Non-Competition; Non-Solicitation.

(i)    For a period from the Closing until the earlier of the fifth anniversary of the Closing Date and the dissolution or liquidation of Sellers, except as provided in the Transition Services Agreement, each Seller shall not directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in the Business or that otherwise competes with the Business (a "Restricted Business").

(ii)    For a period from the Closing to the earlier of the fifth anniversary of the Closing Date and the dissolution or liquidation of Sellers, each Seller shall not (A) cause, solicit, induce or encourage any Transferred Employee to leave such Transferred Employee's employment with Buyer or (B) cause, induce or encourage any actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former customer of a Seller and any Person that becomes a client or customer of the Business after the Closing) or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship with Buyer (but taking into account, in each case, the fact that the Chapter 11 Cases have commenced and that, following the Closing, Sellers intend to dissolve and liquidate and, as a result thereof, may reject, terminate or cease any remaining relationships with any other Persons).

(iii)    The covenants and undertakings contained in this Section 6(l) relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 6(l) will cause irreparable injury to Buyer, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, Buyer will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 6(l). The rights and remedies provided by this Section 6(l) are cumulative and in addition to any other rights and remedies which Buyer may have hereunder or at law or in equity.

(m)    Replacement Credit Support Requirements.    From and after the Closing Date, Buyer agrees to provide replacement guarantees, standby letters of credit or other assurances of payment reasonably required to assume each Assumed Lease, in form and substance satisfactory to Sellers and the respective banks or other counterparties, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Credit Support Requirements, except to the extent such Credit Support Requirements are rejected by Sellers in connection with the Chapter 11 Cases.

(n)    Insurance.    To the extent permitted pursuant to each insurance policy of Sellers covering the Acquired Assets or the Assumed Liabilities, as soon as reasonably practicable (and, in any event, within 15 Business Days) following the Closing Date, Sellers shall use commercially reasonable efforts to cause the insurance carriers of such insurance policies to add Buyer as an additional named insured on all such insurance policies and to take any additional actions reasonably necessary to cause the insurance carriers of such insurance policies to provide

56

Buyer with the right to make claims related to the Acquired Assets or Assumed Liabilities under such insurance policies; provided, however, such commercially reasonable efforts and additional actions shall not require Sellers to incur any additional Liabilities with respect to such insurance policies.

(o)     Delivery of Wind-Down Escrow Information.  Concurrently with the delivery by Sellers to the Bankruptcy Court pursuant to the Sale Order of any reports or financial information required to be delivered to the Bankruptcy Court regarding the Wind-Down Escrow Amount, Sellers shall deliver such reports or financial information to Buyer.

7.     Conditions to Obligation to Close.

(a)     Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)     The representations and warranties of Sellers:

(A)     set forth in Section 3(d) shall be true and correct in all respects at and as of the Closing Date as if made at and as of such time;

(B)     set forth in Sections 3(a), (b), (c), (i), the first sentence of (n), (v), and (w), shall be true and correct in all material respects (except to the extent such representations and warranties are qualified by "materiality," Material Adverse Effect or similar materiality qualifications, they shall be true and correct in all respects) at and as of the Closing Date as if made at and as of such time (except to the extent such representations and warranties expressly relate to an earlier date, then as of such earlier date); and

(C)     otherwise set forth in Section 3, shall be true and correct in all respects (disregarding for these purposes any exception in such representation and warranties relating to "materiality," Material Adverse Effect or similar materiality qualifications) at and as of the Closing Date as if made at and as of such time (except to the extent such representations and warranties expressly relate to an earlier date, then as of such earlier date), except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(ii)     Sellers shall have performed and complied with their covenants and agreements hereunder through the Closing in all material respects;

(iii)     since the date of this Agreement, there shall not have occurred a Material Adverse Effect;

(iv)     Sellers and Buyer shall have received all authorizations, consents and approvals of Governmental Entities listed on Annex J, and Buyer shall have received evidence of each of the foregoing reasonably satisfactory to it;

57

(v)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(vi)    any applicable waiting period under the HSR Act shall have expired or been terminated;

(vii)   each of the consents identified on Annex N shall have been obtained;

(viii)  each delivery contemplated by Section 2(f)(i) to be delivered to Buyer shall have been delivered; and

(ix)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable; provided, however, that Buyer may waive the requirement that the Sale Order be final and non-appealable as long as the Sale Order has been entered by the Bankruptcy Court and no order staying, reversing, modifying or amending the Sale Order is in effect on the Closing Date.

(b)     Conditions to Sellers' Obligations.  Sellers' obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)     the representations and warranties of Buyer set forth in Section 4 shall be true and correct in all material respects (except to the extent such representations and warranties are qualified by "materiality," material adverse effect or similar materiality qualifications, they shall be true and correct in all respects) at and as of the Closing Date as if made at and as of such time (except to the extent such representations and warranties expressly relate to an earlier date, then as of such earlier date);

(ii)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(iii)   Sellers and Buyer shall have received all authorizations, consents and approvals of Governmental Entities listed on Annex J, and Sellers shall have received evidence of each of the foregoing reasonably satisfactory to them;

(iv)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(v)     Buyer shall have successfully cured any defaults under the Assumed Contracts that are being assumed and assigned at Closing by payment of any Cure Amounts (or shall have created reserves therefor) as ordered by the Bankruptcy Court, and Buyer shall have provided Sellers evidence thereof;

(vi)    Buyer shall have offered employment consistent with Section 6(g)(i);

58

(vii)    any applicable waiting period under the HSR Act shall have expired or been terminated;

(viii)    each delivery contemplated by Section 2(f)(ii) to be delivered to Sellers shall have been delivered; and

(ix)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable; provided, however, that Sellers may waive the requirement that the Sale Order be final and non-appealable as long as the Sale Order has been entered by the Bankruptcy Court and no order staying, reversing, modifying or amending the Sale Order is in effect on the Closing Date.

(c)    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated in this Agreement set forth in Section 7(a) or Section 7(b), as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts (or, where applicable, commercially reasonable efforts) to satisfy the conditions to the consummation of the transactions contemplated in this Agreement or other breach of a representation, warranty or covenant hereunder.

8.    Termination.

(a)    Termination of Agreement.    This Agreement may be terminated and the transactions contemplated in this Agreement abandoned at any time prior to the Closing, in the cases of clauses (i) through (xi), and at any time prior to the Bidding Procedures Hearing, in the case of clause (xii):

(i)    by mutual written consent of Sellers and Buyer;

(ii)    by Buyer, if any of the conditions to the obligations of Buyer set forth in Section 7(a) shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    by Sellers, if any condition to the obligations of Sellers set forth in Section 7(b) shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(iv)    by Buyer, if there shall be a breach by any Seller of any representation, warranty, covenant or agreement of such Seller contained in this Agreement which would result in a failure of a condition set forth in Section 7(a), and which breach cannot be cured or has not been cured within 10 Business Days after the giving of written notice by Buyer to Sellers of such breach;

(v)    by Sellers, if there shall be a breach by Buyer of any representation, warranty, covenant or agreement of Buyer contained in this Agreement which would result in a failure of a condition set forth in Section 7(b), and which breach cannot be

59

cured or has not been cured within 10 Business Days after the giving of written notice by Sellers to Buyer of such breach;

(vi)    by Buyer or Sellers, if Sellers fail to identify Buyer as the successful bidder at the conclusion of the Auction, but only after the earlier to occur of (A) the closing of a Competing Transaction or (B) the selection of a Person other than Buyer as the Back-Up Bidder (as defined in the Bidding Procedures);

(vii)    by Buyer, if (A) Sellers withdraw or seek authority to withdraw the Sale Motion, (B) Sellers or any other party authorized to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code files any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party whether or not authorized to be filed under section 1121 of the Bankruptcy Code) that would reasonably be expected in any material respect to delay, hinder, modify or otherwise interfere with this Agreement and the transactions contemplated by this Agreement, (C) the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transaction provided for in this Agreement or (D) a trustee or examiner with expanded powers is appointed in the Chapter 11 Case pursuant to section 1104 of the Bankruptcy Code;

(viii)    by Buyer, if (A) the Sale Order is modified in any material respect without Buyer's prior written consent, (B) any rules are adopted in connection with the Auction that, in any material respect, are not consistent with the Bidding Procedures or (C) the Bidding Procedures set forth in the Sale Motion are modified in any material respect without the prior written consent of Buyer;

(ix)    by Buyer, if (A) if the Final Order (as defined in the DIP Facility Agreement) has not been entered by the Bankruptcy Court by July 16, 2010 (or such later date if extended by the DIP Lenders) or (B) at any time if the Sellers cease to have access to the Loans or Letters of Credit (each as defined in the DIP Facility Agreement) in the amounts and on substantially similar terms contemplated by the DIP Facility Agreement;

(x)    by Buyer or Sellers, as applicable, on any date that is after the Drop Dead Date if the Closing shall not have occurred on or before such date; provided, however, that Buyer or Sellers, as applicable, shall not have the right to terminate this Agreement under this Section 8(a)(x) if the Closing has not occurred on or before such date solely because (A) of such Party's material failure to fulfill any of its obligations under this Agreement or (B) a Governmental Entity of competent jurisdiction, other than the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(xi)    by Sellers, if (A) all of the conditions set forth in Section 7(a) have been satisfied, (B) Sellers have provided irrevocable notice to Buyer of their intention to immediately consummate the transactions contemplated by this Agreement and (C) Buyer intentionally breaches its obligation to consummate the transactions contemplated