by this Agreement within five Business Days following the date on which it receives such notice from Sellers;

(xii)    by Buyer, only prior to the Bidding Procedures Hearing, if Buyer shall have used commercially reasonable efforts to negotiate, prepare, execute and deliver for execution a paper supply agreement with International Paper, and International Paper shall not have executed such agreement; or

(xiii)    by Buyer, on the first Business Day after the date on which the Loughlin Services are terminated unless such services resume prior to such termination.

(b)    Procedure Upon Termination.  In the event of termination and abandonment by Buyer or Sellers, or both, pursuant to Section 8(a), written notice thereof shall be given to the other Party, this Agreement shall terminate and the purchase of the Acquired Assets hereunder shall be abandoned, without further action by Buyer or Sellers.  If this Agreement is terminated as provided herein, then each Party shall destroy all documents, work papers and other material of any other Party relating to the transactions contemplated in this Agreement, whether so obtained before or after the execution hereof, and provide a written certification of such destruction to the Party furnishing the same.

(c)    Effect of Termination; Break-Up Fee.

(i)    If any Party terminates this Agreement pursuant to Section 8(a), then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 1 (Definitions), the provisions of Section 2(d) relating to the disposition of the Deposit following termination of this Agreement, Section 9 (Miscellaneous), and this Section 8 (Termination) shall survive any such termination in accordance with their terms) and no Party shall have any liability to any other Party hereunder except as expressly set forth in this Section 8(c).

(ii)    If any Party terminates this Agreement pursuant to Section 8(a), the Deposit, together with all accrued investment income or interest thereon, shall be either returned to Buyer or delivered to Sellers in accordance with Section 2(d)(ii).

(iii)    If this Agreement is terminated pursuant to Section 8(a)(ii) (other than for failure of a condition set forth in Section 7(a)(vi)), Sections 8(a)(iv), 8(a)(vi), 8(a)(vii), 8(a)(viii), 8(a)(ix) or 8(a)(x), Sellers shall pay to Buyer in immediately available funds the Reimbursable Expenses within five Business Days after the delivery by Buyer to Sellers of notice of demand for payment setting forth a reasonable description of the Reimbursable Expenses.

(iv)    In addition, in the event that either Buyer or Sellers terminate this Agreement pursuant to Section 8(a)(vi), then, in addition to the Reimbursable Expenses, Buyer shall also be entitled to a cash fee equal to $2,650,000 (the "Break-Up Fee"), such fee to be paid by the Competing Purchaser to Buyer promptly after the closing of a Competing Transaction.

(v)    The Break-Up Fee payable under the circumstances provided in Section 8(c)(iv), together with Reimbursable Expenses to the extent available under Section 8(c)(iii), shall be the exclusive remedy of Buyer and its Affiliates for any termination of this Agreement contemplated by such provisions. In no event shall Sellers or any of their respective Affiliates have any liability with respect to Buyer or any other Person hereunder in excess of the applicable Break-Up Fee and Reimbursable Expenses in the event that this Agreement terminates under Section 8(a)(vi), and any claim, right or cause of action by Buyer or any other Person against Sellers or their respective Affiliates in excess of the Break-Up Fee and Reimbursable Expenses is hereby fully waived, released and forever discharged. The Deposit payable to Sellers under the circumstances provided in Section 8(c)(ii) shall be the exclusive remedy of Sellers and its Affiliates for any termination of this Agreement except as contemplated by Section 8(c)(viii) and the Guaranty. Except as contemplated by Section 8(c)(viii) and the Guaranty, in no event shall Buyer or its Affiliates have any liability with respect to Sellers or any other Person hereunder in excess of the Deposit in the event that this Agreement is terminated, and any claim, right or cause of action by Sellers or any other Person against Buyer or its Affiliates in excess of the Deposit is hereby fully waived, released and forever discharged. In no event shall a Party or an Affiliate of such Party have any Liability to the other Party or any other Person for any special, incidental, exemplary, indirect, consequential or punitive damages, and any such claim, right or cause of action for any damages that are special, incidental, exemplary, indirect, consequential or punitive is hereby fully waived, released and forever discharged.

(vi)    Any obligation to pay the Break-Up Fee and Reimbursable Expenses hereunder shall be absolute and unconditional; such payment shall constitute an administrative expense of Sellers' estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever. Sellers and Buyer agree that (A) the Bidding Incentives were a material and necessary inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated in this Agreement and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever, (B) it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred in the event of a termination in circumstances in which the Bidding Incentives are payable in accordance with this Agreement and (C) the Bidding Incentives are not penalties, but rather they constitute liquidated damages in a reasonable amount that will compensate Buyer in the circumstances in which such amounts are payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby.

(vii)    If this Agreement is terminated in accordance with Section 8(a), (A) the Confidentiality Agreement shall survive such termination, and nothing in Section 8(b) or in this Section 8(c) shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement and (B) Buyer agrees that all prohibitions in the Confidentiality Agreement shall be extended to a period of two years from the date of such termination.

(viii)  If Sellers terminate this Agreement pursuant to Section 8(a)(xi), and on the date of such termination there is no Back-Up Bidder (as defined in the Bidding Procedures), Buyer shall be liable for any damages incurred by Sellers related to, arising out of or resulting from such termination; provided, however, that in no event shall any such damages exceed the Initial Purchase Price (after giving effect to the payment of the Deposit to Sellers in accordance with Section 2(d)(ii)(C)).

(ix)  If Buyer terminates this Agreement pursuant to Section 8(a)(xiii) and Sellers caused the termination of the Loughlin Services, Sellers's sole obligation under this Agreement shall be to pay to Buyer in immediately available funds $1,500,000 within five Business Days after the delivery by Buyer to Sellers of notice of demand for payment.

9.    Miscellaneous.

(a)    Expenses. Except as otherwise provided in this Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

(b)    Entire Agreement.   This Agreement, the Related Agreements and the Confidentiality Agreement, together with any annexes, exhibits and schedules hereto and thereto, constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(c)    Incorporation of Annexes, Exhibits and Schedules. The annexes, exhibits and Schedules to this Agreement shall be deemed to be a part of this Agreement to the same extent as if set forth verbatim in the body of this Agreement.

(d)    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of Buyer and the Company (on behalf of all Sellers) except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the

terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9(d), except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(e)    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including any chapter 7 of the Bankruptcy Code or other trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Parties; provided, however, that the rights of Buyer under this Agreement may be assigned by Buyer (or any permitted assignee of Buyer), without the prior written consent of any Seller, to (i) one or more Affiliates of Buyer or (ii) one or more of the lenders to Buyers or its Affiliates (or any agent or trustee for such lenders (and any other relevant secured parties)), in each case, so long as such assignment shall not release Buyer from its obligations hereunder.

(f)    Covenant Not to Sue.

(i)    On and after the Closing Date, Buyer on the one hand, and Sellers, on the other hand, each covenants and agrees not to sue or otherwise bring any action against the other and each of the current and former directors, officers, employees, agents, managers, advisors, attorneys and Representatives (solely in their capacity as such and in no other capacity) of the other with respect to any and all claims based in whole or in part upon any act, omission, or transaction, taking place at any time on or before the Closing Date in connection with this Agreement or the transactions contemplated hereby, with the exception of (A) acts, omissions, transactions, events or occurrences resulting from or involving any fraud of any such Persons, (B) as otherwise expressly contemplated by the Transition Services Agreement or (C) to enforce any obligations pursuant to this Agreement that survive the Closing Date.

(ii)    Notwithstanding any other term in this Agreement to the contrary, the waivers, covenants and agreements contained in this Section 9(f) shall survive the Closing and shall bind and inure to the benefit of, as the case may be, Buyer and its successors and assigns and Sellers, their Affiliates, and their estate, creditors, successors and assigns, including any trustee in any case under chapter 7 of the Bankruptcy Code.

(g)    Notices. All notices, requests, demands, claims and other communications hereunder will be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given: (i) when delivered personally to the recipient; (ii) when sent by facsimile (with written confirmation of transmission) or email (with confirmation of receipt by email); (iii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Sellers:

            National Envelope Corporation
            333 Earle Ovington Boulevard, Suite 1035
            Uniondale, New York 11553
            Attention: Dale G. Nissenbaum
            Facsimile: (516) 699-4030
            Email: DNissenbaum@natenv.com   .

with a copy  (which shall not constitute notice) to:

            Latham & Watkins LLP
            233 South Wacker Drive, Suite 5800
            Chicago, Illinois 60606
            Attention: Josef S. Athanas
            Facsimile: (312) 993-9767
            Email: josef.athanas@lw.com

If to Buyer:

            c/o The Gores Group, LLC
            10877 Wilshire Boulevard, 18th Floor
            Los Angeles, California 90024
            Attention: General Counsel
            Facsimile: (310) 443-2149
            Email: ehattler@gores.com

with a copy  (which shall not constitute notice) to:

            Weil, Gotshal & Manges LLP
            201 Redwood Shores Parkway
            Redwood Shores, California 94065
            Attention: Kyle C. Krpata
            Facsimile: (650) 802-3100
            Email: kyle.krpata@weil.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9(g).

    (h)    Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York (other than Section 5-1401 of the New York general obligations law), except to the extent that the laws are superseded by the Bankruptcy Code, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws.  For so long as Sellers

are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby, such matter shall be brought in the courts of the State of New York sitting in the County of New York or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated in this Agreement.

(i)    <u>Consent to Service of Process</u>.  Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9(g)</u>.

(j)    <u>Waivers of Jury Trial</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(k)    <u>Specific Performance</u>.  Sellers acknowledge and agree that Buyer may be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that Buyer may have under law or equity, Buyer shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof. The Parties further acknowledge and agree that no Seller shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by Buyer or any remedy to enforce specifically the terms and provisions of this Agreement or otherwise obtain any equitable relief against Buyer and that Sellers' sole and exclusive remedies with respect to such breach shall be the remedies set forth in <u>Section 8(c)(v)</u>.

(l)    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, in each case, so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

66

(m)  <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(n)  <u>No Survival of Sellers' Representations, Warranties and Agreements</u>.  Each of the representations, warranties, covenants and agreements of Sellers and Buyer made in this Agreement shall not survive the Closing Date; <u>provided</u>, <u>however</u>, that any covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

(o)  <u>Construction</u>.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  The word "<u>including</u>" and "<u>include</u>" and other words of similar import will be deemed to be followed by the phrase "without limitation."  The words "<u>herein</u>," "<u>hereto</u>" and "<u>hereby</u>," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "<u>related to the Business</u>" and other words of similar import will be deemed to mean "relating to the operation of the Business as conducted as of the date hereof."  References to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Annexes and Exhibits herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Annexes and Exhibits of this Agreement.  The word "<u>if</u>" and other words of similar import will be deemed to be followed by the phrase "and only if."  Any reference herein to law or to a law, statute, rule or regulation of any Governmental Entity (or any provision thereof) shall include all laws and such law, statute, rule or regulation promulgated thereunder (or provision thereof), including any successor thereto, as it may be amended from time to time.  Any reference herein to "<u>dollars</u>" or "<u>$</u>" shall mean United States dollars.

(p)  <u>Computation of Time</u>.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

(q)  <u>Mutual Drafting</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(r)  <u>Schedules</u>.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth on the Schedules.  The disclosure of any matter in any section of the Schedules shall be deemed to be a disclosure for  all other sections of the Schedules to the extent that it is reasonably apparent that such disclosure is relevant to such other Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by any Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No

67

disclosure on the Schedules relating to any possible breach or violation of any Contract or Legal Requirement shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter on the Schedules be deemed or interpreted to expand the scope of any Seller's representations, warranties and/or covenants set forth in this Agreement. The information contained on the Schedules is in all events subject to the Confidentiality Agreement.

(s)     Headings; Table of Contents.  The Section headings and the table of contents contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(t)     Counterparts; Facsimile or Email Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

(u)     Time of Essence.  Time is of the essence of this Agreement.

(v)     Non-Recourse.  Except as contemplated by the Guaranty, no past, present or future director, officer, employee, incorporator, member, partner or equity holder of any Seller or Buyer shall have any liability for any obligations or Liabilities of such Seller or Buyer under this Agreement or any Related Agreements, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**SELLERS:**

**NEC HOLDINGS CORP.**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE CORPORATION**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – WH LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – AECO LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – CHINO LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – CITY OF INDUSTRY, LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – ENNIS LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

[Signature Page to Asset Purchase Agreement]

**NATIONAL ENVELOPE – CORSICANA LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – GRAND PRAIRIE LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – AURORA LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – LENEXA LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – APPLETON LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – ELK GROVE VILLAGE LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

**NATIONAL ENVELOPE – SCOTTDALE LLC**

By: _____
Name: James Shelby Marlow
Title:  Authorized Person

[Signature Page to Asset Purchase Agreement]

**NATIONAL ENVELOPE CORPORATION –
EAST**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

**NATIONAL ENVELOPE – SPECIALTIES
GROUP LLC**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

**NATIONAL ENVELOPE – HOUSTON LLC**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

**NATIONAL ENVELOPE – SHELBYVILLE
EQUITY LLC**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

**NATIONAL ENVELOPE – EXTON EQUITY
LLC**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

**NATIONAL ENVELOPE – NASHVILLE
EQUITY LLC**

By: _____
     Name: James Shelby Marlow
     Title:  Authorized Person

[Signature Page to Asset Purchase Agreement]

**NATIONAL ENVELOPE – HOUSTON EQUITY LLC**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**NATIONAL ENVELOPE – LEASING LLC**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**NEW YORK ENVELOPE CORP.**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**NATIONAL ENVELOPE CORPORATION – NORTH**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**NATIONAL ENVELOPE CORPORATION – SOUTH**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**NATIONAL ENVELOPE CORPORATION – CENTRAL**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

**OLD COLONY ENVELOPE CORP.**

By: _____
    Name: James Shelby Marlow
    Title:  Authorized Person

[Signature Page to Asset Purchase Agreement]

ARISTOCRAT ENVELOPE CORPORATION

By: _____

Name: James Shelby Marlow
Title:   Authorized Person

[Signature Page to Asset Purchase Agreement]

**BUYER:**

NEV HOLDINGS, LLC

By: _____
Name: Jordan Katz
Title: Vice President

[Signature Page to Asset Purchase Agreement]

## EXHIBIT A

Form of Bidding Procedures

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEC HOLDINGS CORP.,<br>*et al.*,[1] | Case No. 10-11890 (PJW) |
| | Joint Administration Pending |
| Debtors. | |

**BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT
AND ANALYSIS OF BIDS IN CONNECTION WITH THE
SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS**

(the "**Bidding Procedures**")[2]

These Bidding Procedures have been approved by order of the United States Bankruptcy Court for Delaware (the "**Court**") in connection with the above-captioned jointly administered cases of NEC Holdings Corp. and its subsidiaries (collectively, the "**Debtors**" or the "**Company**"), dated as of [_____], 2010 [Docket No. ___] (the "**Bidding Procedures Order**").

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

[2] [ALL DATES SET FORTH HEREIN ARE SUBJECT TO CONTINUED DISCUSSION.]

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct the sale (the "**Sale**") by auction (the "**Auction**") of all or substantially all of the assets of the Debtors (the "**Assets**," including, without limitation, that portion of the Assets defined as the "**Acquired Assets**" in the Asset Purchase Agreement dated as of July 8, 2010 (the "**Stalking Horse APA**"), by and among the Debtors and NEV Holdings, LLC (the "**Stalking Horse Bidder**")) pursuant to the terms and conditions substantially in the form of the Stalking Horse APA. Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse APA.

> Copies of the Bidding Procedures Order, Stalking Horse APA or other documents related thereto are available upon request to the Garden City Group, Inc. by calling (866) 405-2134, emailing NationalEnvelope@gardencitygroup.com or visiting www.NationalEnvelopeInfo.com.

**A.     Assets to Be Sold.**

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for any or all of the Assets.

**B.     Stalking Horse Bidder**

On July 8, 2010, the Debtors and the Stalking Horse Bidder entered into the Stalking Horse APA for the sale of the Acquired Assets pursuant to which, among other things: (i) the Stalking Horse Bidder agreed to pay One Hundred Thirty Four Million Five Hundred Thousand Dollars ($134,500,000) in cash (the "**Cash Purchase Price**") and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Acquired Assets, subject to the outcome of the Auction and Court approval; and (ii) the Debtors agreed, in the event that the Court approves, and the Debtors consummate, the purchase of substantially all of the Acquired Assets by any Person or combination of Persons other than the Stalking Horse Bidder (a "**Competing Transaction**") to (a) pay the Stalking Horse Bidder a break-up fee in the amount of Two Million Six Hundred Fifty Thousand Dollars ($2,650,000) (the "**Break-Up Fee**") from the proceeds of the Competing Transaction and (b) reimburse the Stalking Horse Bidder's reasonable out-of-pocket expenses up to an aggregate amount equal to Two Million Dollars ($2,000,000) (the "**Reimbursable Expenses**").

**C.     Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a Person (other than the Stalking Horse Bidder) interested in purchasing any of the Assets (a "**Potential Bidder**") must, on or before July 30, 2010 deliver (unless previously delivered) to each of (i) National Envelope Corporation, at 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553 (Attn: Dale Nissenbaum, General Counsel); (ii) Latham & Watkins LLP, 233 South Wacker Drive, Chicago, IL 60606 (Attn: Josef S. Athanas and Stephen R. Tetro II) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Michael R. Nestor and Kara Hammond Coyle), proposed co-counsel to the Debtors; (iii) William Blair & Company, LLC, 222 West Adams Street, Chicago, Illinois 60606 (Attn: Geoffrey A. Richards); and (iv) Paul Hastings, Janofsky & Walker LLP, 600

Peachtree Street, N.E., Twenty-Fourth Floor, Atlanta, GA 30308 (Attn: Jesse H. Austin, III) and Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE 19801 (Attn:  Kurt F. Gwynne), co-counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement and debtor-in-possession credit agreement; each of the following documents (the "**Preliminary Bid Documents**"):

a.  an executed confidentiality agreement (the "**Confidentiality Agreement**") reasonably acceptable to the Company and containing terms in the aggregate no less favorable to the Company in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein) than those contained in the confidentiality agreement by and among the Stalking Horse Bidder, the Company and certain of their respective affiliates;

b.  a non-binding indication of interest with respect to the purchase of any or all of the Assets (identifying the Assets to be purchased, purchase price (clearly indicating total cash consideration to be provided to the Debtors at closing) and material terms of such purchase;

c.  unless waived by the Debtors in their discretion, preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, including, but not limited to, its ability to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under section 365 of the Bankruptcy Code, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and their advisors will determine, after consultation with the advisors for the Consulting Parties (as defined below).

Within two (2) Business Days after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors, after consultation with the advisors for the Consulting Parties, shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents.  The Debtors may work with Potential Bidders during the two (2) Business Day period to attempt to correct or cure any deficiencies in any Preliminary Bid Documents.  Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable by the end of such two (2) Business Day period (as it may be extended by the Debtors) (each, an "**Acceptable Bidder**") may conduct a due diligence review with respect to the Debtors or submit bids to purchase any or all of the Assets and assume all of the Assumed Liabilities.  The Stalking Horse Bidder is deemed an Acceptable Bidder.

**D.    Obtaining Due Diligence Access.**

After receipt of an executed Confidentiality Agreement and notification of Acceptable Bidder status, the Debtors shall provide each Acceptable Bidder reasonable due diligence

information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder. To the extent the Debtors give any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, the Debtors shall make such information available to the Stalking Horse Bidder. The due diligence period will end on the Bid Deadline (as defined herein).

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors, the Assets, or the Sale to any person except an Acceptable Bidder or such other parties to the extent provided in the applicable Confidentiality Agreement.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however*, the Debtors may decline to provide such information to Acceptable Bidders who, the Debtors in their reasonable business judgment subsequently determine do not intend in good faith to, or have the capacity to, consummate the purchase of any or all of the Assets. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

The Debtors designate William Blair & Company, LLC ("**William Blair**") to coordinate all reasonable requests for additional information and due diligence access. The contact information for William Blair is: William Blair & Company, LLC, 222 West Adams Street, Chicago, Illinois 60606, Tel. (312) 364-5436, Attn: Geoffrey A. Richards, grichards@williamblair.com.

**E.    Bid Requirements.**

To be entitled to participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder, or, subject to the limitations and requirements of paragraph G., below, the DIP Lender, Term A Lenders, Term B Lenders or their applicable designee or assignee if making a credit bid) must deliver to the Debtors and their advisors by the Bid Deadline an irrevocable offer that must:

      a.    be in writing;

      b.    at a minimum, alone or combined with other offers, exceed the aggregate sum of the following: (i) the Cash Purchase Price; (ii) the Assumed Liabilities; (iii) the Break-Up Fee; (iv) the maximum Reimbursable Expenses; and (v) the minimum bid increment of Three Hundred and Fifty Thousand Dollars ($350,000) (such aggregate sum, the "**Minimum Initial Bid Increment**") (all of which must be in cash, marketable securities that are freely tradable with readily ascertainable value, and/or the assumption of administrative expense liabilities of the Debtors) (the "**Overbid Amount**");

      c.    constitute a good faith, bona fide offer to purchase any or all of the Assets;

d.  be accompanied by a clean and a duly executed copy of the Stalking Horse APA and the documents set forth as schedules and exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with the Stalking Horse Bidder, which may not be materially more burdensome to the Debtors or inconsistent with these Bidding Procedures;

e.  identify with particularity each and every condition to closing, including any regulatory conditions and a timeline for satisfying such conditions;

f.  identify with particularity the executory contracts and unexpired leases for which assumption and assignment is required;

g.  not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) regulatory contingencies of any kind (other than a condition that any applicable waiting period under HSR (as defined below) shall have expired or been terminated), and/or (iii) the outcome or completion of a due diligence review by the Acceptable Bidder;

h.  remain irrevocable until forty-eight (48) hours after the conclusion of the Sale Hearing or such longer period of time as set forth below if the Acceptable Bidder is selected as the Back-Up Bidder (defined below);

i.  provide (i) a commitment to close within the later of (A) three (3) days after the entry of the Sale Order and (B) the expiration or termination of the applicable HSR waiting period; and (ii) a representation that the Acceptable Bidder will make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("**HSR**") and pay the fees associated with such filings within two (2) Business Days following the entry of the Sale Order

j.  provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, after consultation with the advisors for the Consulting Parties, that such Acceptable Bidder has the financial wherewithal and ability to consummate the proposed purchase with readily available funds and satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code, including executed copies of any financing agreements, letters or commitments;

k.  fully disclose the identity of each entity that will be bidding for purchasing or obtaining possession of any or all of the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable

5

Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

l.  be accompanied by a cash deposit equal to Fifteen Million Four Hundred Fifty Thousand Dollars ($15,450,000), by wire transfer of immediately available funds to an account or accounts designated by the Debtors (the "**Good Faith Deposit**");

m.  state that the offering party or parties consents to the jurisdiction of the Court; and

n.  not request or entitle the Acceptable Bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment and shall include an acknowledgement and representation of the Acceptable Bidder that (i) the sale of the Assets is on an "as is" and "with all faults" basis and without representations, warranties or guarantees, express, implied or statutory, written or oral, of any kind, nature or description by the Debtors, their agents, their representatives or their estates, except as otherwise provided in a definitive purchase agreement with the Debtors; and (ii) it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Stalking Horse APA.

Within two (2) Business Days after the Bid Deadline, the Debtors shall determine which bids are deemed to be "**Qualified Bids**" and which Acceptable Bidders are "**Qualified Bidders**" after consultation with their advisors and the advisors to the agent (the "**DIP Agent**") for the postpetition lenders (the "**DIP Lenders**"), the agent (the "**Prepetition Agent**," and, together with the DIP Agent the "**Agent**") for the Term A lenders (the "**Term A Lenders**"), and the revolving lenders (the "**Revolving Lenders**," and, together with the DIP Lenders and the Term A Lenders, the "**Lenders**") and the official committee of unsecured creditors (the "**Creditors' Committee**" and, together with the Agent, the "**Consulting Parties**") and will notify the Acceptable Bidders and the Stalking Horse Bidder whether any bids submitted constitute Qualified Bids so as to enable Qualified Bidders to bid at the Auction. Any bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors. The Stalking Horse Bidder is deemed to be a Qualified Bidder. The Stalking Horse APA submitted by the Stalking Horse Bidder and any additional bids timely submitted by the Stalking Horse Bidder (to the extent such bids are generally consistent with the terms of the Stalking Horse APA) are deemed Qualified Bids, qualifying the Stalking Horse Bidder to participate in the Auction.

**F.     Bid Deadline.**

To be entitled to be Qualified Bids, binding bids must be received by each of the Debtors, their advisors, and the advisors to each of the Consulting Parties, in each case so as to be actually received no later than 9:00 a.m. (prevailing Eastern Time) on August 16, 2010 (the "**Bid Deadline**").

**G.     Credit Bidding**

The DIP Lenders, Term A Lenders, Revolving Lenders and the Term B lenders under the Debtors' prepetition credit agreement (the "**Term B Lenders**"), or their applicable designee or assignee, may make a credit bid or joint credit bid for all of the collateral securing their claims to the full extent permitted by Section 363(k) of the Bankruptcy Code; provided, however, that the conditions set forth in this Paragraph G must be satisfied before the credit bid of a DIP Lender, Term A Lender, Revolving Lender or Term B Lender is deemed to be a Qualified Bid. To be a Qualified Bid, a credit bid must also comply with each of the requirements set forth in Paragraph E above (other than the requirement in E(b) that the bid be all in cash, marketable securities that are freely tradable with readily ascertainable value, and/or the assumption of administrative expense liabilities, and the requirement for a deposit in E(l)). In addition, to be a Qualified Bid, a credit bid must (i) include a cash amount as part of the purchase price for all Assets upon which such DIP Lenders, Term A Lenders, Revolving Lenders and Term B Lenders do not have a first priority security interest, (ii) provide for payment in cash at closing and/or the assumption of the administrative and priority expense claims against the Debtors accrued and unpaid through closing, and (iii) include a cash amount as part of the purchase price sufficient to pay the Break-Up Fee and Reimbursable Expenses. In the event a Consulting Party submits a credit bid for all of its collateral pursuant to these Bidding Procedures by the Bid Deadline or at any Auction, such parties shall waive any rights to consult with the Debtors and their advisors and shall not be entitled to be Consulting Parties unless and until such credit bid is irrevocably withdrawn.

**H.     Evaluation of Qualified Bids.**

The Debtors shall provide the Stalking Horse Bidder and all other Qualified Bidders who have submitted a Qualifed Bid (i) as promptly as practicable (and in no event later than 24 hours) after the expiration of the Bid Deadline, copies of all asset purchase agreements received by Debtors as part of any Qualified Bids (the "**Qualified APAs**") and (ii) as promptly as practicable (and in no event later than 48 hours) after the expiration of the Bid Deadline, copies of all agreements, schedules, exhibits and annexes related to the Qualified APAs, other than (a) agreements, schedules, exhibits and annexes which contain confidential or financial information of the Person submitting such Qualified APA and (b) financing letters delivered in connection with such Qualified APA.

Prior to the Auction, and after consultation with the advisors for the Consulting Parties, the Debtors and their advisors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "**Starting Bid**"). No later than one (1) business day prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid. By no later than 5:00 p.m. (prevailing Eastern Time) on the business day prior to the Auction, the Debtors shall distribute copies of the

7

Starting Bid (other than portions that contain confidential or financial information of such bidder and other than financing letters delivered in connection with such Starting Bid) to each Qualified Bidder who has submitted a Qualified Bid (including the Stalking Horse Bidder).

**I.    No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse APA will be deemed the Successful Bid (as defined herein) and, subject to the termination rights under the Stalking Horse APA, the Debtors will immediately pursue entry of an order by the Court approving the Stalking Horse APA and authorizing the sale of the Acquired Assets and the transfer of the Assumed Liabilities to the Stalking Horse Bidder.

**J.    Auction.**

If one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction. The Auction shall commence on August 20, 2010 at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834 at 9:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders following consultation with its advisors and the advisors to the Consulting Parties.

The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

a.    only Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

b.    the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

c.    only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, their respective advisors, and the advisors to the Consulting Parties shall be permitted to attend the Auction;

d.    bidding at the Auction shall begin at the Starting Bid;

e.    subsequent bids at the Auction, including any bids by the Stalking Horse Bidder, shall be made in minimum increments of Three Hundred and Fifty Thousand Dollars ($350,000);

f.    the Stalking Horse Bidder shall receive a credit equal to the sum of the Break-Up Fee and the Reimbursable Expenses in each round of bidding when bidding at the Auction;

g.    each Qualified Bidder will be informed of the terms of the previous bids;

h.    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.      each Qualified Bidder will be required to confirm on the record of the Auction that it has not colluded with any other person with respect to the bidding or the Sale;

j.      absent irregularities in the conduct of the Auction, the Court will not consider bids made after the Auction is closed; and

k.      the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors, after consultation with their advisors as well as the advisors to the Consulting Parties, from time to time on the record at the Auction; *provided*, that any such other Auction Procedures shall not be inconsistent with any order of the Court in the Debtors' Chapter 11 Cases.

**K.**      **Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and after consulting with their advisors and the advisors to the Consulting Parties, shall identify the highest or otherwise best bid(s) (the "**Successful Bid**"). The Qualified Bidder(s) having submitted the Successful Bid will be deemed the "**Successful Bidder**." The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (i) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, (iii) the Successful Bid was a Qualified Bid, and (iv) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for all of the Assets and is in the best interests of the Debtors.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

**L.**      **Sale Hearing.**

A hearing to consider approval of the Sale of all of the Assets and the transfer of all of the Assumed Liabilities to the Successful Bidder (or to approve the Stalking Horse APA if no Auction is held) (the "**Sale Hearing**") is presently scheduled to take place on August 23, 2010 at [____ ___.m.] (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Peter J. Walsh, United States Bankruptcy Judge at 824 North Market Street, Wilmington, Delaware 19801.

9

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

**M.    Designation of Back-Up Bidder.**

Following the approval of the Sale of all or substantially all of the Assets to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale within the later of (i) five (5) days after the entry of the Sale Order or (ii) the expiration or termination of the applicable HSR waiting period, the Debtors shall be authorized, after consultation with the advisors to the Consulting Parties, but not required, to deem the next highest or otherwise best Qualified Bid (the "**Back-Up Bid**" and the party submitting the Back-Up Bid, the "**Back-Up Bidder**"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors, in consultation with the advisors to the Consulting Parties shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder submitting such bid without further order of the Court. The Back-Up Bid shall remain open until the first business day following the consummation of a Sale of the Assets to the Successful Bidder, subject to any right to terminate such bid in the applicable purchase agreement.

**N.    Break-Up Fee and Reimbursable Expenses.**

The Debtors shall pay to the Stalking Horse Bidder, by wire transfer in immediately available funds to an account designated by the Stalking Horse Bidder, all amounts due to the Stalking Horse Bidder, including the Break-Up Fee, to be paid from the proceeds of the Competing Transaction, and the Reimbursable Expenses, in each instance in accordance with the applicable provisions of the Stalking Horse APA. The Break-Up Fee and the Reimbursable Expenses were a material inducement for, and a condition of, the Stalking Horse Bidder entering into the Stalking Horse APA.

**O.    Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of all of the Assets, be credited to the purchase price paid for all of the Assets. If the Successful Bidder fails to consummate the purchase of all of the Assets, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors to the extent provided in the applicable asset purchase agreement.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Stalking Horse Bidder) will be returned within fifteen (15) days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale of all of the Assets. The Good Faith Deposit of the Stalking Horse Bidder shall be returned or retained in accordance with the terms of the Stalking Horse APA.

P.    **Reservation of Rights.**

The Debtors reserve their rights, following consultation with their advisors and the advisors to the Consulting Parties, to modify these Bidding Procedures in any manner that is not inconsistent with the Stalking Horse APA or the Bidding Procedures Order and that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the Sale of all of the Assets and the transfer of all of the Assumed Liabilities, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids if, in the Debtors' business judgment, following consultation with their advisors and the advisors to the Consulting Parties, the Debtors determine that such Qualified Bid is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (iii) contrary to the best interests of the Debtors. Notwithstanding the foregoing, the provisions of this paragraph shall not operate or be construed to permit the Debtors to (A) accept any Qualified Bid that (x) does not require a bid deposit of at least the amount of the Good Faith Deposit be placed in a protected, segregated account, which shall serve as protection and security for the Stalking Horse Bidder as outlined herein or (y) does not equal or exceed the Overbid Amount, or (B) impose any terms and conditions upon the Stalking Horse Bidder that are contradictory to or in breach of the terms of the Stalking Horse APA other than any such terms and conditions set forth in these Bidding Procedures or the Bidding Procedures Order.

The Debtors shall provide to the Stalking Horse the information and documents specified in the Stalking Horse APA relating to the Auction and other bids within the time period and on the terms and conditions set forth in the Stalking Horse APA and these Bidding Procedures.

Q.    **Miscellaneous**

In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall have standing to object to the Sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures) at the Sale Hearing.

## EXHIBIT B

Form of Sale Order

069504.1001

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NEC HOLDINGS CORP.,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-11890 (PJW)<br><br>Jointly Administered<br><br>Docket Ref. No. [___] |

ORDER AUTHORIZING (I) SALE OF CERTAIN OF THE
ASSETS OF THE DEBTORS FREE AND CLEAR OF
LIENS, CLAIMS AND INTERESTS, (II) ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

Upon the motion, dated July [__], 2010 (the "Motion") of the above-captioned

debtors and debtors in possession (collectively, the "Debtors"), seeking, among other things,

entry of an order pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (4416); and Aristocrat Envelope Corporation, a New York corporation (9284).  The mailing address for National Envelope Corporation is 333 Earle Ovington Boulevard, Suite 1035, Uniondale, NY 11553.

"Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to sell the Acquired Assets pursuant to the terms of an Asset Purchase Agreement, dated as of July 8, 2010 (the "Agreement")[2] by and among the Debtors, as sellers, NEV Holdings, LLC, as purchaser (the "Purchaser"); and the Court having entered an order (the "Bidding Procedures Order"), dated July [___], 2010 [Docket No. _____] approving, among other things, the Bidding Procedures (the "Bidding Procedures") based upon the evidence presented at the hearing held on July 22, 2010 (the "Bidding Procedures Hearing"); and the Auction (as defined in the Bidding Procedures Order) having been held in accordance with the Bidding Procedures Order on August 20, 2010; and at the conclusion of the Auction, the Purchaser having been chosen as the Successful Bidder (as defined in the Bidding Procedures); and [_____] having been chosen by the Debtors to be the Back-up Bidder (as defined in the Bidding Procedures); and the Court having conducted a hearing to consider the results of the Auction and the Debtors' request to enter into and consummate the transactions contemplated by the Agreement on August [____], 2010 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Agreement, a copy of which is attached hereto as Exhibit A, and all transactions contemplated thereby (together, the "Sale"); and the Court having reviewed and considered the Agreement and the Motion, the arguments of counsel made, and the evidence adduced at the Bidding Procedures Hearing and the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing and these Chapter 11 Cases, and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby

---

[2] Any term used but not defined herein shall have the meaning ascribed to such term in the Agreement.

FOUND AND DETERMINED THAT:[3]

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      The Court has jurisdiction over this Motion and the transactions contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

D.      As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) due, proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sale, and the assumption and assignment of the Assumed Contracts has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and in compliance with the Bidding Procedures Order to each party entitled thereto, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Auction, the Sale or the assumption and assignment of the Assumed Contracts is or shall be required.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Bankruptcy Rule 7052.

3

E.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order and the Auction was duly noticed.

F.      Except as set forth in the Agreement, each of the Debtors (i) has full corporate or other power and authority to execute the Agreement and all other documents contemplated thereby, and the Sale by the Debtors has been duly and validly authorized by all necessary corporate or other action, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agreement, and (iii) has taken all corporate or other action necessary to authorize and approve the Agreement and the consummation by the Debtors of the transactions contemplated thereby; and no consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate such transactions.

G.      Except as set forth in the Agreement, the Debtors (i) have good, valid and marketable title to all of the Acquired Assets, (ii) the Acquired Assets are to be transferred free and clear of any and all Liens, Claims and Interests (as defined below), which, for the avoidance of doubt, do not include Assumed Liabilities and (iii) all of the Acquired Assets are, or will on the date of Sale, be owned by the Debtors and will be transferred under the Agreement.

H.      Approval of the Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

I.      The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale pursuant to

section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the Sale the value of the Debtors' assets will be harmed.

      J.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the official committee of unsecured creditors in these Chapter 11 Cases (the "Committee"); (iii) counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement; (iv) counsel to the agents for the Debtors' postpetition secured lenders; (v) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (vi) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vii) all Persons known or reasonably believed to have asserted a Lien, Claim and Interest on any of the Acquired Assets; (viii) the non-Debtor parties to the Leases and Contracts; (ix) the Attorneys General in the State(s) where the Acquired Assets are located; (x) the United States Environmental Protection Agency; (xi) the New Jersey Environmental Protection Agency; (xii) any other applicable state environmental agency; (xiii) counsel to International Paper; and (xiv) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors as of the Petition Date, as filed with the Debtors' petitions.[4]

      K.    As evidenced by the affidavits of service filed with the Court and based upon the representations of counsel at the Sale Hearing and as approved under the Bidding Procedures Order: (i) due, proper, timely, adequate and sufficient notice of the Auction and the Sale Hearing has been provided to all parties in interest; (ii) such notice was and is good, sufficient and appropriate under the circumstances of the Debtors' Chapter 11 Cases and was

---

[4] [ADD ADDITIONAL PARTIES AS APPROPRIATE]

provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy

Rules 2002, 6004, 9006 and 9007 and the Local Rules; and (iii) no other or further notice of the

the Auction, the Sale Hearing or of the entry of this Sale Order is necessary or shall be required.

   L.  Upon conclusion of the Auction, the Purchaser submitted the highest and

best offer for the Acquired Assets, as set forth in the Agreement, including the payment of the

Purchase Price, as defined therein.

   M.  The Agreement was negotiated, proposed and entered into by the Debtors

and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

Neither Debtors, nor the Purchaser, nor any Affiliate of the Purchaser has engaged in any

conduct that would cause or permit the Agreement to be avoided under section 363(n) of the

Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any

person, and the aggregate price paid by the Purchaser for the Acquired Assets was not controlled

by any agreement among any bidders.

   N.  The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Specifically,

(i) the Purchaser recognized that the Debtors were free to deal with any other party interested in

acquiring the Acquired Assets; (ii) the Purchaser complied with the provisions in the Bidding

Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive bidding

procedures set forth in the Bidding Procedures Order; (iv) the Purchaser in no way induced or

caused the chapter 11 filings by the Debtors; and (v) the negotiation and execution of the

Agreement was at arms' length and in good faith.

   O.  The consideration provided by Purchaser for the Acquired Assets pursuant

to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the

Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia.

   P.  The Sale must be approved and consummated promptly in order to preserve the value of the Debtors' assets.

   Q.  As of the Closing, pursuant and subject to the terms of the Agreement, the transfer of the Acquired Assets to the Purchaser will be a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Purchaser with all right, title, and interest of the Debtors in the Acquired Assets free and clear of all Liens, Claims and Interests.

   R.  The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if each of (i) the sale of the Acquired Assets to the Purchaser, and (ii) the assignment of the Assumed Contracts and the Assumed Liabilities to the Purchaser were not free and clear of all Liens, Claims and Interests of any kind or nature whatsoever (except Permitted Liens), or if the Purchaser would, or in the future could, be liable for any of the Excluded Liabilities.

   S.  The Debtors may sell the Acquired Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever (except Permitted Liens) because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those (i) holders of Liens, Claims and Interests and (ii) non-debtor parties to Assumed Contracts who did not object timely, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Those (i) holders of Liens, Claims and Interests and (ii) non-debtor parties to Assumed Contracts who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, Claims and Interests, if any, attach to the portion of the Purchase Price ultimately attributable to the property against or in which they claim an interest, in the order of their priority, with the same validity, force and effect which they now have as against such property, subject to any claims and defenses the Debtors may possess with respect thereto.

T.     Neither the Purchaser nor any of its Affiliates is a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the Agreement.

U.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts are in the best interests of the Debtors, their estates, and their creditors. The Assumed Contracts and Assumed Liabilities being assigned to the Purchaser, are an integral part of the Agreement and, accordingly, such assumption and assignment of Assumed Contracts and Assumed Liabilities are reasonable and enhance the value of the Debtors' estates.

V.     The Debtors have served a notice of assignment and cure costs (the "Contract Notice") on all counterparties to Assumed Contracts identified, as of the Initial Designation Deadline, on the Assumed Contracts List. Such Contract Notices were adequate and

sufficient of the proposed assumption and assignment of the Assumed Contracts identified on the Assumed Contracts List pursuant to the terms of the Agreement.

W.      For all such counterparties to Assumed Contracts that were served with a Contract Notice at least 10 days prior to the Sale Hearing, the deadline to file an objection to the assumption and assignment to the Purchaser of any Assumed Contract (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, or overruled. To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the Assumed Contract, and (ii) the proposed cure amount (the "Cure Amount") set forth on the Contract Notice.

X.      The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the Agreement did not provide that the Purchaser could (i) on or prior to the Initial Designation Deadline modify, pursuant to the terms of Section 2(i)(iii) of the Agreement, the Assumed Contract List to include or remove a Non-Lease Contract or a Lease, or (ii) on or prior to the Subsequent Designation Deadline modify, pursuant to the terms of Section 2(i)(vi) of the Agreement, the Assumed Contract List to include one or more additional Leases. The notice and opportunity to object provided in accordance with the Agreement and this Order to counterparties to subsequently designated Assumed Leases fairly and reasonably protects any rights that such counterparties may have with respect to any additions to the Assumed Contracts List.

Y.      The Debtors have, including by way of entering into the Agreement, and the provisions relating to the Assumed Contracts therein and the performance of the Purchaser

thereunder, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code and (ii) Purchaser has provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

       Z.     Without limiting the effect or scope of the foregoing, the transfer of the Acquired Assets and the Assumed Contracts from the Seller to the Purchaser does not and will not deem the Purchaser or its affiliates, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Agreement), including a "successor employer" for the purposes of the Internal Revenue Code of 1986 or the Employee Retirement Income Security Act of 1974; (ii) have, *de facto* or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Purchaser and the Debtors); or (iv) be holding itself out to the public as a continuation of the Debtors. Except for the Assumed Liabilities, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets or otherwise. Without limiting the generality of the foregoing, and except for the Assumed Liabilities, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser, and each of their Affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of antitrust,

environmental, successor or transferee liability, labor law, *de facto* merger, or substantial

continuity, whether known or unknown as of the Closing, now existing or hereafter arising,

whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors,

including, but not limited to, liabilities on account of any taxes arising, accruing, or payable

under, out of, in connection with, or in any way relating to the operation of the Debtors' business

prior to the Closing.

        AA.    Approval of the Agreement and assumption and assignment of the

Assumed Contracts and consummation of the Sale of the Acquired Assets at this time are in the

best interests of the Debtors, their creditors, their estates and other parties in interest and

represent an exercise of the Debtors' sound business judgment.

        NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

        1.      The Motion is granted, as further described herein.

        2.      All objections to the Motion or the relief requested therein that have not

been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are

overruled on the merits.

        3.      Notice of the Sale Hearing was fair and equitable under the circumstances

and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules

2002, 6004 and 9014.

### Approval of the Agreement

        4.      The Agreement, and all of the terms and conditions thereof, is hereby

approved.

5.    Pursuant to sections 363(b) and 365 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under and comply with the terms of the Agreement, and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Agreement.

6.    The Debtors are authorized to execute and deliver, and empowered to perform under, consummate and implement, the Agreement, together with all additional instruments, documents, and agreements that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement, including effectuating amendments to the Agreement in furtherance thereof.

7.    This Order and the Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, all non-debtor parties to the Assumed Contracts, all successors and assigns of the Purchaser, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code. Nothing contained in any chapter 11 plan confirmed in these bankruptcy cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Agreement or this Order.

8.    The Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto in a writing signed by both parties, and in accordance with the terms thereof, without further order of the

Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Purchaser shall have no obligation to proceed with the Closing until all conditions precedent in the Agreement to its obligation to do so have been met, satisfied, or waived in accordance with the terms of the Agreement.

<u>**Transfer of Assets**</u>

10.      Pursuant to sections 105(a), 363(f) and 365 of the Bankruptcy Code, upon the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease), the Acquired Assets shall be transferred to the Purchaser in accordance with the Agreement and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and, except as set forth in the Agreement, shall vest the Purchaser with title to the Acquired Assets, free and clear of all liens, mortgages, pledges, options, security interests, charges, rights of first refusal, hypothecations, encumbrances on real property, easements, encroachments, rights of way, restrictive covenants on real property, real property licenses, leases or conditional sale arrangements, debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, determined or undeterminable, known or unknown, including those arising under any law or action and those arising under any contract or otherwise, including any tax liability, and including any rights, claims or causes of action based on any theories of transferee or successor liability (other than Permitted Liens and Assumed Liabilities, each as defined in the Purchase Agreement) (collectively, the "<u>Liens, Claims and Interests</u>"). Liens, Claims and Interests shall also include but are not limited to: (a) those that purport to give to any party a right terminate the Debtors' or

13

the Purchaser's interest in the Acquired Assets, or any similar rights; (b) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease); and (c) all debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability.  All Liens, Claims and Interests released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect that they now have as against the Debtors, the estates or the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto; provided, however, that notwithstanding any of the foregoing to the contrary, no Liens, Claims or Interests shall attach to the Transition Account or the proceeds thereof or the Wind-Down Account or the proceeds thereof (except as otherwise provided in paragraph 36 below). The sole and exclusive right and remedy available to purported creditors, equity holders, including, without limitation, equity holders of the Debtors, holders of any other Liens, Claims and Interests, and parties in interest shall be a right to assert Liens, Claims and Interests against the Debtors' estates and, to the extent permitted by paragraph 36 below, the proceeds of the Wind-Down Account after payment of the Wind-Down Expenses.

11.    Upon receipt of the Purchase Price, the Debtors are authorized and directed to pay in cash from the sale proceeds received by the Debtors the claims of the DIP Agent, on behalf of the DIP Lenders, and the claims of the Prepetition Agent, on behalf of the Prepetition Lenders, in the same order of priority as existed prior to the Closing, with any remaining unused portion of the Purchase Price to be retained by the Debtors; provided, however, the Debtors shall be permitted to retain any proceeds held in the Transition Account and the Wind-Down Account disbursed to the Debtors in accordance with the Agreement, the Transition Services Agreement and any applicable escrow agreement.  Notwithstanding anything to the contrary contained herein or in any of such releases or other documents, the obligations and liabilities of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders under or in respect of the DIP Facility Documents or Prepetition Loan Documents, respectively, insofar as such obligations and liabilities survive termination of the DIP Facility Documents or Prepetition Loan Documents in accordance with this Order, shall continue in full force and effect in accordance with their terms; and provided further that, pursuant to and in accordance with the Order Authorizing Debtor's Application Pursuant To Section 327(a) And 328(a) Of The Bankruptcy Code To Retain And Employ William Blair & Company, LLC As Investment Bankers For The Debtors Nunc Pro Tunc To The Petition Date [D.I. ___], the Debtors are authorized and directed to pay to William Blair & Company, LLC ("Blair") from the proceeds of the sale, and as part of the "Carve-Out" as set forth and defined in the Final Order (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Authorizing The Use Of Cash Collateral Pursuant To Section 363 Of The Bankruptcy Code, (III) Granting Adequate Protection To The Prepetition Lenders Pursuant To Sections 361, 362, 363 and 364 Of The Bankruptcy Code, And (IV) Granting Liens

15

And Superpriority Claims [D.I. ___], the M&A Fee (as defined in the Blair Engagement Letter) in the amount of $_____ upon entry of this Order on the docket. For the avoidance of doubt, Blair is not relieved from seeking final approval of its fees pursuant to a final fee application. The DIP Agent, on behalf of the DIP Lenders, and the Prepetition Agent, on behalf of the Prepetition Lenders, shall retain their respective liens and super priority claims, as applicable, with respect to (a) the Excluded Assets (as defined in the Agreement), (b) to the extent permitted by paragraph 36 below, the proceeds of the Wind-Down Account after payment in full of the Wind-Down Expenses and (c) any fund which may be established per agreement between the Debtors, the DIP Agent, on behalf of the DIP Lenders, and/or the Prepetition Agent, on behalf of the Prepetition Lenders, as security for the indemnification obligations of the Debtors as set forth in the Prepetition Loan Documents, the DIP Financing Documents, or the DIP Order, as applicable.

12.    Except as set forth in the Agreement, all persons and entities, including, but not limited to, the Debtors, all debt security holders, all equity security holders, the Creditors' Committee, governmental, tax, and regulatory authorities, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, parties to executory contracts, customers, lenders, trade and other creditors and their respective successors or assigns and any trustees thereof holding Liens, Claims and Interests of any kind or nature whatsoever against or in the Debtors or the Acquired Assets conveyed as of the date hereof, or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease, (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under or out of, in

16

connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors, designees or assigns, its property, or the Acquired Assets conveyed in accordance with the Agreement, such persons' or entities' Liens, Claims and Interests.

13.     The transfer of the Acquired Assets to the Purchaser pursuant to the Agreement shall constitute a legal, valid, and effective transfer of such Acquired Assets on the Closing Date (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease), and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever.  As of the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease), the Purchaser shall have any and all rights, claims, defenses and offsets held by Debtors and the estates with respect to Assumed Liabilities.

14.     Except for Permitted Liens and Assumed Liabilities as set forth in the Agreement, the transfer of the Acquired Assets pursuant to this Order shall not subject the Purchaser to any liability with respect to any obligations incurred in connection with or in any way related to the Acquired Assets prior to the date of Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or

in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

### Assumption and Assignment of Non-Lease Contracts and Leases

15.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Agreement, of the Assumed Contracts are hereby approved, and the requirements of section 365(b)(l) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

16.    On or before the Initial Designation Deadline, the Purchaser shall have the right pursuant to the Agreement to (a) designate any Non-Lease Contract or Lease that is not an Identified Assumed Contract as an Assumed Contract by amending the Assumed Contract List and (b) designate any Identified Assumed Contract that is not to be an Assumed Contract by amending the Assumed Contract List to remove such Assumed Contract.

17.    Unless otherwise agreed to by the Purchaser and the Debtors in writing, the Subsequent Designation Deadline shall be December 17, 2010.  On or before the Subsequent Designation Deadline, the Purchaser shall have the right pursuant to the Agreement to designate any Lease that is not already an Identified Assumed Contract as an Assumed Contract by amending the Assumed Contract List.

18.    The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon and subject to the occurrence of the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease), the Assumed Contracts listed on the Assumed Contracts List free and clear of

18

all Liens, Claims and Interests of any kind or nature whatsoever, which Assumed Contracts by operation of this Order, shall be deemed assumed and assigned effective as of the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, at the time of the transfer of such Assumed Lease), and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts and Assumed Liabilities to the Purchaser.

19.    Subject to paragraph 20 hereof, the Assumed Contracts shall be transferred and assigned to, and following the Closing of the Sale (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, following the transfer of such Assumed Lease) remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such transfer and assignment to the Purchaser. The Debtors may assume the Assumed Contracts in accordance with section 365 of the Bankruptcy Code. Subject to paragraph 20, the Debtors may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the non-debtor party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the

Bankruptcy Code for the assumption and assignment by the Debtors to the Purchaser of each Assumed Contract have been satisfied. Upon Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, upon the transfer of such Assumed Lease), in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assumed Contract. Any portion of any Assumed Contract that purports to permit a landlord thereunder to cancel the remaining term of such Assumed Contract if the Debtors discontinue their use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against the Purchaser, its assignees and sublessees; and the landlords under any such Assumed Contract shall not have the right to cancel or otherwise modify the Assumed Contract or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such Assumed Contract to the Purchaser, or the interruption of business activities at any of the leased premises.

20.     The Debtors have served, on all of the non-debtor counterparties to Assumed Contracts listed on the Assumed Contract List as of the Initial Designation Deadline, a Contract Notice that included, to the extent applicable (a) the Assumed Contract, (b) the name of the counterparty to such Assumed Contract, (c) the Cure Amount for such Assumed Contract, (d) the identity of the assignee for such Assumed Contract, and (e) the deadline by which any such Assumed Contract counterparty must file a Contract Objection to the proposed assumption and assignment, and no other or further notice is required with respect to the Assumed Contracts listed on the Assumed Contract List as of the Initial Designation Deadline. For all non-debtor counterparties to an Assumed Contract served a Contract Notice in accordance with this paragraph 20, ten or more days prior to the Sale Hearing, to which no Contract Objection was

timely filed, such Assumed Contract is hereby deemed assumed and assigned in accordance with the Contract Notice. For all non-debtor counterparties to an Assumed Contract served with a Contract Notice less than ten days prior to the Sale Hearing, if a timely filed Contract Objection is not received, the counterparty to such Assumed Contract shall be deemed to have consented to such assumption and assignment and Cure Amount, and the assignment will be deemed effective as of the date hereof. If any counterparty timely files a Contract Objection that cannot be resolved by the Purchaser and the counterparty, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment shall be deemed effective as of the date set forth in the Contract Notice.

21.    Within five business days after the designation of a lease as a Assumed Lease pursuant to Section 2(i)(vi) of the Agreement, the Debtors shall serve, on the counterparty to such Assumed Lease, a Contract Notice that includes, to the extent applicable (a) the Assumed Lease, (b) the name of the counterparty to such Assumed Lease, (c) the Cure Amount for such Assumed Lease, (d) the identity of the assignee for such Assumed Lease, and (e) the deadline by which any such Assumed Lease counterparty must file a Contract Objection to the proposed assumption and assignment (including any objection to the Cure amount for such Lease or to adequate assurance of future performance thereunder), which deadline shall not be less than ten days following the service of the Contract Notice, and no other or further notice is required. If a timely filed Contract Objection is not received, the counterparty to such Assumed Lease shall be deemed to have consented to such assumption and assignment and Cure Amount, and the assignment will be deemed to be effective on such date. If any counterparty timely files a Contract Objection that cannot be resolved by the Purchaser and the counterparty, the Court shall

resolve such Contract Objection prior to the assumption and assignment of such designated contract, and upon entry of an order by the Court resolving such Contract Objection, the assumption and assignment of such designated contract shall be deemed effective as of the date set forth in the Contract Notice.

22.    All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing, or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, prior to the transfer of such Assumed Lease, (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were interposed, are deemed satisfied by the Cure Amounts with respect to each Assumed Contract in those amounts set forth in the Contract Notice, which was served in accordance with the Bidding Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable, by the Purchaser.

23.    With the exception of the Cure Amounts set forth in the Contract Notices, or as otherwise reflected in this Order, each non-Debtor party to an Assumed Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtors, any Purchaser, or the property of any of them, any default existing as of the date of the Sale Hearing; or, against any Purchaser, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors.  Except as provided in the Agreement or this Order, after the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, after the transfer of such Assumed Lease), the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such claims are forever barred and estopped from asserting such claims against the

22

Debtors, their successors or assigns, their property or their assets or estates. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption, assignment and/or transfer of any Assumed Contract. The Purchaser's promise pursuant to the terms of the Agreement to pay the Cure Amounts and to perform the obligations under the Assumed Contract after the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, after the transfer of such Assumed Lease) shall constitute adequate assurance of its future performance under the Assumed Contracts being assigned to it within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

24.    Notwithstanding anything to the contrary in this Order, no executory contract or unexpired lease will be assumed and assigned pursuant to this Order until the Closing (or, with respect to any Assumed Lease subsequently designated pursuant to Section 2(i)(vi) of the Agreement, until the transfer of such Assumed Lease).

25.    The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

26.    All executory Contracts (but not unexpired Leases) to which any Debtor is a party and which are not Assumed Contracts or Non-Lease Contracts pursuant to which the Sellers are providing services to the Purchaser pursuant to the Transition Services Agreement (the "Rejected Contracts") are hereby rejected as of the Closing Date, without other or further notice (other than as set forth in paragraph 27 of this Order) or further order of this Court. The Debtors do not waive any claims they may have against any landlord or counterparty to the

Rejected Contracts, whether or not such claims arise under, are related to the rejection of, or are independent of the Rejected Contracts.

27.     The Debtors have served a notice of rejection (the "Rejection Notice") on all counterparties to the Rejected Contracts, setting forth that each counterparty to a Rejected Contract shall be required to file a rejection damages claim, if any, relating to the rejection of such Rejected Contracts by the later of (a) the claims bar date established in the Debtors' Chapter 11 Cases or (b) 30 days after the effective date of rejection of such Rejected Contract.

28.     Unless authorized in writing by the Purchaser or permitted under the terms of the Transition Services Agreement, the Debtors shall not reject any unexpired Lease prior to the occurrence of the Subsequent Designation Deadline. In the event that the Transition Services Agreement permits, or the Purchaser authorizes the Debtors, in writing, to reject any unexpired Lease prior to the occurrence of the Subsequent Designation Deadline, the Debtors shall serve a Rejection Notice on the counterparty to such Lease, and such Lease shall be deemed rejected by the Debtors as of the date of such Rejection Notice without other or further notice or order of this Court. Any unexpired Lease not previously assumed or rejected by the Debtors, and not designated as an Assumed Lease pursuant to Section 2(i)(vi) of the Agreement, shall be deemed rejected by the Debtors as of the Subsequent Designation Deadline. Within five business days after the Subsequent Designation Deadline, the Debtors shall file with the Court and serve on the counterparties to unexpired Leases rejected as of the Subsequent Designation Deadline pursuant to this paragraph, a Rejection Notice, and no other or further notice is required.

**Additional Provisions**

29.     The consideration provided by the Purchaser for the Acquired Assets under the Agreement constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia.

30.     The consideration provided by the Purchaser for the Acquired Assets under the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

31.     The transaction contemplated by the Agreement is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser, including the assignment to the Purchaser of the Assumed Contracts. The Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

32.     On the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Liens, Claims and Interests in the Acquired Assets, if any, as such Liens, Claims and Interests may have been recorded or may otherwise exist.

33.     This Order (a) shall be effective as a determination that, upon the Closing, all Liens, Claims and Interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Acquired Assets. For the avoidance of doubt, all Liens, Claims and Interests with respect to

(i) the Excluded Assets and (ii) to the extent permitted by paragraph 36, below, the proceeds of

the Wind-Down Account after payment of the Wind-Down Expenses, shall continue with the

same validity, force, effect and priority as they now have, subject to any claims and defenses the

Debtors may possess with respect thereto.

34.    If any person or entity that has filed financing statements, mortgages,

mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens, Claims and

Interests in the Acquired Assets conveyed pursuant to the Agreement shall not have delivered to

the Debtors prior to the Closing, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of all Liens, Claims and

Interests which the person or entity has with respect to such Acquired Assets or otherwise, then

(a) the Debtors are hereby authorized to execute and file such statements, instruments, releases

and other documents on behalf of the person or entity with respect to such Acquired Assets and

(b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this

Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence

of the release of all Liens, Claims and Interests in the such Acquired Assets of any kind or nature

whatsoever.

35.    The Purchaser shall be entitled to avail itself of any and all Seller Services

to be provided under the Transition Services Agreement, including, but not limited to occupying

Leased Real Property that is subject to a Lease that has not been assumed by Purchaser as of the

Closing Date, free of any interference from any entity or person, subject to Purchaser's compliance with this Order and the Transition Services Agreement. All expenses related to such services will be paid in accordance with the terms and conditions of the Transition Services Agreement. Debtors and Purchaser shall be authorized to continue to take any and all actions as may be necessary or desirable to implement the Transition Services Agreement and each of the transactions contemplated thereby. Other than actions permitted by an Order of this Court, all utility providers, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the operations, institute any action in any court (other than in this Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the operations contemplated under the Transition Services Agreement.

36.    The amounts deposited into the Transition Account and the Wind-Down Account (each as defined in the Transition Services Agreement) shall not be, and shall not be deemed to be, property of the Debtors' estates. The Debtors shall be entitled to periodically direct that funds from the Wind-Down Account be used to pay budgeted Wind-Down Expenses (as defined in the Transition Services Agreement), including to direct that funds be delivered from the Wind-Down Account to Professionals to pay fees and expenses of Professionals incurred prior to the later of (a) the termination of the Transition Services Agreement and (b) the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases, and to periodically direct that funds from the Transition Account be delivered to employees and creditors to pay other Liabilities incurred prior to the termination of the Transition Services Agreement, in each case as contemplated by the Transition Services Agreement, and in each case

27

whether paid prior to or after the termination of the Transition Services Agreement, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases. The respective escrow agents for the Wind-Down Account and the Transition Account shall disburse the funds in the Wind-Down Account and the Transition Account, respectively, for the above-described purposes at the direction of the Debtors. None of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders shall have any Lien, Claim or Interest in the Transition Account or the proceeds thereof or in the Wind-Down Account; provided, however, that notwithstanding the foregoing, unless and until the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders are paid in full in cash, the Liens, Claims and Interest of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders on the proceeds of the Wind-Down Account (but not on the Wind-Down Account itself), if any, remaining after payment of the Wind-Down Expenses shall continue in the same order of priority existing prior to the Closing.

37.     The Purchaser shall indemnify and hold harmless each Seller Service Provider (as defined in the Transition Services Agreement), their affiliates and each of their respective representatives in accordance with the terms and conditions of the Transition Services Agreement.

38.     The Purchaser shall have no obligation to pay or provide wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment to current or former employees of the Debtors and their eligible dependents and beneficiaries, except as set forth in the Agreement or the Transition Services Agreement. Furthermore, (a) the Purchaser

28

shall have no obligation or liability, as a successor or otherwise, with respect to any collective bargaining agreement or any multiemployer pension welfare, retention, employee benefit and/or incentive plan or agreement to which any Debtors are a party (including, without limitation, arising from or related to the rejection or other termination of any such plan or agreement), (b) the Purchaser shall in no way be deemed a party to or assignee of any such plan or agreement, (c) no employee of the Purchaser shall be deemed in any way covered by or a party to any such plan or agreement, and (d) all parties to any such agreement are hereby enjoined from asserting against the Purchaser any and all claims arising from or relating to such plan or agreement.

39.    Any amounts that become payable by the Debtors to the Purchaser pursuant to the Agreement (and related agreements executed in connection therewith) (a) shall constitute administrative expenses of the Debtors' estates under sections 503(b) and/or 507(a)(2) of the Bankruptcy Code, and (b) shall be paid by the Debtors in the time and manner provided for in the Agreement (and such related agreements) without further Court order.

40.    All non-Debtor entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing.

41.    Neither the Purchaser nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (a) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Agreement), including a "successor employer" for the purposes of the Internal Revenue Code of 1986 or the Employee Retirement Income Security Act of 1974 or other applicable laws; (b) have, *de facto* or otherwise, merged with or into any of the Debtors; (c) be a mere continuation of the Debtors or their estates (and there is no continuity of

enterprise between the Purchaser and the Debtors); or (d) be holding itself out to the public as a continuation of the Debtors.  Except for the Assumed Liabilities, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets or otherwise.  Without limiting the generality of the foregoing, and except for the Assumed Liabilities, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser, and each of their Affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing.

42.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any Permit with respect to the Acquired Assets transferred to the Purchaser by the Debtors, and all such Permits are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

43.    Following the Closing, no holder of a Lien, Claim or Interest in the Debtors or the Acquired Assets shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Lien, Claim or Interest, or any actions that the Debtors may take in their Chapter 11 Cases.

44.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order and the Agreement, all amendments thereto, any waivers and consents

thereunder, and of each of the agreements executed in connection therewith (including, but not limited to, the Transition Services Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Excluded Liabilities or any Liens, Claims and Interests in the Debtors or the Acquired Assets, of any kind or nature whatsoever.

45.    Notwithstanding Bankruptcy Rule 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self executing. In the absence of any entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Agreement at any time.

46.    The terms and provisions of the Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Liens, Claims and Interests in the Acquired Assets to be sold to the Purchaser pursuant to the Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

47.    The provisions of this Order are non-severable and mutually dependent without the written consent of the Purchaser and the Debtors.

48.    To the extent of any conflict between the Agreement or the Transition Services Agreement and this Order, the terms and provisions of this Order shall govern.

31

49.    The failure specifically to include any particular provisions of the

Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Agreement be authorized and approved in its entirety.

Dated: Wilmington, Delaware
       August ___, 2010


_____
UNITED STATES BANKRUPTCY JUDGE

<u>EXHIBIT C</u>

Form of Escrow Agreement

069504.1001

**FINAL**

## ESCROW AGREEMENT

This Escrow Agreement ("Escrow Agreement") is dated as of July 8, 2010, by and among NEC Holdings Corp., a Delaware Corporation, National Envelope Corporation, a New York corporation, for itself and as representative for each other Seller under the Agreement (as defined below) ("Seller Representative"), the Subsidiaries of Seller Representative listed on Annex A to the Agreement and NEV Holdings, LLC, a Delaware limited liability company ("Buyer"), and Union Bank, N.A., as escrow agent ("Escrow Agent"). Capitalized terms used in this Escrow Agreement but not otherwise defined herein have the respective meanings given to them in the Agreement (as defined below).

A.    Sellers and Buyer are parties to that certain Asset Purchase Agreement dated as of the date hereof (the "Agreement"), providing for, among other things, the sale by Sellers of the Acquired Assets to Buyer.

B.    Pursuant to the terms of the Agreement, the parties have agreed to (i) deposit $15,450,000 (the "Deposit") with Escrow Agent, which will be released to Seller Representative or Buyer in accordance with the terms of the Agreement, and (ii) deposit the Working Capital Escrow Amount with Escrow Agent, which will be released to Seller Representative and/or Buyer in accordance with the terms of the Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Establishment of Escrow Accounts; Investment of Deposit and Escrow Amount.**

(a)    Establishment of Deposit Escrow Account. On the date hereof, Buyer will deliver to Escrow Agent the Deposit by wire transfer of immediately available funds to Escrow Agent as follows:

Union Bank, N.A.
Monterey Park, CA 91755
ABA: 122000496
Account: 37130196431 TRUS DG
Account Name: Corporate Trust
For Further Credit: 6711910200 Gores/ National Envelope Deposit Escrow
Attention: Jennifer Earle

Escrow Agent will acknowledge the receipt of the Deposit in writing to both Seller Representative and Buyer. Escrow Agent will deposit the Deposit in an account identified as being established pursuant to this Escrow Agreement (the "Deposit Escrow Account").

(b)    Establishment of Working Capital Escrow Account. On the Closing Date, Buyer will deliver to Escrow Agent the Working Capital Escrow Amount by wire transfer of immediately available funds to Escrow Agent as follows:

Union Bank, N.A.
Monterey Park, CA 91755
ABA: 122000496
Account: 37130196431 TRUS DG
Account Name: Corporate Trust
For Further Credit: 6711910201 Gores/ National Envelope Working Capital Escrow
Attention: Jennifer Earle

Escrow Agent will acknowledge the receipt of the Working Capital Escrow Amount in writing to both Seller Representative and Buyer. Escrow Agent will deposit the Working Capital Escrow Amount in an account identified as being established pursuant to this Escrow Agreement (the "Working Capital Escrow Account" and, together with the Deposit Escrow Account, the "Escrow Accounts").

(c)     Purposes.   The Deposit and the Working Capital Escrow Amount are being delivered for the purposes set forth in the Agreement. The Deposit, together with all investments thereof, additions thereto and all income accumulated thereon and proceeds therefrom, are hereinafter collectively referred to as the "Deposit Escrow Fund," and the Working Capital Escrow Amount, together with all investments thereof, additions thereto and all income accumulated thereon and proceeds therefrom, are hereinafter collectively referred to as the "Working Capital Escrow Fund." The Deposit Escrow Fund and the Working Capital Escrow Fund are hereinafter collectively referred to as the "Escrow Funds." Escrow Agent will hold the Escrow Funds in escrow upon the terms and conditions set forth in this Escrow Agreement and shall not withdraw the Escrow Funds (or any portion thereof) from the Escrow Accounts except as provided herein.

(d)     Appointment of Escrow Agent.   The parties hereby designate and appoint Escrow Agent to serve in accordance with the terms, conditions and provisions of this Escrow Agreement, and Escrow Agent hereby agrees to act as escrow agent and to hold, safeguard, invest and disburse the Escrow Funds, pursuant to the terms and conditions hereof.

(e)     Investment of Deposit and Working Capital Escrow Amount.   Pending disbursement of the Escrow Funds, the Deposit and the Working Capital Escrow Amount shall be invested from time to time by Escrow Agent pursuant to the joint written instructions it receives from Buyer and Seller Representative, but in all cases only in Permitted Investments. "Permitted Investments" shall be defined as either: (i) obligations issued or guaranteed by the United States or by any person controlled or supervised by or acting as an instrumentality of the United States pursuant to authority granted by Congress, or an investment fund consisting of such obligations, (ii) obligations issued or guaranteed by any state or political subdivision thereof rated either AA or higher or MIG 1 or higher, by Moody's Investors Service, Inc., or AA or higher or an equivalent, by Standard & Poors Corporation, both of New York, New York, or their successors, (iii) commercial or finance paper which is rated either Prime-1 or higher, or an equivalent by Moody's Investors Service, Inc., or A-1 or higher or any equivalent by Standard & Poor's Corporation, both of New York, New York, or their successors or (iv) certificates of deposit or time, demand or money market deposits of banks or trust companies, organized under the laws of the United States or any state, and money market mutual funds rated AAA by the Standard and Poor's Rating Group. If Escrow Agent does not receive joint written instructions

2

from Buyer and Seller Representative regarding the investment of any portion of the Escrow Funds, then Escrow Agent shall invest such portion of the Escrow Funds with respect to which it received no instructions in any investment described in subsection (iv) of this Section 1(e) in the Union Bank, N.A. Institutional Trust Deposit Account 1 (an interest bearing deposit account of Escrow Agent). Joint written instructions regarding investment of the Deposit and/or Working Capital Escrow Amount shall specify the type and identity of the investments to be purchased and/or sold and shall also include the name of the broker-dealer, if any, which Buyer and Seller Representative shall jointly appoint to work with Escrow Agent in respect of such investment, particular settlement procedures, if any (which settlement procedures shall be consistent with industry standard and practices), and such other information as Escrow Agent may require.

(f)    Authority of Escrow Agent. Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made in accordance with the terms, and subject to the conditions, of this Escrow Agreement. Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of Escrow Agent or for any third person or dealing as principal for its own account. The parties hereto acknowledge that Escrow Agent is not providing investment supervision, recommendations, or advice.

2.    **Disbursement of Escrow Funds.**

(a)    Disbursement of Deposit Escrow Fund.

(i)    The Deposit Escrow Fund shall be disbursed to Seller Representative or Buyer by Escrow Agent only in accordance with this Section 2(a) or pursuant to joint written instructions executed by each of Seller Representative and Buyer and delivered to Escrow Agent.

(ii)    The Deposit Escrow Fund shall become payable to Seller Representative upon the earlier of (A) the Closing or (B) a Deposit Transfer (as defined below). Seller Representative shall give written notice to Escrow Agent and Buyer upon the occurrence of a Deposit Transfer occurring prior to the Closing (a "Seller Deposit Payment Notice"), notifying Escrow Agent of the date of the Deposit Transfer and instructing Escrow Agent to disburse the Deposit Escrow Fund from the Deposit Escrow Account in accordance with the Seller Representative Deposit Payment Notice. No later than two (2) Business Days following the date of receipt of the Seller Deposit Payment Notice, or on such later date as may be designated in such Seller Deposit Payment Notice, Escrow Agent shall pay out of the Deposit Escrow Account to or at the direction of Seller Representative the entire amount of the Deposit Escrow Fund in accordance with the payment instructions provided in the Seller Deposit Payment Notice. If within two (2) Business Days of the date of the Seller Deposit Payment Notice, Buyer delivers a written notice of objection to the distribution of the Deposit Escrow Fund in accordance with the Seller Deposit Payment Notice, Escrow Agent shall not deliver the Deposit Escrow Fund as directed by the Seller Representative Deposit Payment Notice and shall continue to hold the Deposit Escrow Fund in the Deposit Escrow Account until it receives either

3

(A) a joint written direction signed by Buyer and Seller Representative directing the distribution of the Deposit Escrow Fund or (B) a copy of a final non-appealable order of a court having competent jurisdiction which provides directions to Escrow Agent as to how to distribute the Deposit Escrow Fund, together with a certificate of the presenting party to the effect that such order is final and non-appealable and from a court of competent jurisdiction.

(iii)    In the event of any termination of the Agreement in accordance with its terms prior to the Closing, other than a Deposit Transfer, Seller Representative and Buyer shall give written notice to Escrow Agent (a "Joint Deposit Payment Notice"), notifying Escrow Agent of such termination of the Agreement and instructing Escrow Agent to disburse the Deposit Escrow Fund from the Deposit Escrow Account to Buyer in accordance with the Joint Deposit Payment Notice. Promptly, but in any event no later than two (2) Business Days following the date of receipt of the Joint Deposit Payment Notice, or on such later date as may be designated in such Joint Deposit Payment Notice, Escrow Agent shall pay out of the Deposit Escrow Account to or at the direction of Buyer the entire amount of the Deposit Escrow Fund in accordance with the instructions provided in the Joint Deposit Payment Notice.

(iv)    Seller Representative and Buyer shall give written notice to Escrow Agent two (2) Business Days in advance of the anticipated Closing (a "Closing Deposit Payment Notice"), notifying Escrow Agent of the Closing Date and instructing Escrow Agent to disburse the Deposit Escrow Fund from the Deposit Escrow Account to Seller Representative on the Closing Date in accordance with the Closing Deposit Payment Notice. On the Closing Date, Escrow Agent shall pay out of the Deposit Escrow Account to or at the direction of Seller Representative the entire amount of the Deposit Escrow Fund in accordance with the payment instructions provided in the Closing Deposit Payment Notice.

(vi)    "Deposit Transfer" means any transfer of the deposit by Buyer pursuant to Section 2(d)(ii)(C) of the Agreement.

(b)    Disbursement of Working Capital Escrow Fund. The Working Capital Escrow Fund shall be disbursed to Seller Representative and/or Buyer by Escrow Agent only pursuant to joint written instructions (the "Working Capital Payment Notice") executed by each of Seller Representative and Buyer and delivered to Escrow Agent.

(c)    Disbursement Instructions. Escrow Agent shall promptly disburse the Escrow Funds in accordance with this Section 2 to the applicable person designated on Schedule A attached hereto, or as otherwise provided on the Seller Deposit Notice or the Working Capital Payment Notice, as applicable. Escrow Agent shall seek confirmation of such instructions by telephone call-back to an Authorized Signer (as defined below), and Escrow Agent may rely upon the confirmations of anyone purporting to be the Authorized Signer so designated. Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyer or Seller Representative to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank

designated.    The parties to this Agreement acknowledge that such security procedure is commercially reasonable.

    3.    **Termination.**  The Deposit Escrow Account shall be deemed dissolved upon the disbursement by Escrow Agent of the entire Deposit Escrow Fund in accordance with this Escrow Agreement, and the Working Capital Escrow Account shall be deemed dissolved upon the disbursement by Escrow Agent of the entire Working Capital Escrow Fund in accordance with this Escrow Agreement.  This Escrow Agreement shall terminate at the time of the final distribution by Escrow Agent of the entire Deposit Escrow Fund and the entire Working Capital Escrow Fund in accordance with this Escrow Agreement.

    4.    **Duties of Escrow Agent.**

    (a)    Notwithstanding any provision herein to the contrary, Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will Escrow Agent be deemed to be a fiduciary to any party hereto or any other person under this Escrow Agreement.

    (b)    Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity of the service thereof.  Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that the person purporting to give receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  Escrow Agent may conclusively presume that the undersigned representative of any party hereto which is an entity other than a natural person has full power and authority to instruct Escrow Agent on behalf of that party unless written notice to the contrary is delivered to Escrow Agent.  Concurrently with the execution of this Escrow Agreement, Buyer and Seller Representative shall deliver to Escrow Agent authorized signers' forms in the form of <u>Schedule B-1</u> and <u>Schedule B-2</u> to this Escrow Agreement ("<u>Authorized Signer</u>").  Authorized Signer for purposes of <u>Schedule B-2</u> shall also include any chapter 7 or chapter 11 trustee of Seller Representative's estate ("<u>Trustee</u>").  Any Trustee shall use commercially reasonable efforts to deliver to Escrow Agent authorized signers' forms in the form of <u>Schedule B-2</u>.

    (c)    Escrow Agent shall provide Buyer and Seller Representative with written monthly reports of the status of the Escrow Funds, and shall permit Buyer and Seller Representative to inspect and obtain copies of the records of Escrow Agent regarding the Escrow Funds, during normal business hours, within a reasonable time upon receiving prior written notice from the requesting party and at the requesting party's expense.

    (d)    Escrow Agent may act pursuant to the advice of counsel, at the sole expense of Buyer, with respect to any matter relating to this Escrow Agreement and shall not be liable for any action taken or omitted by it in good faith in accordance with such advice. Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

(e)    Except as provided in <u>Section 9</u> hereto, Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving as escrow holder only and having only possession thereof. Any payments of interest and/or dividend income due to Buyer and/or Seller Representative shall be subject to withholding regulations then in force with respect to United States taxes.

(f)    Escrow Agent makes no representation as to the validity, value, genuineness or the collectability of any security or other document or instrument held by or delivered to it.

(g)    Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder.

(h)    Escrow Agent may resign as Escrow Agent by written notice to Buyer and Seller Representative (the "<u>Resignation Notice</u>"). If, prior to the expiration of sixty (60) Business Days after the delivery of the Resignation Notice, Escrow Agent shall not have received joint written instructions from Buyer and Seller Representative designating a banking corporation or trust organized either under the laws of the United States or of any state thereof as successor escrow agent and consented to in writing by such successor escrow agent, Escrow Agent may apply to a court of competent jurisdiction to appoint a successor escrow agent. Alternatively, if Escrow Agent shall have received such joint written instructions from Buyer and Seller Representative, it shall promptly transfer the Escrow Funds to such successor escrow agent. Upon the appointment of a successor escrow agent and the transfer of the Escrow Funds thereto, the duties and liabilities of Escrow Agent hereunder shall terminate.

(i)    In the event of any disagreement between the other parties hereto resulting in adverse claims or demands being made in connection with the Escrow Funds or in the event that Escrow Agent is in doubt as to what action it should take hereunder, Escrow Agent shall be entitled to retain the Escrow Funds until Escrow Agent shall (i) have received a copy of a final non-appealable order of a court having competent jurisdiction directing delivery of the Escrow Funds, in which event Escrow Agent shall disburse the Escrow Funds in accordance with such order, (ii) have received a written agreement executed by Buyer and Seller Representative directing delivery of the Escrow Funds, in which event Escrow Agent shall disburse the Escrow Funds in accordance with such agreement or (iii) file an interpleader action in any court of competent jurisdiction, and upon the filing thereof and deposit of the Escrow Funds with such court, Escrow Agent shall be relieved of all liability as to the Escrow Funds and shall be entitled to recover solely from Buyer attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

(j)    Other than in connection with a dispute under this Escrow Agreement or the Agreement and except as otherwise required by law, no printed or other matter in any language (including, without limitation, prospectuses, notices, reports and promotional material) that mentions Escrow Agent's name or the rights, powers, or duties of Escrow Agent shall be issued by the other parties hereto or on such parties' behalf unless Escrow Agent shall first have given its specific written consent thereto.

(k)    Any corporation or association into which Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

(l)    Escrow Agent shall not incur liability for not performing any act or not fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, terrorism or the unavailability of the Federal Reserve Bank).

5.    **Limited Responsibility.**

(a)    This Escrow Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto. No implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent. Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Escrow Agreement.

(b)    ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

(c)    No provision of this Escrow Agreement shall require Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights hereunder.

6.    **Ownership for Tax Purposes.**

(a)    Buyer and Seller Representative each agree that, for purposes of federal and other taxes based on income, Seller Representative will be treated as the owner of the Deposit Escrow Fund and Working Capital Escrow Fund and Seller Representative will report (based on the interest and dividends actually received) the income, if any, that is earned on, or derived from, the Deposit Escrow Fund and Working Capital Escrow Fund as its income, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto.

(b)    Subject to funds being available therefor, Escrow Agent shall, pursuant to written instructions from Seller Representative, make a distribution to Seller Representative from the Deposit Escrow Fund and Working Capital Escrow Fund on or prior to March 1 of each applicable year an amount equal to 40% of the aggregate income earned on the Deposit Escrow Fund and Working Capital Escrow Fund during the preceding calendar year.  Concurrently with such distribution, Escrow Agent shall provide Buyer and the Seller with notice of the amount disbursed to Seller Representative.

(c)    Prior to the date hereof, the parties shall provide Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that Escrow Agent may request.  Seller Representative understands that if such tax reporting documentation is not provided and certified to Escrow Agent, Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Deposit Escrow Fund and Working Capital Escrow Fund, as applicable.

7.    **Notices.**  All notices, consents, waivers and other communications under this Escrow Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt) provided that a copy is mailed by registered mail, return receipt requested, (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested) or (d) sent by electronic transmission, which includes facsimile, email with an imaged or scanned attachment (such as a .pdf) or other similar electronic transmission, signed by an Authorized Signer with receipt confirmed by Escrow Agent, in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

If to Buyer:

c/o The Gores Group, LLC
10877 Wilshire Boulevard
18th Floor
Los Angeles, CA 90024
Attention:  General Counsel
Fax No.:  (310) 443-2149
Email: ehattler@gores.com

With a copy to (which shall not constitute notice to):

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Attention:  Kyle Krpata
Fax No.:  (650) 802-3100
Email: kyle.krpata@weil.com

If to Seller Representative:

National Envelope Corporation
333 Earle Ovington Boulevard, Suite 1035
Uniondale, New York 11553
Attention: Dale G. Nissenbaum
Fax No.: (516) 699-4030
Email: dnissenbaum@natenv.com

With a copy to (which shall not constitute notice to):

Latham & Watkins LLP
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Attention: Josef S. Athanas
Fax No.: (312) 997-9767
Email: josef.athanas.com

If to Escrow Agent:

Union Bank, N.A.
120 S. San Pedro St., 4th Floor
Los Angeles, CA 90012,
Attention: Jennifer Earle, Corporate Trust
Fax: (213) 972-5673
Email: jennifer.earle@unionbank.com

8.    **Counterparts.**  This Escrow Agreement may be executed in one or more counterparts, each of which will be deemed to be an original and all of which, when taken together, will be deemed to constitute one and the same.  Counterparts of this Agreement may be delivered by facsimile or electronic copies (such as .pdf copies) and shall be considered an original signature of the signing party.

9.    **Fees; Indemnification.**  Buyer and Seller shall each pay Escrow Agent one-half of the fees set forth on Schedule C attached hereto (the "Fee") for its services hereunder and shall each reimburse Escrow Agent for one-half of all reasonable expenses, disbursements and advances incurred or made by it in the performance of its duties hereunder (including, without limitation, the reasonable out-of-pocket fees, expenses and disbursements of its counsel). Buyer and Seller, severally and not jointly, shall indemnify, defend and hold Escrow Agent harmless from and against any and all taxes and any and all reasonable out-of-pocket expenses (including reasonable attorneys' fees), assessments, liabilities, claims, damages, actions, suits or other charges (collectively, "Costs") incurred by or assessed against it for any thing done or omitted by it in the performance of its duties hereunder, except as a result of Escrow Agent's own gross negligence or willful misconduct.  Buyer and Seller shall each bear one-half of such Costs.  Escrow Agent shall invoice the parties for all reimbursable expenses, which expenses shall be paid one-half by Buyer and one-half by Seller.  The agreements of Buyer and Seller contained in this Section 9 shall survive any termination of this Escrow Agreement or any

9

resignation or removal of the Escrow Agent. The Escrow Agent shall have, and is hereby granted, a prior lien upon any Escrow Funds that Buyer and Seller become entitled to receive with respect to such party's one-half share of its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities. The Escrow Agent shall be entitled, and is hereby granted the right, to set off and deduct such party's one-half share of any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from amounts that become payable to such party.

10.    **Section Headings.**  The headings of sections in this Escrow Agreement are provided for convenience only and will not affect its construction or interpretation.

11.    **Waiver.**  The rights and remedies of the parties to this Escrow Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Escrow Agreement or the documents referred to in this Escrow Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Escrow Agreement or the documents referred to in this Escrow Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Escrow Agreement or the documents referred to in this Escrow Agreement.

12.    **Exclusive Agreement and Modification.**  This Escrow Agreement supersedes all prior agreements among the parties with respect to its subject matter and constitutes (along with the documents referred to in this Escrow Agreement, only as those additional documents apply to parties other than Escrow Agent) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Escrow Agreement may not be amended except by a written agreement executed by all of the parties hereto.

13.    **Governing Law; Jurisdiction.**  This Escrow Agreement and the legal relations between the parties arising hereunder shall be governed by and construed and interpreted in accordance with the laws of the State of New York without reference to such state's principles of conflicts of law. Each of the parties hereto hereby irrevocably agrees that any action, suit or proceeding against any of them by any of the other aforementioned parties with respect to this Escrow Agreement shall be brought before the jurisdiction of any federal or state court of competent jurisdiction located in the Borough of Manhattan in the State of New York. Each party hereto further irrevocably consents to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to it by hand or by registered or certified mail, return receipt requested, in the manner provided for herein. Each party hereto hereby expressly and irrevocably waives any claim or defense in any such action or proceeding based on improper venue or *forum non conveniens* or any similar basis. To the extent permitted by law, in connection with any claim, cause of action, proceeding or other dispute

concerning this Escrow Agreement, the parties to this Agreement expressly, intentionally, and deliberately waive any right each may otherwise have to trial by jury.

14.   **Expenses.**  In the event of a dispute between the parties in connection with this Escrow Agreement and the transactions contemplated hereby, each of Buyer and Seller Representative agrees that the prevailing party shall be entitled to reimbursement by the other party of reasonable fees and expenses (including, without limitation, attorneys' fees) incurred in connection with any action or proceeding.

15.   **Successors and Assigns.**  This Escrow Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No other persons shall have any rights under this Escrow Agreement. Subject to the provisions of Section 4(k), assignment of the interest of any of the parties hereto shall not be binding unless and until written notice of such assignment shall be delivered to the other parties and shall require the prior written consent of the other parties hereto (such consent not to be unreasonably withheld).  Any corporation into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent will be a party, or any corporation succeeding to all or substantially all the business of the Escrow Agent will be the successor of the Escrow Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

16.   **USA PATRIOT Act.**  Buyer and Seller Representative shall provide to Escrow Agent such information as Escrow Agent may reasonably require to permit Escrow Agent to comply with its obligations under the federal USA PATRIOT Act (Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001).  Escrow Agent shall not credit any amount of interest or investment proceeds earned on the Escrow Funds, or make any payment of all or a portion of the Escrow Funds, to any person unless and until such person has provided to Escrow Agent such documents as Escrow Agent may require to permit Escrow Agent to comply with its obligations under such Act.  Further, each of the parties represents and warrants to the Escrow Agent that it is not a hedge fund.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

11

IN WITNESS WHEREOF, the parties have caused this Escrow Agreement to be duly executed as of the day and year first above written.

**BUYER:**                                    NEV HOLDINGS, LLC

By:        _Jordan Katz_

Name:    _Jordan Katz_

Title:    _Vice President_

**SELLER REPRESENTATIVE:**        NATIONAL ENVELOPE CORPORATION

By:        _____

Name:    _____

Title:    _____

**ESCROW AGENT:**                    UNION BANK, N.A.
as Escrow Agent

By:        _____

Name:    _____

Title:    _____

**SELLERS:**                            NEC HOLDINGS CORP.

By:        _____
Name:
Title:

NATIONAL ENVELOPE – WH LLC

By:        _____
Name:
Title:

[SIGNATURE PAGE TO ESCROW AGREEMENT]