**FINAL**

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is entered into as of _____, 2010, by and among NEV Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("Buyer"), National Envelope Corporation, a corporation formed under the laws of the State of New York ("Seller Representative"), and the Subsidiaries of Seller Representative indentified on Annex A hereto (together with Seller Representative, "Seller Service Providers"). Buyer and Seller Service Providers are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein have the meanings given to such terms in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of July 8, 2010, by and among (a) Buyer and (b) NEC Holdings Corp., a corporation formed under the laws of the State of Delaware ("NEC Holdings"), Seller Service Providers and the other Subsidiaries of Seller Representative indentified on Annex A thereto (collectively with NEC Holdings and Seller Service Providers, "Sellers").

## RECITALS

WHEREAS, pursuant to the Purchase Agreement, Buyer purchased from Sellers the Acquired Assets; and

WHEREAS, Buyer and Seller Service Providers have agreed to provide certain Services (as defined below) to each other as described herein following the Closing, pursuant to and in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## SERVICES

1.1 Services.

(a)     Subject to the terms and conditions of this Agreement, from and after the Closing Date and until the termination or expiration of this Agreement pursuant to Article III below, (i) Seller Service Providers shall provide, and, as applicable, use commercially reasonable efforts to cause their Affiliates and any third parties to provide, to Buyer, the Services described on Exhibit A[1] attached hereto (the "Sellers Services"), in accordance with the terms and conditions and for the periods set forth therein and herein, and (ii) Buyer shall provide, and, as applicable, use commercially reasonable efforts to cause its Affiliates and any third parties to

---

[1] Exhibit A and Exhibit B contain general descriptions of the Sellers Service and the Buyer Services to be provided pursuant to this Agreement. Between signing and the closing contemplated by the APA, the Parties will develop a more detailed description of the services for each exhibit and such exhibits will be mutually agreed upon by the Parties prior to the execution of this Agreement, but will not impact the obligations of the Parties to perform under this Agreement.

provide, to Seller Service Providers, the Services described on <u>Exhibit B</u> attached hereto (the "<u>Buyer Services</u>" and, together with the Sellers Services, the "<u>Services</u>"), in accordance with the terms and conditions and for the periods set forth therein and herein. Each of the foregoing time periods shall be referred to herein as a "<u>Transition Period</u>." The term "<u>Service Recipient</u>" shall refer to Buyer, in the case of Sellers Services, and the applicable Seller Service Provider(s), in the case of Buyer Services, and the term "<u>Service Provider</u>" shall refer to the applicable Seller Service Provider(s), in the case of Sellers Services, and Buyer, in the case of the Buyer Services.

(b)    Each Party agrees to provide commercially reasonable assistance to the other Parties, their Affiliates and any third parties selected by such other Parties to provide the Services in a manner designed (to the extent reasonably possible) to minimize disruptions to either of Seller Service Providers' or Buyer's respective business operations.

(c)    Each Party shall use its commercially reasonable efforts to take all such actions as may be reasonably necessary to enable the other Parties to provide the Services in a timely manner, including, without limitation, providing access, necessary information and specific authorizations and approvals to the other Parties.

(d)    Each Party shall, and shall use commercially reasonable efforts to cause its Affiliates and any third parties to, observe and comply in all material respects with any and all applicable laws and any confidentiality, security, privacy or other policies of Buyer and Seller Service Providers, as applicable (to the extent disclosed to such Party), relating to the performance of the Services.

(e)    Each Party shall use its commercially reasonable efforts to assume responsibility for (or engage a third party to assume responsibility for) providing the Services as soon as reasonably practicable following the date hereof.

1.2 <u>Service Coordinators</u>. Each of Seller Representative (on behalf of Seller Service Providers) and Buyer shall nominate a representative to act as the primary contact person with respect to the provision of the Services (each such person, a "<u>Service Coordinator</u>"). The Service Coordinators shall be managerial level employees of Buyer and Seller Representative, as applicable. The initial Service Coordinators shall be _____ for Seller Service Providers and _____ for Buyer, and each of their respective phone, facsimile numbers and email addresses is set forth on <u>Schedule 1.2</u> attached hereto. Each of Seller Representative and Buyer may, in its sole discretion, change its Service Coordinator from time to time by providing written notice to the other Party of such change and the relevant contact information for such new Service Coordinator at least five (5) Business Days prior to such change taking effect. Unless Seller Representative (on behalf of Seller Service Providers) and Buyer otherwise agree in writing, all material communications relating to the Services or this Agreement, including dispute notices, notices regarding transition of Services, service level failures and service disruptions, shall be directed to the Service Coordinators in accordance with <u>Section 5.6</u>.

1.3 <u>Personnel</u>. In providing the Services, each Party shall use its commercially reasonable efforts to make available to the applicable Service Recipient during regular business hours the personnel of the Party providing the applicable Services as necessary to provide such

Services including, without limitation, any personnel specifically set forth on Exhibit A or Exhibit B attached hereto with respect to such Service (but only to the extent such personnel remain employed by the applicable Party). In addition, Seller Service Providers shall use, to the extent reasonably practicable, the same employees and/or outside vendors and other third party providers who provided such Services to the Business prior to the date of this Agreement. Each Party shall remain solely responsible for the proper performance of all Persons engaged by such Party to perform the Services, and, except as provided in Section 4.2, no Service Recipient shall be liable for the actions or inactions of any Persons engaged by the Service Provider to render the Services except to the extent that such Liability arises out of the gross negligence, fraud, bad faith or willful misconduct of such Service Recipient or out of actions or inactions taken at the explicit instruction of such Service Recipient.

 1.4 Additional Services. The Services detailed in this Agreement and the related Exhibits may not include all of the services that Buyer or Seller Service Providers will ultimately require following the date of this Agreement. In the event and to the extent additional services are required by Buyer or by Seller Service Providers which have not been addressed herein, including, without limitation, with respect to Buyer Services, software, technology, technical services and finance, administration or support functions (collectively, the "Additional Services"), Seller Representative (on behalf of Seller Service Providers) and Buyer shall work together in good faith to provide for the Additional Services, in accordance with such reasonable terms upon which Seller Representative (on behalf of Seller Service Providers) and Buyer shall agree in writing, in a commercially reasonable manner designed to support the Party needing such Additional Services until such Party is able to perform such services for itself or can engage a third party vendor to provide such services, which time shall be treated, for the purposes of this Agreement, as a Transition Period. Any Additional Services agreed to by the Parties in accordance with this Section 1.4 shall be deemed to constitute Sellers Services or Buyer Services, as applicable, and shall be governed by the terms of this Agreement.

 1.5 Excluded Services. Except as otherwise specified in Exhibit A or Exhibit B attached hereto, as applicable, no Party shall be required to provide to any other Party under this Agreement any (a) legal or Tax services, other than cooperation with respect to any requests for information related to legal or Tax issues, (b) financial reporting services for lending or regulatory purposes, other than cooperation with respect to any requests for information related to financial reporting issues or (c) budget-related services.

## ARTICLE II

## QUALITY OF SERVICES; SPECIFIC PERFORMANCE; EXCLUSIVE REMEDY

 2.1 Quality of Services.

  (a) Each Party represents severally, but not jointly, that the Services will be performed in a timely, efficient, workmanlike and commercially reasonable manner in all material respects and in a fashion intended to support the business of the other Party as such business is conducted as of the date hereof, and, with respect to specific Services, in accordance with the standards, if any, set forth in Exhibit A or Exhibit B attached hereto, as applicable, with respect to such Services. Without limiting the generality of the foregoing, to the extent

reasonably practicable and, in the case of Seller Service Providers, taking into account the changes in such Parties' business as a result of the Chapter 11 Cases and the consummation of transactions contemplated by the Purchase Agreement, the Services will be provided at the same general level of service, with the same degree of care (which in no event may be less than reasonable care), with similar response times, to the same extent, and in a manner similar in all material respects to the manner in which such Services historically have been provided to or by each Party's business, as applicable, unless a higher standard for any particular Service is set forth in Exhibit A or Exhibit B attached hereto, as applicable.

(b)    To the extent reasonably practicable, each of Seller Service Providers and Buyer agrees to pass through to the other Party any warranties provided by third party service providers or subcontractors employed to provide the Services.

(c)    In the event of an alleged breach, default or nonperformance of any obligation under this Agreement by Seller Service Providers or Buyer, the applicable Service Coordinator shall provide prompt written notice to the allegedly breaching, defaulting or nonperforming Party setting forth in reasonable detail the nature and extent of the alleged breach, default or nonperformance. The allegedly breaching, defaulting or nonperforming Party will then have a period of five (5) Business Days (or such other period as may be set forth in Exhibit A or Exhibit B attached hereto, as applicable) in which to initiate actions reasonably designed to cure such alleged breach, default or nonperformance, and all such deficiencies shall, in any case, be cured within thirty (30) days (or such other period as may be set forth in Exhibit A or Exhibit B, as applicable) following receipt by the allegedly breaching, defaulting or nonperforming Party of formal notice thereof; provided, however, that if the alleged breach, default or nonperformance relates to Buyer's failure to make any payment (other than nonpayment of the Payroll Cost (as defined on Exhibit A)) under this Agreement after Sellers' Service Coordinator provides written notice of such failure to pay to Buyer, Buyer will then have a period of ten (10) Business Days to cure all such deficiencies; provided, further, however, that if the alleged breach, default or nonperformance relates to Buyer's failure to pay the Payroll Cost, Buyer will not be entitled to notice of such deficiency and must cure such deficiency by the close of business on the Wednesday of the week the payment of the Payroll Cost is due.

2.2 Specific Performance. The Parties acknowledge and agree that the other Parties may be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that any Party may have under law or equity (subject to Section 2.3), a Party shall be entitled to seek injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

2.3 Exclusive Remedy. EXCEPT AS OTHERWISE EXPLICITLY PROVIDED IN THIS AGREEMENT, TERMINATION PURSUANT TO SECTION 3.2 AND SPECIFIC PERFORMANCE TO THE EXTENT AVAILABLE UNDER SECTION 2.2 SHALL BE THE SOLE AND EXCLUSIVE REMEDIES OF ANY PARTY AND ITS AFFILIATES AND THEIR RESPECTIVE REPRESENTATIVES FOR ANY BREACH, DEFAULT OR NONPERFORMANCE OF THIS AGREEMENT. FOR THE AVOIDANCE OF DOUBT, EXCEPT AS OTHERWISE EXPLICITLY PROVIDED IN THIS AGREEMENT, NO

MONETARY REMEDIES SHALL BE AVAILABLE TO ANY PARTY FOR ANY BREACH, DEFAULT OR NONPERFORMANCE OF THIS AGREEMENT.

## ARTICLE III

### TERM AND TERMINATION

3.1 <u>Term</u>.  Unless earlier terminated pursuant to <u>Section 3.2</u>, with respect to each of the Services (or any portion thereof), the term of this Agreement as related thereto will be for a period commencing as of the Closing Date and continuing until the earlier of the date on which (a) Seller Service Providers complete their performance of all of their obligations under <u>Exhibit A</u> attached hereto or Buyer completes its performance of all of its obligations under <u>Exhibit B</u> attached hereto, in each case, with respect to the applicable Services (or portion thereof), (b) the Transition Period during which the applicable Services (or portion thereof) are to be provided, as set forth in <u>Exhibit A</u> or <u>Exhibit B</u> attached hereto, as applicable, expires and (c) January 5, 2011. Notwithstanding any termination or expiration of the Services hereunder, Buyer's obligation with respect to payment of Liabilities in connection with the use, administration and operation of each Facility (as defined below) shall continue until the effective date of Sellers' final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of the agreement under which such Liability arises so long as (i) Sellers are complying with Sections 2(i)(v) and 2(i)(vi) of the Purchase Agreement with respect to Sellers' performance under such agreements and (ii) upon receipt of written notice from Buyer that any such agreements are no longer necessary, Sellers promptly take all necessary actions to reject such agreements under Section 365 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that Buyer shall, subject to <u>Exhibit A</u>, (A) be liable only for such Liabilities as would not have been incurred by Sellers on the Closing Date had they rejected all such agreements as of such date and (B) be liable only for Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement.  This Agreement shall automatically terminate upon the last to occur of (1) Seller's final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of all agreements relating to the Sellers Services, and (2) expiration or termination of all Services to be performed hereunder.

3.2 <u>Termination</u>.

(a)    Except as otherwise specified in <u>Exhibit A</u> or <u>Exhibit B</u> attached hereto, any or all of the Services may be terminated by the Service Recipient, in its sole discretion, at any time by furnishing three (3) Business Days' prior written notice to the applicable Service Provider of the Service Recipient's intention to terminate the applicable Services, which written notice shall specify (i) the Services (or portion thereof) being terminated and (ii) the date on which the Services (or portion thereof) shall be terminated; <u>provided</u>, <u>however</u>, that, notwithstanding <u>Section 2.3</u>, if the Service Recipient is Buyer, Buyer shall be responsible for the payment of any and all charges and fees owed to the Service Provider under this Agreement for Services rendered prior to the later of (A) the effective date of the termination and (B) the effective date of the rejection of the agreement, including Leases, under which such Services were rendered.

(b)    Buyer may immediately terminate this Agreement with respect to any Seller Service Provider by written notice to such Seller Service Provider without any prior notice if such Seller Service Provider materially breaches any of its obligations hereunder and such breach remains uncured for the applicable period specified in Section 2.1(c).

(c)    Any Seller Service Provider may immediately terminate its obligations under this Agreement by written notice to Buyer without any prior notice upon the occurrence of any of the following events:

(i)    Buyer materially breaches any of its obligations hereunder and such breach remains uncured for the applicable period specified in Section 2.1(c);

(ii)    the date on which such Seller Service Provider has completed its performance of all of its obligations specified in Exhibit A;

(iii)    the date on which such Seller Service Provider incurs any Liability in excess of the funds immediately available in the Transition Account (as defined below) and such deficiency remains uncured for the applicable period specified in Section 2.1(c);

(iv)    any amount or fee payable under this Agreement by Buyer remains unpaid by Buyer for the applicable period specified in Section 2.1(c);

(v)    the appropriate personnel to perform such Seller Service Provider's Sellers Services are no longer employed by such Seller Service Provider; or

(vi)    Buyer does not provide adequate Buyer Services to support the provision by such Seller Service Provider of the Sellers Services and such deficiency remains uncured by Buyer for the applicable period specified in Section 2.1(c);

provided, however, any such termination shall not terminate the obligations of any other Seller Service Provider. Upon any termination of this Agreement or any Seller Services by a Seller Service Provider pursuant to this Section 3.2(c), such Seller Service Provider shall be permitted to immediately effect a final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of all agreements relating to the terminated Sellers Services unless such agreements are otherwise related to or necessary for the provision of any other Seller Services.

3.3 Survival of Certain Obligations.  Sections 2.2 and 2.3, this Article III and Articles IV and V shall survive the termination or expiration of this Agreement.

## ARTICLE IV

### CONSIDERATION; PREPAYMENT; TAXES

4.1 Consideration for Buyer Services.  The sole consideration for Buyer providing the Buyer Services shall be the provision of the Sellers Services by Seller Service Providers to Buyer.  For the avoidance of doubt, the Buyer Services shall be provided at no cost and expense to all Seller Service Providers.

4.2 <u>Payment for Seller Services</u>. Buyer will pay directly, or reimburse the applicable Seller Service Provider for, any and all fees, costs, expenses and other Liabilities incurred by Seller Service Providers in the provision of the Seller Services in accordance with <u>Exhibit A</u>.

(a)    To the extent not included in the direct payments or reimbursements made by Buyer pursuant to the foregoing, Buyer shall reimburse Sellers Service Providers' or pay directly to the appropriate Governmental Entity, on Seller Service Providers' behalf out of Buyer's own funds: (i) any applicable sales, use, gross receipts, value added or similar tax that is imposed as a result of, or measured by, any Seller Services rendered hereunder unless covered by an exemption certificate and (ii) any other Taxes (including property taxes) imposed on the applicable Seller Service Provider.

(b)    Upon payment of any amounts pursuant to this <u>Section 4.2</u>, Buyer shall furnish the applicable Seller Service Provider with reasonable documentary evidence of such payment.

(c)    For the avoidance of doubt, for all purposes under this Agreement, Buyer shall, subject to <u>Exhibit A</u>, (A) be liable only for such Liabilities as would not have been incurred by Sellers on the Closing Date had they terminated all Employees (as defined below) and rejected all agreements necessary for the provision of Seller Services as of such date, and (B) be liable for Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement.

4.3 <u>Transition Escrow Account</u>.

(a)    Buyer deposited into a segregated escrow account ("<u>Transition Account</u>") one million dollars ($1,000,000), which amount shall be held in escrow pursuant to the Transition Escrow Agreement, dated as of the date hereof, by and between Buyer and Seller Representative until the expiration or termination of this Agreement. In the event that Buyer fails to pay when due any Liability required to be paid by Buyer pursuant to this Agreement, upon three (3) days' prior written notice to Buyer, Seller Service Providers shall be entitled to direct the escrow agent to pay such unpaid amounts using the funds in the Transition Account and Seller Service Providers shall notify Buyer of any such payment concurrently with the direction to the escrow agent to make such payment. Buyer shall replenish the Transition Account to its original balance within three (3) days' following the payment of any Liability from the Transition Account.

(b)    With respect to any fees, costs, expenses and other Liabilities to be incurred by Seller Service Providers in the provision of the Seller Services for which Buyer will reimburse the applicable Seller Service Provider, except as otherwise contemplated by <u>Exhibit A</u>, no later than ten (10) Business Days prior to the date on which such fees, costs, expenses or other Liabilities are due and payable, Buyer shall deposit such amounts in the Transition Account and Seller Service Providers shall promptly direct the escrow agent to pay such amounts to the applicable parties.

(c)    In no event shall any Seller Service Provider use amounts in the Transition Account for any purpose, or direct the escrow agent to use amounts in the Transition Account, other than for the provision of Sellers Services or the payment of any Liability related thereto.

(d)    In no event shall Buyer have any ability to direct the escrow agent to disburse funds from the Transition Account other than in accordance with the following sentence unless, in the case of Section 4.3(b), Seller Service Providers have not directed the escrow agent to disburse the funds for the purposes such funds were deposited in the Transition Account. If any amounts remain in the Transition Account after the termination of this agreement in accordance with Sections 3.1 or 3.2 and if, applicable, the payment of all Buyer Liabilities pursuant to this Section 4.3, such amounts shall be returned by the escrow agent to Buyer.

4.4 Wind-Down Escrow Account.  Pursuant to Section 2(f)(ii)(I) of the Purchase Agreement, Buyer delivered the Wind-Down Escrow Amount in accordance with the terms of the Wind-Down Escrow Agreement into a segregated escrow account (the "Wind-Down Account"), which amount shall be held in escrow until the later of (a) the expiration or termination of this Agreement and (b) the payment of all Wind-Down Expenses (as defined below) incurred prior to the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases.  Pursuant to the Wind-Down Escrow Agreement, Seller shall be permitted to direct the escrow agent to disburse funds from the Wind-Down Account to pay all wind-down expenses of the Sellers (Exhibit C provides an estimated budget of such wind-down expenses) (the "Wind-Down Expenses"), including the fees and expenses of the professionals in the Chapter 11 Cases and including expenses related to environmental Liabilities associated with the Sellers' real property located in Union, New Jersey.  Pursuant to the terms of the Wind-Down Escrow Agreement, Buyer shall have no ability to direct escrow agent to disburse funds from the Wind-Down Account nor shall any funds be disbursable to Buyer.  If any amounts remain in the Wind-Down Account after the payment of all Wind-Down Expenses, such amounts shall be delivered by the escrow agent to Seller Representative.

4.5 Indemnity.  Notwithstanding Section 2.3, Buyer shall indemnify and hold harmless each Seller Service Provider, its Affiliates and each of their respective Representatives from and against any Liabilities incurred by any Seller Service Providers, their Affiliates and their respective Representatives related to, arising out of or resulting from: (i) this Agreement or the provision of any Sellers Services, provided, however, that this Section 4.5(i) shall, subject to Exhibit A, (A) only apply to such Liabilities as would not have been incurred by Sellers on the Closing Date had they terminated all Employees and rejected all agreements necessary for the provision of Seller Services as of such date and (B) only apply to such Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement, and (ii) the breach of Buyer of its obligations hereunder or from the gross negligence, fraud, bad faith or willful misconduct of Buyer, its Affiliates, their respective Representatives or any other Person engaged by Buyer or Seller Service Providers in the performance of the obligations hereunder.

## ARTICLE V

### MISCELLANEOUS

5.1 <u>No Representations or Warranties</u>.

     (a)    THE PARTIES MAKE NO EXPRESS REPRESENTATIONS OR WARRANTIES EXCEPT THOSE EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT AND THE SCHEDULES HERETO.

     (b)    EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT AND THE SCHEDULES HERETO, EACH PARTY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, REPRESENTATIONS AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, TO THE FULL EXTENT PERMISSIBLE, INCLUDING, WITHOUT LIMITATION, AVAILABILITY, ACCURACY, COMPLETENESS, CORRECTNESS, RELIABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT WITH RESPECT TO ANY OF THE SERVICES, GOODS OR PRODUCTS FURNISHED PURSUANT TO THIS AGREEMENT.

5.2 <u>Confidentiality</u>.  From and after the Closing Date, neither Seller Service Providers nor Buyer, nor any of their respective Affiliates or Representatives, shall use, divulge, furnish or make accessible to anyone (other than such other Affiliates, Representatives and service providers who are required to know in order to provide the Services hereunder), any proprietary, non-public or other confidential information of Buyer, in the case of Seller Service Providers, or any Seller Service Provider, in the case of Buyer, in each case, provided to it by such other Party in connection with the provision of Services hereunder (including, without limitation, any information known to any Seller Service Provider or Buyer concerning such other Party's business), except to the extent that disclosure of such information is required by applicable law (in which case Buyer or the Seller Representative (on behalf of Seller Service Providers), as the case may be, shall use commercially reasonable efforts to advise the Seller Representative or Buyer, as the case may be, prior to making such disclosure to provide any Seller Service Provider or Buyer, as the case may be, a reasonable opportunity to review the proposed disclosure and to attempt to obtain a protective order or other assurance that confidential treatment will be accorded such confidential information).  Each Seller Service Provider shall use its reasonable best efforts to cooperate with Buyer, and Buyer shall use its reasonable best efforts to cooperate with each Seller Service Provider, in each case, in preserving such proprietary or confidential aspects of such other Party's business.

5.3 <u>Work Product</u>.  If any Party develops, invents, obtains or creates any data, information, records, content, copyrightable works or other intellectual property that constitute, cover or are embedded in any deliverable provided or required to be provided in accordance with this Agreement in connection with the provision of Services ("<u>Work Product</u>"), such Party, as applicable, agrees that such Work Product belongs to the other Party, as applicable.  Each Party hereby assigns all right, title and interest, including all copyrights and other intellectual property rights, in and to all such Work Product to the other Party.

5.4 <u>Entire Agreement</u>. This Agreement, together with any annexes, exhibits and schedules hereto, constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

5.5 <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of Buyer and the Seller Representative (on behalf of all Seller Service Providers) except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 5.5</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.6 <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder will be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) when sent by facsimile (with written confirmation of transmission) or email (with confirmation of receipt by email); (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (d) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller Service Providers:

> [Seller Service Coordinator]
> National Envelope Corporation
> 333 Earle Ovington Boulevard, Suite 1035
> Uniondale, New York 11553
> Attention: Dale G. Nissenbaum
> Facsimile: (516) 699-4030
> Email: DNissenbaum@natenv.com

with a copy  (which shall not constitute notice) to:

> Latham & Watkins LLP
> 233 South Wacker Drive, Suite 5800
> Chicago, Illinois 60606
> Attention: Josef S. Athanas
> Facsimile: (312) 993-9767
> Email: josef.athanas@lw.com

If to Buyer:

> [Buyer Service Coordinator]
> c/o The Gores Group, LLC
> 10877 Wilshire Boulevard, 18th Floor
> Los Angeles, California 90024
> Attention: General Counsel
> Facsimile: (310) 443-2149
> Email: ehattler@gores.com

with a copy  (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, California 94065
> Attention: Kyle C. Krpata
> Facsimile: (650) 802-3100
> Email: kyle.krpata@weil.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 5.6.

5.7 Governing Law; Jurisdiction. This Agreement shall in all aspects be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York (other than Section 5-1401 of the New York general obligations law), except to the extent that the laws are superseded by the Bankruptcy Code, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws. For so long as Seller Service Providers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement or the transactions contemplated hereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller Service Providers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement or the transactions contemplated hereby, such matter shall be brought in the courts of the State of New York sitting in the County

of New York or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated in this Agreement.

5.8 <u>Consent to Service of Process</u>.  Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 5.6</u>.

5.9 <u>Waivers of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

5.10    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, in each case, so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

5.11    <u>Successors and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including any chapter 7 or other trustee, responsible Person or similar representative for Seller Service Providers or Seller Service Providers' estate appointed in connection with the Chapter 11 Cases.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Parties; provided, however, that the rights of Buyer under this Agreement may be assigned by Buyer, without the prior written consent of any Seller, to (a) one or more Affiliates of Buyer or (b) one or more of its lenders (or any administrative or collateral agent for such lenders), in each case, so long as Buyer shall continue to remain obligated in full hereunder.

5.12    <u>Headings</u>. The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

5.13    <u>Counterparts; Facsimile or Email Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be

executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

5.14    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

5.15    Relationship of the Parties.  It is expressly understood and agreed that in rendering the Services hereunder, all of the Parties are acting as independent contractors and that this Agreement does not make any Person providing Services an employee, agent or other representative of any other Party for any purpose whatsoever.  No Party has the right or authority to enter into any contract, warranty, guarantee or other undertaking in the name or for the account of any other Party, or to assume or create any obligation or liability of any kind, express or implied, on behalf of any other party, or to bind any other party in any manner whatsoever, or to hold itself out as having any right, power or authority to create any such obligation or liability on behalf of any other party or to bind any other party in any manner whatsoever (except as to any actions taken by a party at the express written request and direction of any other party); provided, however, that, for purposes of this Agreement, Seller Representative shall be entitled to take all of the foregoing actions on behalf of any Seller Service Provider.  No employee, contractor or subcontractor of any Party shall be deemed to be an employee, contractor or subcontractor of any other Party.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first set forth above.

**BUYER:**

**NEV HOLDINGS, LLC**

By:_____
    Name:
    Title:

**SELLER REPRESENTATIVE:**

**NATIONAL ENVELOPE CORPORATION**

By:_____
    Name:
    Title:

**SELLER SERVICE PROVIDERS:**

[SELLER SERVICE PROVIDERS]

By:_____
    Name:
    Title:

## EXHIBIT A

### SERVICES PROVIDED BY SELLER SERVICE PROVIDERS

It is intent of the Parties that the Seller Services be limited generally to the retention by Sellers of (a) certain facilities leased by Sellers to be identified prior to Closing at which Buyer will conduct the Business (the "Facilities") together with ancillary agreements relating to the operations of the physical plant of the Facilities (e.g., utilities, cleaning services, grounds keeping services and insurance policies), and (b) the retention of the employment relationship with certain personnel (the "Employees") at Facilities from which such personnel will perform their historical duties in support of the Business without altering any employment terms or increasing the level of salary or benefits. In addition to the foregoing, the Seller Services shall include the following:

Employees

Each Seller Service Provider and Employee is an independent contractor with respect to Buyer. Without limiting the foregoing, (a) Seller Service Providers hereby reserve sufficient authority so as to maintain a right to administrative direction and control over the Employees, which shall include, without limitation, the payment of wages and overtime, the withholding of income and employment Taxes from said wages, the tracking and recording of attendance and hours worked, and the administration of any vacation, sick leave, benefits or insurance programs, and (b) Seller Service Providers shall observe and perform all obligations applicable to them under applicable law as the employers of the Employees.

During the Transition Period, each Employee will for all purposes continue to be an employee solely of the applicable Seller Service Provider. Seller Service Providers will, consistent with their practices with respect to the Employees (a) pay compensation and provide benefits (subject to the terms and conditions of the applicable Seller Service Provider plans and Section 6(g) of the Purchase Agreement) to the Employees equal to (and, unless otherwise agreed by the Buyer, in no event greater than or, in the case of benefits, other than as required to maintain the Employees' coverage under Seller Service Providers' plans or as a result of changes that affect all plan participants equally) the wages paid and benefits provided by Seller Service Providers to similarly situated employees of Seller Service Providers (excluding any benefits provided under equity compensation plans), (b) make all payments to Employees (including bonuses or commissions as determined in consultation with Buyer) directly through Seller Service Providers' payroll systems, (c) make all required payroll withholding deductions for Employees and remit Taxes with respect to Employees to all applicable Governmental Entities, (d) file all Tax reports with respect to the Employees to the extent required under applicable law and (e) maintain and keep in force at all times during the Transition Period liability insurance coverage relating to acts, omissions and employment of all Employees, including, without limitation, commercial general liability insurance, workers' compensation insurance and employer's liability insurance, consistent with any such coverage in effect for such purposes immediately prior to the Closing Date.

On a monthly basis, Seller Service Providers shall provide payroll services (including, without limitation, payment of all withholding, unemployment, social security and other payroll

Taxes). Seller Service Providers shall provide Buyer an invoice each Tuesday before 10 a.m. prevailing Pacific time setting forth the amount for that week's payroll and the reasonable and out-of-pocket costs incurred by Seller Service Providers in administering such payroll (the "Payroll Cost"). Buyer shall deposit the Payroll Cost in the Transition Account by the close of business on each Tuesday.

Notwithstanding anything contained herein, in no event shall Buyer bear any costs arising out of, or relating to the closure of, any Facility or termination of employment of any Employee, including, without limitation, severance pay, costs arising out of any collective bargaining agreement or relationship, multi-employer plan withdrawal liability (including incremental increases, if any, in withdrawal liability as a result of service provided during the Transition Period) or WARN Act Liabilities (or any similar applicable state or local plant-closing law); provided, however, that in the event that Buyer fails to provide Seller Service Providers with sufficient advance written notice to permit Seller Service Providers to comply with their obligations under the WARN Act (or any similar applicable state or local plant-closing law), Buyer shall be responsible for the costs incurred by Seller Service Providers arising out of, or relating to such non-compliance by Seller Service Providers; provided, further, however, that Buyer shall bear all costs resulting from its obligation to satisfy the Liabilities under COBRA pursuant to Section 6(g)(iii) of the Purchase Agreement.

Facilities/Third Parties

With respect to the costs related to the Facilities (including rent, utilities, and maintenance services) and other Liabilities payable to third party service providers or Governmental Entities, Seller Service Providers shall forward all invoices or statements for such services to the Buyer Service Coordinator. Buyer shall deposit the amounts set forth on such invoices or statements in the Transition Account no later than ten (10) Business Days prior the date on which such payment is due or pay when due, on Seller Service Providers' behalf out of Buyer's own funds, each such invoice or statement directly to the applicable payee.

Proration of Pre-Paid Expenses

All costs for Seller Services paid by any Seller Service Providers prior to the Closing Date related to (a) the Facilities (including, without limitation, rent, utilities, and maintenance services), (b) the Employees and (c) third party service providers or Governmental Entities for periods that begin before the Closing Date and end after the Closing Date shall be allocated between Seller Service Providers, on the one hand, and Buyer, on the other hand, on a per-diem basis, and Seller Service Providers' proportionate share of such pre-paid costs shall be determined from the beginning of such period through the Closing Date and Buyer's proportionate share of such pre-paid costs shall be determined from the day after the Closing Date until the end of such period. If as result of such determination the amount of costs paid by Seller Service Providers prior to the Closing Date exceeds Seller Service Providers' proportionate shares of such costs, Buyer shall, within 45 days of the Closing Date, deposit, in immediately available funds, such excess into the Wind-Down Account, unless Buyer delivers to Seller Service Providers a notice that they dispute the Seller Service Providers' determination of such costs (a "Dispute Notice"), in which event Buyer shall pay to Seller Service Providers the amount of any undisputed items within such 45 day period. If Buyer delivers a dispute notice

within such 45-day period, then for 20 days following delivery of the Dispute Notice (the "Resolution Period"), Buyer and Seller Service Providers shall attempt in good faith to resolve their differences with respect to the disputed items (the "Disputed Items"). Any resolution by Buyer and Seller Service Providers during the Resolution Period as to any Disputed Items shall be set forth in a writing executed by Buyer and Seller Service Providers and will be final, binding and conclusive on both Buyer and Seller Service Providers and Buyer shall pay to Seller Service Providers any amounts owing as a result of such resolution within 5 days after execution of such agreement. If Buyer and Seller Service Providers do not resolve all Disputed Items by the end of the Resolution Period, then all Disputed Items remaining in dispute will be submitted within 10 days after the expiration of the Resolution Period to Grant Thornton LLP or, if such firm declines to act in such capacity, a national independent accounting firm mutually acceptable to Buyer and Seller Service Providers (the "Neutral Arbitrator"). The Neutral Arbitrator shall act as an arbitrator to determine only those Disputed Items remaining in dispute as of the end of the Resolution Period. All fees and expenses relating to the work, if any, to be performed by the Neutral Arbitrator will be allocated between Buyer and Seller Service Providers in the same proportion that the aggregate amount of the Disputed Items so submitted to the Neutral Arbitrator that is unsuccessfully disputed by each such Party (as finally determined by the Neutral Arbitrator) bears to the total amount of such Disputed Items so submitted. In addition, Buyer and Seller Service Providers shall give the Neutral Arbitrator reasonable access to all Records, facilities, Representatives, and personnel of such Party as reasonably necessary to perform its function as arbitrator of the Disputed Items. In the event Buyer or Seller Service Providers shall participate in teleconferences or meetings with, or make presentations to, the Neutral Arbitrator, the other Party shall be entitled to participate in such teleconferences, meetings or presentations. Buyer and Seller Service Providers shall use their commercially reasonable efforts to cause the Neutral Arbitrator to deliver to Buyer and Seller Service Providers a written determination (such determination to include a work sheet setting forth all material calculations and methods used in arriving at such determination) of the Disputed Items submitted to the Neutral Arbitrator within 20 days of its engagement to review such Disputed Items, which determination will be final, binding and conclusive and upon which judgment may be entered. Buyer shall pay to Seller Service Providers the amounts determined by the Neutral Arbitrator within five (5) days after the Neutral Arbitrator resolves the Disputed Items. For the avoidance of doubt, in no event shall Seller Service Providers owe Buyer any amounts as of the result of the foregoing proration.

## EXHIBIT B

### SERVICES PROVIDED BY BUYER

All administrative and other support necessary for the services set forth on Exhibit A or any other Sellers Services provided hereunder.

### Employees

Each Buyer Service Provider and employee of Buyer and its Affiliates, including, without limitation, the Transferred Employees, is an independent contractor with respect to Sellers. Without limiting the foregoing, (a) Buyer Service Providers hereby reserve sufficient authority so as to maintain a right to administrative direction and control over the such employees, which shall include, without limitation, the payment of wages and overtime, the withholding of income and employment Taxes from said wages, the tracking and recording of attendance and hours worked, and the administration of any vacation, sick leave, benefits or insurance programs, and (b) Buyer Service Providers shall observe and perform all obligations applicable to them under applicable law as the employers of such Employee.

## EXHIBIT C

WIND-DOWN EXPENSES

# ANNEX A

ADDITIONAL SELLER SERVICE PROVIDERS

## SCHEDULES

Schedule 1.2

Service Coordinator Contact Information

For Seller Service Providers:
[NAME]
Title:
Phone:
Facsimile:
Email:


For Buyer:
[NAME]
Title:
Phone:
Facsimile:
Email:

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This **FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "Amendment"), entered into effective as of July 21, 2010, is made by and between NEV Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("Buyer"), and National Envelope Corporation, a corporation formed under the laws of the State of New York (the "Company"), on behalf of itself and each other Seller, and amends that certain Asset Purchase Agreement, dated as of July 8, 2010 (the "Purchase Agreement"), by and among (i) NEC Holdings Corp., corporation formed under the laws of the State of Delaware ("Parent"), the Company, and the Subsidiaries of the Company identified on Annex A thereto (together with Parent and the Company, "Sellers," and each, individually, a "Seller"), and (ii) Buyer. Sellers and Buyer are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used and not otherwise defined in this Amendment will have the meanings set forth in the Purchase Agreement.

**WHEREAS**, the Parties have heretofore entered into the Purchase Agreement and desire to amend the Purchase Agreement in accordance with Section 9(d) thereof as more fully set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises herein made and the mutual agreements herein contained, the Parties hereby agree as follows:

1.    <u>Amendments</u>.  The Parties hereby agree that the Purchase Agreement shall be amended as follows:

(a)    Section 1 of the Purchase Agreement is hereby amended by adding the following defined term after the defined term "Acquired Assets":

""<u>Acquired Avoidance Claims</u>" means any and all Avoidance Claims other than Insider/Professional Avoidance Claims."

(b)    Section 1 of the Purchase Agreement is hereby amended by adding the following defined term after the defined term "Auction":

""<u>Avoidance Claims</u>" means any and all preference, avoidance, recovery or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code."

(c)    Section 1 of the Purchase Agreement is hereby amended by adding the following defined term after the defined term "Initial Purchase Increase Amount":

""<u>Insider/Professional Avoidance Claims</u>" means any and all Avoidance Claims that may be brought by or on behalf of the Debtors or their estates against (a) any Person, including any officer or director of Sellers, that is an "insider" as defined in section 101(31) of the Bankruptcy Code, (b) any Person

CH\1178743

that is a professional that has been retained by the Sellers pursuant to section 327 or 363 of the Bankruptcy Code or (c) Loughlin Meghji + Company Associates, Inc."

    (d)    The definition of "Related Agreements" in Section 1 of the Purchase Agreement is hereby deleted and replaced in its entirety by the following:

    ""Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, the Assignment of Intellectual Property, the Transition Services Agreement, the Guaranty and all other Contracts, Schedules, certificates or other documents being delivered pursuant to or in connection with this Agreement."

    (e)    The definition of "Acquired Assets" in Section 1 of the Purchase Agreement is hereby amended by deleting all language following "(m)" and adding the following in its place:

    "any rights, claims or causes of action of any Seller related to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assumed Contract in respect of the assets, properties, conduct of business or operations of such Seller arising out of events occurring on or prior to the Closing Date, excluding any rights, claims or causes of action, in each case, related to any Excluded Assets or Excluded Liabilities; (n) all claims and causes of action (other than to the extent related to (i) the Excluded Assets or Excluded Liabilities or (ii) Insider/Professional Avoidance Claims) of Sellers as of the Closing Date against Persons other than Sellers, their Affiliates and their respective Representatives and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery including rights to recover insurance proceeds as of the Closing Date (regardless of whether such rights are currently exercisable) to the extent related to the Acquired Assets; (o) all Acquired Avoidance Claims; and (p) all items set forth on Annex C; provided, however, that, notwithstanding anything contained herein to the contrary, the Acquired Assets shall not include (i) any Excluded Asset or any prepaid expenses, rights of setoff, or other rights of recovery related to any Acquired Asset prior to the Closing Date, in each case, solely with respect to Taxes or (ii) any claims, rights or causes of action that Sellers have against any present or former directors or officers of Sellers."

    (f)    Clause (l) in the definition of "Excluded Assets" in Section 1 of the Purchase Agreement is hereby amended to read as follows:

    "(l) all Insider/Professional Avoidance Claims;"

    (g)    Section 9(f)(i) of the Purchase Agreement is hereby amended by adding the following subsection (ii) and renumbering the existing subsection (ii) to (iii):

2

"(ii)    On and after the Closing Date, Buyer covenants and agrees not to sue or otherwise bring any action against any Person with respect to any and all Acquired Avoidance Claims or assert any Acquired Avoidance Claims defensively against any Person."

(h)    Exhibit G of the Purchase Agreement is hereby deleted and replaced in its entirety by Exhibit A hereto.

2.    <u>Miscellaneous</u>.

(a)    Except as specifically amended by this Amendment, the terms and conditions of the Purchase Agreement shall remain in full force and effect and shall be unaffected by this Amendment.

(b)    Solely to the extent as provided in Section 6(a) of the Purchase Agreement, each Party hereto agrees, without further consideration, until the dissolution or liquidation of Sellers, to take such further actions and execute, acknowledge (if appropriate) and deliver, or cause the execution, acknowledgment and delivery of, such further documents and instruments as may reasonably be requested by another Party hereto or such other Party's successors and permitted assigns, to carry out the purpose and intent of this Amendment.

(c)    This Amendment shall in all aspects be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York (other than Section 5-1401 of the New York general obligations law), except to the extent that the laws are superseded by the Bankruptcy Code, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Amendment or the transactions contemplated hereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Amendment or the transactions contemplated hereby, such matter shall be brought in the courts of the State of New York sitting in the County of New York or of the United States for the Southern District of New York, and by execution and delivery of this Amendment, each of the Parties consents to the exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Amendment or the transactions contemplated in this Amendment.

(d)    Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9(g) of the Purchase Agreement.

3

(e)    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AMENDMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AMENDMENT.

(f)    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Amendment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

*[Signature Pages Follow]*

4

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first above written.

<u>SELLERS</u>:

**NATIONAL ENVELOPE CORPORATION**

By: _____

Name:

Title:

<u>BUYER</u>:

**NEV HOLDINGS, LLC**

By: _____

Name: Jordan Katz

Title: Vice President

[Signature Page to First Amendment to Asset Purchase Agreement]

## Exhibit A

Form of Transition Services Agreement

(see attached)

FINAL

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is entered into as of _____, 2010, by and among NEV Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("Buyer"), National Envelope Corporation, a corporation formed under the laws of the State of New York ("Seller Representative"), and the Subsidiaries of Seller Representative indentified on Annex A hereto (together with Seller Representative, "Seller Service Providers"). Buyer and Seller Service Providers are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein have the meanings given to such terms in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of July 8, 2010, by and among (a) Buyer and (b) NEC Holdings Corp., a corporation formed under the laws of the State of Delaware ("NEC Holdings"), Seller Service Providers and the other Subsidiaries of Seller Representative indentified on Annex A thereto (collectively with NEC Holdings and Seller Service Providers, "Sellers").

### RECITALS

WHEREAS, pursuant to the Purchase Agreement, Buyer purchased from Sellers the Acquired Assets; and

WHEREAS, Buyer and Seller Service Providers have agreed to provide certain Services (as defined below) to each other as described herein following the Closing, pursuant to and in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I

### SERVICES

1.1 Services.

      (a)    Subject to the terms and conditions of this Agreement, from and after the Closing Date and until the termination or expiration of this Agreement pursuant to Article III below, (i) Seller Service Providers shall provide, and, as applicable, use commercially reasonable efforts to cause their Affiliates and any third parties to provide, to Buyer, the Services described on Exhibit A[1] attached hereto (the "Sellers Services"), in accordance with the terms and conditions and for the periods set forth therein and herein, and (ii) Buyer shall provide, and, as applicable, use commercially reasonable efforts to cause its Affiliates and any third parties to

---

[1] Exhibit A and Exhibit B contain general descriptions of the Sellers Service and the Buyer Services to be provided pursuant to this Agreement. Between signing and the closing contemplated by the APA, the Parties will develop a more detailed description of the services for each exhibit and such exhibits will be mutually agreed upon by the Parties prior to the execution of this Agreement, but will not impact the obligations of the Parties to perform under this Agreement.

provide, to Seller Service Providers, the Services described on <u>Exhibit B</u> attached hereto (the "<u>Buyer Services</u>" and, together with the Sellers Services, the "<u>Services</u>"), in accordance with the terms and conditions and for the periods set forth therein and herein. Each of the foregoing time periods shall be referred to herein as a "<u>Transition Period</u>." The term "<u>Service Recipient</u>" shall refer to Buyer, in the case of Sellers Services, and the applicable Seller Service Provider(s), in the case of Buyer Services, and the term "<u>Service Provider</u>" shall refer to the applicable Seller Service Provider(s), in the case of Sellers Services, and Buyer, in the case of the Buyer Services.

(b)    Each Party agrees to provide commercially reasonable assistance to the other Parties, their Affiliates and any third parties selected by such other Parties to provide the Services in a manner designed (to the extent reasonably possible) to minimize disruptions to either of Seller Service Providers' or Buyer's respective business operations.

(c)    Each Party shall use its commercially reasonable efforts to take all such actions as may be reasonably necessary to enable the other Parties to provide the Services in a timely manner, including, without limitation, providing access, necessary information and specific authorizations and approvals to the other Parties.

(d)    Each Party shall, and shall use commercially reasonable efforts to cause its Affiliates and any third parties to, observe and comply in all material respects with any and all applicable laws and any confidentiality, security, privacy or other policies of Buyer and Seller Service Providers, as applicable (to the extent disclosed to such Party), relating to the performance of the Services.

(e)    Each Party shall use its commercially reasonable efforts to assume responsibility for (or engage a third party to assume responsibility for) providing the Services as soon as reasonably practicable following the date hereof.

1.2 <u>Service Coordinators</u>.  Each of Seller Representative (on behalf of Seller Service Providers) and Buyer shall nominate a representative to act as the primary contact person with respect to the provision of the Services (each such person, a "<u>Service Coordinator</u>").  The Service Coordinators shall be managerial level employees of Buyer and Seller Representative, as applicable.  The initial Service Coordinators shall be _____ for Seller Service Providers and _____ for Buyer, and each of their respective phone, facsimile numbers and email addresses is set forth on <u>Schedule 1.2</u> attached hereto.  Each of Seller Representative and Buyer may, in its sole discretion, change its Service Coordinator from time to time by providing written notice to the other Party of such change and the relevant contact information for such new Service Coordinator at least five (5) Business Days prior to such change taking effect.  Unless Seller Representative (on behalf of Seller Service Providers) and Buyer otherwise agree in writing, all material communications relating to the Services or this Agreement, including dispute notices, notices regarding transition of Services, service level failures and service disruptions, shall be directed to the Service Coordinators in accordance with <u>Section 5.6</u>.

1.3 <u>Personnel</u>.  In providing the Services, each Party shall use its commercially reasonable efforts to make available to the applicable Service Recipient during regular business hours the personnel of the Party providing the applicable Services as necessary to provide such

Services including, without limitation, any personnel specifically set forth on Exhibit A or Exhibit B attached hereto with respect to such Service (but only to the extent such personnel remain employed by the applicable Party). In addition, Seller Service Providers shall use, to the extent reasonably practicable, the same employees and/or outside vendors and other third party providers who provided such Services to the Business prior to the date of this Agreement. Each Party shall remain solely responsible for the proper performance of all Persons engaged by such Party to perform the Services, and, except as provided in Section 4.2, no Service Recipient shall be liable for the actions or inactions of any Persons engaged by the Service Provider to render the Services except to the extent that such Liability arises out of the gross negligence, fraud, bad faith or willful misconduct of such Service Recipient or out of actions or inactions taken at the explicit instruction of such Service Recipient.

1.4 <u>Additional Services</u>.  The Services detailed in this Agreement and the related Exhibits may not include all of the services that Buyer or Seller Service Providers will ultimately require following the date of this Agreement.  In the event and to the extent additional services are required by Buyer or by Seller Service Providers which have not been addressed herein, including, without limitation, with respect to Buyer Services, software, technology, technical services and finance, administration or support functions (collectively, the "<u>Additional Services</u>"), Seller Representative (on behalf of Seller Service Providers) and Buyer shall work together in good faith to provide for the Additional Services, in accordance with such reasonable terms upon which Seller Representative (on behalf of Seller Service Providers) and Buyer shall agree in writing, in a commercially reasonable manner designed to support the Party needing such Additional Services until such Party is able to perform such services for itself or can engage a third party vendor to provide such services, which time shall be treated, for the purposes of this Agreement, as a Transition Period.  Any Additional Services agreed to by the Parties in accordance with this Section 1.4 shall be deemed to constitute Sellers Services or Buyer Services, as applicable, and shall be governed by the terms of this Agreement.

1.5 <u>Excluded Services</u>.  Except as otherwise specified in Exhibit A or Exhibit B attached hereto, as applicable, no Party shall be required to provide to any other Party under this Agreement any (a) legal or Tax services, other than cooperation with respect to any requests for information related to legal or Tax issues, (b) financial reporting services for lending or regulatory purposes, other than cooperation with respect to any requests for information related to financial reporting issues or (c) budget-related services.

## ARTICLE II

QUALITY OF SERVICES; SPECIFIC PERFORMANCE; EXCLUSIVE REMEDY

2.1 <u>Quality of Services.</u>

(a)    Each Party represents severally, but not jointly, that the Services will be performed in a timely, efficient, workmanlike and commercially reasonable manner in all material respects and in a fashion intended to support the business of the other Party as such business is conducted as of the date hereof, and, with respect to specific Services, in accordance with the standards, if any, set forth in Exhibit A or Exhibit B attached hereto, as applicable, with respect to such Services.  Without limiting the generality of the foregoing, to the extent

reasonably practicable and, in the case of Seller Service Providers, taking into account the changes in such Parties' business as a result of the Chapter 11 Cases and the consummation of transactions contemplated by the Purchase Agreement, the Services will be provided at the same general level of service, with the same degree of care (which in no event may be less than reasonable care), with similar response times, to the same extent, and in a manner similar in all material respects to the manner in which such Services historically have been provided to or by each Party's business, as applicable, unless a higher standard for any particular Service is set forth in Exhibit A or Exhibit B attached hereto, as applicable.

(b)      To the extent reasonably practicable, each of Seller Service Providers and Buyer agrees to pass through to the other Party any warranties provided by third party service providers or subcontractors employed to provide the Services.

(c)      In the event of an alleged breach, default or nonperformance of any obligation under this Agreement by Seller Service Providers or Buyer, the applicable Service Coordinator shall provide prompt written notice to the allegedly breaching, defaulting or nonperforming Party setting forth in reasonable detail the nature and extent of the alleged breach, default or nonperformance. The allegedly breaching, defaulting or nonperforming Party will then have a period of five (5) Business Days (or such other period as may be set forth in Exhibit A or Exhibit B attached hereto, as applicable) in which to initiate actions reasonably designed to cure such alleged breach, default or nonperformance, and all such deficiencies shall, in any case, be cured within thirty (30) days (or such other period as may be set forth in Exhibit A or Exhibit B, as applicable) following receipt by the allegedly breaching, defaulting or nonperforming Party of formal notice thereof; provided, however, that if the alleged breach, default or nonperformance relates to Buyer's failure to make any payment (other than nonpayment of the Payroll Cost (as defined on Exhibit A)) under this Agreement after Sellers' Service Coordinator provides written notice of such failure to pay to Buyer, Buyer will then have a period of ten (10) Business Days to cure all such deficiencies; provided, further, however, that if the alleged breach, default or nonperformance relates to Buyer's failure to pay the Payroll Cost, Buyer will not be entitled to notice of such deficiency and must cure such deficiency by the close of business on the Wednesday of the week the payment of the Payroll Cost is due.

2.2 Specific Performance. The Parties acknowledge and agree that the other Parties may be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that any Party may have under law or equity (subject to Section 2.3), a Party shall be entitled to seek injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

2.3 Exclusive Remedy. EXCEPT AS OTHERWISE EXPLICITLY PROVIDED IN THIS AGREEMENT, TERMINATION PURSUANT TO SECTION 3.2 AND SPECIFIC PERFORMANCE TO THE EXTENT AVAILABLE UNDER SECTION 2.2 SHALL BE THE SOLE AND EXCLUSIVE REMEDIES OF ANY PARTY AND ITS AFFILIATES AND THEIR RESPECTIVE REPRESENTATIVES FOR ANY BREACH, DEFAULT OR NONPERFORMANCE OF THIS AGREEMENT. FOR THE AVOIDANCE OF DOUBT, EXCEPT AS OTHERWISE EXPLICITLY PROVIDED IN THIS AGREEMENT, NO

MONETARY REMEDIES SHALL BE AVAILABLE TO ANY PARTY FOR ANY BREACH, DEFAULT OR NONPERFORMANCE OF THIS AGREEMENT.

## ARTICLE III

## TERM AND TERMINATION

3.1 <u>Term</u>.  Unless earlier terminated pursuant to <u>Section 3.2</u>, with respect to each of the Services (or any portion thereof), the term of this Agreement as related thereto will be for a period commencing as of the Closing Date and continuing until the earlier of the date on which (a) Seller Service Providers complete their performance of all of their obligations under <u>Exhibit A</u> attached hereto or Buyer completes its performance of all of its obligations under <u>Exhibit B</u> attached hereto, in each case, with respect to the applicable Services (or portion thereof), (b) the Transition Period during which the applicable Services (or portion thereof) are to be provided, as set forth in <u>Exhibit A</u> or <u>Exhibit B</u> attached hereto, as applicable, expires and (c) January 5, 2011. Notwithstanding any termination or expiration of the Services hereunder, Buyer's obligation with respect to payment of Liabilities in connection with the use, administration and operation of each Facility (as defined below) shall continue until the effective date of Sellers' final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of the agreement under which such Liability arises so long as (i) Sellers are complying with Sections 2(i)(v) and 2(i)(vi) of the Purchase Agreement with respect to Sellers' performance under such agreements and (ii) upon receipt of written notice from Buyer that any such agreements are no longer necessary, Sellers promptly take all necessary actions to reject such agreements under Section 365 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that Buyer shall, subject to <u>Exhibit A</u>, (A) be liable only for such Liabilities as would not have been incurred by Sellers on the Closing Date had they rejected all such agreements as of such date and (B) be liable only for Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement.  This Agreement shall automatically terminate upon the last to occur of (1) Seller's final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of all agreements relating to the Sellers Services, and (2) expiration or termination of all Services to be performed hereunder.

3.2 <u>Termination</u>.

(a)    Except as otherwise specified in <u>Exhibit A</u> or <u>Exhibit B</u> attached hereto, any or all of the Services may be terminated by the Service Recipient, in its sole discretion, at any time by furnishing three (3) Business Days' prior written notice to the applicable Service Provider of the Service Recipient's intention to terminate the applicable Services, which written notice shall specify (i) the Services (or portion thereof) being terminated and (ii) the date on which the Services (or portion thereof) shall be terminated; <u>provided</u>, <u>however</u>, that, notwithstanding <u>Section 2.3</u>, if the Service Recipient is Buyer, Buyer shall be responsible for the payment of any and all charges and fees owed to the Service Provider under this Agreement for Services rendered prior to the later of (A) the effective date of the termination and (B) the effective date of the rejection of the agreement, including Leases, under which such Services were rendered.

(b)     Buyer may immediately terminate this Agreement with respect to any Seller Service Provider by written notice to such Seller Service Provider without any prior notice if such Seller Service Provider materially breaches any of its obligations hereunder and such breach remains uncured for the applicable period specified in Section 2.1(c).

(c)     Any Seller Service Provider may immediately terminate its obligations under this Agreement by written notice to Buyer without any prior notice upon the occurrence of any of the following events:

(i)     Buyer materially breaches any of its obligations hereunder and such breach remains uncured for the applicable period specified in Section 2.1(c);

(ii)     the date on which such Seller Service Provider has completed its performance of all of its obligations specified in Exhibit A;

(iii)     the date on which such Seller Service Provider incurs any Liability in excess of the funds immediately available in the Transition Account (as defined below) and such deficiency remains uncured for the applicable period specified in Section 2.1(c);

(iv)     any amount or fee payable under this Agreement by Buyer remains unpaid by Buyer for the applicable period specified in Section 2.1(c);

(v)     the appropriate personnel to perform such Seller Service Provider's Sellers Services are no longer employed by such Seller Service Provider; or

(vi)     Buyer does not provide adequate Buyer Services to support the provision by such Seller Service Provider of the Sellers Services and such deficiency remains uncured by Buyer for the applicable period specified in Section 2.1(c);

provided, however, any such termination shall not terminate the obligations of any other Seller Service Provider. Upon any termination of this Agreement or any Seller Services by a Seller Service Provider pursuant to this Section 3.2(c), such Seller Service Provider shall be permitted to immediately effect a final disposition, through assumption or rejection under Section 365 of the Bankruptcy Code, of all agreements relating to the terminated Sellers Services unless such agreements are otherwise related to or necessary for the provision of any other Seller Services.

3.3 Survival of Certain Obligations.  Sections 2.2 and 2.3, this Article III and Articles IV and V shall survive the termination or expiration of this Agreement.

### ARTICLE IV

### CONSIDERATION; PREPAYMENT; TAXES

4.1 Consideration for Buyer Services.  The sole consideration for Buyer providing the Buyer Services shall be the provision of the Sellers Services by Seller Service Providers to Buyer.  For the avoidance of doubt, the Buyer Services shall be provided at no cost and expense to all Seller Service Providers.

4.2 <u>Payment for Seller Services</u>. Buyer will pay directly, or reimburse the applicable Seller Service Provider for, any and all fees, costs, expenses and other Liabilities incurred by Seller Service Providers in the provision of the Seller Services in accordance with <u>Exhibit A</u>.

(a)    To the extent not included in the direct payments or reimbursements made by Buyer pursuant to the foregoing, Buyer shall reimburse Sellers Service Providers' or pay directly to the appropriate Governmental Entity, on Seller Service Providers' behalf out of Buyer's own funds: (i) any applicable sales, use, gross receipts, value added or similar tax that is imposed as a result of, or measured by, any Seller Services rendered hereunder unless covered by an exemption certificate and (ii) any other Taxes (including property taxes) imposed on the applicable Seller Service Provider.

(b)    Upon payment of any amounts pursuant to this <u>Section 4.2</u>, Buyer shall furnish the applicable Seller Service Provider with reasonable documentary evidence of such payment.

(c)    For the avoidance of doubt, for all purposes under this Agreement, Buyer shall, subject to <u>Exhibit A</u>, (A) be liable only for such Liabilities as would not have been incurred by Sellers on the Closing Date had they terminated all Employees (as defined below) and rejected all agreements necessary for the provision of Seller Services as of such date, and (B) be liable for Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement.

4.3 <u>Transition Escrow Account</u>.

(a)    Buyer deposited into a segregated escrow account ("<u>Transition Account</u>") one million dollars ($1,000,000), which amount shall be held in escrow pursuant to the Transition Escrow Agreement, dated as of the date hereof, by and between Buyer and Seller Representative until the expiration or termination of this Agreement. In the event that Buyer fails to pay when due any Liability required to be paid by Buyer pursuant to this Agreement, upon three (3) days' prior written notice to Buyer, Seller Service Providers shall be entitled to direct the escrow agent to pay such unpaid amounts using the funds in the Transition Account and Seller Service Providers shall notify Buyer of any such payment concurrently with the direction to the escrow agent to make such payment. Buyer shall replenish the Transition Account to its original balance within three (3) days' following the payment of any Liability from the Transition Account.

(b)    With respect to any fees, costs, expenses and other Liabilities to be incurred by Seller Service Providers in the provision of the Seller Services for which Buyer will reimburse the applicable Seller Service Provider, except as otherwise contemplated by <u>Exhibit A</u>, no later than ten (10) Business Days prior to the date on which such fees, costs, expenses or other Liabilities are due and payable, Buyer shall deposit such amounts in the Transition Account and Seller Service Providers shall promptly direct the escrow agent to pay such amounts to the applicable parties.

(c)    In no event shall any Seller Service Provider use amounts in the Transition Account for any purpose, or direct the escrow agent to use amounts in the Transition Account, other than for the provision of Sellers Services or the payment of any Liability related thereto.

(d)    In no event shall Buyer have any ability to direct the escrow agent to disburse funds from the Transition Account other than in accordance with the following sentence unless, in the case of Section 4.3(b), Seller Service Providers have not directed the escrow agent to disburse the funds for the purposes such funds were deposited in the Transition Account. If any amounts remain in the Transition Account after the termination of this agreement in accordance with Sections 3.1 or 3.2 and, if applicable, the payment of all Buyer Liabilities pursuant to this Section 4.3, such amounts shall be returned by the escrow agent to Buyer.

4.4 <u>Wind-Down Escrow Account</u>.  Pursuant to Section 2(f)(ii)(I) of the Purchase Agreement, Buyer delivered the Wind-Down Escrow Amount in accordance with the terms of the Wind-Down Escrow Agreement into a segregated escrow account (the "<u>Wind-Down Account</u>"), which amount shall be held in escrow until the later of (a) the expiration or termination of this Agreement and (b) the payment of all Wind-Down Expenses (as defined below) incurred prior to the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases.  Pursuant to the Wind-Down Escrow Agreement, Seller shall be permitted to direct the escrow agent to disburse funds from the Wind-Down Account to pay all wind-down expenses of the Sellers (<u>Exhibit C</u> provides an estimated budget of such wind-down expenses and may be amended as set forth in the Final Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Lenders Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, and (IV) Granting Liens and Superpriority Claims, entered by the Bankruptcy Court on July 16, 2010) (the "<u>Wind-Down Expenses</u>"), including the fees and expenses of the professionals in the Chapter 11 Cases and including expenses related to environmental Liabilities associated with the Sellers' real property located in Union, New Jersey.  Pursuant to the terms of the Wind-Down Escrow Agreement, Buyer shall have no ability to direct escrow agent to disburse funds from the Wind-Down Account nor shall any funds be disbursable to Buyer.  If any amounts remain in the Wind-Down Account after the payment of all Wind-Down Expenses, such amounts shall be delivered by the escrow agent to Seller Representative.

4.5 <u>Indemnity</u>.  Notwithstanding <u>Section 2.3</u>, Buyer shall indemnify and hold harmless each Seller Service Provider, its Affiliates and each of their respective Representatives from and against any Liabilities incurred by any Seller Service Providers, their Affiliates and their respective Representatives related to, arising out of or resulting from: (i) this Agreement or the provision of any Sellers Services, <u>provided</u>, <u>however</u>, that this <u>Section 4.5(i)</u> shall, subject to <u>Exhibit A</u>, (A) only apply to such Liabilities as would not have been incurred by Sellers on the Closing Date had they terminated all Employees and rejected all agreements necessary for the provision of Seller Services as of such date and (B) only apply to such Liabilities that are administrative expenses in the Chapter 11 Cases related to, arising out of or resulting from this Agreement, and (ii) the breach of Buyer of its obligations hereunder or from the gross negligence, fraud, bad faith or willful misconduct of Buyer, its Affiliates, their respective

Representatives or any other Person engaged by Buyer or Seller Service Providers in the performance of the obligations hereunder.

## ARTICLE V

## MISCELLANEOUS

5.1 <u>No Representations or Warranties</u>.

(a)    THE PARTIES MAKE NO EXPRESS REPRESENTATIONS OR WARRANTIES EXCEPT THOSE EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT AND THE SCHEDULES HERETO.

(b)    EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT AND THE SCHEDULES HERETO, EACH PARTY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, REPRESENTATIONS AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, TO THE FULL EXTENT PERMISSIBLE, INCLUDING, WITHOUT LIMITATION, AVAILABILITY, ACCURACY, COMPLETENESS, CORRECTNESS, RELIABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT WITH RESPECT TO ANY OF THE SERVICES, GOODS OR PRODUCTS FURNISHED PURSUANT TO THIS AGREEMENT.

5.2 <u>Confidentiality</u>.  From and after the Closing Date, neither Seller Service Providers nor Buyer, nor any of their respective Affiliates or Representatives, shall use, divulge, furnish or make accessible to anyone (other than such other Affiliates, Representatives and service providers who are required to know in order to provide the Services hereunder), any proprietary, non-public or other confidential information of Buyer, in the case of Seller Service Providers, or any Seller Service Provider, in the case of Buyer, in each case, provided to it by such other Party in connection with the provision of Services hereunder (including, without limitation, any information known to any Seller Service Provider or Buyer concerning such other Party's business), except to the extent that disclosure of such information is required by applicable law (in which case Buyer or the Seller Representative (on behalf of Seller Service Providers), as the case may be, shall use commercially reasonable efforts to advise the Seller Representative or Buyer, as the case may be, prior to making such disclosure to provide any Seller Service Provider or Buyer, as the case may be, a reasonable opportunity to review the proposed disclosure and to attempt to obtain a protective order or other assurance that confidential treatment will be accorded such confidential information).  Each Seller Service Provider shall use its reasonable best efforts to cooperate with Buyer, and Buyer shall use its reasonable best efforts to cooperate with each Seller Service Provider, in each case, in preserving such proprietary or confidential aspects of such other Party's business.

5.3 <u>Work Product</u>.  If any Party develops, invents, obtains or creates any data, information, records, content, copyrightable works or other intellectual property that constitute, cover or are embedded in any deliverable provided or required to be provided in accordance with this Agreement in connection with the provision of Services ("<u>Work Product</u>"), such Party, as applicable, agrees that such Work Product belongs to the other Party, as applicable.  Each Party

hereby assigns all right, title and interest, including all copyrights and other intellectual property rights, in and to all such Work Product to the other Party.

5.4 <u>Entire Agreement</u>.  This Agreement, together with any annexes, exhibits and schedules hereto, constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

5.5 <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of Buyer and the Seller Representative (on behalf of all Seller Service Providers) except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 5.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.6 <u>Notices</u>.  All notices, requests, demands, claims and other communications hereunder will be in writing except as expressly provided herein.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) when sent by facsimile (with written confirmation of transmission) or email (with confirmation of receipt by email); (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (d) three Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller Service Providers:

> [Seller Service Coordinator]
> National Envelope Corporation
> 333 Earle Ovington Boulevard, Suite 1035
> Uniondale, New York 11553
> Attention: Dale G. Nissenbaum
> Facsimile: (516) 699-4030
> Email: DNissenbaum@natenv.com

with a copy (which shall not constitute notice) to:

> Latham & Watkins LLP
> 233 South Wacker Drive, Suite 5800
> Chicago, Illinois 60606
> Attention: Josef S. Athanas
> Facsimile: (312) 993-9767
> Email: josef.athanas@lw.com

If to Buyer:

> [Buyer Service Coordinator]
> c/o The Gores Group, LLC
> 10877 Wilshire Boulevard, 18th Floor
> Los Angeles, California 90024
> Attention: General Counsel
> Facsimile: (310) 443-2149
> Email: ehattler@gores.com

with a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, California 94065
> Attention: Kyle C. Krpata
> Facsimile: (650) 802-3100
> Email: kyle.krpata@weil.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 5.6.

5.7 Governing Law; Jurisdiction. This Agreement shall in all aspects be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York (other than Section 5-1401 of the New York general obligations law), except to the extent that the laws are superseded by the Bankruptcy Code, and the obligations, rights and remedies of the Parties shall be determined in accordance with such laws. For so long as Seller Service Providers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement or the transactions contemplated hereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller Service Providers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement or the transactions contemplated hereby, such matter shall be brought in the courts of the State of New York sitting in the County

11

of New York or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated in this Agreement.

5.8 <u>Consent to Service of Process</u>. Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 5.6</u>.

5.9 <u>Waivers of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

5.10    <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, in each case, so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

5.11    <u>Successors and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including any chapter 7 or other trustee, responsible Person or similar representative for Seller Service Providers or Seller Service Providers' estate appointed in connection with the Chapter 11 Cases. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Parties; provided, however, that the rights of Buyer under this Agreement may be assigned by Buyer, without the prior written consent of any Seller, to (a) one or more Affiliates of Buyer or (b) one or more of its lenders (or any administrative or collateral agent for such lenders), in each case, so long as Buyer shall continue to remain obligated in full hereunder.

5.12    <u>Headings</u>. The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

5.13    <u>Counterparts; Facsimile or Email Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.    This Agreement or any counterpart may be

executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

5.14    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

5.15    Relationship of the Parties.  It is expressly understood and agreed that in rendering the Services hereunder, all of the Parties are acting as independent contractors and that this Agreement does not make any Person providing Services an employee, agent or other representative of any other Party for any purpose whatsoever.  No Party has the right or authority to enter into any contract, warranty, guarantee or other undertaking in the name or for the account of any other Party, or to assume or create any obligation or liability of any kind, express or implied, on behalf of any other party, or to bind any other party in any manner whatsoever, or to hold itself out as having any right, power or authority to create any such obligation or liability on behalf of any other party or to bind any other party in any manner whatsoever (except as to any actions taken by a party at the express written request and direction of any other party); provided, however, that, for purposes of this Agreement, Seller Representative shall be entitled to take all of the foregoing actions on behalf of any Seller Service Provider.  No employee, contractor or subcontractor of any Party shall be deemed to be an employee, contractor or subcontractor of any other Party.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first set forth above.

<u>BUYER</u>:

**NEV HOLDINGS, LLC**

By:_____
    Name:
    Title:

<u>SELLER REPRESENTATIVE</u>:

**NATIONAL ENVELOPE CORPORATION**

By:_____
    Name:
    Title:

<u>SELLER SERVICE PROVIDERS</u>:

[SELLER SERVICE PROVIDERS]

By:_____
    Name:
    Title:

[SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT]

## EXHIBIT A

### SERVICES PROVIDED BY SELLER SERVICE PROVIDERS

It is intent of the Parties that the Seller Services be limited generally to the retention by Sellers of (a) certain facilities leased by Sellers to be identified prior to Closing at which Buyer will conduct the Business (the "Facilities") together with ancillary agreements relating to the operations of the physical plant of the Facilities (e.g., utilities, cleaning services, grounds keeping services and insurance policies), and (b) the retention of the employment relationship with certain personnel (the "Employees") at Facilities from which such personnel will perform their historical duties in support of the Business without altering any employment terms or increasing the level of salary or benefits. In addition to the foregoing, the Seller Services shall include the following:

Employees

Each Seller Service Provider and Employee is an independent contractor with respect to Buyer. Without limiting the foregoing, (a) Seller Service Providers hereby reserve sufficient authority so as to maintain a right to administrative direction and control over the Employees, which shall include, without limitation, the payment of wages and overtime, the withholding of income and employment Taxes from said wages, the tracking and recording of attendance and hours worked, and the administration of any vacation, sick leave, benefits or insurance programs, and (b) Seller Service Providers shall observe and perform all obligations applicable to them under applicable law as the employers of the Employees.

During the Transition Period, each Employee will for all purposes continue to be an employee solely of the applicable Seller Service Provider. Seller Service Providers will, consistent with their practices with respect to the Employees (a) pay compensation and provide benefits (subject to the terms and conditions of the applicable Seller Service Provider plans and Section 6(g) of the Purchase Agreement) to the Employees equal to (and, unless otherwise agreed by the Buyer, in no event greater than or, in the case of benefits, other than as required to maintain the Employees' coverage under Seller Service Providers' plans or as a result of changes that affect all plan participants equally) the wages paid and benefits provided by Seller Service Providers to similarly situated employees of Seller Service Providers (excluding any benefits provided under equity compensation plans), (b) make all payments to Employees (including bonuses or commissions as determined in consultation with Buyer) directly through Seller Service Providers' payroll systems, (c) make all required payroll withholding deductions for Employees and remit Taxes with respect to Employees to all applicable Governmental Entities, (d) file all Tax reports with respect to the Employees to the extent required under applicable law and (e) maintain and keep in force at all times during the Transition Period liability insurance coverage relating to acts, omissions and employment of all Employees, including, without limitation, commercial general liability insurance, workers' compensation insurance and employer's liability insurance, consistent with any such coverage in effect for such purposes immediately prior to the Closing Date.

On a monthly basis, Seller Service Providers shall provide payroll services (including, without limitation, payment of all withholding, unemployment, social security and other payroll

Taxes). Seller Service Providers shall provide Buyer an invoice each Tuesday before 10 a.m. prevailing Pacific time  setting forth the amount for that week's payroll and the reasonable and out-of-pocket costs incurred by Seller Service Providers in administering such payroll (the "Payroll Cost"). Buyer shall deposit the Payroll Cost in the Transition Account by the close of business on each Tuesday.

Notwithstanding anything contained herein, in no event shall Buyer bear any costs arising out of, or relating to the closure of, any Facility or termination of employment of any Employee, including, without limitation, severance pay, costs arising out of any collective bargaining agreement or relationship, multi-employer plan withdrawal liability (including incremental increases, if any, in withdrawal liability as a result of service provided during the Transition Period) or WARN Act Liabilities (or any similar applicable state or local plant-closing law); provided, however, that in the event that Buyer fails to provide Seller Service Providers with sufficient advance written notice to permit Seller Service Providers to comply with their obligations under the WARN Act (or any similar applicable state or local plant-closing law), Buyer shall be responsible for the costs incurred by Seller Service Providers arising out of, or relating to such non-compliance by Seller Service Providers; provided, further, however, that Buyer shall bear all costs resulting from its obligation to satisfy the Liabilities under COBRA pursuant to Section 6(g)(iii) of the Purchase Agreement.

Facilities/Third Parties

With respect to the costs related to the Facilities (including rent, utilities, and maintenance services) and other Liabilities payable to third party service providers or Governmental Entities, Seller Service Providers shall forward all invoices or statements for such services to the Buyer Service Coordinator. Buyer shall deposit the amounts set forth on such invoices or statements in the Transition Account no later than ten (10) Business Days prior the date on which such payment is due or pay when due, on Seller Service Providers' behalf out of Buyer's own funds, each such invoice or statement directly to the applicable payee.

Proration of Pre-Paid Expenses

All costs for Seller Services paid by any Seller Service Providers prior to the Closing Date related to (a) the Facilities (including, without limitation, rent, utilities, and maintenance services), (b) the Employees and (c) third party service providers or Governmental Entities for periods that begin before the Closing Date and end after the Closing Date shall be allocated between Seller Service Providers, on the one hand, and Buyer, on the other hand, on a per-diem basis, and Seller Service Providers' proportionate share of such pre-paid costs shall be determined from the beginning of such period through the Closing Date and Buyer's proportionate share of such pre-paid costs shall be determined from the day after the Closing Date until the end of such period. If as result of such determination the amount of costs paid by Seller Service Providers prior to the Closing Date exceeds Seller Service Providers' proportionate shares of such costs, Buyer shall, within 45 days of the Closing Date, deposit, in immediately available funds, such excess into the Wind-Down Account, unless Buyer delivers to Seller Service Providers a notice that they dispute the Seller Service Providers' determination of such costs (a "Dispute Notice"), in which event Buyer shall pay to Seller Service Providers the amount of any undisputed items within such 45 day period. If Buyer delivers a dispute notice

within such 45-day period, then for 20 days following delivery of the Dispute Notice (the "Resolution Period"), Buyer and Seller Service Providers shall attempt in good faith to resolve their differences with respect to the disputed items (the "Disputed Items"). Any resolution by Buyer and Seller Service Providers during the Resolution Period as to any Disputed Items shall be set forth in a writing executed by Buyer and Seller Service Providers and will be final, binding and conclusive on both Buyer and Seller Service Providers and Buyer shall pay to Seller Service Providers any amounts owing as a result of such resolution within 5 days after execution of such agreement. If Buyer and Seller Service Providers do not resolve all Disputed Items by the end of the Resolution Period, then all Disputed Items remaining in dispute will be submitted within 10 days after the expiration of the Resolution Period to Grant Thornton LLP or, if such firm declines to act in such capacity, a national independent accounting firm mutually acceptable to Buyer and Seller Service Providers (the "Neutral Arbitrator"). The Neutral Arbitrator shall act as an arbitrator to determine only those Disputed Items remaining in dispute as of the end of the Resolution Period. All fees and expenses relating to the work, if any, to be performed by the Neutral Arbitrator will be allocated between Buyer and Seller Service Providers in the same proportion that the aggregate amount of the Disputed Items so submitted to the Neutral Arbitrator that is unsuccessfully disputed by each such Party (as finally determined by the Neutral Arbitrator) bears to the total amount of such Disputed Items so submitted. In addition, Buyer and Seller Service Providers shall give the Neutral Arbitrator reasonable access to all Records, facilities, Representatives, and personnel of such Party as reasonably necessary to perform its function as arbitrator of the Disputed Items. In the event Buyer or Seller Service Providers shall participate in teleconferences or meetings with, or make presentations to, the Neutral Arbitrator, the other Party shall be entitled to participate in such teleconferences, meetings or presentations. Buyer and Seller Service Providers shall use their commercially reasonable efforts to cause the Neutral Arbitrator to deliver to Buyer and Seller Service Providers a written determination (such determination to include a work sheet setting forth all material calculations and methods used in arriving at such determination) of the Disputed Items submitted to the Neutral Arbitrator within 20 days of its engagement to review such Disputed Items, which determination will be final, binding and conclusive and upon which judgment may be entered. Buyer shall pay to Seller Service Providers the amounts determined by the Neutral Arbitrator within five (5) days after the Neutral Arbitrator resolves the Disputed Items. For the avoidance of doubt, in no event shall Seller Service Providers owe Buyer any amounts as of the result of the foregoing proration.

## EXHIBIT B

### SERVICES PROVIDED BY BUYER

All administrative and other support necessary for the services set forth on <u>Exhibit A</u> or any other Sellers Services provided hereunder.

<u>Employees</u>

Each Buyer Service Provider and employee of Buyer and its Affiliates, including, without limitation, the Transferred Employees, is an independent contractor with respect to Sellers. Without limiting the foregoing, (a) Buyer Service Providers hereby reserve sufficient authority so as to maintain a right to administrative direction and control over the such employees, which shall include, without limitation, the payment of wages and overtime, the withholding of income and employment Taxes from said wages, the tracking and recording of attendance and hours worked, and the administration of any vacation, sick leave, benefits or insurance programs, and (b) Buyer Service Providers shall observe and perform all obligations applicable to them under applicable law as the employers of such Employee.

## EXHIBIT C

WIND-DOWN EXPENSES

**NEC WIND DOWN BUDGET**

| | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Cumulative |
|---|---|---|---|---|---|---|---|
| **OPERATIONS** | | | | | | | |
| Residual Sales / EBITDA | | | Gores Obligations, subject to TSA | | | | |
| | | | | | | | |
| Employees | | | Gores Obligations, subject to TSA | | | | |
| WARN Act | | | | | | | |
| COBRA | | | | | | | |
| | | | | | | | |
| Rationalization Costs | | | Gores Obligations, subject to TSA | | | | |
| Machinery Moves | | | | | | | |
| Overtime | | | | | | | |
| | | | | | | | |
| Maintenance / Security for Plants | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (180,000) |
| | | | | | | | |
| Administration OldCo | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (150,000) |
| Dedicated Resources | | | | | | | |
| | | | | | | | |
| **Net Cost to OldCo** | **(55,000)** | **(55,000)** | **(55,000)** | **(55,000)** | **(55,000)** | **(55,000)** | **(330,000)** |
| | | | | | | | |
| Environmental Clean Up | (333,333) | (333,333) | (333,333) | (333,333) | (333,333) | (333,333) | (2,000,000) |
| | | | | | | | |
| **PROFESSIONAL FEES** | | | | | | | |
| Company Bankruptcy Counsel (Latham) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (2,700,000) |
| Company Financial Advisor | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (540,000) |
| Company Corporate Counsel (Fulbright) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| Term Loan A Advisors (FTI Consulting) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (150,000) |
| Term Loan A Counsel (Paul Hastings) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (600,000) |
| Term Loan B Financial Advisors | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| Term Loan B Counsel | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (600,000) |
| Unsecured Creditor Committee - FA | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (150,000) |
| Unsecured Creditor Committee - Counsel | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| U.S. Trustee | (190,000) | | | (50,000) | | | (190,000) |
| Delaware Counsel (Young Conway) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| Claims Agent (Garden City) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| Other - Contingency | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (300,000) |
| | | | | | | | |
| **Total Professional Fees** | **(1,180,000)** | **(1,090,000)** | **(1,090,000)** | **(1,140,000)** | **(1,090,000)** | **(1,090,000)** | **(6,680,000)** |
| | | | | | | | |
| **Summary of Cash Flow:** | | | | | | | |
| Net Cost to OldCo | (55,000) | (55,000) | (55,000) | (55,000) | (55,000) | (55,000) | (330,000) |
| Environmental Clean Up Costs | (333,333) | (333,333) | (333,333) | (333,333) | (333,333) | (333,333) | (2,000,000) |
| Total Professional Fees | (1,190,000) | (1,090,000) | (1,090,000) | (1,140,000) | (1,090,000) | (1,090,000) | (6,690,000) |
| Net Cash Flow | (1,578,333) | (1,478,333) | (1,478,333) | (1,528,333) | (1,478,333) | (1,478,333) | (9,020,000) |
| | | | | | | | |
| Beginning Cash Balance | - | (1,578,333) | (3,056,667) | (4,535,000) | (6,063,333) | (7,541,667) | |
| Net Cash Flow | (1,578,333) | (1,478,333) | (1,478,333) | (1,528,333) | (1,478,333) | (1,478,333) | |
| | | | | | | | |
| **Ending Cash Balance** | **(1,578,333)** | **(3,056,667)** | **(4,535,000)** | **(6,063,333)** | **(7,541,667)** | **(9,020,000)** | |

# ANNEX A

ADDITIONAL SELLER SERVICE PROVIDERS

## SCHEDULES

Schedule 1.2

Service Coordinator Contact Information

For Seller Service Providers:
[NAME]
Title:
Phone:
Facsimile:
Email:


For Buyer:
[NAME]
Title:
Phone:
Facsimile:
Email: