# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NEC HOLDINGS CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-11890 (PJW)<br><br>Jointly Administered<br><br>**Hearing Date: January 20, 2011 at 2:00 p.m. (ET)**<br>**Obj. Deadline: January 13, 2011 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR AN ORDER ENFORCING SALE ORDER AND ASSET PURCHASE AGREEMENT AND DIRECTING WORKING CAPITAL ARBITER TO MAKE ITS DECISION CONSISTENT THEREWITH

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"),[2] hereby move this Court (the "**Motion**") for entry of an order, in substantially the form attached hereto as Exhibit A, enforcing the Sale Order and Purchase Agreement (each as defined below)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NEC Holdings Corp., a Delaware corporation (6395); National Envelope Corporation, a New York corporation (5935); National Envelope – WH LLC, a New York limited liability company (9721); National Envelope – AECO LLC, a Delaware limited liability company (9071); National Envelope – Chino LLC, a California limited liability company (9266); National Envelope – City of Industry, LLC, a California limited liability company (9710); National Envelope – Ennis LLC, a Delaware limited liability company (3868); National Envelope – Corsicana LLC, a Texas limited liability corporation (9716); National Envelope – Grand Prairie LLC, a Texas limited liability company (9258); National Envelope – Aurora LLC, a Colorado limited liability company (9712); National Envelope – Lenexa LLC, a Kansas limited liability company (9256); National Envelope – Appleton LLC, a Wisconsin limited liability company (9719); National Envelope – Elk Grove Village LLC, an Illinois limited liability company (9262); National Envelope – Scottdale LLC, a Pennsylvania limited liability company (9711); National Envelope Corporation – East, a New Jersey Corporation (6888); National Envelope – Specialties Group LLC, a Delaware limited liability company (9156); National Envelope – Houston LLC, a Texas limited liability company (9210); National Envelope – Shelbyville Equity LLC, a Delaware limited liability company (9255); National Envelope – Exton Equity LLC, a Delaware limited liability company (9354); National Envelope – Nashville Equity LLC, a Delaware limited liability company (9410); National Envelope – Houston Equity LLC, a Delaware limited liability company (9488); National Envelope – Leasing LLC, a Delaware limited liability company (9542); New York Envelope Corporation, a New York corporation (3186); National Envelope Corporation – North, a Massachusetts corporation (1548); National Envelope Corporation – South, a Georgia corporation (5404); National Envelope Corporation – Central, a Missouri corporation (8259); Old Colony Envelope Corporation, a Massachusetts corporation (1748); and Aristocrat Envelope Corporation, a New York corporation (9284). The mailing address for National Envelope Corporation is National Envelope Corporation, c/o Getzler Henrich & Associates, LLC, 295 Madison Avenue, 20th Floor, New York, NY, 10017 (Attn: Mark Samson and Dale Nissenbaum).

[2] Unless indicated otherwise, capitalized terms used but not defined herein have the meanings ascribed to them in the Purchase Agreement.

and directing the arbiter of the working capital adjustment to make his decision consistent therewith. In support of this Motion, the Debtors respectfully state:

## Preliminary Statement

1. The Debtors sold substantially all of their assets to NEV Holdings, LLC (the "**Purchaser**") pursuant to an Asset Purchase Agreement dated as of July 8, 2010 (as amended, the "**Purchase Agreement**"). The Purchase Agreement was approved by this Court on August 23, 2010 and the purchase closed on September 7, 2010 (the "**Closing Date**"). Since that time, the Debtors have provided various services to the Purchaser pursuant to a Transition Services Agreement dated as of September 7, 2010 (as amended, the "**TSA**").

2. The Purchaser is attempting to massively reduce the purchase price it was obligated to pay under the Purchase Agreement and thereby eliminate any recovery for unsecured creditors in these cases by taking positions contrary to controlling Third Circuit law, the plain terms of the Purchase Agreement and the TSA, and common sense. At the time the Purchase Agreement was signed on July 8, 2010, the parties estimated that net working capital at closing would be $125,000,000. At closing on September 7, 2010, the Debtors estimated that net working capital was $123,120,008. The Purchaser now asserts that net working capital at closing was $112,007,433 and seeks repayment of approximately $12,000,000 from the $14,000,000 working capital escrow, which would effectively be a $12,000,000 purchase price reduction.

3. The Purchase Agreement delineates the method for calculating the final net working capital value and provides specific dispute procedures. These procedures include joint retention of Grant Thornton LLP or another national accounting firm as arbiter of any disputes regarding the value of working capital at closing ("**Arbiter**"). There are a number of net

working capital valuation disputes that will have to be addressed to the Arbiter. However, a large portion of the $12,000,000 price reduction sought by the Purchaser results from the Purchaser's misreading of the Purchase Agreement and TSA and misunderstanding of applicable Third Circuit law—matters which must be decided by this Court.

4. Among its asserted bases for reducing the net working capital and, thus, the purchase price, the Purchaser asserts that $2,565,811.75 of accounts receivable should be valued at zero because the account debtors have set off rights. As described in detail below, the law is clear in the Third Circuit that setoff rights are extinguished by the sale of accounts receivable to a purchaser in a section 363 sale if the corresponding accounts payable are not also transferred. Here, these accounts receivable were sold to Purchaser without the accounts payable being assumed. Accordingly, the account debtors have no set off rights.

5. Second, the Purchaser asserts an absurd position with respect to payables owed to its largest supplier, International Paper Company ("**International Paper**"). Pursuant to the Purchase Agreement, the Purchaser assumed $20 million of prepetition unsecured payables to International Paper. The Purchaser now claims that instead of paying those payables at closing, the Purchaser entered into a note payable with International Paper. The Purchaser further claims that the amount of the Purchaser's note due in the next year ($3,500,000) is a current liability of the Debtors that should reduce the value of working capital by $3,500,000. It was clearly not the intention of the parties that the assumed International Paper liabilities reduce the value of the working capital. Moreover, it is nonsensical and patently unfair that simply by choosing to pay its obligations over time pursuant to a note, the Purchaser could increase current liabilities and manipulate the working capital value.

6. Finally, the Purchaser attempts to include $303,165.25 of its unpaid obligations owed to the Debtors under the TSA as current liabilities that reduce the value of the working capital. The Debtors incurred these obligations for the Purchaser's benefit and the Purchaser expressly agreed to pay for them in the TSA. It was clearly not the intention of the parties that the Debtors would perform services and incur obligations for the Purchaser's benefit and then pay for them by allowing the Purchaser to reduce the working capital value and, thus, the purchase price.

7. If the Arbiter is permitted to (i) value fully collectible accounts receivable at zero, (ii) increase accounts payable by the current amount of a note to which the Debtors were never even a party and (iii) increase accounts payable by the amount of its unpaid obligations under the TSA, the Debtors' estates and creditors will receive far less from the sale than they bargained for. This Court, which is much better suited to make determinations regarding interpretation of Third Circuit law, Delaware law, the Purchase Agreement and its Sale Order, must direct the Arbiter to decide working capital value consistently with applicable law, the Purchase Agreement and the Sale Order.

## Jurisdiction

8. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). In addition, the Sale Order expressly provides that this Court retains jurisdiction to enforce and implement the terms and provisions of the Sale Order, the Purchase Agreement and the TSA in all respects. Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

9. The statutory bases for the relief requested herein are Sections 105(a) and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").

## Background

10. On June 10, 2010 (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108. On June 11, 2010, the Court entered an order consolidating these Chapter 11 Cases for procedural purposes only [Docket No. 34]. On June 22, 2010, the Office of the United States Trustee appointed an official committee of unsecured creditors pursuant to Section 1102 of the Bankruptcy Code (the "**Committee**").

### A. The Purchase Agreement

11. On July 8, 2010, the Debtors entered into the Purchase Agreement[3] with the Purchaser, an affiliate of The Gores Group, LLC, pursuant to which the Debtors agreed to sell the Acquired Assets (as defined in the Purchase Agreement) to the Purchaser, and the Purchaser agreed to provide the following consideration: (a) $134,500,000 in cash, and (b) assume certain liabilities, including the International Paper Claim (as defined below).[4]

12. Prior to the Petition Date, International Paper was the largest customer and largest supplier of the Debtors. As set forth in the Debtors' Chapter 11 Voluntary Petitions [Docket No. 1], as of the Petition Date, the Debtors estimated that International Paper held an unsecured claim of $43,081,101.77. Given the size and importance of International Paper to the Debtors'

[3] A copy of the Purchase Agreement is attached as Exhibit A to the Sale Order.

[4] As noted below, after a spirited auction, the purchase price increased to $149,850,000.00 in cash, plus a $37,686,928.74 note, plus assumption of certain liabilities including the International Paper Claim.

operations, the Purchase Agreement contained several provisions specifically addressing the Purchaser's relationship with International Paper, as distinguished from every other customer and supplier. Most importantly, the definition of "Assumed Liabilities" in the Purchase Agreement expressly includes "the International Paper Claim" which is further defined as "$20,000,000 of that certain trade payable due and owing by [the Debtors] to International Paper, and certain of its Affiliates, on account of goods sold to [the Debtors]" (the "**International Paper Claim**"). Purchase Agreement § 1.

13. The Purchase Agreement required that the Debtors and the Purchaser enter into the TSA prior to the consummation of the sale under the Purchase Agreement.[5] The TSA provides, among other things, that the Debtors are required to provide certain services ("**Seller Services**") which include refraining from rejecting any contract or lease listed on Schedule A-1 of the TSA (the "**TSA Contracts**"), or any unexpired lease of real property ("**TSA Leases**"), until the Debtors are provided with written notice by the Purchaser that such agreements may be rejected. TSA § 1.1(a). However, the TSA also requires that the Purchaser "pay directly, or reimburse the applicable [Debtor] for, any and all fees, costs, expenses and other Liabilities incurred by the [Debtors] in the provision of the Seller Services." TSA § 4.2.[6] The TSA clarifies that "For the avoidance of doubt…the Purchaser is liable "for such Liabilities as would not have been incurred by [the Debtors] on the Closing Date had they rejected all agreements necessary for the provision of Seller Services as of such date." TSA § 4.2(c).

---

5 A copy of the executed TSA is attached hereto as Exhibit C.

6 "Liability" is defined by the Purchase Agreement as "any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes." Purchaser Agreement § 1.

## B. The Purchase Agreement's Working Capital Mechanism

14. The Purchase Agreement also established a typical mechanism to adjust the purchase price based on the actual value of the Debtors' net working capital at closing versus the estimated value set forth in the Purchase Agreement. The Purchase Agreement defines "Net Working Capital" as:

> the excess of (a) Current Assets as of such date, minus (b) Current Liabilities as of such date, in each case, determined in accordance with GAAP and, to the extent consistent with GAAP, the accounting methods, policies, practices, procedures or classifications historically used by Sellers (the "Accounting Principles"). "Current Assets" means the aggregate of the current assets of Sellers included in the Acquired Assets (excluding Cash), and "Current Liabilities" means the aggregate of the current Liabilities included in the Assumed Liabilities, in each case, as determined in accordance with the Accounting Principles, subject to the modifications thereto set forth in this paragraph. In determining Current Assets and Current Liabilities hereunder, all Intercompany accounts receivable, Intercompany accounts payable and all Taxes shall be disregarded (other than Property Taxes allocated to Buyer in accordance with Section 6(i)(ii)). For purposes of determining the value of Inventory items included in the Net Working Capital, Inventory items will be valued at the lower of cost or market, with the cost being based on the purchase price of goods principally using a first-in, first-out flow of Inventory assumption, in accordance with the Accounting Principles. For illustrative purposes only, a sample of the accounts to be used in the calculation of Net Working Capital is set forth on Annex H attached hereto; provided, however, that Net Working Capital shall be determined in accordance with the immediately preceding sentences.

Purchase Agreement § 1.

15. The initial estimated value of the Net Working Capital at the Closing Date of $125,000,000 was made by the parties when the Purchase Agreement was signed (the "**Target Working Capital Amount**"). Purchase Agreement, p. 15. At the time, the Purchaser argued that the value of working capital was closer to $135,000,000 and that the Debtors were setting the Target Working Capital Amount too low. *Declaration of Dale Nissenbaum in Support of Debtors' Motion for an Order Enforcing Sale Order and Asset Purchase Agreement and Directing Working Capital Arbiter to make its Decision Consistent Therewith*, attached hereto as

Exhibit B (the "**Nissenbaum Declaration**"), ¶ 4 . In fact, the Purchaser temporarily broke off negotiations because it felt so strongly that the Target Working Capital Amount should be $135,000,000. Nissenbaum Declaration ¶ 4.

16. The Purchase Agreement provided that five days prior to the closing, the Debtors would prepare and deliver to the Purchaser a statement setting forth the Debtors' estimate of the Net Working Capital as of the Closing Date. Purchase Agreement, p. 19. This updated estimate would be compared with the Target Net Working Capital and, if this updated estimate were more than $1,000,000 less than the Target Net Working Capital, the Purchaser would be entitled to reduce the purchase price by $1,000,000 and fund $14,000,000 into the working capital escrow at closing instead of the full $15,000,000. The Debtors' updated estimate of Net Working Capital in early September was $123,120,008-- $1,879,992 less than the Target Working Capital Amount. Accordingly, at closing, the Purchaser funded $14,000,000 into the working capital escrow.

17. Pursuant to the Purchase Agreement, the Purchaser was to provide a statement of actual Net Working Capital as of the closing date within 45 days after closing. Purchase Agreement, p. 20. To the Debtors', the Creditors' Committee's and every other party in interest's astonishment, the Purchaser alleged actual Net Working Capital as of the closing date was merely $112,007,433-- $12,992,567 less than the Target Working Capital Amount. The Purchaser managed to present such a low number not only in the typical manner by taking questionable write offs and write downs which will be dealt with by the Arbiter, but by misreading the Purchase Agreement and the TSA and misinterpreting applicable Third Circuit law regarding set off rights.

18. Pursuant to the Purchase Agreement, 45 days after receiving the Purchaser's statement of actual Net Working Capital, the Debtors were to provide their own statement of actual Net Working Capital disputing any items set forth in the Purchaser's statement. Purchase Agreement § 2(g)(iii).[7] The actual Net Working Capital calculated by the Debtors was $120,749,985, much more in line with the earlier estimates of the parties.

19. The parties have a period of time to try to resolve any differences prior to submitting the matter to the Arbiter. The Debtors believe that the threshold legal issues raised in this Motion regarding interpretation of Third Circuit law, the Purchase Agreement and the TSA should be resolved by this Court so that the Arbiter has the proper guidance prior to starting its work.

**C. The Sale Order and Consummation of the Asset Sale**

20. On August 20, 2010, the Debtors conducted a spirited auction pursuant to Section 363 of the Bankruptcy Code, at which a revised offer from the Purchaser was determined to be the highest and best offer. The Debtors entered into a Second Amendment to the Asset Purchase Agreement with the Purchaser, pursuant to which the Purchaser agreed to pay the following consideration for substantially all of the assets of the Debtors: (a) $149.85 million in cash, (b) assumption of certain Assumed Liabilities (including the International Paper Claim), and (c) $37,686,928.74 in second lien debt payable to the Term B Lenders (as defined in the Purchase Agreement). The Bankruptcy Court approved the sale to the Purchaser (the "**Asset Sale**") based on this revised offer on August 23, 2010 pursuant to the *Order Authorizing (I) Sale of Certain of the Assets of the Debtors Free and Clear of Liens, Claims and Interests, (II) Assumption and*

---

[7] On November 26, 2010, the Debtors and the Purchaser entered into a Fourth Amendment To Asset Purchase Agreement which provided an additional five business days for the Debtors to review the Closing Net Working Capital Statement and dispute any items set forth therein.

*Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Assumption of Certain Liabilities* [Docket No. 471] (the "**Sale Order**").

21. The Sale Order provided that, pursuant to Section 363(f), "the Acquired Assets shall be transferred to the Purchaser in accordance with the Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and, except as set forth in the Purchase Agreement, shall vest the Purchaser with title to the Acquired Assets, free and clear of all liens, mortgages, pledges, options, security interests, charges, rights of first refusal, hypothecations, encumbrances on real property, real property licenses, leases or conditional sale arrangements, debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, determined or undeterminable, known or unknown, including those arising under any law or action and those arising under any contract or otherwise, including any tax liability and including any rights, claims or causes of action based on any theories of transferee or successor liability (other than Permitted Liens and Assumed Liabilities, each as defined in the Purchase Agreement) (collectively, the "**Liens, Claims and Interests**")." Sale Order at ¶ 12.

22. The Asset Sale was consummated on the Closing Date. In connection with the consummation of the Asset Sale, the Debtors and the Purchaser executed the TSA and the Debtors began providing the Seller Services as required thereunder.

**Relief Requested**

23. By this Motion, the Debtors request an order determining that: (a) the Sale Order extinguished any right of setoff that could have been asserted against the Purchaser with respect to the accounts receivable that the Purchaser acquired under the Sale Order and that the Arbiter's conclusive statement of Net Working Capital shall not include any right of setoff with respect to the accounts receivable that were acquired by the Purchaser, (b) the Arbiter's conclusive

statement of Net Working Capital shall not include, incorporate, or take account of the International Paper Claim or any portion of the International Paper Claim, and (c) the Arbiter's conclusive statement of Net Working Capital shall not include, incorporate, or take account of the Purchaser's obligations under the TSA.

## Basis for Relief

### A. The Purchaser's Treatment of Purported Setoff Rights Is Incorrect and Ignores Applicable Bankruptcy Law

24. Included in the Purchaser's Closing Net Working Capital Statement is an assertion that the accounts receivable amount in the Estimated Net Working Capital Statement should be reduced by $2,565,811.75 because such amounts are subject to offset with pre-petition payables. The Purchaser asserted that $227,316.37 of this amount was "already offset" while the remaining $2,338,495.69 is "not yet offset."

25. This treatment of accounts receivable acquired in a Section 363 sale is contrary to controlling law and should not be permitted. Specifically, controlling Third Circuit law plainly prohibits the assertion of any setoff right by an account debtor against accounts receivable sold "free and clear" to a purchaser in a Section 363 sale. The Third Circuit Court of Appeals addressed this very issue in Folger Adam Security, Inc. v. Dematteis/Macgregor, JV, 209 F.3d 252, 263-64 (3d Cir. 2000). In Folger Adam, the debtor sold substantially all of its assets, including accounts receivable, pursuant to a sale authorized under Section 363. Folger Adam, 209 F.3d at 255-56. Following the closing of the sale, a dispute arose between the purchaser in the asset sale and an account debtor regarding whether the account debtor could assert certain affirmative defenses or setoff rights with respect to collection efforts of the purchaser on the accounts receivable. Id. at 254-57. The Court of Appeals found that any setoff rights against the accounts receivable that the account debtor may have possessed prior to the sale of assets had

been "extinguished" by the "free and clear sale." Id. at 263. As a result, the account debtor was not permitted to assert any setoff rights when the purchaser attempted to collect on the account receivable it acquired in the sale.

26. Similarly, in In re Trans World Airlines, Inc., the Bankruptcy Court for the District of Delaware addressed an attempted offset by an account debtor against a purchaser in a Section 363 sale. 275 B.R. 712 (2002). The purchaser in the sale had purchased the accounts receivable of the debtor, but when the purchaser attempted to collect on the accounts receivable one account debtor asserted a right of setoff with respect to the debt. Id. at 716. The court found that Section 363 "eliminated setoff rights vis-à-vis the buyer by permitting a sale free of such interests" and that the sale order approving the sale "transferred the account receivable to [the purchaser] free and clear of any setoff rights which [the account debtor] may have." Id. at 718; see also HHI Formtech LLC v. Magna Powertrain USA Inc. (In re Formtech Industries LLC), Adv. Proc. No. 10-50186 (Bankr. D. Del. Nov. 17, 2010) (same).

27. Here, the Asset Sale was conducted pursuant to Section 363 and the Acquired Assets were transferred "free and clear" pursuant to Section 363(f). See Sale Order at ¶ 12. As a result, any right of setoff that may have applied to the accounts receivable as of the date of the Asset Sale cannot be asserted against the Purchaser because the accounts receivable were sold "free and clear" of such claims and interests.

28. Additionally, the Purchaser lists $227,316.37 in accounts receivable as having been "already offset." Purchaser is wrong on the facts. Under Section 362 of the Bankruptcy Code, only setoffs for which the Debtors request relief from the stay may be effectuated. 11 U.S.C. § 362(a)(7). Here, the Debtors requested and received relief from the stay to effectuate

only ***three*** setoffs with account debtors during these Chapter 11 Cases,[8] none of which relate to the $227,316.37 that Purchaser claims has "already [been] offset."

29. To the extent any other account debtor asserts that any other setoffs were taken during these Chapter 11 Cases, such setoffs are void because they were taken in violation of the automatic stay.

30. As a result of the foregoing, the accounts receivable acquired by the Purchaser should not be decreased by any amounts relating to setoffs that were not effectuated prior to the Closing Date.

### B. The Purchaser's Treatment of the International Paper Claim Is Contrary to Both the Plain Meaning of the Purchase Agreement and the Intentions of the Parties

31. In the Purchaser's statement of alleged actual Net Working Capital, the Purchaser asserts that $3,500,000 of the International Paper Claim the Purchaser assumed as part of the consideration paid for the Debtors' assets is, in fact, a current liability that should reduce the value of the Net Working Capital. This interpretation is contrary to the plain meaning of the Purchase Agreement, as well as the intentions of the parties.

---

[8] First, the Debtors requested and received authority to enter into a stipulation with Lindenmeyr Munroe, a Division of Central National-Gottesman Inc. ("**Lindenmeyr**"), pursuant to which Lindenmeyr setoff a pre-petition sum of $1,060,745.05 that was owed by the Debtors to Lindenmeyr with a pre-petition sum of $2,538,594.90 that was owed to the Debtors by Lindenmeyr. *Order Authorizing the Debtors to Enter into a Stipulation With Lindenmeyr Munroe* [Docket No. 468]. The remaining $1,477,849.85 was paid to the Purchaser after the Closing Date. Second, the Debtors requested and received authority to enter into a stipulation with Lewis Paper International, Inc. ("**Lewis Paper**"), pursuant to which Lewis Paper setoff a pre-petition sum of $5,458.20 that was owed by the Debtors to Lewis Paper with a pre-petition sum of $8,010.03 that was owed to the Debtors by Lewis Paper. *Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Enter into a Settlement Letter with Lewis Paper International Inc.* [Docket No. 470]. Third, the Debtors requested and received relief from the automatic stay to enter into a stipulation with Olmsted-Kirk Paper Company relating to the setoff of an account receivable that was not sold to the Purchaser in the Asset Sale. *Order Authorizing the Debtors to Enter Into Stipulation with Olmsted-Kirk Paper Company* [Docket No. 905].

32. As noted above, the definition of Net Working Capital provides that "Current Liabilities" means "the aggregate of the current Liabilities included in the Assumed Liabilities, in each case, as determined in accordance with the Accounting Principals." Purchase Agreement § 1. The Purchaser asserts that because it is scheduled to pay International Paper $3,500,000 this year on account of the International Paper Claim, this amount should be included in the Net Working Capital.

33. This interpretation turns the meaning of "current Liability" on its head. Under the Purchase Agreement, "current Liability" means a current liability ***of the Debtors***, not the Purchaser. Indeed, the entire working capital process is designed to assess the ***Debtors'*** assets and liabilities as of the Closing Date. This $3,500,000 amount was not a liability of the Debtors as of the Closing Date. Rather, this amount is a liability ***of Purchaser*** that it apparently incurred in negotiating with International Paper over how it was going to pay off the International Paper Claim – which liability Purchaser expressly assumed under the Purchase Agreement. The Debtors were not signatories to the agreement between the Purchaser and International Paper that purportedly resulted in this $3,500,000 note from Purchaser to International Paper and, indeed, ***have not even been allowed to review any such document***, despite their repeated requests to review it. In short, the Purchaser's liabilities, current or long term, have no bearing whatsoever on the determination of Net Working Capital.

34. Further confirming the absurdity of the Purchaser's suggested interpretation, it would result in the Purchaser having sole discretion to take whatever amount that the Purchaser desired from the working capital escrow in order to pay portions of the International Paper Claim within the next year, even up to the full $14,000,000 that was placed in the working capital escrow pursuant to the Sale Order. For example, had the Purchaser instead agreed to pay more

to International Paper on account of the International Paper Claim during the next year, then the Purchaser, under the Purchaser's interpretation of the Purchase Agreement, would be entitled to obtain even more from the working capital escrow.

35. Certainly, the parties did not intend, and the Purchase Agreement does not contemplate, permitting the Purchaser to take the $14,000,000 that was placed in the working capital escrow and use it to pay the International Paper Claim – again, ***a claim that the Purchaser assumed*** as part of the consideration paid for the Acquired Assets. The Arbiter should be prohibited from interpreting the Purchase Agreement in this manner.

36. Moreover, it is evident from the Purchase Agreement that neither the Debtors nor the Purchaser contemplated such an interpretation at the time the Purchase Agreement was executed. Annex H to the Purchase Agreement provides a list of accounts that are to be reviewed to determine working capital value. There is no account for a note payable to International Paper because the note payable to International Paper did not even exist.

### C. The Purchaser's Treatment of Liabilities Incurred During the Provision of Seller Services Under The Transition Services Agreement Is Contrary to Both the Plain Meaning of the Transition Services Agreement and the Intentions of the Parties

37. Included in the Purchaser's statement of alleged actual Net Working Capital is an assertion that $303,165.25 of expenses related to the provision of Seller Services under the TSA, including the payment of rent for certain leases of real property, should be included in the accounts payable portion of the Net Working Capital. Such inclusion is clearly improper and violates the plain language of the TSA.

38. As noted above, the TSA requires that the Purchaser pay *all* expenses related to the provision of Seller Services. The Purchaser's agreement to pay such expenses is a core element of the TSA because without such agreement the Debtors would have rejected every

contract not assumed and assigned to the Purchaser at closing that could have created additional financial exposure for the Debtors. Indeed, this motivation is memorialized in the TSA, which provides that the Purchaser must pay for all expenses that would have not been incurred by the Debtors if on the Closing Date the Debtors had rejected all agreements necessary for the provisions of Seller Services. TSA § 4.2(c).

39. The Purchaser is attempting to avoid their obligations under the TSA by including such obligations in the Purchaser's statement of alleged actual Net Working Capital and, effectively, paying such obligations from the working capital escrow. Such an attempt should not be permitted.

**<u>Notice</u>**

40. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to the administrative agent for the lenders under the Debtors' prepetition credit agreement; (c) counsel to official committee of unsecured creditors; (d) the Environmental Protection Agency; (e) the New Jersey Environmental Protection Agency; (f) the Pension Benefit Guaranty Corporation; (g) the Internal Revenue Service; (h) counsel to the unions of which the Debtors' employees are members; (i) counsel to the Debtors' shareholders; (j) those parties requesting service of documents filed in these Chapter 11 Cases; and (k) counsel to the Purchaser. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

41. A copy of the Motion is available on the Court's website: <u>www.deb.uscourts.gov</u>. Additional copies of the Motion are available for free on the website of the Debtors' claims, noticing, soliciting and balloting agent, The Garden City Group, Inc. at <u>www.nationalenvelopeinfo.com</u> or can be requested by calling 866-405-2134.

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form attached hereto as Exhibit A, determining that (a) the Sale Order extinguished any right of setoff that could have been asserted against the Purchaser with respect to the accounts receivable that the Purchaser acquired under the Sale Order and that the Arbiter's conclusive statement of Net Working Capital shall not include any right of setoff with respect to the accounts receivable that were acquired by the Purchaser, (b) the Arbiter's conclusive statement of Net Working Capital shall not include, incorporate, or take account of the International Paper Claim or any portion of the International Paper Claim, (c) the Arbiter's conclusive statement of Net Working Capital shall not include, incorporate, or take account of the Purchaser's obligations under the TSA, and (d) such other relief as this Court deems just and proper.

Dated: December 29, 2010
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Morgan L. Seward (No. 5388)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION